UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **GREGORY SCOTT AND MICHELLE SCOTT, INDIVIDIALLY AND ON BEHALF OF THE MINOR, JORDAN SCOTT, AS THE PARENTS AND TUTORS OF JORDAN SCOTT** | DOCKET NO.: _____ |
| **VERSUS** | JUDGE: _____ |
| **NORTHERN LOUISIANA MEDICAL CENTER; RUSTON LOUISIANA HOSPITAL COMPANY, LLC; & BRADY DUBOIS** | MAGISTRATE: _____ |

## COMPLAINT

The complaint of Gregory Scott ("GREG") and Michelle Scott ("MICHELLE"), individually and on behalf of the minor, Jordan Scott ("JORDAN"), as the parents of and tutors of Jordan Scott, persons of the full age of majority, domiciled in the Parish of Lincoln, State of Louisiana, collectively referred to herein sometimes as "PLAINTIFFS," respectfully represent as follows:

### PARTIES, JURISDICTION, & VENUE

1. The jurisdiction of this court is invoked pursuant to 42 U.S.C.A. § 1395dd, *et seq.* and 28 U.S.C. § 1331. Further, this court has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the United States District Court for the Western District of Louisiana because a "substantial part of the events or omissions giving rise" to the claims asserted herein occurred in the Western District of Louisiana, within the meaning of 28 U.S.C. § 1391(b)(2).

3. The Defendants in this matter are:

    a. Ruston Louisiana Hospital Company, LLC, a healthcare services company authorized to do and doing business in the State of Louisiana under the trade name Northern

        Louisiana Medical Center (collectively referred to herein as "NORTHERN"), with its registered office and agent for service in Louisiana located at 501 Louisiana Avenue, Baton Rouge, La. 70802; and

    b.    Brady DuBois ("DUBOIS"), a person the full age of majority and domiciled in the State of Missouri.

## FACTS COMMON TO ALL COUNTS

### *Overview*

4.    This case is about a business practice which:

    a.    delays adequate medical treatment;

    b.    discriminates against patients who cannot pay immediately for adequate medical screenings versus those who can pay immediately when presenting with the very same symptoms;

    c.    places profits over patient safety; and

    d.    has left a teenage girl paralyzed for the remainder of her life.

5.    More specifically:

    a.    In the early hours of August 19, 2014, JORDAN presented to NORTHERN's emergency room with neurological deficiencies in both her upper and lower extremities. JORDAN is now paralyzed due to the delay in treating her symptoms. Consequently, a medical malpractice suit has been filed in Lincoln Parish, Louisiana.

    b.    During the deposition of Dr. Taylor—JORDAN's treating physician at the NORTHERN emergency room—on February 25, 2016, in the state malpractice litigation, testimony was taken regarding NORTHERN's policies and procedures which place profits over emergency room patient safety.

    c.    For instance, Dr. Taylor testified that he wanted to order an MRI to evaluate JORDAN's condition by 9:07 a.m. However, because of a policy at NORTHERN which requires that emergency room requests for MRI's be summarily denied and delayed until reimbursement from the insurance company has been certified, no MRI was authorized and taken until after 3:00 p.m.

    d.    If the MRI had been ordered when Dr. Taylor desired, JORDAN's condition—a hematoma on her spinal cord—would have been identified and treated approximately seven (7) hours before and her permanent injuries would not have occurred and/or

2

would have been much less severe. Accordingly, NORTHERN's profits-over-patients policy was a direct and proximate cause of JORDAN's paralysis.

### *Dr. Taylor's Testimony*

6.  Notably, Dr. Taylor testified as follows:

    Q: Did you feel that, when you treated Jordan Scott, that an MRI was warranted?

    A: Yes.

    \*          \*          \*          \*

    Q: You would agree—would you not, that Jordan Scott should have received an MRI as soon as she entered the emergency room?

    A: Relatively, yes, sir.

    \*          \*          \*          \*

    Q: Were you aware of [NORTHERN's policy of not allowing emergency room MRI's] prior to this time [when JORDAN was admitted]?

    A: I knew it was going to be difficult.

    Q: Why is that?

    A: Because they [NORTHERN] typically don't want to do MRI's through the emergency department.

    \*          \*          \*          \*

    Q: Well, if not this case, what case would warrant an emergency MRI, with a twelve-year-old girl who could face potential paralysis if this diagnosis was not made as soon as possible?...

    A: She [NORTHERN's emergency room manager] immediately told me, she goes "They're not going to do an MRI for us." And I said, "Can you please just go try; go talk to them?" She [NORTHERN's emergency room manager] later told me "No." So later I went to [NORTHERN's] radiology manager, and talked to her and she told me that they couldn't do it. So I told her I was going to have to admit Jordan to get the MRI.

\*        \*        \*        \*

Q: Would you agree that any hospital the size of NORTHERN should allow an emergency room physician to obtain an MRI if an emergency situation such as Jordan Scott faced August 19, 2014?

A: My professional opinion, yes, sir.

Q: And did you bring this up at any point in time to [NORTHERN] administration?...

A: Yes, sir.

Q: And what did – what happened?

A: Nothing has changed.

\*        \*        \*        \*

Q: Are you aware that Dr. Wood testified yesterday that there was more weakness in the legs and the arms and you should have immediately gotten an MRI?

A: I'm not aware of that, no, sir.

Q: Well, do you agree with that?

A: She needed an MRI. Yes, sir.

Q: Well, you knew that when you first did your physical examination. Correct?

A: Well, that was part of the differential, yes, sir.

\*        \*        \*        \*

Q: Isn't it true that with the diagnosis of progressive weakness to the point where the child had to be brought into the emergency room the morning of August 19th, 2014, that there should have been an immediate…MRI being done and this should have been handled as an emergency situation?

A: An MRI [should have been ordered].

4

Q: The MRI?

A: Yes, sir.

Q: Okay. As soon as possible?

A: Relatively quickly. Yes, sir.

Q: And isn't it true that even minutes and hours can make a huge difference in the diagnosis and recovery of a patient such as Jordan Scott when she's got progressing neurological deficits?

A: Yes.

        *            *            *            *

Q: "Patient was going to be admitted. This was held up until MRI was done. There's been a delay getting access to an MRI, and then reading it. Dr." Did you write that?

A: Yes.

        *            *            *            *

Q: Now, after this, did you go to anyone in the hospital and tell them that it's a bad policy not to be able to order an MRI from the emergency room?

A: Yes.

Q: Who specifically did you talk to?

A: Brady Dubois, the CEO at the time.

        *            *            *            *

Q: What did you tell Brady [DUBOIS]?

A: That we needed to be able to get MRI's in the emergency department, that this is the 21st Century and that there's emergent conditions that we need to be able to get them.

Q: I take it by that you felt that this was an antiquated policy?

A: The MRI machine is right down the hallway.

Q: How far?

A: Less than fifty yards.

    *    *    *    *

Q: Tell me the contents of that conversation [with DUBOIS].

A: That I was upset with not being able to get an MRI and that we should be able to get them.

Q: Okay.

A: And I believe his – he [DUBOIS] has a child that's in the same class or grade [as JORDAN]. I know they go to the same school as Jordan, so he was personally knowledgeable about her condition.

Q: Okay. And did you say anything else specifically?

A: That in 2015 you should be able to get an MRI if you have it available, that there are conditions that only an MRI can diagnose...

    *    *    *    *

Q: What is the reason as far as why the hospital does it [prohibit MRI's from the emergency room]?...

A: <u>I was told financial reimbursement</u>.

Q: Okay. Explain that to me.

A: <u>They said to get reimbursed on an MRI, they had to precertify</u>.

Q: Precertify? What does that mean?

A: <u>It's to get permission from the insurance company</u>.

    *    *    *    *

Q: Did you talk to [DUBOIS] about that [the delayed MRI's], also?

A: Yes.

Q: What did he say?

A: <u>It was financial implications</u>.

Q: Like what?

A: <u>Reimbursement</u>.

Q: And how could that affect reimbursement?

A: <u>They have – a lot of insurance companies will not reimburse for non-precertified MRI's</u>.

    \*        \*        \*        \*

Q: Did you feel that, when you treated Jordan Scott, that an MRI was warranted?

A: Yes.

Q: Why didn't you order one?

A: I tried to.

Q: What happened?

A: <u>I was not allowed to get one</u>.

### *Factual Summary, Causation, & Damages*

7. In short, the sworn deposition testimony of Dr. Taylor confirms that the decision to deny emergency room requests for MRI examinations until the patient has been admitted and insurance reimbursement has been confirmed is both:

    (i) an actual policy and practice of NORTHERN; and

    (ii) a purely financial-based policy and practice, completely unrelated to the actual practice of medicine or providing of medical treatment.

8. As a direct result of NORTHERN's profits-over-patients policy, JORDAN is now permanently paralyzed from her thoracic spine down, causing her serious damages in the form of: past, present, and future pain and suffering; past, present, and future emotional

distress; past, present and future loss of wages and earning capacity; past, present, and future medical expenses; and past, present, and future loss of enjoyment of life.

9. As a direct result of NORTHERN's profits-over-patients policy, GREG and MICHELLE have also suffered serious emotional harm and loss of consortium, past, present, and future.

10. PLAINTIFFS did not learn of NORTHERN's profits-over-patients policy until Dr. Taylor's deposition, which was taken on February 25, 2016.

11. The facts articulated herein above are constructively incorporated to each count below as if re-alleged in full.

## COUNT 1: EMTALA Violations

### *Overview of EMTALA & Inapplicability of the Med-Mal Cap*

12. The Emergency Medical Treatment & Labor Act ("EMTALA") provides, in pertinent part:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital <u>must</u> provide for an appropriate medical screen examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.[1]

\*          \*          \*          \*

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.[2]

\*          \*          \*          \*

---

[1] *See,* 42 U.S.C.A. § 1395dd(a). (Emphasis added).
[2] *See,* 42 U.S.C.A. § 1395dd(d)(2)(A).

> A participating hospital may not <u>delay</u> provision of an appropriate medical screening examination…or further medical examination and treatment…<u>in order to inquire about the individual's method of payment or insurance status</u>.[3]

13. PLAINTIFFS' claims under EMTALA are not subject to the limitation of damages set forth in the Louisiana Medical Malpractice Act because the acts sued upon herein are not related to medical treatment. Rather, the profits-over-patients policy is a pure business decision totally unrelated to the providing of medical treatment and/or applicable standard of care. *See, Romar ex rel. Romar v. Fresno Community Hosp. and Medical Center*, (E.D. Cal. 2008), 583 F.Supp. 2d 1179 (State law damages cap did <u>not</u> apply to EMTALA claim that was not based on professional negligence; professional standard of care was not inextricably intertwined with claim because professional standard of care was not incorporated into duty to provide materially similar treatment.).

### *EMTALA Violation #1: Inadequate Medical Screening*

14. Financially-motivated decisions which ignore patient needs are inherently incompatible with "emergency" room treatment. EMTALA codifies this benevolent logic into binding Federal law. Nevertheless, and in the face of EMTALA's clear requirements, NORTHERN consciously refused adequate medical treatment which directly caused JORDAN's injuries.

15. In short, NORTHERN violated EMTALA in its creation and implementation of the profits-over-patients policy which prohibited MRI's—even when severe neurological deficiencies were present—until insurance reimbursement had been confirmed. This amounts to wholly inadequate medical screening which directly and proximately caused JORDAN's injuries.

---

[3] *See,* 42 U.S.C.A. § 1395dd(h). (Emphasis added).

### *EMTALA Violation #2: Disparate Screening*

16. If a patient presents to NORTHERN with neurological deficiencies in her hands and feet, and that patient has money-in-hand, NORTHERN will promptly order an MRI. However, if a patient presents to NORTHERN with neurological deficiencies in her hands and feet, but that patient does not have money-in-hand, NORTHERN will not order an MRI until insurance reimbursement has been confirmed. This amounts to disparate screening based on a patient's immediate willingness and/or ability to pay, *vel non*.

17. If NORTHERN treated patients who do not have money-in-hand in the same fashion as they treat patients who do have money-in-hand, an MRI would have been timely ordered, the hematoma would have been timely diagnosed and treated, and JORDAN would not be paralyzed for the rest of her life. Accordingly, NORTHERN's disparate screening is a direct and proximate cause of JORDAN's injuries.

18. Additionally, Dr. Taylor testified that some insurance companies—such as JORDAN's— require "precertification" in order to obtain reimbursement for emergency room MRI's. Accordingly, if NORTHERN had treated JORDAN based upon her actual symptoms—as opposed to her particular insurance company's "precertification" requirements—then she would have received a timely MRI, which would have allowed timely diagnosis and treatment, thus preventing her permanent paralysis. Similarly, if JORDAN had insurance through a company which provided reimbursements for MRI's regardless of "precertification," then she would have obtained the MRI timely, which would have allowed timely diagnosis of and treatment for her condition, thus preventing her permanent paralysis. This also amounts to disparate screening which is a direct and proximate cause of JORDAN's injuries.

*EMTALA Violation #3: Delay of Appropriate Medical Screening*

19. An MRI is an "appropriate medical screening examination" which is within NORTHERN's capability. In fact, a radiology department is just down the hall from where JORDAN was treated.

20. NORTHERN violated EMTALA and directly caused JORDAN's damages by delaying an MRI examination for approximately seven (7) hours "in order to admit and inquire about [JORDAN's] method of payment or insurance status."

21. If NORTHERN did not have a policy of admitting and waiting for confirmation of reimbursement before authorizing MRI examinations, an MRI examination would have been conducted hours sooner, allowing for timely intervention and treatment of JORDAN's condition before the onset of permanent paralysis. Accordingly, the delay of an appropriate medical screening examination is a direct and proximate cause of JORDAN's injuries.

*EMTALA Violation #4: Delay of Further Medical Examination and Treatment*

22. At a minimum, an MRI is a "further medical examination and treatment" which is required under EMTALA.

23. NORTHERN violated EMTALA and directly caused JORDAN's damages by delaying an MRI examination for approximately seven (7) hours "in order to admit and inquire about [JORDAN's] method of payment or insurance status."

24. If NORTHERN did not have a policy of admitting and waiting for confirmation of reimbursement before authorizing MRI examinations, an MRI examination would have been conducted hours sooner, allowing for timely intervention and treatment of JORDAN's condition before the onset of permanent paralysis. Accordingly, the delay in providing further medical examination and treatment is a direct and proximate cause of JORDAN's injuries

## COUNT 2: Negligent Administration

25. The facts outlined above also constitute a claim of intentional administrative negligence. Specifically, NORTHERN breached its administrative duties owed to JORDAN with its intentional, profits-driven decision to refuse and/or delay an MRI until insurance reimbursement had been confirmed. This breach proximately caused JORDAN's damages.

26. Once again, this claim is not subject to the limitation of damages set forth in the Louisiana Medical Malpractice Act because it is not "malpractice" as defined by the Louisiana Medical Malpractice Act. To the contrary, the actionable conduct described herein amounts to a pure business decision unrelated to the actual practice of medicine within the physician-patient relationship.

## COUNT 3: Malfeasance

27. The acts and omissions described herein—specifically, the profits-over-patients policy which prohibited the ordering of an MRI until insurance reimbursement had been confirmed—amounts to malfeasance, which is defined as "an act which is wholly wrongful or unlawful [and] the doing of an act which a person ought not to do at all."[4] The profits-over-patients policy described herein is most certainly "an act which is wholly wrongful or unlawful," and "the doing of an act which a person ought not do at all" which proximately caused JORDAN's injuries.

28. Once again, this claim is uncapped because it is not "malpractice" as defined under the Louisiana Medical Malpractice Act. To the contrary, PLAINTIFFS' claim of malfeasance pertains to a pure business decision which is completely unrelated to the applicable standard of care or the actual practice of medicine within the physician-patient relationship.

## COUNT 4: Intentional Action

29. The facts outlined above also constitute a claim of intentional tort or intentional action. Additionally, it should be noted that Dr. Taylor's testimony also suggests the records in this matter may have been "sanitized" in effort to escape liability. This would likewise constitute an intentional act under Louisiana law.

30. Once again, this claim is not subject to the limitation of damages set forth in the Louisiana Medical Malpractice Act because it is not "malpractice." To the contrary, the conduct complained of herein amounts to an intentional act which is not covered by the Louisiana Medical Malpractice Act.

## SOLIDARY LIABILITY & RESPONDEAT SUPERIOR

31. NORTHERN's liability is based upon its actual implementation of and adherence to the profits-over-patients policy which caused JORDAN's injuries.

32. On information and belief, DUBOIS was actively involved in the creation, authorization, and/or approval of the profits-over-patients policy described herein. NORTHERN is likewise liable for the acts and omissions of DUBOIS under the doctrine of respondeat superior and/or vicarious liability.

33. Accordingly, all of the Defendants are solidarily liable for each specific count alleged herein, either directly and/or through the doctrine of respondeat superior. Therefore, any allegation against a single Defendant is to be interpreted and applied against all Defendants equally.

---

4 *Boyte v. Wooten*, 04-1818 (W.D. La. 10/16/2007); 2007 WL 3023935.

## PRAYER

WHEREFORE, the PLAINTIFFS, Gregory Scott and Michelle Scott, individually and on behalf of their minor daughter, Jordan Scott, as the parents and tutors of Jordan Scott, pray for the following:

    a. a trial by jury; and

    b. after due proceedings, a judgment in their favor and against all Defendants, for:

        (i) all general damages, past, present, and future;

        (ii) all special damages, past, present, and future;

        (iii) court costs, including expert witness fees, and legal interest; and

        (iv) all other relief to which they may be entitled, in law or in equity.

**Respectfully submitted by Attorneys for PLAINTIFFS:**

| | |
|---|---|
| *Oscar L. Shoenfelt, III* _____ | *Russell A. Woodard, Jr.*_____ |
| OSCAR L. SHOENFELT, III (#12032) | RUSSELL A. WOODARD, JR. (#34163) |
| Bar Roll Number 12032 | **BREITHAUPT, DUNN, DUBOS,** |
| **OSCAR L. SHOENFELT, III, L.L.C.** | **SHAFTO & WOLLESON, LLC** |
| 2109 Perkins Road | 1811 Tower Dr., Suite D |
| Baton Rouge, La. 70808 | Monroe, La. 71207 |
| Telephone: (225) 336-4300 | Telephone: (318) 322-1202 |
| Facsimile: (225) 336-4350 | Facsimile: (318) 322-1984 |
| Email: info@shoenfeltlaw.com | E-mail: rwoodard@bddswlaw.com |

## SERVICE INSTRUCTIONS

**Please serve Defendants as follows**:

| | |
|---|---|
| **Brady Dubois**, through his attorney of record | **Ruston Louisiana Hospital Company, LLC** |
| Richard E. Gruner, Jr. | d/b/a **Norther Louisiana Medical Center**, |
| Blue Williams, LLP | through its agent for service, |
| 3421 North Causeway Blvd., Suite 900 | Corporation Service Company |
| Telephone: (504) 830-4921 | Baton Rouge, LA 70802 |
| Fax: (504) 849-3049 | |
| Email: rgruner@bluewilliams.com | |