# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| GREGORY SCOTT AND MICHELLE SCOTT, INDIVIDUALLY AND ON BEHALF OF THE MINOR, J.S., AS THE PARENTS AND TUTORS OF J.S. | * | CIVIL ACTION NO.  16-0376 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| NORTHERN LOUISIANA MEDICAL CENTER; RUSTON LOUISIANA HOSPITAL COMPANY, LLC; & BRADY DUBOIS | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), or alternatively to stay the case pending the outcome of the medical review panel [doc. # 10], filed by defendants Ruston Louisiana Hospital Company, LLC d/b/a Northern Louisiana Medical Center and Brady Dubois.  For reasons explained below, it is recommended that the motion be GRANTED IN PART and DENIED IN PART.

### Background

On March 21, 2016, Gregory Scott and Michelle Scott invoked this court's federal question jurisdiction, 28 U.S.C. § 1331, to assert claims, individually, and on behalf of their minor child, J.S.,[1] against Ruston Louisiana Hospital Company, LLC d/b/a Northern Louisiana Medical Center ("NLMC") and NLMC's former CEO, Brady Dubois, pursuant to the Emergency

---

[1]   The court will refer to the minor by her initials in accordance with LR 5.7.12W and the E-Government Act of 2002.

Medical Treatment & Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.  Plaintiffs also set forth various state law claims for negligent administration, malfeasance, and "intentional action," via the court's supplemental jurisdiction, 28 U.S.C. § 1367.  According to the complaint, "a medical malpractice suit" also was filed in Lincoln Parish, Louisiana.  (Compl., ¶ 5a).

Plaintiffs allege that on the morning of August 19, 2014, J.S., who was twelve years old at the time, presented to the NLMC emergency room with neurological deficiencies in both of her upper and lower extremities.  (Compl., ¶ 5).  By 9:07 a.m., the attending emergency room physician, James Taylor, M.D., wanted to order an MRI to evaluate J.S.'s condition.  *Id*.  The MRI, however, was not obtained until after 3:00 p.m., purportedly due to NLMC's blanket policy to deny emergency room requests for MRIs until the insurance company had certified reimbursement.  *Id*.  Plaintiffs contend that if the MRI had ben ordered at the time Dr. Taylor desired, then J.S.'s condition – a spinal cord hematoma – would have been identified and treated approximately seven (7) hours earlier, thereby avoiding or reducing the extent of her subsequent permanent paralysis.  *Id*.  Plaintiffs seek recovery for all general and special damages, past, present, and future, plus fees, costs, and interest.  (Compl., Prayer).

On May 6, 2016, defendants filed the instant motion to dismiss for failure to state a claim upon which relief can be granted, or in the alternative, to stay the case pending the outcome of the medical review panel.  Plaintiffs filed their opposition on May 23, 2016.  [doc. # 15].  Defendants filed a motion for leave to file a reply on May 31, 2016.  [doc. # 16].  On June 1, 2016, plaintiffs filed a motion to strike defendants' motion for leave to file a reply brief, along with the exhibits attached thereto.  [doc. # 17].  The parties further briefed the motion to strike.  [doc. #s 20-23].  The matter is now ripe.

## Discussion

### I.    Standard of Review

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  A pleading states a claim for relief when, *inter alia*, it contains a "short and plain statement . . . showing that the pleader is entitled to relief . . ."  Fed.R.Civ.P. 8(a)(2).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007)).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  *Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between.  *See Iqbal, supra*.  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim.  *See Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.  Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra* (citation omitted).  A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable, and that recovery is unlikely.  *Twombly,*

Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions.  *Iqbal, supra*.  A pleading comprised of  "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*.  Moreover, courts are compelled to dismiss claims grounded upon invalid

3

legal theories even though they might otherwise be well-pleaded.  *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827 (1989).

Nevertheless, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision."  *Gilbert v. Outback Steakhouse of Florida Inc.*, 295 Fed. Appx. 710, 713 (5th Cir. 2008) (citations and internal quotation marks omitted).  Further, "a complaint need not pin plaintiff's claim for relief to a precise legal theory.  Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of [her] legal argument."  *Skinner v. Switzer*, 562 U. S. 521, 131 S. Ct. 1289, 1296 (2011).  Indeed, "[c]ourts must focus on the substance of the relief sought and the allegations pleaded, not on the label used."  *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' "  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atl.*, 127 S. Ct. at 1958).

When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments.  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted).  However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" – including public records.  *Dorsey, supra*; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n9 (5th Cir. 2007) (citation omitted) (proper to take judicial notice of matters of public record).  Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000) (citations and internal quotation marks omitted).

4

## II.     EMTALA

a)      Plaintiffs State a Claim for Relief against NLMC under EMTALA

     i)      Law

Congress passed EMTALA in an attempt to curb "patient dumping," i.e., the practice of refusing to treat patients who are unable to pay.  *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir.1998).  Under EMTALA, if any individual comes to the emergency department of a hospital and requests examination or treatment for a medical condition, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists."  42 U.S.C. § 1395dd(a).

The Fifth Circuit has recognized that, "[a]n appropriate medical screening examination is determined by whether it was performed equitably in comparison to other patients with similar symptoms, not by its proficiency in accurately diagnosing the patient's illness."  *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir.2000) (citation and internal quotation marks omitted).   Thus, "[a]n inappropriate screening examination is one that has a disparate impact on the plaintiff."  *Guzman v. Mem'l Hermann Hosp. Sys.*, 409 Fed. Appx. 769, 773 (5th Cir.2011) (citation omitted).  A patient may prove disparate impact by showing that the hospital did not follow its own standard screening procedures or by pointing to differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital.  *Id.*  (citation omitted).  Alternatively, a patient can establish an EMTALA violation by showing that the hospital provided such a cursory screening that it amounted to no screening at all.  *Id.*  (citation omitted).  Consequently, "a

5

treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Marshall*, 134 F.3d at 323 (citation omitted).

EMTALA also provides that once a hospital determines that a presenting individual has an emergency medical condition, then the hospital must provide either:

> **(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> **(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b).

However, the duty to stabilize does not arise unless and until the hospital has actual knowledge that the patient has an unstabilized medical emergency. *Battle, supra* (citation omitted).[2]

Moreover, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . ." *Battle, supra* (citing 42 U.S.C. § 1395dd(e)(3)(A)).

---

[2]  An emergency medical condition is defined as,
a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).

Finally, EMTALA prohibits a participating hospital from delaying an appropriate medical screening examination or the administration of further medical examination and treatment in order to inquire about the individual's method of payment or insurance status.  42 U.S.C. § 1395dd(h).[3]

ii)    <u>Analysis</u>

Plaintiffs allege that NLMC violated EMTALA in four ways:  by providing an inadequate medical screening, disparate screening, delay of appropriate medical screening, and delay of further medical examination and treatment.  (Compl., ¶¶ 14-24).  It is apparent, however, that there is considerable overlap between these alleged violations.  At minimum, both the inadequate medical screening and disparate screening claims derive from EMTALA's paragraph (a) requirement that the hospital provide an "appropriate medical screening examination."  Furthermore, EMTALA's delay proscription is tied to the hospital's obligations to provide an appropriate medical screening examination and to stabilize emergency medical conditions.

Nevertheless, plaintiffs maintain that an "appropriate medical screening examination" includes more than even-handed or uniform treatment of patients, it also requires an examination within the capability of the hospital's emergency department, which, in this case, entailed an MRI.  *See* Opp. Memo., pgs. 17-18 (citing, *inter alia*, *Ruiz v. Kepler*, 832 F. Supp. 1444 (D.

---

[3]  The implementing regulations further explain that

a participating hospital may not seek, or direct an individual to seek, authorization from the individual's insurance company for screening or stabilization services to be furnished by a hospital, physician, or nonphysician practitioner to an individual until after the hospital has provided the appropriate medical screening examination required under paragraph (a) of this section, and initiated any further medical examination and treatment that may be required to stabilize the emergency medical condition under paragraph (d)(1) of this section.

42 C.F.R. § 489.24(d)(4)(ii).

N.M. 1993)).  Plaintiffs further emphasize that they have alleged facts sufficient to "demonstrate the accepted practice for emergency rooms operating in the '21st Century' is to order an MRI when someone presents with [J.S.]'s symptoms . . ."  (Opp. Memo., pg. 18).

This latter argument suggests that EMTALA imposes a national or objective standard of care in screening patients.  It is clear, however, that EMTALA is not a federal malpractice statute.  *Thornhill v. Jackson Par. Hosp.*, Civ. Action No. 15-1867, 2016 WL 2587276, at *3 (W.D. La. May 4, 2016) (James, J.) (citations omitted); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir.1995) (EMTALA does not impose a national standard of care).  Accordingly, the Fifth Circuit has stressed that an "'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms."  *Marshal, supra* (citations omitted).[4]  Consequently, "an inappropriate screening examination" is limited to instances where the patient shows one of the following:  1) that the hospital did not follow its own standard screening procedures, 2) differences between the screening examination that the patient received and examinations that other patients with similar symptoms received *at the same hospital*, or 3) that the hospital provided such a cursory screening that it amounted to no screening at all.  *Id.*  (citation omitted).

Defendants contend that plaintiffs have not established any of the foregoing circumstances.  The court reiterates, however, that at the pleading stage, plaintiffs only need

---

[4] Indeed, EMTALA requires only that the screening be "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department . . ."  42 U.S.C. § 1395dd(a).  Thus, the statute precludes resort to a malpractice or other objective standard of care to ascertain whether a screening is "appropriate." *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 272 (6th Cir.1990).

allege sufficient facts for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, supra*. Here, plaintiffs allege that J.S. did not receive an MRI until at least six hours after Dr. Taylor initially determined that one was necessary. According to the complaint, the delay stemmed from NLMC's blanket policy to deny emergency room requests for MRIs until the insurance company had certified reimbursement.  Moreover, per Dr. Taylor (as recounted in the complaint), the rationale behind NLMC's blanket prohibition on MRIs for emergency room patients was to ensure that NLMC obtained permission from the insurance companies for the test so they could ensure payment.[5]  Because the purported reasoning behind NLMC's policy was to ensure reimbursement for the test, this lends credence to plaintiff's argument that NLMC theoretically would permit a patient with cash in hand to obtain

_____

[5]  Defendants submitted Dr. Taylor's entire deposition with their proposed reply brief in an attempt to "assist the Court in determining whether the plaintiffs have adequately set forth a basis for an EMTALA claim against the hospital." (Defs. Opp. Memo., pgs. 4-5 [doc. # 20]). Defendants stress that Dr. Taylor:  1) was unaware of any *written* NLMC policy that prohibited MRIs in the emergency room; and 2) on another occasion, actually was able to order an MRI from within the emergency department.  *See* Defs. Prop. Reply Memo., pgs. 3-4, Exh. A.  They contend that the court can consider this extrinsic evidence within the parameters of the instant 12(b)(6) motion because plaintiffs quoted from the deposition in their complaint and it is central to their claim.  *See Collins, supra*.  Plaintiffs disagree and filed a motion to strike Dr. Taylor's deposition, together with defendants' proposed reply brief.  *See* M/Strike.

The court questions whether Dr. Taylor's deposition is central to plaintiffs' claim.  After discovery, plaintiffs ultimately may be able to prevail on the merits without reliance on Dr. Taylor.  Regardless, Dr. Taylor's deposition does not establish that plaintiffs fail to state a claim for relief under EMTALA.  He unequivocally stated that he was told that the reason NLMC required admission to obtain an MRI was to ensure reimbursement for the procedure.  (Taylor Depo., pgs. 150-153).  Taylor further testified that, on another occasion, he was able to obtain an MRI from within the emergency room under circumstances where the patient already had been pre-approved for an MRI, thus assuring that NLMC would be reimbursed for the procedure. (Taylor Resumed Depo., pgs. 27-28).  This testimony supports plaintiffs' contention that her MRI was delayed to ensure reimbursement.

In short, whether the court considers Dr. Taylor's full deposition does not affect the viability of plaintiffs' EMTALA claim.  Accordingly, by separate order, the court will grant defendants' motion for leave to file a reply and deny the motion to strike.

an MRI in the emergency room – notwithstanding NLMC's policy.  In other words, there is a reasonable expectation that discovery will reveal evidence to support J.S.'s contention that she received a screening examination that differed from other patients with similar symptoms.[6]

In any event, the facts alleged in the complaint also support plaintiffs' derivative claim that NLMC's admission requirement effectively delayed J.S.'s MRI for purposes of inquiring about or to ensure J.S.'s method of payment or insurance status in further violation of EMTALA. *See* 42 U.S.C. § 1395dd(h).

b)      Louisiana's Pre-Suit Medical Review Panel Requirement does not apply to EMTALA

In 1975, the legislature enacted the Louisiana Medical Malpractice Act ("LMMA") in response to a perceived medical malpractice insurance crisis.  *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 888 So.2d 782, 785–86 (La. 2004) (citations and internal quotation marks omitted).  The purpose of the LMMA was to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the public.  *Id.* (citation omitted).  Thus, the LMMA accords qualified health care providers two substantial advantages in actions against them  for malpractice, namely, 1) a requirement that the claim first be reviewed by a medical review panel before commencing suit in a court of law, and 2) a limit on the amount of damages recoverable.  *Id.*

---

[6]  Although Congress enacted EMTALA to combat "patient dumping," the requirements and duties imposed under subsections (a) and (b) do not presuppose a fiscal motivation for the disparate treatment.  42 U.S.C. § 1395dd(a) & (b); *see also Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253, 119 S.Ct. 685, 687(1999) (holding that § 1395dd(b) contains no express or implied improper motive requirement, and recognizing that the majority of circuits have held that § 1395dd(a) does not impose an improper motive requirement).  Of course, § 1395dd(h) expressly incorporates motive into subsections (a) and (b) in circumstances where a hospital delays action to inquire about payment or insurance status.  *See* discussion, *infra*.

As to the former, the LMMA specifically provides that "[n]o action against a health care provider . . . may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel." *Flagg v. Stryker Corp.*, 819 F.3d 132, 137–38 (5th Cir.2016) (en banc) (citing La. R.S. § 40:1231.8(B)(1)(a)(i)).  Furthermore, before filing suit, a plaintiff must wait until "the panel has rendered its expert opinion on the merits of the complaint . . ." *Id.* (citing *Delcambre v. Blood Sys., Inc.,* 893 So.2d 23, 27 (La.2005)).  If the plaintiff fails to comply with the pre-suit exhaustion requirement, then her claim is subject to dismissal without prejudice.  *Id.*  (citations omitted).

Under EMTALA:

[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A).

EMTALA also preempts state or local law requirements that directly conflict with any of its requirements. 42 U.S.C. § 1395dd(f).

Thus, the question presented is whether EMTALA incorporates, and does not otherwise preempt, the LMMA's pre-suit exhaustion requirement.  Although the parties have not directed the court's attention to any Fifth Circuit decision on point, other courts have held that § 1395dd(d)(2)(A) does not expressly or impliedly incorporate state-mandated procedural requirements for medical malpractice claims.  *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 866 (4th Cir.1994); *Keating v. Tangipahoa Hosp. Dist. No. 1*, Civ Action No. 94-3799, 1995 WL 91128, at *2 (E.D. La. Mar. 1, 1995) (citing *Power, supra*, and declining to apply the LMMA's medical review panel process to EMTALA); *Bauman v. Tenet Health Sys. Hosps., Inc.*, Civ

Action No. 00-1176, 2000 WL 1219151, at *4 (E.D. La. Aug. 25, 2000) (Schwartz, J.) (plaintiff need not conform EMTALA claim to LMMA's pre-suit requirements).  The undersigned agrees with the foregoing authority, and finds that EMTALA does not incorporate the LMMA's pre-suit medical review panel process.

In addition, the Louisiana Supreme Court has held that EMTALA preempts the LMMA's pre-suit exhaustion requirement because the latter directly conflicts with EMTALA's two-year limitations period, which is not subject to tolling.  *Spradlin v. Acadia-St. Landry Med. Found.*, 758 So.2d 116, 124 (La. 2000).[7]  While not bound by the Louisiana Supreme Court's interpretation regarding the preemptive effect of a federal law, the undersigned agrees with its reasoning.  *See Power, supra* (acknowledging that it was not bound by the Virginia Supreme Court's interpretation of federal law, the fourth circuit nonetheless agreed with its conclusion that Virginia's prohibition on filing suit until the claim had been reviewed by a medical malpractice panel directly conflicted with EMTALA).

c)      The LMMA's Damages Cap Applies to Plaintiffs' EMTALA Claim

As noted above, the second benefit conferred upon qualified health care providers by the LMMA is to limit the provider's liability to $100,000 per patient, and to impose a $500,000 cap on the total amount recoverable for all malpractice claims for injuries or death of a patient, not including future medical care and benefits, plus interest and cost.  La. R. S. § 40:1231.2(B)(1)-(2).

Again, the question arises as to whether EMTALA incorporates, and does not otherwise

---

[7]  Here, of course, the incident at issue occurred more than two years ago on August 19, 2014.  Therefore, plaintiffs' EMTALA claim would be time-barred if the court were to apply the LMMA and dismiss the suit as premature.

preempt, the LMMA's limitation on recoverable damages.[8]  The vast majority of federal courts have held that EMTALA's incorporation of state law extends to caps on damages for medical malpractice claims – at least so long as the challenged conduct falls within the particular state's definition of malpractice.  *Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 517–18 (6th Cir.2005); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 862–64 (4th Cir.1994); *Valencia v. St. Francis Hosp. & Health Ctr.*, Civ. Action No. 03-0252, 2004 WL 963712, at *5 (S.D. Ind. Mar. 1, 2004); *Kiser, ex rel. Austen v. Jackson Madison Cty. Gen. Hosp. Dist.*, Civ. Action No. 01-1259, 2002 WL 1398543, at *7 (W.D. Tenn. May 3, 2002); *Romar ex rel. Romar v. Fresno Cmty. Hosp. & Med. Ctr.*, 583 F. Supp.2d 1179, 1185 (E.D. Cal.2008) (no dispute that EMTALA incorporates state law damage caps with respect to medical malpractice claims).

Furthermore, EMTALA does not preempt state law malpractice damages caps because there is no direct conflict between the two.  *See Power, supra* (Virginia's $1 million damages cap did not conflict with EMTALA); *Valencia, supra* (Indiana's $1.25 million cap did not conflict with EMTALA); *Kiser, supra* (no conflict between Tennessee's $130,000 cap and EMTALA). As the Fourth Circuit explained,  Congress "was clearly aware of a growing concern in some states that excessive damage awards were fueling a medical malpractice crisis, and that Congress apparently wished to preserve state-enacted ceilings on the amount of damages that could be recovered in EMTALA through the incorporation of § 1395dd(d)(2)(A)."  *Power*, 42 F.3d at 862 (citation and internal quotation marks omitted).

---

[8]  The issue of recoverable damages ordinarily does not arise in the context of a 12(b)(6) motion, which typically focuses upon the sufficiency of plaintiff's factual allegations or the vitality of her claims.  Here, however, plaintiffs specifically allege that their EMTALA claim is not subject to the LMMA's damages cap.  (Compl., ¶ 13).

The undersigned agrees with the foregoing authority and finds that the LMMA's limitation on recoverable damages potentially may apply to plaintiffs' EMTALA claim – so long as the challenged conduct falls within the ambit of medical malpractice under the LMMA.  This approach is supported by *Coleman v. Deno*, where the Louisiana Supreme Court declined to draw a bright line between medical malpractice and patient dumping claims.  *Coleman v. Deno*, 813 So.2d 303, 315 (La. 2002).  Recognizing instead that the two types of claims can overlap, the court applied a six factor analysis in determining that the conduct by the qualified healthcare provider (improper transfer) fell within the scope of the LMMA, and its limitations.  *Id.*[9]  The resulting "*Coleman* factors" include,

i)     whether the particular wrong is treatment related or caused by a dereliction of professional skill,

ii)    whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

iii)   whether the pertinent act or omission involved assessment of the patient's condition,

iv)    whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

v)     whether the injury would have occurred if the patient had not sought treatment, and

vi)    whether the tort alleged was intentional.

*Coleman, supra* (citations omitted).

The court remains mindful that coverage under the LMMA should be strictly construed because the limitations imposed by the LMMA represent special legislation in derogation of the

---

[9]  The court instructed the appeals court, on remand, to render judgment in accordance with the limitations of the LMMA.  *Id.*

rights of tort victims.  *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 888 So.2d 782, 787-88

(La. 2004).  Further, the limitations of the LMMA apply only to cases of medical malpractice as

defined in the Act, and any ambiguities must be strictly construed against coverage.  *Id.*

Thus, before applying the *Coleman* factors, the court observes that the language of the

LMMA is broad enough to encompass plaintiffs' EMTALA claim against NLMC.  The LMMA

covers qualified healthcare providers, which includes any hospital, as defined in Louisiana

Revised Statute § 40:2102.[10]  La. R. S. § 40:1231.1A(10).  Moreover, the NLMC is a qualified

health care provider entitled to the protections of the LMMA.  *See Scott v. Wood*, (La. Pat.

Comp. Fund Oversight Board); M/Dismiss, Exh. A).[11]

Furthermore, the LMMA defines malpractice as,

> any **unintentional tort** or any breach of contract based on health care or
> professional services rendered, or which should have been rendered, by a health
> care provider, to a patient, **including failure to render services timely** and the handling
of a patient, . . . in the training or supervision of health care providers . . .
La. R. S. § 40:1231.1A(13) (emphasis added).

---

[10]   "Hospital" means any institution, place, building, or agency, public or private, whether for profit or not, with facilities for the diagnosis, treatment, or care of persons who are suffering from illness, injury, infirmity, or deformity or other physical condition for which obstetrical, medical, or surgical services would be available and appropriate and which operates or is affiliated with facilities for the overnight care, observation, or recovery of those persons.
La. R. S. § 40:2102.

[11]  Plaintiffs urge the court not to consider the evidence attached to defendants' motion to dismiss because it is improper to do so in the context of a 12(b)(6) motion.  However, to the extent that the court is unable to take judicial notice of the complaint filed with the Louisiana Patients Compensation Fund Oversight Board, the court may consider the evidence so long as plaintiffs receive adequate notice.  *See Mackey v. Owens*, 1999 WL 423077 (5th Cir. June 2, 1999).  A report and recommendation provides sufficient notice to the parties.  *See* discussion, i*nfra*.

Here, NLMC ultimately provided J.S. with an MRI.  The issue, of course, is the inordinate

amount of time that it took NLMC to administer the MRI, which plaintiffs attribute to NLMC's

financially motivated policy to condition MRIs on precertification.  Nevertheless, failure to

render services timely may constitute malpractice under the LMMA.  *Muse v. Lane Mem'l Hosp.*

*Found.*, 916 So.2d 231, 236 (La. App. 1st Cir. 2005) (even if alleged imposition of a prepayment

deposit caused delayed receipt of a bone scan, "failure to render services timely" is within the

LMMA's express definition of malpractice).[12]

     i)    *Whether the particular wrong is treatment related or caused by a dereliction of*
           *professional skill*

Plaintiffs endeavor to attribute the MRI delay to NLMC's economic policy to facilitate

reimbursement by conditioning the diagnostic test on precertification.  In *Coleman*, however, the

Louisiana Supreme Court recognized that the decision to transfer a patient to another facility –

even if motivated by financial considerations – could not be separated from the other treatment

decisions made by the healthcare provider.  *See Coleman, supra*.  Furthermore, "the legislature

did not intend for applicability of the Medical Malpractice Act to depend on the motives of the

doctors, be it greed or philanthropy, at the time of the alleged wrongful acts."  *Id*. (citing *Bolden*

*v. Dunaway,* 727 So.2d 597 (La. App. 1st Cir. 1998)).[13]

---

[12]  Plaintiffs characterize NLMC's policy as an intentional tort, and therefore outside the
scope of the LMMA.  However, whether the tort alleged is intentional is one of the *Coleman*
factors addressed below.

[13]  In *Dupuy v. NMC Operating Co., L.L.C.*, the Louisiana Supreme Court observed that,
[n]othing in the statute's plain language limits its application to direct treatment by
a physician. Indeed, the statute includes under the ambit of the MMA injuries that
are "based on health care or professional services rendered ... by a health care
provider, to a patient . . ." La. R.S. 40:1231.1(A)(13). The use of the broad term
"health care provider," rather than simply "physician" or "medical doctor,"

In this case, the delay in obtaining the MRI is intertwined with whether or not the diagnostic test should have been made available in the emergency room.  Regardless of motivation, the delay is treatment related.[14]

    ii)    *Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached*

An EMTALA claim is not concerned so much with whether the appropriate standard of care was breached, but whether the patient received the same treatment as other similarly situated patients, or if further medical examination and treatment was delayed to inquire about payment or insurance status.  As such, the appropriate standard of care will not be at issue, and thus, expert medical evidence should prove unnecessary.

    iii)    *Whether the pertinent act or omission involved assessment of the patient's condition*

 The need for a timely MRI directly resulted from the emergency room physician's

---

necessarily includes actions which are treatment related and undertaken by the Hospital in its capacity as a health care provider—even if those actions are not performed directly by a medical professional.

*Dupuy v. NMC Operating Co., L.L.C.*, 187 So.3d 436, 443 (La. 2016).

[14] Not unlike the plaintiff in *Coleman, supra*, the plaintiffs in this case rely on broad statements made by the court of appeal in *Spradlin v. Acadia St. Landry Medical Foundation*, 711 So.2d 699 (La. App. 3d Cir. 1998).  In *Coleman*, however, the supreme court noted that it granted certiorari in *Spradlin*, and repudiated the court of appeal's broad statements.  *Coleman, supra* (citing  *Spradlin v. Acadia St. Landry Medical Foundation*, 758 So.2d 116 (La. 2000)).  The supreme court explained in *Spradlin* that

[b]ecause the present case is before the court on an exception of prematurity, we do not address whether EMTALA's provision that incorporates state law for recovery of damages includes state substantive provisions imposing limitations on the recovery of damages caused by medical malpractice. The statement by the court of appeal that EMTALA claims are not subject to the procedural and *substantive* limitations of the state malpractice act was dicta, since substantive limitations were not before the court.

*Spradlin*, 758 So.2d at 122 n10.

assessment of J.S.'s condition.  Simply because plaintiffs contend that the delay was due to financial considerations does not remove the matter from the realm of medical malpractice.  *See Coleman, supra*; *Dading v. Goodyear Tire & Rubber Co.*, Civ. Action No. 05-0100, 2005 WL 2037450, at *5 (E.D. La. July 25, 2005) (Berrigan, J.) (even decisions based on policy may be construed as involving an assessment of the patient if they affect whether the patient receives an assessment).

<blockquote>
iv)      *Whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform*
</blockquote>

Here, the incident occurred within the context of J.S.'s ongoing relationship with the emergency room physician.  Furthermore, the administration of the MRI was within the scope of activities that NLMC was licensed to perform.  *See* La. R. S. § 40:2109(B)(3) & (4) (the Department of Health and Hospitals is tasked with adopting minimum standards for hospital's x-ray and pharmacy facilities and access to same, plus equipment essential to health of hospital patients).[15]

<blockquote>
v)      *Whether the injury would have occurred if the patient had not sought treatment*
</blockquote>

J.S.'s paralysis would have occurred if she had not sought treatment.  In fact, that is the basis for her suit – the failure to receive timely diagnostic testing and treatment for her condition. In *Coleman*, however, plaintiff likely would have required an arm amputation, or worse, even if he had not sought treatment.  *See Coleman, supra*.  Instead, the supreme court focused on

---

[15]  In *Dupuy v. NMC Operating Co., L.L.C.*, the Louisiana Supreme Court looked to the activities regulated by § 40:2109(B) to determine that the activity at issue (sterilization of surgical instruments) was within the scope of activities that a hospital is required and licensed to perform.  *Dupuy, supra*.

18

whether the delay in treatment – due to an allegedly economically based transfer decision – was linked to treatment. *Id*. It concluded that failure to provide enough treatment was clearly linked to treatment. *Id*. The same result obtains here: the failure to provide timely diagnostic testing ordered/desired by the emergency room physician is related to J.S.'s treatment.

      vi)     *Whether the tort alleged was intentional*

Plaintiffs contend that NLMC breached its duties owed to J.S. based on its intentional, profits-driven decision to refuse and/or delay an MRI until insurance reimbursement has been assured. *See* Complaint. However, the court must examine the nature of the acts to determine whether they truly constitute intentional torts as alleged by the plaintiffs. *Butler v. Louisiana State Univ. Health Scis. Ctr.*, Civ. Action No. 12-1838, 2012 WL 7784402, at *3 (W.D. La. Nov. 19, 2012) (Hornsby, M.J.), report and recommendation adopted, 2013 WL 1180873 (W.D. La. Mar. 20, 2013) (Hicks, J.) (citation omitted).

Under Louisiana law,

> the meaning of intent is that the person who acts either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or 2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself. Act is distinguished from intent in that the word act is used to denote an external manifestation of the actor's will which produces consequences. That act must proceed from volition of the actor.

*White v. Glen Ret. Sys.*, ___ So.3d ___, 2016 WL 1664502 (La. App. 2d Cir. 4/27/16) (citing William E. Crawford, Tort Law, § 12:4 in 12 *Louisiana Civil Law Treatise* (2d ed. 2009)).

In other contexts, the Louisiana Supreme Court has remarked that,

> "[s]ubstantially certain to follow" requires more than a reasonable probability that an injury will occur and "certain" has been defined to mean "inevitable" or "incapable of failing" . . . Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer

constitute intentional wrongdoing."
*Reeves v. Structural Pres. Sys.*, 731 So.2d 208, 213 (La. 1999) (citations and internal quotation marks omitted).

The Scotts' complaint does not allege requisite facts to support either prong of an intentional tort claim against NLMC.  *See Bush v. Thoratec Corp.*, Civ. Action No. 11-1654, 2011 WL 5038842, at *7 (E.D. La. Oct. 24, 2011) (Fallon, J.) (although plaintiff used the words "intentionally" and "knowingly," she failed to assert any facts to back up those labels or to suggest that the hospital intended the patient's injury); *Butler, supra* (physician's alleged intentional refusal to perform procedure in the absence of payment easily fell within the scope of a medical malpractice claim).

The undersigned acknowledges the malleability of the *Coleman* factors and their less than uniform treatment by the courts.  *Taylor v. Ochsner Clinic Found.*, Civ. Action No. 11-1926, 2011 WL 6140885, at *7 (E.D. La. Dec. 9, 2011) (Vance, J.) (citing cases).  Nonetheless, upon consideration, the court is persuaded that plaintiffs' EMTALA claim sounds in medical malpractice, and therefore, remains subject to the LMMA's limitations on damages.[16] Accordingly, plaintiffs' allegations that their EMTALA claim entitles them to recover damages beyond the LMMA cap is not substantiated and subject to dismissal.[17]

---

[16]  The undersigned respectfully disagrees with other Louisiana federal courts that have reached a contrary result.  *See e.g., EMT Jeff v. Universal Health Servs., Inc.*, Civ. Action No. 04-1507, 2005 WL 2036893, at *3 (E.D. La. July 27, 2005) (Berrigan, J.) (EMTALA claim not limited with respect to damages by the LMMA); *Bauman v. Tenet Health Sys. Hosps., Inc.*, Civ. Action No. 00-1176, 2000 WL 1219151, at *4 (E.D. La. Aug. 25, 2000) (Schwartz, J.) (denied motion to dismiss EMTALA claim because the complaint did not allege any malpractice/negligence claims).

[17]  *But see Lacoste*, 966 So.2d at 529 (whether the case is one in medical malpractice or negligence will ultimately be decided at trial by the trier of fact).

### III.     State Law Claims Against NLMC

Plaintiffs' complaint includes claims for negligent administration, malfeasance, and "intentional action."  (Compl., ¶¶ 25-30).  In their opposition brief, plaintiffs clarified that their complaint includes a claim under the Louisiana "Anti-Dumping" Statute, Louisiana Revised Statute § 40:2113.4-6 ("LADS"), which imposes a "statutory duty on the part of certain hospitals to provide emergency services to all persons residing in the territorial area, regardless of whether they are insured or able to pay."  *Spradlin, supra*.

NLMC's motion seeks dismissal of plaintiffs' state law claims on the merits.  However, the court's application of the *Coleman* factors to plaintiffs' EMTALA claim necessarily compels a finding that plaintiffs' state law claims against NLMC under LADS, for negligent administration, and for malfeasance also sound in medical malpractice, thereby subjecting the claims to the LMMA's medical review panel exhaustion requirement.  *See* discussion, *supra*.[18]

---

[18]   In *Billeaudeau v. Opelousas Gen. Hosp. Auth.*, the Louisiana Third Circuit Court of Appeal considered the *Coleman* factors, but determined that a claim for negligent credentialing against the hospital did not sound in medical practice, and thus not subject to the limitations of the LMMA.  *Billeaudeau v. Opelousas Gen. Hosp. Auth.*, 189 So.3d 561 (La. App. 3d Cir. 2016), *writ granted*, 192 So.3d 781 (La. 6/28/16).  More on point, however, is the third circuit's earlier decision in *Plaisance v. Our Lady of Lourdes Reg'l Med. Ctr., Inc.*, wherein the court affirmed the trial court's dismissal of a negligent credentialing claim against a hospital as premature because of plaintiff's failure to submit their claims to a medical review panel prior to suit.  *Plaisance v. Our Lady of Lourdes Reg'l Med. Ctr., Inc.*, 2010 47 So.3d 17 (La. App. 3d Cir. 2010).

In any event, to determine Louisiana law, federal courts look to the final decisions of the Louisiana Supreme Court.  *Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009) (citation omitted).  In the absence of a decision by the Louisiana Supreme Court on a given issue, federal courts are compelled to make an *Erie* guess.  *In re Katrina Canal Breaches Litigation*, 495 F.3d at 206; *Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 628 (5th Cir. 2000).  In so doing, the court must use its best judgment to determine

how [the Louisiana Supreme C]ourt would resolve the issue if presented with the

Here, plaintiffs do not contest that the medical review panel has yet to issue its findings as to plaintiffs' claims. Accordingly, plaintiffs' state law claims against NLMC under LADS, for negligent administration, and for malfeasance remain premature, and subject to dismissal on that basis. *Flagg, supra.*[19]

---

same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

*In re Katrina Canal Breaches Litigation*, 495 F.3d at 206 (internal citations and quotation marks omitted).

The undersigned is persuaded that the Louisiana Supreme Court would find that plaintiffs' state law claims are subject to the LMMA's limitations. In fact, while clearly not dispositive, the court granted certiorari in *Billeaudeau, supra*.

[19] Even if plaintiffs had complied with the LMMA's pre-suit exhaustion requirement, their complaint still would fail to state a claim for relief under LADS and for malfeasance. The supreme court has recognized that LADS does not contain an express private cause of action, and, on three occasions, has declined to decide whether it may provide the basis for a private cause of action under general tort law. *See Toston v. St. Francis Med. Ctr., Inc. ex rel. Bd. of Supr's of Louisiana State Univ. & Agr. & Mech. Coll.*, 108 So.3d 197, 204 (La. App. 2d Cir. 2012) (citations omitted). Given that the Louisiana legislature is well aware of how to create a private cause of action when it is so inclined, the conspicuous absence of one in LADS impels the conclusion that the legislature did not intend one in this instance. *See e.g., Monier v. St. Charles Par. Sch. Bd.*, 65 So.3d 731, 735 (La. App. 5th Cir. 2011) (no private cause of action under Teacher Bill of Rights because legislature did not provide for a remedy for any violation of the rights afforded under the law).

Furthermore, in *Ellett v. Newland*, the Louisiana Supreme Court defined malfeasance as the "doing of an act which is wholly wrongful *and unlawful*, . . . the doing of an act which a person ought not to do at all." *Ellett v. Newland*, 171 La. 1019, 1024, 132 So. 761, 762 (1931) (emphasis added) (citation omitted). In *Ellet*, the defendants "knowingly committed a wrongful *criminal* act." *See Boyte v. Wooten*, Civ. Action No. 04-1818, 2007 WL 3023935 (W.D. La. Oct. 16, 2007) (James, J.) (citing *Ellett, supra*); *Jones v. Herlin*, Civ. Action No. 12-1978, 2013 WL 5270547 at *7 (W.D. La. Sept. 17, 2013) (Walter, J.) (malfeasance is reserved for extremely egregious offenses, generally arising to the level of criminal conduct). In this case, plaintiffs do not allege any facts to suggest that defendants were guilty of a criminal act.

Although not addressed by the parties in their memoranda, plaintiffs allege in their complaint that their "intentional action" claim includes an allegation that defendants "sanitized" their records to escape liability in this matter.  (Compl., ¶ 29).[20]  To the extent that Louisiana Civil Code Article 2315 would recognize an intentional tort claim for "record sanitization," plaintiffs, at minimum, would have to set forth facts to plausibly show that defendants intentionally sanitized records.  *See Burge v. St. Tammany Par.*, 336 F.3d 363, 374 (5th Cir.2003) (tort of spoliation of evidence contemplates intentional destruction of evidence carried out for the purpose of depriving the opposing party of its use).  Plaintiffs' complaint, however, remains bereft of such factual allegations, and therefore, fails to state a claim for relief.  *See Roberts v. CRST Van Expedited Inc.*, Civ. Action No. 14-3430, 2016 WL 3648276, at *4 (W.D. La. June 30, 2016) (Doherty, J.) (no indication that evidence was intentionally destroyed).

## IV.   Claims against Dubois

By its terms, EMTALA authorizes a private cause of action only against hospitals, not individuals, employees, or physicians.  42 U.S.C. § 1395dd(d)(2)(A); *Hammond ex rel. Estate of Tillman v. St. Francis Med. Ctr., Inc.*, Civ. Action No. 06-0101, 2010 WL 4628020, at *3 (W.D. La. Nov. 4, 2010) (Trimble, J.) (EMTALA's statutory obligations are on participating hospitals, not physicians); *see also Acosta v. Bleich*, Civ. Action No. 03-3052, 2004 WL 1057570, at *2 (E.D. La. May 10, 2004) (no private cause of action against physicians); *Vaughn ex rel. Vaughn v. Hosp. Serv. Dist. No. 1 Jefferson Par.*, Civ. Action No. 01-3456, 2002 WL 126649, at *1 (E.D. La. Jan. 30, 2002)  (no private cause of action against physicians).  Moreover, plaintiffs did not

---

[20]   In the course of the court's application of the *Coleman* factors, the undersigned determined that plaintiffs' complaint failed to state a claim for an intentional tort.  *See* discussion, *supra*.

contest this point in response to defendants' motion.  *See* Pl. Opp. Memo.  Accordingly, the court finds that the complaint fails to state a claim for relief against Dubois under EMTALA.

Also, according to the complaint, Dubois was CEO of NLMC, a healthcare services limited liability company, acting within the course and scope of his employment at the time of the events at issue.  *See* Compl., ¶¶ 3, 6, 32.[21]  As such, Dubois comes within the definition of health care provider subject to the protections of the LMMA.  *See*  La. R. S. § 40:1231.1A(10).[22] Accordingly, plaintiffs' state law claims against Dubois under LADS, for negligent administration, and for malfeasance remain premature, and subject to dismissal on that basis. *See* discussion, *supra*; *Flagg, supra*.[23]

Finally, for the same reasons that plaintiffs' complaint fails to state an intentional tort claim against NLMC, it also fails to state an intentional tort claim against Dubois.  *See* discussion, *supra*.

## V.      Discretionary Stay

---

[21]  Plaintiffs allege that NLMC is liable for Dubois' acts or omissions under the doctrine of respondeat superior or vicarious liability, which presupposes that Dubois was acting within the course scope of his employment.  *See Hernandez v. Theriot*, Civ. Action No. 14-0042, 2016 WL 4118919, at *7 (M.D. La. Aug. 1, 2016) (employer's vicarious liability extends only to the employee's tortious conduct that is within the course and scope of employment).

[22]  "Health care provider" includes a limited liability company whose business is conducted principally by health care providers, or an officer or employee thereof acting within the course and scope of his employment.  *Id*.  The supreme court further explained that, "[b]y expanding the definition of *health care provider* to include *corporations, facilities,* or *institutions* providing health care *as a hospital, and all officers, employees,* or *agents thereof,* the private malpractice act covers an entire hospital, including its governing board and non-professional employees."  *Sibley v. Bd. of Sup'rs of Louisiana State Univ.*, 477 So.2d 1094, 1102 (La.1985).

[23]  In addition, even if LADS provided a private cause of action against hospitals, it would not extend to physicians or individuals.  *Hammond, supra*.

Of plaintiffs' myriad claims and theories of recovery asserted against NLMC and Dubois in this case, solely their EMTALA claim against NLMC survives the undersigned's recommended disposition of defendants' motion to dismiss.  Because the EMTALA claim remains pending, NLMC urges the court to stay this matter until the medical review panel issues its findings.

Courts enjoy the discretionary authority to stay proceedings "in the interest of justice and in control of their dockets." *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983). The court's discretion is not limitless, however.  *Id*.  In deciding whether to grant a stay, the courts "must weigh competing interests and maintain an even balance."  *Id*.  (citing *Landis v. North American Co.*, 299 U.S. 248, 254-55, 57 S.Ct. 163, 165-66 (1936)).  Accordingly, the court's decision to grant a stay should contemplate the following factors, "1) hardship and inequity on the moving party without a stay; 2) prejudice the non-moving party will suffer if a stay is granted; and 3) judicial economy." *Falgoust v. Microsoft Corp.*, 2000 WL 462919 (E.D. La. Apr. 19, 2000) (citations omitted).

Applying these considerations, the court recognizes that plaintiffs have a keen interest in the timely resolution of their EMTALA claim.  Nonetheless, plaintiffs' medical malpractice claim against the qualified health care providers substantially overlaps with her EMTALA claim. Given the relatedness of the claims, the court finds that it is in the strong interest of judicial economy to stay the instant EMTALA proceedings pending a determination by the medical review panel on the malpractice claim.  *Vaughn ex rel. Vaughn v. Hosp. Serv. Dist. No. 1 Jefferson Par.*, Civ. Action No. 01-3456, 2002 WL 126649, at *2 (E.D. La. Jan. 30, 2002) (citing

25

*Spradlin, supra*).[24]

## VI. Summary Judgment

To the extent that the undersigned has expanded upon the grounds for dismissal urged by movants, the court always may grant summary judgment *sua sponte* so long as the adverse party receives adequate notice and a reasonable time to respond. Fed.R.Civ.P. 56(f)(1); *Stingley v. Den Mar Inc.*, 2009 WL 2762374, *3 (5th Cir. Sept. 1, 2009) (unpubl.) (citing *inter alia*, *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770-71 (5th Cir.2000)). The instant report and recommendation provides adequate notice to the parties. *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (citing *Magourik v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998)).

## <u>Conclusion</u>

For the foregoing reasons,

IT IS RECOMMENDED that defendants' motion to dismiss [doc. # 10] be GRANTED IN PART, as follows,

1) that plaintiffs' intentional tort claims against defendants Ruston Louisiana Hospital Company, LLC d/b/a Northern Louisiana Medical Center and Brady Dubois be DISMISSED WITH PREJUDICE, Fed.R.Civ.P. 12(b)(6);

2) that plaintiffs' EMTALA, 42 U.S.C. § 1395dd, claim asserted against defendant, Brady Dubois, be DISMISSED WITH PREJUDICE, Fed.R.Civ.P. 12(b)(6);

3) that plaintiffs' allegations that their EMTALA, 42 U.S.C. § 1395dd, claim is not subject to the LMMA's cap on damages be DISMISSED WITH PREJUDICE, Fed.R.Civ.P. 56; and

4) that plaintiffs' remaining state law claims under Louisiana Revised Statute §

---

[24] Other Louisiana federal courts have declined to exercise their discretion to stay an EMTALA claim pending the outcome of the medical review panel. *See e.g., Jeff, supra*. Be that as it may, the undersigned finds that a stay is appropriate based on the challenged conduct in *this* case.

40:2113.4-6, for negligence, and for malfeasance be DISMISSED, WITHOUT
PREJUDICE, as premature.  Fed.R.Civ.P. 56.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss otherwise be

DENIED.

IT IS FURTHER RECOMMENDED that defendants' alternative motion to stay this case

pending the outcome of the related medical review panel proceeding be GRANTED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties

have **fourteen (14) days** from service of this Report and Recommendation to file specific,

written objections with the Clerk of Court.  A party may respond to another party's objections

within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any

objection or response or request for extension of time shall be furnished to the District Judge at

the time of filing.  Timely objections will be considered by the District Judge before he makes a

final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS
REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE
SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,
FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL
FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 9th day of September 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE