1
2
3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

4    * * * * * * * * * * * * * * * * * * *

5

6

7

GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

ORIGINAL

8
9

VS.                NO. 3:16-CV-00376

10
11

NORTHERN LOUISIANA MEDICAL
CENTER, RUSTON, LOUISIANA,
HOSPITAL COMPANY, LLC, AND
BRADY DuBOIS

12
13    * * * * * * * * * * * * * * * * *

14

DEPOSITION OF

15

EDWARD CALVERT, M.D.

16

October 17, 2016

17
18    * * * * * * * * * * * * * * * *

19

At:

20
21

North Louisiana Medical Center
401 E. Vaughn Avenue
Ruston, Louisiana 71270

22

REPORTED BY:

23
24

LINDA PEROT
CERTIFIED COURT REPORTER
CERTIFICATE NO. 23012
STATE OF LOUISIANA

25

*Linda Perot, CCR*

1

Exhibit "1"

1    APPEARANCES:

2
     FOR PLAINTIFFS:
3
          BREITHAUPT, DUNN, DuBOS, SHAFTO & WOLLESON
4         1811 Tower Drive, Suite D
          Monroe, Louisiana 71201
5         Phone:  (318) 322-1202

6              appearing herein by and through
               Mr. Russell A. Woodard, Jr.
7              rwoodard@bddswlaw.com

8    AND VIA TELEPHONE CONFERENCE CALL

9         OSCAR L. SHOENFELT
          ATTORNEY AT LAW
10        2109 Perkins Road
          Baton Rouge, Louisiana 70808
11        Phone:  (225) 336-4300
          E-Mail:  info@shoenfeltlaw.com
12

13   FOR DEFENDANT NORTHERN LOUISIANA MEDICAL CENTER:

14
          BLUE WILLIAMS
15        3421 North Causeway Boulevard
          Suite 900
16        Metairie, Louisiana 70002
          Phone:  (504) 831-4091
17
               appearing herein by and through
18             Mr. Kurt S. Blankenship
               E-Mail:  kblankenship@bluewilliams.com
19
     FOR DEFENDANT JACOB M. WOOD, M.D.:
20
          HUDSON, POTTS & BERNSTEIN
21        1800 Hudson Lane, Suite 300
          Monroe, Louisiana 71201
22        Phone:  (318) 388-4400

23             appearing herein by and through
               Mr. Donald H. Zeigler, III on behalf of
24             Mr. Gordon L. James
               E-Mail:  tzeigler@hplaw.com
25

*Linda Perot, CCR*

2

Exhibit "1"

1   APPEARANCES (CONTINUED):

2   FOR DEFENDANT JAMES PATRICK TAYLOR, M.D.:

3       DEGAN, BLANCHARD & NASH
        400 Poydras Street, Suite 2600
4       New Orleans, Louisiana 70130
        Phone:  (504) 529-3333

5           appearing herein by and through
6           Ms. Maryann G. Hoskins
            E-Mail:  dhoskins@degan.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Linda Perot, CCR*

Exhibit "1"

INDEX

PAGE

EXAMINATION
    BY MR. WOODARD . . . . . . . . . . . . . . . . 7,74


EXAMINATION
    BY MR. BLANKENSHIP . . . . . . . . . . . . . . 55


OBJECTIONS
    BY MS. HOSKINS . . . . . 9, 11, 14, 15, 18, 19, 20, 22,
    . . . . 24, 25, 26, 27, 33, 36, 39, 40,
    . . . . 41, 43, 45, 47, 48, 50, 52, 76,
    . . . . . . . . . . . . 75, 77, 79, 80


    BY MR. BLANKENSHIP . . . . 10, 11, 14, 15, 16, 18, 20,
    . . . . 21, 22, 24, 25, 26, 27, 28,
    . . . . 30, 33, 34, 35, 37, 39, 40,
    . . . . 41, 42, 43, 45, 47, 49, 50,
    . . 51, 52, 53, 76, 77, 78, 79, 80

*Linda Perot, CCR*

EXHIBIT INDEX

PAGE

Exhibit 1        Transcript of Dr. Alam . . . . . . . . . . 8

Exhibit 2        Excerpts from Transcript of Dr. Taylor . . 9

Exhibit 3 . . . . . . . . . . . . . . . attached post-deposition

Exhibit 4 . . . . . . . . . . . . . . . attached post-deposition

Exhibit 5        Website Screen Shot . . . . . . . . . 28

Exhibit 6        Website Screen Shot . . . . . . . . . . 30

Exhibit 7 . . . . . . . . . . . . . . . attached post deposition

Exhibit 8        The ACR Appropriateness Criteria . . . . 31

Exhibit 9        Screen Shot from The ACR Appropriateness
                 Criteria . . . . . . . . . . . . . . . 32

Exhibit 10       Screen Shot from The ACR Appropriateness
                 Criteria . . . . . . . . . . . . . . . 36

Exhibit 11       Website Screen Shot . . . . . . . . . . 38

Exhibit 12       Thirty Minutes or Less Pledge . . . . . 39

Exhibit 13 . . . . . . . . . . . . . . . . . . . . . 74

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Linda Perot, CCR*

## STIPULATIONS

It is stipulated and agreed between counsel that this deposition of **EDWARD CALVERT, M.D.,** is taken pursuant to Notice by counsel for Defendants in accordance with the *Federal Rules of Civil Procedure,* and may be used for all purposes and in any manner consistent therewith. All objections except as to the form of the question and responsiveness of the answer are reserved until such time as the deposition is offered and introduced into evidence.

The parties hereto waive all formalities in connection with the taking of said deposition, except the swearing of the witness, reduction of the questions and answers to typewriting, and reading and signing of the deposition.

The witness, **EDWARD CALVERT, M.D.,** was advised of his right to read and sign this deposition, and he elected to exercise that right.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Linda Perot, CCR*

**EDWARD CALVERT, M.D.,**

being first duly sworn by **LINDA PEROT**, Certified Court Reporter 23012, was examined and testified as follows:

**EXAMINATION**

BY MR. WOODARD:

Q   Good morning, Doctor.

A   Good morning.

Q   Will you please state your name and address for the record?

A   Edward Calvert, 1120 Brookhaven Avenue, Ruston, Louisiana.

Q   And it's my understanding you are a physician in the North Louisiana Emergency Physicians Partnership?

A   I am.

Q   Okay.  And that serves Northern Louisiana Medical Center?

A   Correct.

Q   And you are not technically an employee of Northern Louisiana Medical Center?

A   I think, technically, we are partners of some kind.  I'm self-employed, I suppose.

Q   And the partners of NLEP, LLP, that would be Drs. Alam, Taylor, White and yourself?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    A    I'm not certain who all the partners are.

2    Q    Okay.  Alam and Taylor are your partners,

3         though?

4    A    I think -- I suppose.  It's sort of unusual

5         the way this ER is set up.  Most of the

6         time, you are self-employed.  With this one,

7         they make you partners of some kind.  I

8         think it's a tax issue more than an actual

9         partnership.

10   Q    How long have you known Dr. Alam and Dr.

11        Taylor?

12   A    I've known Dr. Alam since probably 2005; Dr.

13        Taylor since, I believe, 2013.

14   Q    Have you found them both to be trustworthy?

15   A    I have.

16   Q    Reliable?

17   A    Yes.

18   Q    Honest?

19   A    Yes.

20   Q    Can you think of any instance of dishonesty

21        since you've known Dr. Alam or Dr. Taylor?

22   A    I cannot.

23   Q    I'd like to show you --

24            MR. WOODARD:

25                what's been marked as "-- 1."

*Linda Perot, CCR*

8

Exhibit "1"

1  Q   This is a transcript of Dr. Alam's testimony

2      from a trial Mr. Ziegler and I actually had

3      not too long ago.  If you will, flip with me

4      to the second page, Lines 7 through 9.  Can

5      you read for the record that question and

6      answer?

7  A   "No MRI or CT scan of the thoracic spine.

8      Is that right?"  "No.  MRI is not emergency

9      med department procedure.  It takes longer

10     time.  We cannot order it fast."

11 Q   Okay.  Have you ever seen that before?

12 A   No.

13         MR. WOODARD:

14             I have "Exhibit 2" here, some

15         deposition excerpts from Dr. Taylor.

16 Q   Have you read that deposition?

17 A   I have not.

18 Q   Okay.  I want you to assume for me instead

19     of going through these excerpts in detail

20     that Dr. Taylor has testified in this

21     particular case he asked for an MRI.  His

22     request was denied or delayed and the reason

23     he was given was financial considerations.

24         MS. HOSKINS:

25             Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   (To Witness):   Go ahead.

2   MR. BLANKENSHIP:

3       I join in the objection.

4   MR. WOODARD:

5       You can state the basis for your

6   form objection.

7   MS. HOSKINS:

8       Well, I don't think that's

9   exactly --

10  MR. BLANKENSHIP:

11      His answer --

12  MS. HOSKINS:

13      Right.  I don't think that's exactly

14  what he said.  I'm not -- it's a

15  paraphrase of what he said and I'm just

16  making my objection for the record.

17  MR. WOODARD:

18      Okay.

19  MS. HOSKINS:

20      I mean, if you want a verbatim, we

21  can read it.  I don't think that's

22  necessary, but --

23  MR. WOODARD:

24      That's fine.  I just -- if there was

25  some way I could rephrase the

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1       paraphrasing that you don't have a

2       problem with.

3   Q   All right.  And I want you to also assume

4       for me that Dr. Taylor testified that he was

5       told that requests for MRIs from the

6       emergency room have to be precertified.

7           MS. HOSKINS:

8               Object to the form.

9           MR. BLANKENSHIP:

10              Same objection.

11  Q   Have you ever heard of any of those things I

12      just mentioned by Dr. Taylor?

13  A   I have not.

14  Q   Okay.  Look back at "Exhibit 1."  Do you

15      agree with Dr. Alam that MRIs cannot be

16      ordered fast from the emergency room?

17  A   I do.

18  Q   And why do you agree with that?

19  A   MRI is not an emergency procedure.  It's

20      just not something that is available to us

21      through the emergency room.

22  Q   Is that something you wish was available?

23  A   I'm sorry?

24  Q   Is that something that you personally wish

25      was available?

*Linda Perot, CCR*

11

1  A    In an ideal world.  However, MRI takes

2       thirty minutes to an hour and it's just not

3       an emergency procedure by the nature of MRI.

4  Q    Have you ever attempted to order an MRI from

5       the emergency room?

6  A    Not on an emergency room patient.

7  Q    Have you ever had occasion to order an MRI

8       on an emergency room patient, but you did

9       not make an order because you knew it would

10      take a significant amount of time?

11 A    It's not really available through the

12      emergency room, so --

13 Q    Who has told you that it's not available

14      through the emergency room?

15           MS. HOSKINS:

16               Objection.  I don't think that's

17           what he said.

18 Q    Is that what you said?

19 A    It's not a test that we use in the emergency

20      room because it's not available for us to

21      order.

22 Q    What do you mean that it's not available for

23      y'all to order?

24 A    If I attempted to order an MRI, it wouldn't

25      be done.  There's -- unless we order it on

*Linda Perot, CCR*

12

Exhibit "1"

1   an inpatient, it's something that I would
2   have to discuss directly with either an
3   admitting physician or a radiologist or get
4   the orthopaedic doctor to tell me that it
5   was necessary.  It's not something that I
6   could just type an order in the computer and
7   it would be done.
8   Q   Do you have any idea why -- you could press
9       a button and order a CT scan.  Correct?
10  A   Correct.
11  Q   Do you have any idea why you can't do that
12      for an MRI?
13  A   It's just one of tests that's typically
14      reserved for people who require an inpatient
15      stay or can be done on an outpatient basis.
16  Q   Typically, --
17  A   We use the CT to rule out emergency
18      conditions typically, and then if somebody
19      needs further investigation, that's done
20      sort of at the next level, not through the
21      emergency room.
22  Q   And when you say it's typically reserved for
23      inpatients and who else?
24  A   Done on an outpatient basis.  Typically, we
25      order a CAT scan to rule out emergency

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  conditions and, if the CAT scan is negative,
2  then we would send them to have an
3  outpatient MRI via their primary physician.
4  Q  And the way you're understanding MRIs are
5  used at Northern, typically there's a delay
6  which allows for confirmation of either
7  insurance or a patient's ability to pay?
8       MS. HOSKINS:
9            Objection.
10      MR. BLANKENSHIP:
11           Object to the form.
12  A  I don't know anything about the financial
13  aspect of it.
14  Q  It was a poor question.  It's your
15  understanding that, typically, the way MRIs
16  are ordered and conducted at Northern,
17  there's a significant period of time to
18  where confirmation of reimbursement can be
19  confirmed.  Is that correct?
20      MS. HOSKINS:
21           Objection.
22      MR. BLANKENSHIP:
23           Same objection.
24  A  Again, I have no idea about the financial
25  aspect of it.

*Linda Perot, CCR*                                    14

1    Q    If Dr. Taylor testified that he spoke with

2         Brady Dubois, the former CEO of Northern, --

3         do you remember -- were you working here

4         when Mr. Dubois was so employed? --

5    A    I was.

6    Q    -- that he spoke with Mr. Dubois and he

7         said, "We can't allow emergency room MRIs

8         for financial considerations," would you be

9         in a position to dispute Dr. Taylor's

10        testimony?

11              MS. HOSKINS:

12                   Object to the form.

13              MR. BLANKENSHIP:

14                   Object to the form.

15   A    I have no idea what conversation he had with

16        Brady.

17   Q    Would you have any reason to doubt

18        Dr. Taylor?

19              MR. BLANKENSHIP:

20                   Same objection.

21   Q    So it seems that you, Dr. Alam and

22        Dr. Taylor all agree that it's very

23        difficult to obtain an MRI from the

24        emergency room.  Is that correct?

25   A    That's correct.

*Linda Perot, CCR*

15

MR. BLANKENSHIP:

Object to the form.

Q   And as we discussed before, I'm a lawyer. I'm not a doctor.  Tell me, if I come to you and I present with something, some conditions, and you say, "I want this test run," where do you go?  Is it a computer screen?  Is it a station where you write handwritten notes?

A   It's a computer screen.

MS. HOSKINS:

Just for clarification, you're talking about if you present to NLMC emergency room?

MR. WOODARD:

I think he understands the question.

Q   You can go ahead.

A   Yeah.  We have a system called MEDHOST that we do all of our documentation and we order our tests through MEDHOST.

Q   Okay.  And MEDHOST is electronic?

A   Correct.

Q   And if you want to order a CT scan, you can press a button?

A   Correct.

*Linda Perot, CCR*

16

Exhibit "1"

1   Q   Are there any other type of diagnostic
2       images you can order with the press of a
3       button?
4   A   X-rays, some ultrasound.
5   Q   But there is no button on MEDHOST for MRIs?
6   A   There is not, not that I'm aware of.
7   Q   How often do you see or use that MEDHOST
8       software?
9   A   Every day.
10  Q   Daily?  And you've never --
11  A   Every day that I work, yes.
12  Q   Poor question.  And you've never noticed an
13      MRI button?
14  A   I have not.
15  Q   Have you ever inquired as to why there is no
16      MRI button?
17  A   I have not.
18  Q   Do you have any idea as you sit here today
19      why there is no MRI button?
20  A   It's just not a modality we use in the
21      emergency department.
22  Q   I can't remember their first names, but are
23      you familiar with Ms. Burns and Ms. Goss?
24  A   Yes.  Sandy Goss.
25  Q   Sandy Goss?

*Linda Perot, CCR*

17

1    A    Sandy Goss is her name.

2    Q    Okay.

3    A    I don't know who Burns is.

4    Q    Would you agree if they said all other

5         departments can order an MRI electronically

6         except the emergency room?

7              MR. BLANKENSHIP:

8                   Object to the form.

9              MS. HOSKINS:

10                  Object to the form.

11   A    I have no knowledge of other departments.

12   Q    Are you aware of any MRIs ever being ordered

13        from the emergency room by any physician?

14   A    I am not.

15   Q    And how long have you been at Northern?

16   A    On and off since 2005.

17   Q    Would it be fair to say that the ordering of

18        MRIs from the emergency department at

19        Northern is discouraged?

20             MR. BLANKENSHIP:

21                  Object to the form.

22   A    I've never been discouraged.  It's just not

23        something that's typically available to us.

24   Q    Are you aware of -- let me ask this.  Have

25        you ever made any complaints to hospital

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647 acourtreporter2@gmail.com

Exhibit "1"

1       administration that you would like to have

2       the option for an MRI?

3    A   I have not.

4    Q   Are you aware of any physicians who have

5       made such a complaint?

6    A   I am not.

7    Q   And you've never requested an MRI out of the

8       emergency room?

9    A   I have not.

10   Q   But since 2005, you have had some patients

11      where they presented with symptoms where you

12      would have like to have obtained an MRI?

13          MS. HOSKINS:

14              Object to the form.

15   A   Normally, I can rule in or out conditions

16      with what's available to me in CAT scan or

17      plain x-ray enough to give the patient a

18      really need to be for that MRI.  So through

19      the nature of MRI, it's not something that

20      we can do quickly in the emergency room.

21   Q   The MRI machine is right down the hallway

22      from the emergency department.  Correct?

23   A   I honestly don't know.

24   Q   If Dr. Taylor testified that the MRI machine

25      is right down the hallway from the emergency

*Linda Perot, CCR*

19

1        department, would you be in any position to

2        dispute that?

3  A  I would not.

4  Q  If Dr. Taylor testified that "This is the

5        21st Century; we ought to be able to obtain

6        an MRI from the emergency department," would

7        you agree with that?

8           MR. BLANKENSHIP:

9               Object to the form.

10         MS. HOSKINS:

11             Object to the form.

12  A  That's his statement.  I don't -- I've never

13        worked in an emergency room where MRI was

14        available to me.

15  Q  How many emergency rooms have you worked in?

16  A  Six or seven.

17  Q  If a hospital advertises and markets that it

18        has MRIs available for all patients,

19        inpatients and outpatients, would it be fair

20        for patients to expect that they can obtain

21        an MRI from the emergency room?

22           MR. BLANKENSHIP:

23              Object to the form.

24         MS. HOSKINS:

25             Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   It's not an emergency procedure.

2   Q   I understand.  But my question was, if a

3       hospital advertises that they provide MRIs

4       for all patients, inpatients, outpatients,

5       emergency, non-emergency, would it be fair

6       for patients to expect that they can obtain

7       an emergency room MRI?

8           MR. BLANKENSHIP:

9               Same objection.

10  A   I don't really know how to answer that.  I

11      mean, they can advertise whatever they want,

12      I suppose.  It's just not something we use

13      through the emergency room.  It's available

14      for inpatients; it's available for

15      outpatients.  But whatever they advertise,

16      it's just not something we do in the ER.

17  Q   But you wouldn't condone it as a good

18      medical practice to falsely advertise what

19      services a hospital can or can't offer.

20      Correct?

21          MS. HOSKINS:

22              Object to the form.

23          MR. BLANKENSHIP:

24              Object to the form.

25  A   Correct.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    Are you -- do you have any knowledge at all
2         about the case that I'm here on today?
3    A    I do not.
4    Q    Have you ever heard of Jordan Scott?
5    A    I've heard the name strictly because I know
6         that's the case that I'm here for today.
7    Q    Are you aware she's a patient who presented;
8         at the time, she was twelve years old?  And,
9         according to Dr. Taylor's testimony, he
10        wanted an MRI at around 9 a.m. and an MRI
11        was not conducted until nearly 3 p.m.?
12            MS. HOSKINS:
13                Object to the form.
14            MR. BLANKENSHIP:
15                Same objection.
16   A    I have no knowledge of the case.
17   Q    Are you aware that that girl is now
18        paralyzed for the rest of her life?
19   A    I am not.
20   Q    Would you agree that's a tragic case?
21            MR. BLANKENSHIP:
22                Object to the form.
23            MS. HOSKINS:
24                Object to the form.
25   A    I do agree.

*Linda Perot, CCR*

22

1   Q   Doctor, you are trained to help people.

2       Correct?

3   A   Correct.

4   Q   You're not trained on how to give

5       depositions?

6   A   I'm not.

7   Q   Right now, you're thinking about "What am I

8       going to do once I get out of this

9       deposition and what am I going to walk into

10      in the emergency department?" Correct?

11  A   I don't work today, thankfully.

12  Q   You're not working today. If you were

13      working today, you walk in every day not

14      knowing what's going to present itself?

15  A   Correct.

16  Q   You're holding a cup of coffee in your hand.

17      When you're working, you may be drinking a

18      cup of coffee, and then all of a sudden

19      things go from tranquil to a gunshot wound

20      comes in and you've got all hands on deck?

21  A   Correct.

22  Q   And you've got to use your expertise, your

23      medical judgment to try to help that person?

24  A   Correct.

25  Q   You've got to assess the situation, diagnose

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1      the problem, and then treat the problem.

2      Correct?

3   A  Correct.

4   Q  And you've been educated.  You've been

5      trained.  You have experience to help deal

6      with those medical issues?

7   A  Correct.

8   Q  Is it true that sometimes business decisions

9      can get in the way of you exercising -- or a

10     doctor exercising his medical judgment?

11         MS. HOSKINS:

12             Object to the form.

13         MR. BLANKENSHIP:

14             Object to the form.

15  A  Not with me.

16  Q  Have you ever wanted to do something,

17     provide treatment to a particular patient

18     and been handcuffed by a particular

19     administrative or business decision?

20  A  Yes.  I'm sure that I have, but I can't

21     think of a specific example.

22  Q  And that's more of where I was going with my

23     question.  Again, I'm asking you to assume

24     instead of making you read all this

25     deposition testimony.  I'm trying to move

*Linda Perot, CCR*

24

Exhibit "1"

1    things along so you can get out of here.  If

2    Dr. Taylor testified he wanted to order an

3    MRI as early as, say, 9 a.m., he made the

4    request to order an MRI, he was denied his

5    request for an MRI, and when he was told why

6    his requests were denied it was because of

7    administrative financial consideration.  I

8    want you to assume those things.  If that's

9    true, would that be an instance where a

10   physician's medical judgment was being

11   handcuffed by a business decision?

12       MR. BLANKENSHIP:

13           Object to the form.

14       MS. HOSKINS:

15           Object to the form.

16   A   Assuming all those things are true, yes, it

17       would be.

18   Q   Okay.  And sometimes, those business or

19       administrative decisions are made by people

20       who never went to medical school like you?

21       MR. BLANKENSHIP:

22           Object to the form.

23   A   Yes.

24   Q   People who never went to medical school like

25       Dr. Taylor or Dr. Alam.  Correct?

*Linda Perot, CCR*

25

1    A    Correct.

2    Q    And sometimes, those administrative and

3         business decisions are made without any

4         consultation with people who went to medical

5         school such as yourself, Dr. Alam and Dr.

6         Taylor?

7              MR. BLANKENSHIP:

8                   Object to the form.

9    A    Yes.

10   Q    And when those decisions are adopted, y'all

11        pretty much have to just go with the hands

12        you are dealt.  Correct?

13   A    Correct.

14   Q    Okay.  Again, I'm asking you to accept as

15        true Dr. Taylor's testimony that Mr. Dubois

16        told him, "We, as a hospital, cannot grant

17        or order MRIs from the emergency room for

18        financial considerations."  Assuming that is

19        true, would it be fair to say that that

20        policy does not involve an assessment of

21        each particular patient's condition?

22             MR. BLANKENSHIP:

23                  Object to the form.

24             MS. HOSKINS:

25                  Object to the form.

*Linda Perot, CCR*

1  A   If it's a global policy, then I guess it
2      doesn't involve individual patients.
3  Q   And if Jordan Scott presented --
4          MR. WOODARD:
           Y'all help me.   August 19th?
5          MR. BLANKENSHIP:
6              That's right.
7  Q   If Jordan Scott presented August 19th of
8      2014 and that policy I'm asking you to
9      assume exists, that would not have been
10     applied for her specific case.   Correct?
11         MR. BLANKENSHIP:
12             Object to the form.
13
14 A   Correct.
15 Q   It wouldn't have been applied during the
       scope of her particular treatment?
16         MR. BLANKENSHIP:
17             Same objection.
18
19 A   I suppose.
20 Q   If that policy exists, that would be an
21     administrative or a business decision
22     without consideration of any medical
23     judgment?
24         MS. HOSKINS:
25             Object to the form.

*Linda Perot, CCR*                                    27

Exhibit "1"

1    MR. BLANKENSHIP:

2         Same objection.

3    A    If it exists, yes.

4    Q    And I think you used the word "globally."

5    If it's applied globally or universally,

6    that would mean that it's being done so

7    without specific considerations of each

8    specific patient.   Correct?

9    A    Correct.

10   Q    And if Dr. Taylor says the policy exists and

11   the hospital says it doesn't exist, that

12   would require a credibility call between the

13   two.   Correct?

14        MS. HOSKINS:

15             Object to the form.

16        MR. BLANKENSHIP:

17             Object to the form.

18   A    I suppose.

19   Q    I'm trying to move along.

20        MR. WOODARD:

21             I'm going to show you what's been

22   marked as "Exhibit 5."

23   Q    Are you aware that Northern Louisiana

24   Medical Center has a website?

25   A    Not directly, no.   I've never seen it.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647 acourtreporter2@gmail.com

Exhibit "1"

1   Q   I'll represent to you that this is taken off

2       Northern's website.  Do you see the top

3       line?  It says, "Magnetic Resonance

4       Imaging?"

5   A   I do.

6   Q   Is that what lay folks like me refer to as

7       an MRI?

8   A   Yes.

9   Q   Look in the second paragraph.  It says,

10      "Northern has been offering MRIs as a part

11      of the diagnostic imaging department since

12      1994, and today we serve both inpatients and

13      outpatients."  Do you see that?

14  A   I do.

15  Q   When Jordan Scott was presenting to the

16      emergency department in August of 2014,

17      would she be considered an inpatient or an

18      outpatient?

19  A   She was an emergency room patient.

20  Q   So inpatient?

21  A   She doesn't really fall into either

22      category.

23  Q   Assuming she was admitted?

24  A   If she was admitted, she would be an

25      inpatient.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   Q   Okay.  And you see 1994.  If Dr. Taylor
2       testified that, "Look, this is the 21st
3       Century; we ought to be able to have access
4       to an MRI," that would be consistent with
5       Northern's own website.  Correct?
6           MR. BLANKENSHIP:
7               Object to the form.
8   A   Correct.
9           MR. WOODARD:
10              I next want to show you "Exhibit 6,"
11          which is another caption of Northern's
12          website.
13  Q   Look at the top.  It says, "Diagnostic
14      Imaging."  Correct?
15  A   Yes.  Correct.
16  Q   And if you see down toward the bottom, it
17      says, "Why should I have my imaging exam
18      done in an accredited facility?"  Northern
19      is an accredited facility.  Correct?
20  A   I don't know.
21  Q   Okay.  According to this website?
22          MR. BLANKENSHIP:
23              Object.  Speaks for itself.
24          MR. WOODARD:
25              That's fair.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   Q   Do you see the line I've highlighted there,

2       "ACR gold standards of gold seals of

3       accreditation?"

4   A   I do.

5   Q   ACR, is that the American College of

6       Radiology?

7   A   Yes.

8   Q   Are you aware that accreditation is required

9       for providers that bill for MRIs under

10      Medicare?

11  A   I am not.

12          MR. WOODARD:

13              I want to show you "Exhibit 8."

14  (OFF RECORD DISCUSSION.)

15  Q   "Exhibit 8" is entitled *The ACR*

16      *Appropriateness Criteria*.  Do you see that?

17  A   I do.

18  Q   And again, that's the American College of

19      Radiology?

20  A   Yes.

21  Q   And whenever you, as an emergency room

22      physician, want to order diagnostic imaging,

23      do you work with your radiology department?

24  A   I do.

25  Q   Okay.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

MR. WOODARD:

I now want to show you "Exhibit 9," which is a screen shot from another part of that article.

Q  It looks like the ACR has defined "appropriateness" on when imaging is or is not required.  Do you see that highlighted paragraph at the top?

A  I do.

Q  And in the paragraph toward the bottom, that speaks to rating appropriateness.  Do you see that?

A  I do.

Q  Do you see the highlighted line toward the bottom that says, "The direct or indirect cost of a procedure are not considered as a risk or harm when determining -- " quote, unquote, " -- 'appropriateness'."

A  I do.

Q  Does that make sense to you?

A  Yes.

Q  And do you think that's how things ought to be, especially in the emergency department, considerations based on a financial -- or excuse me.  Strike that.  Financial

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

considerations should not be considered when deciding which treatment to offer to a particular patient?

    **MS. HOSKINS:**

       Object to the form.

    **MR. BLANKENSHIP:**

       Same objection.

A   I do.

Q   You do agree with that?

A   I do agree with it.

Q   And I'm not trying to trick you.  If you look at "Exhibit 9," I have one question here.  The top paragraph, "The concept of appropriateness as applied to health care."  It's the second sentence of the first paragraph.  Do you see that?

A   I do.

Q   Do you understand the difference, if any, between appropriateness and health care, or does there appear to be a difference in this article between appropriateness and the practice of medicine?

A   I'm not sure what you mean.

Q   I'm not sure what I mean either.  What does that sentence mean to you?

1    A    They are defining appropriateness in the

2         setting of health care.

3    Q    And in that definition, they say costs are

4         not to be considered.   Correct?

5              MR. BLANKENSHIP:

6                   Object to the form.

7    A    I don't believe it mentions cost at all in

8         that paragraph.

9    Q    I'm sorry.   In the writing appropriate

10        paragraph.

11   A    Yes.

12   Q    Have you ever heard of precertification?

13   A    I have.

14   Q    What is your understanding of what

15        precertification means?

16   A    I think it's normally when someone has a

17        test that's ordered on a non-emergency basis

18        and the insurance company can require sort

19        of oversight to see if that procedure is

20        appropriate.

21   Q    Precertification is required or used in non-

22        emergent basises?

23   A    That's my understanding.

24             MR. BLANKENSHIP:

25                  Object to the form.

*Linda Perot, CCR*

34

Exhibit "1"

1   Q   Is it your understanding that requiring

2       precertification in emergency basis would be

3       inappropriate?

4          MR. BLANKENSHIP:

5            Object to the form.

6   A   Yes.

7   Q   And it would be inappropriate because it

8       would delay or deny possibly pressing or

9       emergency medical needs to inquire into

10      insurance?

11  A   Yes.

12  Q   And I'm guessing, as an emergency room

13      physician, you are trained and educated on

14      what I would call EMTALA?

15  A   Yes.

16  Q   What is your understanding of what EMTALA

17      is?

18  A   It's a series of laws or rules, I guess,

19      that state that we have to do everything

20      within our power to determine that somebody

21      is medically stable before you would then

22      deny treatment to them, I suppose, or refer

23      them somewhere else for treatment.

24  Q   Right.  And you've been trained on that.

25      You've been educated on that.  And you've

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   been told, as an emergency room physician,

2   you have different duties than a non-

3   emergency doctor.  Correct?

4   A   Correct.

5       MS. HOSKINS:

6           Object to the form.

7   Q   And those duties include you can't dump a

8   patient just because he or she doesn't have

9   insurance or money.  Correct?

10  A   Correct.

11  Q   And you can't deny screening examinations to

12  a patient just because he or she does not

13  have money or insurance.  Correct?

14  A   Correct.

15  Q   If there is necessary treatment that's

16  available, you provide it without regard for

17  insurance or for payment.  Correct?

18  A   Correct.

19  Q   In your training and education of EMTALA,

20  are you trained or informed on how to

21  identify when there has been an EMTALA

22  violation?

23  A   Yes.  I think so.

24      MR. WOODARD:

25          On "Exhibit 10," I have another

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   screen shot from Northern's website on

2   the precertification issue.  This seems

3   to echo what you were saying.  It says,

4   "You may preregister online at least

5   three business days in advance of your

6   requested procedure date."  That does

7   not seem to speak to emergency

8   procedures.  Correct?

9   MR. BLANKENSHIP:

10  Object to the form.  It speaks for

11  itself.

12  A   Correct.

13  Q   Emergencies, you don't get three day's

14  notice.  Correct?

15  A   Correct.

16  Q   And so, applying this precertification in an

17  emergency setting would be kind of a square

18  peg in a round hole?

19  A   Correct.

20  MS. HOSKINS:

21  Excuse me.  Do you want to turn your

22  speaker down?

23  (OFF RECORD DISCUSSION).

24  MR. WOODARD TO MR. SHOENFELT:

25  Hey, Oscar.

*Linda Perot, CCR*

37

1   MR. SHOENFELT:

2       Yes?

3   MR. WOODARD:

4       Mute your phone for me.  And I'm not

5   trying to hush you up, just in case you

6   need to engage.

7   MS. HOSKINS:

8       Just for clarification, Oscar is on

9   your cell phone listening.

10  MR. WOODARD:

11      That's right.

12  MR. WOODARD:

13      Now, "Exhibit 11" is a screen shot

14  from Northern's website.

15  Q   And this also seems to echo what you were

16  saying.  The part at the bottom, "If you

17  don't have insurance, no one will be denied

18  necessary medical care due to lack of

19  insurance or inability to pay."  Do you see

20  that?

21  A   I do.

22  Q   That's what you've been trained to do as an

23  ER physician?

24  A   Correct.

25  Q   That's consistent with your Hippocratic

*Linda Perot, CCR*

38

1        oath?

2    A   Correct.

3    Q   And a policy or a practice or even a single

4        instance in violation of that would

5        constitute an EMTALA violation.   Correct?

6            MS. HOSKINS:

7                Object to the form.

8            MR. BLANKENSHIP:

9                Object to the form.

10   Q   I can rephrase the question.   Accepting

11       Dr. Taylor's testimony as true that there

12       was an emergency condition, that the MRI was

13       available, that the MRI was requested, that

14       the MRI was denied because of insurance

15       inquiries, it's your understanding that

16       would result in an EMTALA violation.

17       Correct?

18           MS. HOSKINS:

19               Object to the form.

20           MR. BLANKENSHIP:

21               Object to the form.

22   A   Yes.

23           MR. WOODARD:

24               "Exhibit 12."

25   Q   Northern Louisiana Medical Center represents

*Linda Perot, CCR*

39

1
2

on its website the thirty minutes or less
pledge.  Have you ever seen that?

3   A   I have.

4   Q   And that basically says you're going to get
5       meaningful service within thirty minutes.
6       You're going to be treated on an as-needed
7       basis based on the severity of the condition
8       presented.  Correct?

9           MS. HOSKINS:

10              Object to the form.

11          MR. BLANKENSHIP:

12              Object to the form.

13  A   I think what it means is that you will be
14      seen and triaged within thirty minutes of
15      your arrival to the emergency department.

16  Q   You will be seen and triaged within thirty
17      minutes.  And then, after that, you're going
18      to be pigeonholed into, okay, here is a
19      runny nose, and then on the other end of the
20      continuum we've got a heart attack or
21      neurological deficits, something like that.
22      Correct?

23  A   Correct.

24          MR. BLANKENSHIP:

25              Object to the form.

*Linda Perot, CCR*                                    40

Exhibit "1"

1   Q   With this thirty-minute pledge in mind, if
2       Dr. Taylor testified that he wanted an MRI
3       for a twelve-year-old girl with neurological
4       deficits in her hands and feet as early as
5       9 a.m. and she did not obtain the MRI until
6       3 p.m., do you think that would be
7       consistent with the thirty-minute pledge?

8           MS. HOSKINS:
9               Object to the form.

10          MR. BLANKENSHIP:
11              Object to the form.

12  A   I don't think the pledge applies to that as
13      long as she was seen and triaged within
14      thirty minutes of her arrival to the ER.

15  Q   Okay.  Do you think that would be
16      consistent, the scenario I just gave to you,
17      MRI requested as early as 9 a.m., not
18      conducted until 3 p.m. with emergency
19      progressing neurological deficits in a
20      twelve-year-old girl?  Do you think that gap
21      in time is consistent with best practices at
22      Northern Louisiana Medical Center's
23      emergency department?

24          MS. HOSKINS:
25              Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

MR. BLANKENSHIP:

    Object to the form.

A   Again, an MRI is not something that is available to us through the emergency room.

Q   Fair point.  That would be an instance where, assuming those facts as true, request at 9:00, MRI finally given at 3:00, if you accept Dr. Taylor's testimony, he was doing everything he could to try to get the MRI in that time frame.  But because of a business decision at the hospital, he could not get it, --

MR. BLANKENSHIP:

    Object to the form.

Q   -- assuming those facts as true.  Is that correct?

A   That's correct.

Q   Now, I know you feel like you're probably banging your head against the wall and I'm almost done, but it's my understanding you say "MRIs can't be ordered from the emergency room department because that's not a modality we use."  Is that a fair characterization of your testimony?

A   Yes.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    And you don't know -- you don't know why
2         that's something that's not available to
3         y'all?
4              MS. HOSKINS:
5                   Object to the form.
6              MR. BLANKENSHIP:
7                   Same objection.
8    A    No, not directly.
9    Q    Can you think of any legitimate reason if
10        the radiology department is right down the
11        hall, the MRI machine is right down the
12        hall, why you can't have access to that in
13        the special cases where you may need it as
14        an emergency room physician?
15             MS. HOSKINS:
16                  Object to the form.
17             MR. BLANKENSHIP:
18                  Same objection.
19   A    I don't know exactly how to answer that.
20        It's just always been we try to use another
21        modality that's faster in itself to try to
22        rule out emergency conditions.  A CT can be
23        done in a few minutes whereas an MRI takes,
24        you know, a half hour or an hour, you know,
25        to do the procedure.  So typically, we use

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    the faster modality to try to rule in or out
2    an emergency condition, and then move on to
3    the next step.
4    Q    But there are certain things that an MRI
5    will pick up that a CT scan will not pick
6    up.  Correct?
7    A    Correct.
8    Q    And, say, blood thickness, the density of
9    blood around, say, a spinal cord.  That may
10   be an incident where you can run a CT scan
11   and it won't pick up, but an MRI would
12   definitely pick that up.  Correct?
13   A    I'm not a radiologist, so I'm not sure about
14   that.
15   Q    Sure.
16   A    My understanding is that I think blood --
17   acute blood shows up fairly well on a CAT
18   scan, but there certainly may be things that
19   an MRI would pick up that a CAT scan can't.
20   Q    Which test is typically more expensive, a CT
21   scan or an MRI?
22   A    I have no direct knowledge of that.
23   Q    Do you have any knowledge -- when you say
24   you have no direct knowledge, do you have
25   any indirect knowledge?

*Linda Perot, CCR*

44

Exhibit "1"

1   A   No, not really.  I honestly have no idea

2       what things cost.

3   Q   Okay.  Who would be the best person to ask

4       that?

5   A   I guess someone in the billing department.

6       I don't -- I don't really know.

7   Q   Who is in charge of the billing department?

8   A   I have no idea.

9   Q   You don't know?

10  A   No.

11  Q   It sounds like you walk into work like I do,

12      ready to get in and get out.

13  A   That's right.

14  Q   But I think you said, in an ideal world, you

15      would like to have the option to press a

16      button and get an MRI if a particular case

17      came in front of you and you decided you

18      wanted one.  Correct?

19          MR. BLANKENSHIP:

20              Object to the form.

21          MS. HOSKINS:

22              Object to the form.

23  A   Yes.

24  Q   You said an MRI can take thirty minutes to

25      an hour to conduct?

*Linda Perot, CCR*

45

Exhibit "1"

1   A   Yes.

2   Q   And a CT scan about fifteen minutes?

3   A   Closer to five, probably, for most CTs.

4   Q   Okay.  What about an x-ray?

5   A   A few seconds.

6          MR. WOODARD:

7              Can we go off the record real quick?

8   I'd like to talk with my counsel.

9          MS. HOSKINS:

10             Sure.

11         MR. BLANKENSHIP:

12             Sure.

13  (OFF RECORD.)

              EXAMINATION

14

15  BY MR. WOODARD, continuing:

16  Q   All right.  Doctor, a few more questions and

17  you're off.  If a -- I want you to put

18  yourself in Dr. Taylor's shoes.  If a young

19  twelve-year-old girl comes in with

20  progressing neurological deficits in her

21  hands and feet and you have reason to

22  believe there is a compression of the cord

23  which would require an MRI, what would you

24  do to try to get an MRI ordered and

25  conducted for that patient?

*Linda Perot, CCR*                              46

MS. HOSKINS:

    Object to the form.

MR. BLANKENSHIP:

    Same objection.

A  Assuming all of those things, should have two options.  I could probably call and try to talk to the radiologist directly and see if that's something that we could get done, or transfer her to a facility where an MRI is routinely available, assuming I knew all of this.

Q  And who would you call when you say "and talk to the radiologist"?

A  Whoever was on duty for that day.  Or I may call and try to talk with the orthopaedic surgeon to see if they could order the MRI.

Q  And if the request to radiology and the request to another physician were denied, you would then say, "Look, I recommend this patient for transfer"?

A  Assuming all of those things, yes, probably.

Q  Okay.  Are there any written rules on when you can order an MRI from the emergency room?

A  I don't know.  I have not seen a written

1    rule.

2  Q   And remind me.  You've been here off and on

3      since 2005?

4  A   I have.

5  Q   Any training on when you can or cannot order

6      an MRI from the emergency room?

7          MR. BLANKENSHIP:

8              Here at the hospital or in general

9          as part of his medical training?

10 Q   I think he understands the question.

11 A   No.  I don't think there's any specific

12     training.  It's just sort of what I've

13     experienced in practice.

14 Q   Is it your understanding that a patient has

15     to be admitted to obtain an MRI?

16 A   At this facility.

17 Q   At Northern?

18 A   Correct.  Or done on an outpatient basis.

19 Q   Which would be a non-emergency setting.

20 A   Correct.

21 Q   So, the only way an emergency room MRI can

22     be conducted at this facility is admitting

23     the patient?

24         MS. HOSKINS:

25             Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

MR. BLANKENSHIP:

Join the objection.

A   That wouldn't be an emergency room MRI.

Q   Sure. You said that an MRI is different from the other tests in that it can be done in fifteen to thirty minutes.  Are there also some additional benefits to MRIs as opposed to a CT scan and an x-ray?

A   Yes, there are things we can see on an MRI that we can't see on the other two.

Q   And that's why I think you used the phrase "ideal world."  You'd like to be able to have that option.  Correct?

MR. BLANKENSHIP:

Object to the form.

A   Correct.

Q   Have you ever discussed with anyone at the hospital -- doctors, nurses, administration why MRIs are not available on the software that you mentioned?

MS. HOSKINS:

Object to the form.

MR. BLANKENSHIP:

Same objection.

A   I have not.

*Linda Perot, CCR*

49

Exhibit "1"

1   Q   When you were a resident, did you ever order

2       an MRI from the emergency room?

3   A   I don't know for sure.  I trained at a much

4       larger facility, so it's possible.

5   Q   Aside from being a slightly longer test, can

6       you think of any other reason as to why you

7       would not be allowed to order an MRI from

8       the emergency room?

9           MR. BLANKENSHIP:

10              Object to the form.

11          MS. HOSKINS:

12              Object to the form.

13  A   Normally, we can rule in or out what we need

14      to based on other modalities.

15  Q   But you would agree, in an emergency

16      department, there's really no such thing as

17      normal.  Correct?  You get new cases every

18      day.

19  A   Correct.

20  Q   All right.  Let me make sure I understand

21      this note from my counsel.  Are you

22      testifying that the emergency department

23      here does not include determining if a

24      patient needs a MRI on an emergency basis if

25      that is available to an in-patient?

*Linda Perot, CCR*

50

Exhibit "1"

1    A    I'm not sure I understand the question.

2    Q    I don't either.  I'll move on.  And again,

3         you said, if you need an MRI, you've got to

4         admit the patient.  Correct?

5    A    Correct.

6    Q    And so, that would be an administrative

7         decision where Northern has not allowed the

8         emergency department to order an MRI.

9         Correct?

10             MR. BLANKENSHIP:

11                 Object to the form.

12             I'm not sure where the decision came from.

13   A    I'm not sure where the decision came from.

13        It's not my decision.

14   Q    You're not aware that it was Dr. Alam's

15        decision?

16   A    No.

17   Q    You're not aware that it was Dr. Taylor's

18        decision?

19   A    No.

20   Q    You're not aware of any physician who said

21        hey, we don't want to be able to order an

22        MRI?

23   A    Correct.

24   Q    Would it be safe to assume that that came

25        from administration?

1  A   Or the radiology department, possibly.

2  Q   And if the radiology department said that

3      was not its decision, it'd be safe to assume

4      that came from the business department or

5      administration at Northern?

6           MR. BLANKENSHIP:

7                Same objection.

8  A   Yes.

9  Q   Would you agree with Dr. Taylor's testimony

10     if he said that minutes can be critical when

11     you're talking about compression of the

12     spinal cord in a patient such as a twelve

13     year old girl with progressing neurological

14     deficits?

15          MS. HOSKINS:

16               Object to the form.

17          MR. BLANKENSHIP:

18               Same objection.

19 A   Yes, I would agree with that.

20 Q   And so, your options that you're allowed as

21     an emergency room physician, if you're ever

22     presented with a situation that requires an

23     MRI, you either call radiology, you call

24     another doctor such as an ortho, or you

25     transfer.  Correct?

*Linda Perot, CCR*                        52

Exhibit "1"

1    A    Yes.

2    Q    And all three of those decision take a

3         significant amount of time.

4    A    Correct.

5    Q    The actual call to radiology, is that you

6         pick up your cell phone and you call them or

7         do you have a phone in your office?

8    A    At the nurses' station.

9    Q    All right.  And if you call her and she

10        denies and says we can't do that, then you

11        call the doctor and he says we can't do

12        that, that's several minutes which have

13        passed.  Correct?

14   A    Correct.

15   Q    And then, if you transfer, where would you

16        transfer the patient?

17   A    Typically, LSU-Shreveport.

18   Q    And that's about an hour and a half drive,

19        if you're booking it.  Correct?

20   A    About an hour.

21   Q    By helicopter, how long are we talking?

22             MR. BLANKENSHIP:

23                  Object to the form.  Calls for

24             speculation.

25   A    I think it's about twenty or thirty minutes.

*Linda Perot, CCR*

53

Exhibit "1"

1  Q   And you're aware of instances where patients

2      have been transferred from here to

3      Shreveport by helicopter?

4  A   Yes.

5  Q   And you're aware of both the time they've

6      left and the time they've arrived,

7      generally?

8  A   Generally.

9  Q   So, it wouldn't call for speculation on your

10     part, would it?

11 A   I suppose not.

12 Q   But those are the only three options you

13     have available, calling radiology, calling

14     another doctor, and transferring the

15     patient.  Correct?

16 A   Correct.

17 Q   And all three of those options take time.

18 A   Correct.

19 Q   Time in a situation, a hypothetical I'll

20     pose to you, where minutes are very

21     critical.

22 A   Correct.

23 Q   Okay.

24          MR. WOODARD:

25              Thank you, Doctor.

*Linda Perot, CCR*

54

Exhibit "1"

1   MS. HOSKINS:

2       Trey?

3   MR. ZEIGLER:

4       No questions.

5   MR. BLANKENSHIP:

6       Good morning, Dr. Calvert.  Again,

7   I'm Kurt Blankenship and I represent the

8   hospital.  I do have some questions for

9   you.

                    EXAMINATION

10

11  BY MR. BLANKENSHIP:

12  Q    Touching on the helicopter flights to

13       Shreveport, you have ridden on those

14       helicopter flights with the patient?

15  A    Not to Shreveport; no, sir.

16  Q    So your understanding of the time frame

17       involved is just a general understanding you

18       have, not based on any personal knowledge of

19       yours.  Correct?

20  A    Yes, sir.

21  Q    All right.  You've said several times in

22       your testimony this morning that you can

23       rule out conditions faster using other

24       modalities than an MRI.  Is that a fair

25       understanding of what you said?

*Linda Perot, CCR*

55

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   Yes.

2   Q   And you've told us that the CAT scan can

3   take just a few minutes; x-rays just a few

4   seconds, and the MRI takes longer, thirty

5   minutes to an hour.

6   A   Yes.

7   Q   So, my sense from what you're saying, my

8   understanding of what you're saying, in

9   general, is that because you're in an

10   emergency room setting, you generally go to

11   the faster tests that you as the physician

12   believes will rule in or out a condition or

13   a possible diagnosis and ascertain faster

14   whether the condition is present or not.

15   Correct?

16   A   Correct.

17   Q   And that's why you would normally order the

18   CT first, because that rules in or out a

19   number of modalities.  Correct?

20   A   Correct.

21   Q   You would agree with me, wouldn't you,

22   Doctor, that a radiologist is, by virtue of

23   his specialized -- his or her specialized

24   training and experience, better qualified

25   than an ER physician to determine what

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   medical conditions are best ruled in and out

2   by an MRI?

3       MR. WOODARD:

4           Object to form.

5   A   They certainly have more specialized

6   training than we do.

7   Q   Okay.  And they have more specialized

8   training in interpreting MRIs than you do as

9   an ER physician.

10  A   Correct.

11  Q   Do you ever, as an ER physician, interpret

12  the MRI itself?

13  A   Not an MRI, no.

14  Q   But you do interpret tests?

15  A   Preliminary interpretations.  They're always

16  over rid by a radiologist.

17  Q   It's fair to say, isn't it, that you rely on

18  the radiologist to give sort of a definitive

19  interpretation of either the CAT scan or the

20  MRI?

21  A   Correct.

22  Q   Now, you were asked what would your options

23  be if a twelve year old girl presented with

24  neurological deficits and you described

25  those for us, and I want to go back over

*Linda Perot, CCR*

57

Exhibit "1"

1    just a couple of them.  First of all, your

2    decision making path would depend, wouldn't

3    it, on a number of things that you as the ER

4    physician learn or see as part of your

5    treatment and examination of the patient.

6    And, by that, I mean first you'd be looking

7    at the history the patient gave you.

8  A    Correct.

9  Q    Then you'd be relying on your clinical

10   assessment of the patient in whether or not

11   neurological deficits are demonstrated.

12   Correct?

13 A    Correct.

14 Q    And then, based on your training and

15   experience, that information, the history

16   and your clinical assessment, would lead you

17   down one of several paths as to what further

18   testing you would want to do to make a more

19   definitive diagnosis.  Correct?

20 A    Correct.

21 Q    And that's the normal course of events for

22   ER physicians when they're treating and

23   examining patients in the ER.  Correct?

24 A    Correct.

25 Q    All right.  And one of those options that's

*Linda Perot, CCR*

58

Exhibit "1"

1      available to you is to consult with a

2      specialist.   Correct?

3   A   Correct.

4   Q   All right.   And there at Northern Louisiana

5      Medical Center, in August of 2014, there was

6      an orthopaedic surgeon available to consult

7      with.   Right?   Dr. Major Blair?

8   A   I'm not certain, you know, who was on call

9      that day or when he -- he's gone from this

10     facility and I don't know when he left.

11  Q   Let me make it just a general question.

12     Generally, are there specialists available

13     to consult with?

14  A   We only have one orthopaedist on staff right

15     now, so he's on call sometimes and he's not

16     other times.   I believe at that particular

17     time there was probably coverage every day

18     for orthopaedics.

19  Q   Okay.   But an orthopaedic surgeon would be

20     one of the types of specialists that you

21     could potentially consult as an ER physician

22     when you're confronted with a suspected

23     spinal cord injury.  Correct?

24  A   Correct.

25  Q   All right.   And that physician may or may

*Linda Perot, CCR*

59

Exhibit "1"

1      not decide to order an MRI himself.

2      Correct?

3   A  Correct.

4   Q  And you've also testified earlier that

5      you've worked in six or seven emergency

6      rooms in the course of your career?

7   A  Yes.

8   Q  When did you start practicing emergency

9      medicine?

10  A  I believe 1999.

11  Q  All right.  And you've been here since 2005.

12     That's what you told us.  Correct?

13  A  Correct.

14  Q  All right.

15        MS. HOSKINS:

16           I think he said "off and on" --

17        MR. BLANKENSHIP:

18           Okay.

19        MS. HOSKINS:

20           -- since 2005.

21        MR. BLANKENSHIP:

22           All right.

23  Q  Have you worked in other emergency rooms

24     that are part of a facility that is

25     comparable to Northern Louisiana Medical

*Linda Perot, CCR*

60

Exhibit "1"

1    Center?  And, by that, I'm just trying to

2    distinguish between a facility like

3    LSU-Shreveport and a facility like just a

4    rural clinic.  You know, there's a spectrum

5    of facilities available.

6  A   Most of the other facilities I have worked

7    at have had more options available than

8    Northern Louisiana Medical Center.

9  Q   Okay.  And when you say "options available,"

10   are you --

11 A   Specialty services available.

12 Q   Right, that's what I was getting at.  You're

13   talking about they might have neurologists

14   on staff or they might have neurosurgeons on

15   staff, things like that.

16 A   Correct.

17 Q   Okay.  Now, you were asked if you were

18   trained to identify EMTALA violations.  And

19   he first asked you -- EMTALA is a federal

20   law, is it not?

21 A   It is.

22 Q   All right.  And you're not trained in the

23   practice of law.  Correct?

24 A   I am not.

25 Q   And you're not called upon to determine

*Linda Perot, CCR*

61

Exhibit "1"

1    whether certain fact scenarios constitute a
2    violation of the law or not.   Correct?
3  A  I'm not.
4  Q  You have a basic understanding as a
5    physician of what EMTALA obligates you as a
6    physician to do.   Correct?
7  A  Correct.
8  Q  And to summarize that obligation, is it fair
9    to say that it's basically to triage and
10    stabilize the patient within the
11    capabilities of the facility.   Correct?
12  A  Correct.
13  Q  And that process, the triage unit and the
14    stabilization of the patient is to be done
15    without consideration for finances.
16    Correct?
17  A  Correct.
18  Q  All right.   And that's what you believe you
19    do here as the ER physician at Northern
20    Louisiana Medical Center.   Correct?
21  A  Correct.
22  Q  You never ask a patient, I'm going to order
23    this test, can you pay for it?
24  A  No, I don't.
25  Q  That's never a consideration for you?

*Linda Perot, CCR*

62

Exhibit "1"

1   A   No, it's not.

2   Q   And I take it that in your practice as an

3        emergency room physician here at the

4        hospital at Northern Louisiana Medical

5        Center, you don't get involved in any

6        decisions about whether a test is going to

7        be paid for by the patient's insurance

8        company or the patient himself or not.

9   A   I don't, no.

10   Q   You're not trained or familiar with the

11        requirements of various health insurers and

12        their contracts with their patients in the

13        hospital.  Correct?

14   A   I am not.

15   Q   You were asked a number of questions about

16        administration making decisions versus

17        physicians making decisions.  Let me phrase

18        it to you this way:  You as the physician,

19        it's your prerogative, isn't it, to assess

20        the patient and make the appropriate

21        diagnosis.  Correct?

22   A   Correct.

23   Q   And it's your prerogative to order what

24        tests you believe are necessary to make that

25        diagnosis, if they're within the capability

1        of the hospital.   Correct?

2    A   Correct.

3    Q   And it's your prerogative as the physician

4        to decide whether a patient could best be

5        treated for a specific condition at another

6        facility.   Correct?

7    A   Correct.

8    Q   And then, recommend or order the transfer.

9        Correct?

10   A   Correct.

11   Q   And that happens all the time for an

12       emergency room physician.   Correct?

13   A   Correct.

14   Q   You said, I believe, that you don't have any

15       knowledge of the specifics of this case.

16       Correct?

17   A   Correct.

18   Q   And just to be clear for the record, you

19       have not reviewed the medical chart for

20       Jordan Scott's visit to the emergency room

21       on August 19, 2014?

22   A   I have not.

23   Q   I believe you said at one point, if I wrote

24       it down correctly, that you've never worked

25       in an ER where the MRI is available.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
1           Correct?
2    A      Correct.
3    Q      So, if that is the policy or the practice
4           here, and I'm not suggesting that it is, but
5           if it is, it's not unusual in your
6           experience, is it?
7    A      Correct.
8    Q      I want to show you, Dr. Calvert, a document
9           that was identified and attached as an
10          exhibit in a previous deposition in this
11          case.  I'll give you a minute to take a look
12          at it, but I'll represent to you while
13          you're looking at it that this is a list of
14          MRIs ordered through the emergency room here
15          at Northern Louisiana Medical Center from
16          roughly 2013 to 2016 that was generated from
17          the hospital's computer system.  And, as you
18          can see, the name of the patient is redacted
19          from this document.  If you look at the
20          first page of this attachment, the third
21          line down indicates that you, yourself,
22          ordered an MRI through the emergency room on
23          April 28th, 2014.  Let me first ask you, you
24          treat, in the course of any shift in the ER,
25          anywhere from ten or so patients to maybe
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1        multiple tens of patients.  Correct?

2    A   Typically, twenty-five patients or so.

3    Q   And you normally do how many ER shifts a

4        month?

5    A   Sixteen to eighteen.

6    Q   So, just roughly doing the math, you take

7        care of at least several hundred patients

8        per month every month.  Correct?

9    A   Correct.

10   Q   And it would be straining or taxing the

11       ability of anyone to remember all the

12       specifics of the patients that they treat.

13       Correct?

14   A   Correct.

15   Q   All right.  So, with that by way of

16       background, first let me ask if you

17       specifically recall ordering a brain MRI

18       without contrast for a patient on

19       April 28th, 2014?

20   A   I do not.

21   Q   But, given this list, do you have any reason

22       to believe that the hospital computer system

23       is inaccurate when it says that such an MRI

24       was ordered?

25   A   I do not.  But my suspicion is that that was

*Linda Perot, CCR*

66

Exhibit "1"

1       ordered as an in-patient.

2   Q   Okay.  There's a code that allows us to

3       determine whether they were in-patient or

4       outpatients but it shows you as the ordering

5       physician.  Correct?  And the other people

6       listed in the ordering physician column, let

7       me ask you about some of these.  First of

8       all, you'll notice that Dr. Alam's office --

9       I mean, name appears many times.  Do you see

10      that?

11  A   I do.

12  Q   Are you familiar with Dr. Holly Kidd?

13  A   I am.

14  Q   And who is that?  Is that another ER

15      physician?

16  A   No, it's not.  She's a Green Clinic Internal

17      Medicine doctor.

18  Q   All right.  And Dr. Martin Blackwelder?

19  A   Green Clinic Internal Medicine.

20  Q   You see Dr. Taylor's name there?

21  A   I do.

22  Q   And then, Dr. Jacqueline White?

23  A   I do.

24  Q   Who is that?

25  A   She's an emergency room doctor.

*Linda Perot, CCR*

67

1  Q    And what about Dr. Beau Burton?

2  A    He's a -- I believe a nurse practitioner in

3       the ER.

4  Q    Okay.  Does he work with your group?

5  A    He does.

6  Q    Or for your group?  All right.  And

7       Dr. Regan Bonan?

8  A    Green Clinic Internal Medicine.

9  Q    Okay.  So, we've seen enough names to know

10      that the ordering physician here is a

11      mixture of Green Clinic Physicians and ER

12      physicians.  Correct?

13 A    Correct.

14 Q    All right.  And the list speaks for itself,

15      but you can verify for us, can't you, that a

16      number of the MRIs shown ordered here are of

17      the cervical spine.  Correct?

18 A    Yes.  It looks like three of them.

19 Q    Okay.  And then some are of the lumbar

20      spine.  Correct?

21 A    Correct.

22 Q    At least one is of the thoracic spine.

23 A    Correct.

24 Q    And then, a lot of them are either of the

25      head or the brain.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    A    Correct.

2    Q    Okay.  Does it happen sometimes,

3         Dr. Calvert, either in the emergency room

4         here at Northern Louisiana Medical Center or

5         others that if you believe an MRI might be

6         appropriate for a patient for whatever

7         reason, that you would call the radiologist

8         on duty and say, hey, I've got a patient

9         here.  This is what I'm seeing.  I think

10        maybe an MRI is in order.  What do you

11        think?  Does that happen?

12   A    Yes.

13   Q    All right.  And under those circumstances,

14        does the radiologist sometimes respond that

15        yeah, I agree.  Send him up.  We'll do an

16        MRI.  Or, try this first or anything like

17        that?

18   A    I can't remember a specific instance but,

19        yes, they would go over the possibilities,

20        you know, of potential things that we could

21        do to try to take care of the patient.

22   Q    Okay.  Is it fair to say that the

23        radiologist, the physician radiologist is

24        sort of the gatekeeper for determining

25        whether an MRI is appropriate for a patient?

*Linda Perot, CCR*

69

1   A   I'm not sure that I would use the term
2       "gatekeeper," but they have, certainly, more
3       training to know whether the test is
4       appropriate or not.
5   Q   Okay.  You were asked a number of questions
6       about whether you had ever discussed the
7       unavailability, as you described, of MRIs
8       here with either administration or other
9       physicians, and I want to ask you about
10      that.  First of all, to use the term
11      "unavailability," it has different meanings
12      in my mind, so I want to clarify that.  An
13      MRI machine is present here in the hospital.
14      Correct?
15  A   Yes.
16  Q   And MRIs can be physically performed here in
17      the hospital.  Correct?
18  A   Correct.
19  Q   So, another way of saying "unavailability,"
20      as you've been describing it, of saying is
21      it's not normally ordered through the ER?
22      An MRI is not normally ordered through the
23      ER?
24  A   I have not ever ordered an MRI from the
25      emergency room.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    That you recall?

2    A    I have not ever ordered an MRI other than on

3         an in-patient.

4    Q    Even though this computer sheet shows that

5         it was ordered for --

6              MR. WOODARD:

7                   Object to form.  He's stated he

8              thinks that was an in-patient.

9    Q    I think you said you suspect it was an

10        in-patient.

11   A    It's not possible for me to order an MRI

12        from the emergency room; so if this shows up

13        under my name, chances are that was an MRI

14        written on admission orders.  And I write

15        for those every day.

16   Q    For a patient that is going to be admitted.

17   A    For a patient who's going to be admitted.

18   Q    Right.  And when you write the admission

19        orders under those circumstances, is that an

20        order that you, yourself, are generating,

21        for lack of a better way to describe it, or

22        is that an order that comes from another

23        physician?

24   A    I think technically it's from another

25        physician because we don't have admitting

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
 1              privileges to the hospital.  As sort of part
 2              of the customary procedure, we write what
 3              we'll call "bridge orders" to get the
 4              patient admitted to the hospital.  The order
 5              technically comes from me, but it's on
 6              behalf of the admitting physician.
 7    Q    Okay.  It happens, though, sometimes that
 8              you don't' actually talk to the admitting
 9              physician when you're writing the bridge
10              orders, right?  You have sort of a standard
11              protocol for ordering sets of tests for
12              specific kinds of patients, right?
13    A    Yes, but we always discuss admissions with
14              the admitting physician.
15    Q    Okay.
16    A    But yes, there's a typical work up for a
17              heart patient or a --
18    Q    But you don't necessarily have to talk to
19              the admitting physician to know what that
20              is.  Correct?
21    A    Correct.
22    Q    Now, getting back to the questions about
23              discussions, have you ever discussed this
24              unavailability, as you've described it, of
25              the MRIs through the emergency room with
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

| | | |
|---|---|---|
| 1 | | other physicians here? |
| 2 | A | Not that I recall. |
| 3 | Q | Because, again, in your experience, it's not |
| 4 | | that unusual, right? |
| 5 | A | Correct. |
| 6 | Q | And I'm not sure you were asked this |
| 7 | | specific question, so I want to ask it: |
| 8 | | You've never had any discussion with anyone |
| 9 | | in hospital administration about |
| 10 | | unavailability of MRIs through the ER as you |
| 11 | | have described it in this testimony today? |
| 12 | A | I have not. |
| 13 | Q | And I think we know the answer to this |
| 14 | | question but, just to be sure, to get ready |
| 15 | | for this deposition today, you didn't review |
| 16 | | any physical documents.  Correct? |
| 17 | A | I did not. |
| 18 | | MR. BLANKENSHIP: |
| 19 | | Thank you, Dr. Calvert. |
| 20 | | MR. WOODARD: |
| 21 | | I've got a few follow-ups. |
| 22 | | WITNESS: |
| 23 | | Okay. |
| 24 | | MR. WOODARD: |
| 25 | | This sheet, what do you want to mark |

*Linda Perot, CCR*

73

1   this, Mr. Blankenship?

2   MR. BLANKENSHIP:

3       Your last number was ten, I believe,

4   so we can make it eleven.

5   COURT REPORTER:

6       The last number was twelve.

7   MR. BLANKENSHIP:

8       Twelve?  Let's make it "13."

9                        REEXAMINATION

10  BY MR. WOODARD:

11  Q   Okay.  This sheet right here, Doctor,

12      there's nothing showing what time any of

13      these MRIs were ordered.  Correct?

14  A   I don't believe so.

15  Q   There's nothing showing what time any of

16      these MRIs were conducted.  Correct?

17  A   Correct.

18  Q   So, if you're looking at this sheet,

19      Exhibit 13, there could have been a

20      five-minute delay between the order and the

21      MRI or there could have been a five-day

22      delay for all you know.  There is no

23      telling.

24  A   Correct.

25  Q   There's nothing on Exhibit 13 that shows

*Linda Perot, CCR*

74

1  whether these MRIs required precertification

2  or did not require precertification.

3  Correct?

4  A  Correct.

5  Q  And of these few MRIs that purportedly come

6  from the ER in Exhibit 13, it looks like at

7  least seven of them dealt with the spine.

8  Correct?

9  A  Correct.

10  Q  And you understand that the MRI that

11  Dr. Taylor wanted in this case addressed the

12  thumbar area of the spine?

13  MS. HOSKINS:

14  Object to the form.

15  A  Lumbar?

16  Q  "Thumbar."  Thoracic.

17  A  Thoracic.

18  Q  Hey, that's that new area that I invented

19  between thoracic and lumbar.

20  A  I'm not sure what he ordered.  I honestly

21  don't have any knowledge.

22  Q  Assume that he wanted the thoracic area of

23  the spine to be examined.  That would be

24  consistent with the few MRIs that exist on

25  Exhibit 13.  Correct?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   There is a thoracic spine MRI on it.

2   Q   Okay.  And then, several other areas, the

3        cervical and the lumbar.  Correct?

4   A   Correct.

5   Q   And so, that would suggest that at least the

6        brain and the spine are areas where you may

7        need an MRI on certain occasions?

8           MS. HOSKINS:

9              Object to the form.

10          MR. BLANKENSHIP:

11             Same objection.

12   A   Correct.

13   Q   An MRI is a diagnostic screening

14        examination.  Correct?

15   A   I don't know about a "screening"

16        examination.  It's a diagnostic examination.

17   Q   Diagnostic.

18   A   You don't use them to screen for anything

19        that I'm aware of.

20   Q   I said "screening."  Diagnostic imaging

21        examination?

22   A   Correct.

23   Q   And when we were talking about

24        unavailability, it's physically available at

25        Northern Louisiana Medical Center.  Correct?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
1    A    There is a machine here.
2    Q    There is a machine here and it's relatively
3         close to the emergency department.  Correct?
4    A    I'm not aware of it's location.
5    Q    You would not be in a position to dispute or
6         argue with Dr. Taylor whenever he describes
7         where the MRI machine is located?
8    A    I would not.
9    Q    And so, while it's physically available, for
10        all practical respects, it's not available
11        to you in the emergency department.
12        Correct?
13             MR. BLANKENSHIP:
14                  Object to the form.
15   A    Correct.
16   Q    And that's because, due to an administrative
17        business decision, you are not available to
18        press a button and order an MRI from the
19        emergency department?
20             MS. HOSKINS:
21                  Object to the form.
22             MR. BLANKENSHIP:
23                  Object to the form.
24   A    I'm not sure where the decision came from.
25        I just know it's not available.
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

| | | |
|---|---|---|
| 1 | Q | It didn't come from the doctors.  Correct? |
| 2 | A | Correct. |
| 3 | Q | Who orders the software? |
| 4 | A | I assume administration. |
| 5 | Q | And so, if the software is ordered by |
| 6 | | administration and the software doesn't have |
| 7 | | a button that allows you to order an MRI, it |
| 8 | | would be safe to say that administration has |
| 9 | | made the decision to not allow emergency |
| 10 | | room doctors to order an MRI? |
| 11 | | MR. BLANKENSHIP: |
| 12 | | Object to the form. |
| 13 | A | Again, I'm not sure who made the decision |
| 14 | | not to include it. |
| 15 | Q | You've seen no evidence based on the |
| 16 | | software ordered by the administration that |
| 17 | | they want to allow you to be able to order |
| 18 | | an MRI from the emergency room? |
| 19 | | MR. BLANKENSHIP: |
| 20 | | Object to the form. |
| 21 | A | Correct. |
| 22 | Q | We talked about the delay in an MRI, fifteen |
| 23 | | to thirty minutes, typically? |
| 24 | A | That's how long it takes to perform the |
| 25 | | actual MRI. |

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
 1   Q   Okay.  That would, of course, be a shorter
 2       time frame than several hours.  Correct?
 3   A   Correct.
 4   Q   And so, even if it's not the fastest test
 5       available, if under certain circumstances
 6       it's the best test available, that would be
 7       better than having a patient sit around and
 8       wait seven hours.
 9           MS. HOSKINS:
10               Object to the form.
11           MR. BLANKENSHIP:
12               Same objection.
13   A   Correct.
14   Q   Especially a patient with progressing
15       neurological defects.
16   A   Correct.
17   Q   Would it be very frustrating for you as a
18       physician if you were presented with a
19       patient who you thought, in your medical
20       judgment, using your training, your
21       expertise required an MRI and, because of
22       hospital policies and procedures, you were
23       not able to get an MRI?
24           MR. BLANKENSHIP:
25               Object to the form.
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    A    Yes.

2    Q    And would it keep you up at night knowing

3          that that policy has now left a teenage girl

4          paralyzed for the rest of her life?

5          MS. HOSKINS:

6              Object to the form.

7          MR. BLANKENSHIP:

8              Object to the form.

9    A    Yes.

10    Q    You have a daughter yourself.  Correct?

11    A    I do.

12    Q    That would be very troubling to you?

13    A    Yes.

14          MR. WOODARD:

15              No further questions.

16          (WITNESS ELECTED TO READ AND SIGN.)

17

18                   DEPOSITION CONCLUDED AT 9:30 A.M.

19

20

21

22

23

24

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
1                    R E P O R T E R ' S   P A G E

2        I, LINDA PEROT, Certified Court Reporter

3   No. 23012, in and for the State of Louisiana,

4   the officer, as defined in Rule 28 of the

5   Federal Rules of Civil Procedure and/or Article

6   1434(B) of the Louisiana Code of Civil

7   Procedure, before whom this proceeding was

8   taken, do hereby state on the Record:

9

10        That due to the interaction in the

11   spontaneous discourse of this proceeding, dashes

12   (--) have been used to indicate pauses, changes

13   in thought, and/or talkovers; that same is the

14   proper method for a Court Reporter's

15   transcription of proceeding, and that the dashes

16   (--) do not indicate that words or phrases have

17   been left out of this transcript;

18

19        That any words and/or names which could

20   not be verified through reference material have

21   been denoted with the phrase "(spelled

22   phonetically)."

23

24   _____
     LINDA PEROT, CCR No. 23012
25
```

_Linda Perot, CCR_

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

81

Exhibit "1"

**CERTIFICATE**

1

2     This certification is valid only for a

3     transcript accompanied by my original signature

4     And required official seal stamped on this

5     certificate.

6     I, LINDA PEROT, Certified Court Reporter,

7     Certificate No. 23012, as the officer before

8     whom this testimony was taken, do hereby certify

9     that **EDWARD CALVERT, M.D.**, after having been

10    duly sworn by me upon authority of R.S. 37:2554,

11    did appear on the 27th day of July, 2016,

12    commencing at 8:06 a.m., and concluding at

13    9:30 a.m., as hereinbefore set forth in the

14    foregoing 81 pages; that this testimony was

15    reported by me in the stenomask reporting

16    method, was prepared and transcribed by me or

17    under my personal direction and supervision, and

18    is true and correct to the best of my ability

19    and understanding; that the transcript has been

20    prepared in compliance with the transcript

21    format guidelines required by statute and rules

22    of the Board; that I am informed about the

23    complete arrangement, financial or otherwise,

24    with the person or entity making arrangements

25    for deposition services; that I have acted in

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   compliance with the prohibition on contractual

2   relationships, as defined by Louisiana Code of

3   Civil Procedure Article 1434 and rules and

4   advisory opinions of the Board; that I have no

5   actual knowledge of any prohibited employment or

6   contractual relationship, direct or indirect,

7   between a court reporting firm and any party

8   litigant in this matter, nor is there any such

9   relationship between myself and a party litigant

10  in this matter; that I am not related to counsel

11  or to any of the parties hereto, I am in no

12  manner associated with counsel for any of the

13  interested parties to this litigation, and I am

14  in no way concerned with the outcome thereof.

15       West Monroe, Louisiana, on this the 18th

16  day of October, 2016.

17

18

19       _____

20       LINDA PEROT
         CERTIFIED COURT REPORTER
21       CERTIFICATE NO. 23012
         STATE OF LOUISIANA

22

23

24

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094   Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
 1                    WITNESS CERTIFICATE TO

 2              OCTOBER 17, 2016, DEPOSITION OF

 3                    EDWARD CALVERT, M.D.

 4            *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 5

 6        I, EDWARD CALVERT, M.D., deponent in the

 7    foregoing deposition, do hereby certify that the

 8    same was submitted to me for examination; that I

 9    have read the deposition and find it to be a

10    true and correct transcription of the testimony

11    as given by me on October 17, 2016, before Linda

12    Perot, Certified Court Reporter No. 23012, in

13    the matter of Scott, et al. vs. Northern

14    Louisiana Medical Center, et al.,, with the

15    exception of any corrections noted on the

16    attached errata sheet.

17

18        ( ) No Corrections

19        ( ) Corrections

20

21    _____          _____

22    Date                EDWARD CALVERT, M.D.

23

24

25
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

| | | | | |
|---|---|---|---|---|
| DEPOSITION ERRATA SHEET TO OCTOBER 17, 2016 DEPOSITION OF EDWARD CALVERT, M.D. | | | | |
| Page | Line | Now Reads | Should Read | Reason for Change |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_____          _____
(Date)          EDWARD   CALVERT,   M.D.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 1

### A

**a.m** 22:10 25:3
41:5,17 80:17
82:12,13
**ability** 14:7
66:11 82:18
**able** 20:5 30:3
49:12 51:21
78:17 79:23
**accept** 26:14
42:8
**Accepting** 39:10
**access** 30:3
43:12
**accompanied**
82:3
**accreditation**
31:3,8
**accredited** 30:18
30:19
**ACR** 5:11,12,14
31:2,5,15 32:5
**acted** 82:25
**actual** 8:8 53:5
78:25 83:5
**acute** 44:17
**additional** 49:7
**address** 7:9
**addressed** 75:11
**administration**
19:1 49:18
51:25 52:5
63:16 70:8
73:9 78:4,6,8
78:16
**administrative**
24:19 25:7,19
26:2 27:21
51:6 77:16
**admission** 71:14
71:18
**admissions**
72:13
**admit** 51:4
**admitted** 29:23

29:24 48:15
71:16,17 72:4
**admitting** 13:3
48:22 71:25
72:6,8,14,19
**adopted** 26:10
**advance** 37:5
**advertise** 21:11
21:15,18
**advertises** 20:17
21:3
**advised** 6:20
**advisory** 83:4
**ago** 9:3
**agree** 11:15,18
15:22 18:4
20:7 22:20,25
33:9,10 50:15
52:9,19 56:21
69:15
**agreed** 6:2
**ahead** 10:1
16:17
**Alam** 5:4 7:25
8:2,10,12,21
11:15 15:21
25:25 26:5
**Alam's** 9:1
51:14 67:8
**allow** 15:7 78:9
78:17
**allowed** 50:7
51:7 52:20
**allows** 14:6 67:2
78:7
**American** 31:5
31:18
**amount** 12:10
53:3
**and/or** 81:5,13
81:19
**answer** 6:9 9:6
10:11 21:10
43:19 73:13
**answers** 6:16

**appear** 33:20
82:11
**APPEARAN...**
2:1 3:1
**appearing** 2:6
2:17,23 3:5
**appears** 67:9
**applied** 27:11,15
28:5 33:14
**applies** 41:12
**applying** 37:16
**appropriate**
34:9,20 63:20
69:6,25 70:4
**appropriateness**
5:11,12,14
31:16 32:6,11
33:14,19,21
34:1
**appropriatene...**
32:18
**April** 65:23
66:19
**area** 75:12,18,22
**areas** 76:2,6
**argue** 77:6
**arrangement**
82:23
**arrangements**
82:24
**arrival** 40:15
41:14
**arrived** 54:6
**article** 32:4
33:21 81:5
83:3
**as-needed** 40:6
**ascertain** 56:13
**Aside** 50:5
**asked** 9:21
57:22 61:17,19
63:15 70:5
73:6
**asking** 24:23
26:14 27:9

**aspect** 14:13,25
**assess** 23:25
63:19
**assessment**
26:20 58:10,16
**associated** 83:12
**assume** 9:18
11:3 24:23
25:8 27:10
51:24 52:3
75:22 78:4
**assuming** 25:16
26:18 29:23
42:6,15 47:5
47:10,21
**attached** 5:6,7
5:10 65:9
**attachment**
65:20
**attack** 40:20
**attempted** 12:4
12:24
**ATTORNEY**
2:9
**August** 27:5,8
29:16 59:5
64:21
**authority** 82:10
**available** 11:20
11:22,25 12:11
12:13,20,22
18:23 19:16
20:14,18 21:13
21:14 36:16
39:13 42:4
43:2 47:10
49:19 50:25
54:13 59:1,6
59:12 61:5,7,9
61:11 64:25
76:24 77:9,10
77:17,25 79:5
79:6
**Avenue** 1:20
7:11

**aware** 17:6
18:12,24 19:4
22:7,17 28:23
31:8 51:14,17
51:20 54:1,5
76:19 77:4

### B

**back** 11:14
57:25 72:22
**background**
66:16
**banging** 42:19
**based** 32:24
40:7 50:14
55:18 58:14
78:15
**basic** 62:4
**basically** 40:4
62:9
**basis** 10:5 13:15
13:24 34:17
35:2 40:7
48:18 50:24
**basises** 34:22
**Baton** 2:10
**Beau** 68:1
**behalf** 1:6 2:23
72:6
**believe** 8:13
34:7 46:22
59:16 60:10
62:18 63:24
64:14,23 66:22
68:2 69:5 74:3
74:14
**believes** 56:12
**benefits** 49:7
**BERNSTEIN**
2:20
**best** 41:21 45:3
57:1 64:4 79:6
82:18
**better** 56:24
71:21 79:7

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 2

**bill** 31:9
**billing** 45:5,7
**Blackwelder** 67:18
**Blair** 59:7
**BLANCHARD** 3:3
**Blankenship** 2:18 4:7,13 10:2,10 11:9 14:10,22 15:13 15:19 16:1 18:7,20 20:8 20:22 21:8,23 22:14,21 24:13 25:12,21 26:7 26:22 27:6,12 27:17 28:1,16 30:6,22 33:6 34:5,24 35:4 37:9 39:8,20 40:11,24 41:10 42:1,13 43:6 43:17 45:19 46:11 47:3 48:7 49:1,14 49:23 50:9 51:10 52:6,17 53:22 55:5,7 55:11 60:17,21 73:18 74:1,2,7 76:10 77:13,22 78:11,19 79:11 79:24 80:7
**blood** 44:8,9,16 44:17
**BLUE** 2:14
**Board** 82:22 83:4
**Bonan** 68:7
**booking** 53:19
**bottom** 30:16 32:10,15 38:16
**Boulevard** 2:15
**Brady** 1:11 15:2

15:16
**brain** 66:17 68:25 76:6
**BREITHAUPT** 2:3
**bridge** 72:3,9
**Brookhaven** 7:11
**Burns** 17:23 18:3
**Burton** 68:1
**business** 24:8,19 25:11,18 26:3 27:21 37:5 42:10 52:4 77:17
**button** 13:9 16:24 17:3,5 17:13,16,19 45:16 77:18 78:7

---
**C**
**call** 2:8 28:12 35:14 47:6,12 47:15 52:23,23 53:5,6,9,11 54:9 59:8,15 69:7 72:3
**called** 16:18 61:25
**calling** 54:13,13
**Calls** 53:23
**Calvert** 1:15 6:3 6:19 7:1,11 55:6 65:8 69:3 73:19 82:9
**capabilities** 62:11
**capability** 63:25
**caption** 30:11
**care** 33:14,19 34:2 38:18 66:7 69:21
**career** 60:6

**case** 9:21 22:2,6 22:16,20 27:11 38:5 45:16 64:15 65:11 75:11
**cases** 43:13 50:17
**CAT** 13:25 14:1 19:16 44:17,19 56:2 57:19
**category** 29:22
**Causeway** 2:15
**CCR** 81:25
**cell** 38:9 53:6
**Center** 1:10,20 2:13 7:18,21 28:24 39:25 59:5 61:1,8 62:20 63:5 65:15 69:4 76:25
**Center's** 41:22
**Century** 20:5 30:3
**CEO** 15:2
**certain** 8:1 44:4 59:8 62:1 76:7 79:5
**certainly** 44:18 57:5 70:2
**certificate** 1:24 82:1,5,7 83:21
**certification** 82:2
**Certified** 1:23 7:2 81:2 82:6 83:20
**certify** 82:8
**cervical** 68:17 76:3
**chances** 71:13
**changes** 81:12
**characterizati...** 42:24
**charge** 45:7

**chart** 64:19
**circumstances** 69:13 71:19 79:5
**Civil** 6:6 81:5,6 83:3
**clarification** 16:12 38:8
**clarify** 70:12
**clear** 64:18
**clinic** 61:4 67:16 67:19 68:8,11
**clinical** 58:9,16
**close** 77:3
**Closer** 46:3
**code** 67:2 81:6 83:2
**coffee** 23:16,18
**College** 31:5,18
**column** 67:6
**come** 16:4 75:5 78:1
**comes** 23:20 46:19 71:22 72:5
**commencing** 82:12
**company** 1:10 34:18 63:8
**comparable** 60:25
**complaint** 19:5
**complaints** 18:25
**complete** 82:23
**compliance** 82:20 83:1
**compression** 46:22 52:11
**computer** 13:6 16:7,10 65:17 66:22 71:4
**concept** 33:13
**concerned** 83:14
**CONCLUDED**

80:17
**concluding** 82:12
**condition** 26:21 39:12 40:7 44:2 56:12,14 64:5
**conditions** 13:18 14:1 16:6 19:15 43:22 55:23 57:1
**condone** 21:17
**conduct** 45:25
**conducted** 14:16 22:11 41:18 46:25 48:22 74:16
**CONFEREN...** 2:8
**confirmation** 14:6,18
**confirmed** 14:19
**confronted** 59:22
**connection** 6:14
**consideration** 25:7 27:22 62:15,25
**considerations** 9:23 15:8 26:18 28:7 32:24 33:1
**considered** 29:17 32:16 33:1 34:4
**consistent** 6:7 30:4 38:25 41:7,16,21 75:24
**constitute** 39:5 62:1
**consult** 59:1,6 59:13,21
**consultation** 26:4

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 3

**CONTINUED**
3:1
**continuing**
46:15
**continuum**
40:20
**contracts** 63:12
**contractual** 83:1
83:6
**contrast** 66:18
**conversation**
15:15
**cord** 44:9 46:22
52:12 59:23
**correct** 7:19
13:9,10 14:19
15:24,25 16:22
16:25 19:22
21:20,25 23:2
23:3,10,15,21
23:24 24:2,3,7
25:25 26:1,12
26:13 27:11,14
28:8,9,13 30:5
30:8,14,15,19
34:4 36:3,4,9
36:10,13,14,17
36:18 37:8,12
37:14,15,19
38:24 39:2,5
39:17 40:8,22
40:23 42:16,17
44:6,7,12
45:18 48:18,20
49:13,16 50:17
50:19 51:4,5,9
51:23 52:25
53:4,13,14,19
54:15,16,18,22
55:19 56:15,16
56:19,20 57:10
57:21 58:8,12
58:13,19,20,23
58:24 59:2,3
59:23,24 60:2

60:3,12,13
61:16,23 62:2
62:6,7,11,12
62:16,17,20,21
63:13,21,22
64:1,2,6,7,9,10
64:12,13,16,17
65:1,2,7 66:1,8
66:9,13,14
67:5 68:12,13
68:17,20,21,23
69:1 70:14,17
70:18 72:20,21
73:5,16 74:13
74:16,17,24
75:3,4,8,9,25
76:3,4,12,14
76:22,25 77:3
77:12,15 78:1
78:2,21 79:2,3
79:13,16 80:10
82:18
**correctly** 64:24
**cost** 32:16 34:7
45:2
**costs** 34:3
**counsel** 6:2,4
46:8 50:21
83:10,12
**couple** 58:1
**course** 58:21
60:6 65:24
79:1
**court** 1:1,23 7:3
74:5 81:2,14
82:6 83:7,20
**coverage** 59:17
**credibility** 28:12
**Criteria** 5:11,13
5:15 31:16
**critical** 52:10
54:21
**CT** 9:7 13:9,17
16:23 43:22
44:5,10,20

46:2 49:8
56:18
**CTs** 46:3
**cup** 23:16,18
**customary** 72:2

**D**

**D** 2:4
**Daily** 17:10
**dashes** 81:11,15
**date** 37:6
**daughter** 80:10
**day** 17:9,11
23:13 47:14
50:18 59:9,17
71:15 82:11
83:16
**day's** 37:13
**days** 37:5
**deal** 24:5
**dealt** 26:12 75:7
**decide** 60:1 64:4
**decided** 45:17
**deciding** 33:2
**decision** 24:19
25:11 27:21
42:11 51:7,12
51:13,15,18
52:3 53:2 58:2
77:17,24 78:9
78:13
**decisions** 24:8
25:19 26:3,10
63:6,16,17
**deck** 23:20
**defects** 79:15
**DEFENDANT**
2:13,19 3:2
**Defendants** 6:5
**deficits** 40:21
41:4,19 46:20
52:14 57:24
58:11
**defined** 32:5
81:4 83:2

**defining** 34:1
**definitely** 44:12
**definition** 34:3
**definitive** 57:18
58:19
**DEGAN** 3:3
**delay** 14:5 35:8
74:20,22 78:22
**delayed** 9:22
**demonstrated**
58:11
**denied** 9:22 25:4
25:6 38:17
39:14 47:18
**denies** 53:10
**denoted** 81:21
**density** 44:8
**deny** 35:8,22
36:11
**department** 9:9
17:21 18:18
19:22 20:1,6
23:10 29:11,16
31:23 32:23
40:15 41:23
42:22 43:10
45:5,7 50:16
50:22 51:8
52:1,2,4 77:3
77:11,19
**departments**
18:5,11
**depend** 58:2
**deposition** 1:14
5:10 6:3,10,14
6:17,21 9:15
9:16 23:9
24:25 65:10
73:15 80:17
82:25
**depositions** 23:5
**describe** 71:21
**described** 57:24
70:7 72:24
73:11

**describes** 77:6
**describing** 70:20
**detail** 9:19
**determine** 35:20
56:25 61:25
67:3
**determining**
32:17 50:23
69:24
**dhoskins@de...**
3:6
**diagnose** 23:25
**diagnosis** 56:13
58:19 63:21,25
**diagnostic** 17:1
29:11 30:13
31:22 76:13,16
76:17,20
**difference** 33:18
33:20
**different** 36:2
49:4 70:11
**difficult** 15:23
**direct** 32:15
44:22,24 83:6
**direction** 82:17
**directly** 13:2
28:25 43:8
47:7
**discouraged**
18:19,22
**discourse** 81:11
**discuss** 13:2
72:13
**discussed** 16:3
49:17 70:6
72:23
**discussion** 31:14
37:23 73:8
**discussions**
72:23
**dishonesty** 8:20
**dispute** 15:9
20:2 77:5
**distinguish** 61:2

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 4

**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**doctor** 7:7 13:4
16:4 23:1
24:10 36:3
46:16 52:24
53:11 54:14,25
56:22 67:17,25
74:11
**doctors** 49:18
78:1,10
**document** 65:8
65:19
**documentation**
16:19
**documents**
73:16
**doing** 42:8 66:6
**don't'** 72:8
**Donald** 2:23
**doubt** 15:17
**Dr** 5:4,5 8:10,10
8:12,12,21,21
9:1,15,20 11:4
11:12,15 15:1
15:9,18,21,22
19:24 20:4
22:9 25:2,25
25:25 26:5,5
26:15 28:10
30:1 39:11
41:2 42:8
46:18 51:14,17
52:9 55:6 59:7
65:8 67:8,12
67:18,20,22
68:1,7 69:3
73:19 75:11
77:6
**drinking** 23:17
**drive** 2:4 53:18
**Drs** 7:25
**DuBOIS** 1:11
15:2,4,6 26:15

**DuBOS** 2:3
**due** 38:18 77:16
81:10
**duly** 7:2 82:10
**dump** 36:7
**DUNN** 2:3
**duties** 36:2,7
**duty** 47:14 69:8

_____ E _____

**E** 1:20
**E-Mail** 2:11,18
2:25 3:6
**earlier** 60:4
**early** 25:3 41:4
41:17
**echo** 37:3 38:15
**educated** 24:4
35:13,25
**education** 36:19
**Edward** 1:15
6:3,19 7:1,11
82:9
**eighteen** 66:5
**either** 13:2 14:6
29:21 33:24
51:2 52:23
57:19 68:24
69:3 70:8
**elected** 6:21
80:16
**electronic** 16:21
**electronically**
18:5
**eleven** 74:4
**Emergencies**
37:13
**emergency** 7:14
9:8 11:6,16,19
11:21 12:3,5,6
12:8,12,14,19
13:17,21,25
15:7,24 16:14
17:21 18:6,13
18:18 19:8,20

19:22,25 20:6
20:13,15,21
21:1,5,7,13
23:10 26:17
29:16,19 31:21
32:23 35:2,9
35:12 36:1,3
37:7,17 39:12
40:15 41:18,23
42:4,22 43:14
43:22 44:2
47:23 48:6,21
49:3 50:2,8,15
50:22,24 51:8
52:21 56:10
60:5,8,23 63:3
64:12,20 65:14
65:22 67:25
69:3 70:25
71:12 72:25
77:3,11,19
78:9,18
**emergent** 34:22
**employed** 15:4
**employee** 7:20
**employment**
83:5
**EMTALA** 35:14
35:16 36:19,21
39:5,16 61:18
61:19 62:5
**engage** 38:6
**entitled** 31:15
**entity** 82:24
**ER** 8:5 21:16
38:23 41:14
56:25 57:9,11
58:3,22,23
59:21 62:19
64:25 65:24
66:3 67:14
68:3,11 70:21
70:23 73:10
75:6
**especially** 32:23

79:14
**events** 58:21
**evidence** 6:11
78:15
**exactly** 10:9,13
43:19
**exam** 30:17
**examination** 4:3
4:6 7:5 46:14
55:10 58:5
76:14,16,16,21
**examinations**
36:11
**examined** 7:3
75:23
**examining** 58:23
**example** 24:21
**excerpts** 5:5
9:15,19
**excuse** 32:25
37:21
**exercise** 6:21
**exercising** 24:9
24:10
**exhibit** 5:1,4,5,6
5:7,8,9,10,11
5:12,14,16,17
5:18 9:14
11:14 28:22
30:10 31:13,15
32:3 33:12
36:25 38:13
39:24 65:10
74:19,25 75:6
75:25
**exist** 28:11
75:24
**exists** 27:10,20
28:3,10
**expect** 20:20
21:6
**expensive** 44:20
**experience** 24:5
56:24 58:15
65:6 73:3

**experienced**
48:13
**expertise** 23:22
79:21

_____ F _____

**facilities** 61:5,6
**facility** 30:18,19
47:9 48:16,22
50:4 59:10
60:24 61:2,3
62:11 64:6
**fact** 62:1
**facts** 42:6,15
**fair** 18:17 20:19
21:5 26:19
30:25 42:5,23
55:24 57:17
62:8 69:22
**fairly** 44:17
**fall** 29:21
**falsely** 21:18
**familiar** 17:23
63:10 67:12
**fast** 9:10 11:16
**faster** 43:21
44:1 55:23
56:11,13
**fastest** 79:4
**federal** 6:5
61:19 81:5
**feel** 42:18
**feet** 41:4 46:21
**fifteen** 46:2 49:6
78:22
**finally** 42:7
**finances** 62:15
**financial** 9:23
14:12,24 15:8
25:7 26:18
32:24,25 82:23
**fine** 10:24
**firm** 83:7
**first** 7:2 17:22
33:15 56:18

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 5

58:1,6 61:19
65:20,23 66:16
67:7 69:16
70:10
five 46:3
five-day 74:21
five-minute
74:20
flights 55:12,14
flip 9:3
folks 29:6
follow-ups
73:21
follows 7:4
foregoing 82:14
form 6:8 9:25
10:6 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
33:5 34:6,25
35:5 36:6
37:10 39:7,9
39:19,21 40:10
40:12,25 41:9
41:11,25 42:2
42:14 43:5,16
45:20,22 47:2
48:25 49:15,22
50:10,12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
formalities 6:13
format 82:21

former 15:2
forth 82:13
found 8:14
frame 42:10
55:16 79:2
front 45:17
frustrating
79:17
further 13:19
58:17 80:15

— G —
G 3:6
gap 41:20
gatekeeper
69:24 70:2
general 48:8
55:17 56:9
59:11
generally 54:7,8
56:10 59:12
generated 65:16
generating
71:20
getting 61:12
72:22
girl 22:17 41:3
41:20 46:19
52:13 57:23
80:3
give 19:17 23:4
57:18 65:11
given 9:23 42:7
66:21
global 27:1
globally 28:4,5
go 10:1 16:7,17
23:19 26:11
46:7 56:10
57:25 69:19
going 9:19 23:8
23:9,14 24:22
28:21 40:4,6
40:17 62:22
63:6 71:16,17

gold 31:2,2
good 7:7,8 21:17
55:6
Gordon 2:24
Goss 17:23,24
17:25 18:1
grant 26:16
Green 67:16,19
68:8,11
GREGORY 1:5
group 68:4,6
guess 27:1 35:18
45:5
guessing 35:12
guidelines 82:21
gunshot 23:19

— H —
H 2:23
half 43:24 53:18
hall 43:11,12
hallway 19:21
19:25
hand 23:16
handcuffed
24:18 25:11
hands 23:20
26:11 41:4
46:21
handwritten
16:9
happen 69:2,11
happens 64:11
72:7
harm 32:17
head 42:19
68:25
health 33:14,19
34:2 63:11
heard 11:11
22:4,5 34:12
heart 40:20
72:17
helicopter 53:21
54:3 55:12,14

help 23:1,23
24:5 27:5
hereinbefore
82:13
hereto 6:13
83:11
hey 37:25 51:21
69:8 75:18
highlighted 31:1
32:7,14
Hippocratic
38:25
history 58:7,15
holding 23:16
hole 37:18
Holly 67:12
Honest 8:18
honestly 19:23
45:1 75:20
Hoskins 3:6
4:10 9:24 10:7
10:12,19 11:7
12:15 14:8,20
15:11 16:11
18:9 19:13
20:10,24 21:21
22:12,23 24:11
25:14 26:24
27:24 28:14
33:4 36:5
37:20 38:7
39:6,18 40:9
41:8,24 43:4
43:15 45:21
46:9 47:1
48:24 49:21
50:11 52:15
55:1 60:15,19
75:13 76:8
77:20 79:9
80:5
hospital 1:10
18:25 20:17
21:3,19 26:16
28:11 42:11

48:8 49:18
55:8 63:4,13
64:1 66:22
70:13,17 72:1
72:4 73:9
79:22
hospital's 65:17
hour 12:2 43:24
43:24 45:25
53:18,20 56:5
hours 79:2,8
Hudson 2:20,21
hundred 66:7
hush 38:5
hypothetical
54:19

— I —
idea 13:8,11
14:24 15:15
17:18 45:1,8
ideal 12:1 45:14
49:12
identified 65:9
identify 36:21
61:18
III 2:23
images 17:2
imaging 29:4,11
30:14,17 31:22
32:6 76:20
in-patient 50:25
67:1,3 71:3,8
71:10
inability 38:19
inaccurate
66:23
inappropriate
35:3,7
incident 44:10
include 36:7
50:23 78:14
INDEX 4:1 5:1
indicate 81:12
81:16

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 6

indicates 65:21
indirect 32:15
  44:25 83:6
individual 27:2
INDIVIDUAL...
  1:6
info@shoenfel...
  2:11
information
  58:15
informed 36:20
  82:22
injury 59:23
inpatient 13:1
  13:14 29:17,20
  29:25
inpatients 13:23
  20:19 21:4,14
  29:12
inquire 35:9
inquired 17:15
inquiries 39:15
instance 8:20
  25:9 39:4 42:5
  69:18
instances 54:1
insurance 14:7
  34:18 35:10
  36:9,13,17
  38:17,19 39:14
  63:7
insurers 63:11
interaction
  81:10
interested 83:13
Internal 67:16
  67:19 68:8
interpret 57:11
  57:14
interpretation
  57:19
interpretations
  57:15
interpreting
  57:8

introduced 6:11
invented 75:18
investigation
  13:19
involve 26:20
  27:2
involved 55:17
  63:5
issue 8:8 37:2
issues 24:6
it'd 52:3

——————
J
JACOB 2:19
Jacqueline
  67:22
James 2:24 3:2
join 10:3 49:2
Jordan 1:6,7
  22:4 27:3,8
  29:15 64:20
Jr 2:6
judgment 23:23
  24:10 25:10
  27:23 79:20
July 82:11

——————
K
kblankenship...
  2:18
keep 80:2
Kidd 67:12
kind 7:23 8:7
  37:17
kinds 72:12
knew 12:9 47:10
know 14:12 18:3
  19:23 21:10
  22:5 30:20
  42:18 43:1,1
  43:19,24,24
  45:6,9 47:25
  50:3 59:8,10
  61:4 68:9
  69:20 70:3

72:19 73:13
  74:22 76:15
  77:25
knowing 23:14
  80:2
knowledge
  18:11 22:1,16
  44:22,23,24,25
  55:18 64:15
  75:21 83:5
known 8:10,12
  8:21
Kurt 2:18 55:7

——————
L
L 2:9,24
lack 38:18 71:21
Lane 2:21
larger 50:4
law 2:9 61:20,23
  62:2
laws 35:18
lawyer 16:3
lay 29:6
lead 58:16
learn 58:4
left 54:6 59:10
  80:3 81:17
legitimate 43:9
Let's 74:8
level 13:20
life 22:18 80:4
LINDA 1:23 7:2
  81:2,25 82:6
  83:19
line 29:3 31:1
  32:14 65:21
Lines 9:4
list 65:13 66:21
  68:14
listed 67:6
listening 38:9
litigant 83:8,9
litigation 83:13
LLC 1:10

LLP 7:24
located 77:7
location 77:4
long 8:10 9:3
  18:15 41:13
  53:21 78:24
longer 9:9 50:5
  56:4
look 11:14 29:9
  30:2,13 33:12
  47:19 65:11,19
looking 58:6
  65:13 74:18
looks 32:5 68:18
  75:6
lot 68:24
Louisiana 1:2,9
  1:10,20,21,24
  2:4,10,13,16
  2:21 3:4 7:12
  7:14,17,21
  28:23 39:25
  41:22 59:4
  60:25 61:8
  62:20 63:4
  65:15 69:4
  76:25 81:3,6
  83:2,15,22
LSU-Shrevep...
  53:17 61:3
lumbar 68:19
  75:15,19 76:3

——————
M
M 2:19
M.D 1:15 2:19
  3:2 6:3,19 7:1
  82:9
machine 19:21
  19:24 43:11
  70:13 77:1,2,7
Magnetic 29:3
Major 59:7
making 10:16
  24:24 58:2

63:16,17 82:24
manner 6:7
  83:12
mark 73:25
marked 8:25
  28:22
markets 20:17
Martin 67:18
Maryann 3:6
material 81:20
math 66:6
matter 83:8,10
mean 10:20
  12:22 21:11
  28:6 33:23,24
  33:25 58:6
  67:9
meaningful 40:5
meanings 70:11
means 34:15
  40:13
med 9:9
MEDHOST
  16:18,20,21
  17:5,7
medical 1:9,20
  2:13 7:18,21
  21:18 23:23
  24:6,10 25:10
  25:20,24 26:4
  27:22 28:24
  35:9 38:18
  39:25 41:22
  48:9 57:1 59:5
  60:25 61:8
  62:20 63:4
  64:19 65:15
  69:4 76:25
  79:19
medically 35:21
Medicare 31:10
medicine 33:22
  60:9 67:17,19
  68:8
mentioned

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 7

11:12 49:20
mentions 34:7
Metairie 2:16
method 81:14
82:16
MICHELLE
1:5
mind 41:1 70:12
MINOR 1:6
minute 65:11
minutes 5:17
12:2 40:1,5,14
40:17 41:14
43:23 45:24
46:2 49:6
52:10 53:12,25
54:20 56:3,5
78:23
mixture 68:11
modalities 50:14
55:24 56:19
modality 17:20
42:23 43:21
44:1
money 36:9,13
Monroe 1:3 2:4
2:21 83:15
month 66:4,8,8
morning 7:7,8
55:6,22
move 24:25
28:19 44:2
51:2
MRI 9:7,8,21
11:19 12:1,3,4
12:7,24 13:12
14:3 15:23
17:13,16,19
18:5 19:2,7,12
19:18,19,21,24
20:6,13,21
21:7 22:10,10
25:3,4,5 29:7
30:4 39:12,13
39:14 41:2,5

41:17 42:3,7,9
43:11,23 44:4
44:11,19,21
45:16,24 46:23
46:24 47:9,16
47:23 48:6,15
48:21 49:3,4,9
50:2,7,24 51:3
51:8,22 52:23
55:24 56:4
57:2,12,13,20
60:1 64:25
65:22 66:17,23
69:5,10,16,25
70:13,22,24
71:2,11,13
74:21 75:10
76:1,7,13 77:7
77:18 78:7,10
78:18,22,25
79:21,23
MRIs 11:5,15
14:4,15 15:7
17:5 18:12,18
20:18 21:3
26:17 29:10
31:9 42:21
49:7,19 57:8
65:14 68:16
70:7,16 72:25
73:10 74:13,16
75:1,5,24
multiple 66:1
Mute 38:4

**N**
name 7:9 18:1
22:5 65:18
67:9,20 71:13
names 17:22
68:9 81:19
NASH 3:3
nature 12:3
19:19
nearly 22:11

necessarily
72:18
necessary 10:22
13:5 36:15
38:18 63:24
need 19:18 38:6
43:13 50:13
51:3 76:7
needs 13:19 35:9
50:24
negative 14:1
neurological
40:21 41:3,19
46:20 52:13
57:24 58:11
79:15
neurologists
61:13
neurosurgeons
61:14
never 17:10,12
18:22 19:7
20:12 25:20,24
28:25 62:22,25
64:24 73:8
new 3:4 50:17
75:18
night 80:2
NLEP 7:24
NLMC 16:13
non- 34:21 36:2
non-emergency
21:5 34:17
48:19
normal 50:17
58:21
normally 19:15
34:16 50:13
56:17 66:3
70:21,22
North 1:20 2:15
7:14
Northern 1:9
2:13 7:17,21
14:5,16 15:2

18:15,19 28:23
29:10 30:18
39:25 41:22
48:17 51:7
52:5 59:4
60:25 61:8
62:19 63:4
65:15 69:4
76:25
Northern's 29:2
30:5,11 37:1
38:14
nose 40:19
note 50:21
notes 16:9
notice 6:4 37:14
67:8
noticed 17:12
number 56:19
58:3 63:15
68:16 70:5
74:3,6
nurse 68:2
nurses 49:18
nurses' 53:8

**O**
oath 39:1
Object 9:25 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
30:23 33:5
34:6,25 35:5
36:6 37:10
39:7,9,19,21
40:10,12,25
41:9,11,25

42:2,14 43:5
43:16 45:20,22
47:2 48:25
49:15,22 50:10
50:12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
objection 10:3,6
10:16 11:10
12:16 14:9,21
14:23 15:20
21:9 22:15
27:18 28:2
33:7 43:7,18
47:4 49:2,24
52:7,18 76:11
79:12
objections 4:9
6:8
obligates 62:5
obligation 62:8
obtain 15:23
20:5,20 21:6
41:5 48:15
obtained 19:12
occasion 12:7
occasions 76:7
October 1:16
83:16
offer 21:19 33:2
offered 6:11
offering 29:10
office 53:7 67:8
officer 81:4 82:7
official 82:4
okay 7:17 8:2
9:11,18 10:18
11:14 16:21
18:2 25:18
26:14 30:1,21
31:25 40:18

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 8

41:15 45:3
46:4 47:22
54:23 57:7
59:19 60:18
61:9,17 67:2
68:4,9,19 69:2
69:22 70:5
72:7,15 73:23
74:11 76:2
79:1
old 22:8 52:13
57:23
once 23:8
online 37:4
opinions 83:4
opposed 49:7
option 19:2
45:15 49:13
options 47:6
52:20 54:12,17
57:22 58:25
61:7,9
order 9:10 12:4
12:7,9,21,23
12:24,25 13:6
13:9,25 16:19
16:23 17:2
18:5 25:2,4
26:17 31:22
47:16,23 48:5
50:1,7 51:8,21
56:17 60:1
62:22 63:23
64:8 69:10
71:11,20,22
72:4 74:20
77:18 78:7,10
78:17
ordered 11:16
14:16 18:12
34:17 42:21
46:24 65:14,22
66:24 67:1
68:16 70:21,22
70:24 71:2,5

74:13 75:20
78:5,16
ordering 18:17
66:17 67:4,6
68:10 72:11
orders 71:14,19
72:3,10 78:3
original 82:3
Orleans 3:4
ortho 52:24
orthopaedic
13:4 47:15
59:6,19
orthopaedics
59:18
orthopaedist
59:14
Oscar 2:9 37:25
38:8
ought 20:5 30:3
32:22
outcome 83:14
outpatient 13:15
13:24 14:3
29:18 48:18
outpatients
20:19 21:4,15
29:13 67:4
oversight 34:19

——————
P
——————
p.m 22:11 41:6
41:18
page 4:2 5:2 9:4
65:20 81:1
pages 82:14
paid 63:7
paragraph 29:9
32:8,10 33:13
33:16 34:8,10
paralyzed 22:18
80:4
paraphrase
10:15
paraphrasing

11:1
PARENTS 1:7
part 29:10 32:3
38:16 48:9
54:10 58:4
60:24 72:1
particular 9:21
24:17,18 26:21
27:16 33:3
45:16 59:16
parties 6:13
83:11,13
partners 7:22,24
8:1,2,7
partnership
7:15 8:9
party 83:7,9
passed 53:13
path 58:2
paths 58:17
patient 12:6,8
19:17 22:7
24:17 28:8
29:19 33:3
36:8,12 46:25
47:20 48:14,23
50:24 51:4
52:12 53:16
54:15 55:14
58:5,7,10
62:10,14,22
63:8,20 64:4
65:18 66:18
69:6,8,21,25
71:16,17 72:4
72:17 79:7,14
79:19
patient's 14:7
26:21 63:7
patients 19:10
20:18,20 21:4
21:6 27:2 54:1
58:23 63:12
65:25 66:1,2,7
66:12 72:12

PATRICK 3:2
pauses 81:12
pay 14:7 38:19
62:23
payment 36:17
peg 37:18
people 13:14
23:1 25:19,24
26:4 67:5
perform 78:24
performed
70:16
period 14:17
Perkins 2:10
PEROT 1:23
7:2 81:2,25
82:6 83:19
person 23:23
45:3 82:24
personal 55:18
82:17
personally 11:24
phone 2:5,11,16
2:22 3:4 38:4,9
53:6,7
phonetically
81:22
phrase 49:11
63:17 81:21
phrases 81:16
physical 73:16
physically 70:16
76:24 77:9
physician 7:14
13:3 14:3
18:13 31:22
35:13 36:1
38:23 43:14
47:18 51:20
52:21 56:11,25
57:9,11 58:4
59:21,25 62:5
62:6,19 63:3
63:18 64:3,12
67:5,6,15

68:10 69:23
71:23,25 72:6
72:9,14,19
79:18
physician's
25:10
physicians 7:15
19:4 58:22
63:17 68:11,12
70:9 73:1
pick 44:5,5,11
44:12,19 53:6
pigeonholed
40:18
plain 19:17
PLAINTIFFS
2:2
please 7:9
pledge 5:17 40:2
41:1,7,12
point 42:5 64:23
policies 79:22
policy 26:20
27:1,9,20
28:10 39:3
65:3 80:3
poor 14:14
17:12
pose 54:20
position 15:9
20:1 77:5
possibilities
69:19
possible 50:4
56:13 71:11
possibly 35:8
52:1
post 5:10
post-deposition
5:6,7
potential 69:20
potentially
59:21
POTTS 2:20
power 35:20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 9

Poydras 3:3
practical 77:10
practice 21:18
  33:22 39:3
  48:13 61:23
  63:2 65:3
practices 41:21
practicing 60:8
practitioner
  68:2
precertification
  34:12,15,21
  35:2 37:2,16
  75:1,2
precertified
  11:6
Preliminary
  57:15
prepared 82:16
  82:20
preregister 37:4
prerogative
  63:19,23 64:3
present 16:5,13
  23:14 56:14
  70:13
presented 19:11
  22:7 27:3,8
  40:8 52:22
  57:23 79:18
presenting
  29:15
press 13:8 16:24
  17:2 45:15
  77:18
pressing 35:8
pretty 26:11
previous 65:10
primary 14:3
privileges 72:1
probably 8:12
  42:18 46:3
  47:6,21 59:17
problem 11:2
  24:1,1

procedure 6:6
  9:9 11:19 12:3
  21:1 32:16
  34:19 37:6
  43:25 72:2
  81:5,7 83:3
procedures 37:8
  79:22
proceeding 81:7
  81:11,15
process 62:13
progressing
  41:19 46:20
  52:13 79:14
prohibited 83:5
prohibition 83:1
proper 81:14
protocol 72:11
provide 21:3
  24:17 36:16
providers 31:9
purportedly
  75:5
purposes 6:7
pursuant 6:4
put 46:17

——— Q ———

qualified 56:24
question 6:9 9:5
  14:14 16:16
  17:12 21:2
  24:23 33:12
  39:10 48:10
  51:1 59:11
  73:7,14
questions 6:16
  46:16 55:4,8
  63:15 70:5
  72:22 80:15
quick 46:7
quickly 19:20
quote 32:17

——— R ———

R.S 82:10
radiologist 13:3
  44:13 47:7,13
  56:22 57:16,18
  69:7,14,23,23
radiology 31:6
  31:19,23 43:10
  47:17 52:1,2
  52:23 53:5
  54:13
rating 32:11
read 6:20 9:5,16
  10:21 24:24
  80:16
reading 6:17
ready 45:12
  73:14
real 46:7
really 12:11
  19:18 21:10
  29:21 45:1,6
  50:16
reason 9:22
  15:17 43:9
  46:21 50:6
  66:21 69:7
recall 66:17 71:1
  73:2
recommend
  47:19 64:8
record 7:10 9:5
  10:16 31:14
  37:23 46:7,13
  64:18 81:8
redacted 65:18
reduction 6:15
REEXAMIN...
  74:9
refer 29:6 35:22
reference 81:20
Regan 68:7
regard 36:16
reimbursement
  14:18
related 83:10

relationship
  83:6,9
relationships
  83:2
relatively 77:2
Reliable 8:16
rely 57:17
relying 58:9
remember 15:3
  17:22 66:11
  69:18
remind 48:2
rephrase 10:25
  39:10
reported 1:22
  82:15
Reporter 1:23
  7:3 74:5 81:2
  82:6 83:20
Reporter's 81:1
  81:14
reporting 82:15
  83:7
represent 29:1
  55:7 65:12
represents 39:25
request 9:22
  25:4,5 42:6
  47:17,18
requested 19:7
  37:6 39:13
  41:17
requests 11:5
  25:6
require 13:14
  28:12 34:18
  46:23 75:2
required 31:8
  32:7 34:21
  75:1 79:21
  82:4,21
requirements
  63:11
requires 52:22
requiring 35:1

reserved 6:10
  13:14,22
resident 50:1
Resonance 29:3
respects 77:10
respond 69:14
responsiveness
  6:9
rest 22:18 80:4
result 39:16
review 73:15
reviewed 64:19
rid 57:16
ridden 55:13
right 6:20,22 9:8
  10:13 11:3
  19:21,25 23:7
  27:7 35:24
  38:11 43:10,11
  45:13 46:16
  50:20 53:9
  55:21 58:25
  59:4,7,14,25
  60:11,14,22
  61:12,22 62:18
  66:15 67:18
  68:6,14 69:13
  71:18 72:10,12
  73:4 74:11
risk 32:17
Road 2:10
room 11:6,16,21
  12:5,6,8,12,14
  12:20 13:21
  15:7,24 16:14
  18:6,13 19:8
  19:20 20:13,21
  21:7,13 26:17
  29:19 31:21
  35:12 36:1
  42:4,22 43:14
  47:24 48:6,21
  49:3 50:2,8
  52:21 56:10
  63:3 64:12,20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 10

65:14,22 67:25
69:3 70:25
71:12 72:25
78:10,18
**rooms** 20:15
60:6,23
**Rouge** 2:10
**roughly** 65:16
66:6
**round** 37:18
**routinely** 47:10
**rule** 13:17,25
19:15 43:22
44:1 48:1
50:13 55:23
56:12 81:4
**ruled** 57:1
**rules** 6:5 35:18
47:22 56:18
81:5 82:21
83:3
**run** 16:7 44:10
**runny** 40:19
**rural** 61:4
**Russell** 2:6
**Ruston** 1:10,21
7:12
**rwoodard@b...**
2:7

_____
**S**
_____

**S** 2:18
**safe** 51:24 52:3
78:8
**Sandy** 17:24,25
18:1
**saying** 37:3
38:16 56:7,8
70:19,20
**says** 28:10,11
29:3,9 30:13
30:17 32:15
37:3 40:4
53:10,11 66:23
**scan** 9:7 13:9,25

14:1 16:23
19:16 44:5,10
44:18,19,21
46:2 49:8 56:2
57:19
**scenario** 41:16
**scenarios** 62:1
**school** 25:20,24
26:5
**scope** 27:16
**Scott** 1:5,6,7,7
22:4 27:3,8
29:15
**Scott's** 64:20
**screen** 5:8,9,12
5:14,16 16:8
16:10 32:3
37:1 38:13
76:18
**screening** 36:11
76:13,15,20
**seal** 82:4
**seals** 31:2
**second** 9:4 29:9
33:15
**seconds** 46:5
56:4
**see** 17:7 29:2,13
30:1,16 31:1
31:16 32:7,12
32:14 33:16
34:19 38:19
47:7,16 49:9
49:10 58:4
65:18 67:9,20
**seeing** 69:9
**seen** 9:11 28:25
40:2,14,16
41:13 47:25
68:9 78:15
**self-employed**
7:23 8:6
**send** 14:2 69:15
**sense** 32:20 56:7
**sentence** 33:15

33:25
**series** 35:18
**serve** 29:12
**serves** 7:17
**service** 40:5
**services** 21:19
61:11 82:25
**set** 8:5 82:13
**sets** 72:11
**setting** 34:2
37:17 48:19
56:10
**seven** 20:16 60:5
75:7 79:8
**severity** 40:7
**SHAFTO** 2:3
**sheet** 71:4 73:25
74:11,18
**shift** 65:24
**shifts** 66:3
**SHOENFELT**
2:9 37:24 38:1
**shoes** 46:18
**shorter** 79:1
**shot** 5:8,9,12,14
5:16 32:3 37:1
38:13
**show** 8:23 28:21
30:10 31:13
32:2 65:8
**showing** 74:12
74:15
**shown** 68:16
**shows** 44:17
67:4 71:4,12
74:25
**Shreveport** 54:3
55:13,15
**sign** 6:20 80:16
**signature** 82:3
**significant**
12:10 14:17
53:3
**signing** 6:17
**single** 39:3

**sir** 55:15,20
**sit** 17:18 79:7
**situation** 23:25
52:22 54:19
**six** 20:16 60:5
**Sixteen** 66:5
**slightly** 50:5
**software** 17:8
49:19 78:3,5,6
78:16
**somebody** 13:18
35:20
**sorry** 11:23 34:9
**sort** 8:4 13:20
34:18 48:12
57:18 69:24
72:1,10
**sounds** 45:11
**speak** 37:7
**speaker** 37:22
**speaks** 30:23
32:11 37:10
68:14
**special** 43:13
**specialist** 59:2
**specialists** 59:12
59:20
**specialized**
56:23,23 57:5
57:7
**Specialty** 61:11
**specific** 24:21
27:11 28:7,8
48:11 64:5
69:18 72:12
73:7
**specifically**
66:17
**specifics** 64:15
66:12
**spectrum** 61:4
**speculation**
53:24 54:9
**spelled** 81:21
**spinal** 44:9

52:12 59:23
**spine** 9:7 68:17
68:20,22 75:7
75:12,23 76:1
76:6
**spoke** 15:1,6
**spontaneous**
81:11
**square** 37:17
**stabilization**
62:14
**stabilize** 62:10
**stable** 35:21
**staff** 59:14 61:14
61:15
**stamped** 82:4
**standard** 72:10
**standards** 31:2
**start** 60:8
**state** 1:24 7:9
10:5 35:19
81:3,8 83:22
**stated** 71:7
**statement** 20:12
**STATES** 1:1
**station** 16:8 53:8
**statute** 82:21
**stay** 13:15
**stenomask**
82:15
**step** 44:3
**stipulated** 6:2
**STIPULATI...**
6:1
**straining** 66:10
**Street** 3:3
**strictly** 22:5
**Strike** 32:25
**sudden** 23:18
**suggest** 76:5
**suggesting** 65:4
**Suite** 2:4,15,21
3:3
**summarize** 62:8
**supervision**

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 11

82:17
suppose 7:23 8:4
  21:12 27:19
  28:18 35:22
  54:11
sure 24:20 33:23
  33:24 44:13,15
  46:10,12 49:4
  50:3,20 51:1
  51:12 70:1
  73:6,14 75:20
  77:24 78:13
surgeon 47:16
  59:6,19
suspect 71:9
suspected 59:22
suspicion 66:25
swearing 6:15
sworn 7:2 82:10
symptoms 19:11
system 16:18
  65:17 66:22

**T**

take 12:10 45:24
  53:2 54:17
  56:3 63:2
  65:11 66:6
  69:21
taken 6:4 29:1
  81:8 82:8
takes 9:9 12:1
  43:23 56:4
  78:24
talk 46:8 47:7,13
  47:15 72:8,18
talked 78:22
talking 16:13
  52:11 53:21
  61:13 76:23
talkovers 81:13
tax 8:8
taxing 66:10
Taylor 3:2 5:5
  7:25 8:2,11,13

8:21 9:15,20
  11:4,12 15:1
  15:18,22 19:24
  20:4 25:2,25
  26:6 28:10
  30:1 41:2
  75:11 77:6
Taylor's 15:9
  22:9 26:15
  39:11 42:8
  46:18 51:17
  52:9 67:20
technically 7:20
  7:22 71:24
  72:5
teenage 80:3
TELEPHONE
  2:8
tell 13:4 16:4
telling 74:23
ten 65:25 74:3
tens 66:1
term 70:1,10
test 12:19 16:6
  34:17 44:20
  50:5 62:23
  63:6 70:3 79:4
  79:6
testified 7:3 9:20
  11:4 15:1
  19:24 20:4
  25:2 30:2 41:2
  60:4
testifying 50:22
testimony 9:1
  15:10 22:9
  24:25 26:15
  39:11 42:8,24
  52:9 55:22
  73:11 82:8,14
testing 58:18
tests 13:13 16:20
  49:5 56:11
  57:14 63:24
  72:11

Thank 54:25
  73:19
thankfully
  23:11
thereof 83:14
therewith 6:7
thickness 44:8
thing 50:16
things 11:11
  23:19 25:1,8
  25:16 32:22
  44:4,18 45:2
  47:5,21 49:9
  58:3 61:15
  69:20
think 7:22 8:4,8
  8:20 10:8,13
  10:21 12:16
  16:16 24:21
  28:4 32:22
  34:16 36:23
  40:13 41:6,12
  41:15,20 43:9
  44:16 45:14
  48:10,11 49:11
  50:6 53:25
  60:16 69:9,11
  71:9,24 73:13
thinking 23:7
thinks 71:8
third 65:20
thirty 5:17 12:2
  40:1,5,14,16
  41:14 45:24
  49:6 53:25
  56:4 78:23
thirty-minute
  41:1,7
thoracic 9:7
  68:22 75:16,17
  75:19,22 76:1
thought 79:19
  81:13
three 37:5,13
  53:2 54:12,17

68:18
thumbar 75:12
  75:16
time 6:10 8:6
  9:10 12:10
  14:17 22:8
  41:21 42:10
  53:3 54:5,6,17
  54:19 55:16
  59:17 64:11
  74:12,15 79:2
times 55:21
  59:16 67:9
today 17:18 22:2
  22:6 23:11,12
  23:13 29:12
  73:11,15
told 11:5 12:13
  25:5 26:16
  36:1 56:2
  60:12
top 29:2 30:13
  32:8 33:13
Touching 55:12
Tower 2:4
tragic 22:20
trained 23:1,4
  24:5 35:13,24
  36:20 38:22
  50:3 61:18,22
  63:10
training 36:19
  48:5,9,12
  56:24 57:6,8
  58:14 70:3
  79:20
tranquil 23:19
transcribed
  82:16
transcript 5:4,5
  9:1 81:17 82:3
  82:19,20
transcription
  81:15
transfer 47:9,20

52:25 53:15,16
  64:8
transferred 54:2
transferring
  54:14
treat 24:1 65:24
  66:12
treated 40:6
  64:5
treating 58:22
treatment 24:17
  27:16 33:2
  35:22,23 36:15
  58:5
Trey 55:2
triage 62:9,13
triaged 40:14,16
  41:13
trial 9:2
trick 33:11
troubling 80:12
true 24:8 25:9
  25:16 26:15,19
  39:11 42:6,15
  82:18
trustworthy
  8:14
try 23:23 42:9
  43:20,21 44:1
  46:24 47:6,15
  69:16,21
trying 24:25
  28:19 33:11
  38:5 61:1
turn 37:21
TUTORS 1:7
twelve 22:8
  52:12 57:23
  74:6,8
twelve-year-old
  41:3,20 46:19
twenty 53:25
twenty-five 66:2
two 28:13 47:6
  49:10

acourtreporter2@gmail.com                                                                318-348-7647

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 12

**types** 59:20
**typewriting** 6:16
**typical** 72:16
**typically** 13:13
  13:16,18,22,24
  14:5,15 18:23
  43:25 44:20
  53:17 66:2
  78:23
  tzeigler@hpla...
  2:25

**U**

**ultrasound** 17:4
**unavailability**
  70:7,11,19
  72:24 73:10
  76:24
**understand** 21:2
  33:18 50:20
  51:1 75:10
**understanding**
  7:13 14:4,15
  34:14,23 35:1
  35:16 39:15
  42:20 44:16
  48:14 55:16,17
  55:25 56:8
  62:4 82:19
**understands**
  16:16 48:10
**unit** 62:13
**UNITED** 1:1
**universally** 28:5
**unquote** 32:18
**unusual** 8:4 65:5
  73:4
**use** 12:19 13:17
  17:7,20 21:12
  23:22 42:23
  43:20,25 70:1
  70:10 76:18

**V**

**valid** 82:2

**various** 63:11
**Vaughn** 1:20
**verbatim** 10:20
**verified** 81:20
**verify** 68:15
**versus** 63:16
**violation** 36:22
  39:4,5,16 62:2
**violations** 61:18
**virtue** 56:22
**visit** 64:20
**VS** 1:8

**W**

**wait** 79:8
**waive** 6:13
**walk** 23:9,13
  45:11
**wall** 42:19
**want** 9:18 10:20
  11:3 16:6,23
  21:11 25:8
  30:10 31:13,22
  32:2 37:21
  46:17 51:21
  57:25 58:18
  65:8 70:9,12
  73:7,25 78:17
**wanted** 22:10
  24:16 25:2
  41:2 45:18
  75:11,22
**way** 8:5 10:25
  14:4,15 24:9
  48:21 63:18
  66:15 70:19
  71:21 83:14
**we'll** 69:15 72:3
**we've** 40:20 68:9
**website** 5:8,9,16
  28:24 29:2
  30:5,12,21
  37:1 38:14
  40:1
**went** 25:20,24

26:4
**West** 83:15
**WESTERN** 1:2
**White** 7:25
  67:22
**WILLIAMS**
  2:14
**wish** 11:22,24
**witness** 6:15,19
  10:1 73:22
  80:16
**WOLLESON**
  2:3
**WOOD** 2:19
**Woodard** 2:6
  4:4 7:6 8:24
  9:13 10:4,17
  10:23 16:15
  27:4 28:20
  30:9,24 31:12
  32:1 36:24
  37:24 38:3,10
  38:12 39:23
  46:6,15 54:24
  57:3 71:6
  73:20,24 74:10
  80:14
**word** 28:4
**words** 81:16,19
**work** 17:11
  23:11 31:23
  45:11 68:4
  72:16
**worked** 20:13
  20:15 60:5,23
  61:6 64:24
**working** 15:3
  23:12,13,17
**world** 12:1
  45:14 49:12
**wouldn't** 12:24
  21:17 27:15
  49:3 54:9
  56:21 58:2
**wound** 23:19

**write** 16:8 71:14
  71:18 72:2
**writing** 34:9
  72:9
**written** 47:22,25
  71:14
**wrote** 64:23

**X**

**x-ray** 19:17 46:4
  49:8
**x-rays** 17:4 56:3

**Y**

**y'all** 12:23 26:10
  27:5 43:3
**yeah** 16:18
  69:15
**year** 52:13 57:23
**years** 22:8
**young** 46:18

**Z**

**Zeigler** 2:23
  55:3
**Ziegler** 9:2

**0**

**1**

**1** 5:4 8:25 11:14
**10** 4:13 5:14
  36:25
**11** 4:10,13 5:16
  38:13
**1120** 7:11
**12** 5:17 39:24
**13** 5:18 74:8,19
  74:25 75:6,25
**14** 4:10,13
**1434** 83:3
**1434(B)** 81:6
**15** 4:10,13
**16** 4:13
**17** 1:16
**18** 4:10,13

**1800** 2:21
**1811** 2:4
**18th** 83:15
**19** 4:10 64:21
**1994** 29:12 30:1
**1999** 60:10
**19th** 27:5,8

**2**

**2** 5:5 9:14
**20** 4:10,13
**2005** 8:12 18:16
  19:10 48:3
  60:11,20
**2013** 8:13 65:16
**2014** 27:9 29:16
  59:5 64:21
  65:23 66:19
**2016** 1:16 65:16
  82:11 83:16
**21** 4:13
**2109** 2:10
**21st** 20:5 30:2
**22** 4:10,13
**225** 2:11
**23012** 1:24 7:3
  81:3,25 82:7
  83:21
**24** 4:10,13
**25** 4:10,13
**26** 4:10,13
**2600** 3:3
**27** 4:10,13
**27th** 82:11
**28** 4:13 5:8 81:4
**28th** 65:23 66:19

**3**

**3** 5:6 22:11 41:6
  41:18
**3:00** 42:7
**3:16-CV-00376**
  1:8
**30** 4:14 5:9
**300** 2:21

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 13

**31** 5:11
**318** 2:5,22
**32** 5:13
**322-1202** 2:5
**33** 4:10,14
**336-4300** 2:11
**34** 4:14
**3421** 2:15
**35** 4:14
**36** 4:10 5:15
**37** 4:14
**37:2554** 82:10
**38** 5:16
**388-4400** 2:22
**39** 4:10,14 5:17

_____ **4** _____
**4** 5:7
**40** 4:10,14
**400** 3:3
**401** 1:20
**41** 4:11,14
**42** 4:14
**43** 4:11,14
**45** 4:11,14
**47** 4:11,14
**48** 4:11
**49** 4:14

_____ **5** _____
**5** 5:8 28:22
**50** 4:11,14
**504** 2:16 3:4
**51** 4:15
**52** 4:11,15
**529-3333** 3:4
**53** 4:15
**55** 4:7

_____ **6** _____
**6** 5:9 30:10

_____ **7** _____
**7** 5:10 9:4
**7,74** 4:4
**70002** 2:16

**70130** 3:4
**70808** 2:10
**71201** 2:4,21
**71270** 1:21
**74** 5:18
**75** 4:11
**76** 4:11,15
**77** 4:11,15
**78** 4:15
**79** 4:11,15

_____ **8** _____
**8** 5:4,11 31:13
31:15
**8:06** 82:12
**80** 4:11,15
**81** 82:14
**831-4091** 2:16

_____ **9** _____
**9** 4:10 5:5,12 9:4
22:10 25:3
32:2 33:12
41:5,17
**9:00** 42:7
**9:30** 80:17 82:13
**900** 2:15



SERVICES, NORTHERN LOUISIANA MEDICAL CENTER - MAGNETIC RESONANCE IMAGING MRI

# Magnetic Resonance Imaging

It's clear—precision is important during diagnosis. Of all imaging technologies, MRI or Magnetic Resonance Imaging gives doctors the clearest, most precise image of the inside of the body. It's sophisticated, and uses a strong magnetic field to show the structure and detail of organs, soft tissue and bones, which can pinpoint all types of issues from abnormalities to disease. Northern Louisiana Medical Center performs MRIs with your comfort in mind. Nervous about your test? Just speak to one of our staff.

Northern Louisiana Medical Center has been offering MRIs as part of the diagnostic imaging department since 1994, and today we serve both inpatients and outpatients. Our technologist is registered in MR imaging and has 20 years of MR scanning experience.

**For more information, please contact:**
**Sheri Burns, NLMC Director of Radiology**
**(318) 254-2461**

**If you are a physician and need to schedule a patient, please call:**
**Central Scheduling**
**(318) 254-2791**

Exhibit "1"

APR. 12. 2016  9:44AM    COURTHOUSE ANNEX                    NO. 005    P. 3

1    HERMAN M. HODGE, JR.                    THIRD JUDICIAL DISTRICT COURT

2    VS. NO. 55,272                                         PARISH OF LINCOLN

3    STATE FARM FIRE & CASUALTY AND               STATE OF LOUISIANA

4    KENNETH L. COX

5                          -----0-----

6              A PORTION OF THE PROCEEDINGS HAD on the Jury Trial in

7    the above entitled and numbered cause had at Ruston, Louisiana on

8    the 31st day of March, 2016 before His Honor, Jay B. McCallum,

9    Judge for the Third Judicial District Court, State of Louisiana.

10         A P P E A R A N C E S: FOR THE PLAINTIFF:

11                               K. LAMAR WALTERS, III

12                               RUSSELL A. WOODARD, JR.

13                               P. O. Box 14106

14                               Monroe, LA 71207

15                               ------------------------

16                               FOR THE DEFENDANT:

17                               GORDON L. JAMES

18                               DONALD H. ZEIGLER, III

19                               P. O. Box 3008

20                               Monroe, LA 71210-3008

21                               ------------------

22                               Reported by Jon Anne Winstead,

23                               Certified Digital Reporter

24                          -----0-----

25                  - - - - - - - - -

26              DR. MOHAMMAD J. ALAM

27                  - - - - - - - - -

28         Called as a witness on behalf of the defendant, who,

29    after first being duly sworn on his oath, testified as follows:

30              (COUNSEL STIPULATED AS TO HIS EXPERTISE IN EMERGENCY

31         MEDICINE.)

32                          DIRECT EXAMINATION

Jon Anne Winstead, Official Court Reporter
Third Judicial District Court

EXHIBIT
1

Exhibit "1"

APR. 12. 2016  9:46AM   COURTHOUSE ANNEX                      NO. 005   P. 13

1   about their accident history or their pain history because

2   they're focused on what's going on at that time?

3   A.      It's a possibility.   I can't say that.

4   Q.      Now, Dr. Alam, you -- you ordered an MRI or a CT Scan of

5   the lumbar spine only, is that correct?

6   A.      Correct.

7   Q.      No MRI or CT Scan of the thoracic spine, is that right?

8   A.      No, MRI is not a emergency med-- department procedure.

9   It takes longer time.   We cannot order it fast.

10  Q.      Sure.

11  A.      No, I did not order any other Cat Scan.   The area where

12  he complained of pain, I ordered the Cat Scan.

13  Q.      Okay.   And Mr. Zeigler showed you a note where there was

14  a reference to Mr. Hodge complaining about a loss of

15  consciousness, a few second loss of consciousness.   It's in the

16  nurse's note.   I think it's at page 6 of your notes.   And it says

17  patient -- patient fell off ladder at work, reports may have had

18  loss of consciousness for a couple of seconds, alert and oriented

19  at this time.   Now when -- when you have a patient coma in with a

20  -- a reported loss of consciousness, I assume you don't feel the

21  need to order a CT Scan of the brain or of the head unless

22  they're -- they're showing signs of cognitive deficients where

23  they're not alert and oriented.   Would that be accurate?

24  A.      Correct.

25  Q.      All right.

26          MR. WALTERS: All right, thank you, Doctor.

27          THE COURT: Thank you.   Is there any redirect?

28          MR. ZEIGLER: No, Your Honor.

29          THE COURT: All right, well I think you're released to

30  go back to wherever you'd like to go.   Back to work or

31  home or wherever.

32          THE WITNESS: Thank you.

Exhibit "1"

Page 1

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

* * * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE SCOTT,
INDIVIDUALLY AND ON BEHALF OF
THE MINOR, JORDAN SCOTT, AS THE
PARENTS AND TUTORS OF JORDAN
SCOTT

VERSUS                                      NO. 2015-00923

JACOB WOOD, M.D., THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER,
JAMES TAYLOR, M.D.

* * * * * * * * * * * * * * * * *

DEPOSITION OF

JAMES PATRICK TAYLOR, M.D.

February 25, 2016

(commencing at 9:01 a.m.)

* * * * * * * * * * * * * * * * *

Taken at:

    Law Office of Russell A. Woodard
    114 North Trenton Street
    Ruston, Louisiana 71270

* * * * * * * * * * * * * * * * *

Reported By:

    WANDA J. EADY
    CERTIFIED COURT REPORTER
    CERTIFICATE NO. 87255
    PARISH OF OUACHITA
    STATE OF LOUISIANA

Exhibit "1"

EXHIBIT

2

Page 25

1    Q    All right.  Tell me the physician notes.

2    A    The physician notes has three pages here.

3    Q    How many pages is in the computer?

4    A    I don't know.  It's just scrolling on the computer.

5    Q    Did you add anything on the computer -- well, first

6    of all, let's go over as far as your physical examination.

7    A    Yes, sir.

8    Q    Did you in any way change the physical examination

9    after you first entered it into the computer?

10   A    The very first time change it or add to it?

11   Q    Add to it, delete, --

12   A    Yes, I did.

13   Q    You added to your physical examination?

14   A    That's correct.

15   Q    When?

16   A    At the admission, time of admission.

17   Q    You're talking about, like, the same day?

18   A    Yes, sir.

19   Q    Did you ever go back after the day of this

20   admission of Jordan Scott and add or delete anything from any

21   of your physician notes other than the addendum?

22   A    No, sir.

23   Q    You would agree -- so you would agree, would you

24   not, that Jordan Scott should have received an MRI as soon as

25   she entered the emergency room?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 26

1    A    Relatively, yes, sir.

2    Q    As soon as possible.  Would you --

3    A    As soon -- yes, sir.

4    Q    And you were prevented from doing that by the

5    hospital.  Is that correct?

6         MR. GRUNER:  Object to the form of the question.

7    Q    Go ahead and answer, Doctor.

8    A    Yes.  Okay.

9         MR. SHOENFELT TO MR. GRUNER:  And, Counsel, can you

10        state your form of the objection, why you are

11        objecting?

12        MR. GRUNER:  You said "by the hospital."  He said

13        by the radiology department earlier.  I'm not sure

14        he meant hospital staff.

15   Q    What did you mean, Doctor?

16   A    That soon after -- I resulted the thyroid and the

17   labs at 9:07 according to the chart.  It was around that time

18   right when I resulted the labs and had them back that I asked

19   Ron, who is our charge nurse, Wyatt, I believe is the last

20   name, -- he's no longer with us.

21   Q    Why?

22   A    I'm not sure.

23   Q    You asked --

24   A    He's probably semi-retired.

25   Q    At 9:07, you asked Ron Wyatt what?

Page 27

1       A    That I needed to get an MRI.  He tried to get one

2    for me.

3       Q    Wait.  Did you need to get one or that you needed

4    to get one?

5       A    I needed to get an MRI.

6       Q    Because you knew this was a neurological emergency,

7    didn't you?

8       A    I knew that there was something going on with her

9    neurologically.

10      Q    You know that, in a neurological emergency,

11   particularly with compression on a cord, that you need to act

12   as soon as possible?

13      A    That was part of -- that was part of the thought

14   process.

15      Q    And Ron told you what regarding the MRI?

16      A    Ron was -- because, on our computer physician order

17   entry from the emergency department, there is no way to order

18   an MRI.

19      Q    Now, who is Ron again?

20      A    Ron was our charge nurse that day at that

21   particular time.

22      Q    So you talked with Ron and he said you could not

23   get an MRI?

24      A    Ron was calling radiology in MRI -- to get an MRI

25   because we have no way of ordering it.  Whatever I needed to

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 28

1    do to order the MRI, that's what needed to be done while I

2    was going to see other patients.  That's what he told me.

3    I'm not sure what -- I can tell you what time period it was,

4    but I can't give you the exact time.  Ron told me that they

5    said that you cannot get an MRI through the emergency

6    department.

7         Q    Were you aware of this prior to this time?

8         A    I knew it was going to be difficult.

9         Q    Why is that?

10        A    Because they typically don't want to do MRIs

11   through the emergency department.

12        Q    And why is that?

13        A    You'll have to ask them.

14        Q    But, I mean, did you have problems with this prior

15   to this time?

16        A    Directly, no.

17        Q    Okay.  What about indirectly?

18        A    I knew that in the past they had given other

19   people -- wouldn't do MRIs through the emergency department.

20        Q    They would not do them?

21        A    That's correct.

22        Q    So was it known among the emergency room physicians

23   that you couldn't get an MRI in the emergency room?

24        A    Nothing official, no.

25        Q    Well, my question, nothing official, but was it

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 29

1    known among the emergency room physicians that you couldn't

2    get an MRI in the emergency room?

3         A    Known as a policy?  No.

4         Q    Well, was it possible?

5         A    Was it possible to not get one or possible --

6         Q    No.  Was it possible to get one?

7         A    I was attempting to.

8         Q    Okay.  I'm thinking about when did this -- when did

9    you first become aware of this issue?

10        A    That they would not do one --

11        Q    Yes.

12        A    -- absolutely?  That day.

13        Q    When did you first become aware that the North

14   Louisiana Medical Center had such a policy that it made it

15   extremely difficult, if not impossible, for an emergency room

16   physician to get an MRI?

17             MR. GRUNER:  Object to the form.

18        A    I can't give you a time, date or anything.

19        Q    Was it years ago?

20        A    I don't know if I've ever tried to order one

21   before.

22        Q    Had other physicians tried to order MRIs and not

23   been successful?

24        A    Not that I know of.  Not directly, no.

25        Q    But you were aware of this before August 2014.

EXHIBIT A

9a0c3o83-be8a-46a5-b387-b14bb655a077

Page 30

1    Correct?

2        A    That they would probably give me a difficult time?

3        Q    Yeah.

4        A    Yes, sir.

5        Q    Well, if not this case, what case would warrant an

6    emergency MRI with a twelve-year-old girl who could face

7    potential paralysis if this diagnosis was not made as soon as

8    possible?  They still would not allow you.  Did you tell them

9    that?

10       A    I can tell you what happened.

11       Q    What happened?

12       A    Ron subsequently told me that they said that we

13   couldn't do an MRI.  I tried to get -- oh, good Lord! -- our

14   ER manager, --

15            MS. WHITE:   Sandy.

16       A    -- Sandy, Sandy Goss, to try to intervene.

17       Q    And what happened with Sandy?

18       A    She immediately told me, she goes, "They're not

19   going to do an MRI for us."  And I said, "Can you please just

20   go try; go talk to them?"  She later told me, "No."  So later

21   I went to Sherry Burns, the radiology manager, and talked to

22   her and she told me that they couldn't do it.  So I told her

23   I was going to have to admit Jordan to get the MRI.  That's

24   what I told her.

25       Q    Well, I thought at one point you discharged her.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 31

1      A    This was all before that.

2      Q    And why did you discharge her if you wanted to get

3   an MRI?

4      A    A mental lapse on my part.

5      Q    So you admit that you made a misdiagnosis?

6          MS. HOSKINS:  Object to the form.

7      A    I did not make a misdiagnosis.  I made a bad

8   judgment at that particular time.

9      Q    Well, you admit that you breached the standard of

10   care, then.  Is that correct?

11          MS. HOSKINS:  Object to the form.

12      A    For having that discussion with them?

13      Q    No.  For not making sure that this girl who had

14   neurological deficits received an MRI as soon as possible

15   when you knew that continued compression on the cord could

16   cause her to become paralyzed.

17      A    That was part of the differential.  Yes, sir.

18      Q    But you admit that you breached the standard of

19   care by not making sure she had an MRI and discharging her

20   home.  Correct?

21          MS. HOSKINS:  Object to the form.

22      A    I did not discharge her home.

23      Q    Well, you admit that you breached the standard of

24   care by attempting to discharge her home when she needed to

25   get an MRI.  Do you agree with that?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 32

1          MS. HOSKINS:  Object to the form.

2     A    I did not discharge her home.

3     Q    Do you feel you gave her proper care?

4     A    With the resources I had available, I did the best

5     I could at that time.

6     Q    Would you agree that any hospital the size of North

7     Monroe [sic] Hospital should allow an emergency room

8     physician to obtain an MRI if an emergency situation such as

9     Jordan Scott faced August 19th, 2014?

10         MR. GRUNER:  Object to the form.

11    A    My professional opinion, yes, sir.

12    Q    And did you bring this up at any point in time to

13    the hospital administrator?

14    A    That day or afterwards?

15    Q    Any time.

16    A    Yes, sir.

17    Q    And what did -- what happened?

18    A    Nothing has changed.

19    Q    Nothing has still changed.  Is that correct?

20    A    That's correct.

21    Q    Now, Doctor, didn't you note this problem in the

22    medical record?

23    A    Of what part?

24    Q    The fact that you couldn't get an MRI.

25    A    I did make a little note of it, yes, sir.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 38

```
 1       Q    The MRI?

 2       A    Yes, sir.

 3       Q    Okay.  As soon as possible?

 4       A    Relatively quickly.  Yes, sir.

 5       Q    And isn't it true that even minutes and hours can

 6  make a huge difference in the diagnosis and recovery of a

 7  patient such as Jordan Scott when she's got progressing

 8  neurological deficits?

 9       A    Yes.

10       Q    So did Dr. Wood suggest to you that this was

11  conversion disorder?

12       A    The word "conversion" never came out.  No, sir.

13       Q    Did you write that in the medical record?

14       A    I think on one of my addendums, I did.

15       Q    Did you write in the medical record that he

16  suggested conversion disorder could have caused this?

17       A    It was part of the -- part of the things that we

18  talked about; not conversion, but social issues.  No.  But

19  she had neurologically something going on.  Yes, sir.

20       Q    Is it true you never suspected an epidural

21  hematoma?

22       A    Did I ever suspect it?  No, sir.

23       Q    And why is that?

24       A    Was not aware that that could happen in that case

25  like that.  It was a -- it's one of the risk factors that we
```

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 41

1      certified by the attorneys for the hospital under oath?

2          A      No, sir.

3                 MR. GRUNER:  Object to the form.  The lawyers don't

4          certify.

5                 MR. SHOENFELT:  It's in a response to request for

6          production, so I think it's under oath, unless I'm

7          mistaken.

8          Q      So why is that not in the medical record?

9          A      I don't know why it's not in there.

10         Q      It's on the computer, is it not?

11         A      It was two days ago.

12         Q      All right.  Isn't it true that the patients asked

13     you to have an MRI done many times?

14         A      Do people ask me a lot  --

15         Q      No.  The parents, Mr. and Mrs. Scott.

16         A      We talked about it, yes.

17         Q      And what did you tell them? ·

18         A      I told them I couldn't get one, they wouldn't let

19     me get one through the emergency department.  And that's when

20     I went in and talked with them after I got off the initial

21     phone call with Dr. Wood, had a discussion with them.  It was

22     Jordan's mom is the one that hit me between the eyes verbally

23     and, basically, her reaction was "No, no, no; that's not

24     acceptable."  And then, she asked me, "If this was your

25     daughter, would you take her home?"  And how are you supposed

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 42

1    to respond to that, "No, I would not."

2         Q.   Well, shouldn't you treat each patient as if it was

3    your own daughter?

4         A    That's correct.  Yes, sir.  That's why -- that's

5    why, at that particular time, it was a horrible lapse of

6    judgment on my part because that's when I lost -- that's when

7    I lost their trust and confidence, and that's what I took

8    personally.

9         Q    Okay.  And you breached the standard of care, did

10   you not?

11        A    I lost their confidence and trust at that moment.

12             MS. HOSKINS:  Object to the form.

13             MR. SHOENFELT:  What's your objection?  State it on

14             the --

15             MS. HOSKINS:  He's not saying he breached the

16             standard of care.  You are.

17             MR. SHOENFELT:  Well, I'm asking him a question.

18        A    No, sir.

19        Q    You did not breach the standard of care?

20        A    Not by -- not with that ten minutes I was in there

21   talking with them.

22        Q    Well, what about when she came in and she had

23   uneven deficits when you first examined her from a

24   neurological point of view and you knew it was an emergency

25   and no MRI was ordered?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 43

1      A    I tried -- was trying to get an MRI.

2      Q    Well, what time did you do the physical exam?

3      A    When I first saw her.

4      Q    No.  What time in the morning?

5      A    7:50ish.  7:40.

6      Q    That's what I'm saying.  So 7:40 in the morning,

7   you started trying to get an MRI.  Correct?

8      A    No, sir.

9      Q    Okay.  When?

10     A    It was around 9:10.

11     Q    Well, what happened from 7:40 to 9:10?

12     A    Waiting for lab work.

13     Q    Why did you wait for the lab work?

14     A    To make sure it wasn't something metabolic.

15     Q    So you said each minute and each hour can be

16   important.  Correct?

17     A    It can be.  Yes, sir.

18     Q    So you decided to wait to see if -- instead of

19   ordering the MRI, to see if there was something metabolic

20   that was causing this paralysis with the child as opposed to

21   going ahead and ordering the MRI?

22          MS. HOSKINS:  Object to the form.

23     Q    Is that correct?

24     A    That's correct.  Yes.

25     Q    Okay.  Is that proper medical care?

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 44

1    A   I did not order the MRI sooner.

2    Q   You should have.  Right?

3    A   I wish I had.

4    Q   Well, Dr. Wood said that, as soon as you knew there

5    was a difference in the upper and the lower limbs, that you

6    should have tried to order an MRI on an emergency basis and

7    got a neurosurgical consult.  Is that --

8            MR. ZIEGLER:  Object to the form.

9            MR. SHOENFELT:  What's your objection?

10           MR. ZIEGLER:  I'm objecting to the form.  All I

11           have to do is say I object to the form.  I think --

12           MR. SHOENFELT:  Well, I don't think that's actually

13           true.

14           MR. ZIEGLER:  Well, --

15           MR. SHOENFELT:  You're supposed to say what your

16           objection is because a lot of people just say it

17           because they think it's a safeguard.

18           MR. ZIEGLER:  I tell you what.  We'll let the judge

19           decide that.

20           MR. SHOENFELT:  Well, we --

21           MR. ZIEGLER:  I object to the form.  He can answer

22           the question.

23    A   That's his medical opinion.  Yes, sir.

24    Q   Okay.  You disagree with that or are you agreeing?

25    A   Say that again.  I'm sorry.

Page 45

1    Q    Don't you agree that as soon as you saw the

2    neurological deficits that were of a progressive nature this

3    child was exhibiting, that you should have began an emergency

4    ordering of an MRI and look for a neurosurgical consult?

5    A    They weren't progressing before my eyes.

6    Q    It's either a "yes" or "no."

7    A    No.

8    Q    Okay.  And the reason is because that it was not

9    progressing before your eyes?

10   A    It's the time period.  It's part of the

11   differential.

12   Q    So what did you think metabolically could have

13   caused this type of -- with a history, first of all, of

14   progressive for four or five days, activity as a cheerleader?

15   Did you do a percussion in the thoracic area?

16   A    I did.

17   Q    And what did that show?

18   A    She had some tenderness in the upper -- between the

19   upper scapulas, between the scapula and the upper part of the

20   scapula, but she also demonstrated numbness, as well.

21   Q    So what did that indicate to you?

22   A    That she had something neurologically going on.

23   Q    Did it indicate to you that it was not caused by

24   compression on a cord as opposed to something metabolic?

25   A    Did I know there was compression on the cord?

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 46

1    Q    Yes.

2    A    No, I did not.

3    Q    I'm trying to figure out why you decided to wait to

4    see if it was metabolic instead of going ahead and starting

5    the emergency procedures while it was progressing with these

6    neurological deficits as you waited.

7    A    Because there's other things that can cause it.

8    Q    That's what I'm saying.  What could have caused

9    this type of -- with this history with this child, with the

10   percussion, with the pain in the thoracic area, what would be

11   causing it just in the thoracic area?

12   A    Could have transverse myelitis, could have

13   Guillain-Barre syndrome, could have extremely high potassium

14   or extremely low potassium, could have thyroid disorders,

15   could have a type of neural polymyositis.

16   Q    But shouldn't a compression on the cord caused by a

17   physical injury be number one on your list based on the

18   history, the pain in the thoracic area of this child?

19   A    I had no history of injury.

20   Q    You had no history that she had been cheerleading?

21   A    She had been cheerleading, but no history of

22   injury.

23   Q    So did you feel that more probably than not that

24   you had a metabolic issue?

25   A    Oh, no, sir.  No, sir.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 47

1    Q    Well, why, if you -- what did you think was most

2    probable?

3    A    That something was going on with her

4    neurologically.

5    Q    Did you think, based on the history and the

6    physical examination, that more probably than not it was a

7    compression on the cord?

8    A    Or the cord involved itself.

9    Q    Did you note that the nursing notes said that the

10   pain was eight out of ten in the thoracic area?

11   A    I've seen that in reviewing the nursing notes.

12   Q    Do you agree with that?

13   A    No, sir.

14   Q    Okay.

15   A    Eight out of ten?

16   Q    Yeah.

17   A    No, sir.

18   Q    Well, how do you account for the discrepancy?

19   A    I'm not sure.

20   Q    Well, Dr. Wood says in the admit summary, "She has

21   been heavily involved in cheerleading practices and was not

22   absolutely sure that she did not have an acute injury, but

23   she cannot recall any falls or specific times."  Do you agree

24   with that?

25   A    There was no history of injury when I talked with

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 48

1   them.

2        Q    But you did have the history that she had been

3   involved in cheerleading practice.  Correct?

4        A    I did.  I did.

5        Q    Anything about the trampoline?

6        A    Didn't know anything about a trampoline.

7        Q    Are you aware this had been going on for -- that

8   she had been having back pain for how long?

9        A    Five days.

10       Q    Okay.  Let's go over -- all right.  Let's see.  Do

11  you have the record there?

12       A    Yes, sir.

13       Q    Page 1 is the admit sheet.  Correct?

14       A    Yes.

15       Q    All right.

16            MR. SHOENFELT:  For the record, I'm going to attach

17            this as an exhibit to the deposition.  I'll mark it

18            as "Exhibit 2."  This is, again, the certified copy

19            of the record from the hospital.

20            MR. GRUNER:  How many pages is it?

21            MR. SHOENFELT:  Thirty-six.

22       Q    Okay.  So "Exhibit 2" contains the certified copy

23  of the record received from the hospital's attorneys.  Page 1

24  is the admit sheet.  Do you have it?  Oh, this is it.  I'm

25  sorry.  I've got it here.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 49

1    A    Yeah.

2    Q    I got a little mixed up there.  I've got it sitting

3  here.  All right.  That's the admit sheet.  Correct?

4    A    That's correct.

5    Q    Let me see that.

6    A    Yes, sir.

7    Q    All right.  So did you have anything to do with the

8  creation of any of this particular document?

9    A    Of the face sheet?

10   Q    Yes.

11   A    No, sir.

12   Q    Do you know what that "821/NA Coded" means?

13   A    No, sir.

14   Q    Do you know whose signature is on the front?

15   A    No, sir.

16   Q    Page 2, did you have anything to do with the

17  creation of that particular sheet?

18   A    No, sir.

19   Q    Page 3 is the short-stay summary of Dr. Wood.  Did

20  you have anything to do with this sheet?

21   A    No, sir.

22   Q    Is there anything that you disagree with on this

23  page 3?

24        MS. HOSKINS:  Object to the form.

25   A    (Peruses document.)  The only thing I would

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 50

1   disagree with is about the progression, like, the last three

2   lines of the history of present illness.

3       Q    When you say she had a complete work-up and

4   everything was negative, that's not true, is it?

5       A    That's correct.  That's not true.

6       Q    Is that what you told him?

7       A    No, sir.

8       Q    What did you actually tell him when you talked to

9   him?

10      A    The first conversation?

11      Q    Yes.

12      A    That I had -- we discussed different things that

13  had taken place.  I told him about the labs that were ordered

14  and that I couldn't get an MRI.

15      Q    So basically, with your differential diagnosis of

16  some kind of physical injury as opposed to metabolic, after

17  you got the labs back you knew that it was a physical injury

18  that was compressing the cord.  Correct?

19      A    Not necessarily a physical injury, but cord

20  compression is on there for other reasons.  It could be a

21  disc; it could be a tumor.

22      Q    Well, that's a physical compression on the cord, is

23  it not?

24      A    Yeah, but it's not an injury.

25      Q    I just said there was a physical compression on the

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 62

1      A    No, sir.

2      Q    Okay.  Did you ever consider making a neurosurgical

3   consult by telephone?

4      A    Neurosurgery will not take a transfer without a

5   surgically-proven pathology.

6      Q    What do you mean by "surgically proven"?

7      A    Like, by imaging.

8      Q    Oh, you mean, like, an imaging?

9      A    Yes, sir.

10     Q    So, again, the MRI was important.  Correct?

11     A    To get her -- to get her transferred.  Yes, sir.

12     Q    And you knew that from the beginning?

13     A    I got the MRI ordered when I felt like I needed to.

14     Q    No.  But you knew from the beginning as soon as she

15   walked in the emergency room that --

16     A    I knew she had something neurologically going on.

17     Q    I know that, but let me finish my question.  You

18   knew when she walked in that, in order to get her transferred

19   if there was -- if she needed surgery, you had to have an

20   MRI?

21     A    That's correct.

22          MS. HOSKINS:  Object to the form.  She didn't walk

23          in.

24          MR. SHOENFELT:  That's a good point.

25     Q    Okay.  You knew when she came in not neurologically

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 134

1      Q    So you sat there for five minutes just

2    contemplating?

3      A    I don't know if it was five minutes, but it was --

4    I didn't jump up out of the chair and go.

5      Q    Okay.  So what did you think was going to happen to

6    Jordan when you ordered the discharge?

7      A    Can't tell you.

8      Q    Well, that's something you should consider when

9    you're discharging a patient.

10     A    Sure.  Absolutely.

11     Q    You would agree with that?  I mean, like, wait

12   until I ask the question.  That's something you should

13   consider when discharging a patient.  Correct?

14     A    That's correct.

15     Q    Did you feel like she would have permanent

16   paralysis?

17     A    I didn't know what was going to happen.  I used bad

18   judgment for that short period of time there.

19     Q    Now, after this, did you go to anyone in the

20   hospital and tell them that it's a bad policy not to be able

21   to order an MRI from the emergency room?

22     A    Yes.

23     Q    Who specifically did you talk to?

24     A    Brady Dubois, the CEO at the time.

25     Q    Brittany --

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 135

1     A     Brady.  I'm sorry.

2     Q     Brady?

3     A     Yes.

4     Q     Okay.  Where did you have this conversation with

5     him?

6     A     Which one?

7     Q     Okay.  Well, let's — the first one.

8     A     I can't tell you —

9           MR. GRUNER:  Let me enter an objection here. Just

10          in case I need this again as a result or

11          discussions taken during any type of quality

12          assurance peer review or committee meetings, they

13          are privileged pursuant to Louisiana law.  So,

14          again, I will make an objection with respect to the

15          discussion of peer review and committee meetings.

16          If there's any discussions outside of that that

17          were just hallway or office discussions that were

18          not part of committees, I don't have an objection

19          to that.

20    Q     Having said that, can you respond?

21    A     I had one in a stairwell and I had one in his

22    office —

23    Q     Okay.  Well, —

24    A     — that were not — that were not part of those

25    episodes.

Page 136

1     Q    Okay.  Were there others that were part of those

2   episodes as referred to by counsel for the hospital?

3     A    Were there other people with --

4     Q    No.

5     A    -- Brady and I, or during those episodes that he

6   objected to?

7     Q    Well, I'll ask both of those questions.  That's a

8   good question.  Was this run -- I'll just ask this directly

9   instead of referring to the previous objection.  Was this

10  discussed at committee hearings and quality control committee

11  hearings?  And you can answer that "yes" or "no."

12             MR. GRUNER:  I think you can answer "yes" or "no."

13             The specifics of the discussions and those sorts of

14             things are not discoverable.

15    A    Yes.

16    Q    When did those meetings take place?

17    A    Afterward.  I can't tell you what dates they were.

18    Q    Now, how many were there, committee, control,

19  whatever he's saying is privileged?  How many meetings were

20  there?

21             MR. GRUNER TO WITNESS:  If you know.

22    A    Discussed, two.

23    Q    What specific meetings?  I mean, was it the quality

24  assurance meeting, or what was the --

25    A    Peer review.  Peer review.

Exhibit "1"

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 137

1    Q    Peer review?

2    A    Med exec.

3    Q    Med exec?

4    A    That's correct.

5    Q    So it was one peer review and one med exec?

6    A    And they were combined, yes.

7    Q    Okay.  Now, when was the -- you had a meeting in

8    the stairwell and you had one in his office.  When did those

9    meetings take place?

10   A    Afterwards.

11   Q    I understand that.  But which one was first?

12   A    I believe the stairwell one was the first one.

13   Q    Okay.  And when was that?

14   A    I can't tell you when.  I have no idea.

15   Q    Well, I mean, was it within a month of this

16   treatment on August 19th, 2014?

17   A    There was one within a month.

18   Q    Within a month?

19   A    Yes.

20   Q    In the stairwell?

21   A    Yes.

22   Q    Okay.  Tell me what you told -- was his name Brady?

23   A    That's correct.

24   Q    What did you tell Brady?

25   A    That we needed to be able to get MRIs in the

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 138

1    emergency department, that this is the 21st Century and that

2    there's emergent conditions that we need to be able to get

3    them.

4        Q    I take it by that you felt that this was an

5    antiquated policy?

6            MR. GRUNER:  Object to the form.

7        Q    You can answer the question.

8        A    The MRI machine is right down the hallway.

9        Q    How far?

10       A    Less than fifty yards.

11       Q    Well, let's draw a little map.

12       A    Oh, Lord!

13           MR. SHOENFELT:  "Exhibit 8."

14       A    This is the best of my ability.  If I've got

15   different rooms wrong, then -- but it's the general location.

16       Q    No, I understand.  I know you're answering to the

17   best of your ability, Doctor.

18       A    (Witness drawing.)  Roughly, that's -- the

19   radiology department is right across the hallway from the

20   emergency department, and the MRI is going down the hallway

21   going towards ICU.

22       Q    So the area from the emergency room to radiology is

23   how far?

24       A    I'd say less than fifty yards.

25       Q    Fifty yards?  So if you really wanted to, you could

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 150

1    condition.

2         Q    Okay.  And did you say anything else specifically?

3         A    That in 2015 you should be able to get an MRI if

4    you have it available, that there are conditions that only

5    MRI can diagnose, not CAT scan.

6         Q    Well, can you order a CAT scan in the emergency

7    room?

8         A    Yes.  Yes.

9         Q    What is the reason for the difference?

10        A    They type of imaging.

11        Q    I mean, they are both in the radiology department.

12   Correct?

13        A    Uh-huh (yes).

14        Q    So why do you have to be admitted for one and not

15   for the other?

16        A    I can't answer that for you.

17        Q    Is there any sense to that as far as you know?

18        A    As far as me, personally?

19        Q    Yeah.

20        A    Absolutely not.

21        Q    What is the reason as far as why the hospital does

22   it?

23        A    The reason I was given, or do you want to ask them?

24        Q    No.  I want to ask you.

25        A    I was told financial reimbursement.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 151

1    Q    Okay.  Explain that to me.

2    A    They said to get reimbursed on an MRI, they had to

3    precertify.

4    Q    Precertify?  What does that mean?

5    A    It's to get permission from the insurance company.

6    Q    So what does that have to do with admission?

7    A    I have no idea.

8    Q    Okay.  Had you ever -- did you tell him

9    specifically this -- well, strike that.  Did you tell him

10   that the outcome could have been different for Jordan if she

11   had had an earlier MRI?

12   A    I did not tell him that her condition could have

13   been -- could have been different, that it was -- that I

14   needed to be able to get an MRI for her.

15   Q    Okay.  What did he say?

16   A    That they couldn't do MRIs out of the ER.

17   Q    But he didn't elaborate any further other than it

18   was a financial issue?

19   A    It was a financial issue.

20   Q    Did he discuss it -- did he say anything about the

21   effect it would have on health care?  Was that a

22   consideration at all?

23        MR. GRUNER:  During the stairwell?

24        MR. SHOENFELT:  Yes.  During the stairwell

25        conversation.

Exhibit "1"

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 152

```
1          MR. GRUNER:  And let me object to the form before.

2      I wasn't quite sure that you established that it

3      was Brady who told you about the financial issue in

4      that conversation.

5          WITNESS:  He did.  He did.

6          MR. GRUNER:  I'm just making sure it's clarified.

7      A    And the day that Jordan was there in my

8  conversation with Sherry, the radiology manager, and she said

9  it was because of reimbursement.

10     Q    And that was at 9:07 when you decided --

11     A    No.  That would have been around 11 o'clockish.

12     Q    Sherry -- what was her name again?

13     A    I believe it's Burns, I believe.

14     Q    Is she a health care provider?

15     A    She's radiology department manager.

16     Q    I mean, but does she --

17     A    I'm sure she -- I'm sure she probably has a history

18  of rad tech.  I don't know for sure.

19     Q    And she told you at 11:00 that the reason that you

20  couldn't get the MRI was because of a financial issue?

21     A    The reason why we can't do it in the emergency --

22  why they don't do them out of the emergency department.

23     Q    Had there ever been any other complaints regarding

24  that, to your knowledge?

25     A    That specific?
```

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 153

1    Q    Yes.

2    A    No.

3    Q    All right.  So is the policy still the same?

4    A    If we were in the emergency department right now

5  and I tried to get an MRI?

6    Q    Yes, sir.

7    A    I think I would be met with some resistance.

8    Q    Is there a written policy on this?

9    A    I don't know.

10    Q    Do you have written emergency room protocols?

11    A    We do.

12    Q    Who wrote those?

13    A    I've never -- I've never seen a policy for an MRI

14  in the emergency department, but I cannot tell you that one

15  doesn't exist.

16    Q    You've never seen an emergency room protocol --

17    A    For the MRIs.  That would be a radiology policy.

18    Q    Okay.  Have you ever looked at the radiology

19  protocol?

20    A    No.

21    Q    Have you ever looked at the emergency room

22  protocol?

23    A    I've looked at some of them, yes.

24    Q    I mean, didn't you write those?

25    A    No.

Exhibit "1"

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 155

1    A    To come and get them?

2    Q    Yes.

3    A    I wouldn't say twenty seconds.

4    Q    It doesn't take but a few minutes to come down

5  there and pick somebody up.   Correct?

6    A    That's as long as it takes to get it done.

7    Q    Did you talk to Brady about policies of other

8  hospitals you've worked at?

9    A    Yes.

10    Q    I mean, when you were at St. Francis, —

11    A    Yeah.

12    Q    — did they have that same policy?

13    A    If you needed to get — you had to talk to

14  radiology  department about getting one.

15    Q    I mean, was it —

16    A    There was no button to push for an MRI.

17         MR. GRUNER:  Are you talking about at St. Francis?

18    A    No.  At St. Francis Cabrini in Alexandria.

19    Q    Yeah.  St. Francis Cabrini.

20    A    Yes.

21    Q    Could you order an MRI from the emergency room?

22    A    I had before, yes.

23    Q    So that was back when?

24    A    I was there from '97 to 2005.

25    Q    So their policy was different from the one at North

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 156

1    Monroe -- North Louisiana Medical Center.  Correct?

2           MR. GRUNER:  Object to the form of the question.

3    A    I was able to get an MRI in Alexandria.

4    Q    And you could get it done quickly?

5    A.   Relatively quickly.

6    Q    Well, I mean, when you said something about "This

7    is 2015; you should be able to get an MRI done," --

8    A    Uh-huh (yes).

9    Q    -- what did you mean by that?

10   A    That I could order an MRI and it would get done.

11   Q    You think that's required for proper health care in

12   the emergency room.  Correct?

13   A    Yes, sir.

14   Q    And when you told Brady that, he said, "Well, it's

15   a financial consideration"?

16   A    He started explaining the reason why.

17   Q    How long did that conversation last?

18   A    Five minutes.

19   Q    When is the next time you saw him?

20   A    It was much later.  It was in his office.

21   Q    Okay.  Tell me when that -- what happened then?

22   A    We work different -- some of the things, like,

23   there weren't enough techs.  They weren't able to do twenty-

24   four/seven MRI.

25   (OFF RECORD TALKING.)

Page 158

1    trained on CT and did some limited MRI.  And she knew how

2    upset I had been about this and she offered to come and sit

3    and watch them do -- retrain on some MRIs and to offer her

4    services uncompensated to be on call as long as I wasn't

5    working to come help out the ER.

6        Q.   How long have you been upset about it?

7        A    Since that day.

8        Q    Since August 2014.  Correct?

9        A    Absolutely.  Absolutely.

10       Q    Because you knew the delay shouldn't have occurred?

11       A    I was upset with the system, the very things that

12   we're talking about.

13       Q    Okay.

14       A    I have anxiety before every shift.

15       Q    You mean, since that time?

16       A    Oh, absolutely.

17       Q    And why is that?

18       A    Because I'm afraid another Jordan Scott is going to

19   come in the door.

20       Q    Did you tell Brady all this?

21       A    Oh, yeah.

22       Q    And what did he say?

23       A    He sympathized and said it affected him, too,

24   because his child is in the same grade and he has to see them

25   at school and  --

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 159

1    Q    But he still wouldn't change the policy?

2    A    Never gave in, no.  And then, I was told something

3    about the radiologists on after hours has to pay for a

4    virtual radiology reading and it's not in the contract to be

5    reimbursed for that, and the radiologists would be out three

6    hundred and fifty dollars ($350) for every MRI that was read

7    not by them.

8    Q    Not by who?

9    A    By the radiologists.  Like, if they had to use an

10   off-site, off-hours radiology service.

11   Q    Was that in the second meeting?

12   A    That was actually kind of in a follow-up after my

13   wife, but that was just in passing he was trying to explain.

14   There was a third one.

15   Q    A third meeting?

16   A    Yes.

17   Q    Okay.

18        MR. SHOENFELT:  Let me call this other court

19        reporter and see if we can get somebody.

20        COURT REPORTER:  Yeah.  I haven't heard back from

21        the one who lives here, so she must be busy.

22        MR. SHOENFELT:  I really want to finish this now.

23   (OFF RECORD.)

24   EXAMINATION BY MR. SHOENFELT, continuing:

25        Q    All right.  My last question was -- oh.  I think

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 173

1               came out of peer review, they are privileged.

2        Q    Was that in peer review or did you discuss it

3    outside of peer review?

4        A    Both.

5        Q    Okay.  Well, good.  Tell me what -- tell me what

6    you discerned from that issue.  Did you talk -- strike that.

7    Did you talk to Brady about that, also?

8        A    Yes.

9        Q    And what did he say?

10       A    It was financial implications.

11       Q    Like what?

12       A    Reimbursement.

13       Q    And how would that affect reimbursement?

14       A    They have -- a lot of insurance companies will not

15   reimburse for non-precertified MRIs.

16       Q    So part of the time that was the two and a half

17   hours was while the hospital was precertifying the --

18       A    I don't know that.

19            MR. SHOENFELT:  For the record, the court reporter,

20            although we don't want her to go and we're not

21            agreeing that she's going, but she has to go.

22            Correct?

23            COURT REPORTER:  I have to go.

24            MR. SHOENFELT:  She has to go.

25            COURT REPORTER:  I have to go.  I can't find

Exhibit "1"

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

James P. Taylor, M.D.
February 25, 2016

20

```
1      A.  He said that he could not do an MRI in the

2   emergency department.

3      Q.  Did he tell you who he spoke with?

4      A.  He did not.  I asked him to call MRI, but I

5   don't know if that's who he called.

6      Q.  Okay.  How long after your initial

7   conversation with Ron do you believe he told you

8   that?

9      A.  Twenty, thirty minutes, maybe.

10      Q.  I took your earlier testimony that once Ron

11   told you that, that you then got on the phone.  Is

12   that correct?

13      A.  No, in person with Sandy Goss.

14      Q.  Okay.  So Sandy was the next person you

15   talked to?

16      A.  Yeah.  Sandy was around at that time.  I

17   think she was familiar with at least Jordan's mom.

18   I believe they knew each other or knew of each

19   other.

20      Q.  Okay.  And what did you tell Sandy at that

21   time?

22      A.  I was frustrated that they said they

23   wouldn't do an MRI and she said, well, they're not

24   going to do one in the emergency department.  And I

25   said, would you please go talk to somebody and I
```

EXHIBIT A

James P. Taylor, M.D.
February 25, 2016

21

1   need an MRI.

2       Q.  Okay.  What did Sandy do then?  Do you

3   know?

4       A.  I assumed that she went and talked to them

5   and came back and later told me that they don't do

6   ER MRIs.

7       Q.  Do you know who Sandy spoke with?

8       A.  I do not.

9       Q.  How long after Ron told you that he had

10  spoken with somebody in radiology did you talk to

11  Sandy?

12      A.  Not very long after.

13      Q.  Okay.  But you don't know who Ron or Sandy

14  spoke with?

15      A.  No.

16      Q.  Your next action then to get the MRI was to

17  call Sheri?

18      A.  I walked over there.

19      Q.  You walked over and talked to her in

20  person?

21      A.  I walked to her office, right.  She was

22  actually out in the hallway.

23      Q.  Again, what specifically did you tell Sheri

24  at that time?

25      A.  That I needed to get an MRI.

James P. Taylor, M.D.
February 25, 2016

22

```
1        Q.  Did you tell her it was emergent?

2        A.  I needed an MRI in the emergency

3   department.

4        Q.  Did you tell her --

5        A.  Did I use the word "emergent"?

6        Q.  Yeah.

7        A.  I did not use the word "emergent."

8        Q.  Did you tell her specifically what the

9   nature of Jordan's neurological deficit was?

10       A.  Yeah, it was something with her spine.

11       Q.  What did she say?

12       A.  We don't do emergency -- we can't do MRIs

13  in the emergency department -- through the emergency

14  department.

15       Q.  After that conversation with Sheri, about

16  what time frame are we talking -- well, strike that.

17  What was the time frame that you spoke with Sheri,

18  if you recall?

19       A.  It was not long.  It was enough time for me

20  to leave her office to say I'm going to admit her to

21  get an MRI and for me to walk up to administration

22  to go and try to find Brady and talk to him, but he

23  was out.  So I came back and just called Jake Wood

24  to do it.

25       Q.  So --
```

James P. Taylor, M.D.
February 25, 2016

26

1      Q.  Okay.  Subsequent to this case, have you

2  ever attempted to order an MRI out of the emergency

3  department?

4      A.  Yes.

5      Q.  And were you successful in getting that MRI

6  accomplished?

7      A.  Yeah, there was one time.

8      Q.  Okay.  What type of case was that?

9      A.  It was immediately after peer review.  In

10  urgent care, there was somebody there with lower

11  back pain, with weakness in their legs and they

12  called from urgent care -- Quickcare, that was the

13  particular urgent care, called Dr. Blair to discuss

14  it with him, and he told them to have the patient

15  come to the ER for me to see.

16      Q.  And was it your order for the MRI that was

17  accomplished or Dr. Blair's order?

18      A.  No, it was me.  I became a disruptive

19  physician that day because of what I had been

20  through, and I went all the way to the CEO.

21  Dr. Blair knew I was unhappy back then.

22      Q.  All right.  Any other attempts to order an

23  MRI out of the emergency department?

24      A.  The only other time -- that I had tried to

25  order an MRI?  No.  There was a -- since that time,

EXHIBIT A

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

* * * * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

VERSUS                                           PCF NO. 2015-00923

JACOB WOOD, M.D.,
THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER
AND JAMES TAYLOR, M.D.

* * * * * * * * * * * * * * * * * *

DEPOSITION OF

SHERI GARRETT BURNS

May 12, 2016

(commencing at 1:01 p.m.)

* * * * * * * * * * * * * * * * * *

Taken at:

Northern Louisiana Medical Center
401 East Vaughn Avenue
Ruston, Louisiana 71270

* * * * * * * * * * * * * * * * * *

Reported By:              WANDA J. EADY
                         CERTIFIED COURT REPORTER
                         CERTIFICATE NO. 87255
                         PARISH OF OUACHITA
                         STATE OF LOUISIANA

EXHIBIT
3

Page 2

1  APPEARANCES:
2
3     FOR GREGORY SCOTT AND MICHELLE SCOTT,
      INDIVIDUALLY AND ON BEHALF OF THE MINOR,
      JORDAN SCOTT, AS THE PARENTS AND TUTORS
4     OF JORDAN SCOTT:
5        OSCAR L. SHOENFELT, III
         ATTORNEY-AT-LAW
6        2109 Perkins Road
         Baton Rouge, Louisiana 70808
7
8     FOR NORTHERN LOUISIANA MEDICAL CENTER:
9
         BLUE WILLIAMS
10       3421 North Causeway Boulevard,
         No. 900
11       Metairie, Louisiana 70002
         appearing herein by and through
12       Mr. Kurt S. Blankenship
13
14    FOR JACOB M. WOOD, M.D.:
15       HUDSON, POTTS & BERNSTEIN
         Post Office Drawer 3008
16       Monroe, Louisiana 71210-3008
         appearing herein by and through
17       Ms. Sera White on behalf of
         Mr. Gordon L. James
18
19 VIA     FOR JAMES PATRICK TAYLOR, M.D.:
20 TELEPHONE:
         DEGAN, BLANCHARD & NASH
21       400 Poydras Street, Suite 2600
         New Orleans, Louisiana 70130
22       appearing herein by and through
         Ms. Maryann Hoskins
23
24 ALSO PRESENT:    Susan White, Risk Manager
25 ************************

Page 3

1          INDEX OF EXHIBITS
2   Exhibit 1   Page 1 of MRI List . . . . . . . . . . . . 12
3   Exhibit 2   Page 2 of MRI List . . . . . . . . . . . . 12
4
5   ********************
6
7          STIPULATIONS
8      This deposition is taken for use before the Medical
9   Review Panel, pursuant to the Louisiana Code of Civil
10  Procedure, and may be used for all purposes and in any manner
11  consistent therewith. All objections except as to the form
12  of the question and responsiveness of the answer are
13  reserved.
14
15          ********************
16
17     The witness, SHERI GARRETT BURNS, was advised of her
18  right to read and sign this deposition, and she elected to
19  exercise that right.
20
21          ********************
22
23
24
25

Page 4

1       SHERI GARRETT BURNS, being first duly sworn, testified
2   as follows:
3   EXAMINATION BY MR. SHOENFELT:
4      Q   Would you please state your full name for the
5   record?
6      A   Sheri Garrett Burns.
7      Q   And give me your address, please.
8      A   Home address?
9      A   Yeah. That would be good.
10     A   996 Long Straw Road, Choudrant, Louisiana.
11     Q   How do you spell that?
12     A   C-H-O-U-D-R-A-N-T.
13     Q   I was wondering how you pronounced that.
14         MR. SHOENFELT:  So I'm going to ask you some
15     questions today.  This is called a deposition.
16     Have you ever taken a deposition?
17         WITNESS:  I have not.
18         MR. SHOENFELT:  Okay.  If you don't understand any
19     question, just ask me to repeat it and I'll be
20     happy to do so.  But if you do answer, I will
21     assume you understand it.  Does that sound fair?
22         WITNESS:  Yes.
23     Q   Can you give me your occupation?
24     A   I am the director of radiology.
25     Q   At Northern —

Page 5

1      A   Northern Louisiana Medical Center.
2      Q   And what does that encompass?
3      A   I manage the radiology department and all of the
4   techs that work for me.
5      Q   Can you give me a rundown of your educational
6   background?
7      A   I have a Bachelor of Science in radiologic
8   technology.
9      Q   And where was that?
10     A   From ULM, University of Louisiana at Monroe.
11     Q   And what year did you obtain that?
12     A   1988.
13     Q   And where did you go to high school?
14     A   Bastrop High School.
15     Q   The Rams.  Correct?
16     A   The mighty Rams.
17     Q   All right.  What year did you graduate?
18     A   1983.
19     Q   What did you do from '83 to '88?
20     A   I was in college.
21     Q   In college?  At ULM?
22     A   Yes.
23     Q   And after you got your B.S. in radiology, what did
24   you do?
25     A   I worked at St. Francis Medical Center in Monroe

2  (Pages 2 to 5)

Page 10

1  create them?
2    A  I did help create, and they are reviewed by my
3  radiologist that's over the department.
4    Q  Who is that?
5    A  Steve Pate.
6    Q  He's an M.D.?
7    A  Yes.
8    Q  P-A-Y-T-E?
9    A  P-A-T-E.
10   Q  How long has he been at North Louisiana Medical
11 Center?
12   A  He was here prior to me.
13   Q  Prior to 1999?
14   A  Yes.
15   Q  That's a long time.
16   A  (Affirmative nod.)
17   Q  Okay.  So you report to the assistant CEO, but
18 Steve Pate is the M.D. --
19   A  He's the medical director of radiology.
20   Q  So he's the medical director?
21   A  Correct.
22   Q  And you're the director?
23   A  Yes.
24   Q  So as a medical director, what does he do?
25   A  He oversees.  He approves our policies and

Page 11

1  procedures, too.  He looks at those yearly.  He participates
2  in our radiation safety meetings.
3    Q  So does the -- what's that? -- the Joint
4  Commission, ACAH, do they require a medical director, M.D.,
5  or do you know?
6    A  I'm not sure.  I don't know if that's a true
7  requirement.  We've always had a medical director over the
8  department.
9    Q  You said he looks at the policies periodically.  Is
10 that correct?
11   A  Yes.
12   Q  Okay.  What did you review in preparation for your
13 deposition?
14   A  I reviewed Dr. Taylor's --
15     MR. BLANKENSHIP:  Deposition.
16   A  -- deposition, and I pulled the list of MRIs that
17 had been done in the emergency room.
18   Q  Where is that?
19   A  (Proffers document.)
20     MR. SHOENFELT:  For the record, we're --
21     MR. BLANKENSHIP TO MS. HOSKINS:  Maryann, I'm
22 sorry.  I didn't think about faxing this to you.
23 Maybe we could take a short break and send it to
24 you.
25     MS. HOSKINS:  Just tell me, how many pages is it?

Page 12

1      MR. BLANKENSHIP:  Two pages.
2      MS. WHITE:  I can text it to her or e-mail it to
3  her.
4      MR. BLANKENSHIP:  Sara is offering to e-mail it.
5  She's going to take a picture of it real quick and
6  e-mail it to you.
7      MS. HOSKINS:  Okay.  Thank you.
8  (OFF RECORD DISCUSSION.)
9      MR. SHOENFELT:  Okay.  For the record, I'm going to
10 mark this as "Exhibit 1."
11   Q  And I guess -- this is two pages.  Correct?
12   A  Yes.
13     MR. SHOENFELT:  So I'll mark the second page as
14 "Exhibit 2."
15   Q  So --
16     MR. BLANKENSHIP:  And for the record, the original
17 of this document had actual patient names on it.
18 We have redacted those names, but left everything
19 else.
20   Q  Okay.  Sheri -- Sheri? --
21   A  Yes.
22   Q  All right.  -- tell me about this "Exhibit 1" and
23 "2."
24   A  I just pulled a list of -- I pulled by the order
25 service, EOP.  It stands for emergency outpatient.  So I

Page 13

1  pulled all MRIs that were ordered from the emergency room.
2    Q  So you're saying where it says "HSV"?
3    A  Yes.
4    Q  What does that stand for?
5      MR. BLANKENSHIP:  EOP.  He's asking what --
6    A  The EOP is for emergency outpatient.
7    Q  Emergency outpatient?  Okay.  So explain this to
8  me, what this means.
9    A  This is just MRIs that were ordered from the
10 emergency room, and I did it by date range that's listed at
11 the top.
12   Q  Okay.  According to this, this was a computer
13 printout?
14   A  Yes.
15   Q  Okay.  Where is this kept?  In the radiology
16 department or --
17     MR. BLANKENSHIP:  The physical computer or --
18   Q  Yeah.  The physical computer.
19   A  The computer?  Yes.
20   Q  Okay.  And I assume it's part of the hospital
21 computer system?
22   A  Yes.
23   Q  And what is it under, if you wanted to pull this
24 up?
25   A  The report name is Statistics by Procedure.

4 (Pages 10 to 13)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 14

1     Q   Statistics by Procedure?  I see.  And how did you
2   narrow it down to the emergency room?
3     A   Because I picked just those orders that originated
4   from EOP, emergency outpatient.
5     Q   Okay.  What is an emergency outpatient?
6     A   A patient that is registered in the emergency –
7   being seen in the emergency room.
8     Q   So would these be patients who were never admitted
9   to the hospital?
10     A   Some of these could be.
11     Q   Do you know when these studies would have been
12   ordered and when they would have been performed?
13     A   The order date and perform date is the start date
14   to the left.
15     Q   Okay.  Where it says "start date."  Well, the first
16   one, for example, on "Exhibit 1" says, "12-10-15."  Correct?
17     A   Correct.
18     Q   That's the start date.  That's when it would have
19   been ordered?
20     A   Ordered and done.
21     Q   Well, how long would it have taken to have been
22   completed?  Do you know?
23     A   Would be within that day.  I mean, I would have to
24   pull specific exams to –
25     Q   So it is your testimony that these were ordered in

Page 15

1   the emergency room.  Correct?
2     A   Correct.
3     Q   Okay.  How were they ordered?
4     A   How were they ordered?
5     Q   Yeah.  I understand there is no button to order an
6   MRI.
7     A   Well, the order is put into the computer system.
8     Q   Order is put into computer.  How do you put it in?
9     A   You –
10     MR. BLANKENSHIP:  He's asking how does a physician
11   put it in or order them?
12     A   They go into HMS, pull up – I mean, do you want
13   step by step?
14     Q   Yeah.  I mean, there was some testimony earlier
15   about filling out some kind of outpatient sheet.
16     MR. BLANKENSHIP:  Downtime form.
17     Q   Downtime form.  Is that what this is?
18     A   Oh.  Like, they do a written order, and then
19   somebody would take the written order and put it in the
20   computer.
21     Q   Well, was that how these were done?  Do you know?
22     A   I don't know.
23     Q   Okay.  And all these are emergency room physicians,
24   Holly Kidd, –
25     A   She is not.  And that one has "106" beside it,

Page 16

1   which could be that they started out in the emergency room
2   and went to the floor.  So on that particular one, I don't
3   know for sure if the order started in the ER or if it was
4   after they were admitted.  But if it doesn't have a room
5   number, they were strictly an emergency room patient.
6   (OFF RECORD DISCUSSION.)
7     Q   I'm going to get you – this is the exhibit.
8     A   Okay.
9     Q   I'm going to get you to mark some stuff.  So why
10   don't you write on the exhibit, where it says "EOP," just
11   write out "emergency room – " whatever that –
12     MR. BLANKENSHIP:  Emergency outpatient.
13     Q   Emergency outpatient.
14     A   (Complies.)
15     Q   Okay.  Then, you said as far as, if we're looking
16   at this, it says the procedure, which would be – is that
17   "MR"?  Is that an MRI?
18     A   Yes, sir.
19     Q   Okay.  "MR" is MRI.  Ankle – is that without
20   contrast?
21     A   Correct.
22     Q   Okay.  And then, it says "12-10-15" at the top of
23   "Exhibit 1."  That's the start date.  That would be the date
24   they would take it or order it?
25     A   (Affirmative nod.)

Page 17

1     MR. BLANKENSHIP:  Both.
2     A   Both.
3     Q   Both.  Okay.  Service, patient name was taken off.
4   Correct?
5     A   Correct.
6     Q   The patient number is there and it has an order,
7   order number and it says "300."  Where would that order be?
8     A   In the computer system.
9     Q   In the computer system?
10     A   And it's automatically assigned as orders are
11   entered, so that would have been the third order entered –
12     Q   Oh, is that –
13     A   – because it goes – it jumps by one hundred.
14     Q   I see.  Okay.  For that day?
15     A   For that visit.
16     Q   For that visit for that patient?
17     A   Correct.
18     Q   What's "Location; Q/P"?  Is that outpatient?
19     MR. BLANKENSHIP:  I think it's O/P.
20     Q   Is that outpatient?
21     A   Outpatient.  Correct.
22     Q   Outpatient.  And the ordering physician, and then
23   the family physician.  Correct?
24     A   Correct.
25     Q   And what's the "ST tech"?

5 (Pages 14 to 17)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 18

1    A   The "ST" is the status, and the "tech" is the x-ray
2    tech that performed the exam.
3    Q   So what does "F" mean, status F?
4    A   Final.
5    Q   Final?  What does that mean?
6    A   That there is a final report.
7    Q   The report was run.  What does "R" mean?
8    A   Resulted?  I'm not familiar with the "R."
9    Q   And then, "Exhibit 1" is -- why is that a different
10   page than "Exhibit 2"?  Is this just different dates?
11   A   It's a different time range.
12   Q   Okay.  All right.  So would I be correct in saying
13   that, in the year 2013, these would -- "Exhibit 2" would have
14   all of the MRIs that would have been ordered in the emergency
15   room?
16   A   Yes.
17   Q   So these are MRIs of the brain, cervical spine,
18   hip, and then an MRA of the head.  Is that the same as an
19   MRI?
20   A   Well, it's MR angiography.  It's looking at the
21   vessels themselves.
22   Q   And then, on "Exhibit 2" for 2013, which of those
23   physicians are actually ER physicians?
24   A   All but Sheila Mariano, Derek Liston, --
25   Q   Why don't you put an "X" by those, the ones that

Page 19

1    are not ER?
2    A   -- and Holly Kidd.  (Complies.)  Oh, wait.  Liston
3    is.
4        MR. BLANKENSHIP:  I was going to say isn't Dr.
5    Liston an ER physician?
6        WITNESS:  He is.
7        MR. BLANKENSHIP:  Once you're finished, say out
8    loud which ones you've marked as not ER physicians.
9    A   Sheila Mariano and Holly Kidd.
10   Q   Okay.  Now, as far as "Exhibit 1," would I be
11   correct in saying that this list would contain every MRI that
12   was performed or ordered in the emergency room for the year
13   2014 at North Louisiana Medical Center?
14   A   Yes.
15   Q   Okay.  So there's one at, like, April 28th, it
16   looks like; one June 1st; one June 22nd; one August 21st; and
17   one September 18th.  Is that correct?  The MRA was
18   September --
19   A   18th.
20   Q   -- 18th.
21   A   Correct.
22   Q   And then, will you mark on "Exhibit 1" all the
23   physicians that are not ER physicians?
24   A   Okay.  Holly Kidd, Mark Blackwelder, Reagan Bonin.
25   That's all.

Page 20

1    Q   What is this "Procedure total; 5," and it says
2    "inpatient"?  What does that mean?  I'm talking about
3    "Exhibit 1."
4    A   Five of these converted from an ER patient to an
5    inpatient.
6    Q   Okay.  So the study could have been ordered in the
7    emergency room, and then it would have been performed when
8    the patient was admitted?
9    A   I can't really say positively from this.  It could
10   have ordered in the ER or it could have ordered after they
11   were inpatient.
12   Q   Now, and then on "Exhibit 1," it says, "Procedure
13   total inpatient, 4; outpatient, 9."
14       MR. BLANKENSHIP:  I'm sorry.  Where are you?
15       MR. SHOENFELT:  I'm on "Exhibit 2."
16   Q   How do those numbers come up?  I don't -- it says
17   "Inpatient, 4; outpatient, 9; industrial, 0; total, 13," I
18   guess, procedure total thirteen?
19       MR. BLANKENSHIP:  Oh, okay.  I see.
20   A   Correct.
21   Q   Patient count would be three inpatient, and
22   outpatient seven.  Correct?
23   A   Correct.
24   Q   So do you have an explanation as to -- there's been
25   some testimony that there is a button in the emergency room

Page 21

1    that you can order a CT and an x-ray, but there's not a
2    button where you can order an MRI.
3        MR. BLANKENSHIP:  In the computer.
4    Q   In the computer.
5    A   Yes.  I understand.
6    Q   Are you aware of that?
7    A   I have been made aware of that.
8    Q   When?
9    A   I don't remember exactly when.
10   Q   I mean, -- okay.  Was that recently or, I mean,
11   what --
12   A   Yes.
13   Q   Recently?  You mean, like, in the last week?
14   A   Like, in the last month or so.
15   Q   Last month or so?  Okay.  When did that come up?
16   A   Maybe when I was reviewing --
17       MR. BLANKENSHIP:  Dr. Taylor's?
18   A   -- Dr. Taylor's deposition.
19   Q   I mean, how did that -- how did you get that
20   information?  He doesn't say it in the deposition.
21   A   It said that there was nothing -- he couldn't order
22   it from within the ED documentation system.
23   Q   And that's the first time you were aware that there
24   was not a button to order an MRI on the computer?
25   A   Correct.

1a08adaf-d104-435c-8703-b0bc0306c2e1

Exhibit "1"

Page 22

1    MR. BLANKENSHIP: So we can be specific, the
2  emergency department computer system.
3    A   The emergency.
4    Q   The emergency department.
5    MR. BLANKENSHIP: Because there's a separate
6  computer system --
7    A   Yes.
8    Q   Well, can you order an MRI anywhere in the hospital
9  on the computer?
10   A   Yes.
11   Q   Why is there a difference in the ER and the
12 hospital as to how you can order an MRI?
13   A   Apparently, the MRI was not set up on the ED
14 system.
15   Q   Okay. So it's set up everywhere except for in the
16 emergency room, -- is that correct? -- as far as your
17 knowledge?
18    MR. BLANKENSHIP: As a computer button.
19   Q   As a computer button.
20   A   As a computer button? Apparently so.
21   Q   Apparently so? And what is the reason for that?
22 What is the reason that the MRI is set up on the computer to
23 order in every place in the hospital except for the ER?
24   A   I don't know.
25   Q   Did you discuss it with anyone?

Page 23

1    A   I have not.
2    Q   I mean, you seem to hesitate. Did you get some
3  information on it or --
4    A   Well, I mean, I just didn't -- I didn't realize
5  that it wasn't set up in there.
6    MR. BLANKENSHIP: And maybe she's hesitating
7      because she discussed it with counsel.
8    Q   Did you discuss it with anyone other than counsel?
9    A   No.
10    MR. BLANKENSHIP TO MS. HOSKINS: Maryann, did you
11     get it?
12    MS. HOSKINS: Yes, sir. Thank you.
13    MR. BLANKENSHIP: Okay.
14   Q   Now, have you been involved at any time personally
15 with any patients who have -- where an MRI has been ordered
16 in the emergency room and the patient has been taken directly
17 to the diagnostic center to have the MRI run from the
18 emergency room at North Louisiana Medical Center?
19   A   Say that one more time. I didn't under- --
20    MR. BLANKENSHIP: I'm going to object to the form.
21     She may not understand what you mean "involved
22     personally."
23   Q   Okay. I mean, do you have any -- I mean, you ran
24 this "Exhibit 1" and "2." Correct?
25   A   Correct.

Page 24

1    Q   Were you involved in any of these --
2    A   Not directly.
3    Q   I mean, do you remember any of them?
4    A   Not specifically, no.
5    Q   Do you remember specifically any time to your
6  knowledge that an ER physician ordered an -- was able to
7  order an MRI while in the emergency room, had the patient
8  taken directly over to the MRI machine at North Louisiana
9  Medical Center and had the MRI run?
10   A   Am I aware of --
11   Q   Yes.
12   A   Yes.
13    MR. BLANKENSHIP: Are you aware of that happening?
14   A   Yes.
15   Q   Okay. In that instance, are there any written
16 procedures or anything written down as to who should take the
17 patient over there, how the MRI should be facilitated in any
18 way?
19   A   No.
20   Q   As the director of the radiology department, how do
21 you feel that should be effectuated when that order is made
22 in the emergency room?
23   A   I don't understand.
24    MR. BLANKENSHIP: Are you asking physically how it
25     happens?

Page 25

1    Q   Yeah. I mean, who -- you're saying the order can't
2  be put in the computer. Correct?
3    MR. BLANKENSHIP: In the emergency room.
4    A   Oh, it is put in the computer.
5    Q   It's put in the computer by how if there is no
6  button in the emergency room?
7    A   They go into the other computer system and put it
8  in.
9    Q   Who is "they"?
10   A   I can't say for sure who is actually putting it in.
11   Q   Okay. I mean, you don't know who would put it in.
12 The doctor couldn't put it in, or could he?
13   A   I know they do now.
14   Q   Well, when did that start?
15   A   I don't know when it started, but --
16   Q   Well, when did you become aware? You said now you
17 are aware. When did you become aware?
18   A   Again, from when I was reading his, he said that he
19 can now put it in, that he used to have to write it.
20   Q   Well, was there a change made at some point in time
21 that you are aware of?
22   A   Not that I'm aware of, no.
23   Q   Okay. So I'm trying to figure out, like, for these
24 exhibits, how these patients -- who took these patients over
25 to radiology and had the test run?

7 (Pages 22 to 25)
1a08adaf-d104-435c-8703-b0bc0306c2e1



Page 26

1    A   My technologists go to the emergency room and get
2  the patients and bring them back.
3    Q   Okay.  And you are aware of that happening before?
4    A   Yes.
5    Q   So if Jordan Scott on August 19th, 2014 was denied
6  an MRI based on any reason, including financial, that would
7  not have -- that would have been different treatment than
8  other patients had received?
9        MR. BLANKENSHIP:  Object to the form.
10   A   Can you repeat that again?
11   Q   Yeah.  You read Dr. Taylor's deposition.  Correct?
12   A   Correct.
13   Q   Okay.  Assuming that Jordan Scott was denied an MRI
14 being run in the emergency room at 9:07, that would have been
15 different from the way other patients have been treated at
16 North Louisiana Medical Center.  Would that be correct?
17       MR. BLANKENSHIP:  Same objection.
18   A   To my knowledge, it was not denied.
19   Q   I understand that.  But I'm just saying, assuming
20 that what Dr. Taylor said to be true, she would have been
21 treated differently than other patients at North Louisiana
22 Medical Center.  Correct?
23       MR. BLANKENSHIP:  Same objection.  (To witness):
24       You can answer, if you can.
25   A   I really don't know how to answer that.

Page 27

1    Q   I'm just -- assuming that what Dr. Taylor --
2  assuming.  Okay?  I can ask you, assuming that Dr. Taylor,
3  what he said was true, that she was denied or maybe his
4  request for an MRI because of money oriented or financial
5  reasons, that would have been different than other patients
6  who have been treated at North Louisiana Medical Center?
7        MR. BLANKENSHIP:  Same objection.
8    A   We don't even know financial stuff in radiology.  I
9  mean, we have an order from a physician.  They've got an
10 armband that they are registered, and we do what's on the
11 order.  I mean, we don't even know financial stuff on a
12 patient.
13   Q   I understand.  But I'm just asking you --
14       MR. SHOENFELT TO COURT REPORTER:  Can you read the
15       question back?
16       COURT REPORTER:  I can play it back for you.
17       MR. SHOENFELT:  Play it back.
18   Q   In other words, you can respond to the question.
19 Okay?
20   A   Okay.
21       MR. BLANKENSHIP:  If you know the answer.
22 (OFF RECORD DISCUSSION.)
23   Q   I'm going to ask it again.  I want you to listen to
24 me -- okay? --
25   A   Okay.

Page 28

1    Q   -- and try to answer the question, if you can.  I
2  said, assuming what Dr. Taylor said in his deposition was
3  true, that Jordan Scott was denied an MRI in the emergency
4  room because of financial reasons, that would be different
5  than any other patient you know that's been treated at North
6  Louisiana Medical Center.  You would agree with that?
7        MR. BLANKENSHIP:  Object --
8        MS. HOSKINS:  Object to the form.  I don't think
9        that's exactly what Dr. Taylor said.
10       MR. BLANKENSHIP:  And I join in the objection.  (To
11       witness):  But you can answer, Sheri, if you can.
12   A   That would be different.
13   Q   I mean, in other words, you are telling me that you
14 never know -- that you of no requisite of a patient to
15 show any kind of financial ability to pay before an MRI is
16 run from -- ordered from the emergency room and run at North
17 Louisiana Medical Center?
18   A   No.
19   Q   You don't know of any.  Correct?
20   A   Correct.
21   Q   Okay.  So am I correct that you have no knowledge
22 of any necessity for a patient to be admitted before an MRI
23 or something can be ordered in the emergency room?
24   A   No.
25       MS. HOSKINS:  Pardon me.  I didn't hear the answer.

Page 29

1        MR. BLANKENSHIP:  "No," she said.
2    A   No.
3    Q   I take it no one has ever discussed that with you
4  at any point in time?  No one from the hospital has ever
5  discussed with you that you need to get insurance
6  verification or some kind of ability to pay before a
7  diagnostic study can be run?
8    A   No.
9    Q   So, I mean, are you telling me that, if a patient
10 had an appointment to come get this study run, you don't
11 verify it with insurance?
12   A   Not personally.  That happens in the business
13 office in admissions.  They don't get to me if all that is
14 not taken care of, whatever --
15   Q   Well, how do you know that?  You just testified you
16 didn't know anything about the financial ability to pay.
17   A   Well, I don't personally.  I know that -- how I
18 know is, occasionally we have had somebody on the schedule
19 that we don't do because of whatever reason, you know,
20 something in the business office.
21   Q   Oh, really?
22   A   It might be rescheduled, you know, if they weren't
23 precerted, but we have nothing to do with that process.
24   Q   But you are aware of that.  I mean, you --
25       MR. BLANKENSHIP:  Let her finish her answer.

8 (Pages 26 to 29)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 30

1    Q  Go ahead.
2    A  I have nothing to do with that.
3    Q  That's not my —
4    A  I don't check it.  I don't know about it.
5    Q  Well, your testimony is you were unaware of any
6  kind of financial status of the patient, and now you are
7  testifying you are aware that patients have been denied
8  coverage if they are not precertified, — is that correct? —
9  or denied —
10    MR. BLANKENSHIP:  Object to the form.
11    Q  — denied having the test done if they are not
12  precertified?
13    MR. BLANKENSHIP:  Object to the form.  That's not
14    what she said.
15    A  I have no knowledge of their financial status when
16  a patient comes in my department.
17    Q  But you are assuming that they've been precertified
18  by the business office.  Correct?
19    A  Yes, because I know that does take place.  I just
20  have nothing —
21    Q  You just know it takes place, but you don't know
22  anything about it?
23    A  Correct.
24    Q  So what else do you know that you don't know
25  anything about as far as they have to do — what? — get

Page 31

1  precertified or —
2    MR. BLANKENSHIP:  Object to the form.  (To
3    witness):  You can answer.
4    A  Most MRIs have to be precertified on an
5  outpatient —
6    Q  Most of them?
7    A  I assume.  Like I said, I don't — I'm not involved
8  in that process.
9    Q  So they may need to be precertified if they are in
10  the ER.  You don't really know, do you?
11    A  I don't think so in ER.  I really don't know.
12    Q  You really don't know?
13    A  I don't know.
14    Q  Okay.  I mean, there is a financial registration
15  portion at the emergency room.  You're aware of that?
16    A  I'm sure there is at some point.
17    Q  No one has ever talked to you about, "We want to
18  make sure that these patients are certified so we can make
19  sure that we get reimbursed for these MRIs"?
20    A  I've never had that conversation.
21    Q  Never had that?  That would come from the business
22  office?
23    A  Yes.
24    Q  Now, you said there were cases where people had to
25  reschedule when they didn't get precertified, — correct? —

Page 32

1  patients at North Louisiana Medical Center?
2    A  Yes.
3    Q  To your knowledge, has anybody not been
4  precertified that got an MRI at North Louisiana Medical
5  Center?
6    MR. BLANKENSHIP:  Object to the form.
7    A  I have no knowledge.
8    Q  You have no knowledge one way or the other?
9    A  No, sir.
10    Q  You don't know if what happened with "Exhibit 1" or
11  "Exhibit 2," if these patients who got these MRIs from the ER
12  may have been precertified.  Correct?
13    A  I have no idea.
14    Q  But you were assuming they all had been
15  precertified.  Correct?
16    MR. BLANKENSHIP:  Object to the form.
17    A  I don't know.  I don't know their status as far as
18  insurance or —
19    MR. BLANKENSHIP:  She's said that six or seven
20    times.
21    Q  And how hands-on are you as far as, if an order
22  comes through and you're saying a patient is in the ER that,
23  according to your supervision, then radiology should come
24  over and get the patient and take them directly to the
25  diagnostic center.  Is that correct?

Page 33

1    A  Correct.
2    Q  And you've seen that happen before?
3    A  Yes.
4    Q  And my question to you would be why didn't that
5  happen on August 19th, 2014, when Dr. Taylor ordered an MRI
6  for Jordan Scott?
7    MR. BLANKENSHIP:  Object to the form.
8    Q  Meaning, why didn't someone from radiology come
9  over and take her immediately to get the MRI?
10    A  To my knowledge, as soon as we received the order,
11  she was brought to MRI.
12    Q  Okay.  Well, an order was made — a written order
13  was made at 12:35 and she wasn't in MRI until after 3
14  o'clock.  How do you explain that?
15    MR. BLANKENSHIP:  I don't think that's correct.  I
16    object to the form.  It's, like, 2:30 or 2:40,
17    something like that.  It's in the record.  Whatever
18    the record says.
19    Q  It says to x-ray at 12: —
20    MR. BLANKENSHIP:  Those are different.  That was
21    the chest and the neck x-rays.
22    Q  Okay.  Did you review the medical record?
23    A  I have not looked at the medical record.
24    Q  Is there any — you just pulled up these charts.
25  Correct?

9  (Pages 30 to 33)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 38

1   believe. "Is she a health care provider?" "She's radiology
2   department manager." "I mean, but does she -- " "I'm sure
3   she -- I'm sure she probably has a history of rad tech. I
4   don't know for sure." "And she told you at 11:00 that the
5   reason you couldn't get the MRI was because of financial
6   issues?" "The reason we can't do it in the emergency -- why
7   they don't do them out of the emergency room." You don't
8   recall any of that?
9       A   No, sir.
10      Q   You don't have any knowledge of any financial
11  issues of getting MRIs out of the emergency room?
12      A   No.
13      Q   And you don't know why there's not an order button
14  in the emergency room for MRIs?
15          MR. BLANKENSHIP: In the emergency room computer
16          system?
17      Q   In the emergency room computer.
18      A   No.
19      Q   I mean, can you think of any reason from a physical
20  or physiological point of view why a button couldn't be in
21  the emergency room for an MRI order?
22      A   No.
23      Q   Page 27, Dr. Taylor says, referring to another
24  instance, "The only other time that I tried to order an MRI
25  since that time, there was a female with headaches and visual

Page 39

1   problems that had multiple negative CTs of her head that was
2   seen. I can't give your an age, nine-year-old or ten-year-old
3   or something like that, that was seeing a neuro
4   ophthalmologist in Shreveport and he had an order, an MRI
5   that was being done, scheduled for outpatient at 1:30 that
6   day, and her and her mother checked in because her headache
7   got worse. That physician called the hospital and wanted to
8   go ahead and do the MRI. On that particular one, I actually
9   talked to Sheri about that one because she was already
10  scheduled and stuff like that. The MRI was done." You don't
11  recall that?
12      A   I don't recall that, no.
13      Q   Well, are you saying that might have occurred,
14  didn't occur or you just don't recall?
15          MR. BLANKENSHIP: Object to the form. She already
16          answered.
17      A   I don't recall it.
18      Q   Have you ever received any electronic mail of any
19  type concerning whether MRIs can be run -- or ordered from
20  the emergency room at North Louisiana Medical Center?
21          MR. BLANKENSHIP: Object to the form. I think he's
22          talking about e-mails.
23      Q   I'm talking about anything, e-mails, something
24  faxed, anything, any information.
25      A   No.

Page 40

1       Q   Never? Never come up.
2       A   (Negative nod.)
3       Q   Is that correct?
4       A   Correct.
5       Q   You never talked to Dr. Wood about it, about that
6   issue. Is that correct?
7       A   No. That's correct.
8       Q   Dr. Blair?
9       A   No.
10      Q   Do you know Dr. Blair?
11      A   Yes.
12      Q   You did see Dr. Blair there on August 19th, 2014.
13  Correct?
14      A   Yes. He was physically in the department.
15      Q   Was any other physician physically in the
16  department to your recollection?
17      A   Not to my -- well, the radiologist was.
18      Q   Did you go in and look at the MRI that was run on
19  Jordan Scott?
20      A   I did.
21      Q   What did you see?
22      A   I'm not an MRI technologist, so I don't really -- I
23  can't interpret MRIs, but --
24      Q   Okay. Well, tell me what you recall in the
25  conversation -- any conversations that took place in the

Page 41

1   radiology department concerning Jordan Scott between anybody.
2       A   Well, the conversations were that, "We need to get
3   her out of here."
4       Q   And that was between the radiologist and Dr. Blair.
5   Is that correct?
6       A   Correct.
7       Q   Anyone else?
8       A   Not to my knowledge, no.
9       Q   Okay. Dr. Taylor, page 21. I think this is the
10  second -- the telephone deposition. "Your next action to get
11  the MRI was to call Sheri?" Answer: "I walked over there."
12  "You walked over there and talked to her in person?" Dr.
13  Taylor: "I walked to her office, right. She was actually
14  out in the hallway." "Again, specifically, did you tell
15  Sheri at that time?" Answer: "Do I need to get an MRI?"
16  Question: "Did you tell her it was emergent?" "I need an
17  MRI in the emergency department." Question: "Did you tell
18  her?" "Did I use the word 'emergent?'" He says, "Yeah. I
19  did not use the word 'emergent.'" "Did you tell her
20  specifically what the nature of Jordan's neurological deficit
21  was?" Answer: "Yeah. It was something with her spine." Do
22  you recall any of that conversation?
23      A   I do not. Do not recall speaking with him at all.
24      Q   "What did she say?" Answer: "We don't do
25  emergencies. We can't do MRIs in the emergency department

11 (Pages 38 to 41)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 42

1  through the emergency department." You deny that
2  conversation?
3      A. Yes. I deny that.
4      Q. But if that's true, Jordan Scott would have been
5  treated different than any other patient you've ever known
6  that would need an MRI at North Louisiana Medical Center.
7  Correct?
8      MR. BLANKENSHIP: Object to the form. (To
9      witness): You can answer.
10     A. If she had been denied, that would be different.
11  Yes.
12     Q. And you weren't aware of Dr. Taylor trying to talk
13  to Brady on August 19th, 2014?
14     A. I am not aware.
15     Q. Did you see Brady on August 19th, 2014?
16     A. I do not remember.
17     Q. Did you ever talk to him about the care Jordan
18  Scott received?
19     A. No, sir.
20     Q. Did you make any kind of -- did you give any kind
21  of statements to anyone about anything that happened
22  regarding Jordan Scott on August 19th, 2014?
23     A. No.
24     Q. And the first time that -- when is the first time
25  you were aware there was a complaint filed or a lawsuit had

Page 43

1  been brought?
2      A. It was when I spoke with you (indicating Mr.
3  Blankenship).
4      Q. That was just recently?
5      MR. BLANKENSHIP: "You," being counsel, she means.
6      A. Counsel.
7      Q. You mean just recently?
8      A. Yes.
9      Q. Did you ever talk with -- were you called to give
10  any kind of testimony of any nature in any hospital review
11  committees or anything of that nature?
12     A. No.
13     Q. Did you ever talk to Sandy Goss about this?
14     A. No.
15     Q. Who do you deal with in the business office
16  regarding precertification for diagnostic studies?
17     A. I do not deal with anyone.
18     Q. I mean, how do you know -- you don't have any idea
19  if the patient has been precertified or not?
20     A. No.
21     Q. There's nothing in the computer to say that?
22     A. I don't know.
23     Q. Let's see. Let me get the right record here. Were
24  you involved in the patient being transferred at all?
25     A. No, sir.

Page 44

1      Q. Page 18 of the 2016 record, there's a doctor's
2  order for an MRI.
3      MR. BLANKENSHIP: For Jordan Scott.
4      Q. How would that order in the emergency department
5  get into the computer?
6      A. The nurse, M. Rhodes, put it in at 1430.
7      MR. BLANKENSHIP: That was after she was on the
8      floor.
9      Q. So why would that happen, if the order is at 12:35,
10  but it's not put in until two hours later?
11     A. I'm assuming it's, whenever the patient gets to the
12  floor, they put the inpatient orders in.
13     Q. So that's an inpatient order, in your opinion?
14     A. It's what it appears, yes, observation to peds for
15  Dr. Wood, admission orders, --
16     MR. BLANKENSHIP: It says "admission orders" on the
17      bottom.
18     Q. Okay. Page 23, this is a chest x-ray. Can you
19  tell me what time that was taken?
20     MR. SHOENFELT: For the record, it's Jordan Scott's
21      chest x-ray.
22     MR. BLANKENSHIP: It's page 23, I would assume, of
23      one of the versions, the 20- --
24     MR. SHOENFELT: The 2016 record. That's what I'm
25      using now.

Page 45

1      MR. BLANKENSHIP: The 2016.
2      A. The order date and time is 8-19 at 7:48 a.m. This
3  does not show the exact time the x-ray was taken on this
4  report.
5      Q. Is there something --
6      A. It was dictated at 8:49 a.m., so it was between
7  those times.
8      Q. Okay. So would someone have taken Jordan Scott
9  over to x-ray?
10     A. This was a single view chest, so -- it says
11  "portable." They went to the emergency department and took
12  the x-ray --
13     Q. So someone actually went from the --
14     A. -- with a portable unit.
15     Q. -- radiology department to take the x-ray at
16  9 o'clock that morning. Correct?
17     A. It would have been before 9 o'clock because it was
18  dictated at 8:49, so --
19     Q. Was it dictated on August 19th?
20     A. Yes. At the very bottom.
21     Q. Okay. So how would that -- that order would have
22  got in the computer, put in the computer by the nurse --
23  correct? -- in the ER?
24     A. I don't know who put it in.
25     Q. But they would have gone over there to do a

12 (Pages 42 to 45)

1a08adaf-d104-435c-8703-b0bc0306c2e1

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

* * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

VERSUS                                    PCF NO. 2015-00923

JACOB WOOD, M.D.,
THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER
AND JAMES TAYLOR, M.D.

* * * * * * * * * * * * * * * * *

DEPOSITION OF

SANDRA THORNHILL GOSS

May 12, 2016

(commencing at 9:05 a.m.)

* * * * * * * * * * * * * * * *

Taken at:

        Northern Louisiana Medical Center
        401 East Vaughn Avenue
        Ruston, Louisiana 71270

* * * * * * * * * * * * * * * *

Reported By:          WANDA J. EADY
                     CERTIFIED COURT REPORTER
                     CERTIFICATE NO. 87255
                     PARISH OF OUACHITA
                     STATE OF LOUISIANA

EXHIBIT
4

Page 2

```
1  APPEARANCES:
2
3        FOR GREGORY SCOTT AND MICHELLE SCOTT,
         INDIVIDUALLY AND ON BEHALF OF THE MINOR,
         JORDAN SCOTT, AS THE PARENTS AND TUTORS
4        OF JORDAN SCOTT:
5        OSCAR L. SHOENFELT, III
         ATTORNEY-AT-LAW
6        2109 Perkins Road
         Baton Rouge, Louisiana 70808
7
8        FOR NORTHERN LOUISIANA MEDICAL CENTER:
9
         BLUE WILLIAMS
10       3421 North Causeway Boulevard,
         No. 900
11       Metairie, Louisiana 70002
         appearing herein by and through
12       Mr. Kurt S. Blankenship
13
14       FOR JACOB M. WOOD, M.D.:
15       HUDSON, POTTS & BERNSTEIN
         Post Office Drawer 3008
16       Monroe, Louisiana 71210-3008
         appearing herein by and through
17       Ms. Sara White on behalf of
         Mr. Gordon L. James
18
19  VIA          FOR JAMES PATRICK TAYLOR, M.D.:
     TELEPHONE:
20
         DEGAN, BLANCHARD & NASH
21       400 Poydras Street, Suite 2600
         New Orleans, Louisiana 70130
22       appearing herein by and through
         Ms. Maryann Hoskins
23
24  ALSO PRESENT:   Gregory Scott
                    Susan White, Risk Manager
25       *****************
```

Page 3

```
1            INDEX OF EXHIBITS
2   Exhibit 1   Drawing . . . . . . . . . . . . . . . . . 26
3   Exhibit 2   Triage Assessment Recording . . . . . . . 56
4
5        *******************
6
7            STIPULATIONS
8      This deposition is taken for use before the Medical
9   Review Panel, pursuant to the Louisiana Code of Civil
10  Procedure, and may be used for all purposes and in any manner
11  consistent therewith.  All objections except as to the form
12  of the question and responsiveness of the answer are
13  reserved.
14
15       *******************
16
17     The witness, SANDRA THORNHILL GOSS, was advised of her
18  right to read and sign this deposition, and she elected to
19  exercise that right.
20
21       *******************
22
23
24
25
```

Page 4

```
1      SANDRA THORNHILL GOSS, being first duly sworn, testified
2   as follows:
3   EXAMINATION BY MR. SHOENFELT:
4      Q   Would you please state your full name for the
5   record?
6      A   Certainly.  It's Sandra Thornhill Goss.
7          MR. SHOENFELT:  Ms. Goss, my name is Oscar
8      Shoenfelt.  I'm here today to ask you some
9      questions.  This is a deposition.  Have you ever
10     taken a deposition?
11         WITNESS:  No, sir.
12         MR. SHOENFELT:  Well, your attorney is going to
13     advise you can read and sign after.  I'm going to
14     ask you a series of questions.  If you don't
15     understand any question, just ask me to repeat it
16     and I'll be happy to do so.  You understand that?
17         WITNESS:  I understand.
18     Q   Can you give me your address, please?
19     A   Yes.  It's 106 Winwood Avenue, and that's here in
20  Ruston.
21     Q   That's your residence.  Is that correct?
22     A   That's correct.
23     Q   And you are, as I can tell by looking at your tag
24  there, Director of Emergency Services for North Louisiana
25  Medical Center.  Is that correct?
```

Page 5

```
1      A   Yes, sir.
2      Q   Tell me what that encompasses.
3      A   As the director, I am responsible for overseeing
4   the day-to-day operations of the emergency room.
5      Q   And when you say "day-to-day operations," what does
6   that mean exactly?
7      A   Staffing, budget, meetings.
8      Q   Who is your immediate superior?
9      A   The CNO, which is Ronnie Erson.
10     Q   Did you say he was the C- --
11     A   CNO.
12     Q   What does "CNO" mean?
13     A   The Chief Nursing Officer.
14     Q   Is he a nurse?
15     A   He is.
16     Q   And who does he report to?
17     A   He reports to the CEO, which is Roy Finch.
18     Q   And how long has Mr. Finch been there -- or been
19  here?
20     A   Just a few months.
21     Q   Okay.  Who was his predecessor?
22     A   Brady Dubois.
23     Q   So it's Brady Dubois, and then Ronnie, and then
24  you.  Correct?
25     A   Correct.  Now, Ronnie wasn't here at that time.
```

2 (Pages 2 to 5)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 14

1  policies?
2      A   Yes, sir.
3      Q   So when did Mr. -- is his name Dubois?
4      A   Dubois.  Uh-huh (yes).
5      Q   Dubois?
6      A   Dubois.
7          MR. BLANKENSHIP:  Dubois.
8      Q   Dubois?  When did Mr. Dubois begin to work at --
9      A   I don't --
10     Q   -- North Louisiana Medical Center?
11     A   I don't recall that.
12     Q   Okay.  Well, was he there when you were in the
13  education department?
14     A   No, sir.
15     Q   All right.  So did he come while you were Director
16  of Emergency Services?
17     A   I don't remember.
18     Q   You just know it was sometime -- you were in
19  education up until 2009, so it was sometime after 2009?
20     A   I don't remember.
21     Q   Did you ever have a meeting with him?
22     A   Well, yes.  I've met with him.
23     Q   I mean, your immediate boss was who again?
24     A   The CNO.
25     Q   The CNO?

Page 15

1      A   Uh-huh (yes).
2      Q   Okay.  You never had any kind of written materials
3  as to the policies that you were to enforce in the emergency
4  room other than just the regular ER policies?
5      A   Correct.
6          MR. BLANKENSHIP:  I'm going to object to the form.
7          (To witness):  But you can answer.
8      Q   Did you receive e-mails from Mr. Dubois at any
9  time?
10     A   Yes.  I have --
11     Q   What have you reviewed in preparation for your
12  deposition?
13     A   The medical record and the policies.
14     Q   Did you review the -- which medical record?  The
15  new one or the one that was presented earlier?
16         MR. BLANKENSHIP TO WITNESS:  If you know.
17     A   I don't know.
18     Q   Okay.  Well, how many pages is the one that you
19  reviewed?
20     A   Are they numbered?
21         MR. BLANKENSHIP:  They're not numbered at the
22         bottom?
23     A   Do you want me to count them?
24     Q   Well, let me ask you what date is the
25  certification?

Page 16

1      A   March the 1st of '16.
2      Q   Okay.  So that was the second copy that was
3  presented.  Did you ever look at any records prior to those
4  records --
5      A   No, sir.
6      Q   -- regarding this case?
7      A   No, sir.
8      Q   All right.  So the only thing that you've reviewed
9  in preparation for your deposition would be the emergency
10  room record from August 19th, 2014?
11     A   If that's the date on the record, yes.  I don't
12  remember the date.  Yes.  It looks like August the 19th.
13     Q   Well, this case involves Jordan Scott.  You are
14  familiar with the case, I'm assuming?
15     A   Yes, sir.
16     Q   So what do you have besides the record there?
17     A   I have the policies.
18         MR. BLANKENSHIP:  The ones you requested.
19     Q   The ones I requested?
20     A   Yes, sir.
21     Q   All right.  Are there any policies particular to
22  the emergency room that you are aware of as to the ordering
23  of diagnostic studies in the emergency room?
24         MR. BLANKENSHIP:  Any diagnostic studies?
25         MR. SHOENFELT:  Yes.

Page 17

1      A   In the emergency room?
2      Q   Yeah.  You're the director of the emergency room.
3      A   I do not have policies relating to that.
4      Q   There's no policies?
5      A   (Negative nod.)
6      Q   So there's no written policies as to the ordering
7  of studies in the emergency room that you are aware of, --
8      A   Not that I'm aware of, no.
9      Q   -- particularly on August 19th, 2014.  Is that
10  correct?
11     A   That is correct.
12     Q   Were there -- the only thing you reviewed in
13  preparation for this deposition were the emergency room
14  records -- or the policies that I asked for specifically, and
15  also the record.  Is that correct?
16     A   That is correct.
17     Q   You didn't review anything else?
18     A   No, sir.
19     Q   Did you talk to anyone else?
20         MR. BLANKENSHIP:  Excuse me.  (To witness):  And
21         you reviewed Dr. Taylor's deposition.
22     A   Oh, yes.
23     Q   You reviewed Dr. Taylor's deposition?
24     A   Yes.  Yes.
25     Q   Anything else you reviewed?

5 (Pages 14 to 17)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 42

1  an MRI in the emergency room and that the patient be taken
2  directly to the MRI machine and have an MRI done at North
3  Louisiana Medical Center?
4     A  I'm sorry. Can you repeat it? I —
5     Q  Do you know of any reason why a physician cannot
6  order an MRI at the emergency room so that a patient who is
7  neurologically impaired and timing is important could go
8  directly to the MRI from the emergency room and have the
9  study done while under the care of the emergency room
10 physician at North Louisiana Medical Center?
11    A  I do not know.
12    Q  That issue has never arose since you have been
13 Director of Emergency Services at North Louisiana Medical
14 Center?
15       MR. BLANKENSHIP: I'm going to object to the form.
16       "Issue"? I'm not sure if she understands what you
17       mean by that, but —
18    Q  Well, you do understand — you read Dr. Taylor's
19 deposition, didn't you?
20    A  Yes.
21    Q  Okay. He's saying that he wasn't allowed to order
22 an MRI from the emergency room because the patient had to be
23 admitted, and then cleared for insurance. Are you aware of
24 any such policies?
25    A  No.

Page 43

1       MS. HOSKINS: Object to the form — this is Maryann
2       Hoskins — just insofar as it characterizes Dr.
3       Taylor's deposition testimony.
4       MR. BLANKENSHIP TO WITNESS: Okay. I'm sorry. Did
5       you answer?
6     Q  Well, let me ask you. Since you've been Director
7  of Emergency Services at North Louisiana Medical Center, have
8  physicians been able to order — emergency room physicians
9  been able to order MRIs in the emergency room and the patient
10 be taken directly to the imaging center here to have those
11 studies done?
12    A  Yes.
13    Q  Have you seen that happen?
14    A  I haven't seen it happen, but I know that it's
15 happened. I mean, I know that they've ordered them.
16    Q  Well, how do you know that they've ordered them if
17 you haven't —
18    A  I mean, I wasn't in the room. But I review records
19 daily on different things, so I've seen MRIs being ordered.
20    Q  So you, as Director of Emergency Services, would
21 agree that a physician should have the ability — ER
22 physicians should have the ability to order an MRI in the
23 emergency room and have the patient taken directly over
24 there, particularly if timing is important?
25    A  Yes.

Page 44

1     Q  And you know of no other instance other than Jordan
2  Scott where the ER physician has ordered an MRI, and then had
3  to have the patient admitted in order to have the MRI
4  performed?
5       MR. BLANKENSHIP: Object to the form. (To
6       witness): But you can answer.
7     A  I don't recall any other names, no.
8     Q  Was anything about whether she could get an MRI, —
9  Jordan Scott get an MRI on August 19th, 2014, was that ever
10 discussed by anyone with you —
11    A  No.
12    Q  — on August 19th, 2014?
13    A  No, sir.
14    Q  So if Dr. — assuming Dr. Taylor had come to you at
15 9:07 a.m. and said, "I want to get an MRI immediately; this
16 patient has neurological deficits; timing is important," what
17 would you have done?
18    A  I would have went to my boss, and then up the chain
19 of command.
20    Q  Up the chain of command? Why is that?
21    A  If he needed it done and he wasn't able to get it
22 done, we would — I would go outside to find somebody to talk
23 to him.
24    Q  Well, couldn't you make it happen?
25    A  Absolutely not. I'm —

Page 45

1     Q  Why?
2     A  Well, that — I don't have the —
3       MR. BLANKENSHIP: Let her finish her answer.
4       MR. SHOENFELT: Okay.
5     A  I don't have the authority.
6     Q  You don't have the authority to do what?
7     A  To order a test. To make someone do a test. I
8  don't have that authority.
9     Q  But Dr. Taylor was ordering — assuming he was
10 ordering the MRI, —
11    A  Okay.
12    Q  — you don't have the facility or you don't have
13 the authority as Director of Emergency Services to call
14 radiology and say, "Hey, we need to get this test done as
15 soon as possible; we've got a twelve-year-old girl here who
16 is neurologically impaired; every second is important; we
17 need to get the test done so we can see what the problem is"?
18 You don't have that authority?
19       MR. BLANKENSHIP: Object to the form. (To
20       witness): But you can answer.
21    A  Yes. I could call radiology for that, yes.
22    Q  Okay. You do have that authority?
23    A  I can —
24       MR. BLANKENSHIP: Object to the form. (To
25       witness): You can answer.

12 (Pages 42 to 45)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 46

1    A    I can call radiology and say that the doctor has
2   requested or ordered this test.
3    Q    And have you ever done that?
4    A    Yes.
5    Q    Well, tell me about that instance.  What happened
6   in that particular case?
7    A    I don't know the name, but a patient came in that
8   was needing an MRI of a hip, and the doctor ordered the MRI.
9   And I called radiology and said that the physician had
10  ordered the MRI.
11   Q    All right.  What happened?
12   A    They did the MRI.
13   Q    What?  They took him directly from the emergency
14  room over to the radiology center and had the MRI done?
15   A    Yes, sir.
16   Q    And do you recall when that was?
17   A    Several --
18       MR. BLANKENSHIP:  Go ahead.
19   A    Several months ago.  I don't know the exact date.
20  No, sir.
21   Q    Several months ago?
22   A    Uh-huh (yes).
23   Q    Okay.  It was not prior to August 19th, 2014.  Is
24  that correct?
25   A    No, sir.

Page 47

1    Q    Prior to August 19th, 2014, had you ever done
2   that?  Had you ever had an ER physician want to order an MRI
3   and had the patient taken directly over there?
4    A    Not that I --
5        MR. BLANKENSHIP:  I object to the form.  (To
6        witness):  You can answer.
7    A    Not that I recall, no.
8    Q    To your knowledge, prior to August 19th, 2014, had
9   any patient ever been in the emergency room at North
10  Louisiana Medical Center and the ER physician ordered an MRI
11  and the patient was taken directly over to the imaging center
12  to have the MRI done?
13   A    I don't know.
14   Q    But your testimony is there was never an issue --
15  was there ever an issue of that occurring before
16  August 19th, 2014?
17       MR. BLANKENSHIP:  Object to the form.  (To
18       witness):  But you can answer.
19   A    No.  I mean, I don't know if there was an issue,
20  no.
21   Q    You don't know of any issues?
22   A    No, sir.
23   Q    So you don't -- you are unaware of any ER physician
24  ever ordering an MRI at North Louisiana Medical Center where
25  the patient was taken directly from the ER to the imaging

Page 48

1   center prior to August 19th, 2014?
2    A    I don't know of any issues, no.
3    Q    But you don't know of it ever happening?
4    A    Correct.  I don't know.
5    Q    Is there any reason for that?
6    A    Not to my knowledge, no.
7    Q    Does that seem unusual to you?
8        MR. BLANKENSHIP:  That she wouldn't know?
9    A    No.  I mean, that -- so you've never heard --
10  you've never seen a patient taken directly from the ER over
11  to imaging prior to August 19th, 2014?
12   A    Not that I recall, no.
13   Q    But you agree that the ER -- I mean, the physician
14  should have that capability to make that order and have the
15  patient taken directly over there?
16   A    If it's -- if that's what they order, yes, sir.
17   Q    Okay.  Was there ever any discussions or any
18  procedures or policies that you were ever aware of regarding
19  the issue of ER physicians being able to order MRIs in the
20  emergency room at North Louisiana Medical Center after
21  August 19th, 2014?
22       MR. BLANKENSHIP:  Ever any discussions after
23       August 19th?
24   Q    Anything.  Any discussions, any e-mails, any memos.
25  Anything that you are aware of where this was ever discussed

Page 49

1   with anyone in the ER or anyone at the hospital?
2    A    Not that I'm aware of, no.
3    Q    All right.  So page 40 of Dr. Taylor's deposition
4   he states, quote, "...I guess it was two days later that I
5   wrote the addendum, I was asked to clarify because, by doing
6   the admission, it looked like there was a time gap where
7   nobody was doing anything and they wanted me to explain."
8   "Who asked you to do it?"  Answer:  "The hospital."
9   Question:  "So the hospital was certainly aware of this
10  problem?"  Answer:  "Sandy Goss asked me to clarify."  "Who
11  is Sandy Goss?"  "She's the ED manager.  Now, whether it came
12  from quality department or whoever, I don't know."  Do you
13  deny that taking place, that conversation with Dr. Taylor?
14   A    No, I don't deny that.
15   Q    Why?
16   A    Because --
17       WITNESS TO MR. BLANKENSHIP:  Can I answer that?
18       MR. BLANKENSHIP:  Sure.
19   A    Because she came back to the emergency room and,
20  when she comes from admission in the hospital back to our
21  care, she falls back under Dr. Taylor.  And so, there was no
22  documentation from the time she came from MRI back into the
23  emergency room to the time of dispo, or us transferring to
24  LSU.
25   Q    Okay.  Run that by me again.

13 (Pages 46 to 49)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 54

1  2014, had Jordan taken directly over there when he made
2  the -- or wanted to have the MRI done. Correct?
3      A.  Correct.
4      Q.  And do you have any idea, like, once he placed the
5  order in the record, why she couldn't be taken directly over
6  there?
7      A.  I don't know that answer.
8      Q.  Well, I think the order was actually placed in the
9  record after she was going to be admitted. Let's see. At
10  12:35 p.m. Do you know why, in a situation -- emergency
11  situation with a child with neurological deficits, why she
12  couldn't be taken directly to the imaging center at that
13  point in time?
14      MR. BLANKENSHIP:  "At that point," being 12:35?
15      MR. SHOENFELT:  Yes.
16      A.  These are admission orders, so it would have been
17  done when she was admitted to the hospital.
18      Q.  Okay. And you just think it's -- you think it's a
19  coincidence that Dr. Taylor went ahead and admitted her when
20  he ordered the MRI?
21      MR. BLANKENSHIP:  Admit -- I mean, I'm going to
22      object to the form. (To witness):  You can answer.
23      A.  I don't -- I don't know the reasoning behind Dr.
24  Taylor --
25      Q.  You know of no reason that she couldn't have been

Page 55

1  taken over there at any point in time from the emergency room
2  to the imaging center the morning of August 19th, 2014?
3      A.  I do not.
4      Q.  You don't know anything about any kind of policy
5  where that you had to have -- be admitted to the hospital to
6  have an MRI performed?
7      A.  No.
8      Q.  And you've never had any discussion with anyone at
9  the hospital regarding any issue with an MRI being ordered
10  from the emergency room?
11      A.  No.
12      Q.  Nothing in a -- have you ever had to clear
13  insurance with a patient before they had anything done at the
14  emergency room at North Louisiana Medical Center?
15      A.  No, sir.
16      Q.  You're not privy to any kind of discussions that
17  took place regarding reimbursement for MRIs run at North
18  Louisiana Medical Center?
19      A.  No, sir.
20      Q.  Is there any, to your knowledge, any policies --
21  emergency room policies regarding what screening should be
22  done if a patient presents with a neurological deficit at the
23  emergency room?
24      A.  No, sir.
25      Q.  As far as you know, a patient such as Jordan Scott

Page 56

1  with neurological deficits could have had an MRI done --
2  ordered in the emergency room and taken directly over to the
3  imaging center on August 19, 2014. Is that correct?
4      A.  That's correct.
5      Q.  Now, you do have some kind of financial
6  registration when a patient comes to the emergency room.
7  Correct?
8      A.  I'm sorry. I don't understand that.
9      Q.  I mean, that is part of your procedure to get
10  insurance information and that type of thing?
11      A.  Admissions does that. Yes, sir.
12      Q.  And the procedure says that "The emergency room
13  physician, provider or designee retains the right and
14  responsibility to perform a medical screening examine on
15  every patient presenting for emergency services, determine if
16  a life or limb-threatening situation exists unless the
17  private physician is in attendance at the time the patient
18  presents." Correct?
19      A.  Correct.
20      Q.  That's the policy that you understand?
21      A.  Yes, sir.
22      MR. SHOENFELT:  For the record, I have --
23      Q.  What is this chart?
24      MR. SHOENFELT:  I made a copy of it. I'm going to
25      attach it as "Exhibit 2."

Page 57

1      A.  This is our triage assessment scoring that the
2  nurses provide to each patient they triage.
3      Q.  So what does it mean, "requires immediate life-
4  saving intervention"? It says "A," and then it says go to
5  No. 1. What does that mean?
6      A.  That means 1 is the level of triage, so Level 1
7  would be a lifesaving measure would be required.
8      Q.  Okay. And that would include the ability to order
9  diagnostic studies as soon as possible in the emergency room?
10      MR. BLANKENSHIP:  Object to the form. (To
11      witness):  You can answer.
12      A.  That would be the -- I'm sorry.
13      Q.  No. 1 is what?
14      A.  1 means that's a level of triage. We have five
15  levels, a five-level triage system in the emergency room. It
16  goes from 1 for lifesaving to 5, meaning there's no resources
17  needed.
18      Q.  So what was Jordan Scott, based on your review of
19  the medical record?
20      MR. BLANKENSHIP:  Object to the form.
21      A.  I don't recall that.
22      Q.  Can you look in the record and identify it for me?
23      A.  Uh-huh (yes).
24      MR. BLANKENSHIP:  You're talking about the initial
25      triage?

Page 70

1  gotten MRIs from the emergency department?
2      A   Yes, ma'am.
3      Q   Okay.  Have you spoken to Dr. Taylor about his
4  deposition?
5      A   No, ma'am.
6      Q   Have you spoken to anybody else at the hospital
7  regarding Dr. Taylor's deposition?
8      A   Just Susan White and Kurt.
9      Q   Okay.  And I'm sure Kurt will keep you straight,
10 but I don't want to know about anything that you discussed
11 with him.  Dr. Taylor testified that he -- there's no button
12 for the emergency department physicians to check to order an
13 MRI from the emergency department.
14      MR. BLANKENSHIP:  Are you talking about now or at
15      that time?
16      MS. HOSKINS:  Thank you.
17      Q   At that time.
18      A   No, ma'am.
19      Q   Is that correct or, at that time was that correct?
20      A   That is correct.  There is no button.
21      Q   Do you know why that was?
22      A   No, ma'am.
23      Q   So is there a check button for a physician to order
24 a CT from the emergency room?
25      A   Yes, ma'am.

Page 71

1      Q   If a physician wanted to order an MRI, how would he
2  or she order it through the computer system?
3      A   He would have to go on the HMS side of the
4  medical -- I'm sorry -- of the electronic system, or a
5  handwritten paper order could have taken place.
6      Q   Okay.  Did you ever speak to Mr. Dubois about
7  whether he had conversations with Dr. Taylor regarding the
8  ability to order an MRI from the ED?
9      MR. BLANKENSHIP:  You cut out, Maryann.  We
10     couldn't ask who you were asking.  Dubois --
11     MS. HOSKINS:  I'm sorry.
12     Q   Dr. Taylor testified that he had several
13 conversations with Brady Dubois regarding the ability for ED
14 physicians to order an MRI from the ER.  Did Mr. Dubois tell
15 you about any conversations he had with Dr. Taylor?
16      A   No, ma'am.
17      MS. HOSKINS:  That is all I have.
18      MR. SHOENFELT:  I have a couple of follow-ups.
19 REEXAMINATION BY MR. SHOENFELT:
20     Q   My recollection of your testimony was that, prior
21 to August 19th, 2014, you could not think of any instances at
22 all where a physician ordered an MRI from the emergency room
23 and the patient was taken directly to the emergency room.  Is
24 that correct?
25      A   That's correct.

Page 72

1      Q   It's not a matter of remembering names.  You just
2  can't remember any time?
3      A   Right.
4      Q   Okay.  Now, tell me about this button.  That sounds
5  interesting.
6      A   It's an -- he's talking about the order.  On the
7  computer screen, it's not an actual button you pick like a
8  keyboard.  It's on the screen.  You check what boxes you want
9  to order, and there's not an MRI button or check mark.
10     Q   Okay.  Is there one now?
11      A   No, sir.
12     Q   Okay.  There's never been an MRI button?
13      A   No, sir.
14     Q   Okay.  And what's the reason for that?
15      MR. BLANKENSHIP TO WITNESS:  If you know.
16      A   I don't know.
17     Q   So I would be correct in saying you do treat
18 patients that come in that need an MRI different from
19 patients who come in and need a CT, for example?
20      MR. BLANKENSHIP:  Object to the form.  (To
21      witness):  You can answer.
22      A   I mean, that's dependent upon what the physician
23 orders.
24     Q   No.  No, no.  There's no button for an MRI.
25 Correct?

Page 73

1      A   Correct.
2      Q   There never has been.  Will there ever be one?
3      MR. BLANKENSHIP:  Object to the form.  (To
4      witness):  You can answer, if you know.
5      A   I don't know.
6      Q   Well, why -- you told me that you felt that it
7  would be the appropriate standard of care for an emergency
8  room to have the ability for a physician to order an MRI for
9  a neurologically impaired patient and have them taken
10 directly over there, but there's no button for it?
11      A   If the physician feels the need to order that,
12 then, yes.
13     Q   The question was, but there's no button for it even
14 though you feel that the physician should be able to order
15 it.  Correct?
16      MR. BLANKENSHIP:  Object to the form.  (To
17      witness):  You can answer.
18      A   Correct.
19     Q   And why?
20      A   I can't answer that.
21     Q   Well, you're the Director of Emergency Services.
22 That never peaked your curiosity?
23      A   But I'm not a physician, so I don't order -- I
24 don't do the orders.  So that's a physician --
25     Q   Well, you're director of the whole emergency

19  (Pages 70 to 73)

b01c7bdf-905d-48b8-9df9-4529b35364dd

Page 74

1 services, though. Correct?
2    A   Yes.
3    Q   You help physicians; you assist them?
4    A   Correct.
5    Q   Okay. So have you ever thought that they may want
6 to order an MRI from the emergency room?
7    A   Yes.
8    Q   What did you do? Did you talk to anyone about that
9 issue or follow up on it in any way?
10       MR. BLANKENSHIP: "That issue," being the button
11       issue?
12       MR. SHOENFELT: Yeah.
13   A   No, sir.
14   Q   But there is a button for a CT?
15   A   Yes.
16   Q   And why is that?
17   A   I can't answer that.
18   Q   Could it be a financial reason, perhaps?
19       MR. BLANKENSHIP: Object to the form. (To
20       witness): You can answer.
21   A   Not that -- I don't know that answer.
22   Q   You don't know. But you've never discussed it with
23 anybody --
24   A   No, sir.
25   Q   -- even though you think the proper standard of

Page 75

1 care would be for there to be -- a physician should be able
2 to order an MRI in the emergency room. Correct?
3    A   Correct.
4    Q   So you don't intend to follow up on that
5 whatsoever?
6        MR. BLANKENSHIP: Object to the form. (To
7        witness): You can answer.
8    A   No.
9    Q   Why?
10   A   Because that's a physician test.
11   Q   Well, you're a nurse. Correct?
12   A   I am.
13   Q   You don't ever help a physician when you think they
14 are making an error or if they've made a misdiagnosis? You
15 don't ever step in and say, "Well, Doctor, I think you should
16 consider that."
17       MR. BLANKENSHIP: Object to the form.
18   Q   Isn't that part of your duty as a nurse?
19   A   It is.
20       MR. BLANKENSHIP: Object to the form.
21   Q   Shouldn't that be part of your duty as Director of
22 Emergency Services? If you feel that the ER doctor should be
23 able to order that MRI, shouldn't you follow up on that?
24       MR. BLANKENSHIP: Object to the form.
25   A   Yes.

Page 76

1    Q   Are you going to do it now?
2        MR. BLANKENSHIP: Object to the form. (To
3        witness): Don't answer that.
4        MR. SHOENFELT: On what grounds?
5        MR. BLANKENSHIP: Possible remedial action, I
6        guess.
7    Q   Okay. So now, tell me, can you order x-rays in the
8 emergency room? Is there a button for that?
9    A   Yes, sir.
10   Q   How about an ultrasound?
11   A   Yes, sir.
12   Q   Any diagnostic studies that you can order -- that
13 you know of that you can order in the emergency room there's
14 a button for except the MRI?
15   A   I can't answer that. I don't know if there's any
16 other buttons that aren't there.
17   Q   And I'm correct in saying, then, that there is
18 disparity as far as that MRI screening process. If a
19 physician wants to order that, it's not as easy as ordering a
20 CT.
21       MR. BLANKENSHIP: Object to the form.
22   Q   Would you agree with that?
23       MR. BLANKENSHIP: Object to the form. Sorry.
24   A   He can order it.
25   Q   No, that's not my question. If you want to order

Page 77

1 a -- a patient comes in and you want to order a CT, you push
2 the button. Correct?
3    A   Correct.
4    Q   And what happens?
5    A   The CT is ordered.
6    Q   And is the patient taken over to the imaging
7 center?
8    A   Yes.
9    Q   Directly from the ER?
10   A   Yes.
11   Q   And you've seen that happen?
12   A   Yes.
13   Q   But you've never seen an MRI ordered except one
14 time that you can recall after August 19th, 2014. Correct?
15       MR. BLANKENSHIP: Object to the form. (To
16       witness): You can answer.
17   A   Correct.
18   Q   And that hasn't -- you haven't ever questioned
19 anyone why that is?
20   A   No, sir.
21   Q   You've never heard any rumors it's because MRIs are
22 expensive and there might be some issue about getting
23 reimbursement unless they are cleared by insurance first?
24   A   No, sir.
25   Q   You wouldn't agree with that policy, would you?

20 (Pages 74 to 77)

b01c7bdf-906d-48b8-9df9-4529b35384dd

Page 78

1    A   Agree with the policy –
2        MR. BLANKENSHIP: With such a policy.
3    A   Oh.
4    Q   Yeah. You wouldn't agree with such a financial
5  policy, would you?
6    A   No.
7    Q   Now, tell me, if a patient wants to order an MRI,
8  what is the – is there a procedure for that?
9        MR. BLANKENSHIP: You mean, if a physician, I
10       assume?
11   Q   Yeah. A physician. All right. Let's just say,
12 you know, Dr. Taylor wanted to order an MRI at 9:07. He
13 couldn't push a button, could he?
14   A   No.
15   Q   Okay. Well, what would – what's the procedure you
16 have in place to make sure he knows how to get the MRI done?
17   A   The easiest is to write it on a downtime x-ray
18 form, order the MRI, is the easiest.
19   Q   Okay. Well, I want to know what written policy you
20 have so the physician will know how to do it.
21   A   I don't know of any such policy.
22   Q   Okay. Well, how does he know that that's the
23 easiest way?
24   A   I don't know.
25   Q   Well, don't you think it would be good for the ER

Page 79

1  physicians to know that, --
2        MR. BLANKENSHIP: Object to the form. (To
3        witness): You can answer.
4    Q   -- as Director of Emergency Services?
5    A   They are instructed on our downtime procedures and
6  that's considered a downtime paper form. They write on it
7  and it goes to the perspective unit, whether it's lab or
8  x-ray.
9    Q   It goes to the perspective unit. But you've never
10 done that. Correct?
11       MR. BLANKENSHIP: Personally?
12   Q   Yeah. You've never known it to happen. Is that
13 correct?
14       MR. BLANKENSHIP: That's a different question.
15   Q   Have you ever known that to happen?
16   A   For an MRI –
17   Q   Yeah.
18   A   – or for anything?
19   Q   For an MRI to be written on this down thing and
20 taken over there.
21   A   I can't recall of any.
22   Q   Now, what about when you arranged this hip thing?
23 Is that what you did?
24   A   No.
25   Q   So why didn't you use the procedure that the

Page 80

1  physicians should use?
2    A   Because I'm not – I can't order.
3    Q   Well, you could have told – the doctor wanted to
4  order the hip, you said, after August 19th, 2014.
5    A   Uh-huh (yes).
6    Q   What did you -- who was this anyway? What doctor?
7    A   I don't recall that.
8    Q   Well, what did you do? He had to come to you.
9  Correct?
10   A   I was in the nurse's station again.
11   Q   But he didn't know the procedure, that he could
12 have written on a down-- down-- what is it? The down
13 paper?
14   A   It's called downtime, and it's just a piece of
15 paper that has orders and you can write what you want on the
16 paper.
17   Q   All right. Did you do that when the hip MRI was
18 ordered?
19   A   No, sir.
20   Q   Well, why?
21   A   Because I'm not doing the ordering.
22   Q   Well, could you have told the doctor to do that? I
23 mean, –
24   A   Yes.
25   Q   Did you?

Page 81

1    A   I don't recall how the MRI was ordered that day. I
2  don't know if he ordered it on downtime or on the other HMS
3  system. I don't know.
4    Q   Well, shouldn't you have written policies as to how
5  an MRI can be ordered?
6        MR. BLANKENSHIP: Object to the form.
7    A   I don't have a policy pertaining to that, no, sir.
8    Q   And you've never -- I mean, have you told
9  physicians that? There's – what? – five physicians that
10 work in the ER primarily. Correct?
11   A   Yes, sir.
12   Q   Do they all know about this downtime ordering?
13   A   Yes, sir.
14   Q   Okay. Now, who takes the sheet over to imaging?
15   A   When we -- for instance, if they ordered an MRI, we
16 would pick up the phone and call MRI and say, "We have a
17 patient for a downtime procedure." They come and pick up the
18 patient and the order because they have to have an order to
19 do a procedure.
20   Q   Okay. But that's never been done, to your
21 knowledge?
22       MR. BLANKENSHIP: Object to the form.
23   A   For an MRI?
24   Q   Yes.
25   A   I can't specifically pinpoint a particular time,

21 (Pages 78 to 81)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 82

1  so, no, I can't answer that.
2     Q   So you do agree, on August 19, 2014, that Dr.
3  Taylor could not push a button and order an MRI like every
4  other diagnostic study. Correct?
5     A   Correct.
6     Q   What is the cost of an MRI?
7     A   I have no idea.
8     Q   What is the cost of a CT? Do you know?
9     A   I have no idea.
10    Q   Have you ever discussed that with anybody in the
11 radiology department?
12    A   No, sir.
13    Q   There's no -- I'm assuming there's no policies you
14 know of, standard protocol for a patient presenting with
15 neurological deficits at the emergency room. Correct?
16    A   Correct.
17    Q   But if a patient, for example, presented with
18 neurological symptoms that could be diagnosed with a CT, the
19 doctor could readily order that with the button. Correct?
20    A   Correct.
21    Q   Or an x-ray, they could order. The same thing.
22 Correct?
23    A   Correct.
24    Q   But the MRI, there's really no set procedure for
25 that?

Page 83

1     MR. BLANKENSHIP: Object to the form.
2     Q   Correct?
3     A   There's no button.
4     Q   There's no button, but there's no written procedure
5  in place or any procedure that you know of?
6     A   Correct.
7     Q   And it's never been done, to your knowledge, using
8  this procedure you said they can write on the down sheet?
9     MR. BLANKENSHIP: Object to the form.
10    Q   Correct?
11    WITNESS TO MR. BLANKENSHIP: I can answer?
12    MR. BLANKENSHIP TO WITNESS: You can answer.
13    Q   Correct?
14    A   Correct.
15    MR. SHOENFELT: That's all I have.
16    MR. BLANKENSHIP: Just a follow-up on that issue,
17    Ms. Goss.
18 EXAMINATION BY MR. BLANKENSHIP:
19    Q   When you say you don't have any knowledge that
20 "that" has been done, are you talking about whether a
21 downtime form was used to order an MRI by any ER physician at
22 any time?
23    A   Correct.
24    Q   Okay. Are you saying that you know for a fact that
25 it's never happened or you're just not aware one way or the

Page 84

1  other?
2     A   I'm just not aware one way or the other.
3     Q   All right. And --
4     MR. BLANKENSHIP: Okay. That's all I wanted to
5  clarify.
6     MR. SHOENFELT: No further questions. Thank you.
7     COURT REPORTER: Read and sign?
8     MR. BLANKENSHIP: Yes. And I want you to send it
9  directly to her, please.
10    COURT REPORTER: Okay.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25            DEPOSITION CONCLUDED AT 11 A.M.

Page 85

1              CERTIFICATE
2     I, WANDA J. EADY, Certified Court Reporter in and for
3  the State of Louisiana, as the officer before whom this
4  testimony was taken, do hereby certify that SANDRA THORNHILL
5  GOSS, after having been duly sworn by me upon authority of
6  R.S. 37:2554, did testify as hereinbefore set forth in the
7  foregoing 84 pages; that this testimony was reported by me in
8  the penwriter reporting method, was prepared and transcribed
9  by me or under my personal direction and supervision, and is
10 a true and correct transcript to the best of my ability and
11 understanding; that the transcript has been prepared in
12 compliance with transcript format guidelines required by
13 statute or by rules of the board, and that I am informed
14 about the complete arrangement, financial or otherwise, with
15 the person or entity making arrangements for deposition
16 services; that I have acted in compliance with the
17 prohibition on contractual relationships, as defined by
18 Louisiana Code of Civil Procedure Article 1434 and in rules
19 and advisory opinions of the board; that I have no actual
20 knowledge of any prohibited employment or contractual
21 relationship, direct or indirect, between a court reporting
22 firm and any party litigant in this matter nor is there any
23 such relationship between myself and a party litigant in this
24 matter. I am not related to counsel or to the parties herein
25 nor am I otherwise interested in the outcome of this matter.

22 (Pages 82 to 85)

b01c7bdf-906d-48b8-9df9-4529b35364dd

www.northernlouisianamedicalcenter.com/northern-louisiana-medical-center/diagnosticimaging.asp

SERVICES, DIAGNOSTIC IMAGING

# Diagnostic Imaging

At Northern Louisiana Medical Center, diagnostic imaging is used to create a graphic depiction of the structures and functions of the body's organs and other internal systems. These images are used to examine and diagnose certain medical conditions.

## Our services:

- CT Scanner
- DEXA
- Digital Mammography
- Magnetic Resonance Angiography (MRA)
- Magnetic Resonance Imaging (MRI)
- Nuclear Medicine
- Ultrasound
- X-Ray



Northern Louisiana Medical Center

NOW THE OFFICIAL IMAGING CENTER FOR

LA TECH   LOUISIANA TECH ATHLETICS

## Accreditation Frequently Asked Questions:

**What should I know about radiation safety?**
Before your imaging procedure, be sure to ask your physician the following questions:

- Why is the test needed?
- How will having the test improve my care?
- Are there alternatives that do not use radiation and deliver similar results?
- Is the facility accredited by the American College of Radiology (ACR)?
- Are pediatric and adult tests delivered using the appropriate radiation doses?

**Why should I have my imaging exam done at an accredited facility?**
When you see the gold seals of accreditation prominently displayed in our imaging facility, you can be sure that you are in a facility that meets standards for imaging quality and safety. Look for the **ACR Gold Seals of Accreditation**. To achieve the ACR Gold Standard of Accreditation, our facility's personnel qualifications, equipment requirements, quality assurance, and quality control procedures have gone through a rigorous review process and have met specific qualifications. It's important for patients to know that every aspect of the



# Accreditation – American College of Radiology

www.acr.org/quality-safety/accreditation

ESPN   Yahoo

## MRI

The MRI Accreditation Program evaluates staff qualifications, quality control, MR safety policies and image quality. Accreditation is required for providers that bill for MRI under part B of the Medicare Physician Fee Schedule.



Exhibit "1"

# ACR Appropriateness Criteria®
## Overview

**Prologue**

In creating the ACR Appropriateness Criteria® (ACR AC), the ACR Task Force on Appropriateness Criteria incorporated attributes for developing acceptable medical practice guidelines used by the Agency for Healthcare Research and Quality (AHRQ) as designed by the Institute of Medicine. These attributes are:

Exhibit "1"



## Defining Appropriateness

The ACR has adopted the AQA's definition of appropriateness. "The concept of appropriateness, as applied to health care, balances risk and benefit of a treatment, test, or procedure in the context of available resources for an individual patient with specific characteristics. Appropriateness criteria provide guidance to supplement the clinician's judgment as to whether a patient is a reasonable candidate for the given treatment, test or procedure."[1]

An assumption when assessing appropriateness is that the ordering health care provider has not yet determined whether a radiological procedure is clinically useful for the specific situation. The expert panel may recommend no radiological procedure as being appropriate for a specific clinical scenario. In those instances where more than one radiological procedure may be appropriate, the expert panel will provide additional guidance or clarification of the issues.

## Rating Appropriateness

The ACR AC methodology is based on the RAND Appropriateness Method[2]. The appropriateness ratings for each of the procedures or treatments included in the AC topics are determined using a modified Delphi method. A series of surveys are conducted to elicit each panelist's expert interpretation of the evidence, based on the available data, regarding the appropriateness of an imaging or therapeutic procedure for a specific clinical scenario. The expert panel members review the evidence presented and assess the risks or harms of doing the procedure balanced with the benefits of performing the procedure. The direct or indirect costs of a procedure are not considered as a risk or harm when determining appropriateness. When the evidence for a specific topic and variant is uncertain or incomplete, expert opinion may supplement the available evidence or may be the sole source for assessing the appropriateness.

Exhibit "1"



**Northern Louisiana Medical Center**

SERVICES            PATIENTS            VISITORS            COMMUNITY            Al



**PATIENTS, ADMISSIONS, PRECERTIFICATION**

# Precertification

**Get ready. Get set.**

## It's all about preparation.

Completing paperwork before you arrive saves time and reduces stress at check-in.

**CLICK HERE to Pre-Register Online.**
Online pre-registration is available for all inpatient, outpatient services including diagnostic testing. You may pre-register online at least 3 business days in advance of your requested procedure date.

*10*



SERVICES          PATIENTS          VISITORS          COMMUNITY          AB



**PATIENTS, INSURANCE/ACCEPTED PLANS**

# Insurance Accepted Plans

**Are you covered?**

## If you have insurance:

Northern Louisiana Medical Center accepts most major insurance providers. Contact our Financial Counselors if you have questions about our accepted providers.

## If you don't have insurance:

No one will be denied necessary medical care due to lack of insurance or inability to pay. However, if you are uninsured you may be asked to pay a deposit when you're admitted or when you register for an outpatient procedure.



**Northern Louisiana Medical Center**

SERVICES   PATIENTS   VISITORS   COMMUNITY   AE

# 30
## 30-Minutes-Or-Less
### E.R. Service Pledge

## Less Waiting

Less waiting where it matters most — our emergency room.

**LEARN MORE**

Exhibit "1"

Ex. 13

OER30   User: ...URNS

Sort report: by Sub-Department
Department : MRI Imaging
HSV       : EOP   Analyzer : *ALL
Procedures : *ALL
Physician # : *ALL

NORTHERN LOUISIANA MEDICAL CENTER
Statistics by Procedure - Patient listing
From 01/01/14 *ALL  To 03/24/16 *ALL  (CONTINUOUS)

Page:    1
Date:  3/24/16
Time:  16:08

| Procedure | Qty | Start Dt | Service Dt | Patient Name | Patient# | Order# | HSV | Location | Ordering Physician | Family Physician | ST | Tech | Anlz |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MR-ANKLE WO CONTRAST | 1 | 12/10/15 | | | 8453743 | 300 | EOP | O/P | ALAM MOHAMMAD J MD | WILLIS MELINDA | F | LLH | |
| MR-BRAIN W | 1 | 1/09/16 | | | 8457736 | 1100 | EOP | NUIE  106 -1 | KIDD HOLLY | TAMKLOE MARTINA | F | OLD | |
| MR-BRAIN WO | 1 | 4/28/14 | | | 8367497 | 1300 | EOP | NUIW  305 -1 | CALVERT EDWARD H M | BATES JOHNATHAN | R | LLH | |
| MR-BRAIN WO | 1 | 6/01/14 | | | 8372538 | 700 | EOP | O/P | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WO | 1 | 9/03/15 | | | 8439075 | 700 | EOP | O/P | BLACKWELDER MARK A | BLACKWELDER MARK A | F | OLD | |
| MR-BRAIN WO | 1 | 1/05/16 | | | 8457235 | 1000 | EOP | NUIW  148 -1 | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 6/22/14 | | | 8375571 | 200 | EOP | NUIE  106 -1 | ALAM MOHAMMAD J MD | THOMPSON DANIEL | F | OLD | |
| MR-BRAIN WW | 1 | 9/18/14 | | | 8388181 | 900 | EOP | O/P | ALAM MOHAMMAD J MD | BELUE JAMES M MD | F | LLH | |
| MR-BRAIN WW | 1 | 6/30/15 | | | 8429526 | 1000 | EOP | O/P | WHITE JACQUELYN K | GRIGSBY BENSON A M | F | LLH | |
| MR-BRAIN WW | 1 | 8/12/15 | | | 8435872 | 800 | EOP | O/P | BURTON BEAU | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 9/01/15 | | | 8438642 | 2000 | EOP | NUIW  154 -1 | BONIN REAGAN | TAMKLOE MARTINA | F | LLH | |
| MR-BRAIN WW | 1 | 9/25/15 | | | 8442425 | 100 | EOP | O/P | TAYLOR JAMES PATRI | MCGEHEE DAVID W MD | F | LLH | |
| MR-BRAIN WW | 1 | 10/05/15 | | | 8443948 | 200 | EOP | O/P | COLEMAN THOMAS WIL | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 10/22/15 | | | 8446658 | 200 | EOP | O/P | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 9/21/15 | | | 8441721 | 300 | EOP | O/P | WALKER CHARLES | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 1/20/16 | | | 8459335 | 700 | EOP | O/P | NGUYEN HOA | UNKNOWN PRIMARY CA | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 8/21/14 | | | 8384060 | 300 | EOP | O/P | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 4/02/15 | | | 8416517 | 600 | EOP | O/P | TAYLOR JAMES PATRI | UNKNOWN PRIMARY | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 3/05/16 | | | 8466513 | 900 | EOP | O/P | ALAM MOHAMMAD J MD | BALLARD RICHARD I | F | LLH | |
| MR-ORBT-FAC-NCK W | 1 | 10/05/15 | | | 8443948 | 300 | EOP | O/P | COLEMAN THOMAS WIL | UNKNOWN PRIMARY CA | F | LLH | |
| MR-UDR SPINE WO CON | 1 | 4/02/15 | | | 8416517 | 500 | EOP | O/P | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MRA-CHEST W-CONTRAST | 1 | 5/19/15 | | | 8423653 | 1100 | EOP | O/P | ALAM MOHAMMAD J MD | BLACKWELDER MARK A | F | LLH | |
| MRA-LAD WO | 1 | 9/18/14 | | | 8388181 | 1000 | EOP | O/P | ALAM MOHAMMAD J MD | BELUE JAMES M MD | F | OLD | |

|  | Inpatient | Outpatient | Industrial | Total |
|---|---|---|---|---|
| PROCEDURE TOTAL: | 5 | 18 | 0 | 23 |
| PATIENT COUNT: | 5 | 15 | 0 | 20 |

Exhibit 1

```
OEOR30   User: ...adURNS

                              NORTHERN LOUISIANA MEDICAL CENTER                        Page:   1
                              Statistics by Procedure - Patient listing                Date:   3/24/16
                              From 01/01/10  To 12/31/13 *ALL  (CONTINUOUS)            Time:   16:10

Sort report: by Sub-Department
Department : MRI Imaging
HSV        : EOP                    Analyzer : *ALL
Procedures : *ALL
Physician #: *ALL
```

| Procedure | Qty | Start Dt | Service Dt | Patient Name | Patient# | Order# | HSV | Location | Ordering Physician | Family Physician | ST | Tech | Anlz |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MR-BRAIN WO | 1 | 1/04/13 | | | 8294472 | 1900 | EOP | NU3W 323 -1 | ALAM MOHAMMAD J MD | MARIANO SHEILA MAR | F | LLH | |
| MR-BRAIN WO | 1 | 3/27/13 | | | 8307646 | 1600 | EOP | O/P | AGARWAL KUSHAL MD | AGARWAL KUSHAL MD | F | DLD | |
| MR-BRAIN WO | 1 | 5/01/13 | | | 8313389 | 1200 | EOP | NU1W 146 -1 | MARIANO SHEILA MAR | MARIANO EDWARD J M | F | DLD | |
| MR-BRAIN WW | 1 | 3/01/13 | | | 8303476 | 1200 | EOP | O/P | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 6/30/13 | | | 8322616 | 700 | EOP | O/P | ALAM MOHAMMAD J MD | TAMACLOE SEDO E | F | LLH | |
| MR-BRAIN WW | 1 | 12/09/13 | | | 8327305 | 1900 | EOP | NU3W 314 -1 | LISTON DEREK C | HARRIS BRYAN | F | DLD | |
| MR-BRAIN WW | 1 | 12/30/13 | | | 8350438 | 1000 | EOP | O/P | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 5/29/13 | | | 8317759 | 700 | EOP | O/P | EUGENE EDWIG MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 1/05/13 | | | 8294414 | 300 | EOP | O/P | ALAM MOHAMMAD J MD | GRIGSBY BENSON A M | F | LLH | |
| MR-HIP WO CONTRAST | 1 | 6/07/13 | | | 8319327 | 100 | EOP | O/P | BELUE JAMES M MD | BELUE JAMES M MD | F | LLH | |
| MRA-HEAD WO | 1 | 1/04/13 | | | 8294172 | 100 | EOP | NU3W 323 -1 | KIDD HOLLY | MARIANO SHEILA MAR | F | LLH | |
| MRA-HEAD WO | 1 | 3/01/13 | | | 8303476 | 300 | EOP | O/P | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MRA-HEAD WO | 1 | 3/27/13 | | | 8307546 | 1500 | EOP | O/P | AGARWAL KUSHAL MD | AGARWAL KUSHAL MD | F | DLD | |

```
                        Inpatient    Outpatient    Industrial    Total
PROCEDURE TOTAL:            4            9             0           13
   PATIENT COUNT:           3            7             0           10
```

*Current Computer System started 2013*

Exhibit "1"

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

* * * * * * * * * * * * * * * * * * * *


GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

VS.                NO. 3:16-CV-00376

NORTHERN LOUISIANA MEDICAL
CENTER, RUSTON, LOUISIANA,
HOSPITAL COMPANY, LLC, AND
BRADY DuBOIS


* * * * * * * * * * * * * * * *


DEPOSITION OF

EDWARD CALVERT, M.D.

October 17, 2016


* * * * * * * * * * * * * * * *

At:


North Louisiana Medical Center
401 E. Vaughn Avenue
Ruston, Louisiana 71270

REPORTED BY:

LINDA PEROT
CERTIFIED COURT REPORTER
CERTIFICATE NO. 23012
STATE OF LOUISIANA

GREGORY SCOTT, ET AL.                                        EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                      October 17, 2016

---

**Page 2**

APPEARANCES:

FOR PLAINTIFFS:

    BREITHAUPT, DUNN, DuBOS, SHAFTO & WOLLESON
    1811 Tower Drive, Suite D
    Monroe, Louisiana 71201
    Phone: (318) 322-1202
      appearing herein by and through
      Mr. Russell A. Woodard, Jr.
      rwoodard@bddswlaw.com
AND VIA TELEPHONE CONFERENCE CALL
    OSCAR L. SHOENFELT
    ATTORNEY AT LAW
    2109 Perkins Road
    Baton Rouge, Louisiana 70808
    Phone: (225) 336-4300
    E-Mail: info@shoenfeltlaw.com

FOR DEFENDANT NORTHERN LOUISIANA MEDICAL CENTER:

    BLUE WILLIAMS
    3421 North Causeway Boulevard
    Suite 900
    Metairie, Louisiana 70002
    Phone: (504) 831-4091

      appearing herein by and through
      Mr. Kurt S. Blankenship
      E-Mail: kblankenship@bluewilliams.com

FOR DEFENDANT JACOB M. WOOD, M.D.:

    HUDSON, POTTS & BERNSTEIN
    1800 Hudson Lane, Suite 300
    Monroe, Louisiana 71201
    Phone: (318) 388-4400
    appearing herein by and through
    Mr. Donald H. Zeigler, III on behalf of
    Mr. Gordon L. James
    E-Mail: tzeigler@hplaw.com

---

**Page 3**

1    APPEARANCES (CONTINUED):
2    FOR DEFENDANT JAMES PATRICK TAYLOR, M.D.:
3    DEGAN, BLANCHARD & NASH
      400 Poydras Street, Suite 2600
4    New Orleans, Louisiana 70130
      Phone: (504) 529-3333
5
      appearing herein by and through
6    Ms. Maryann G. Hoskins
      E-Mail: dhoskins@degan.com
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1              INDEX
2                        PAGE
3    EXAMINATION
4      BY MR. WOODARD. . . . . . . . . . . . . . . . . 7,74
5
6    EXAMINATION
7      BY MR. BLANKENSHIP. . . . . . . . . . . . . . 55
8
9    OBJECTIONS
10      BY MS. HOSKINS. . . . . . 9, 11, 14, 15, 18, 19, 20, 22,
      . . . . .24, 25, 26, 27, 33, 36, 39, 40,
11      . . . .41, 43, 45, 47, 48, 50, 52, 76,
      . . . . . . . . . . . . . 75, 77, 79, 80
12
13      BY MR. BLANKENSHIP . . . . .10, 11, 14, 15, 16, 18, 20,
      . . . . .21, 22, 24, 25, 26, 27, 28,
14      . . . . .30, 33, 34, 35, 37, 39, 40,
      . . . . .41, 42, 43, 45, 47, 49, 50,
15      . . . 51, 52, 53, 76, 77, 78, 79, 80
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1            EXHIBIT INDEX
2                      PAGE
3
4    Exhibit 1    Transcript of Dr. Alam . . . . . . . . . . .8
5    Exhibit 2    Excerpts from Transcript of Dr. Taylor . . .9
6    Exhibit 3. . . . . . . . . . . . . attached post-deposition
7    Exhibit 4. . . . . . . . . . . . . attached post-deposition
8    Exhibit 5    Website Screen Shot . . . . . . . . . . .28
9    Exhibit 6    Website Screen Shot . . . . . . . . . . . .30
10    Exhibit 7. . . . . . . . . . . . . . attached post deposition
11    Exhibit 8    The ACR Appropriateness Criteria . . . . . 31
12    Exhibit 9    Screen Shot from The ACR Appropriateness
13              Criteria . . . . . . . . . . . . . . . . 32
14    Exhibit 10    Screen Shot from The ACR Appropriateness
15              Criteria . . . . . . . . . . . . . . . . 36
16    Exhibit 11    Website Screen Shot . . . . . . . . . . . .38
17    Exhibit 12    Thirty Minutes or Less Pledge . . . . . . .39
18    Exhibit 13 . . . . . . . . . . . . . . . . . . . . . . .74
19
20
21
22
23
24
25

2 (Pages 2 to 5)

---

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 6

1                STIPULATIONS
2     It is stipulated and agreed between counsel
3  that this deposition of EDWARD CALVERT, M.D., is
4  taken pursuant to Notice by counsel for
5  Defendants in accordance with the Federal Rules
6  of Civil Procedure, and may be used for all
7  purposes and in any manner consistent therewith.
8  All objections except as to the form of the
9  question and responsiveness of the answer are
10  reserved until such time as the deposition is
11  offered and introduced into evidence.
12
13     The parties hereto waive all formalities in
14  connection with the taking of said deposition,
15  except the swearing of the witness, reduction of
16  the questions and answers to typewriting, and
17  reading and signing of the deposition.
18
19     The witness, EDWARD CALVERT, M.D., was
20  advised of his right to read and sign this
21  deposition, and he elected to exercise that
22  right.
23
24     * * * * * * * * * * * * * * * * * * * *
25

---

Page 7

1          EDWARD CALVERT, M.D.,
2  being first duly sworn by LINDA PEROT, Certified
3  Court Reporter 23012, was examined and testified
4  as follows:
5           EXAMINATION
6  BY MR. WOODARD:
7  Q  Good morning, Doctor.
8  A  Good morning.
9  Q  Will you please state your name and address
10    for the record?
11  A  Edward Calvert, 1120 Brookhaven Avenue,
12    Ruston, Louisiana.
13  Q  And it's my understanding you are a
14    physician in the North Louisiana Emergency
15    Physicians Partnership?
16  A  I am.
17  Q  Okay.  And that serves Northern Louisiana
18    Medical Center?
19  A  Correct.
20  Q  And you are not technically an employee of
21    Northern Louisiana Medical Center?
22  A  I think, technically, we are partners of
23    some kind.  I'm self-employed, I suppose.
24  Q  And the partners of NLEP, LLP, that would be
25    Drs. Alam, Taylor, White and yourself?

---

Page 8

1  A  I'm not certain who all the partners are.
2  Q  Okay.  Alam and Taylor are your partners,
3    though?
4  A  I think -- I suppose.  It's sort of unusual
5    the way this ER is set up.  Most of the
6    time, you are self-employed.  With this one,
7    they make you partners of some kind.  I
8    think it's a tax issue more than an actual
9    partnership.
10  Q  How long have you known Dr. Alam and Dr.
11    Taylor?
12  A  I've known Dr. Alam since probably 2005; Dr.
13    Taylor since, I believe, 2013.
14  Q  Have you found them both to be trustworthy?
15  A  I have.
16  Q  Reliable?
17  A  Yes.
18  Q  Honest?
19  A  Yes.
20  Q  Can you think of any instance of dishonesty
21    since you've known Dr. Alam or Dr. Taylor?
22  A  I cannot.
23  Q  I'd like to show you --
24       MR. WOODARD:
25         what's been marked as "-- 1."

---

Page 9

1  Q  This is a transcript of Dr. Alam's testimony
2    from a trial Mr. Ziegler and I actually had
3    not too long ago.  If you will, flip with me
4    to the second page, Lines 7 through 9.  Can
5    you read for the record that question and
6    answer?
7  A  "No MRI or CT scan of the thoracic spine.
8    Is that right?"  "No.  MRI is not emergency
9    med department procedure.  It takes longer
10    time.  We cannot order it fast."
11  Q  Okay.  Have you ever seen that before?
12  A  No.
13       MR. WOODARD:
14         I have "Exhibit 2" here, some
15    deposition excerpts from Dr. Taylor.
16  Q  Have you read that deposition?
17  A  I have not.
18  Q  Okay.  I want you to assume for me instead
19    of going through these excerpts in detail
20    that Dr. Taylor has testified in this
21    particular case he asked for an MRI.  His
22    request was denied or delayed and the reason
23    he was given was financial considerations.
24       MS. HOSKINS:
25         Object to the form.

3 (Pages 6 to 9)

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

|  | Page 10 |
|---|---|
| 1 | (To Witness): Go ahead. |
| 2 | MR. BLANKENSHIP: |
| 3 | I join in the objection. |
| 4 | MR. WOODARD: |
| 5 | You can state the basis for your |
| 6 | form objection. |
| 7 | MS. HOSKINS: |
| 8 | Well, I don't think that's |
| 9 | exactly -- |
| 10 | MR. BLANKENSHIP: |
| 11 | His answer -- |
| 12 | MS. HOSKINS: |
| 13 | Right. I don't think that's exactly |
| 14 | what he said. I'm not -- it's a |
| 15 | paraphrase of what he said and I'm just |
| 16 | making my objection for the record. |
| 17 | MR. WOODARD: |
| 18 | Okay. |
| 19 | MS. HOSKINS: |
| 20 | I mean, if you want a verbatim, we |
| 21 | can read it. I don't think that's |
| 22 | necessary, but -- |
| 23 | MR. WOODARD: |
| 24 | That's fine. I just -- if there was |
| 25 | some way I could rephrase the |

|  | Page 11 |
|---|---|
| 1 | paraphrasing that you don't have a |
| 2 | problem with. |
| 3 | Q   All right. And I want you to also assume |
| 4 | for me that Dr. Taylor testified that he was |
| 5 | told that requests for MRIs from the |
| 6 | emergency room have to be precertified. |
| 7 | MS. HOSKINS: |
| 8 | Object to the form. |
| 9 | MR. BLANKENSHIP: |
| 10 | Same objection. |
| 11 | Q   Have you ever heard of any of those things I |
| 12 | just mentioned by Dr. Taylor? |
| 13 | A   I have not. |
| 14 | Q   Okay. Look back at "Exhibit 1." Do you |
| 15 | agree with Dr. Alam that MRIs cannot be |
| 16 | ordered fast from the emergency room? |
| 17 | A   I do. |
| 18 | Q   And why do you agree with that? |
| 19 | A   MRI is not an emergency procedure. It's |
| 20 | just not something that is available to us |
| 21 | through the emergency room. |
| 22 | Q   Is that something you wish was available? |
| 23 | A   I'm sorry? |
| 24 | Q   Is that something that you personally wish |
| 25 | was available? |

|  | Page 12 |
|---|---|
| 1 | A   In an ideal world. However, MRI takes |
| 2 | thirty minutes to an hour and it's just not |
| 3 | an emergency procedure by the nature of MRI. |
| 4 | Q   Have you ever attempted to order an MRI from |
| 5 | the emergency room? |
| 6 | A   Not on an emergency room patient. |
| 7 | Q   Have you ever had occasion to order an MRI |
| 8 | on an emergency room patient, but you did |
| 9 | not make an order because you knew it would |
| 10 | take a significant amount of time? |
| 11 | A   It's not really available through the |
| 12 | emergency room, so -- |
| 13 | Q   Who has told you that it's not available |
| 14 | through the emergency room? |
| 15 | MS. HOSKINS: |
| 16 | Objection. I don't think that's |
| 17 | what he said. |
| 18 | Q   Is that what you said? |
| 19 | A   It's not a test that we use in the emergency |
| 20 | room because it's not available for us to |
| 21 | order. |
| 22 | Q   What do you mean that it's not available for |
| 23 | y'all to order? |
| 24 | A   If I attempted to order an MRI, it wouldn't |
| 25 | be done. There's -- unless we order it on |

|  | Page 13 |
|---|---|
| 1 | an inpatient, it's something that I would |
| 2 | have to discuss directly with either an |
| 3 | admitting physician or a radiologist or get |
| 4 | the orthopaedic doctor to tell me that it |
| 5 | was necessary. It's not something that I |
| 6 | could just type an order in the computer and |
| 7 | it would be done. |
| 8 | Q   Do you have any idea why -- you could press |
| 9 | a button and order a CT scan. Correct? |
| 10 | A   Correct. |
| 11 | Q   Do you have any idea why you can't do that |
| 12 | for an MRI? |
| 13 | A   It's just one of tests that's typically |
| 14 | reserved for people who require an inpatient |
| 15 | stay or can be done on an outpatient basis. |
| 16 | Q   Typically, -- |
| 17 | A   We use the CT to rule out emergency |
| 18 | conditions typically, and then if somebody |
| 19 | needs further investigation, that's done |
| 20 | sort of at the next level, not through the |
| 21 | emergency room. |
| 22 | Q   And when you say it's typically reserved for |
| 23 | inpatients and who else? |
| 24 | A   Done on an outpatient basis. Typically, we |
| 25 | order a CAT scan to rule out emergency |

                                                    4 (Pages 10 to 13)

acourtreporter2@gmail.com                Exhibit "1"                318-348-7647

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 14

1   conditions and, if the CAT scan is negative,
2   then we would send them to have an
3   outpatient MRI via their primary physician.
4   Q   And the way you're understanding MRIs are
5   used at Northern, typically there's a delay
6   which allows for confirmation of either
7   insurance or a patient's ability to pay?
8       MS. HOSKINS:
9           Objection.
10      MR. BLANKENSHIP:
11          Object to the form.
12  A   I don't know anything about the financial
13      aspect of it.
14  Q   It was a poor question.  It's your
15      understanding that, typically, the way MRIs
16      are ordered and conducted at Northern,
17      there's a significant period of time to
18      where confirmation of reimbursement can be
19      confirmed.  Is that correct?
20      MS. HOSKINS:
21          Objection.
22      MR. BLANKENSHIP:
23          Same objection.
24  A   Again, I have no idea about the financial
25      aspect of it.

Page 15

1   Q   If Dr. Taylor testified that he spoke with
2       Brady Dubois, the former CEO of Northern, --
3       do you remember -- were you working here
4       when Mr. Dubois was so employed? --
5   A   I was.
6   Q   -- that he spoke with Mr. Dubois and he
7       said, "We can't allow emergency room MRIs
8       for financial considerations," would you be
9       in a position to dispute Dr. Taylor's
10      testimony?
11      MS. HOSKINS:
12          Object to the form.
13      MR. BLANKENSHIP:
14          Object to the form.
15  A   I have no idea what conversation he had with
16      Brady.
17  Q   Would you have any reason to doubt
18      Dr. Taylor?
19      MR. BLANKENSHIP:
20          Same objection.
21  Q   So it seems that you, Dr. Alam and
22      Dr. Taylor all agree that it's very
23      difficult to obtain an MRI from the
24      emergency room.  Is that correct?
25  A   That's correct.

Page 16

1       MR. BLANKENSHIP:
2           Object to the form.
3   Q   And as we discussed before, I'm a lawyer.
4       I'm not a doctor.  Tell me, if I come to you
5       and I present with something, some
6       conditions, and you say, "I want this test
7       run," where do you go?  Is it a computer
8       screen?  Is it a station where you write
9       handwritten notes?
10  A   It's a computer screen.
11      MS. HOSKINS:
12          Just for clarification, you're
13      talking about if you present to NLMC
14      emergency room?
15      MR. WOODARD:
16          I think he understands the question.
17  Q   You can go ahead.
18  A   Yeah.  We have a system called MEDHOST that
19      we do all of our documentation and we order
20      our tests through MEDHOST.
21  Q   Okay.  And MEDHOST is electronic?
22  A   Correct.
23  Q   And if you want to order a CT scan, you can
24      press a button?
25  A   Correct.

Page 17

1   Q   Are there any other type of diagnostic
2       images you can order with the press of a
3       button?
4   A   X-rays, some ultrasound.
5   Q   But there is no button on MEDHOST for MRIs?
6   A   There is not, not that I'm aware of.
7   Q   How often do you see or use that MEDHOST
8       software?
9   A   Every day.
10  Q   Daily?  And you've never --
11  A   Every day that I work, yes.
12  Q   Poor question.  And you've never noticed an
13      MRI button?
14  A   I have not.
15  Q   Have you ever inquired as to why there is no
16      MRI button?
17  A   I have not.
18  Q   Do you have any idea as you sit here today
19      why there is no MRI button?
20  A   It's just not a modality we use in the
21      emergency department.
22  Q   I can't remember their first names, but are
23      you familiar with Ms. Burns and Ms. Goss?
24  A   Yes.  Sandy Goss.
25  Q   Sandy Goss?

5 (Pages 14 to 17)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 18

1    A    Sandy Goss is her name.
2    Q    Okay.
3    A    I don't know who Burns is.
4    Q    Would you agree if they said all other
5    departments can order an MRI electronically
6    except the emergency room?
7         MR. BLANKENSHIP:
8              Object to the form.
9         MS. HOSKINS:
10             Object to the form.
11   A    I have no knowledge of other departments.
12   Q    Are you aware of any MRIs ever being ordered
13   from the emergency room by any physician?
14   A    I am not.
15   Q    And how long have you been at Northern?
16   A    On and off since 2005.
17   Q    Would it be fair to say that the ordering of
18   MRIs from the emergency department at
19   Northern is discouraged?
20        MR. BLANKENSHIP:
21             Object to the form.
22   A    I've never been discouraged.  It's just not
23   something that's typically available to us.
24   Q    Are you aware of -- let me ask this.  Have
25   you ever made any complaints to hospital

Page 19

1    administration that you would like to have
2    the option for an MRI?
3    A    I have not.
4    Q    Are you aware of any physicians who have
5    made such a complaint?
6    A    I am not.
7    Q    And you've never requested an MRI out of the
8    emergency room?
9    A    I have not.
10   Q    But since 2005, you have had some patients
11   where they presented with symptoms where you
12   would have like to have obtained an MRI?
13        MS. HOSKINS:
14             Object to the form.
15   A    Normally, I can rule in or out conditions
16   with what's available to me in CAT scan or
17   plain x-ray enough to give the patient a
18   really need to be for that MRI.  So through
19   the nature of MRI, it's not something that
20   we can do quickly in the emergency room.
21   Q    The MRI machine is right down the hallway
22   from the emergency department.  Correct?
23   A    I honestly don't know.
24   Q    If Dr. Taylor testified that the MRI machine
25   is right down the hallway from the emergency

Page 20

1    department, would you be in any position to
2    dispute that?
3    A    I would not.
4    Q    If Dr. Taylor testified that "This is the
5    21st Century; we ought to be able to obtain
6    an MRI from the emergency department," would
7    you agree with that?
8         MR. BLANKENSHIP:
9              Object to the form.
10        MS. HOSKINS:
11             Object to the form.
12   A    That's his statement.  I don't -- I've never
13   worked in an emergency room where MRI was
14   available to me.
15   Q    How many emergency rooms have you worked in?
16   A    Six or seven.
17   Q    If a hospital advertises and markets that it
18   has MRIs available for all patients,
19   inpatients and outpatients, would it be fair
20   for patients to expect that they can obtain
21   an MRI from the emergency room?
22        MR. BLANKENSHIP:
23             Object to the form.
24        MS. HOSKINS:
25             Object to the form.

Page 21

1    A    It's not an emergency procedure.
2    Q    I understand.  But my question was, if a
3    hospital advertises that they provide MRIs
4    for all patients, inpatients, outpatients,
5    emergency, non-emergency, would it be fair
6    for patients to expect that they can obtain
7    an emergency room MRI?
8         MR. BLANKENSHIP:
9              Same objection.
10   A    I don't really know how to answer that.  I
11   mean, they can advertise whatever they want,
12   I suppose.  It's just not something we use
13   through the emergency room.  It's available
14   for inpatients; it's available for
15   outpatients.  But whatever they advertise,
16   it's just not something we do in the ER.
17   Q    But you wouldn't condone it as a good
18   medical practice to falsely advertise what
19   services a hospital can or can't offer.
20   Correct?
21        MS. HOSKINS:
22             Object to the form.
23        MR. BLANKENSHIP:
24             Object to the form.
25   A    Correct.

6 (Pages 18 to 21)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 22

1 **Q**  Are you -- do you have any knowledge at all
2 about the case that I'm here on today?
3 **A**  I do not.
4 **Q**  Have you ever heard of Jordan Scott?
5 **A**  I've heard the name strictly because I know
6 that's the case that I'm here for today.
7 **Q**  Are you aware she's a patient who presented;
8 at the time, she was twelve years old?  And,
9 according to Dr. Taylor's testimony, he
10 wanted an MRI at around 9 a.m. and an MRI
11 was not conducted until nearly 3 p.m.?
12 MS. HOSKINS:
13 Object to the form.
14 MR. BLANKENSHIP:
15 Same objection.
16 **A**  I have no knowledge of the case.
17 **Q**  Are you aware that that girl is now
18 paralyzed for the rest of her life?
19 **A**  I am not.
20 **Q**  Would you agree that's a tragic case?
21 MR. BLANKENSHIP:
22 Object to the form.
23 MS. HOSKINS:
24 Object to the form.
25 **A**  I do agree.

Page 23

1 **Q**  Doctor, you are trained to help people.
2 Correct?
3 **A**  Correct.
4 **Q**  You're not trained on how to give
5 depositions?
6 **A**  I'm not.
7 **Q**  Right now, you're thinking about "What am I
8 going to do once I get out of this
9 deposition and what am I going to walk into
10 in the emergency department?"  Correct?
11 **A**  I don't work today, thankfully.
12 **Q**  You're not working today.  If you were
13 working today, you walk in every day not
14 knowing what's going to present itself?
15 **A**  Correct.
16 **Q**  You're holding a cup of coffee in your hand.
17 When you're working, you may be drinking a
18 cup of coffee, and then all of a sudden
19 things go from tranquil to a gunshot wound
20 comes in and you've got all hands on deck?
21 **A**  Correct.
22 **Q**  And you've got to use your expertise, your
23 medical judgment to try to help that person?
24 **A**  Correct.
25 **Q**  You've got to assess the situation, diagnose

Page 24

1 the problem, and then treat the problem.
2 Correct?
3 **A**  Correct.
4 **Q**  And you've been educated.  You've been
5 trained.  You have experience to help deal
6 with those medical issues?
7 **A**  Correct.
8 **Q**  Is it true that sometimes business decisions
9 can get in the way of you exercising -- or a
10 doctor exercising his medical judgment?
11 MS. HOSKINS:
12 Object to the form.
13 MR. BLANKENSHIP:
14 Object to the form.
15 **A**  Not with me.
16 **Q**  Have you ever wanted to do something,
17 provide treatment to a particular patient
18 and been handcuffed by a particular
19 administrative or business decision?
20 **A**  Yes.  I'm sure that I have, but I can't
21 think of a specific example.
22 **Q**  And that's more of where I was going with my
23 question.  Again, I'm asking you to assume
24 instead of making you read all this
25 deposition testimony.  I'm trying to move

Page 25

1 things along so you can get out of here.  If
2 Dr. Taylor testified he wanted to order an
3 MRI as early as, say, 9 a.m., he made the
4 request to order an MRI, he was denied his
5 request for an MRI, and when he was told why
6 his requests were denied it was because of
7 administrative financial consideration.  I
8 want you to assume those things.  If that's
9 true, would that be an instance where a
10 physician's medical judgment was being
11 handcuffed by a business decision?
12 MR. BLANKENSHIP:
13 Object to the form.
14 MS. HOSKINS:
15 Object to the form.
16 **A**  Assuming all those things are true, yes, it
17 would be.
18 **Q**  Okay.  And sometimes, those business or
19 administrative decisions are made by people
20 who never went to medical school like you?
21 MR. BLANKENSHIP:
22 Object to the form.
23 **A**  Yes.
24 **Q**  People who never went to medical school like
25 Dr. Taylor or Dr. Alam.  Correct?

7 (Pages 22 to 25)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 26

1    **A**   Correct.
2    **Q**   And sometimes, those administrative and
3         business decisions are made without any
4         consultation with people who went to medical
5         school such as yourself, Dr. Alam and Dr.
6         Taylor?
7              MR. BLANKENSHIP:
8                  Object to the form.
9    **A**   Yes.
10   **Q**   And when those decisions are adopted, y'all
11        pretty much have to just go with the hands
12        you are dealt.  Correct?
13   **A**   Correct.
14   **Q**   Okay.  Again, I'm asking you to accept as
15        true Dr. Taylor's testimony that Mr. Dubois
16        told him, "We, as a hospital, cannot grant
17        or order MRIs from the emergency room for
18        financial considerations."  Assuming that is
19        true, would it be fair to say that that
20        policy does not involve an assessment of
21        each particular patient's condition?
22             MR. BLANKENSHIP:
23                 Object to the form.
24             MS. HOSKINS:
25                 Object to the form.

---

Page 27

1    **A**   If it's a global policy, then I guess it
2         doesn't involve individual patients.
3    **Q**   And if Jordan Scott presented --
4              MR. WOODARD:
5                  Y'all help me.  August 19th?
6              MR. BLANKENSHIP:
7                  That's right.
8    **Q**   If Jordan Scott presented August 19th of
9         2014 and that policy I'm asking you to
10        assume exists, that would not have been
11        applied for her specific case.  Correct?
12             MR. BLANKENSHIP:
13                 Object to the form.
14   **A**   Correct.
15   **Q**   It wouldn't have been applied during the
16        scope of her particular treatment?
17             MR. BLANKENSHIP:
18                 Same objection.
19   **A**   I suppose.
20   **Q**   If that policy exists, that would be an
21        administrative or a business decision
22        without consideration of any medical
23        judgment?
24             MS. HOSKINS:
25                 Object to the form.

---

Page 28

1              MR. BLANKENSHIP:
2                  Same objection.
3    **A**   If it exists, yes.
4    **Q**   And I think you used the word "globally."
5         If it's applied globally or universally,
6         that would mean that it's being done so
7         without specific considerations of each
8         specific patient.  Correct?
9    **A**   Correct.
10   **Q**   And if Dr. Taylor says the policy exists and
11        the hospital says it doesn't exist, that
12        would require a credibility call between the
13        two.  Correct?
14             MS. HOSKINS:
15                 Object to the form.
16             MR. BLANKENSHIP:
17                 Object to the form.
18   **A**   I suppose.
19   **Q**   I'm trying to move along.
20             MR. WOODARD:
21                 I'm going to show you what's been
22             marked as "Exhibit 5."
23   **Q**   Are you aware that Northern Louisiana
24        Medical Center has a website?
25   **A**   Not directly, no.  I've never seen it.

---

Page 29

1    **Q**   I'll represent to you that this is taken off
2         Northern's website.  Do you see the top
3         line?  It says, "Magnetic Resonance
4         Imaging?"
5    **A**   I do.
6    **Q**   Is that what lay folks like me refer to as
7         an MRI?
8    **A**   Yes.
9    **Q**   Look in the second paragraph.  It says,
10        "Northern has been offering MRIs as a part
11        of the diagnostic imaging department since
12        1994, and today we serve both inpatients and
13        outpatients."  Do you see that?
14   **A**   I do.
15   **Q**   When Jordan Scott was presenting to the
16        emergency department in August of 2014,
17        would she be considered an inpatient or an
18        outpatient?
19   **A**   She was an emergency room patient.
20   **Q**   So inpatient?
21   **A**   She doesn't really fall into either
22        category.
23   **Q**   Assuming she was admitted?
24   **A**   If she was admitted, she would be an
25        inpatient.

---

8 (Pages 26 to 29)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 30

1  Q   Okay. And you see 1994. If Dr. Taylor
2  testified that, "Look, this is the 21st
3  Century; we ought to be able to have access
4  to an MRI," that would be consistent with
5  Northern's own website. Correct?
6        MR. BLANKENSHIP:
7          Object to the form.
8  A   Correct.
9        MR. WOODARD:
10          I next want to show you "Exhibit 6,"
11       which is another caption of Northern's
12       website.
13  Q   Look at the top. It says, "Diagnostic
14  Imaging." Correct?
15  A   Yes. Correct.
16  Q   And if you see down toward the bottom, it
17  says, "Why should I have my imaging exam
18  done in an accredited facility?" Northern
19  is an accredited facility. Correct?
20  A   I don't know.
21  Q   Okay. According to this website?
22        MR. BLANKENSHIP:
23          Object. Speaks for itself.
24        MR. WOODARD:
25          That's fair.

---

Page 31

1  Q   Do you see the line I've highlighted there,
2  "ACR gold standards of gold seals of
3  accreditation?"
4  A   I do.
5  Q   ACR, is that the American College of
6  Radiology?
7  A   Yes.
8  Q   Are you aware that accreditation is required
9  for providers that bill for MRIs under
10  Medicare?
11  A   I am not.
12        MR. WOODARD:
13          I want to show you "Exhibit 8."
14  (OFF RECORD DISCUSSION.)
15  Q   "Exhibit 8" is entitled The ACR
16  Appropriateness Criteria. Do you see that?
17  A   I do.
18  Q   And again, that's the American College of
19  Radiology?
20  A   Yes.
21  Q   And whenever you, as an emergency room
22  physician, want to order diagnostic imaging,
23  do you work with your radiology department?
24  A   I do.
25  Q   Okay.

---

Page 32

1        MR. WOODARD:
2          I now want to show you "Exhibit 9,"
3       which is a screen shot from another part
4       of that article.
5  Q   It looks like the ACR has defined
6  "appropriateness" on when imaging is or is
7  not required. Do you see that highlighted
8  paragraph at the top?
9  A   I do.
10  Q   And in the paragraph toward the bottom, that
11  speaks to rating appropriateness. Do you
12  see that?
13  A   I do.
14  Q   Do you see the highlighted line toward the
15  bottom that says, "The direct or indirect
16  cost of a procedure are not considered as a
17  risk or harm when determining -- " quote,
18  unquote, " -- 'appropriateness'."
19  A   I do.
20  Q   Does that make sense to you?
21  A   Yes.
22  Q   And do you think that's how things ought to
23  be, especially in the emergency department,
24  considerations based on a financial -- or
25  excuse me. Strike that. Financial

---

Page 33

1  considerations should not be considered when
2  deciding which treatment to offer to a
3  particular patient?
4        MS. HOSKINS:
5          Object to the form.
6        MR. BLANKENSHIP:
7          Same objection.
8  A   I do.
9  Q   You do agree with that?
10  A   I do agree with it.
11  Q   And I'm not trying to trick you. If you
12  look at "Exhibit 9," I have one question
13  here. The top paragraph, "The concept of
14  appropriateness as applied to health care."
15  It's the second sentence of the first
16  paragraph. Do you see that?
17  A   I do.
18  Q   Do you understand the difference, if any,
19  between appropriateness and health care, or
20  does there appear to be a difference in this
21  article between appropriateness and the
22  practice of medicine?
23  A   I'm not sure what you mean.
24  Q   I'm not sure what I mean either. What does
25  that sentence mean to you?

---

9 (Pages 30 to 33)

GREGORY SCOTT, ET AL.                                      EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                         October 17, 2016

Page 34

1  A   They are defining appropriateness in the
2      setting of health care.
3  Q   And in that definition, they say costs are
4      not to be considered.  Correct?
5          MR. BLANKENSHIP:
6              Object to the form.
7  A   I don't believe it mentions cost at all in
8      that paragraph.
9  Q   I'm sorry.  In the writing appropriate
10     paragraph.
11 A   Yes.
12 Q   Have you ever heard of precertification?
13 A   I have.
14 Q   What is your understanding of what
15     precertification means?
16 A   I think it's normally when someone has a
17     test that's ordered on a non-emergency basis
18     and the insurance company can require sort
19     of oversight to see if that procedure is
20     appropriate.
21 Q   Precertification is required or used in non-
22     emergent basises?
23 A   That's my understanding.
24         MR. BLANKENSHIP:
25             Object to the form.

Page 35

1  Q   Is it your understanding that requiring
2      precertification in emergency basis would be
3      inappropriate?
4          MR. BLANKENSHIP:
5              Object to the form.
6  A   Yes.
7  Q   And it would be inappropriate because it
8      would delay or deny possibly pressing or
9      emergency medical needs to inquire into
10     insurance?
11 A   Yes.
12 Q   And I'm guessing, as an emergency room
13     physician, you are trained and educated on
14     what I would call EMTALA?
15 A   Yes.
16 Q   What is your understanding of what EMTALA
17     is?
18 A   It's a series of laws or rules, I guess,
19     that state that we have to do everything
20     within our power to determine that somebody
21     is medically stable before you would then
22     deny treatment to them, I suppose, or refer
23     them somewhere else for treatment.
24 Q   Right.  And you've been trained on that.
25     You've been educated on that.  And you've

Page 36

1      been told, as an emergency room physician,
2      you have different duties than a non-
3      emergency doctor.  Correct?
4  A   Correct.
5          MS. HOSKINS:
6              Object to the form.
7  Q   And those duties include you can't dump a
8      patient just because he or she doesn't have
9      insurance or money.  Correct?
10 A   Correct.
11 Q   And you can't deny screening examinations to
12     a patient just because he or she does not
13     have money or insurance.  Correct?
14 A   Correct.
15 Q   If there is necessary treatment that's
16     available, you provide it without regard for
17     insurance or for payment.  Correct?
18 A   Correct.
19 Q   In your training and education of EMTALA,
20     are you trained or informed on how to
21     identify when there has been an EMTALA
22     violation?
23 A   Yes.  I think so.
24         MR. WOODARD:
25             On "Exhibit 10," I have another

Page 37

1      screen shot from Northern's website on
2      the precertification issue.  This seems
3      to echo what you were saying.  It says,
4      "You may preregister online at least
5      three business days in advance of your
6      requested procedure date."  That does
7      not seem to speak to emergency
8      procedures.  Correct?
9          MR. BLANKENSHIP:
10             Object to the form.  It speaks for
11             itself.
12 A   Correct.
13 Q   Emergencies, you don't get three day's
14     notice.  Correct?
15 A   Correct.
16 Q   And so, applying this precertification in an
17     emergency setting would be kind of a square
18     peg in a round hole?
19 A   Correct.
20         MS. HOSKINS:
21             Excuse me.  Do you want to turn your
22             speaker down?
23 (OFF RECORD DISCUSSION).
24         MR. WOODARD TO MR. SHOENFELT:
25             Hey, Oscar.

10 (Pages 34 to 37)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 38

1      MR. SHOENFELT:
2          Yes?
3      MR. WOODARD:
4          Mute your phone for me. And I'm not
5      trying to hush you up, just in case you
6      need to engage.
7      MS. HOSKINS:
8          Just for clarification, Oscar is on
9      your cell phone listening.
10     MR. WOODARD:
11         That's right.
12     MR. WOODARD:
13         Now, "Exhibit 11" is a screen shot
14         from Northern's website.
15  Q  And this also seems to echo what you were
16     saying. The part at the bottom, "If you
17     don't have insurance, no one will be denied
18     necessary medical care due to lack of
19     insurance or inability to pay." Do you see
20     that?
21  A  I do.
22  Q  That's what you've been trained to do as an
23     ER physician?
24  A  Correct.
25  Q  That's consistent with your Hippocratic

Page 39

1      oath?
2   A  Correct.
3   Q  And a policy or a practice or even a single
4      instance in violation of that would
5      constitute an EMTALA violation. Correct?
6      MS. HOSKINS:
7          Object to the form.
8      MR. BLANKENSHIP:
9          Object to the form.
10  Q  I can rephrase the question. Accepting
11     Dr. Taylor's testimony as true that there
12     was an emergency condition, that the MRI was
13     available, that the MRI was requested, that
14     the MRI was denied because of insurance
15     inquiries, it's your understanding that
16     would result in an EMTALA violation.
17     Correct?
18     MS. HOSKINS:
19         Object to the form.
20     MR. BLANKENSHIP:
21         Object to the form.
22  A  Yes.
23     MR. WOODARD:
24         "Exhibit 12."
25  Q  Northern Louisiana Medical Center represents

Page 40

1      on its website the thirty minutes or less
2      pledge. Have you ever seen that?
3   A  I have.
4   Q  And that basically says you're going to get
5      meaningful service within thirty minutes.
6      You're going to be treated on an as-needed
7      basis based on the severity of the condition
8      presented. Correct?
9      MS. HOSKINS:
10         Object to the form.
11     MR. BLANKENSHIP:
12         Object to the form.
13  A  I think what it means is that you will be
14     seen and triaged within thirty minutes of
15     your arrival to the emergency department.
16  Q  You will be seen and triaged within thirty
17     minutes. And then, after that, you're going
18     to be pigeonholed into, okay, here is a
19     runny nose, and then on the other end of the
20     continuum we've got a heart attack or
21     neurological deficits, something like that.
22     Correct?
23  A  Correct.
24     MR. BLANKENSHIP:
25         Object to the form.

Page 41

1   Q  With this thirty-minute pledge in mind, if
2      Dr. Taylor testified that he wanted an MRI
3      for a twelve-year-old girl with neurological
4      deficits in her hands and feet as early as
5      9 a.m. and she did not obtain the MRI until
6      3 p.m., do you think that would be
7      consistent with the thirty-minute pledge?
8      MS. HOSKINS:
9          Object to the form.
10     MR. BLANKENSHIP:
11         Object to the form.
12  A  I don't think the pledge applies to that as
13     long as she was seen and triaged within
14     thirty minutes of her arrival to the ER.
15  Q  Okay. Do you think that would be
16     consistent, the scenario I just gave to you,
17     MRI requested as early as 9 a.m., not
18     conducted until 3 p.m. with emergency
19     progressing neurological deficits in a
20     twelve-year-old girl? Do you think that gap
21     in time is consistent with best practices at
22     Northern Louisiana Medical Center's
23     emergency department?
24     MS. HOSKINS:
25         Object to the form.

11 (Pages 38 to 41)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 42

1          MR. BLANKENSHIP:
2              Object to the form.
3    A    Again, an MRI is not something that is
4        available to us through the emergency room.
5    Q    Fair point.  That would be an instance
6        where, assuming those facts as true, request
7        at 9:00, MRI finally given at 3:00, if you
8        accept Dr. Taylor's testimony, he was doing
9        everything he could to try to get the MRI in
10       that time frame.  But because of a business
11       decision at the hospital, he could not get
12       it, --
13          MR. BLANKENSHIP:
14              Object to the form.
15   Q    -- assuming those facts as true.  Is that
16       correct?
17   A    That's correct.
18   Q    Now, I know you feel like you're probably
19       banging your head against the wall and I'm
20       almost done, but it's my understanding you
21       say "MRIs can't be ordered from the
22       emergency room department because that's not
23       a modality we use."  Is that a fair
24       characterization of your testimony?
25   A    Yes.

---

Page 43

1    Q    And you don't know -- you don't know why
2        that's something that's not available to
3        y'all?
4          MS. HOSKINS:
5              Object to the form.
6          MR. BLANKENSHIP:
7              Same objection.
8    A    No, not directly.
9    Q    Can you think of any legitimate reason if
10       the radiology department is right down the
11       hall, the MRI machine is right down the
12       hall, why you can't have access to that in
13       the special cases where you may need it as
14       an emergency room physician?
15          MS. HOSKINS:
16              Object to the form.
17          MR. BLANKENSHIP:
18              Same objection.
19   A    I don't know exactly how to answer that.
20       It's just always been we try to use another
21       modality that's faster in itself to try to
22       rule out emergency conditions.  A CT can be
23       done in a few minutes whereas an MRI takes,
24       you know, a half hour or an hour, you know,
25       to do the procedure.  So typically, we use

---

Page 44

1        the faster modality to try to rule in or out
2        an emergency condition, and then move on to
3        the next step.
4    Q    But there are certain things that an MRI
5        will pick up that a CT scan will not pick
6        up.  Correct?
7    A    Correct.
8    Q    And, say, blood thickness, the density of
9        blood around, say, a spinal cord.  That may
10       be an incident where you can run a CT scan
11       and it won't pick up, but an MRI would
12       definitely pick that up.  Correct?
13   A    I'm not a radiologist, so I'm not sure about
14       that.
15   Q    Sure.
16   A    My understanding is that I think blood --
17       acute blood shows up fairly well on a CAT
18       scan, but there certainly may be things that
19       an MRI would pick up that a CAT scan can't.
20   Q    Which test is typically more expensive, a CT
21       scan or an MRI?
22   A    I have no direct knowledge of that.
23   Q    Do you have any knowledge -- when you say
24       you have no direct knowledge, do you have
25       any indirect knowledge?

---

Page 45

1    A    No, not really.  I honestly have no idea
2        what things cost.
3    Q    Okay.  Who would be the best person to ask
4        that?
5    A    I guess someone in the billing department.
6        I don't -- I don't really know.
7    Q    Who is in charge of the billing department?
8    A    I have no idea.
9    Q    You don't know?
10   A    No.
11   Q    It sounds like you walk into work like I do,
12       ready to get in and get out.
13   A    That's right.
14   Q    But I think you said, in an ideal world, you
15       would like to have the option to press a
16       button and get an MRI if a particular case
17       came in front of you and you decided you
18       wanted one.  Correct?
19          MR. BLANKENSHIP:
20              Object to the form.
21          MS. HOSKINS:
22              Object to the form.
23   A    Yes.
24   Q    You said an MRI can take thirty minutes to
25       an hour to conduct?

---

12 (Pages 42 to 45)

GREGORY SCOTT, ET AL.                                            EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                              October 17, 2016

---

Page 46

1    **A**   Yes.
2    **Q**   And a CT scan about fifteen minutes?
3    **A**   Closer to five, probably, for most CTs.
4    **Q**   Okay.  What about an x-ray?
5    **A**   A few seconds.
6          MR. WOODARD:
7             Can we go off the record real quick?
8          I'd like to talk with my counsel.
9          MS. HOSKINS:
10            Sure.
11         MR. BLANKENSHIP:
12            Sure.
13   (OFF RECORD.)
14            EXAMINATION
15   BY MR. WOODARD, continuing:
16   **Q**   All right.  Doctor, a few more questions and
17         you're off.  If a -- I want you to put
18         yourself in Dr. Taylor's shoes.  If a young
19         twelve-year-old girl comes in with
20         progressing neurological deficits in her
21         hands and feet and you have reason to
22         believe there is a compression of the cord
23         which would require an MRI, what would you
24         do to try to get an MRI ordered and
25         conducted for that patient?

---

Page 47

1          MS. HOSKINS:
2             Object to the form.
3          MR. BLANKENSHIP:
4             Same objection.
5    **A**   Assuming all of those things, should have
6          two options.  I could probably call and try
7          to talk to the radiologist directly and see
8          if that's something that we could get done,
9          or transfer her to a facility where an MRI
10         is routinely available, assuming I knew all
11         of this.
12   **Q**   And who would you call when you say "and
13         talk to the radiologist"?
14   **A**   Whoever was on duty for that day.  Or I may
15         call and try to talk with the orthopaedic
16         surgeon to see if they could order the MRI.
17   **Q**   And if the request to radiology and the
18         request to another physician were denied,
19         you would then say, "Look, I recommend this
20         patient for transfer"?
21   **A**   Assuming all of those things, yes, probably.
22   **Q**   Okay.  Are there any written rules on when
23         you can order an MRI from the emergency
24         room?
25   **A**   I don't know.  I have not seen a written

---

Page 48

1          rule.
2    **Q**   And remind me.  You've been here off and on
3          since 2005?
4    **A**   I have.
5    **Q**   Any training on when you can or cannot order
6          an MRI from the emergency room?
7          MR. BLANKENSHIP:
8             Here at the hospital or in general
9             as part of his medical training?
10   **Q**   I think he understands the question.
11   **A**   No.  I don't think there's any specific
12         training.  It's just sort of what I've
13         experienced in practice.
14   **Q**   Is it your understanding that a patient has
15         to be admitted to obtain an MRI?
16   **A**   At this facility.
17   **Q**   At Northern?
18   **A**   Correct.  Or done on an outpatient basis.
19   **Q**   Which would be a non-emergency setting.
20   **A**   Correct.
21   **Q**   So, the only way an emergency room MRI can
22         be conducted at this facility is admitting
23         the patient?
24         MS. HOSKINS:
25            Object to the form.

---

Page 49

1          MR. BLANKENSHIP:
2             Join the objection.
3    **A**   That wouldn't be an emergency room MRI.
4    **Q**   Sure.  You said that an MRI is different from
5          the other tests in that it can be done in
6          fifteen to thirty minutes.  Are there also
7          some additional benefits to MRIs as opposed
8          to a CT scan and an x-ray?
9    **A**   Yes, there are things we can see on an MRI
10         that we can't see on the other two.
11   **Q**   And that's why I think you used the phrase
12         "ideal world."  You'd like to be able to
13         have that option.  Correct?
14         MR. BLANKENSHIP:
15            Object to the form.
16   **A**   Correct.
17   **Q**   Have you ever discussed with anyone at the
18         hospital -- doctors, nurses, administration
19         why MRIs are not available on the software
20         that you mentioned?
21         MS. HOSKINS:
22            Object to the form.
23         MR. BLANKENSHIP:
24            Same objection.
25   **A**   I have not.

---

13 (Pages 46 to 49)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 50

1    Q    When you were a resident, did you ever order
2    an MRI from the emergency room?
3    A    I don't know for sure.  I trained at a much
4    larger facility, so it's possible.
5    Q    Aside from being a slightly longer test, can
6    you think of any other reason as to why you
7    would not be allowed to order an MRI from
8    the emergency room?
9         MR. BLANKENSHIP:
10             Object to the form.
11        MS. HOSKINS:
12             Object to the form.
13   A    Normally, we can rule in or out what we need
14   to based on other modalities.
15   Q    But you would agree, in an emergency
16   department, there's really no such thing as
17   normal.  Correct?  You get new cases every
18   day.
19   A    Correct.
20   Q    All right.  Let me make sure I understand
21   this note from my counsel.  Are you
22   testifying that the emergency department
23   here does not include determining if a
24   patient needs a MRI on an emergency basis if
25   that is available to an in-patient?

Page 51

1    A    I'm not sure I understand the question.
2    Q    I don't either.  I'll move on.  And again,
3    you said, if you need an MRI, you've got to
4    admit the patient.  Correct?
5    A    Correct.
6    Q    And so, that would be an administrative
7    decision where Northern has not allowed the
8    emergency department to order an MRI.
9    Correct?
10        MR. BLANKENSHIP:
11             Object to the form.
12   A    I'm not sure where the decision came from.
13   It's not my decision.
14   Q    You're not aware that it was Dr. Alam's
15   decision?
16   A    No.
17   Q    You're not aware that it was Dr. Taylor's
18   decision?
19   A    No.
20   Q    You're not aware of any physician who said
21   hey, we don't want to be able to order an
22   MRI?
23   A    Correct.
24   Q    Would it be safe to assume that that came
25   from administration?

Page 52

1    A    Or the radiology department, possibly.
2    Q    And if the radiology department said that
3    was not its decision, it'd be safe to assume
4    that came from the business department or
5    administration at Northern?
6         MR. BLANKENSHIP:
7              Same objection.
8    A    Yes.
9    Q    Would you agree with Dr. Taylor's testimony
10   if he said that minutes can be critical when
11   you're talking about compression of the
12   spinal cord in a patient such as a twelve
13   year old girl with progressing neurological
14   deficits?
15        MS. HOSKINS:
16             Object to the form.
17        MR. BLANKENSHIP:
18             Same objection.
19   A    Yes, I would agree with that.
20   Q    And so, your options that you're allowed as
21   an emergency room physician, if you're ever
22   presented with a situation that requires an
23   MRI, you either call radiology, you call
24   another doctor such as an ortho, or you
25   transfer.  Correct?

Page 53

1    A    Yes.
2    Q    And all three of those decision take a
3    significant amount of time.
4    A    Correct.
5    Q    The actual call to radiology, is that you
6    pick up your cell phone and you call them or
7    do you have a phone in your office?
8    A    At the nurses' station.
9    Q    All right.  And if you call her and she
10   denies and says we can't do that, then you
11   call the doctor and he says we can't do
12   that, that's several minutes which have
13   passed.  Correct?
14   A    Correct.
15   Q    And then, if you transfer, where would you
16   transfer the patient?
17   A    Typically, LSU-Shreveport.
18   Q    And that's about an hour and a half drive,
19   if you're booking it.  Correct?
20   A    About an hour.
21   Q    By helicopter, how long are we talking?
22        MR. BLANKENSHIP:
23             Object to the form.  Calls for
24             speculation.
25   A    I think it's about twenty or thirty minutes.

14 (Pages 50 to 53)

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                    October 17, 2016

Page 54

1    Q    And you're aware of instances where patients
2         have been transferred from here to
3         Shreveport by helicopter?
4    A    Yes.
5    Q    And you're aware of both the time they've
6         left and the time they've arrived,
7         generally?
8    A    Generally.
9    Q    So, it wouldn't call for speculation on your
10        part, would it?
11   A    I suppose not.
12   Q    But those are the only three options you
13        have available, calling radiology, calling
14        another doctor, and transferring the
15        patient.  Correct?
16   A    Correct.
17   Q    And all three of those options take time.
18   A    Correct.
19   Q    Time in a situation, a hypothetical I'll
20        pose to you, where minutes are very
21        critical.
22   A    Correct.
23   Q    Okay.
24             MR. WOODARD:
25             Thank you, Doctor.

Page 55

1              MS. HOSKINS:
2              Trey?
3              MR. ZEIGLER:
4              No questions.
5              MR. BLANKENSHIP:
6              Good morning, Dr. Calvert.  Again,
7         I'm Kurt Blankenship and I represent the
8         hospital.  I do have some questions for
9    you.
10             EXAMINATION
11   BY MR. BLANKENSHIP:
12   Q    Touching on the helicopter flights to
13        Shreveport, you have ridden on those
14        helicopter flights with the patient?
15   A    Not to Shreveport; no, sir.
16   Q    So your understanding of the time frame
17        involved is just a general understanding you
18        have, not based on any personal knowledge of
19        yours.  Correct?
20   A    Yes, sir.
21   Q    All right.  You've said several times in
22        your testimony this morning that you can
23        rule out conditions faster using other
24        modalities than an MRI.  Is that a fair
25        understanding of what you said?

Page 56

1    A    Yes.
2    Q    And you've told us that the CAT scan can
3         take just a few minutes; x-rays just a few
4         seconds, and the MRI takes longer, thirty
5         minutes to an hour.
6    A    Yes.
7    Q    So, my sense from what you're saying, my
8         understanding of what you're saying, in
9         general, is that because you're in an
10        emergency room setting, you generally go to
11        the faster tests that you as the physician
12        believes will rule in or out a condition or
13        a possible diagnosis and ascertain faster
14        whether the condition is present or not.
15        Correct?
16   A    Correct.
17   Q    And that's why you would normally order the
18        CT first, because that rules in or out a
19        number of modalities.  Correct?
20   A    Correct.
21   Q    You would agree with me, wouldn't you,
22        Doctor, that a radiologist is, by virtue of
23        his specialized -- his or her specialized
24        training and experience, better qualified
25        than an ER physician to determine what

Page 57

1         medical conditions are best ruled in and out
2         by an MRI?
3              MR. WOODARD:
4              Object to form.
5    A    They certainly have more specialized
6         training than we do.
7    Q    Okay.  And they have more specialized
8         training in interpreting MRIs than you do as
9         an ER physician.
10   A    Correct.
11   Q    Do you ever, as an ER physician, interpret
12        the MRI itself?
13   A    Not an MRI, no.
14   Q    But you do interpret tests?
15   A    Preliminary interpretations.  They're always
16        over rid by a radiologist.
17   Q    It's fair to say, isn't it, that you rely on
18        the radiologist to give sort of a definitive
19        interpretation of either the CAT scan or the
20        MRI?
21   A    Correct.
22   Q    Now, you were asked what would your options
23        be if a twelve year old girl presented with
24        neurological deficits and you described
25        those for us, and I want to go back over

15 (Pages 54 to 57)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 58

1  just a couple of them.  First of all, your
2  decision making path would depend, wouldn't
3  it, on a number of things that you as the ER
4  physician learn or see as part of your
5  treatment and examination of the patient.
6  And, by that, I mean first you'd be looking
7  at the history the patient gave you.
8  A  Correct.
9  Q  Then you'd be relying on your clinical
10  assessment of the patient in whether or not
11  neurological deficits are demonstrated.
12  Correct?
13  A  Correct.
14  Q  And then, based on your training and
15  experience, that information, the history
16  and your clinical assessment, would lead you
17  down one of several paths as to what further
18  testing you would want to do to make a more
19  definitive diagnosis.  Correct?
20  A  Correct.
21  Q  And that's the normal course of events for
22  ER physicians when they're treating and
23  examining patients in the ER.  Correct?
24  A  Correct.
25  Q  All right.  And one of those options that's

Page 59

1  available to you is to consult with a
2  specialist.  Correct?
3  A  Correct.
4  Q  All right.  And there at Northern Louisiana
5  Medical Center, in August of 2014, there was
6  an orthopaedic surgeon available to consult
7  with.  Right?  Dr. Major Blair?
8  A  I'm not certain, you know, who was on call
9  that day or when he -- he's gone from this
10  facility and I don't know when he left.
11  Q  Let me make it just a general question.
12  Generally, are there specialists available
13  to consult with?
14  A  We only have one orthopaedist on staff right
15  now, so he's on call sometimes and he's not
16  other times.  I believe at that particular
17  time there was probably coverage every day
18  for orthopaedics.
19  Q  Okay.  But an orthopaedic surgeon would be
20  one of the types of specialists that you
21  could potentially consult as an ER physician
22  when you're confronted with a suspected
23  spinal cord injury.  Correct?
24  A  Correct.
25  Q  All right.  And that physician may or may

Page 60

1  not decide to order an MRI himself.
2  Correct?
3  A  Correct.
4  Q  And you've also testified earlier that
5  you've worked in six or seven emergency
6  rooms in the course of your career?
7  A  Yes.
8  Q  When did you start practicing emergency
9  medicine?
10  A  I believe 1999.
11  Q  All right.  And you've been here since 2005.
12  That's what you told us.  Correct?
13  A  Correct.
14  Q  All right.
15  MS. HOSKINS:
16  I think he said "off and on" --
17  MR. BLANKENSHIP:
18  Okay.
19  MS. HOSKINS:
20  -- since 2005.
21  MR. BLANKENSHIP:
22  All right.
23  Q  Have you worked in other emergency rooms
24  that are part of a facility that is
25  comparable to Northern Louisiana Medical

Page 61

1  Center?  And, by that, I'm just trying to
2  distinguish between a facility like
3  LSU-Shreveport and a facility like just a
4  rural clinic.  You know, there's a spectrum
5  of facilities available.
6  A  Most of the other facilities I have worked
7  at have had more options available than
8  Northern Louisiana Medical Center.
9  Q  Okay.  And when you say "options available,"
10  are you --
11  A  Specialty services available.
12  Q  Right, that's what I was getting at.  You're
13  talking about they might have neurologists
14  on staff or they might have neurosurgeons on
15  staff, things like that.
16  A  Correct.
17  Q  Okay.  Now, you were asked if you were
18  trained to identify EMTALA violations.  And
19  he first asked you -- EMTALA is a federal
20  law, is it not?
21  A  It is.
22  Q  All right.  And you're not trained in the
23  practice of law.  Correct?
24  A  I am not.
25  Q  And you're not called upon to determine

16 (Pages 58 to 61)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 62

1    whether certain fact scenarios constitute a
2    violation of the law or not.  Correct?
3    A    I'm not.
4    Q    You have a basic understanding as a
5    physician of what EMTALA obligates you as a
6    physician to do.  Correct?
7    A    Correct.
8    Q    And to summarize that obligation, is it fair
9    to say that it's basically to triage and
10   stabilize the patient within the
11   capabilities of the facility.  Correct?
12   A    Correct.
13   Q    And that process, the triage unit and the
14   stabilization of the patient is to be done
15   without consideration for finances.
16   Correct?
17   A    Correct.
18   Q    All right.  And that's what you believe you
19   do here as the ER physician at Northern
20   Louisiana Medical Center.  Correct?
21   A    Correct.
22   Q    You never ask a patient, I'm going to order
23   this test, can you pay for it?
24   A    No, I don't.
25   Q    That's never a consideration for you?

Page 63

1    A    No, it's not.
2    Q    And I take it that in your practice as an
3    emergency room physician here at the
4    hospital at Northern Louisiana Medical
5    Center, you don't get involved in any
6    decisions about whether a test is going to
7    be paid for by the patient's insurance
8    company or the patient himself or not.
9    A    I don't, no.
10   Q    You're not trained or familiar with the
11   requirements of various health insurers and
12   their contracts with their patients in the
13   hospital.  Correct?
14   A    I am not.
15   Q    You were asked a number of questions about
16   administration making decisions versus
17   physicians making decisions.  Let me phrase
18   it to you this way:  You as the physician,
19   it's your prerogative, isn't it, to assess
20   the patient and make the appropriate
21   diagnosis.  Correct?
22   A    Correct.
23   Q    And it's your prerogative to order what
24   tests you believe are necessary to make that
25   diagnosis, if they're within the capability

Page 64

1    of the hospital.  Correct?
2    A    Correct.
3    Q    And it's your prerogative as the physician
4    to decide whether a patient could best be
5    treated for a specific condition at another
6    facility.  Correct?
7    A    Correct.
8    Q    And then, recommend or order the transfer.
9    Correct?
10   A    Correct.
11   Q    And that happens all the time for an
12   emergency room physician.  Correct?
13   A    Correct.
14   Q    You said, I believe, that you don't have any
15   knowledge of the specifics of this case.
16   Correct?
17   A    Correct.
18   Q    And just to be clear for the record, you
19   have not reviewed the medical chart for
20   Jordan Scott's visit to the emergency room
21   on August 19, 2014?
22   A    I have not.
23   Q    I believe you said at one point, if I wrote
24   it down correctly, that you've never worked
25   in an ER where the MRI is available.

Page 65

1    Correct?
2    A    Correct.
3    Q    So, if that is the policy or the practice
4    here, and I'm not suggesting that it is, but
5    if it is, it's not unusual in your
6    experience, is it?
7    A    Correct.
8    Q    I want to show you, Dr. Calvert, a document
9    that was identified and attached as an
10   exhibit in a previous deposition in this
11   case.  I'll give you a minute to take a look
12   at it, but I'll represent to you while
13   you're looking at it that this is a list of
14   MRIs ordered through the emergency room here
15   at Northern Louisiana Medical Center from
16   roughly 2013 to 2016 that was generated from
17   the hospital's computer system.  And, as you
18   can see, the name of the patient is redacted
19   from this document.  If you look at the
20   first page of this attachment, the third
21   line down indicates that you, yourself,
22   ordered an MRI through the emergency room on
23   April 28th, 2014.  Let me first ask you, you
24   treat, in the course of any shift in the ER,
25   anywhere from ten or so patients to maybe

17 (Pages 62 to 65)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 66

1    multiple tens of patients.  Correct?
2  **A**  Typically, twenty-five patients or so.
3  **Q**  And you normally do how many ER shifts a
4    month?
5  **A**  Sixteen to eighteen.
6  **Q**  So, just roughly doing the math, you take
7    care of at least several hundred patients
8    per month every month.  Correct?
9  **A**  Correct.
10  **Q**  And it would be straining or taxing the
11    ability of anyone to remember all the
12    specifics of the patients that they treat.
13    Correct?
14  **A**  Correct.
15  **Q**  All right.  So, with that by way of
16    background, first let me ask if you
17    specifically recall ordering a brain MRI
18    without contrast for a patient on
19    April 28th, 2014?
20  **A**  I do not.
21  **Q**  But, given this list, do you have any reason
22    to believe that the hospital computer system
23    is inaccurate when it says that such an MRI
24    was ordered?
25  **A**  I do not.  But my suspicion is that that was

---

Page 67

1    ordered as an in-patient.
2  **Q**  Okay.  There's a code that allows us to
3    determine whether they were in-patient or
4    outpatients but it shows you as the ordering
5    physician.  Correct?  And the other people
6    listed in the ordering physician column, let
7    me ask you about some of these.  First of
8    all, you'll notice that Dr. Alam's office --
9    I mean, name appears many times.  Do you see
10    that?
11  **A**  I do.
12  **Q**  Are you familiar with Dr. Holly Kidd?
13  **A**  I am.
14  **Q**  And who is that?  Is that another ER
15    physician?
16  **A**  No, it's not.  She's a Green Clinic Internal
17    Medicine doctor.
18  **Q**  All right.  And Dr. Martin Blackwelder?
19  **A**  Green Clinic Internal Medicine.
20  **Q**  You see Dr. Taylor's name there?
21  **A**  I do.
22  **Q**  And then, Dr. Jacqueline White?
23  **A**  I do.
24  **Q**  Who is that?
25  **A**  She's an emergency room doctor.

---

Page 68

1  **Q**  And what about Dr. Beau Burton?
2  **A**  He's a -- I believe a nurse practitioner in
3    the ER.
4  **Q**  Okay.  Does he work with your group?
5  **A**  He does.
6  **Q**  Or for your group?  All right.  And
7    Dr. Regan Bonan?
8  **A**  Green Clinic Internal Medicine.
9  **Q**  Okay.  So, we've seen enough names to know
10    that the ordering physician here is a
11    mixture of Green Clinic Physicians and ER
12    physicians.  Correct?
13  **A**  Correct.
14  **A**  All right.  And the list speaks for itself,
15    but you can verify for us, can't you, that a
16    number of the MRIs shown ordered here are of
17    the cervical spine.  Correct?
18  **A**  Yes.  It looks like three of them.
19  **Q**  Okay.  And then some are of the lumbar
20    spine.  Correct?
21  **A**  Correct.
22  **Q**  At least one is of the thoracic spine.
23  **A**  Correct.
24  **Q**  And then, a lot of them are either of the
25    head or the brain.

---

Page 69

1  **A**  Correct.
2  **Q**  Okay.  Does it happen sometimes,
3    Dr. Calvert, either in the emergency room
4    here at Northern Louisiana Medical Center or
5    others that if you believe an MRI might be
6    appropriate for a patient for whatever
7    reason, that you would call the radiologist
8    on duty and say, hey, I've got a patient
9    here.  This is what I'm seeing.  I think
10    maybe an MRI is in order.  What do you
11    think?  Does that happen?
12  **A**  Yes.
13  **Q**  All right.  And under those circumstances,
14    does the radiologist sometimes respond that
15    yeah, I agree.  Send him up.  We'll do an
16    MRI.  Or, try this first or anything like
17    that?
18  **A**  I can't remember a specific instance but,
19    yes, they would go over the possibilities,
20    you know, of potential things that we could
21    do to try to take care of the patient.
22  **Q**  Okay.  Is it fair to say that the
23    radiologist, the physician radiologist is
24    sort of the gatekeeper for determining
25    whether an MRI is appropriate for a patient?

---

18 (Pages 66 to 69)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

## Page 70

1   A   I'm not sure that I would use the term
2       "gatekeeper," but they have, certainly, more
3       training to know whether the test is
4       appropriate or not.
5   Q   Okay.  You were asked a number of questions
6       about whether you had ever discussed the
7       unavailability, as you described, of MRIs
8       here with either administration or other
9       physicians, and I want to ask you about
10      that.  First of all, to use the term
11      "unavailability," it has different meanings
12      in my mind, so I want to clarify that.  An
13      MRI machine is present here in the hospital.
14      Correct?
15  A   Yes.
16  Q   And MRIs can be physically performed here in
17      the hospital.  Correct?
18  A   Correct.
19  Q   So, another way of saying "unavailability,"
20      as you've been describing it, of saying is
21      it's not normally ordered through the ER?
22      An MRI is not normally ordered through the
23      ER?
24  A   I have not ever ordered an MRI from the
25      emergency room.

## Page 71

1   Q   That you recall?
2   A   I have not ever ordered an MRI other than on
3       an in-patient.
4   Q   Even though this computer sheet shows that
5       it was ordered for --
6           MR. WOODARD:
7               Object to form.  He's stated he
8           thinks that was an in-patient.
9   Q   I think you said you suspect it was an
10      in-patient.
11  A   It's not possible for me to order an MRI
12      from the emergency room; so if this shows up
13      under my name, chances are that was an MRI
14      written on admission orders.  And I write
15      for those every day.
16  Q   For a patient that is going to be admitted.
17  A   For a patient who's going to be admitted.
18  Q   Right.  And when you write the admission
19      orders under those circumstances, is that an
20      order that you, yourself, are generating,
21      for lack of a better way to describe it, or
22      is that an order that comes from another
23      physician?
24  A   I think technically it's from another
25      physician because we don't have admitting

## Page 72

1       privileges to the hospital.  As sort of part
2       of the customary procedure, we write what
3       we'll call "bridge orders" to get the
4       patient admitted to the hospital.  The order
5       technically comes from me, but it's on
6       behalf of the admitting physician.
7   Q   Okay.  It happens, though, sometimes that
8       you don't actually talk to the admitting
9       physician when you're writing the bridge
10      orders, right?  You have sort of a standard
11      protocol for ordering sets of tests for
12      specific kinds of patients, right?
13  A   Yes, but we always discuss admissions with
14      the admitting physician.
15  Q   Okay.
16  A   But yes, there's a typical work up for a
17      heart patient or a --
18  Q   But you don't necessarily have to talk to
19      the admitting physician to know what that
20      is.  Correct?
21  A   Correct.
22  Q   Now, getting back to the questions about
23      discussions, have you ever discussed this
24      unavailability, as you've described it, of
25      the MRIs through the emergency room with

## Page 73

1       other physicians here?
2   A   Not that I recall.
3   Q   Because, again, in your experience, it's not
4       that unusual, right?
5   A   Correct.
6   Q   And I'm not sure you were asked this
7       specific question, so I want to ask it:
8       You've never had any discussion with anyone
9       in hospital administration about
10      unavailability of MRIs through the ER as you
11      have described it in this testimony today?
12  A   I have not.
13  Q   And I think we know the answer to this
14      question but, just to be sure, to get ready
15      for this deposition today, you didn't review
16      any physical documents.  Correct?
17  A   I did not.
18          MR. BLANKENSHIP:
19              Thank you, Dr. Calvert.
20          MR. WOODARD:
21              I've got a few follow-ups.
22          WITNESS:
23              Okay.
24          MR. WOODARD:
25              This sheet, what do you want to mark

19 (Pages 70 to 73)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 74

1      this, Mr. Blankenship?
2          MR. BLANKENSHIP:
3          Your last number was ten, I believe,
4      so we can make it eleven.
5          COURT REPORTER:
6          The last number was twelve.
7          MR. BLANKENSHIP:
8          Twelve? Let's make it "13."
9          REEXAMINATION
10  BY MR. WOODARD:
11  Q    Okay. This sheet right here, Doctor,
12      there's nothing showing what time any of
13      these MRIs were ordered. Correct?
14  A    I don't believe so.
15  Q    There's nothing showing what time any of
16      these MRIs were conducted. Correct?
17  A    Correct.
18  Q    So, if you're looking at this sheet,
19      Exhibit 13, there could have been a
20      five-minute delay between the order and the
21      MRI or there could have been a five-day
22      delay for all you know. There is no
23      telling.
24  A    Correct.
25  Q    There's nothing on Exhibit 13 that shows

Page 75

1      whether these MRIs required precertification
2      or did not require precertification.
3      Correct?
4  A    Correct.
5  Q    And of these few MRIs that purportedly come
6      from the ER in Exhibit 13, it looks like at
7      least seven of them dealt with the spine.
8      Correct?
9  A    Correct.
10  Q    And you understand that the MRI that
11      Dr. Taylor wanted in this case addressed the
12      thumbar area of the spine?
13          MS. HOSKINS:
14          Object to the form.
15  A    Lumbar?
16  Q    "Thumbar." Thoracic.
17  A    Thoracic.
18  Q    Hey, that's that new area that I invented
19      between thoracic and lumbar.
20  A    I'm not sure what he ordered. I honestly
21      don't have any knowledge.
22  Q    Assume that he wanted the thoracic area of
23      the spine to be examined. That would be
24      consistent with the few MRIs that exist on
25      Exhibit 13. Correct?

Page 76

1  A    There is a thoracic spine MRI on it.
2  Q    Okay. And then, several other areas, the
3      cervical and the lumbar. Correct?
4  A    Correct.
5  Q    And so, that would suggest that at least the
6      brain and the spine are areas where you may
7      need an MRI on certain occasions?
8          MS. HOSKINS:
9          Object to the form.
10          MR. BLANKENSHIP:
11          Same objection.
12  A    Correct.
13  Q    An MRI is a diagnostic screening
14      examination. Correct?
15  A    I don't know about a "screening"
16      examination. It's a diagnostic examination.
17  Q    Diagnostic.
18  A    You don't use them to screen for anything
19      that I'm aware of.
20  Q    I said "screening." Diagnostic imaging
21      examination?
22  A    Correct.
23  Q    And when we were talking about
24      unavailability, it's physically available at
25      Northern Louisiana Medical Center. Correct?

Page 77

1  A    There is a machine here.
2  Q    There is a machine here and it's relatively
3      close to the emergency department. Correct?
4  A    I'm not aware of it's location.
5  Q    You would not be in a position to dispute or
6      argue with Dr. Taylor whenever he describes
7      where the MRI machine is located?
8  A    I would not.
9  Q    And so, while it's physically available, for
10      all practical respects, it's not available
11      to you in the emergency department.
12      Correct?
13          MR. BLANKENSHIP:
14          Object to the form.
15  A    Correct.
16  Q    And that's because, due to an administrative
17      business decision, you are not available to
18      press a button and order an MRI from the
19      emergency department?
20          MS. HOSKINS:
21          Object to the form.
22          MR. BLANKENSHIP:
23          Object to the form.
24  A    I'm not sure where the decision came from.
25      I just know it's not available.

20 (Pages 74 to 77)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 78

1  Q   It didn't come from the doctors.  Correct?
2  A   Correct.
3  Q   Who orders the software?
4  A   I assume administration.
5  Q   And so, if the software is ordered by
6      administration and the software doesn't have
7      a button that allows you to order an MRI, it
8      would be safe to say that administration has
9      made the decision to not allow emergency
10     room doctors to order an MRI?
11         MR. BLANKENSHIP:
12             Object to the form.
13  A   Again, I'm not sure who made the decision
14     not to include it.
15  Q   You've seen no evidence based on the
16     software ordered by the administration that
17     they want to allow you to be able to order
18     an MRI from the emergency room?
19         MR. BLANKENSHIP:
20             Object to the form.
21  A   Correct.
22  Q   We talked about the delay in an MRI, fifteen
23     to thirty minutes, typically?
24  A   That's how long it takes to perform the
25     actual MRI.

---

Page 80

1  A   Yes.
2  Q   And would it keep you up at night knowing
3      that that policy has now left a teenage girl
4      paralyzed for the rest of her life?
5         MS. HOSKINS:
6             Object to the form.
7         MR. BLANKENSHIP:
8             Object to the form.
9  A   Yes.
10  Q  You have a daughter yourself.  Correct?
11  A  I do.
12  Q  That would be very troubling to you?
13  A  Yes.
14         MR. WOODARD:
15             No further questions.
16     (WITNESS ELECTED TO READ AND SIGN.)
17             DEPOSITION CONCLUDED AT 9:30 A.M.
18
19
20
21
22
23
24
25

---

Page 79

1  Q   Okay.  That would, of course, be a shorter
2      time frame than several hours.  Correct?
3  A   Correct.
4  Q   And so, even if it's not the fastest test
5      available, if under certain circumstances
6      it's the best test available, that would be
7      better than having a patient sit around and
8      wait seven hours.
9         MS. HOSKINS:
10            Object to the form.
11        MR. BLANKENSHIP:
12            Same objection.
13  A   Correct.
14  Q   Especially a patient with progressing
15     neurological defects.
16  A   Correct.
17  Q   Would it be very frustrating for you as a
18     physician if you were presented with a
19     patient who you thought, in your medical
20     judgment, using your training, your
21     expertise required an MRI and, because of
22     hospital policies and procedures, you were
23     not able to get an MRI?
24         MR. BLANKENSHIP:
25             Object to the form.

---

Page 81

1             REPORTER'S PAGE
2      I, LINDA PEROT, Certified Court Reporter
3  No. 23012, in and for the State of Louisiana,
4  the officer, as defined in Rule 28 of the
5  Federal Rules of Civil Procedure and/or Article
6  1434(B) of the Louisiana Code of Civil
7  Procedure, before whom this proceeding was
8  taken, do hereby state on the Record:
9
10     That due to the interaction in the
11  spontaneous discourse of this proceeding, dashes
12  (--) have been used to indicate pauses, changes
13  in thought, and/or talkovers; that same is the
14  proper method for a Court Reporter's
15  transcription of proceeding, and that the dashes
16  (--) do not indicate that words or phrases have
17  been left out of this transcript;
18
19     That any words and/or names which could
20  not be verified through reference material have
21  been denoted with the phrase "(spelled
22  phonetically)."
23
24     _____
25     LINDA PEROT, CCR No. 23012

---

21 (Pages 78 to 81)

GREGORY SCOTT, ET AL.                                          EDWARD  CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                         October 17, 2016

Page 82

1                    CERTIFICATE
2          This certification is valid only for a
3    transcript accompanied by my original signature
4    And required official seal stamped on this
5    certificate.
6          I, LINDA PEROT, Certified Court Reporter,
7    Certificate No. 23012, as the officer before
8    whom this testimony was taken, do hereby certify
9    that EDWARD CALVERT, M.D., after having been
10   duly sworn by me upon authority of R.S. 37:2554,
11   did appear on the 27th day of July, 2016,
12   commencing at 8:06 a.m., and concluding at
13   9:30 a.m., as hereinbefore set forth in the
14   foregoing 81 pages; that this testimony was
15   reported by me in the stenomask reporting
16   method, was prepared and transcribed by me or
17   under my personal direction and supervision, and
18   is true and correct to the best of my ability
19   and understanding; that the transcript has been
20   prepared in compliance with the transcript
21   format guidelines required by statute and rules
22   of the Board; that I am informed about the
23   complete arrangement, financial or otherwise,
24   with the person or entity making arrangements
25   for deposition services; that I have acted in

Page 83

1    compliance with the prohibition on contractual
2    relationships, as defined by Louisiana Code of
3    Civil Procedure Article 1434 and rules and
4    advisory opinions of the Board; that I have no
5    actual knowledge of any prohibited employment or
6    contractual relationship, direct or indirect,
7    between a court reporting firm and any party
8    litigant in this matter, nor is there any such
9    relationship between myself and a party litigant
10   in this matter; that I am not related to counsel
11   or to any of the parties hereto, I am in no
12   manner associated with counsel for any of the
13   interested parties to this litigation, and I am
14   in no way concerned with the outcome thereof.
15         West Monroe, Louisiana, on this the 18th
16   day of October, 2016.
17
18         _____
19         LINDA PEROT
20         CERTIFIED COURT REPORTER
21         CERTIFICATE NO. 23012
22         STATE OF LOUISIANA
23
24
25

22 (Pages 82 to 83)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 1

| A |
| --- |
| **a.m** 22:10 25:3 41:5,17 80:17 82:12,13 |
| **ability** 14:7 66:11 82:18 |
| **able** 20:5 30:3 49:12 51:21 78:17 79:23 |
| **accept** 26:14 42:8 |
| **Accepting** 39:10 |
| **access** 30:3 43:12 |
| **accompanied** 82:3 |
| **accreditation** 31:3,8 |
| **accredited** 30:18 30:19 |
| **ACR** 5:11,12,14 31:2,5,15 32:5 |
| **acted** 82:25 |
| **actual** 8:8 53:5 78:25 83:5 |
| **acute** 44:17 |
| **additional** 49:7 |
| **address** 7:9 |
| **addressed** 75:11 |
| **administration** 19:1 49:18 51:25 52:5 63:16 70:8 73:9 78:4,6,8 78:16 |
| **administrative** 24:19 25:7,19 26:2 27:21 51:6 77:16 |
| **admission** 71:14 71:18 |
| **admissions** 72:13 |
| **admit** 51:4 |
| **admitted** 29:23 |

29:24 48:15 71:16,17 72:4
**admitting** 13:3 48:22 71:25 72:6,8,14,19
**adopted** 26:10
**advance** 37:5
**advertise** 21:11 21:15,18
**advertises** 20:17 21:3
**advised** 6:20
**advisory** 83:4
**ago** 9:3
**agree** 11:15,18 15:22 18:4 20:7 22:20,25 33:9,10 50:15 52:9,19 56:21 69:15
**agreed** 6:2
**ahead** 10:1 16:17
**Alam** 5:4 7:25 8:2,10,12,21 11:15 15:21 25:25 26:5
**Alam's** 9:1 51:14 67:8
**allow** 15:7 78:9 78:17
**allowed** 50:7 51:7 52:20
**allows** 14:6 67:2 78:7
**American** 31:5 31:18
**amount** 12:10 53:3
**and/or** 81:5,13 81:19
**answer** 6:9 9:6 10:11 21:10 43:19 73:13
**answers** 6:16

**appear** 33:20 82:11
**APPEARAN...** 2:1 3:1
**appearing** 2:6 2:17,23 3:5
**appears** 67:9
**applied** 27:11,15 28:5 33:14
**applies** 41:12
**applying** 37:16
**appropriate** 34:9,20 63:20 69:6,25 70:4
**appropriateness** 5:11,12,14 31:16 32:6,11 33:14,19,21 34:1
**appropriatene...** 32:18
**April** 65:23 66:19
**area** 75:12,18,22
**areas** 76:2,6
**argue** 77:6
**arrangement** 82:23
**arrangements** 82:24
**arrival** 40:15 41:14
**arrived** 54:6
**article** 32:4 33:21 81:5 83:3
**as-needed** 40:6
**ascertain** 56:13
**Aside** 50:5
**asked** 9:21 57:22 61:17,19 63:15 70:5 73:6
**asking** 24:23 26:14 27:9

**aspect** 14:13,25
**assess** 23:25 63:19
**assessment** 26:20 58:10,16
**associated** 83:12
**assume** 9:18 11:3 24:23 25:8 27:10 51:24 52:3 75:22 78:4
**assuming** 25:16 26:18 29:23 42:6,15 47:5 47:10,21
**attached** 5:6,7 5:10 65:9
**attachment** 65:20
**attack** 40:20
**attempted** 12:4 12:24
**ATTORNEY** 2:9
**August** 27:5,8 29:16 59:5 64:21
**authority** 82:10
**available** 11:20 11:22,25 12:11 12:13,20,22 18:23 19:16 20:14,18 21:13 21:14 36:16 39:13 42:4 43:2 47:10 49:19 50:25 54:13 59:1,6 59:12 61:5,7,9 61:11 64:25 76:24 77:9,10 77:17,25 79:5 79:6
**Avenue** 1:20 7:11

**aware** 17:6 18:12,24 19:4 22:7,17 28:23 31:8 51:14,17 51:20 54:1,5 76:19 77:4

| B |
| --- |
| **back** 11:14 57:25 72:22 |
| **background** 66:16 |
| **banging** 42:19 |
| **based** 32:24 40:7 50:14 55:18 58:14 78:15 |
| **basic** 62:4 |
| **basically** 40:4 62:9 |
| **basis** 10:5 13:15 13:24 34:17 35:2 40:7 48:18 50:24 |
| **basises** 34:22 |
| **Baton** 2:10 |
| **Beau** 68:1 |
| **behalf** 1:6 2:23 72:6 |
| **believe** 8:13 34:7 46:22 59:16 60:10 62:18 63:24 64:14,23 66:22 68:2 69:5 74:3 74:14 |
| **believes** 56:12 |
| **benefits** 49:7 |
| **BERNSTEIN** 2:20 |
| **best** 41:21 45:3 57:1 64:4 79:6 82:18 |
| **better** 56:24 71:21 79:7 |

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 2

**bill** 31:9
**billing** 45:5,7
**Blackwelder** 67:18
**Blair** 59:7
**BLANCHARD** 3:3
**Blankenship** 2:18 4:7,13 10:2,10 11:9 14:10,22 15:13 15:19 16:1 18:7,20 20:8 20:22 21:8,23 22:14,21 24:13 25:12,21 26:7 26:22 27:6,12 27:17 28:1,16 30:6,22 33:6 34:5,24 35:4 37:9 39:8,20 40:11,24 41:10 42:1,13 43:6 43:17 45:19 46:11 47:3 48:7 49:1,14 49:23 50:9 51:10 52:6,17 53:22 55:5,7 55:11 60:17,21 73:18 74:1,2,7 76:10 77:13,22 78:11,19 79:11 79:24 80:7
**blood** 44:8,9,16 44:17
**BLUE** 2:14
**Board** 82:22 83:4
**Bonan** 68:7
**booking** 53:19
**bottom** 30:16 32:10,15 38:16
**Boulevard** 2:15
**Brady** 1:11 15:2

15:16
**brain** 66:17 68:25 76:6
**BREITHAUPT** 2:3
**bridge** 72:3,9
**Brookhaven** 7:11
**Burns** 17:23 18:3
**Burton** 68:1
**business** 24:8,19 25:11,18 26:3 27:21 37:5 42:10 52:4 77:17
**button** 13:9 16:24 17:3,5 17:13,16,19 45:16 77:18 78:7

_____
**C**
**call** 2:8 28:12 35:14 47:6,12 47:15 52:23,23 53:5,6,9,11 54:9 59:8,15 69:7 72:3
**called** 16:18 61:25
**calling** 54:13,13
**Calls** 53:23
**Calvert** 1:15 6:3 6:19 7:1,11 55:6 65:8 69:3 73:19 82:9
**capabilities** 62:11
**capability** 63:25
**caption** 30:11
**care** 33:14,19 34:2 38:18 66:7 69:21
**career** 60:6

**case** 9:21 22:2,6 22:16,20 27:11 38:5 45:16 64:15 65:11 75:11
**cases** 43:13 50:17
**CAT** 13:25 14:1 19:16 44:17,19 56:2 57:19
**category** 29:22
**Causeway** 2:15
**CCR** 81:25
**cell** 38:9 53:6
**Center** 1:10,20 2:13 7:18,21 28:24 39:25 59:5 61:1,8 62:20 63:5 65:15 69:4 76:25
**Center's** 41:22
**Century** 20:5 30:3
**CEO** 15:2
**certain** 8:1 44:4 59:8 62:1 76:7 79:5
**certainly** 44:18 57:5 70:2
**certificate** 1:24 82:1,5,7 83:21
**certification** 82:2
**Certified** 1:23 7:2 81:2 82:6 83:20
**certify** 82:8
**cervical** 68:17 76:3
**chances** 71:13
**changes** 81:12
**characterizati...** 42:24
**charge** 45:7

**chart** 64:19
**circumstances** 69:13 71:19 79:5
**Civil** 6:6 81:5,6 83:3
**clarification** 16:12 38:8
**clarify** 70:12
**clear** 64:18
**clinic** 61:4 67:16 67:19 68:8,11
**clinical** 58:9,16
**close** 77:3
**Closer** 46:3
**code** 67:2 81:6 83:2
**coffee** 23:16,18
**College** 31:5,18
**column** 67:6
**come** 16:4 75:5 78:1
**comes** 23:20 46:19 71:22 72:5
**commencing** 82:12
**company** 1:10 34:18 63:8
**comparable** 60:25
**complaint** 19:5
**complaints** 18:25
**complete** 82:23
**compliance** 82:20 83:1
**compression** 46:22 52:11
**computer** 13:6 16:7,10 65:17 66:22 71:4
**concept** 33:13
**concerned** 83:14
**CONCLUDED**

80:17
**concluding** 82:12
**condition** 26:21 39:12 40:7 44:2 56:12,14 64:5
**conditions** 13:18 14:1 16:6 19:15 43:22 55:23 57:1
**condone** 21:17
**conduct** 45:25
**conducted** 14:16 22:11 41:18 46:25 48:22 74:16
**CONFEREN...** 2:8
**confirmation** 14:6,18
**confirmed** 14:19
**confronted** 59:22
**connection** 6:14
**consideration** 25:7 27:22 62:15,25
**considerations** 9:23 15:8 26:18 28:7 32:24 33:1
**considered** 29:17 32:16 33:1 34:4
**consistent** 6:7 30:4 38:25 41:7,16,21 75:24
**constitute** 39:5 62:1
**consult** 59:1,6 59:13,21
**consultation** 26:4

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 3

**CONTINUED**
3:1
**continuing**
46:15
**continuum**
40:20
**contracts** 63:12
**contractual** 83:1
83:6
**contrast** 66:18
**conversation**
15:15
**cord** 44:9 46:22
52:12 59:23
**correct** 7:19
13:9,10 14:19
15:24,25 16:22
16:25 19:22
21:20,25 23:2
23:3,10,15,21
23:24 24:2,3,7
25:25 26:1,12
26:13 27:11,14
28:8,9,13 30:5
30:8,14,15,19
34:4 36:3,4,9
36:10,13,14,17
36:18 37:8,12
37:14,15,19
38:24 39:2,5
39:17 40:8,22
40:23 42:16,17
44:6,7,12
45:18 48:18,20
49:13,16 50:17
50:19 51:4,5,9
51:23 52:25
53:4,13,14,19
54:15,16,18,22
55:19 56:15,16
56:19,20 57:10
57:21 58:8,12
58:13,19,20,23
58:24 59:2,3
59:23,24 60:2

60:3,12,13
61:16,23 62:2
62:6,7,11,12
62:16,17,20,21
63:13,21,22
64:1,2,6,7,9,10
64:12,13,16,17
65:1,2,7 66:1,8
66:9,13,14
67:5 68:12,13
68:17,20,21,23
69:1 70:14,17
70:18 72:20,21
73:5,16 74:13
74:16,17,24
75:3,4,8,9,25
76:3,4,12,14
76:22,25 77:3
77:12,15 78:1
78:2,21 79:2,3
79:13,16 80:10
82:18
**correctly** 64:24
**cost** 32:16 34:7
45:2
**costs** 34:3
**counsel** 6:2,4
46:8 50:21
83:10,12
**couple** 58:1
**course** 58:21
60:6 65:24
79:1
**court** 1:1,23 7:3
74:5 81:2,14
82:6 83:7,20
**coverage** 59:17
**credibility** 28:12
**Criteria** 5:11,13
5:15 31:16
**critical** 52:10
54:21
**CT** 9:7 13:9,17
16:23 43:22
44:5,10,20

46:2 49:8
56:18
**CTs** 46:3
**cup** 23:16,18
**customary** 72:2

**D**

**D** 2:4
**Daily** 17:10
**dashes** 81:11,15
**date** 37:6
**daughter** 80:10
**day** 17:9,11
23:13 47:14
50:18 59:9,17
71:15 82:11
83:16
**day's** 37:13
**days** 37:5
**deal** 24:5
**dealt** 26:12 75:7
**decide** 60:1 64:4
**decided** 45:17
**deciding** 33:2
**decision** 24:19
25:11 27:21
42:11 51:7,12
51:13,15,18
52:3 53:2 58:2
77:17,24 78:9
78:13
**decisions** 24:8
25:19 26:3,10
63:6,16,17
**deck** 23:20
**defects** 79:15
**DEFENDANT**
2:13,19 3:2
**Defendants** 6:5
**deficits** 40:21
41:4,19 46:20
52:14 57:24
58:11
**defined** 32:5
81:4 83:2

**defining** 34:1
**definitely** 44:12
**definition** 34:3
**definitive** 57:18
58:19
**DEGAN** 3:3
**delay** 14:5 35:8
74:20,22 78:22
**delayed** 9:22
**demonstrated**
58:11
**denied** 9:22 25:4
25:6 38:17
39:14 47:18
**denies** 53:10
**denoted** 81:21
**density** 44:8
**deny** 35:8,22
36:11
**department** 9:9
17:21 18:18
19:22 20:1,6
23:10 29:11,16
31:23 32:23
40:15 41:23
42:22 43:10
45:5,7 50:16
50:22 51:8
52:1,2,4 77:3
77:11,19
**departments**
18:5,11
**depend** 58:2
**deposition** 1:14
5:10 6:3,10,14
6:17,21 9:15
9:16 23:9
24:25 65:10
73:15 80:17
82:25
**depositions** 23:5
**describe** 71:21
**described** 57:24
70:7 72:24
73:11

**describes** 77:6
**describing** 70:20
**detail** 9:19
**determine** 35:20
56:25 61:25
67:3
**determining**
32:17 50:23
69:24
**dhoskins@de...**
3:6
**diagnose** 23:25
**diagnosis** 56:13
58:19 63:21,25
**diagnostic** 17:1
29:11 30:13
31:22 76:13,16
76:17,20
**difference** 33:18
33:20
**different** 36:2
49:4 70:11
**difficult** 15:23
**direct** 32:15
44:22,24 83:6
**direction** 82:17
**directly** 13:2
28:25 43:8
47:7
**discouraged**
18:19,22
**discourse** 81:11
**discuss** 13:2
72:13
**discussed** 16:3
49:17 70:6
72:23
**discussion** 31:14
37:23 73:8
**discussions**
72:23
**dishonesty** 8:20
**dispute** 15:9
20:2 77:5
**distinguish** 61:2

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 4

| | | | | |
|---|---|---|---|---|
| **DISTRICT** 1:1 1:2 | **DuBOS** 2:3 | 19:22,25 20:6 | 79:14 | **experienced** 48:13 |
| **DIVISION** 1:3 | **due** 38:18 77:16 81:10 | 20:13,15,21 21:1,5,7,13 | **events** 58:21 | **expertise** 23:22 79:21 |
| **doctor** 7:7 13:4 16:4 23:1 | **duly** 7:2 82:10 | 23:10 26:17 | **evidence** 6:11 78:15 | |
| 24:10 36:3 | **dump** 36:7 | 29:16,19 31:21 | **exactly** 10:9,13 43:19 | **F** |
| 46:16 52:24 | **DUNN** 2:3 | 32:23 35:2,9 35:12 36:1,3 | **exam** 30:17 | **facilities** 61:5,6 |
| 53:11 54:14,25 | **duties** 36:2,7 | 37:7,17 39:12 | **examination** 4:3 | **facility** 30:18,19 |
| 56:22 67:17,25 74:11 | **duty** 47:14 69:8 | 40:15 41:18,23 | 4:6 7:5 46:14 | 47:9 48:16,22 |
| **doctors** 49:18 | | 42:4,22 43:14 | 55:10 58:5 | 50:4 59:10 |
| 78:1,10 | **E** | 43:22 44:2 | 76:14,16,16,21 | 60:24 61:2,3 |
| **document** 65:8 | **E** 1:20 | 47:23 48:6,21 | **examinations** 36:11 | 62:11 64:6 |
| 65:19 | **E-Mail** 2:11,18 | 49:3 50:2,8,15 | | **fact** 62:1 |
| **documentation** 16:19 | 2:25 3:6 | 50:22,24 51:8 | **examined** 7:3 75:23 | **facts** 42:6,15 |
| **documents** 73:16 | **earlier** 60:4 | 52:21 56:10 | **examining** 58:23 | **fair** 18:17 20:19 21:5 26:19 |
| | **early** 25:3 41:4 41:17 | 60:5,8,23 63:3 | **example** 24:21 | 30:25 42:5,23 |
| **doing** 42:8 66:6 | **echo** 37:3 38:15 | 64:12,20 65:14 | **excerpts** 5:5 | 55:24 57:17 |
| **don't'** 72:8 | **educated** 24:4 | 65:22 67:25 | 9:15,19 | 62:8 69:22 |
| **Donald** 2:23 | 35:13,25 | 69:3 70:25 | **excuse** 32:25 | **fairly** 44:17 |
| **doubt** 15:17 | **education** 36:19 | 71:12 72:25 | 37:21 | **falsely** 21:18 |
| **Dr** 5:4,5 8:10,10 | **Edward** 1:15 | 77:3,11,19 78:9,18 | **exercise** 6:21 | **familiar** 17:23 |
| 8:12,12,21,21 | 6:3,19 7:1,11 | **emergent** 34:22 | **exercising** 24:9 24:10 | 63:10 67:12 |
| 9:1,15,20 11:4 | 82:9 | **employed** 15:4 | **exhibit** 5:1,4,5,6 | **fast** 9:10 11:16 |
| 11:12,15 15:1 | **eighteen** 66:5 | **employee** 7:20 | 5:7,8,9,10,11 | **faster** 43:21 |
| 15:9,18,21,22 | **either** 13:2 14:6 | **employment** 83:5 | 5:12,14,16,17 | 44:1 55:23 |
| 19:24 20:4 | 29:21 33:24 | | 5:18 9:14 | 56:11,13 |
| 22:9 25:2,25 | 51:2 52:23 | **EMTALA** 35:14 | 11:14 28:22 | **fastest** 79:4 |
| 25:25 26:5,5 | 57:19 68:24 | 35:16 36:19,21 | 30:10 31:13,15 | **federal** 6:5 |
| 26:15 28:10 | 69:3 70:8 | 39:5,16 61:18 | 32:3 33:12 | 61:19 81:5 |
| 30:1 39:11 | **elected** 6:21 | 61:19 62:5 | 36:25 38:13 | **feel** 42:18 |
| 41:2 42:8 | 80:16 | **engage** 38:6 | 39:24 65:10 | **feet** 41:4 46:21 |
| 46:18 51:14,17 | **electronic** 16:21 | **entitled** 31:15 | 74:19,25 75:6 | **fifteen** 46:2 49:6 |
| 52:9 55:6 59:7 | **electronically** 18:5 | **entity** 82:24 | 75:25 | 78:22 |
| 65:8 67:8,12 | | **ER** 8:5 21:16 | **exist** 28:11 | **finally** 42:7 |
| 67:18,20,22 | **eleven** 74:4 | 38:23 41:14 | 75:24 | **finances** 62:15 |
| 68:1,7 69:3 | **Emergencies** 37:13 | 56:25 57:9,11 | **exists** 27:10,20 | **financial** 9:23 |
| 73:19 75:11 | **emergency** 7:14 | 58:3,22,23 | 28:3,10 | 14:12,24 15:8 |
| 77:6 | 9:8 11:6,16,19 | 59:21 62:19 | **expect** 20:20 | 25:7 26:18 |
| **drinking** 23:17 | 11:21 12:3,5,6 | 64:25 65:24 | 21:6 | 32:24,25 82:23 |
| **drive** 2:4 53:18 | 12:8,12,14,19 | 66:3 67:14 | **expensive** 44:20 | **fine** 10:24 |
| **Drs** 7:25 | 13:17,21,25 | 68:3,11 70:21 | **experience** 24:5 | **firm** 83:7 |
| **DuBOIS** 1:11 | 15:7,24 16:14 | 70:23 73:10 | 56:24 58:15 | **first** 7:2 17:22 |
| 15:2,4,6 26:15 | 17:21 18:6,13 | 75:6 | 65:6 73:3 | 33:15 56:18 |
| | 18:18 19:8,20 | **especially** 32:23 | | |

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 5

58:1,6 61:19
65:20,23 66:16
67:7 69:16
70:10
**five** 46:3
**five-day** 74:21
**five-minute**
74:20
**flights** 55:12,14
**flip** 9:3
**folks** 29:6
**follow-ups**
73:21
**follows** 7:4
**foregoing** 82:14
**form** 6:8 9:25
10:6 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
33:5 34:6,25
35:5 36:6
37:10 39:7,9
39:19,21 40:10
40:12,25 41:9
41:11,25 42:2
42:14 43:5,16
45:20,22 47:2
48:25 49:15,22
50:10,12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**formalities** 6:13
**format** 82:21

**former** 15:2
**forth** 82:13
**found** 8:14
**frame** 42:10
55:16 79:2
**front** 45:17
**frustrating**
79:17
**further** 13:19
58:17 80:15

— G —
**G** 3:6
**gap** 41:20
**gatekeeper**
69:24 70:2
**general** 48:8
55:17 56:9
59:11
**generally** 54:7,8
56:10 59:12
**generated** 65:16
**generating**
71:20
**getting** 61:12
72:22
**girl** 22:17 41:3
41:20 46:19
52:13 57:23
80:3
**give** 19:17 23:4
57:18 65:11
**given** 9:23 42:7
66:21
**global** 27:1
**globally** 28:4,5
**go** 10:1 16:7,17
23:19 26:11
46:7 56:10
57:25 69:19
**going** 9:19 23:8
23:9,14 24:22
28:21 40:4,6
40:17 62:22
63:6 71:16,17

**gold** 31:2,2
**good** 7:7,8 21:17
55:6
**Gordon** 2:24
**Goss** 17:23,24
17:25 18:1
**grant** 26:16
**Green** 67:16,19
68:8,11
**GREGORY** 1:5
**group** 68:4,6
**guess** 27:1 35:18
45:5
**guessing** 35:12
**guidelines** 82:21
**gunshot** 23:19

— H —
**H** 2:23
**half** 43:24 53:18
**hall** 43:11,12
**hallway** 19:21
19:25
**hand** 23:16
**handcuffed**
24:18 25:11
**hands** 23:20
26:11 41:4
46:21
**handwritten**
16:9
**happen** 69:2,11
**happens** 64:11
72:7
**harm** 32:17
**head** 42:19
68:25
**health** 33:14,19
34:2 63:11
**heard** 11:11
22:4,5 34:12
**heart** 40:20
72:17
**helicopter** 53:21
54:3 55:12,14

**help** 23:1,23
24:5 27:5
**hereinbefore**
82:13
**hereto** 6:13
83:11
**hey** 37:25 51:21
69:8 75:18
**highlighted** 31:1
32:7,14
**Hippocratic**
38:25
**history** 58:7,15
**holding** 23:16
**hole** 37:18
**Holly** 67:12
**Honest** 8:18
**honestly** 19:23
45:1 75:20
**Hoskins** 3:6
4:10 9:24 10:7
10:12,19 11:7
12:15 14:8,20
15:11 16:11
18:9 19:13
20:10,24 21:21
22:12,23 24:11
25:14 26:24
27:24 28:14
33:4 36:5
37:20 38:7
39:6,18 40:9
41:8,24 43:4
43:15 45:21
46:9 47:1
48:24 49:21
50:11 52:15
55:1 60:15,19
75:13 76:8
77:20 79:9
80:5
**hospital** 1:10
18:25 20:17
21:3,19 26:16
28:11 42:11

48:8 49:18
55:8 63:4,13
64:1 66:22
70:13,17 72:1
72:4 73:9
79:22
**hospital's** 65:17
**hour** 12:2 43:24
43:24 45:25
53:18,20 56:5
**hours** 79:2,8
**Hudson** 2:20,21
**hundred** 66:7
**hush** 38:5
**hypothetical**
54:19

— I —
**idea** 13:8,11
14:24 15:15
17:18 45:1,8
**ideal** 12:1 45:14
49:12
**identified** 65:9
**identify** 36:21
61:18
**III** 2:23
**images** 17:2
**imaging** 29:4,11
30:14,17 31:22
32:6 76:20
**in-patient** 50:25
67:1,3 71:3,8
71:10
**inability** 38:19
**inaccurate**
66:23
**inappropriate**
35:3,7
**incident's** 44:10
**include** 36:7
50:23 78:14
**INDEX** 4:1 5:1
**indicate** 81:12
81:16

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 6

**indicates** 65:21
**indirect** 32:15
44:25 83:6
**individual** 27:2
**INDIVIDUAL...**
1:6
**info@shoenfel...**
2:11
**information**
58:15
**informed** 36:20
82:22
**injury** 59:23
**inpatient** 13:1
13:14 29:17,20
29:25
**inpatients** 13:23
20:19 21:4,14
29:12
**inquire** 35:9
**inquired** 17:15
**inquiries** 39:15
**instance** 8:20
25:9 39:4 42:5
69:18
**instances** 54:1
**insurance** 14:7
34:18 35:10
36:9,13,17
38:17,19 39:14
63:7
**insurers** 63:11
**interaction**
81:10
**interested** 83:13
**Internal** 67:16
67:19 68:8
**interpret** 57:11
57:14
**interpretation**
57:19
**interpretations**
57:15
**interpreting**
57:8

**introduced** 6:11
**invented** 75:18
**investigation**
13:19
**involve** 26:20
27:2
**involved** 55:17
63:5
**issue** 8:8 37:2
**issues** 24:6
**it'd** 52:3

**J**

**JACOB** 2:19
**Jacqueline**
67:22
**James** 2:24 3:2
**join** 10:3 49:2
**Jordan** 1:6,7
22:4 27:3,8
29:15 64:20
**Jr** 2:6
**judgment** 23:23
24:10 25:10
27:23 79:20
**July** 82:11

**K**

**kblankenship...**
2:18
**keep** 80:2
**Kidd** 67:12
**kind** 7:23 8:7
37:17
**kinds** 72:12
**knew** 12:9 47:10
**know** 14:12 18:3
19:23 21:10
22:5 30:20
42:18 43:1,1
43:19,24,24
45:6,9 47:25
50:3 59:8,10
61:4 68:9
69:20 70:3

72:19 73:13
74:22 76:15
77:25
**knowing** 23:14
80:2
**knowledge**
18:11 22:1,16
44:22,23,24,25
55:18 64:15
75:21 83:5
**known** 8:10,12
8:21
**Kurt** 2:18 55:7

**L**

**L** 2:9,24
**lack** 38:18 71:21
**Lane** 2:21
**larger** 50:4
**law** 2:9 61:20,23
62:2
**laws** 35:18
**lawyer** 16:3
**lay** 29:6
**lead** 58:16
**learn** 58:4
**left** 54:6 59:10
80:3 81:17
**legitimate** 43:9
**Let's** 74:8
**level** 13:20
**life** 22:18 80:4
**LINDA** 1:23 7:2
81:2,25 82:6
83:19
**line** 29:3 31:1
32:14 65:21
**Lines** 9:4
**list** 65:13 66:21
68:14
**listed** 67:6
**listening** 38:9
**litigant** 83:8,9
**litigation** 83:13
**LLC** 1:10

**LLP** 7:24
**located** 77:7
**location** 77:4
**long** 8:10 9:3
18:15 41:13
53:21 78:24
**longer** 9:9 50:5
56:4
**look** 11:14 29:9
30:2,13 33:12
47:19 65:11,19
**looking** 58:6
65:13 74:18
75:6
**looks** 32:5 68:18
**lot** 68:24
**Louisiana** 1:2,9
1:10,20,21,24
2:4,10,13,16
2:21 3:4 7:12
7:14,17,21
28:23 39:25
41:22 59:4
60:25 61:8
62:20 63:4
65:15 69:4
76:25 81:3,6
83:2,15,22
**LSU-Shrevep...**
53:17 61:3
**lumbar** 68:19
75:15,19 76:3

**M**

**M** 2:19
**M.D** 1:15 2:19
3:2 6:3,19 7:1
82:9
**machine** 19:21
19:24 43:11
70:13 77:1,2,7
**Magnetic** 29:3
**Major** 59:7
**making** 10:16
24:24 58:2

63:16,17 82:24
**manner** 6:7
83:12
**mark** 73:25
**marked** 8:25
28:22
**markets** 20:17
**Martin** 67:18
**Maryann** 3:6
**material** 81:20
**math** 66:6
**matter** 83:8,10
**mean** 10:20
12:22 21:11
28:6 33:23,24
33:25 58:6
67:9
**meaningful** 40:5
**meanings** 70:11
**means** 34:15
40:13
**med** 9:9
**MEDHOST**
16:18,20,21
17:5,7
**medical** 1:9,20
2:13 7:18,21
21:18 23:23
24:6,10 25:10
25:20,24 26:4
27:22 28:24
35:9 38:18
39:25 41:22
48:9 57:1 59:5
60:25 61:8
62:20 63:4
64:19 65:15
69:4 76:25
79:19
**medically** 35:21
**Medicare** 31:10
**medicine** 33:22
60:9 67:17,19
68:8
**mentioned**

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 7

11:12 49:20
**mentions** 34:7
**Metairie** 2:16
**method** 81:14
82:16
**MICHELLE**
1:5
**mind** 41:1 70:12
**MINOR** 1:6
**minute** 65:11
**minutes** 5:17
12:2 40:1,5,14
40:17 41:14
43:23 45:24
46:2 49:6
52:10 53:12,25
54:20 56:3,5
78:23
**mixture** 68:11
**modalities** 50:14
55:24 56:19
**modality** 17:20
42:23 43:21
44:1
**money** 36:9,13
**Monroe** 1:3 2:4
2:21 83:15
**month** 66:4,8,8
**morning** 7:7,8
55:6,22
**move** 24:25
28:19 44:2
51:2
**MRI** 9:7,8,21
11:19 12:1,3,4
12:7,24 13:12
14:3 15:23
17:13,16,19
18:5 19:2,7,12
19:18,19,21,24
20:6,13,21
21:7 22:10,10
25:3,4,5 29:7
30:4 39:12,13
39:14 41:2,5

41:17 42:3,7,9
43:11,23 44:4
44:11,19,21
45:16,24 46:23
46:24 47:9,16
47:23 48:6,15
48:21 49:3,4,9
50:2,7,24 51:3
51:8,22 52:23
55:24 56:4
57:2,12,13,20
60:1 64:25
65:22 66:17,23
69:5,10,16,25
70:13,22,24
71:2,11,13
74:21 75:10
76:1,7,13 77:7
77:18 78:7,10
78:18,22,25
79:21,23
**MRIs** 11:5,15
14:4,15 15:7
17:5 18:12,18
20:18 21:3
26:17 29:10
31:9 42:21
49:7,19 57:8
65:14 68:16
70:7,16 72:25
73:10 74:13,16
75:1,5,24
**multiple** 66:1
**Mute** 38:4

---

**N**

**name** 7:9 18:1
22:5 65:18
67:9,20 71:13
**names** 17:22
68:9 81:19
**NASH** 3:3
**nature** 12:3
19:19
**nearly** 22:11

**necessarily**
72:18
**necessary** 10:22
13:5 36:15
38:18 63:24
**need** 19:18 38:6
43:13 50:13
51:3 76:7
**needs** 13:19 35:9
50:24
**negative** 14:1
**neurological**
40:21 41:3,19
46:20 52:13
57:24 58:11
79:15
**neurologists**
61:13
**neurosurgeons**
61:14
**never** 17:10,12
18:22 19:7
20:12 25:20,24
28:25 62:22,25
64:24 73:8
**new** 3:4 50:17
75:18
**night** 80:2
**NLEP** 7:24
**NLMC** 16:13
**non-** 34:21 36:2
**non-emergency**
21:5 34:17
48:19
**normal** 50:17
58:21
**normally** 19:15
34:16 50:13
56:17 66:3
70:21,22
**North** 1:20 2:15
7:14
**Northern** 1:9
2:13 7:17,21
14:5,16 15:2

18:15,19 28:23
29:10 30:18
39:25 41:22
48:17 51:7
52:5 59:4
60:25 61:8
62:19 63:4
65:15 69:4
76:25
**Northern's** 29:2
30:5,11 37:1
38:14
**nose** 40:19
**note** 50:21
**notes** 16:9
**notice** 6:4 37:14
67:8
**noticed** 17:12
**number** 56:19
58:3 63:15
68:16 70:5
74:3,6
**nurse** 68:2
**nurses** 49:18
**nurses'** 53:8

---

**O**

**oath** 39:1
**Object** 9:25 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
30:23 33:5
34:6,25 35:5
36:6 37:10
39:7,9,19,21
40:10,12,25
41:9,11,25

42:2,14 43:5
43:16 45:20,22
47:2 48:25
49:15,22 50:10
50:12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**objection** 10:3,6
10:16 11:10
12:16 14:9,21
14:23 15:20
21:9 22:15
27:18 28:2
33:7 43:7,18
47:4 49:2,24
52:7,18 76:11
79:12
**objections** 4:9
6:8
**obligates** 62:5
**obligation** 62:8
**obtain** 15:23
20:5,20 21:6
41:5 48:15
**obtained** 19:12
**occasion** 12:7
**occasions** 76:7
**October** 1:16
83:16
**offer** 21:19 33:2
**offered** 6:11
**offering** 29:10
**office** 53:7 67:8
**officer** 81:4 82:7
**official** 82:4
**okay** 7:17 8:2
9:11,18 10:18
11:14 16:21
18:2 25:18
26:14 30:1,21
31:25 40:18

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 8

41:15 45:3
46:4 47:22
54:23 57:7
59:19 60:18
61:9,17 67:2
68:4,9,19 69:2
69:22 70:5
72:7,15 73:23
74:11 76:2
79:1
**old** 22:8 52:13
57:23
**once** 23:8
**online** 37:4
**opinions** 83:4
**opposed** 49:7
**option** 19:2
45:15 49:13
**options** 47:6
52:20 54:12,17
57:22 58:25
61:7,9
**order** 9:10 12:4
12:7,9,21,23
12:24,25 13:6
13:9,25 16:19
16:23 17:2
18:5 25:2,4
26:17 31:22
47:16,23 48:5
50:1,7 51:8,21
56:17 60:1
62:22 63:23
64:8 69:10
71:11,20,22
72:4 74:20
77:18 78:7,10
78:17
**ordered** 11:16
14:16 18:12
34:17 42:21
46:24 65:14,22
66:24 67:1
68:16 70:21,22
70:24 71:2,5

74:13 75:20
78:5,16
**ordering** 18:17
66:17 67:4,6
68:10 72:11
**orders** 71:14,19
72:3,10 78:3
**original** 82:3
**Orleans** 3:4
**ortho** 52:24
**orthopaedic**
13:4 47:15
59:6,19
**orthopaedics**
59:18
**orthopaedist**
59:14
**Oscar** 2:9 37:25
38:8
**ought** 20:5 30:3
32:22
**outcome** 83:14
**outpatient** 13:15
13:24 14:3
29:18 48:18
**outpatients**
20:19 21:4,15
29:13 67:4
**oversight** 34:19

**P**
**p.m** 22:11 41:6
41:18
**page** 4:2 5:2 9:4
65:20 81:1
**pages** 82:14
**paid** 63:7
**paragraph** 29:9
32:8,10 33:13
33:16 34:8,10
**paralyzed** 22:18
80:4
**paraphrase**
10:15
**paraphrasing**

11:1
**PARENTS** 1:7
**part** 29:10 32:3
38:16 48:9
54:10 58:4
60:24 72:1
**particular** 9:21
24:17,18 26:21
27:16 33:3
45:16 59:16
**parties** 6:13
83:11,13
**partners** 7:22,24
8:1,2,7
**partnership**
7:15 8:9
**party** 83:7,9
**passed** 53:13
**path** 58:2
**paths** 58:17
**patient** 12:6,8
19:17 22:7
24:17 28:8
29:19 33:3
36:8,12 46:25
47:20 48:14,23
50:24 51:4
52:12 53:16
54:15 55:14
58:5,7,10
62:10,14,22
63:8,20 64:4
65:18 66:18
69:6,8,21,25
71:16,17 72:4
72:17 79:7,14
79:19
**patient's** 14:7
26:21 63:7
**patients** 19:10
20:18,20 21:4
21:6 27:2 54:1
58:23 63:12
65:25 66:1,2,7
66:12 72:12

**PATRICK** 3:2
**pauses** 81:12
**pay** 14:7 38:19
62:23
**payment** 36:17
**peg** 37:18
**people** 13:14
23:1 25:19,24
26:4 67:5
**perform** 78:24
**performed**
70:16
**period** 14:17
**Perkins** 2:10
**PEROT** 1:23
7:2 81:2,25
82:6 83:19
**person** 23:23
45:3 82:24
**personal** 55:18
82:17
**personally** 11:24
**phone** 2:5,11,16
2:22 3:4 38:4,9
53:6,7
**phonetically**
81:22
**phrase** 49:11
63:17 81:21
**phrases** 81:16
**physical** 73:16
**physically** 70:16
76:24 77:9
**physician** 7:14
13:3 14:3
18:13 31:22
35:13 36:1
38:23 43:14
47:18 51:20
52:21 56:11,25
57:9,11 58:4
59:21,25 62:5
62:6,19 63:3
63:18 64:3,12
67:5,6,15

68:10 69:23
71:23,25 72:6
72:9,14,19
79:18
**physician's**
25:10
**physicians** 7:15
19:4 58:22
63:17 68:11,12
70:9 73:1
**pick** 44:5,5,11
44:12,19 53:6
**pigeonholed**
40:18
**plain** 19:17
**PLAINTIFFS**
2:2
**please** 7:9
**pledge** 5:17 40:2
41:1,7,12
**point** 42:5 64:23
**policies** 79:22
**policy** 26:20
27:1,9,20
28:10 39:3
65:3 80:3
**poor** 14:14
17:12
**pose** 54:20
**position** 15:9
20:1 77:5
**possibilities**
69:19
**possible** 50:4
56:13 71:11
**possibly** 35:8
52:1
**post** 5:10
**post-deposition**
5:6,7
**potential** 69:20
**potentially**
59:21
**POTTS** 2:20
**power** 35:20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD  CALVERT, M.D.
October 17, 2016

Page 9

Poydras 3:3
practical 77:10
practice 21:18
    33:22 39:3
    48:13 61:23
    63:2 65:3
practices 41:21
practicing 60:8
practitioner
    68:2
precertification
    34:12,15,21
    35:2 37:2,16
    75:1,2
precertified
    11:6
Preliminary
    57:15
prepared 82:16
    82:20
preregister 37:4
prerogative
    63:19,23 64:3
present 16:5,13
    23:14 56:14
    70:13
presented 19:11
    22:7 27:3,8
    40:8 52:22
    57:23 79:18
presenting
    29:15
press 13:8 16:24
    17:2 45:15
    77:18
pressing 35:8
pretty 26:11
previous 65:10
primary 14:3
privileges 72:1
probably 8:12
    42:18 46:3
    47:6,21 59:17
problem 11:2
    24:1,1

procedure 6:6
    9:9 11:19 12:3
    21:1 32:16
    34:19 37:6
    43:25 72:2
    81:5,7 83:3
procedures 37:8
    79:22
proceeding 81:7
    81:11,15
process 62:13
progressing
    41:19 46:20
    52:13 79:14
prohibited 83:5
prohibition 83:1
proper 81:14
protocol 72:11
provide 21:3
    24:17 36:16
providers 31:9
purportedly
    75:5
purposes 6:7
pursuant 6:4
put 46:17

—————
        Q
qualified 56:24
question 6:9 9:5
    14:14 16:16
    17:12 21:2
    24:23 33:12
    39:10 48:10
    51:1 59:11
    73:7,14
questions 6:16
    46:16 55:4,8
    63:15 70:5
    72:22 80:15
quick 46:7
quickly 19:20
quote 32:17

—————
        R

R.S 82:10
radiologist 13:3
    44:13 47:7,13
    56:22 57:16,18
    69:7,14,23,23
radiology 31:6
    31:19,23 43:10
    47:17 52:1,2
    52:23 53:5
    54:13
rating 32:11
read 6:20 9:5,16
    10:21 24:24
    80:16
reading 6:17
ready 45:12
    73:14
real 46:7
really 12:11
    19:18 21:10
    29:21 45:1,6
    50:16
reason 9:22
    15:17 43:9
    46:21 50:6
    66:21 69:7
recall 66:17 71:1
    73:2
recommend
    47:19 64:8
record 7:10 9:5
    10:16 31:14
    37:23 46:7,13
    64:18 81:8
redacted 65:18
reduction 6:15
REEXAMIN...
    74:9
refer 29:6 35:22
reference 81:20
Regan 68:7
regard 36:16
reimbursement
    14:18
related 83:10

relationship
    83:6,9
relationships
    83:2
relatively 77:2
Reliable 8:16
rely 57:17
relying 58:9
remember 15:3
    17:22 66:11
    69:18
remind 48:2
rephrase 10:25
    39:10
reported 1:22
    82:15
Reporter 1:23
    7:3 74:5 81:2
    82:6 83:20
Reporter's 81:1
    81:14
reporting 82:15
    83:7
represent 29:1
    55:7 65:12
represents 39:25
request 9:22
    25:4,5 42:6
    47:17,18
requested 19:7
    37:6 39:13
    41:17
requests 11:5
    25:6
require 13:14
    28:12 34:18
    46:23 75:2
required 31:8
    32:7 34:21
    75:1 79:21
    82:4,21
requirements
    63:11
requires 52:22
requiring 35:1

reserved 6:10
    13:14,22
resident 50:1
Resonance 29:3
respects 77:10
respond 69:14
responsiveness
    6:9
rest 22:18 80:4
result 39:16
review 73:15
reviewed 64:19
rid 57:16
ridden 55:13
right 6:20,22 9:8
    10:13 11:3
    19:21,25 23:7
    27:7 35:24
    38:11 43:10,11
    45:13 46:16
    50:20 53:9
    55:21 58:25
    59:4,7,14,25
    60:11,14,22
    61:12,22 62:18
    66:15 67:18
    68:6,14 69:13
    71:18 72:10,12
    73:4 74:11
risk 32:17
Road 2:10
room 11:6,16,21
    12:5,6,8,12,14
    12:20 13:21
    15:7,24 16:14
    18:6,13 19:8
    19:20 20:13,21
    21:7,13 26:17
    29:19 31:21
    35:12 36:1
    42:4,22 43:14
    47:24 48:6,21
    49:3 50:2,8
    52:21 56:10
    63:3 64:12,20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 10

65:14,22 67:25
69:3 70:25
71:12 72:25
78:10,18
**rooms** 20:15
60:6,23
**Rouge** 2:10
**roughly** 65:16
66:6
**round** 37:18
**routinely** 47:10
**rule** 13:17,25
19:15 43:22
44:1 48:1
50:13 55:23
56:12 81:4
**ruled** 57:1
**rules** 6:5 35:18
47:22 56:18
81:5 82:21
83:3
**run** 16:7 44:10
**runny** 40:19
**rural** 61:4
**Russell** 2:6
**Ruston** 1:10,21
7:12
**rwoodard@b...**
2:7

_____

**S**
**S** 2:18
**safe** 51:24 52:3
78:8
**Sandy** 17:24,25
18:1
**saying** 37:3
38:16 56:7,8
70:19,20
**says** 28:10,11
29:3,9 30:13
30:17 32:15
37:3 40:4
53:10,11 66:23
**scan** 9:7 13:9,25

14:1 16:23
19:16 44:5,10
44:18,19,21
46:2 49:8 56:2
57:19
**scenario** 41:16
**scenarios** 62:1
**school** 25:20,24
26:5
**scope** 27:16
**Scott** 1:5,6,7,7
22:4 27:3,8
29:15
**Scott's** 64:20
**screen** 5:8,9,12
5:14,16 16:8
16:10 32:3
37:1 38:13
76:18
**screening** 36:11
76:13,15,20
**seal** 82:4
**seals** 31:2
**second** 9:4 29:9
33:15
**seconds** 46:5
56:4
**see** 17:7 29:2,13
30:1,16 31:1
31:16 32:7,12
32:14 33:16
34:19 38:19
47:7,16 49:9
49:10 58:4
65:18 67:9,20
**seeing** 69:9
**seen** 9:11 28:25
40:2,14,16
41:13 47:25
68:9 78:15
**self-employed**
7:23 8:6
**send** 14:2 69:15
**sense** 32:20 56:7
**sentence** 33:15

33:25
**series** 35:18
**serve** 29:12
**serves** 7:17
**service** 40:5
**services** 21:19
61:11 82:25
**set** 8:5 82:13
**sets** 72:11
**setting** 34:2
37:17 48:19
56:10
**seven** 20:16 60:5
75:7 79:8
**severity** 40:7
**SHAFTO** 2:3
**sheet** 71:4 73:25
74:11,18
**shift** 65:24
**shifts** 66:3
**SHOENFELT**
2:9 37:24 38:1
**shoes** 46:18
**shorter** 79:1
**shot** 5:8,9,12,14
5:16 32:3 37:1
38:13
**show** 8:23 28:21
30:10 31:13
32:2 65:8
**showing** 74:12
74:15
**shown** 68:16
**shows** 44:17
67:4 71:4,12
74:25
**Shreveport** 54:3
55:13,15
**sign** 6:20 80:16
**signature** 82:3
**significant**
12:10 14:17
53:3
**signing** 6:17
**single** 39:3

**sir** 55:15,20
**sit** 17:18 79:7
**situation** 23:25
52:22 54:19
**six** 20:16 60:5
**Sixteen** 66:5
**slightly** 50:5
**software** 17:8
49:19 78:3,5,6
78:16
**somebody** 13:18
35:20
**sorry** 11:23 34:9
**sort** 8:4 13:20
34:18 48:12
57:18 69:24
72:1,10
**sounds** 45:11
**speak** 37:7
**speaker** 37:22
**speaks** 30:23
32:11 37:10
68:14
**special** 43:13
**specialist** 59:2
**specialists** 59:12
59:20
**specialized**
56:23,23 57:5
57:7
**Specialty** 61:11
**specific** 24:21
27:11 28:7,8
48:11 64:5
69:18 72:12
73:7
**specifically**
66:17
**specifics** 64:15
66:12
**spectrum** 61:4
**speculation**
53:24 54:9
**spelled** 81:21
**spinal** 44:9

52:12 59:23
**spine** 9:7 68:17
68:20,22 75:7
75:12,23 76:1
76:6
**spoke** 15:1,6
**spontaneous**
81:11
**square** 37:17
**stabilization**
62:14
**stabilize** 62:10
**stable** 35:21
**staff** 59:14 61:14
61:15
**stamped** 82:4
**standard** 72:10
**standards** 31:2
**start** 60:8
**state** 1:24 7:9
10:5 35:19
81:3,8 83:22
**stated** 71:7
**statement** 20:12
**STATES** 1:1
**station** 16:8 53:8
**statute** 82:21
**stay** 13:15
**stenomask**
82:15
**step** 44:3
**stipulated** 6:2
**STIPULATI...**
6:1
**straining** 66:10
**Street** 3:3
**strictly** 22:5
**Strike** 32:25
**sudden** 23:18
**suggest** 76:5
**suggesting** 65:4
**Suite** 2:4,15,21
3:3
**summarize** 62:8
**supervision**

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 11

82:17
**suppose** 7:23 8:4
  21:12 27:19
  28:18 35:22
  54:11
**sure** 24:20 33:23
  33:24 44:13,15
  46:10,12 49:4
  50:3,20 51:1
  51:12 70:1
  73:6,14 75:20
  77:24 78:13
**surgeon** 47:16
  59:6,19
**suspect** 71:9
**suspected** 59:22
**suspicion** 66:25
**swearing** 6:15
**sworn** 7:2 82:10
**symptoms** 19:11
**system** 16:18
  65:17 66:22

**T**
**take** 12:10 45:24
  53:2 54:17
  56:3 63:2
  65:11 66:6
  69:21
**taken** 6:4 29:1
  81:8 82:8
**takes** 9:9 12:1
  43:23 56:4
  78:24
**talk** 46:8 47:7,13
  47:15 72:8,18
**talked** 78:22
**talking** 16:13
  52:11 53:21
  61:13 76:23
**talkovers** 81:13
**tax** 8:8
**taxing** 66:10
**Taylor** 3:2 5:5
  7:25 8:2,11,13

8:21 9:15,20
  11:4,12 15:1
  15:18,22 19:24
  20:4 25:2,25
  26:6 28:10
  30:1 41:2
  75:11 77:6
**Taylor's** 15:9
  22:9 26:15
  39:11 42:8
  46:18 51:17
  52:9 67:20
**technically** 7:20
  7:22 71:24
  72:5
**teenage** 80:3
**TELEPHONE**
  2:8
**tell** 13:4 16:4
**telling** 74:23
**ten** 65:25 74:3
**tens** 66:1
**term** 70:1,10
**test** 12:19 16:6
  34:17 44:20
  50:5 62:23
  63:6 70:3 79:4
  79:6
**testified** 7:3 9:20
  11:4 15:1
  19:24 20:4
  25:2 30:2 41:2
  60:4
**testifying** 50:22
**testimony** 9:1
  15:10 22:9
  24:25 26:15
  39:11 42:8,24
  52:9 55:22
  73:11 82:8,14
**testing** 58:18
**tests** 13:13 16:20
  49:5 56:11
  57:14 63:24
  72:11

**Thank** 54:25
  73:19
**thankfully**
  23:11
**thereof** 83:14
**therewith** 6:7
**thickness** 44:8
**thing** 50:16
**things** 11:11
  23:19 25:1,8
  25:16 32:22
  44:4,18 45:2
  47:5,21 49:9
  58:3 61:15
  69:20
**think** 7:22 8:4,8
  8:20 10:8,13
  10:21 12:16
  16:16 24:21
  28:4 32:22
  34:16 36:23
  40:13 41:6,12
  41:15,20 43:9
  44:16 45:14
  48:10,11 49:11
  50:6 53:25
  60:16 69:9,11
  71:9,24 73:13
**thinking** 23:7
**thinks** 71:8
**third** 65:20
**thirty** 5:17 12:2
  40:1,5,14,16
  41:14 45:24
  49:6 53:25
  56:4 78:23
**thirty-minute**
  41:1,7
**thoracic** 9:7
  68:22 75:16,17
  75:19,22 76:1
**thought** 79:19
  81:13
**three** 37:5,13
  53:2 54:12,17

68:18
**thumbar** 75:12
  75:16
**time** 6:10 8:6
  9:10 12:10
  14:17 22:8
  41:21 42:10
  53:3 54:5,6,17
  54:19 55:16
  59:17 64:11
  74:12,15 79:2
**times** 55:21
  59:16 67:9
**today** 17:18 22:2
  22:6 23:11,12
  23:13 29:12
  73:11,15
**told** 11:5 12:13
  25:5 26:16
  36:1 56:2
  60:12
**top** 29:2 30:13
  32:8 33:13
**Touching** 55:12
**Tower** 2:4
**tragic** 22:20
**trained** 23:1,4
  24:5 35:13,24
  36:20 38:22
  50:3 61:18,22
  63:10
**training** 36:19
  48:5,9,12
  56:24 57:6,8
  58:14 70:3
  79:20
**tranquil** 23:19
**transcribed**
  82:16
**transcript** 5:4,5
  9:1 81:17 82:3
  82:19,20
**transcription**
  81:15
**transfer** 47:9,20

52:25 53:15,16
  64:8
**transferred** 54:2
**transferring**
  54:14
**treat** 24:1 65:24
  66:12
**treated** 40:6
  64:5
**treating** 58:22
**treatment** 24:17
  27:16 33:2
  35:22,23 36:15
  58:5
**Trey** 55:2
**triage** 62:9,13
**triaged** 40:14,16
  41:13
**trial** 9:2
**trick** 33:11
**troubling** 80:12
**true** 24:8 25:9
  25:16 26:15,19
  39:11 42:6,15
  82:18
**trustworthy**
  8:14
**try** 23:23 42:9
  43:20,21 44:1
  46:24 47:6,15
  69:16,21
**trying** 24:25
  28:19 33:11
  38:5 61:1
**turn** 37:21
**TUTORS** 1:7
**twelve** 22:8
  52:12 57:23
  74:6,8
**twelve-year-old**
  41:3,20 46:19
**twenty** 53:25
**twenty-five** 66:2
**two** 28:13 47:6
  49:10

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

**Page 12**

types 59:20
typewriting 6:16
typical 72:16
typically 13:13
  13:16,18,22,24
  14:5,15 18:23
  43:25 44:20
  53:17 66:2
  78:23
tzeigler@hpla...
  2:25

**U**

ultrasound 17:4
unavailability
  70:7,11,19
  72:24 73:10
  76:24
understand 21:2
  33:18 50:20
  51:1 75:10
understanding
  7:13 14:4,15
  34:14,23 35:1
  35:16 39:15
  42:20 44:16
  48:14 55:16,17
  55:25 56:8
  62:4 82:19
understands
  16:16 48:10
unit 62:13
UNITED 1:1
universally 28:5
unquote 32:18
unusual 8:4 65:5
  73:4
use 12:19 13:17
  17:7,20 21:12
  23:22 42:23
  43:20,25 70:1
  70:10 76:18

**V**

valid 82:2

various 63:11
Vaughn 1:20
verbatim 10:20
verified 81:20
verify 68:15
versus 63:16
violation 36:22
  39:4,5,16 62:2
violations 61:18
virtue 56:22
visit 64:20
VS 1:8

**W**

wait 79:8
waive 6:13
walk 23:9,13
  45:11
wall 42:19
want 9:18 10:20
  11:3 16:6,23
  21:11 25:8
  30:10 31:13,22
  32:2 37:21
  46:17 51:21
  57:25 58:18
  65:8 70:9,12
  73:7,25 78:17
wanted 22:10
  24:16 25:2
  41:2 45:18
  75:11,22
way 8:5 10:25
  14:4,15 24:9
  48:21 63:18
  66:15 70:19
  71:21 83:14
we'll 69:15 72:3
we've 40:20 68:9
website 5:8,9,16
  28:24 29:2
  30:5,12,21
  37:1 38:14
  40:1
went 25:20,24

26:4
West 83:15
WESTERN 1:2
White 7:25
  67:22
WILLIAMS
  2:14
wish 11:22,24
witness 6:15,19
  10:1 73:22
  80:16
WOLLESON
  2:3
WOOD 2:19
Woodard 2:6
  4:4 7:6 8:24
  9:13 10:4,17
  10:23 16:15
  27:4 28:20
  30:9,24 31:12
  32:1 36:24
  37:24 38:3,10
  38:12 39:23
  46:6,15 54:24
  57:3 71:6
  73:20,24 74:10
  80:14
word 28:4
words 81:16,19
work 17:11
  23:11 31:23
  45:11 68:4
  72:16
worked 20:13
  20:15 60:5,23
  61:6 64:24
working 15:3
  23:12,13,17
world 12:1
  45:14 49:12
wouldn't 12:24
  21:17 27:15
  49:3 54:9
  56:21 58:2
wound 23:19

write 16:8 71:14
  71:18 72:2
writing 34:9
  72:9
written 47:22,25
  71:14
wrote 64:23

**X**

x-ray 19:17 46:4
  49:8
x-rays 17:4 56:3

**Y**

y'all 12:23 26:10
  27:5 43:3
yeah 16:18
  69:15
year 52:13 57:23
years 22:8
young 46:18

**Z**

Zeigler 2:23
  55:3
Ziegler 9:2

**0**

**1**

1 5:4 8:25 11:14
10 4:13 5:14
  36:25
11 4:10,13 5:16
  38:13
1120 7:11
12 5:17 39:24
13 5:18 74:8,19
  74:25 75:6,25
14 4:10,13
1434 83:3
1434(B) 81:6
15 4:10,13
16 4:13
17 1:16
18 4:10,13

1800 2:21
1811 2:4
18th 83:15
19 4:10 64:21
1994 29:12 30:1
1999 60:10
19th 27:5,8

**2**

2 5:5 9:14
20 4:10,13
2005 8:12 18:16
  19:10 48:3
  60:11,20
2013 8:13 65:16
2014 27:9 29:16
  59:5 64:21
  65:23 66:19
2016 1:16 65:16
  82:11 83:16
21 4:13
2109 2:10
21st 20:5 30:2
22 4:10,13
225 2:11
23012 1:24 7:3
  81:3,25 82:7
  83:21
24 4:10,13
25 4:10,13
26 4:10,13
2600 3:3
27 4:10,13
27th 82:11
28 4:13 5:8 81:4
28th 65:23 66:19

**3**

3 5:6 22:11 41:6
  41:18
3:00 42:7
3:16-CV-00376
  1:8
30 4:14 5:9
300 2:21

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 13

**31** 5:11
**318** 2:5,22
**32** 5:13
**322-1202** 2:5
**33** 4:10,14
**336-4300** 2:11
**34** 4:14
**3421** 2:15
**35** 4:14
**36** 4:10 5:15
**37** 4:14
**37:2554** 82:10
**38** 5:16
**388-4400** 2:22
**39** 4:10,14 5:17

**4**

**4** 5:7
**40** 4:10,14
**400** 3:3
**401** 1:20
**41** 4:11,14
**42** 4:14
**43** 4:11,14
**45** 4:11,14
**47** 4:11,14
**48** 4:11
**49** 4:14

**5**

**5** 5:8 28:22
**50** 4:11,14
**504** 2:16 3:4
**51** 4:15
**52** 4:11,15
**529-3333** 3:4
**53** 4:15
**55** 4:7

**6**

**6** 5:9 30:10

**7**

**7** 5:10 9:4
**7,74** 4:4
**70002** 2:16

**70130** 3:4
**70808** 2:10
**71201** 2:4,21
**71270** 1:21
**74** 5:18
**75** 4:11
**76** 4:11,15
**77** 4:11,15
**78** 4:15
**79** 4:11,15

**8**

**8** 5:4,11 31:13
   31:15
**8:06** 82:12
**80** 4:11,15
**81** 82:14
**831-4091** 2:16

**9**

**9** 4:10 5:5,12 9:4
   22:10 25:3
   32:2 33:12
   41:5,17
**9:00** 42:7
**9:30** 80:17 82:13
**900** 2:15