1           UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF LOUISIANA

3             MONROE DIVISION

4    * * * * * * * * * * * * * * * * * *

5

6  GREGORY SCOTT AND MICHELLE
    SCOTT, INDIVIDUALLY AND ON      ORIGINAL
    BEHALF OF THE MINOR, JORDAN

7  SCOTT, AS THE PARENTS AND
    TUTORS OF JORDAN SCOTT

8                    NO. 3:16-CV-00376
    VS.

9

    NORTHERN LOUISIANA MEDICAL

10  CENTER, RUSTON, LOUISIANA,
    HOSPITAL COMPANY, LLC, AND

11  BRADY DuBOIS

12

13         * * * * * * * * * * * * * * *

14              DEPOSITION OF

15           EDWARD CALVERT, M.D.

16           October 17, 2016

17

18        * * * * * * * * * * * * * * *

19     At:

20         North Louisiana Medical Center
          401 E. Vaughn Avenue

21       Ruston, Louisiana 71270

22         REPORTED BY:

23          LINDA PEROT
          CERTIFIED COURT REPORTER

24         CERTIFICATE NO. 23012
          STATE OF LOUISIANA

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
 1    APPEARANCES:

 2
      FOR PLAINTIFFS:
 3
          BREITHAUPT, DUNN, DuBOS, SHAFTO & WOLLESON
 4        1811 Tower Drive, Suite D
          Monroe, Louisiana 71201
 5        Phone:  (318) 322-1202

 6            appearing herein by and through
              Mr. Russell A. Woodard, Jr.
 7            rwoodard@bddswlaw.com

 8    AND VIA TELEPHONE CONFERENCE CALL

 9        OSCAR L. SHOENFELT
          ATTORNEY AT LAW
10        2109 Perkins Road
          Baton Rouge, Louisiana 70808
11        Phone:  (225) 336-4300
          E-Mail:  info@shoenfeltlaw.com
12

13    FOR DEFENDANT NORTHERN LOUISIANA MEDICAL CENTER:

14
          BLUE WILLIAMS
15        3421 North Causeway Boulevard
          Suite 900
16        Metairie, Louisiana 70002
          Phone:  (504) 831-4091
17
              appearing herein by and through
18            Mr. Kurt S. Blankenship
              E-Mail:  kblankenship@bluewilliams.com
19
      FOR DEFENDANT JACOB M. WOOD, M.D.:
20
          HUDSON, POTTS & BERNSTEIN
21        1800 Hudson Lane, Suite 300
          Monroe, Louisiana 71201
22        Phone:  (318) 388-4400

23            appearing herein by and through
              Mr. Donald H. Zeigler, III on behalf of
24            Mr. Gordon L. James
              E-Mail:  tzeigler@hplaw.com
25
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094   Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    APPEARANCES (CONTINUED):

2    FOR DEFENDANT JAMES PATRICK TAYLOR, M.D.:

3        DEGAN, BLANCHARD & NASH
           400 Poydras Street, Suite 2600

4        New Orleans, Louisiana 70130
           Phone:  (504) 529-3333

5

6           appearing herein by and through
           Ms. Maryann G. Hoskins
           E-Mail:  dhoskins@degan.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094   Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

INDEX

                                                          PAGE

EXAMINATION
     BY MR. WOODARD . . . . . . . . . . . . . . . . . 7,74


EXAMINATION
     BY MR. BLANKENSHIP . . . . . . . . . . . . . . . 55


OBJECTIONS
     BY MS. HOSKINS . . . . .   9, 11, 14, 15, 18, 19, 20, 22,
                     . . . . 24, 25, 26, 27, 33, 36, 39, 40,
                     . . . . 41, 43, 45, 47, 48, 50, 52, 76,
                     . . . . . . . . . . . . . 75, 77, 79, 80


     BY MR. BLANKENSHIP   . . . . 10, 11, 14, 15, 16, 18, 20,
                     . . . . 21, 22, 24, 25, 26, 27, 28,
                     . . . . 30, 33, 34, 35, 37, 39, 40,
                     . . . . 41, 42, 43, 45, 47, 49, 50,
                     . . 51, 52, 53, 76, 77, 78, 79, 80

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

EXHIBIT INDEX

PAGE

Exhibit 1     Transcript of Dr. Alam   . . . . . . . . . 8

Exhibit 2     Excerpts from Transcript of Dr. Taylor   . . 9

Exhibit 3  . . . . . . . . . . . . .  attached post-deposition

Exhibit 4  . . . . . . . . . . . . .  attached post-deposition

Exhibit 5     Website Screen Shot   . . . . . . . . 28

Exhibit 6     Website Screen Shot  . . . . . . . . . 30

Exhibit 7  . . . . . . . . . . . . . .  attached post deposition

Exhibit 8     The ACR Appropriateness Criteria   . . . . 31

Exhibit 9     Screen Shot from The ACR Appropriateness
              Criteria   . . . . . . . . . . . . . . . 32

Exhibit 10    Screen Shot from The ACR Appropriateness
              Criteria   . . . . . . . . . . . . . . . 36

Exhibit 11    Website Screen Shot  . . . . . . . . . . 38

Exhibit 12    Thirty Minutes or Less Pledge  . . . . . . 39

Exhibit 13  . . . . . . . . . . . . . . . . . . . . 74

*Linda Perot, CCR*

Exhibit "1"

## STIPULATIONS

1
2      It is stipulated and agreed between counsel
3  that this deposition of **EDWARD CALVERT, M.D.,** is
4  taken pursuant to Notice by counsel for
5  Defendants in accordance with the *Federal Rules*
6  *of Civil Procedure*, and may be used for all
7  purposes and in any manner consistent therewith.
8  All objections except as to the form of the
9  question and responsiveness of the answer are
10 reserved until such time as the deposition is
11 offered and introduced into evidence.

12
13     The parties hereto waive all formalities in
14 connection with the taking of said deposition,
15 except the swearing of the witness, reduction of
16 the questions and answers to typewriting, and
17 reading and signing of the deposition.

18
19     The witness, **EDWARD CALVERT, M.D.,** was
20 advised of his right to read and sign this
21 deposition, and he elected to exercise that
22 right.
23         * * * * * * * * * * * * * * * * * *
24
25

*Linda Perot, CCR*                                   6

Exhibit "1"

**EDWARD CALVERT, M.D.,**

1
2  being first duly sworn by **LINDA PEROT**, Certified
3  Court Reporter 23012, was examined and testified
4  as follows:

**EXAMINATION**

5
6  BY MR. WOODARD:

7  Q    Good morning, Doctor.

8  A    Good morning.

9  Q    Will you please state your name and address
10       for the record?

11  A    Edward Calvert, 1120 Brookhaven Avenue,
12       Ruston, Louisiana.

13  Q    And it's my understanding you are a
14       physician in the North Louisiana Emergency
15       Physicians Partnership?

16  A    I am.

17  Q    Okay.  And that serves Northern Louisiana
18       Medical Center?

19  A    Correct.

20  Q    And you are not technically an employee of
21       Northern Louisiana Medical Center?

22  A    I think, technically, we are partners of
23       some kind.  I'm self-employed, I suppose.

24  Q    And the partners of NLEP, LLP, that would be
25       Drs. Alam, Taylor, White and yourself?

*Linda Perot, CCR*

1   A   I'm not certain who all the partners are.

2   Q   Okay.  Alam and Taylor are your partners,

3       though?

4   A   I think -- I suppose.  It's sort of unusual

5       the way this ER is set up.  Most of the

6       time, you are self-employed.  With this one,

7       they make you partners of some kind.  I

8       think it's a tax issue more than an actual

9       partnership.

10  Q   How long have you known Dr. Alam and Dr.

11      Taylor?

12  A   I've known Dr. Alam since probably 2005; Dr.

13      Taylor since, I believe, 2013.

14  Q   Have you found them both to be trustworthy?

15  A   I have.

16  Q   Reliable?

17  A   Yes.

18  Q   Honest?

19  A   Yes.

20  Q   Can you think of any instance of dishonesty

21      since you've known Dr. Alam or Dr. Taylor?

22  A   I cannot.

23  Q   I'd like to show you --

24      MR. WOODARD:

25          what's been marked as "-- 1."

*Linda Perot, CCR*

8

Exhibit "1"

1  Q  This is a transcript of Dr. Alam's testimony

2     from a trial Mr. Ziegler and I actually had

3     not too long ago.  If you will, flip with me

4     to the second page, Lines 7 through 9.  Can

5     you read for the record that question and

6     answer?

7  A  "No MRI or CT scan of the thoracic spine.

8     Is that right?"  "No.  MRI is not emergency

9     med department procedure.  It takes longer

10    time.  We cannot order it fast."

11  Q  Okay.  Have you ever seen that before?

12  A  No.

13       MR. WOODARD:

14         I have "Exhibit 2" here, some

15         deposition excerpts from Dr. Taylor.

16  Q  Have you read that deposition?

17  A  I have not.

18  Q  Okay.  I want you to assume for me instead

19     of going through these excerpts in detail

20     that Dr. Taylor has testified in this

21     particular case he asked for an MRI.  His

22     request was denied or delayed and the reason

23     he was given was financial considerations.

24       MS. HOSKINS:

25         Object to the form.

*Linda Perot, CCR*

9

1   (To Witness):  Go ahead.

2   MR. BLANKENSHIP:

3       I join in the objection.

4   MR. WOODARD:

5       You can state the basis for your

6   form objection.

7   MS. HOSKINS:

8       Well, I don't think that's

9   exactly --

10  MR. BLANKENSHIP:

11      His answer --

12  MS. HOSKINS:

13      Right.  I don't think that's exactly

14  what he said.  I'm not -- it's a

15  paraphrase of what he said and I'm just

16  making my objection for the record.

17  MR. WOODARD:

18      Okay.

19  MS. HOSKINS:

20      I mean, if you want a verbatim, we

21  can read it.  I don't think that's

22  necessary, but --

23  MR. WOODARD:

24      That's fine.  I just -- if there was

25  some way I could rephrase the

*Linda Perot, CCR*

10

1           paraphrasing that you don't have a

2           problem with.

3  Q   All right.  And I want you to also assume

4      for me that Dr. Taylor testified that he was

5      told that requests for MRIs from the

6      emergency room have to be precertified.

7         MS. HOSKINS:

8            Object to the form.

9         MR. BLANKENSHIP:

10            Same objection.

11  Q   Have you ever heard of any of those things I

12      just mentioned by Dr. Taylor?

13  A   I have not.

14  Q   Okay.  Look back at "Exhibit 1."  Do you

15      agree with Dr. Alam that MRIs cannot be

16      ordered fast from the emergency room?

17  A   I do.

18  Q   And why do you agree with that?

19  A   MRI is not an emergency procedure.  It's

20      just not something that is available to us

21      through the emergency room.

22  Q   Is that something you wish was available?

23  A   I'm sorry?

24  Q   Is that something that you personally wish

25      was available?

*Linda Perot, CCR*

11

1    A    In an ideal world.  However, MRI takes

2         thirty minutes to an hour and it's just not

3         an emergency procedure by the nature of MRI.

4    Q    Have you ever attempted to order an MRI from

5         the emergency room?

6    A    Not on an emergency room patient.

7    Q    Have you ever had occasion to order an MRI

8         on an emergency room patient, but you did

9         not make an order because you knew it would

10        take a significant amount of time?

11   A    It's not really available through the

12        emergency room, so --

13   Q    Who has told you that it's not available

14        through the emergency room?

15             MS. HOSKINS:

16                  Objection.  I don't think that's

17             what he said.

18   Q    Is that what you said?

19   A    It's not a test that we use in the emergency

20        room because it's not available for us to

21        order.

22   Q    What do you mean that it's not available for

23        y'all to order?

24   A    If I attempted to order an MRI, it wouldn't

25        be done.  There's -- unless we order it on

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

an inpatient, it's something that I would have to discuss directly with either an admitting physician or a radiologist or get the orthopaedic doctor to tell me that it was necessary.  It's not something that I could just type an order in the computer and it would be done.

Q   Do you have any idea why -- you could press a button and order a CT scan.  Correct?

A   Correct.

Q   Do you have any idea why you can't do that for an MRI?

A   It's just one of tests that's typically reserved for people who require an inpatient stay or can be done on an outpatient basis.

Q   Typically, --

A   We use the CT to rule out emergency conditions typically, and then if somebody needs further investigation, that's done sort of at the next level, not through the emergency room.

Q   And when you say it's typically reserved for inpatients and who else?

A   Done on an outpatient basis.  Typically, we order a CAT scan to rule out emergency

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   conditions and, if the CAT scan is negative,

2   then we would send them to have an

3   outpatient MRI via their primary physician.

4   Q   And the way you're understanding MRIs are

5   used at Northern, typically there's a delay

6   which allows for confirmation of either

7   insurance or a patient's ability to pay?

8       MS. HOSKINS:

9           Objection.

10      MR. BLANKENSHIP:

11          Object to the form.

12  A   I don't know anything about the financial

13  aspect of it.

14  Q   It was a poor question.  It's your

15  understanding that, typically, the way MRIs

16  are ordered and conducted at Northern,

17  there's a significant period of time to

18  where confirmation of reimbursement can be

19  confirmed.  Is that correct?

20      MS. HOSKINS:

21          Objection.

22      MR. BLANKENSHIP:

23          Same objection.

24  A   Again, I have no idea about the financial

25  aspect of it.

*Linda Perot, CCR*

14

1   Q   If Dr. Taylor testified that he spoke with

2       Brady Dubois, the former CEO of Northern, --

3       do you remember -- were you working here

4       when Mr. Dubois was so employed? --

5   A   I was.

6   Q   -- that he spoke with Mr. Dubois and he

7       said, "We can't allow emergency room MRIs

8       for financial considerations," would you be

9       in a position to dispute Dr. Taylor's

10      testimony?

11          MS. HOSKINS:

12              Object to the form.

13          MR. BLANKENSHIP:

14              Object to the form.

15  A   I have no idea what conversation he had with

16      Brady.

17  Q   Would you have any reason to doubt

18      Dr. Taylor?

19          MR. BLANKENSHIP:

20              Same objection.

21  Q   So it seems that you, Dr. Alam and

22      Dr. Taylor all agree that it's very

23      difficult to obtain an MRI from the

24      emergency room.  Is that correct?

25  A   That's correct.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1        MR. BLANKENSHIP:

2            Object to the form.

3   Q   And as we discussed before, I'm a lawyer.

4  I'm not a doctor.  Tell me, if I come to you

5  and I present with something, some

6  conditions, and you say, "I want this test

7  run," where do you go?  Is it a computer

8  screen?  Is it a station where you write

9  handwritten notes?

10  A   It's a computer screen.

11       MS. HOSKINS:

12           Just for clarification, you're

13 talking about if you present to NLMC

14 emergency room?

15       MR. WOODARD:

16           I think he understands the question.

17  Q   You can go ahead.

18  A   Yeah.  We have a system called MEDHOST that

19 we do all of our documentation and we order

20 our tests through MEDHOST.

21  Q   Okay.  And MEDHOST is electronic?

22  A   Correct.

23  Q   And if you want to order a CT scan, you can

24 press a button?

25  A   Correct.

*Linda Perot, CCR*

16

1    Q    Are there any other type of diagnostic

2         images you can order with the press of a

3         button?

4    A    X-rays, some ultrasound.

5    Q    But there is no button on MEDHOST for MRIs?

6    A    There is not, not that I'm aware of.

7    Q    How often do you see or use that MEDHOST

8         software?

9    A    Every day.

10   Q    Daily?  And you've never --

11   A    Every day that I work, yes.

12   Q    Poor question.  And you've never noticed an

13        MRI button?

14   A    I have not.

15   Q    Have you ever inquired as to why there is no

16        MRI button?

17   A    I have not.

18   Q    Do you have any idea as you sit here today

19        why there is no MRI button?

20   A    It's just not a modality we use in the

21        emergency department.

22   Q    I can't remember their first names, but are

23        you familiar with Ms. Burns and Ms. Goss?

24   A    Yes.  Sandy Goss.

25   Q    Sandy Goss?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   Sandy Goss is her name.

2   Q   Okay.

3   A   I don't know who Burns is.

4   Q   Would you agree if they said all other

5       departments can order an MRI electronically

6       except the emergency room?

7           MR. BLANKENSHIP:

8               Object to the form.

9           MS. HOSKINS:

10              Object to the form.

11  A   I have no knowledge of other departments.

12  Q   Are you aware of any MRIs ever being ordered

13      from the emergency room by any physician?

14  A   I am not.

15  Q   And how long have you been at Northern?

16  A   On and off since 2005.

17  Q   Would it be fair to say that the ordering of

18      MRIs from the emergency department at

19      Northern is discouraged?

20          MR. BLANKENSHIP:

21              Object to the form.

22  A   I've never been discouraged.  It's just not

23      something that's typically available to us.

24  Q   Are you aware of -- let me ask this.  Have

25      you ever made any complaints to hospital

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1      administration that you would like to have

2      the option for an MRI?

3  A   I have not.

4  Q   Are you aware of any physicians who have

5      made such a complaint?

6  A   I am not.

7  Q   And you've never requested an MRI out of the

8      emergency room?

9  A   I have not.

10 Q   But since 2005, you have had some patients

11     where they presented with symptoms where you

12     would have like to have obtained an MRI?

13        MS. HOSKINS:

14           Object to the form.

15 A   Normally, I can rule in or out conditions

16     with what's available to me in CAT scan or

17     plain x-ray enough to give the patient a

18     really need to be for that MRI.  So through

19     the nature of MRI, it's not something that

20     we can do quickly in the emergency room.

21 Q   The MRI machine is right down the hallway

22     from the emergency department.  Correct?

23 A   I honestly don't know.

24 Q   If Dr. Taylor testified that the MRI machine

25     is right down the hallway from the emergency

*Linda Perot, CCR*

19

1       department, would you be in any position to

2       dispute that?

3  A  I would not.

4  Q  If Dr. Taylor testified that "This is the

5       21st Century; we ought to be able to obtain

6       an MRI from the emergency department," would

7       you agree with that?

8           MR. BLANKENSHIP:

9              Object to the form.

10       MS. HOSKINS:

11            Object to the form.

12  A  That's his statement.  I don't -- I've never

13       worked in an emergency room where MRI was

14       available to me.

15  Q  How many emergency rooms have you worked in?

16  A  Six or seven.

17  Q  If a hospital advertises and markets that it

18       has MRIs available for all patients,

19       inpatients and outpatients, would it be fair

20       for patients to expect that they can obtain

21       an MRI from the emergency room?

22           MR. BLANKENSHIP:

23              Object to the form.

24       MS. HOSKINS:

25            Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   It's not an emergency procedure.

2   Q   I understand.  But my question was, if a

3       hospital advertises that they provide MRIs

4       for all patients, inpatients, outpatients,

5       emergency, non-emergency, would it be fair

6       for patients to expect that they can obtain

7       an emergency room MRI?

8           MR. BLANKENSHIP:

9               Same objection.

10  A   I don't really know how to answer that.  I

11      mean, they can advertise whatever they want,

12      I suppose.  It's just not something we use

13      through the emergency room.  It's available

14      for inpatients; it's available for

15      outpatients.  But whatever they advertise,

16      it's just not something we do in the ER.

17  Q   But you wouldn't condone it as a good

18      medical practice to falsely advertise what

19      services a hospital can or can't offer.

20      Correct?

21          MS. HOSKINS:

22              Object to the form.

23          MR. BLANKENSHIP:

24              Object to the form.

25  A   Correct.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647 acourtreporter2@gmail.com

Exhibit "1"

1   Q   Are you -- do you have any knowledge at all
2       about the case that I'm here on today?
3   A   I do not.
4   Q   Have you ever heard of Jordan Scott?
5   A   I've heard the name strictly because I know
6       that's the case that I'm here for today.
7   Q   Are you aware she's a patient who presented;
8       at the time, she was twelve years old?  And,
9       according to Dr. Taylor's testimony, he
10      wanted an MRI at around 9 a.m. and an MRI
11      was not conducted until nearly 3 p.m.?
12          MS. HOSKINS:
13              Object to the form.
14          MR. BLANKENSHIP:
15              Same objection.
16  A   I have no knowledge of the case.
17  Q   Are you aware that that girl is now
18      paralyzed for the rest of her life?
19  A   I am not.
20  Q   Would you agree that's a tragic case?
21          MR. BLANKENSHIP:
22              Object to the form.
23          MS. HOSKINS:
24              Object to the form.
25  A    I do agree.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
 1   Q    Doctor, you are trained to help people.

 2        Correct?

 3   A    Correct.

 4   Q    You're not trained on how to give

 5        depositions?

 6   A    I'm not.

 7   Q    Right now, you're thinking about "What am I

 8        going to do once I get out of this

 9        deposition and what am I going to walk into

10        in the emergency department?"  Correct?

11   A    I don't work today, thankfully.

12   Q    You're not working today.  If you were

13        working today, you walk in every day not

14        knowing what's going to present itself?

15   A    Correct.

16   Q    You're holding a cup of coffee in your hand.

17        When you're working, you may be drinking a

18        cup of coffee, and then all of a sudden

19        things go from tranquil to a gunshot wound

20        comes in and you've got all hands on deck?

21   A    Correct.

22   Q    And you've got to use your expertise, your

23        medical judgment to try to help that person?

24   A    Correct.

25   Q    You've got to assess the situation, diagnose
```

*Linda Perot, CCR*

23

1      the problem, and then treat the problem.
2      Correct?
3   A  Correct.
4   Q  And you've been educated.  You've been
5      trained.  You have experience to help deal
6      with those medical issues?
7   A  Correct.
8   Q  Is it true that sometimes business decisions
9      can get in the way of you exercising -- or a
10     doctor exercising his medical judgment?
11         MS. HOSKINS:
12             Object to the form.
13         MR. BLANKENSHIP:
14             Object to the form.
15  A  Not with me.
16  Q  Have you ever wanted to do something,
17     provide treatment to a particular patient
18     and been handcuffed by a particular
19     administrative or business decision?
20  A  Yes.  I'm sure that I have, but I can't
21     think of a specific example.
22  Q  And that's more of where I was going with my
23     question.  Again, I'm asking you to assume
24     instead of making you read all this
25     deposition testimony.  I'm trying to move

*Linda Perot, CCR*

24

Exhibit "1"

1    things along so you can get out of here.  If

2    Dr. Taylor testified he wanted to order an

3    MRI as early as, say, 9 a.m., he made the

4    request to order an MRI, he was denied his

5    request for an MRI, and when he was told why

6    his requests were denied it was because of

7    administrative financial consideration.  I

8    want you to assume those things.  If that's

9    true, would that be an instance where a

10   physician's medical judgment was being

11   handcuffed by a business decision?

12        MR. BLANKENSHIP:

13             Object to the form.

14        MS. HOSKINS:

15             Object to the form.

16   A   Assuming all those things are true, yes, it

17   would be.

18   Q   Okay.  And sometimes, those business or

19   administrative decisions are made by people

20   who never went to medical school like you?

21        MR. BLANKENSHIP:

22             Object to the form.

23   A   Yes.

24   Q   People who never went to medical school like

25   Dr. Taylor or Dr. Alam.  Correct?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   Correct.

2   Q   And sometimes, those administrative and

3       business decisions are made without any

4       consultation with people who went to medical

5       school such as yourself, Dr. Alam and Dr.

6       Taylor?

7           MR. BLANKENSHIP:

8               Object to the form.

9   A   Yes.

10  Q   And when those decisions are adopted, y'all

11      pretty much have to just go with the hands

12      you are dealt.  Correct?

13  A   Correct.

14  Q   Okay.  Again, I'm asking you to accept as

15      true Dr. Taylor's testimony that Mr. Dubois

16      told him, "We, as a hospital, cannot grant

17      or order MRIs from the emergency room for

18      financial considerations."  Assuming that is

19      true, would it be fair to say that that

20      policy does not involve an assessment of

21      each particular patient's condition?

22          MR. BLANKENSHIP:

23              Object to the form.

24          MS. HOSKINS:

25              Object to the form.

*Linda Perot, CCR*

26

1    A    If it's a global policy, then I guess it

2         doesn't involve individual patients.

3    Q    And if Jordan Scott presented --

4              MR. WOODARD:

                    Y'all help me.   August 19th?

5              MR. BLANKENSHIP:

6                   That's right.

7    Q    If Jordan Scott presented August 19th of

8         2014 and that policy I'm asking you to

9         assume exists, that would not have been

10        applied for her specific case.   Correct?

11             MR. BLANKENSHIP:

12                  Object to the form.

13

14   A    Correct.

15   Q    It wouldn't have been applied during the

16        scope of her particular treatment?

17             MR. BLANKENSHIP:

18                  Same objection.

19   A    I suppose.

20   Q    If that policy exists, that would be an

21        administrative or a business decision

22        without consideration of any medical

23        judgment?

24             MS. HOSKINS:

25                  Object to the form.

*Linda Perot, CCR*                                    27

1      MR. BLANKENSHIP:

2           Same objection.

3   A   If it exists, yes.

4   Q   And I think you used the word "globally."

5   If it's applied globally or universally,

6   that would mean that it's being done so

7   without specific considerations of each

8   specific patient.   Correct?

9   A   Correct.

10  Q   And if Dr. Taylor says the policy exists and

11  the hospital says it doesn't exist, that

12  would require a credibility call between the

13  two.   Correct?

14      MS. HOSKINS:

15           Object to the form.

16      MR. BLANKENSHIP:

17           Object to the form.

18  A   I suppose.

19  Q   I'm trying to move along.

20      MR. WOODARD:

21           I'm going to show you what's been

22      marked as "Exhibit 5."

23  Q   Are you aware that Northern Louisiana

24  Medical Center has a website?

25  A   Not directly, no.   I've never seen it.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  Q   I'll represent to you that this is taken off
2      Northern's website.  Do you see the top
3      line?  It says, "Magnetic Resonance
4      Imaging?"
5  A   I do.
6  Q   Is that what lay folks like me refer to as
7      an MRI?
8  A   Yes.
9  Q   Look in the second paragraph.  It says,
10     "Northern has been offering MRIs as a part
11     of the diagnostic imaging department since
12     1994, and today we serve both inpatients and
13     outpatients."  Do you see that?
14 A   I do.
15 Q   When Jordan Scott was presenting to the
16     emergency department in August of 2014,
17     would she be considered an inpatient or an
18     outpatient?
19 A   She was an emergency room patient.
20 Q   So inpatient?
21 A   She doesn't really fall into either
22     category.
23 Q   Assuming she was admitted?
24 A   If she was admitted, she would be an
25     inpatient.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   Q    Okay.  And you see 1994.  If Dr. Taylor

2        testified that, "Look, this is the 21st

3        Century; we ought to be able to have access

4        to an MRI," that would be consistent with

5        Northern's own website.  Correct?

6             MR. BLANKENSHIP:

7                  Object to the form.

8   A    Correct.

9             MR. WOODARD:

10                 I next want to show you "Exhibit 6,"

11        which is another caption of Northern's

12        website.

13  Q    Look at the top.  It says, "Diagnostic

14        Imaging."  Correct?

15  A    Yes.  Correct.

16  Q    And if you see down toward the bottom, it

17        says, "Why should I have my imaging exam

18        done in an accredited facility?"  Northern

19        is an accredited facility.  Correct?

20  A    I don't know.

21  Q    Okay.  According to this website?

22            MR. BLANKENSHIP:

23                 Object.  Speaks for itself.

24            MR. WOODARD:

25                 That's fair.

*Linda Perot, CCR*

30

1   Q   Do you see the line I've highlighted there,

2        "ACR gold standards of gold seals of

3        accreditation?"

4   A   I do.

5   Q   ACR, is that the American College of

6        Radiology?

7   A   Yes.

8   Q   Are you aware that accreditation is required

9        for providers that bill for MRIs under

10       Medicare?

11   A   I am not.

12          MR. WOODARD:

13             I want to show you "Exhibit 8."

14  (OFF RECORD DISCUSSION.)

15   Q   "Exhibit 8" is entitled *The ACR*

16        *Appropriateness Criteria*.  Do you see that?

17   A   I do.

18   Q   And again, that's the American College of

19        Radiology?

20   A   Yes.

21   Q   And whenever you, as an emergency room

22        physician, want to order diagnostic imaging,

23        do you work with your radiology department?

24   A   I do.

25   Q   Okay.

1    MR. WOODARD:

2        I now want to show you "Exhibit 9,"

3    which is a screen shot from another part

4    of that article.

5    Q   It looks like the ACR has defined

6    "appropriateness" on when imaging is or is

7    not required.  Do you see that highlighted

8    paragraph at the top?

9    A   I do.

10   Q   And in the paragraph toward the bottom, that

11   speaks to rating appropriateness.  Do you

12   see that?

13   A   I do.

14   Q   Do you see the highlighted line toward the

15   bottom that says, "The direct or indirect

16   cost of a procedure are not considered as a

17   risk or harm when determining -- " quote,

18   unquote, " -- 'appropriateness'."

19   A   I do.

20   Q   Does that make sense to you?

21   A   Yes.

22   Q   And do you think that's how things ought to

23   be, especially in the emergency department,

24   considerations based on a financial -- or

25   excuse me.  Strike that.  Financial

*Linda Perot, CCR*

32

1  considerations should not be considered when

2  deciding which treatment to offer to a

3  particular patient?

4      MS. HOSKINS:

5          Object to the form.

6      MR. BLANKENSHIP:

7          Same objection.

8  A   I do.

9  Q   You do agree with that?

10 A   I do agree with it.

11 Q   And I'm not trying to trick you.  If you

12     look at "Exhibit 9," I have one question

13     here.  The top paragraph, "The concept of

14     appropriateness as applied to health care."

15     It's the second sentence of the first

16     paragraph.  Do you see that?

17 A   I do.

18 Q   Do you understand the difference, if any,

19     between appropriateness and health care, or

20     does there appear to be a difference in this

21     article between appropriateness and the

22     practice of medicine?

23 A   I'm not sure what you mean.

24 Q   I'm not sure what I mean either.  What does

25     that sentence mean to you?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  A They are defining appropriateness in the

2    setting of health care.

3  Q And in that definition, they say costs are

4    not to be considered. Correct?

5     MR. BLANKENSHIP:

6      Object to the form.

7  A I don't believe it mentions cost at all in

8    that paragraph.

9  Q I'm sorry. In the writing appropriate

10    paragraph.

11  A Yes.

12  Q Have you ever heard of precertification?

13  A I have.

14  Q What is your understanding of what

15    precertification means?

16  A I think it's normally when someone has a

17    test that's ordered on a non-emergency basis

18    and the insurance company can require sort

19    of oversight to see if that procedure is

20    appropriate.

21  Q Precertification is required or used in non-

22    emergent basises?

23  A That's my understanding.

24     MR. BLANKENSHIP:

25      Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    Is it your understanding that requiring

2         precertification in emergency basis would be

3         inappropriate?

4              MR. BLANKENSHIP:

5                  Object to the form.

6    A    Yes.

7    Q    And it would be inappropriate because it

8         would delay or deny possibly pressing or

9         emergency medical needs to inquire into

10        insurance?

11   A    Yes.

12   Q    And I'm guessing, as an emergency room

13        physician, you are trained and educated on

14        what I would call EMTALA?

15   A    Yes.

16   Q    What is your understanding of what EMTALA

17        is?

18   A    It's a series of laws or rules, I guess,

19        that state that we have to do everything

20        within our power to determine that somebody

21        is medically stable before you would then

22        deny treatment to them, I suppose, or refer

23        them somewhere else for treatment.

24   Q    Right.  And you've been trained on that.

25        You've been educated on that.  And you've

*Linda Perot, CCR*

35

Exhibit "1"

1    been told, as an emergency room physician,

2    you have different duties than a non-

3    emergency doctor.  Correct?

4    A    Correct.

5          MS. HOSKINS:

6             Object to the form.

7    Q    And those duties include you can't dump a

8    patient just because he or she doesn't have

9    insurance or money.  Correct?

10   A    Correct.

11   Q    And you can't deny screening examinations to

12   a patient just because he or she does not

13   have money or insurance.  Correct?

14   A    Correct.

15   Q    If there is necessary treatment that's

16   available, you provide it without regard for

17   insurance or for payment.  Correct?

18   A    Correct.

19   Q    In your training and education of EMTALA,

20   are you trained or informed on how to

21   identify when there has been an EMTALA

22   violation?

23   A    Yes.  I think so.

24         MR. WOODARD:

25            On "Exhibit 10," I have another

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    screen shot from Northern's website on
2    the precertification issue.  This seems
3    to echo what you were saying.  It says,
4    "You may preregister online at least
5    three business days in advance of your
6    requested procedure date."  That does
7    not seem to speak to emergency
8    procedures.  Correct?
9         MR. BLANKENSHIP:
10             Object to the form.  It speaks for
11        itself.
12   A    Correct.
13   Q    Emergencies, you don't get three day's
14   notice.  Correct?
15   A    Correct.
16   Q    And so, applying this precertification in an
17   emergency setting would be kind of a square
18   peg in a round hole?
19   A    Correct.
20        MS. HOSKINS:
21             Excuse me.  Do you want to turn your
22        speaker down?
23   (OFF RECORD DISCUSSION).
24        MR. WOODARD TO MR. SHOENFELT:
25             Hey, Oscar.

*Linda Perot, CCR*

37

1   MR. SHOENFELT:

2        Yes?

3   MR. WOODARD:

4        Mute your phone for me.  And I'm not

5   trying to hush you up, just in case you

6   need to engage.

7   MS. HOSKINS:

8        Just for clarification, Oscar is on

9   your cell phone listening.

10  MR. WOODARD:

11       That's right.

12  MR. WOODARD:

13       Now, "Exhibit 11" is a screen shot

14  from Northern's website.

15  Q   And this also seems to echo what you were

16  saying.  The part at the bottom, "If you

17  don't have insurance, no one will be denied

18  necessary medical care due to lack of

19  insurance or inability to pay."  Do you see

20  that?

21  A   I do.

22  Q   That's what you've been trained to do as an

23  ER physician?

24  A   Correct.

25  Q   That's consistent with your Hippocratic

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    oath?

2  A    Correct.

3  Q    And a policy or a practice or even a single

4       instance in violation of that would

5       constitute an EMTALA violation.   Correct?

6           MS. HOSKINS:

7               Object to the form.

8           MR. BLANKENSHIP:

9               Object to the form.

10 Q    I can rephrase the question.   Accepting

11      Dr. Taylor's testimony as true that there

12      was an emergency condition, that the MRI was

13      available, that the MRI was requested, that

14      the MRI was denied because of insurance

15      inquiries, it's your understanding that

16      would result in an EMTALA violation.

17      Correct?

18          MS. HOSKINS:

19              Object to the form.

20          MR. BLANKENSHIP:

21              Object to the form.

22 A    Yes.

23          MR. WOODARD:

24              "Exhibit 12."

25 Q    Northern Louisiana Medical Center represents

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  on its website the thirty minutes or less

2  pledge.  Have you ever seen that?

3  A  I have.

4  Q  And that basically says you're going to get

5  meaningful service within thirty minutes.

6  You're going to be treated on an as-needed

7  basis based on the severity of the condition

8  presented.  Correct?

9      MS. HOSKINS:

10          Object to the form.

11      MR. BLANKENSHIP:

12          Object to the form.

13  A  I think what it means is that you will be

14  seen and triaged within thirty minutes of

15  your arrival to the emergency department.

16  Q  You will be seen and triaged within thirty

17  minutes.  And then, after that, you're going

18  to be pigeonholed into, okay, here is a

19  runny nose, and then on the other end of the

20  continuum we've got a heart attack or

21  neurological deficits, something like that.

22  Correct?

23  A  Correct.

24      MR. BLANKENSHIP:

25          Object to the form.

*Linda Perot, CCR*                                  40

Exhibit "1"

1  Q   With this thirty-minute pledge in mind, if

2      Dr. Taylor testified that he wanted an MRI

3      for a twelve-year-old girl with neurological

4      deficits in her hands and feet as early as

5      9 a.m. and she did not obtain the MRI until

6      3 p.m., do you think that would be

7      consistent with the thirty-minute pledge?

8          MS. HOSKINS:

9              Object to the form.

10         MR. BLANKENSHIP:

11             Object to the form.

12  A   I don't think the pledge applies to that as

13      long as she was seen and triaged within

14      thirty minutes of her arrival to the ER.

15  Q   Okay.  Do you think that would be

16      consistent, the scenario I just gave to you,

17      MRI requested as early as 9 a.m., not

18      conducted until 3 p.m. with emergency

19      progressing neurological deficits in a

20      twelve-year-old girl?  Do you think that gap

21      in time is consistent with best practices at

22      Northern Louisiana Medical Center's

23      emergency department?

24         MS. HOSKINS:

25             Object to the form.

*Linda Perot, CCR*

41

MR. BLANKENSHIP:

Object to the form.

A    Again, an MRI is not something that is available to us through the emergency room.

Q    Fair point.  That would be an instance where, assuming those facts as true, request at 9:00, MRI finally given at 3:00, if you accept Dr. Taylor's testimony, he was doing everything he could to try to get the MRI in that time frame.  But because of a business decision at the hospital, he could not get it, --

MR. BLANKENSHIP:

Object to the form.

Q    -- assuming those facts as true.  Is that correct?

A    That's correct.

Q    Now, I know you feel like you're probably banging your head against the wall and I'm almost done, but it's my understanding you say "MRIs can't be ordered from the emergency room department because that's not a modality we use."  Is that a fair characterization of your testimony?

A    Yes.

*Linda Perot, CCR*

1    Q   And you don't know -- you don't know why

2        that's something that's not available to

3        y'all?

4            MS. HOSKINS:

5               Object to the form.

6            MR. BLANKENSHIP:

7               Same objection.

8    A   No, not directly.

9    Q   Can you think of any legitimate reason if

10       the radiology department is right down the

11       hall, the MRI machine is right down the

12       hall, why you can't have access to that in

13       the special cases where you may need it as

14       an emergency room physician?

15           MS. HOSKINS:

16              Object to the form.

17           MR. BLANKENSHIP:

18              Same objection.

19    A   I don't know exactly how to answer that.

20       It's just always been we try to use another

21       modality that's faster in itself to try to

22       rule out emergency conditions.  A CT can be

23       done in a few minutes whereas an MRI takes,

24       you know, a half hour or an hour, you know,

25       to do the procedure.  So typically, we use

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1      the faster modality to try to rule in or out

2      an emergency condition, and then move on to

3      the next step.

4  Q   But there are certain things that an MRI

5      will pick up that a CT scan will not pick

6      up.  Correct?

7  A   Correct.

8  Q   And, say, blood thickness, the density of

9      blood around, say, a spinal cord.  That may

10     be an incident where you can run a CT scan

11     and it won't pick up, but an MRI would

12     definitely pick that up.  Correct?

13  A   I'm not a radiologist, so I'm not sure about

14     that.

15  Q   Sure.

16  A   My understanding is that I think blood --

17     acute blood shows up fairly well on a CAT

18     scan, but there certainly may be things that

19     an MRI would pick up that a CAT scan can't.

20  Q   Which test is typically more expensive, a CT

21     scan or an MRI?

22  A   I have no direct knowledge of that.

23  Q   Do you have any knowledge -- when you say

24     you have no direct knowledge, do you have

25     any indirect knowledge?

*Linda Perot, CCR*

44

1  A   No, not really.  I honestly have no idea
2      what things cost.
3  Q   Okay.  Who would be the best person to ask
4      that?
5  A   I guess someone in the billing department.
6      I don't -- I don't really know.
7  Q   Who is in charge of the billing department?
8  A   I have no idea.
9  Q   You don't know?
10 A   No.
11 Q   It sounds like you walk into work like I do,
12     ready to get in and get out.
13 A   That's right.
14 Q   But I think you said, in an ideal world, you
15     would like to have the option to press a
16     button and get an MRI if a particular case
17     came in front of you and you decided you
18     wanted one.  Correct?
19         MR. BLANKENSHIP:
20             Object to the form.
21         MS. HOSKINS:
22             Object to the form.
23 A   Yes.
24 Q   You said an MRI can take thirty minutes to
25     an hour to conduct?

*Linda Perot, CCR*

45

1    A   Yes.

2    Q   And a CT scan about fifteen minutes?

3    A   Closer to five, probably, for most CTs.

4    Q   Okay.  What about an x-ray?

5    A   A few seconds.

6          MR. WOODARD:

7             Can we go off the record real quick?

8    I'd like to talk with my counsel.

9          MS. HOSKINS:

10          Sure.

11          MR. BLANKENSHIP:

12          Sure.

13  (OFF RECORD.)

               EXAMINATION

14

15  BY MR. WOODARD, continuing:

16    Q   All right.  Doctor, a few more questions and

17    you're off.  If a -- I want you to put

18    yourself in Dr. Taylor's shoes.  If a young

19    twelve-year-old girl comes in with

20    progressing neurological deficits in her

21    hands and feet and you have reason to

22    believe there is a compression of the cord

23    which would require an MRI, what would you

24    do to try to get an MRI ordered and

25    conducted for that patient?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    MS. HOSKINS:

2        Object to the form.

3    MR. BLANKENSHIP:

4        Same objection.

5    A    Assuming all of those things, should have

6    two options.  I could probably call and try

7    to talk to the radiologist directly and see

8    if that's something that we could get done,

9    or transfer her to a facility where an MRI

10   is routinely available, assuming I knew all

11   of this.

12   Q    And who would you call when you say "and

13   talk to the radiologist"?

14   A    Whoever was on duty for that day.  Or I may

15   call and try to talk with the orthopaedic

16   surgeon to see if they could order the MRI.

17   Q    And if the request to radiology and the

18   request to another physician were denied,

19   you would then say, "Look, I recommend this

20   patient for transfer"?

21   A    Assuming all of those things, yes, probably.

22   Q    Okay.  Are there any written rules on when

23   you can order an MRI from the emergency

24   room?

25   A    I don't know.  I have not seen a written

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1      rule.

2   Q   And remind me.  You've been here off and on

3      since 2005?

4   A   I have.

5   Q   Any training on when you can or cannot order

6      an MRI from the emergency room?

7          MR. BLANKENSHIP:

8              Here at the hospital or in general

9          as part of his medical training?

10  Q   I think he understands the question.

11  A   No.  I don't think there's any specific

12      training.  It's just sort of what I've

13      experienced in practice.

14  Q   Is it your understanding that a patient has

15      to be admitted to obtain an MRI?

16  A   At this facility.

17  Q   At Northern?

18  A   Correct.  Or done on an outpatient basis.

19  Q   Which would be a non-emergency setting.

20  A   Correct.

21  Q   So, the only way an emergency room MRI can

22      be conducted at this facility is admitting

23      the patient?

24          MS. HOSKINS:

25              Object to the form.

*Linda Perot, CCR*

MR. BLANKENSHIP:

Join the objection.

A   That wouldn't be an emergency room MRI.

Q   Sure. You said that an MRI is different from the other tests in that it can be done in fifteen to thirty minutes.  Are there also some additional benefits to MRIs as opposed to a CT scan and an x-ray?

A   Yes, there are things we can see on an MRI that we can't see on the other two.

Q   And that's why I think you used the phrase "ideal world."  You'd like to be able to have that option.  Correct?

MR. BLANKENSHIP:

Object to the form.

A   Correct.

Q   Have you ever discussed with anyone at the hospital -- doctors, nurses, administration why MRIs are not available on the software that you mentioned?

MS. HOSKINS:

Object to the form.

MR. BLANKENSHIP:

Same objection.

A   I have not.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   Q   When you were a resident, did you ever order

2       an MRI from the emergency room?

3   A   I don't know for sure.  I trained at a much

4       larger facility, so it's possible.

5   Q   Aside from being a slightly longer test, can

6       you think of any other reason as to why you

7       would not be allowed to order an MRI from

8       the emergency room?

9           MR. BLANKENSHIP:

10            Object to the form.

11          MS. HOSKINS:

12            Object to the form.

13   A   Normally, we can rule in or out what we need

14       to based on other modalities.

15   Q   But you would agree, in an emergency

16       department, there's really no such thing as

17       normal.  Correct?  You get new cases every

18       day.

19   A   Correct.

20   Q   All right.  Let me make sure I understand

21       this note from my counsel.  Are you

22       testifying that the emergency department

23       here does not include determining if a

24       patient needs a MRI on an emergency basis if

25       that is available to an in-patient?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   I'm not sure I understand the question.

2   Q   I don't either.  I'll move on.  And again,

3       you said, if you need an MRI, you've got to

4       admit the patient.  Correct?

5   A   Correct.

6   Q   And so, that would be an administrative

7       decision where Northern has not allowed the

8       emergency department to order an MRI.

9       Correct?

10          MR. BLANKENSHIP:

11              Object to the form.

12  A   I'm not sure where the decision came from.

13      It's not my decision.

14  Q   You're not aware that it was Dr. Alam's

15      decision?

16  A   No.

17  Q   You're not aware that it was Dr. Taylor's

18      decision?

19  A   No.

20  Q   You're not aware of any physician who said

21      hey, we don't want to be able to order an

22      MRI?

23  A   Correct.

24  Q   Would it be safe to assume that that came

25      from administration?

*Linda Perot, CCR*

51

Exhibit "1"

1    A    Or the radiology department, possibly.

2    Q    And if the radiology department said that

3         was not its decision, it'd be safe to assume

4         that came from the business department or

5         administration at Northern?

6              MR. BLANKENSHIP:

7                   Same objection.

8    A    Yes.

9    Q    Would you agree with Dr. Taylor's testimony

10        if he said that minutes can be critical when

11        you're talking about compression of the

12        spinal cord in a patient such as a twelve

13        year old girl with progressing neurological

14        deficits?

15             MS. HOSKINS:

16                  Object to the form.

17             MR. BLANKENSHIP:

18                  Same objection.

19   A    Yes, I would agree with that.

20   Q    And so, your options that you're allowed as

21        an emergency room physician, if you're ever

22        presented with a situation that requires an

23        MRI, you either call radiology, you call

24        another doctor such as an ortho, or you

25        transfer.  Correct?

*Linda Perot, CCR*                                    52

1   A   Yes.

2   Q   And all three of those decision take a

3   significant amount of time.

4   A   Correct.

5   Q   The actual call to radiology, is that you

6   pick up your cell phone and you call them or

7   do you have a phone in your office?

8   A   At the nurses' station.

9   Q   All right.  And if you call her and she

10   denies and says we can't do that, then you

11   call the doctor and he says we can't do

12   that, that's several minutes which have

13   passed.  Correct?

14   A   Correct.

15   Q   And then, if you transfer, where would you

16   transfer the patient?

17   A   Typically, LSU-Shreveport.

18   Q   And that's about an hour and a half drive,

19   if you're booking it.  Correct?

20   A   About an hour.

21   Q   By helicopter, how long are we talking?

22       MR. BLANKENSHIP:

23           Object to the form.  Calls for

24       speculation.

25   A   I think it's about twenty or thirty minutes.

*Linda Perot, CCR*

53

Exhibit "1"

1    Q    And you're aware of instances where patients

2         have been transferred from here to

3         Shreveport by helicopter?

4    A    Yes.

5    Q    And you're aware of both the time they've

6         left and the time they've arrived,

7         generally?

8    A    Generally.

9    Q    So, it wouldn't call for speculation on your

10        part, would it?

11   A    I suppose not.

12   Q    But those are the only three options you

13        have available, calling radiology, calling

14        another doctor, and transferring the

15        patient.   Correct?

16   A    Correct.

17   Q    And all three of those options take time.

18   A    Correct.

19   Q    Time in a situation, a hypothetical I'll

20        pose to you, where minutes are very

21        critical.

22   A    Correct.

23   Q    Okay.

24             MR. WOODARD:

25                  Thank you, Doctor.

*Linda Perot, CCR*

54

1    MS. HOSKINS:

2         Trey?

3    MR. ZEIGLER:

4         No questions.

5    MR. BLANKENSHIP:

6         Good morning, Dr. Calvert.  Again,

7    I'm Kurt Blankenship and I represent the

8    hospital.  I do have some questions for

9    you.

                    EXAMINATION

10

11   BY MR. BLANKENSHIP:

12   Q    Touching on the helicopter flights to

13        Shreveport, you have ridden on those

14        helicopter flights with the patient?

15   A    Not to Shreveport; no, sir.

16   Q    So your understanding of the time frame

17        involved is just a general understanding you

18        have, not based on any personal knowledge of

19        yours.  Correct?

20   A    Yes, sir.

21   Q    All right.  You've said several times in

22        your testimony this morning that you can

23        rule out conditions faster using other

24        modalities than an MRI.  Is that a fair

25        understanding of what you said?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647 acourtreporter2@gmail.com

Exhibit "1"

1    A    Yes.

2    Q    And you've told us that the CAT scan can

3    take just a few minutes; x-rays just a few

4    seconds, and the MRI takes longer, thirty

5    minutes to an hour.

6    A    Yes.

7    Q    So, my sense from what you're saying, my

8    understanding of what you're saying, in

9    general, is that because you're in an

10    emergency room setting, you generally go to

11    the faster tests that you as the physician

12    believes will rule in or out a condition or

13    a possible diagnosis and ascertain faster

14    whether the condition is present or not.

15    Correct?

16    A    Correct.

17    Q    And that's why you would normally order the

18    CT first, because that rules in or out a

19    number of modalities.   Correct?

20    A    Correct.

21    Q    You would agree with me, wouldn't you,

22    Doctor, that a radiologist is, by virtue of

23    his specialized -- his or her specialized

24    training and experience, better qualified

25    than an ER physician to determine what

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    medical conditions are best ruled in and out

2    by an MRI?

3         MR. WOODARD:

4              Object to form.

5    A   They certainly have more specialized

6        training than we do.

7    Q   Okay.  And they have more specialized

8        training in interpreting MRIs than you do as

9        an ER physician.

10   A   Correct.

11   Q   Do you ever, as an ER physician, interpret

12       the MRI itself?

13   A   Not an MRI, no.

14   Q   But you do interpret tests?

15   A   Preliminary interpretations.  They're always

16       over rid by a radiologist.

17   Q   It's fair to say, isn't it, that you rely on

18       the radiologist to give sort of a definitive

19       interpretation of either the CAT scan or the

20       MRI?

21   A   Correct.

22   Q   Now, you were asked what would your options

23       be if a twelve year old girl presented with

24       neurological deficits and you described

25       those for us, and I want to go back over

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  just a couple of them.  First of all, your

2  decision making path would depend, wouldn't

3  it, on a number of things that you as the ER

4  physician learn or see as part of your

5  treatment and examination of the patient.

6  And, by that, I mean first you'd be looking

7  at the history the patient gave you.

8  A  Correct.

9  Q  Then you'd be relying on your clinical

10  assessment of the patient in whether or not

11  neurological deficits are demonstrated.

12  Correct?

13  A  Correct.

14  Q  And then, based on your training and

15  experience, that information, the history

16  and your clinical assessment, would lead you

17  down one of several paths as to what further

18  testing you would want to do to make a more

19  definitive diagnosis.  Correct?

20  A  Correct.

21  Q  And that's the normal course of events for

22  ER physicians when they're treating and

23  examining patients in the ER.  Correct?

24  A  Correct.

25  Q  All right.  And one of those options that's

*Linda Perot, CCR*

58

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    available to you is to consult with a

2    specialist.   Correct?

3  A    Correct.

4  Q    All right.  And there at Northern Louisiana

5    Medical Center, in August of 2014, there was

6    an orthopaedic surgeon available to consult

7    with.  Right?  Dr. Major Blair?

8  A    I'm not certain, you know, who was on call

9    that day or when he -- he's gone from this

10    facility and I don't know when he left.

11  Q    Let me make it just a general question.

12    Generally, are there specialists available

13    to consult with?

14  A    We only have one orthopaedist on staff right

15    now, so he's on call sometimes and he's not

16    other times.  I believe at that particular

17    time there was probably coverage every day

18    for orthopaedics.

19  Q    Okay.  But an orthopaedic surgeon would be

20    one of the types of specialists that you

21    could potentially consult as an ER physician

22    when you're confronted with a suspected

23    spinal cord injury. Correct?

24  A    Correct.

25  Q    All right.  And that physician may or may

*Linda Perot, CCR*

59

1   not decide to order an MRI himself.

2   Correct?

3  A   Correct.

4  Q   And you've also testified earlier that

5   you've worked in six or seven emergency

6   rooms in the course of your career?

7  A   Yes.

8  Q   When did you start practicing emergency

9   medicine?

10  A   I believe 1999.

11  Q   All right.  And you've been here since 2005.

12   That's what you told us.  Correct?

13  A   Correct.

14  Q   All right.

15      MS. HOSKINS:

16          I think he said "off and on" --

17      MR. BLANKENSHIP:

18          Okay.

19      MS. HOSKINS:

20          -- since 2005.

21      MR. BLANKENSHIP:

22          All right.

23  Q   Have you worked in other emergency rooms

24   that are part of a facility that is

25   comparable to Northern Louisiana Medical

*Linda Perot, CCR*

60

Exhibit "1"

1    Center?  And, by that, I'm just trying to

2    distinguish between a facility like

3    LSU-Shreveport and a facility like just a

4    rural clinic.  You know, there's a spectrum

5    of facilities available.

6  A  Most of the other facilities I have worked

7    at have had more options available than

8    Northern Louisiana Medical Center.

9  Q  Okay.  And when you say "options available,"

10   are you --

11 A  Specialty services available.

12 Q  Right, that's what I was getting at.  You're

13   talking about they might have neurologists

14   on staff or they might have neurosurgeons on

15   staff, things like that.

16 A  Correct.

17 Q  Okay.  Now, you were asked if you were

18   trained to identify EMTALA violations.  And

19   he first asked you -- EMTALA is a federal

20   law, is it not?

21 A  It is.

22 Q  All right.  And you're not trained in the

23   practice of law.  Correct?

24 A  I am not.

25 Q  And you're not called upon to determine

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   whether certain fact scenarios constitute a
2   violation of the law or not.   Correct?

3   A   I'm not.

4   Q   You have a basic understanding as a
5   physician of what EMTALA obligates you as a
6   physician to do.   Correct?

7   A   Correct.

8   Q   And to summarize that obligation, is it fair
9   to say that it's basically to triage and
10  stabilize the patient within the
11  capabilities of the facility.   Correct?

12  A   Correct.

13  Q   And that process, the triage unit and the
14  stabilization of the patient is to be done
15  without consideration for finances.
16  Correct?

17  A   Correct.

18  Q   All right.   And that's what you believe you
19  do here as the ER physician at Northern
20  Louisiana Medical Center.   Correct?

21  A   Correct.

22  Q   You never ask a patient, I'm going to order
23  this test, can you pay for it?

24  A   No, I don't.

25  Q   That's never a consideration for you?

*Linda Perot, CCR*

62

Exhibit "1"

1    A    No, it's not.

2    Q    And I take it that in your practice as an

3         emergency room physician here at the

4         hospital at Northern Louisiana Medical

5         Center, you don't get involved in any

6         decisions about whether a test is going to

7         be paid for by the patient's insurance

8         company or the patient himself or not.

9    A    I don't, no.

10   Q    You're not trained or familiar with the

11        requirements of various health insurers and

12        their contracts with their patients in the

13        hospital.  Correct?

14   A    I am not.

15   Q    You were asked a number of questions about

16        administration making decisions versus

17        physicians making decisions.  Let me phrase

18        it to you this way:  You as the physician,

19        it's your prerogative, isn't it, to assess

20        the patient and make the appropriate

21        diagnosis.  Correct?

22   A    Correct.

23   Q    And it's your prerogative to order what

24        tests you believe are necessary to make that

25        diagnosis, if they're within the capability

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1           of the hospital.   Correct?

2    A     Correct.

3    Q     And it's your prerogative as the physician

4           to decide whether a patient could best be

5           treated for a specific condition at another

6           facility.   Correct?

7    A     Correct.

8    Q     And then, recommend or order the transfer.

9           Correct?

10   A     Correct.

11   Q     And that happens all the time for an

12          emergency room physician.   Correct?

13   A     Correct.

14   Q     You said, I believe, that you don't have any

15          knowledge of the specifics of this case.

16          Correct?

17   A     Correct.

18   Q     And just to be clear for the record, you

19          have not reviewed the medical chart for

20          Jordan Scott's visit to the emergency room

21          on August 19, 2014?

22   A     I have not.

23   Q     I believe you said at one point, if I wrote

24          it down correctly, that you've never worked

25          in an ER where the MRI is available.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1      Correct?

2   A  Correct.

3   Q  So, if that is the policy or the practice

4      here, and I'm not suggesting that it is, but

5      if it is, it's not unusual in your

6      experience, is it?

7   A  Correct.

8   Q  I want to show you, Dr. Calvert, a document

9      that was identified and attached as an

10     exhibit in a previous deposition in this

11     case.  I'll give you a minute to take a look

12     at it, but I'll represent to you while

13     you're looking at it that this is a list of

14     MRIs ordered through the emergency room here

15     at Northern Louisiana Medical Center from

16     roughly 2013 to 2016 that was generated from

17     the hospital's computer system.  And, as you

18     can see, the name of the patient is redacted

19     from this document.  If you look at the

20     first page of this attachment, the third

21     line down indicates that you, yourself,

22     ordered an MRI through the emergency room on

23     April 28th, 2014.  Let me first ask you, you

24     treat, in the course of any shift in the ER,

25     anywhere from ten or so patients to maybe

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1  multiple tens of patients.  Correct?

2  A  Typically, twenty-five patients or so.

3  Q  And you normally do how many ER shifts a

4  month?

5  A  Sixteen to eighteen.

6  Q  So, just roughly doing the math, you take

7  care of at least several hundred patients

8  per month every month.  Correct?

9  A  Correct.

10  Q  And it would be straining or taxing the

11  ability of anyone to remember all the

12  specifics of the patients that they treat.

13  Correct?

14  A  Correct.

15  Q  All right.  So, with that by way of

16  background, first let me ask if you

17  specifically recall ordering a brain MRI

18  without contrast for a patient on

19  April 28th, 2014?

20  A  I do not.

21  Q  But, given this list, do you have any reason

22  to believe that the hospital computer system

23  is inaccurate when it says that such an MRI

24  was ordered?

25  A  I do not.  But my suspicion is that that was

Exhibit "1"

1      ordered as an in-patient.

2   Q   Okay.  There's a code that allows us to

3      determine whether they were in-patient or

4      outpatients but it shows you as the ordering

5      physician.  Correct?  And the other people

6      listed in the ordering physician column, let

7      me ask you about some of these.  First of

8      all, you'll notice that Dr. Alam's office --

9      I mean, name appears many times.  Do you see

10      that?

11   A   I do.

12   Q   Are you familiar with Dr. Holly Kidd?

13   A   I am.

14   Q   And who is that?  Is that another ER

15      physician?

16   A   No, it's not.  She's a Green Clinic Internal

17      Medicine doctor.

18   Q   All right.  And Dr. Martin Blackwelder?

19   A   Green Clinic Internal Medicine.

20   Q   You see Dr. Taylor's name there?

21   A   I do.

22   Q   And then, Dr. Jacqueline White?

23   A   I do.

24   Q   Who is that?

25   A   She's an emergency room doctor.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    And what about Dr. Beau Burton?

2    A    He's a -- I believe a nurse practitioner in

3         the ER.

4    Q    Okay.  Does he work with your group?

5    A    He does.

6    Q    Or for your group?  All right.  And

7         Dr. Regan Bonan?

8    A    Green Clinic Internal Medicine.

9    Q    Okay.  So, we've seen enough names to know

10        that the ordering physician here is a

11        mixture of Green Clinic Physicians and ER

12        physicians.  Correct?

13   A    Correct.

14   Q    All right.  And the list speaks for itself,

15        but you can verify for us, can't you, that a

16        number of the MRIs shown ordered here are of

17        the cervical spine.  Correct?

18   A    Yes.  It looks like three of them.

19   Q    Okay.  And then some are of the lumbar

20        spine.  Correct?

21   A    Correct.

22   Q    At least one is of the thoracic spine.

23   A    Correct.

24   Q    And then, a lot of them are either of the

25        head or the brain.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    A    Correct.

2    Q    Okay.  Does it happen sometimes,

3         Dr. Calvert, either in the emergency room

4         here at Northern Louisiana Medical Center or

5         others that if you believe an MRI might be

6         appropriate for a patient for whatever

7         reason, that you would call the radiologist

8         on duty and say, hey, I've got a patient

9         here.  This is what I'm seeing.  I think

10        maybe an MRI is in order.  What do you

11        think?  Does that happen?

12   A    Yes.

13   Q    All right.  And under those circumstances,

14        does the radiologist sometimes respond that

15        yeah, I agree.  Send him up.  We'll do an

16        MRI.  Or, try this first or anything like

17        that?

18   A    I can't remember a specific instance but,

19        yes, they would go over the possibilities,

20        you know, of potential things that we could

21        do to try to take care of the patient.

22   Q    Okay.  Is it fair to say that the

23        radiologist, the physician radiologist is

24        sort of the gatekeeper for determining

25        whether an MRI is appropriate for a patient?

*Linda Perot, CCR*

Exhibit "1"

1    A    I'm not sure that I would use the term

2        "gatekeeper," but they have, certainly, more

3        training to know whether the test is

4        appropriate or not.

5    Q    Okay.  You were asked a number of questions

6        about whether you had ever discussed the

7        unavailability, as you described, of MRIs

8        here with either administration or other

9        physicians, and I want to ask you about

10       that.  First of all, to use the term

11       "unavailability," it has different meanings

12       in my mind, so I want to clarify that.  An

13       MRI machine is present here in the hospital.

14       Correct?

15    A    Yes.

16    Q    And MRIs can be physically performed here in

17       the hospital.  Correct?

18    A    Correct.

19    Q    So, another way of saying "unavailability,"

20       as you've been describing it, of saying is

21       it's not normally ordered through the ER?

22       An MRI is not normally ordered through the

23       ER?

24    A    I have not ever ordered an MRI from the

25       emergency room.

*Linda Perot, CCR*

70

1   Q   That you recall?

2   A   I have not ever ordered an MRI other than on

3       an in-patient.

4   Q   Even though this computer sheet shows that

5       it was ordered for --

6           MR. WOODARD:

7               Object to form.  He's stated he

8           thinks that was an in-patient.

9   Q   I think you said you suspect it was an

10      in-patient.

11  A   It's not possible for me to order an MRI

12      from the emergency room; so if this shows up

13      under my name, chances are that was an MRI

14      written on admission orders.  And I write

15      for those every day.

16  Q   For a patient that is going to be admitted.

17  A   For a patient who's going to be admitted.

18  Q   Right.  And when you write the admission

19      orders under those circumstances, is that an

20      order that you, yourself, are generating,

21      for lack of a better way to describe it, or

22      is that an order that comes from another

23      physician?

24  A   I think technically it's from another

25      physician because we don't have admitting

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
1              privileges to the hospital.  As sort of part
2              of the customary procedure, we write what
3              we'll call "bridge orders" to get the
4              patient admitted to the hospital.  The order
5              technically comes from me, but it's on
6              behalf of the admitting physician.
7    Q    Okay.  It happens, though, sometimes that
8              you don't' actually talk to the admitting
9              physician when you're writing the bridge
10             orders, right?  You have sort of a standard
11             protocol for ordering sets of tests for
12             specific kinds of patients, right?
13   A    Yes, but we always discuss admissions with
14             the admitting physician.
15   Q    Okay.
16   A    But yes, there's a typical work up for a
17             heart patient or a --
18   Q    But you don't necessarily have to talk to
19             the admitting physician to know what that
20             is.  Correct?
21   A    Correct.
22   Q    Now, getting back to the questions about
23             discussions, have you ever discussed this
24             unavailability, as you've described it, of
25             the MRIs through the emergency room with
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

| | | |
|---|---|---|
| 1 | | other physicians here? |
| 2 | A | Not that I recall. |
| 3 | Q | Because, again, in your experience, it's not |
| 4 | | that unusual, right? |
| 5 | A | Correct. |
| 6 | Q | And I'm not sure you were asked this |
| 7 | | specific question, so I want to ask it: |
| 8 | | You've never had any discussion with anyone |
| 9 | | in hospital administration about |
| 10 | | unavailability of MRIs through the ER as you |
| 11 | | have described it in this testimony today? |
| 12 | A | I have not. |
| 13 | Q | And I think we know the answer to this |
| 14 | | question but, just to be sure, to get ready |
| 15 | | for this deposition today, you didn't review |
| 16 | | any physical documents.  Correct? |
| 17 | A | I did not. |
| 18 | | MR. BLANKENSHIP: |
| 19 | | Thank you, Dr. Calvert. |
| 20 | | MR. WOODARD: |
| 21 | | I've got a few follow-ups. |
| 22 | | WITNESS: |
| 23 | | Okay. |
| 24 | | MR. WOODARD: |
| 25 | | This sheet, what do you want to mark |

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    this, Mr. Blankenship?

2    **MR. BLANKENSHIP:**

3    Your last number was ten, I believe,

4    so we can make it eleven.

5    **COURT REPORTER:**

6    The last number was twelve.

7    **MR. BLANKENSHIP:**

8    Twelve?  Let's make it "13."

9    REEXAMINATION

10   BY MR. WOODARD:

11   Q   Okay.  This sheet right here, Doctor,

12   there's nothing showing what time any of

13   these MRIs were ordered.  Correct?

14   A   I don't believe so.

15   Q   There's nothing showing what time any of

16   these MRIs were conducted.  Correct?

17   A   Correct.

18   Q   So, if you're looking at this sheet,

19   Exhibit 13, there could have been a

20   five-minute delay between the order and the

21   MRI or there could have been a five-day

22   delay for all you know.  There is no

23   telling.

24   A   Correct.

25   Q   There's nothing on Exhibit 13 that shows

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   whether these MRIs required precertification

2   or did not require precertification.

3   Correct?

4   A   Correct.

5   Q   And of these few MRIs that purportedly come

6   from the ER in Exhibit 13, it looks like at

7   least seven of them dealt with the spine.

8   Correct?

9   A   Correct.

10   Q   And you understand that the MRI that

11   Dr. Taylor wanted in this case addressed the

12   thumbar area of the spine?

13        MS. HOSKINS:

14             Object to the form.

15   A   Lumbar?

16   Q   "Thumbar."   Thoracic.

17   A   Thoracic.

18   Q   Hey, that's that new area that I invented

19   between thoracic and lumbar.

20   A   I'm not sure what he ordered.   I honestly

21   don't have any knowledge.

22   Q   Assume that he wanted the thoracic area of

23   the spine to be examined.   That would be

24   consistent with the few MRIs that exist on

25   Exhibit 13.   Correct?

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1   A   There is a thoracic spine MRI on it.

2   Q   Okay.  And then, several other areas, the

3       cervical and the lumbar.  Correct?

4   A   Correct.

5   Q   And so, that would suggest that at least the

6       brain and the spine are areas where you may

7       need an MRI on certain occasions?

8           MS. HOSKINS:

9               Object to the form.

10          MR. BLANKENSHIP:

11              Same objection.

12  A   Correct.

13  Q   An MRI is a diagnostic screening

14      examination.  Correct?

15  A   I don't know about a "screening"

16      examination.  It's a diagnostic examination.

17  Q   Diagnostic.

18  A   You don't use them to screen for anything

19      that I'm aware of.

20  Q   I said "screening."  Diagnostic imaging

21      examination?

22  A   Correct.

23  Q   And when we were talking about

24      unavailability, it's physically available at

25      Northern Louisiana Medical Center.  Correct?

*Linda Perot, CCR*

76

Exhibit "1"

1    A    There is a machine here.

2    Q    There is a machine here and it's relatively

3         close to the emergency department.   Correct?

4    A    I'm not aware of it's location.

5    Q    You would not be in a position to dispute or

6         argue with Dr. Taylor whenever he describes

7         where the MRI machine is located?

8    A    I would not.

9    Q    And so, while it's physically available, for

10        all practical respects, it's not available

11        to you in the emergency department.

12        Correct?

13             MR. BLANKENSHIP:

14                  Object to the form.

15   A    Correct.

16   Q    And that's because, due to an administrative

17        business decision, you are not available to

18        press a button and order an MRI from the

19        emergency department?

20             MS. HOSKINS:

21                  Object to the form.

22             MR. BLANKENSHIP:

23                  Object to the form.

24   A    I'm not sure where the decision came from.

25        I just know it's not available.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    It didn't come from the doctors.  Correct?

2    A    Correct.

3    Q    Who orders the software?

4    A    I assume administration.

5    Q    And so, if the software is ordered by

6         administration and the software doesn't have

7         a button that allows you to order an MRI, it

8         would be safe to say that administration has

9         made the decision to not allow emergency

10        room doctors to order an MRI?

11             MR. BLANKENSHIP:

12                  Object to the form.

13   A    Again, I'm not sure who made the decision

14        not to include it.

15   Q    You've seen no evidence based on the

16        software ordered by the administration that

17        they want to allow you to be able to order

18        an MRI from the emergency room?

19             MR. BLANKENSHIP:

20                  Object to the form.

21   A    Correct.

22   Q    We talked about the delay in an MRI, fifteen

23        to thirty minutes, typically?

24   A    That's how long it takes to perform the

25        actual MRI.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    Q    Okay.  That would, of course, be a shorter
2         time frame than several hours.  Correct?
3    A    Correct.
4    Q    And so, even if it's not the fastest test
5         available, if under certain circumstances
6         it's the best test available, that would be
7         better than having a patient sit around and
8         wait seven hours.
9              MS. HOSKINS:
10                  Object to the form.
11             MR. BLANKENSHIP:
12                  Same objection.
13   A    Correct.
14   Q    Especially a patient with progressing
15        neurological defects.
16   A    Correct.
17   Q    Would it be very frustrating for you as a
18        physician if you were presented with a
19        patient who you thought, in your medical
20        judgment, using your training, your
21        expertise required an MRI and, because of
22        hospital policies and procedures, you were
23        not able to get an MRI?
24             MR. BLANKENSHIP:
25                  Object to the form.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

```
1    A    Yes.

2    Q    And would it keep you up at night knowing

3         that that policy has now left a teenage girl

4         paralyzed for the rest of her life?

5             MS. HOSKINS:

6                 Object to the form.

7             MR. BLANKENSHIP:

8                 Object to the form.

9    A    Yes.

10   Q    You have a daughter yourself.  Correct?

11   A    I do.

12   Q    That would be very troubling to you?

13   A    Yes.

14            MR. WOODARD:

15                No further questions.

16            (WITNESS ELECTED TO READ AND SIGN.)

17

18                    DEPOSITION CONCLUDED AT 9:30 A.M.

19

20

21

22

23

24

25
```

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

**REPORTER'S PAGE**

I, LINDA PEROT, Certified Court Reporter No. 23012, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

_____
LINDA PEROT, CCR No. 23012

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094   Tel. 318-348-7647   acourtreporter2@gmail.com

Exhibit "1"

## CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature And required official seal stamped on this certificate.

I, LINDA PEROT, Certified Court Reporter, Certificate No. 23012, as the officer before whom this testimony was taken, do hereby certify that **EDWARD CALVERT, M.D.,** after having been duly sworn by me upon authority of R.S. 37:2554, did appear on the 27th day of July, 2016, commencing at 8:06 a.m., and concluding at 9:30 a.m., as hereinbefore set forth in the foregoing 81 pages; that this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is true and correct to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the Board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1    compliance with the prohibition on contractual

2    relationships, as defined by Louisiana Code of

3    Civil Procedure Article 1434 and rules and

4    advisory opinions of the Board; that I have no

5    actual knowledge of any prohibited employment or

6    contractual relationship, direct or indirect,

7    between a court reporting firm and any party

8    litigant in this matter, nor is there any such

9    relationship between myself and a party litigant

10   in this matter; that I am not related to counsel

11   or to any of the parties hereto, I am in no

12   manner associated with counsel for any of the

13   interested parties to this litigation, and I am

14   in no way concerned with the outcome thereof.

15        West Monroe, Louisiana, on this the 18th

16   day of October, 2016.

17

18

19   _____

20   LINDA PEROT
     CERTIFIED COURT REPORTER

21   CERTIFICATE NO. 23012
     STATE OF LOUISIANA

22

23

24

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094   Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

1           WITNESS CERTIFICATE TO

2         OCTOBER 17, 2016, DEPOSITION OF

3              EDWARD CALVERT, M.D.

4         * * * * * * * * * * * * * * * * * * *

5

6       I, **EDWARD CALVERT, M.D.**, deponent in the

7    foregoing deposition, do hereby certify that the

8    same was submitted to me for examination; that I

9    have read the deposition and find it to be a

10   true and correct transcription of the testimony

11   as given by me on October 17, 2016, before Linda

12   Perot, Certified Court Reporter No. 23012, in

13   the matter of *Scott, et al. vs. Northern*

14   *Louisiana Medical Center, et al.,*, with the

15   exception of any corrections noted on the

16   attached errata sheet.

17

18       ( )  No Corrections

19       ( )  Corrections

20

21   _____          _____

22   Date                EDWARD CALVERT, M.D.

23

24

25

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

| | | DEPOSITION ERRATA SHEET TO OCTOBER 17, 2016 DEPOSITION OF EDWARD CALVERT, M.D. | | |
|---|---|---|---|---|
| Page | Line | Now Reads | Should Read | Reason for Change |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_____         _____
(Date)              EDWARD CALVERT, M.D.

*Linda Perot, CCR*

105 Comanche Circle, West Monroe, LA 71291-7094  Tel. 318-348-7647  acourtreporter2@gmail.com

Exhibit "1"

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 1

**A**

a.m 22:10 25:3 41:5,17 80:17 82:12,13
ability 14:7 66:11 82:18
able 20:5 30:3 49:12 51:21 78:17 79:23
accept 26:14 42:8
Accepting 39:10
access 30:3 43:12
accompanied 82:3
accreditation 31:3,8
accredited 30:18 30:19
ACR 5:11,12,14 31:2,5,15 32:5
acted 82:25
actual 8:8 53:5 78:25 83:5
acute 44:17
additional 49:7
address 7:9
addressed 75:11
administration 19:1 49:18 51:25 52:5 63:16 70:8 73:9 78:4,6,8 78:16
administrative 24:19 25:7,19 26:2 27:21 51:6 77:16
admission 71:14 71:18
admissions 72:13
admit 51:4
admitted 29:23

29:24 48:15 71:16,17 72:4
admitting 13:3 48:22 71:25 72:6,8,14,19
adopted 26:10
advance 37:5
advertise 21:11 21:15,18
advertises 20:17 21:3
advised 6:20
advisory 83:4
ago 9:3
agree 11:15,18 15:22 18:4 20:7 22:20,25 33:9,10 50:15 52:9,19 56:21 69:15
agreed 6:2
ahead 10:1 16:17
Alam 5:4 7:25 8:2,10,12,21 11:15 15:21 25:25 26:5
Alam's 9:1 51:14 67:8
allow 15:7 78:9 78:17
allowed 50:7 51:7 52:20
allows 14:6 67:2 78:7
American 31:5 31:18
amount 12:10 53:3
and/or 81:5,13 81:19
answer 6:9 9:6 10:11 21:10 43:19 73:13
answers 6:16

appear 33:20 82:11
APPEARAN...
2:1 3:1
appearing 2:6 2:17,23 3:5
appears 67:9
applied 27:11,15 28:5 33:14
applies 41:12
applying 37:16
appropriate 34:9,20 63:20 69:6,25 70:4
appropriateness 5:11,12,14 31:16 32:6,11 33:14,19,21 34:1
appropriatene...
32:18
April 65:23 66:19
area 75:12,18,22
areas 76:2,6
argue 77:6
arrangement 82:23
arrangements 82:24
arrival 40:15 41:14
arrived 54:6
article 32:4 33:21 81:5 83:3
as-needed 40:6
ascertain 56:13
Aside 50:5
asked 9:21 57:22 61:17,19 63:15 70:5 73:6
asking 24:23 26:14 27:9

aspect 14:13,25
assess 23:25 63:19
assessment 26:20 58:10,16
associated 83:12
assume 9:18 11:3 24:23 25:8 27:10 51:24 52:3 75:22 78:4
assuming 25:16 26:18 29:23 42:6,15 47:5 47:10,21
attached 5:6,7 5:10 65:9
attachment 65:20
attack 40:20
attempted 12:4 12:24
ATTORNEY 2:9
August 27:5,8 29:16 59:5 64:21
authority 82:10
available 11:20 11:22,25 12:11 12:13,20,22 18:23 19:16 20:14,18 21:13 21:14 36:16 39:13 42:4 43:2 47:10 49:19 50:25 54:13 59:1,6 59:12 61:5,7,9 61:11 64:25 76:24 77:9,10 77:17,25 79:5 79:6
Avenue 1:20 7:11

aware 17:6 18:12,24 19:4 22:7,17 28:23 31:8 51:14,17 51:20 54:1,5 76:19 77:4

**B**

back 11:14 57:25 72:22
background 66:16
banging 42:19
based 32:24 40:7 50:14 55:18 58:14 78:15
basic 62:4
basically 40:4 62:9
basis 10:5 13:15 13:24 34:17 35:2 40:7 48:18 50:24
basises 34:22
Baton 2:10
Beau 68:1
behalf 1:6 2:23 72:6
believe 8:13 34:7 46:22 59:16 60:10 62:18 63:24 64:14,23 66:22 68:2 69:5 74:3 74:14
believes 56:12
benefits 49:7
BERNSTEIN 2:20
best 41:21 45:3 57:1 64:4 79:6 82:18
better 56:24 71:21 79:7

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 2

bill 31:9
billing 45:5,7
**Blackwelder** 67:18
**Blair** 59:7
**BLANCHARD** 3:3
**Blankenship** 2:18 4:7,13 10:2,10 11:9 14:10,22 15:13 15:19 16:1 18:7,20 20:8 20:22 21:8,23 22:14,21 24:13 25:12,21 26:7 26:22 27:6,12 27:17 28:1,16 30:6,22 33:6 34:5,24 35:4 37:9 39:8,20 40:11,24 41:10 42:1,13 43:6 43:17 45:19 46:11 47:3 48:7 49:1,14 49:23 50:9 51:10 52:6,17 53:22 55:5,7 55:11 60:17,21 73:18 74:1,2,7 76:10 77:13,22 78:11,19 79:11 79:24 80:7
blood 44:8,9,16 44:17
**BLUE** 2:14
**Board** 82:22 83:4
**Bonan** 68:7
booking 53:19
bottom 30:16 32:10,15 38:16
**Boulevard** 2:15
**Brady** 1:11 15:2

15:16
**brain** 66:17 68:25 76:6
**BREITHAUPT** 2:3
**bridge** 72:3,9
**Brookhaven** 7:11
**Burns** 17:23 18:3
**Burton** 68:1
**business** 24:8,19 25:11,18 26:3 27:21 37:5 42:10 52:4 77:17
**button** 13:9 16:24 17:3,5 17:13,16,19 45:16 77:18 78:7

---

**C**

call 2:8 28:12 35:14 47:6,12 47:15 52:23,23 53:5,6,9,11 54:9 59:8,15 69:7 72:3
called 16:18 61:25
calling 54:13,13
**Calls** 53:23
**Calvert** 1:15 6:3 6:19 7:1,11 55:6 65:8 69:3 73:19 82:9
capabilities 62:11
capability 63:25
caption 30:11
care 33:14,19 34:2 38:18 66:7 69:21
career 60:6

**case** 9:21 22:2,6 22:16,20 27:11 38:5 45:16 64:15 65:11 75:11
**cases** 43:13 50:17
**CAT** 13:25 14:1 19:16 44:17,19 56:2 57:19
**category** 29:22
**Causeway** 2:15
**CCR** 81:25
**cell** 38:9 53:6
**Center** 1:10,20 2:13 7:18,21 28:24 39:25 59:5 61:1,8 62:20 63:5 65:15 69:4 76:25
**Center's** 41:22
**Century** 20:5 30:3
**CEO** 15:2
**certain** 8:1 44:4 59:8 62:1 76:7 79:5
certainly 44:18 57:5 70:2
certificate 1:24 82:1,5,7 83:21
certification 82:2
**Certified** 1:23 7:2 81:2 82:6 83:20
certify 82:8
cervical 68:17 76:3
chances 71:13
changes 81:12
characterizati... 42:24
charge 45:7

chart 64:19
circumstances 69:13 71:19 79:5
**Civil** 6:6 81:5,6 83:3
clarification 16:12 38:8
clarify 70:12
clear 64:18
clinic 61:4 67:16 67:19 68:8,11
clinical 58:9,16
close 77:3
**Closer** 46:3
code 67:2 81:6 83:2
coffee 23:16,18
**College** 31:5,18
column 67:6
come 16:4 75:5 78:1
comes 23:20 46:19 71:22 72:5
commencing 82:12
company 1:10 34:18 63:8
comparable 60:25
complaint 19:5
complaints 18:25
complete 82:23
compliance 82:20 83:1
compression 46:22 52:11
computer 13:6 16:7,10 65:17 66:22 71:4
concept 33:13
concerned 83:14
**CONCLUDED**

80:17
concluding 82:12
condition 26:21 39:12 40:7 44:2 56:12,14 64:5
conditions 13:18 14:1 16:6 19:15 43:22 55:23 57:1
condone 21:17
conduct 45:25
conducted 14:16 22:11 41:18 46:25 48:22 74:16
**CONFEREN...** 2:8
confirmation 14:6,18
confirmed 14:19
confronted 59:22
connection 6:14
consideration 25:7 27:22 62:15,25
considerations 9:23 15:8 26:18 28:7 32:24 33:1
considered 29:17 32:16 33:1 34:4
consistent 6:7 30:4 38:25 41:7,16,21 75:24
constitute 39:5 62:1
consult 59:1,6 59:13,21
consultation 26:4

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 3

**CONTINUED**
3:1
**continuing**
46:15
**continuum**
40:20
**contracts** 63:12
**contractual** 83:1
83:6
**contrast** 66:18
**conversation**
15:15
**cord** 44:9 46:22
52:12 59:23
**correct** 7:19
13:9,10 14:19
15:24,25 16:22
16:25 19:22
21:20,25 23:2
23:3,10,15,21
23:24 24:2,3,7
25:25 26:1,12
26:13 27:11,14
28:8,9,13 30:5
30:8,14,15,19
34:4 36:3,4,9
36:10,13,14,17
36:18 37:8,12
37:14,15,19
38:24 39:2,5
39:17 40:8,22
40:23 42:16,17
44:6,7,12
45:18 48:18,20
49:13,16 50:17
50:19 51:4,5,9
51:23 52:25
53:4,13,14,19
54:15,16,18,22
55:19 56:15,16
56:19,20 57:10
57:21 58:8,12
58:13,19,20,23
58:24 59:2,3
59:23,24 60:2

60:3,12,13
61:16,23 62:2
62:6,7,11,12
62:16,17,20,21
63:13,21,22
64:1,2,6,7,9,10
64:12,13,16,17
65:1,2,7 66:1,8
66:9,13,14
67:5 68:12,13
68:17,20,21,23
69:1 70:14,17
70:18 72:20,21
73:5,16 74:13
74:16,17,24
75:3,4,8,9,25
76:3,4,12,14
76:22,25 77:3
77:12,15 78:1
78:2,21 79:2,3
79:13,16 80:10
82:18
**correctly** 64:24
**cost** 32:16 34:7
45:2
**costs** 34:3
**counsel** 6:2,4
46:8 50:21
83:10,12
**couple** 58:1
**course** 58:21
60:6 65:24
79:1
**court** 1:1,23 7:3
74:5 81:2,14
82:6 83:7,20
**coverage** 59:17
**credibility** 28:12
**Criteria** 5:11,13
5:15 31:16
**critical** 52:10
54:21
**CT** 9:7 13:9,17
16:23 43:22
44:5,10,20

46:2 49:8
56:18
**CTs** 46:3
**cup** 23:16,18
**customary** 72:2

**D**

**D** 2:4
**Daily** 17:10
**dashes** 81:11,15
**date** 37:6
**daughter** 80:10
**day** 17:9,11
23:13 47:14
50:18 59:9,17
71:15 82:11
83:16
**day's** 37:13
**days** 37:5
**deal** 24:5
**dealt** 26:12 75:7
**decide** 60:1 64:4
**decided** 45:17
**deciding** 33:2
**decision** 24:19
25:11 27:21
42:11 51:7,12
51:13,15,18
52:3 53:2 58:2
77:17,24 78:9
78:13
**decisions** 24:8
25:19 26:3,10
63:6,16,17
**deck** 23:20
**defects** 79:15
**DEFENDANT**
2:13,19 3:2
**Defendants** 6:5
**deficits** 40:21
41:4,19 46:20
52:14 57:24
58:11
**defined** 32:5
81:4 83:2

**defining** 34:1
**definitely** 44:12
**definition** 34:3
**definitive** 57:18
58:19
**DEGAN** 3:3
**delay** 14:5 35:8
74:20,22 78:22
**delayed** 9:22
**demonstrated**
58:11
**denied** 9:22 25:4
25:6 38:17
39:14 47:18
**denies** 53:10
**denoted** 81:21
**density** 44:8
**deny** 35:8,22
36:11
**department** 9:9
17:21 18:18
19:22 20:1,6
23:10 29:11,16
31:23 32:23
40:15 41:23
42:22 43:10
45:5,7 50:16
50:22 51:8
52:1,2,4 77:3
77:11,19
**departments**
18:5,11
**depend** 58:2
**deposition** 1:14
5:10 6:3,10,14
6:17,21 9:15
9:16 23:9
24:25 65:10
73:15 80:17
82:25
**depositions** 23:5
**describe** 71:21
**described** 57:24
70:7 72:24
73:11

**describes** 77:6
**describing** 70:20
**detail** 9:19
**determine** 35:20
56:25 61:25
67:3
**determining**
32:17 50:23
69:24
**dhoskins@de...**
3:6
**diagnose** 23:25
**diagnosis** 56:13
58:19 63:21,25
**diagnostic** 17:1
29:11 30:13
31:22 76:13,16
76:17,20
**difference** 33:18
33:20
**different** 36:2
49:4 70:11
**difficult** 15:23
**direct** 32:15
44:22,24 83:6
**direction** 82:17
**directly** 13:2
28:25 43:8
47:7
**discouraged**
18:19,22
**discourse** 81:11
**discuss** 13:2
72:13
**discussed** 16:3
49:17 70:6
72:23
**discussion** 31:14
37:23 73:8
**discussions**
72:23
**dishonesty** 8:20
**dispute** 15:9
20:2 77:5
**distinguish** 61:2

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD  CALVERT, M.D.
October 17, 2016

Page 4

**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**doctor** 7:7 13:4
16:4 23:1
24:10 36:3
46:16 52:24
53:11 54:14,25
56:22 67:17,25
74:11
**doctors** 49:18
78:1,10
**document** 65:8
65:19
**documentation**
16:19
**documents**
73:16
**doing** 42:8 66:6
**don't'** 72:8
**Donald** 2:23
**doubt** 15:17
**Dr** 5:4,5 8:10,10
8:12,12,21,21
9:1,15,20 11:4
11:12,15 15:1
15:9,18,21,22
19:24 20:4
22:9 25:2,25
25:25 26:5,5
26:15 28:10
30:1 39:11
41:2 42:8
46:18 51:14,17
52:9 55:6 59:7
65:8 67:8,12
67:18,20,22
68:1,7 69:3
73:19 75:11
77:6
**drinking** 23:17
**drive** 2:4 53:18
**Drs** 7:25
**DuBOIS** 1:11
15:2,4,6 26:15

**DuBOS** 2:3
**due** 38:18 77:16
81:10
**duly** 7:2 82:10
**dump** 36:7
**DUNN** 2:3
**duties** 36:2,7
**duty** 47:14 69:8

_____
E
_____

**E** 1:20
**E-Mail** 2:11,18
2:25 3:6
**earlier** 60:4
**early** 25:3 41:4
41:17
**echo** 37:3 38:15
**educated** 24:4
35:13,25
**education** 36:19
**Edward** 1:15
6:3,19 7:1,11
82:9
**eighteen** 66:5
**either** 13:2 14:6
29:21 33:24
51:2 52:23
57:19 68:24
69:3 70:8
**elected** 6:21
80:16
**electronic** 16:21
**electronically**
18:5
**eleven** 74:4
**Emergencies**
37:13
**emergency** 7:14
9:8 11:6,16,19
11:21 12:3,5,6
12:8,12,14,19
13:17,21,25
15:7,24 16:14
17:21 18:6,13
18:18 19:8,20

19:22,25 20:6
20:13,15,21
21:1,5,7,13
23:10 26:17
29:16,19 31:21
32:23 35:2,9
35:12 36:1,3
37:7,17 39:12
40:15 41:18,23
42:4,22 43:14
43:22 44:2
47:23 48:6,21
49:3 50:2,8,15
50:22,24 51:8
52:21 56:10
60:5,8,23 63:3
64:12,20 65:14
65:22 67:25
69:3 70:25
71:12 72:25
77:3,11,19
78:9,18
**emergent** 34:22
**employed** 15:4
**employee** 7:20
**employment**
83:5
**EMTALA** 35:14
35:16 36:19,21
39:5,16 61:18
61:19 62:5
**engage** 38:6
**entitled** 31:15
**entity** 82:24
**ER** 8:5 21:16
38:23 41:14
56:25 57:9,11
58:3,22,23
59:21 62:19
64:25 65:24
66:3 67:14
68:3,11 70:21
70:23 73:10
75:6
**especially** 32:23

79:14
**events** 58:21
**evidence** 6:11
78:15
**exactly** 10:9,13
43:19
**exam** 30:17
**examination** 4:3
4:6 7:5 46:14
55:10 58:5
76:14,16,16,21
**examinations**
36:11
**examined** 7:3
75:23
**examining** 58:23
**example** 24:21
**excerpts** 5:5
9:15,19
**excuse** 32:25
37:21
**exercise** 6:21
**exercising** 24:9
24:10
**exhibit** 5:1,4,5,6
5:7,8,9,10,11
5:12,14,16,17
5:18 9:14
11:14 28:22
30:10 31:13,15
32:3 33:12
36:25 38:13
39:24 65:10
74:19,25 75:6
75:25
**exist** 28:11
75:24
**exists** 27:10,20
28:3,10
**expect** 20:20
21:6
**expensive** 44:20
**experience** 24:5
56:24 58:15
65:6 73:3

**experienced**
48:13
**expertise** 23:22
79:21

_____
F
_____

**facilities** 61:5,6
**facility** 30:18,19
47:9 48:16,22
50:4 59:10
60:24 61:2,3
62:11 64:6
**fact** 62:1
**facts** 42:6,15
**fair** 18:17 20:19
21:5 26:19
30:25 42:5,23
55:24 57:17
62:8 69:22
**fairly** 44:17
**fall** 29:21
**falsely** 21:18
**familiar** 17:23
63:10 67:12
**fast** 9:10 11:16
**faster** 43:21
44:1 55:23
56:11,13
**fastest** 79:4
**federal** 6:5
61:19 81:5
**feel** 42:18
**feet** 41:4 46:21
**fifteen** 46:2 49:6
78:22
**finally** 42:7
**finances** 62:15
**financial** 9:23
14:12,24 15:8
25:7 26:18
32:24,25 82:23
**fine** 10:24
**firm** 83:7
**first** 7:2 17:22
33:15 56:18

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 5

58:1,6 61:19
65:20,23 66:16
67:7 69:16
70:10
**five** 46:3
**five-day** 74:21
**five-minute**
74:20
**flights** 55:12,14
**flip** 9:3
**folks** 29:6
**follow-ups**
73:21
**follows** 7:4
**foregoing** 82:14
**form** 6:8 9:25
10:6 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
33:5 34:6,25
35:5 36:6
37:10 39:7,9
39:19,21 40:10
40:12,25 41:9
41:11,25 42:2
42:14 43:5,16
45:20,22 47:2
48:25 49:15,22
50:10,12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**formalities** 6:13
**format** 82:21

**former** 15:2
**forth** 82:13
**found** 8:14
**frame** 42:10
55:16 79:2
**front** 45:17
**frustrating**
79:17
**further** 13:19
58:17 80:15

**G**

**G** 3:6
**gap** 41:20
**gatekeeper**
69:24 70:2
**general** 48:8
55:17 56:9
59:11
**generally** 54:7,8
56:10 59:12
**generated** 65:16
**generating**
71:20
**getting** 61:12
72:22
**girl** 22:17 41:3
41:20 46:19
52:13 57:23
80:3
**give** 19:17 23:4
57:18 65:11
**given** 9:23 42:7
66:21
**global** 27:1
**globally** 28:4,5
**go** 10:1 16:7,17
23:19 26:11
46:7 56:10
57:25 69:19
**going** 9:19 23:8
23:9,14 24:22
28:21 40:4,6
40:17 62:22
63:6 71:16,17

**gold** 31:2,2
**good** 7:7,8 21:17
55:6
**Gordon** 2:24
**Goss** 17:23,24
17:25 18:1
**grant** 26:16
**Green** 67:16,19
68:8,11
**GREGORY** 1:5
**group** 68:4,6
**guess** 27:1 35:18
45:5
**guessing** 35:12
**guidelines** 82:21
**gunshot** 23:19

**H**

**H** 2:23
**half** 43:24 53:18
**hall** 43:11,12
**hallway** 19:21
19:25
**hand** 23:16
**handcuffed**
24:18 25:11
**hands** 23:20
26:11 41:4
46:21
**handwritten**
16:9
**happen** 69:2,11
**happens** 64:11
72:7
**harm** 32:17
**head** 42:19
68:25
**health** 33:14,19
34:2 63:11
**heard** 11:11
22:4,5 34:12
**heart** 40:20
72:17
**helicopter** 53:21
54:3 55:12,14

**help** 23:1,23
24:5 27:5
**hereinbefore**
82:13
**hereto** 6:13
83:11
**hey** 37:25 51:21
69:8 75:18
**highlighted** 31:1
32:7,14
**Hippocratic**
38:25
**history** 58:7,15
**holding** 23:16
**hole** 37:18
**Holly** 67:12
**Honest** 8:18
**honestly** 19:23
45:1 75:20
**Hoskins** 3:6
4:10 9:24 10:7
10:12,19 11:7
12:15 14:8,20
15:11 16:11
18:9 19:13
20:10,24 21:21
22:12,23 24:11
25:14 26:24
27:24 28:14
33:4 36:5
37:20 38:7
39:6,18 40:9
41:8,24 43:4
43:15 45:21
46:9 47:1
48:24 49:21
50:11 52:15
55:1 60:15,19
75:13 76:8
77:20 79:9
80:5
**hospital** 1:10
18:25 20:17
21:3,19 26:16
28:11 42:11

48:8 49:18
55:8 63:4,13
64:1 66:22
70:13,17 72:1
72:4 73:9
79:22
**hospital's** 65:17
**hour** 12:2 43:24
43:24 45:25
53:18,20 56:5
**hours** 79:2,8
**Hudson** 2:20,21
**hundred** 66:7
**hush** 38:5
**hypothetical**
54:19

**I**

**idea** 13:8,11
14:24 15:15
17:18 45:1,8
**ideal** 12:1 45:14
49:12
**identified** 65:9
**identify** 36:21
61:18
**III** 2:23
**images** 17:2
**imaging** 29:4,11
30:14,17 31:22
32:6 76:20
**in-patient** 50:25
67:1,3 71:3,8
71:10
**inability** 38:19
**inaccurate**
66:23
**inappropriate**
35:3,7
**incident** 44:10
**include** 36:7
50:23 78:14
**INDEX** 4:1 5:1
**indicate** 81:12
81:16

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 6

indicates 65:21
indirect 32:15
  44:25 83:6
individual 27:2
INDIVIDUAL...
  1:6
info@shoenfel...
  2:11
information
  58:15
informed 36:20
  82:22
injury 59:23
inpatient 13:1
  13:14 29:17,20
  29:25
inpatients 13:23
  20:19 21:4,14
  29:12
inquire 35:9
inquired 17:15
inquiries 39:15
instance 8:20
  25:9 39:4 42:5
  69:18
instances 54:1
insurance 14:7
  34:18 35:10
  36:9,13,17
  38:17,19 39:14
  63:7
insurers 63:11
interaction
  81:10
interested 83:13
Internal 67:16
  67:19 68:8
interpret 57:11
  57:14
interpretation
  57:19
interpretations
  57:15
interpreting
  57:8

introduced 6:11
invented 75:18
investigation
  13:19
involve 26:20
  27:2
involved 55:17
  63:5
issue 8:8 37:2
issues 24:6
it'd 52:3

**J**
JACOB 2:19
Jacqueline
  67:22
James 2:24 3:2
join 10:3 49:2
Jordan 1:6,7
  22:4 27:3,8
  29:15 64:20
Jr 2:6
judgment 23:23
  24:10 25:10
  27:23 79:20
July 82:11

**K**
kblankenship...
  2:18
keep 80:2
Kidd 67:12
kind 7:23 8:7
  37:17
kinds 72:12
knew 12:9 47:10
know 14:12 18:3
  19:23 21:10
  22:5 30:20
  42:18 43:1,1
  43:19,24,24
  45:6,9 47:25
  50:3 59:8,10
  61:4 68:9
  69:20 70:3

72:19 73:13
  74:22 76:15
  77:25
knowing 23:14
  80:2
knowledge
  18:11 22:1,16
  44:22,23,24,25
  55:18 64:15
  75:21 83:5
known 8:10,12
  8:21
Kurt 2:18 55:7

**L**
L 2:9,24
lack 38:18 71:21
Lane 2:21
larger 50:4
law 2:9 61:20,23
  62:2
laws 35:18
lawyer 16:3
lay 29:6
lead 58:16
learn 58:4
left 54:6 59:10
  80:3 81:17
legitimate 43:9
Let's 74:8
level 13:20
life 22:18 80:4
LINDA 1:23 7:2
  81:2,25 82:6
  83:19
line 29:3 31:1
  32:14 65:21
Lines 9:4
list 65:13 66:21
  68:14
listed 67:6
listening 38:9
litigant 83:8,9
litigation 83:13
LLC 1:10

LLP 7:24
located 77:7
location 77:4
long 8:10 9:3
  18:15 41:13
  53:21 78:24
longer 9:9 50:5
  56:4
look 11:14 29:9
  30:2,13 33:12
  47:19 65:11,19
looking 58:6
  65:13 74:18
looks 32:5 68:18
  75:6
lot 68:24
Louisiana 1:2,9
  1:10,20,21,24
  2:4,10,13,16
  2:21 3:4 7:12
  7:14,17,21
  28:23 39:25
  41:22 59:4
  60:25 61:8
  62:20 63:4
  65:15 69:4
  76:25 81:3,6
  83:2,15,22
LSU-Shrevep...
  53:17 61:3
lumbar 68:19
  75:15,19 76:3

**M**
M 2:19
M.D 1:15 2:19
  3:2 6:3,19 7:1
  82:9
machine 19:21
  19:24 43:11
  70:13 77:1,2,7
Magnetic 29:3
Major 59:7
making 10:16
  24:24 58:2

63:16,17 82:24
manner 6:7
  83:12
mark 73:25
marked 8:25
  28:22
markets 20:17
Martin 67:18
Maryann 3:6
material 81:20
math 66:6
matter 83:8,10
mean 10:20
  12:22 21:11
  28:6 33:23,24
  33:25 58:6
  67:9
meaningful 40:5
meanings 70:11
means 34:15
  40:13
med 9:9
MEDHOST
  16:18,20,21
  17:5,7
medical 1:9,20
  2:13 7:18,21
  21:18 23:23
  24:6,10 25:10
  25:20,24 26:4
  27:22 28:24
  35:9 38:18
  39:25 41:22
  48:9 57:1 59:5
  60:25 61:8
  62:20 63:4
  64:19 65:15
  69:4 76:25
  79:19
medically 35:21
Medicare 31:10
medicine 33:22
  60:9 67:17,19
  68:8
mentioned

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 7

11:12 49:20
**mentions** 34:7
**Metairie** 2:16
**method** 81:14
82:16
**MICHELLE**
1:5
**mind** 41:1 70:12
**MINOR** 1:6
**minute** 65:11
**minutes** 5:17
12:2 40:1,5,14
40:17 41:14
43:23 45:24
46:2 49:6
52:10 53:12,25
54:20 56:3,5
78:23
**mixture** 68:11
**modalities** 50:14
55:24 56:19
**modality** 17:20
42:23 43:21
44:1
**money** 36:9,13
**Monroe** 1:3 2:4
2:21 83:15
**month** 66:4,8,8
**morning** 7:7,8
55:6,22
**move** 24:25
28:19 44:2
51:2
**MRI** 9:7,8,21
11:19 12:1,3,4
12:7,24 13:12
14:3 15:23
17:13,16,19
18:5 19:2,7,12
19:18,19,21,24
20:6,13,21
21:7 22:10,10
25:3,4,5 29:7
30:4 39:12,13
39:14 41:2,5

41:17 42:3,7,9
43:11,23 44:4
44:11,19,21
45:16,24 46:23
46:24 47:9,16
47:23 48:6,15
48:21 49:3,4,9
50:2,7,24 51:3
51:8,22 52:23
55:24 56:4
57:2,12,13,20
60:1 64:25
65:22 66:17,23
69:5,10,16,25
70:13,22,24
71:2,11,13
74:21 75:10
76:1,7,13 77:7
77:18 78:7,10
78:18,22,25
79:21,23
**MRIs** 11:5,15
14:4,15 15:7
17:5 18:12,18
20:18 21:3
26:17 29:10
31:9 42:21
49:7,19 57:8
65:14 68:16
70:7,16 72:25
73:10 74:13,16
75:1,5,24
**multiple** 66:1
**Mute** 38:4

**N**

**name** 7:9 18:1
22:5 65:18
67:9,20 71:13
**names** 17:22
68:9 81:19
**NASH** 3:3
**nature** 12:3
19:19
**nearly** 22:11

**necessarily**
72:18
**necessary** 10:22
13:5 36:15
38:18 63:24
**need** 19:18 38:6
43:13 50:13
51:3 76:7
**needs** 13:19 35:9
50:24
**negative** 14:1
**neurological**
40:21 41:3,19
46:20 52:13
57:24 58:11
79:15
**neurologists**
61:13
**neurosurgeons**
61:14
**never** 17:10,12
18:22 19:7
20:12 25:20,24
28:25 62:22,25
64:24 73:8
**new** 3:4 50:17
75:18
**night** 80:2
**NLEP** 7:24
**NLMC** 16:13
**non-** 34:21 36:2
**non-emergency**
21:5 34:17
48:19
**normal** 50:17
58:21
**normally** 19:15
34:16 50:13
56:17 66:3
70:21,22
**North** 1:20 2:15
7:14
**Northern** 1:9
2:13 7:17,21
14:5,16 15:2

18:15,19 28:23
29:10 30:18
39:25 41:22
48:17 51:7
52:5 59:4
60:25 61:8
62:19 63:4
65:15 69:4
76:25
**Northern's** 29:2
30:5,11 37:1
38:14
**nose** 40:19
**note** 50:21
**notes** 16:9
**notice** 6:4 37:14
67:8
**noticed** 17:12
**number** 56:19
58:3 63:15
68:16 70:5
74:3,6
**nurse** 68:2
**nurses** 49:18
**nurses'** 53:8

**O**

**oath** 39:1
**Object** 9:25 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
30:23 33:5
34:6,25 35:5
36:6 37:10
39:7,9,19,21
40:10,12,25
41:9,11,25

42:2,14 43:5
43:16 45:20,22
47:2 48:25
49:15,22 50:10
50:12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**objection** 10:3,6
10:16 11:10
12:16 14:9,21
14:23 15:20
21:9 22:15
27:18 28:2
33:7 43:7,18
47:4 49:2,24
52:7,18 76:11
79:12
**objections** 4:9
6:8
**obligates** 62:5
**obligation** 62:8
**obtain** 15:23
20:5,20 21:6
41:5 48:15
**obtained** 19:12
**occasion** 12:7
**occasions** 76:7
**October** 1:16
83:16
**offer** 21:19 33:2
**offered** 6:11
**offering** 29:10
**office** 53:7 67:8
**officer** 81:4 82:7
**official** 82:4
**okay** 7:17 8:2
9:11,18 10:18
11:14 16:21
18:2 25:18
26:14 30:1,21
31:25 40:18

GREGORY SCOTT, ET AL.                              EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                   October 17, 2016

Page 8

41:15 45:3
46:4 47:22
54:23 57:7
59:19 60:18
61:9,17 67:2
68:4,9,19 69:2
69:22 70:5
72:7,15 73:23
74:11 76:2
79:1
old 22:8 52:13
   57:23
once 23:8
online 37:4
opinions 83:4
opposed 49:7
option 19:2
   45:15 49:13
options 47:6
   52:20 54:12,17
   57:22 58:25
   61:7,9
order 9:10 12:4
   12:7,9,21,23
   12:24,25 13:6
   13:9,25 16:19
   16:23 17:2
   18:5 25:2,4
   26:17 31:22
   47:16,23 48:5
   50:1,7 51:8,21
   56:17 60:1
   62:22 63:23
   64:8 69:10
   71:11,20,22
   72:4 74:20
   77:18 78:7,10
   78:17
ordered 11:16
   14:16 18:12
   34:17 42:21
   46:24 65:14,22
   66:24 67:1
   68:16 70:21,22
   70:24 71:2,5

74:13 75:20
   78:5,16
ordering 18:17
   66:17 67:4,6
   68:10 72:11
orders 71:14,19
   72:3,10 78:3
original 82:3
Orleans 3:4
ortho 52:24
orthopaedic
   13:4 47:15
   59:6,19
orthopaedics
   59:18
orthopaedist
   59:14
Oscar 2:9 37:25
   38:8
ought 20:5 30:3
   32:22
outcome 83:14
outpatient 13:15
   13:24 14:3
   29:18 48:18
outpatients
   20:19 21:4,15
   29:13 67:4
oversight 34:19

─────── P ───────
p.m 22:11 41:6
   41:18
page 4:2 5:2 9:4
   65:20 81:1
pages 82:14
paid 63:7
paragraph 29:9
   32:8,10 33:13
   33:16 34:8,10
paralyzed 22:18
   80:4
paraphrase
   10:15
paraphrasing

11:1
PARENTS 1:7
part 29:10 32:3
   38:16 48:9
   54:10 58:4
   60:24 72:1
particular 9:21
   24:17,18 26:21
   27:16 33:3
   45:16 59:16
parties 6:13
   83:11,13
partners 7:22,24
   8:1,2,7
partnership
   7:15 8:9
party 83:7,9
passed 53:13
path 58:2
paths 58:17
patient 12:6,8
   19:17 22:7
   24:17 28:8
   29:19 33:3
   36:8,12 46:25
   47:20 48:14,23
   50:24 51:4
   52:12 53:16
   54:15 55:14
   58:5,7,10
   62:10,14,22
   63:8,20 64:4
   65:18 66:18
   69:6,8,21,25
   71:16,17 72:4
   72:17 79:7,14
   79:19
patient's 14:7
   26:21 63:7
patients 19:10
   20:18,20 21:4
   21:6 27:2 54:1
   58:23 63:12
   65:25 66:1,2,7
   66:12 72:12

PATRICK 3:2
pauses 81:12
pay 14:7 38:19
   62:23
payment 36:17
peg 37:18
people 13:14
   23:1 25:19,24
   26:4 67:5
perform 78:24
performed
   70:16
period 14:17
Perkins 2:10
PEROT 1:23
   7:2 81:2,25
   82:6 83:19
person 23:23
   45:3 82:24
personal 55:18
   82:17
personally 11:24
phone 2:5,11,16
   2:22 3:4 38:4,9
   53:6,7
phonetically
   81:22
phrase 49:11
   63:17 81:21
phrases 81:16
physical 73:16
physically 70:16
   76:24 77:9
physician 7:14
   13:3 14:3
   18:13 31:22
   35:13 36:1
   38:23 43:14
   47:18 51:20
   52:21 56:11,25
   57:9,11 58:4
   59:21,25 62:5
   62:6,19 63:3
   63:18 64:3,12
   67:5,6,15

68:10 69:23
   71:23,25 72:6
   72:9,14,19
   79:18
physician's
   25:10
physicians 7:15
   19:4 58:22
   63:17 68:11,12
   70:9 73:1
pick 44:5,5,11
   44:12,19 53:6
pigeonholed
   40:18
plain 19:17
PLAINTIFFS
   2:2
please 7:9
pledge 5:17 40:2
   41:1,7,12
point 42:5 64:23
policies 79:22
policy 26:20
   27:1,9,20
   28:10 39:3
   65:3 80:3
poor 14:14
   17:12
pose 54:20
position 15:9
   20:1 77:5
possibilities
   69:19
possible 50:4
   56:13 71:11
possibly 35:8
   52:1
post 5:10
post-deposition
   5:6,7
potential 69:20
potentially
   59:21
POTTS 2:20
power 35:20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD  CALVERT, M.D.
October 17, 2016

Page 9

Poydras 3:3
practical 77:10
practice 21:18
  33:22 39:3
  48:13 61:23
  63:2 65:3
practices 41:21
practicing 60:8
practitioner
  68:2
precertification
  34:12,15,21
  35:2 37:2,16
  75:1,2
precertified
  11:6
Preliminary
  57:15
prepared 82:16
  82:20
preregister 37:4
prerogative
  63:19,23 64:3
present 16:5,13
  23:14 56:14
  70:13
presented 19:11
  22:7 27:3,8
  40:8 52:22
  57:23 79:18
presenting
  29:15
press 13:8 16:24
  17:2 45:15
  77:18
pressing 35:8
pretty 26:11
previous 65:10
primary 14:3
privileges 72:1
probably 8:12
  42:18 46:3
  47:6,21 59:17
problem 11:2
  24:1,1

procedure 6:6
  9:9 11:19 12:3
  21:1 32:16
  34:19 37:6
  43:25 72:2
  81:5,7 83:3
procedures 37:8
  79:22
proceeding 81:7
  81:11,15
process 62:13
progressing
  41:19 46:20
  52:13 79:14
prohibited 83:5
prohibition 83:1
proper 81:14
protocol 72:11
provide 21:3
  24:17 36:16
providers 31:9
purportedly
  75:5
purposes 6:7
pursuant 6:4
put 46:17

_____
        Q
qualified 56:24
question 6:9 9:5
  14:14 16:16
  17:12 21:2
  24:23 33:12
  39:10 48:10
  51:1 59:11
  73:7,14
questions 6:16
  46:16 55:4,8
  63:15 70:5
  72:22 80:15
quick 46:7
quickly 19:20
quote 32:17

_____
        R

R.S 82:10
radiologist 13:3
  44:13 47:7,13
  56:22 57:16,18
  69:7,14,23,23
radiology 31:6
  31:19,23 43:10
  47:17 52:1,2
  52:23 53:5
  54:13
rating 32:11
read 6:20 9:5,16
  10:21 24:24
  80:16
reading 6:17
ready 45:12
  73:14
real 46:7
really 12:11
  19:18 21:10
  29:21 45:1,6
  50:16
reason 9:22
  15:17 43:9
  46:21 50:6
  66:21 69:7
recall 66:17 71:1
  73:2
recommend
  47:19 64:8
record 7:10 9:5
  10:16 31:14
  37:23 46:7,13
  64:18 81:8
redacted 65:18
reduction 6:15
REEXAMIN...
  74:9
refer 29:6 35:22
reference 81:20
Regan 68:7
regard 36:16
reimbursement
  14:18
related 83:10

relationship
  83:6,9
relationships
  83:2
relatively 77:2
Reliable 8:16
rely 57:17
relying 58:9
remember 15:3
  17:22 66:11
  69:18
remind 48:2
rephrase 10:25
  39:10
reported 1:22
  82:15
Reporter 1:23
  7:3 74:5 81:2
  82:6 83:20
Reporter's 81:1
  81:14
reporting 82:15
  83:7
represent 29:1
  55:7 65:12
represents 39:25
request 9:22
  25:4,5 42:6
  47:17,18
requested 19:7
  37:6 39:13
  41:17
requests 11:5
  25:6
require 13:14
  28:12 34:18
  46:23 75:2
required 31:8
  32:7 34:21
  75:1 79:21
  82:4,21
requirements
  63:11
requires 52:22
requiring 35:1

reserved 6:10
  13:14,22
resident 50:1
Resonance 29:3
respects 77:10
respond 69:14
responsiveness
  6:9
rest 22:18 80:4
result 39:16
review 73:15
reviewed 64:19
rid 57:16
ridden 55:13
right 6:20,22 9:8
  10:13 11:3
  19:21,25 23:7
  27:7 35:24
  38:11 43:10,11
  45:13 46:16
  50:20 53:9
  55:21 58:25
  59:4,7,14,25
  60:11,14,22
  61:12,22 62:18
  66:15 67:18
  68:6,14 69:13
  71:18 72:10,12
  73:4 74:11
risk 32:17
Road 2:10
room 11:6,16,21
  12:5,6,8,12,14
  12:20 13:21
  15:7,24 16:14
  18:6,13 19:8
  19:20 20:13,21
  21:7,13 26:17
  29:19 31:21
  35:12 36:1
  42:4,22 43:14
  47:24 48:6,21
  49:3 50:2,8
  52:21 56:10
  63:3 64:12,20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD  CALVERT, M.D.
October 17, 2016

**Page 10**

| | | | | |
|---|---|---|---|---|
| 65:14,22 67:25 | 14:1 16:23 | 33:25 | **sir** 55:15,20 | 52:12 59:23 |
| 69:3 70:25 | 19:16 44:5,10 | **series** 35:18 | **sit** 17:18 79:7 | **spine** 9:7 68:17 |
| 71:12 72:25 | 44:18,19,21 | **serve** 29:12 | **situation** 23:25 | 68:20,22 75:7 |
| 78:10,18 | 46:2 49:8 56:2 | **serves** 7:17 | 52:22 54:19 | 75:12,23 76:1 |
| **rooms** 20:15 | 57:19 | **service** 40:5 | **six** 20:16 60:5 | 76:6 |
| 60:6,23 | **scenario** 41:16 | **services** 21:19 | **Sixteen** 66:5 | **spoke** 15:1,6 |
| **Rouge** 2:10 | **scenarios** 62:1 | 61:11 82:25 | **slightly** 50:5 | **spontaneous** |
| **roughly** 65:16 | **school** 25:20,24 | **set** 8:5 82:13 | **software** 17:8 | 81:11 |
| 66:6 | 26:5 | **sets** 72:11 | 49:19 78:3,5,6 | **square** 37:17 |
| **round** 37:18 | **scope** 27:16 | **setting** 34:2 | 78:16 | **stabilization** |
| **routinely** 47:10 | **Scott** 1:5,6,7,7 | 37:17 48:19 | **somebody** 13:18 | 62:14 |
| **rule** 13:17,25 | 22:4 27:3,8 | 56:10 | 35:20 | **stabilize** 62:10 |
| 19:15 43:22 | 29:15 | **seven** 20:16 60:5 | **sorry** 11:23 34:9 | **stable** 35:21 |
| 44:1 48:1 | **Scott's** 64:20 | 75:7 79:8 | **sort** 8:4 13:20 | **staff** 59:14 61:14 |
| 50:13 55:23 | **screen** 5:8,9,12 | **severity** 40:7 | 34:18 48:12 | 61:15 |
| 56:12 81:4 | 5:14,16 16:8 | **SHAFTO** 2:3 | 57:18 69:24 | **stamped** 82:4 |
| **ruled** 57:1 | 16:10 32:3 | **sheet** 71:4 73:25 | 72:1,10 | **standard** 72:10 |
| **rules** 6:5 35:18 | 37:1 38:13 | 74:11,18 | **sounds** 45:11 | **standards** 31:2 |
| 47:22 56:18 | 76:18 | **shift** 65:24 | **speak** 37:7 | **start** 60:8 |
| 81:5 82:21 | **screening** 36:11 | **shifts** 66:3 | **speaker** 37:22 | **state** 1:24 7:9 |
| 83:3 | 76:13,15,20 | **SHOENFELT** | **speaks** 30:23 | 10:5 35:19 |
| **run** 16:7 44:10 | **seal** 82:4 | 2:9 37:24 38:1 | 32:11 37:10 | 81:3,8 83:22 |
| **runny** 40:19 | **seals** 31:2 | **shoes** 46:18 | 68:14 | **stated** 71:7 |
| **rural** 61:4 | **second** 9:4 29:9 | **shorter** 79:1 | **special** 43:13 | **statement** 20:12 |
| **Russell** 2:6 | 33:15 | **shot** 5:8,9,12,14 | **specialist** 59:2 | **STATES** 1:1 |
| **Ruston** 1:10,21 | **seconds** 46:5 | 5:16 32:3 37:1 | **specialists** 59:12 | **station** 16:8 53:8 |
| 7:12 | 56:4 | 38:13 | 59:20 | **statute** 82:21 |
| rwoodard@b... | **see** 17:7 29:2,13 | **show** 8:23 28:21 | **specialized** | **stay** 13:15 |
| 2:7 | 30:1,16 31:1 | 30:10 31:13 | 56:23,23 57:5 | **stenomask** |
| | 31:16 32:7,12 | 32:2 65:8 | 57:7 | 82:15 |
| _____ | 32:14 33:16 | **showing** 74:12 | **Specialty** 61:11 | **step** 44:3 |
| S | 34:19 38:19 | 74:15 | **specific** 24:21 | **stipulated** 6:2 |
| **S** 2:18 | 47:7,16 49:9 | **shown** 68:16 | 27:11 28:7,8 | **STIPULATI...** |
| **safe** 51:24 52:3 | 49:10 58:4 | **shows** 44:17 | 48:11 64:5 | 6:1 |
| 78:8 | 65:18 67:9,20 | 67:4 71:4,12 | 69:18 72:12 | **straining** 66:10 |
| **Sandy** 17:24,25 | **seeing** 69:9 | 74:25 | 73:7 | **Street** 3:3 |
| 18:1 | **seen** 9:11 28:25 | **Shreveport** 54:3 | **specifically** | **strictly** 22:5 |
| **saying** 37:3 | 40:2,14,16 | 55:13,15 | 66:17 | **Strike** 32:25 |
| 38:16 56:7,8 | 41:13 47:25 | **sign** 6:20 80:16 | **specifics** 64:15 | **sudden** 23:18 |
| 70:19,20 | 68:9 78:15 | **signature** 82:3 | 66:12 | **suggest** 76:5 |
| **says** 28:10,11 | **self-employed** | **significant** | **spectrum** 61:4 | **suggesting** 65:4 |
| 29:3,9 30:13 | 7:23 8:6 | 12:10 14:17 | **speculation** | **Suite** 2:4,15,21 |
| 30:17 32:15 | **send** 14:2 69:15 | 53:3 | 53:24 54:9 | 3:3 |
| 37:3 40:4 | **sense** 32:20 56:7 | **signing** 6:17 | **spelled** 81:21 | **summarize** 62:8 |
| 53:10,11 66:23 | **sentence** 33:15 | **single** 39:3 | **spinal** 44:9 | **supervision** |
| **scan** 9:7 13:9,25 | | | | |

Exhibit "1"

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 11

| | | | | |
|---|---|---|---|---|
| 82:17 | 8:21 9:15,20 | **Thank** 54:25 | 68:18 | 52:25 53:15,16 |
| **suppose** 7:23 8:4 | 11:4,12 15:1 | 73:19 | **thumbar** 75:12 | 64:8 |
| 21:12 27:19 | 15:18,22 19:24 | **thankfully** | 75:16 | **transferred** 54:2 |
| 28:18 35:22 | 20:4 25:2,25 | 23:11 | **time** 6:10 8:6 | **transferring** |
| 54:11 | 26:6 28:10 | **thereof** 83:14 | 9:10 12:10 | 54:14 |
| **sure** 24:20 33:23 | 30:1 41:2 | **therewith** 6:7 | 14:17 22:8 | **treat** 24:1 65:24 |
| 33:24 44:13,15 | 75:11 77:6 | **thickness** 44:8 | 41:21 42:10 | 66:12 |
| 46:10,12 49:4 | **Taylor's** 15:9 | **thing** 50:16 | 53:3 54:5,6,17 | **treated** 40:6 |
| 50:3,20 51:1 | 22:9 26:15 | **things** 11:11 | 54:19 55:16 | 64:5 |
| 51:12 70:1 | 39:11 42:8 | 23:19 25:1,8 | 59:17 64:11 | **treating** 58:22 |
| 73:6,14 75:20 | 46:18 51:17 | 25:16 32:22 | 74:12,15 79:2 | **treatment** 24:17 |
| 77:24 78:13 | 52:9 67:20 | 44:4,18 45:2 | **times** 55:21 | 27:16 33:2 |
| **surgeon** 47:16 | **technically** 7:20 | 47:5,21 49:9 | 59:16 67:9 | 35:22,23 36:15 |
| 59:6,19 | 7:22 71:24 | 58:3 61:15 | **today** 17:18 22:2 | 58:5 |
| **suspect** 71:9 | 72:5 | 69:20 | 22:6 23:11,12 | **Trey** 55:2 |
| **suspected** 59:22 | **teenage** 80:3 | **think** 7:22 8:4,8 | 23:13 29:12 | **triage** 62:9,13 |
| **suspicion** 66:25 | **TELEPHONE** | 8:20 10:8,13 | 73:11,15 | **triaged** 40:14,16 |
| **swearing** 6:15 | 2:8 | 10:21 12:16 | **told** 11:5 12:13 | 41:13 |
| **sworn** 7:2 82:10 | **tell** 13:4 16:4 | 16:16 24:21 | 25:5 26:16 | **trial** 9:2 |
| **symptoms** 19:11 | **telling** 74:23 | 28:4 32:22 | 36:1 56:2 | **trick** 33:11 |
| **system** 16:18 | **ten** 65:25 74:3 | 34:16 36:23 | 60:12 | **troubling** 80:12 |
| 65:17 66:22 | **tens** 66:1 | 40:13 41:6,12 | **top** 29:2 30:13 | **true** 24:8 25:9 |
| | **term** 70:1,10 | 41:15,20 43:9 | 32:8 33:13 | 25:16 26:15,19 |
| **T** | **test** 12:19 16:6 | 44:16 45:14 | **Touching** 55:12 | 39:11 42:6,15 |
| **take** 12:10 45:24 | 34:17 44:20 | 48:10,11 49:11 | **Tower** 2:4 | 82:18 |
| 53:2 54:17 | 50:5 62:23 | 50:6 53:25 | **tragic** 22:20 | **trustworthy** |
| 56:3 63:2 | 63:6 70:3 79:4 | 60:16 69:9,11 | **trained** 23:1,4 | 8:14 |
| 65:11 66:6 | 79:6 | 71:9,24 73:13 | 24:5 35:13,24 | **try** 23:23 42:9 |
| 69:21 | **testified** 7:3 9:20 | **thinking** 23:7 | 36:20 38:22 | 43:20,21 44:1 |
| **taken** 6:4 29:1 | 11:4 15:1 | **thinks** 71:8 | 50:3 61:18,22 | 46:24 47:6,15 |
| 81:8 82:8 | 19:24 20:4 | **third** 65:20 | 63:10 | 69:16,21 |
| **takes** 9:9 12:1 | 25:2 30:2 41:2 | **thirty** 5:17 12:2 | **training** 36:19 | **trying** 24:25 |
| 43:23 56:4 | 60:4 | 40:1,5,14,16 | 48:5,9,12 | 28:19 33:11 |
| 78:24 | **testifying** 50:22 | 41:14 45:24 | 56:24 57:6,8 | 38:5 61:1 |
| **talk** 46:8 47:7,13 | **testimony** 9:1 | 49:6 53:25 | 58:14 70:3 | **turn** 37:21 |
| 47:15 72:8,18 | 15:10 22:9 | 56:4 78:23 | 79:20 | **TUTORS** 1:7 |
| **talked** 78:22 | 24:25 26:15 | **thirty-minute** | **tranquil** 23:19 | **twelve** 22:8 |
| **talking** 16:13 | 39:11 42:8,24 | 41:1,7 | **transcribed** | 52:12 57:23 |
| 52:11 53:21 | 52:9 55:22 | **thoracic** 9:7 | 82:16 | 74:6,8 |
| 61:13 76:23 | 73:11 82:8,14 | 68:22 75:16,17 | **transcript** 5:4,5 | **twelve-year-old** |
| **talkovers** 81:13 | **testing** 58:18 | 75:19,22 76:1 | 9:1 81:17 82:3 | 41:3,20 46:19 |
| **tax** 8:8 | **tests** 13:13 16:20 | **thought** 79:19 | 82:19,20 | **twenty** 53:25 |
| **taxing** 66:10 | 49:5 56:11 | 81:13 | **transcription** | **twenty-five** 66:2 |
| **Taylor** 3:2 5:5 | 57:14 63:24 | **three** 37:5,13 | 81:15 | **two** 28:13 47:6 |
| 7:25 8:2,11,13 | 72:11 | 53:2 54:12,17 | **transfer** 47:9,20 | 49:10 |

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 12

**types** 59:20
**typewriting** 6:16
**typical** 72:16
**typically** 13:13
13:16,18,22,24
14:5,15 18:23
43:25 44:20
53:17 66:2
78:23
tzeigler@hpla...
2:25

**U**

**ultrasound** 17:4
**unavailability**
70:7,11,19
72:24 73:10
76:24
**understand** 21:2
33:18 50:20
51:1 75:10
**understanding**
7:13 14:4,15
34:14,23 35:1
35:16 39:15
42:20 44:16
48:14 55:16,17
55:25 56:8
62:4 82:19
**understands**
16:16 48:10
**unit** 62:13
**UNITED** 1:1
**universally** 28:5
**unquote** 32:18
**unusual** 8:4 65:5
73:4
**use** 12:19 13:17
17:7,20 21:12
23:22 42:23
43:20,25 70:1
70:10 76:18

**V**

**valid** 82:2

**various** 63:11
**Vaughn** 1:20
**verbatim** 10:20
**verified** 81:20
**verify** 68:15
**versus** 63:16
**violation** 36:22
39:4,5,16 62:2
**violations** 61:18
**virtue** 56:22
**visit** 64:20
**VS** 1:8

**W**

**wait** 79:8
**waive** 6:13
**walk** 23:9,13
45:11
**wall** 42:19
**want** 9:18 10:20
11:3 16:6,23
21:11 25:8
30:10 31:13,22
32:2 37:21
46:17 51:21
57:25 58:18
65:8 70:9,12
73:7,25 78:17
**wanted** 22:10
24:16 25:2
41:2 45:18
75:11,22
**way** 8:5 10:25
14:4,15 24:9
48:21 63:18
66:15 70:19
71:21 83:14
**we'll** 69:15 72:3
**we've** 40:20 68:9
**website** 5:8,9,16
28:24 29:2
30:5,12,21
37:1 38:14
40:1
**went** 25:20,24

26:4
**West** 83:15
**WESTERN** 1:2
**White** 7:25
67:22
**WILLIAMS**
2:14
**wish** 11:22,24
**witness** 6:15,19
10:1 73:22
80:16
**WOLLESON**
2:3
**WOOD** 2:19
**Woodard** 2:6
4:4 7:6 8:24
9:13 10:4,17
10:23 16:15
27:4 28:20
30:9,24 31:12
32:1 36:24
37:24 38:3,10
38:12 39:23
46:6,15 54:24
57:3 71:6
73:20,24 74:10
80:14
**word** 28:4
**words** 81:16,19
**work** 17:11
23:11 31:23
45:11 68:4
72:16
**worked** 20:13
20:15 60:5,23
61:6 64:24
**working** 15:3
23:12,13,17
**world** 12:1
45:14 49:12
**wouldn't** 12:24
21:17 27:15
49:3 54:9
56:21 58:2
**wound** 23:19

**write** 16:8 71:14
71:18 72:2
**writing** 34:9
72:9
**written** 47:22,25
71:14
**wrote** 64:23

**X**

**x-ray** 19:17 46:4
49:8
**x-rays** 17:4 56:3

**Y**

**y'all** 12:23 26:10
27:5 43:3
**yeah** 16:18
69:15
**year** 52:13 57:23
**years** 22:8
**young** 46:18

**Z**

**Zeigler** 2:23
55:3
**Ziegler** 9:2

**0**

**1**

**1** 5:4 8:25 11:14
**10** 4:13 5:14
36:25
**11** 4:10,13 5:16
38:13
**1120** 7:11
**12** 5:17 39:24
**13** 5:18 74:8,19
74:25 75:6,25
**14** 4:10,13
**1434** 83:3
**1434(B)** 81:6
**15** 4:10,13
**16** 4:13
**17** 1:16
**18** 4:10,13

**1800** 2:21
**1811** 2:4
**18th** 83:15
**19** 4:10 64:21
**1994** 29:12 30:1
**1999** 60:10
**19th** 27:5,8

**2**

**2** 5:5 9:14
**20** 4:10,13
**2005** 8:12 18:16
19:10 48:3
60:11,20
**2013** 8:13 65:16
**2014** 27:9 29:16
59:5 64:21
65:23 66:19
**2016** 1:16 65:16
82:11 83:16
**21** 4:13
**2109** 2:10
**21st** 20:5 30:2
**22** 4:10,13
**225** 2:11
**23012** 1:24 7:3
81:3,25 82:7
83:21
**24** 4:10,13
**25** 4:10,13
**26** 4:10,13
**2600** 3:3
**27** 4:10,13
**27th** 82:11
**28** 4:13 5:8 81:4
**28th** 65:23 66:19

**3**

**3** 5:6 22:11 41:6
41:18
**3:00** 42:7
**3:16-CV-00376**
1:8
**30** 4:14 5:9
**300** 2:21

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD  CALVERT, M.D.
October 17, 2016

Page 13

**31** 5:11
**318** 2:5,22
**32** 5:13
**322-1202** 2:5
**33** 4:10,14
**336-4300** 2:11
**34** 4:14
**3421** 2:15
**35** 4:14
**36** 4:10 5:15
**37** 4:14
**37:2554** 82:10
**38** 5:16
**388-4400** 2:22
**39** 4:10,14 5:17

_____ **4** _____

**4** 5:7
**40** 4:10,14
**400** 3:3
**401** 1:20
**41** 4:11,14
**42** 4:14
**43** 4:11,14
**45** 4:11,14
**47** 4:11,14
**48** 4:11
**49** 4:14

_____ **5** _____

**5** 5:8 28:22
**50** 4:11,14
**504** 2:16 3:4
**51** 4:15
**52** 4:11,15
**529-3333** 3:4
**53** 4:15
**55** 4:7

_____ **6** _____

**6** 5:9 30:10

_____ **7** _____

**7** 5:10 9:4
**7,74** 4:4
**70002** 2:16

**70130** 3:4
**70808** 2:10
**71201** 2:4,21
**71270** 1:21
**74** 5:18
**75** 4:11
**76** 4:11,15
**77** 4:11,15
**78** 4:15
**79** 4:11,15

_____ **8** _____

**8** 5:4,11 31:13
    31:15
**8:06** 82:12
**80** 4:11,15
**81** 82:14
**831-4091** 2:16

_____ **9** _____

**9** 4:10 5:5,12 9:4
    22:10 25:3
    32:2 33:12
    41:5,17
**9:00** 42:7
**9:30** 80:17 82:13
**900** 2:15



SERVICES, NORTHERN LOUISIANA MEDICAL CENTER - MAGNETIC RESONANCE IMAGING MRI

# Magnetic Resonance Imaging

It's clear—precision is important during diagnosis. Of all imaging technologies, MRI or Magnetic Resonance Imaging gives doctors the clearest, most precise image of the inside of the body. It's sophisticated, and uses a strong magnetic field to show the structure and detail of organs, soft tissue and bones, which can pinpoint all types of issues from abnormalities to disease. Northern Louisiana Medical Center performs MRIs with your comfort in mind. Nervous about your test? Just speak to one of our staff.

Northern Louisiana Medical Center has been offering MRIs as part of the diagnostic imaging department since 1994, and today we serve both inpatients and outpatients. Our technologist is registered in MR imaging and has 20 years of MR scanning experience.

**For more information, please contact:**
**Sheri Burns, NLMC Director of Radiology**
**(318) 254-2461**

**If you are a physician and need to schedule a patient, please call:**
**Central Scheduling**
**(318) 254-2791**

Exhibit "1"

1  HERMAN M. HODGE, JR.                    THIRD JUDICIAL DISTRICT COURT

2  VS. NO. 55,272                              PARISH OF LINCOLN

3  STATE FARM FIRE & CASUALTY AND                STATE OF LOUISIANA

4  KENNETH L. COX

5                        -----0-----

6           A PORTION OF THE PROCEEDINGS HAD on the Jury Trial in

7  the above entitled and numbered cause had at Ruston, Louisiana on

8  the 31st day of March, 2016 before His Honor, Jay B. McCallum,

9  Judge for the Third Judicial District Court, State of Louisiana.

10           A P P E A R A N C E S: FOR THE PLAINTIFF:

11                               K. LAMAR WALTERS, III

12                               RUSSELL A. WOODARD, JR.

13                               P. O. Box 14106

14                               Monroe, LA 71207

15                               ----------------------

16                               FOR THE DEFENDANT:

17                               GORDON L. JAMES

18                               DONALD H. ZEIGLER, III

19                               P. O. Box 3008

20                               Monroe, LA 71210-3008

21                               ------------------

22                               Reported by Jon Anne Winstead,

23                               Certified Digital Reporter

24                        -----0-----

25               - - - - - - - - -

26           DR. MOHAMMAD J. ALAM

27               - - - - - - - - -

28      Called as a witness on behalf of the defendant, who,

29  after first being duly sworn on his oath, testified as follows:

30           (COUNSEL STIPULATED AS TO HIS EXPERTISE IN EMERGENCY

31      MEDICINE.)

32                    DIRECT EXAMINATION

Jon Anne Winstead, Official Court Reporter
Third Judicial District Court

EXHIBIT
1

Exhibit "1"

1   about their accident history or their pain history because

2   they're focused on what's going on at that time?

3   A.     It's a possibility.  I can't say that.

4   Q.     Now, Dr. Alam, you -- you ordered an MRI or a CT Scan of

5   the lumbar spine only, is that correct?

6   A.     Correct.

7   Q.     No MRI or CT Scan of the thoracic spine, is that right?

8   A.     No, MRI is not a emergency med-- department procedure.

9   It takes longer time.  We cannot order it fast.

10  Q.     Sure.

11  A.     No, I did not order any other Cat Scan.  The area where

12  he complained of pain, I ordered the Cat Scan.

13  Q.     Okay.  And Mr. Zeigler showed you a note where there was

14  a reference to Mr. Hodge complaining about a loss of

15  consciousness, a few second loss of consciousness.  It's in the

16  nurse's note.  I think it's at page 6 of your notes.  And it says

17  patient -- patient fell off ladder at work, reports may have had

18  loss of consciousness for a couple of seconds, alert and oriented

19  at this time.  Now when -- when you have a patient coma in with a

20  -- a reported loss of consciousness, I assume you don't feel the

21  need to order a CT Scan of the brain or of the head unless

22  they're -- they're showing signs of cognitive deficients where

23  they're not alert and oriented.  Would that be accurate?

24  A.     Correct.

25  Q.     All right.

26          MR. WALTERS:  All right, thank you, Doctor.

27          THE COURT:  Thank you.  Is there any redirect?

28          MR. ZEIGLER:  No, Your Honor.

29          THE COURT:  All right, well I think you're released to

30  go back to wherever you'd like to go.  Back to work or

31  home or wherever.

32          THE WITNESS:  Thank you.

Page 1

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GREGORY SCOTT AND MICHELLE SCOTT,
INDIVIDUALLY AND ON BEHALF OF
THE MINOR, JORDAN SCOTT, AS THE
PARENTS AND TUTORS OF JORDAN
SCOTT

VERSUS                                          NO. 2015-00923

JACOB WOOD, M.D., THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER,
JAMES TAYLOR, M.D.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

JAMES PATRICK TAYLOR, M.D.

February 25, 2016

(commencing at 9:01 a.m.)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Taken at:

    Law Office of Russell A. Woodard
    114 North Trenton Street
    Ruston, Louisiana 71270

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Reported By:

    WANDA J. EADY
    CERTIFIED COURT REPORTER
    CERTIFICATE NO. 87255
    PARISH OF OUACHITA
    STATE OF LOUISIANA

EXHIBIT

2

Exhibit "1"

Page 25

1    Q    All right.  Tell me the physician notes.

2    A    The physician notes has three pages here.

3    Q    How many pages is in the computer?

4    A    I don't know.  It's just scrolling on the computer.

5    Q    Did you add anything on the computer -- well, first

6    of all, let's go over as far as your physical examination.

7    A    Yes, sir.

8    Q    Did you in any way change the physical examination

9    after you first entered it into the computer?

10   A    The very first time change it or add to it?

11   Q    Add to it, delete, --

12   A    Yes, I did.

13   Q    You added to your physical examination?

14   A    That's correct.

15   Q    When?

16   A    At the admission, time of admission.

17   Q    You're talking about, like, the same day?

18   A    Yes, sir.

19   Q    Did you ever go back after the day of this

20   admission of Jordan Scott and add or delete anything from any

21   of your physician notes other than the addendum?

22   A    No, sir.

23   Q    You would agree -- so you would agree, would you

24   not, that Jordan Scott should have received an MRI as soon as

25   she entered the emergency room?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 26

1    A    Relatively, yes, sir.

2    Q    As soon as possible.  Would you --

3    A    As soon -- yes, sir.

4    Q    And you were prevented from doing that by the

5    hospital.  Is that correct?

6         MR. GRUNER:  Object to the form of the question.

7    Q    Go ahead and answer, Doctor.

8    A    Yes.  Okay.

9         MR. SHOENFELT TO MR. GRUNER:  And, Counsel, can you

10        state your form of the objection, why you are

11        objecting?

12        MR. GRUNER:  You said "by the hospital."  He said

13        by the radiology department earlier.  I'm not sure

14        he meant hospital staff.

15   Q    What did you mean, Doctor?

16   A    That soon after -- I resulted the thyroid and the

17   labs at 9:07 according to the chart.  It was around that time

18   right when I resulted the labs and had them back that I asked

19   Ron, who is our charge nurse, Wyatt, I believe is the last

20   name, -- he's no longer with us.

21   Q    Why?

22   A    I'm not sure.

23   Q    You asked --

24   A    He's probably semi-retired.

25   Q    At 9:07, you asked Ron Wyatt what?

EXHIBIT A

9a0c3o83-be8a-46a5-b387-b14bb655a077

Page 27

1      A     That I needed to get an MRI.  He tried to get one

2    for me.

3      Q     Wait.  Did you need to get one or that you needed

4    to get one?

5      A     I needed to get an MRI.

6      Q     Because you knew this was a neurological emergency,

7    didn't you?

8      A     I knew that there was something going on with her

9    neurologically.

10      Q     You know that, in a neurological emergency,

11    particularly with compression on a cord, that you need to act

12    as soon as possible?

13      A     That was part of -- that was part of the thought

14    process.

15      Q     And Ron told you what regarding the MRI?

16      A     Ron was -- because, on our computer physician order

17    entry from the emergency department, there is no way to order

18    an MRI.

19      Q     Now, who is Ron again?

20      A     Ron was our charge nurse that day at that

21    particular time.

22      Q     So you talked with Ron and he said you could not

23    get an MRI?

24      A     Ron was calling radiology in MRI -- to get an MRI

25    because we have no way of ordering it.  Whatever I needed to

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 28

1    do to order the MRI, that's what needed to be done while I

2    was going to see other patients.  That's what he told me.

3    I'm not sure what -- I can tell you what time period it was,

4    but I can't give you the exact time.  Ron told me that they

5    said that you cannot get an MRI through the emergency

6    department.

7         Q    Were you aware of this prior to this time?

8         A    I knew it was going to be difficult.

9         Q    Why is that?

10        A    Because they typically don't want to do MRIs

11   through the emergency department.

12        Q    And why is that?

13        A    You'll have to ask them.

14        Q    But, I mean, did you have problems with this prior

15   to this time?

16        A    Directly, no.

17        Q    Okay.  What about indirectly?

18        A    I knew that in the past they had given other

19   people -- wouldn't do MRIs through the emergency department.

20        Q    They would not do them?

21        A    That's correct.

22        Q    So was it known among the emergency room physicians

23   that you couldn't get an MRI in the emergency room?

24        A    Nothing official, no.

25        Q    Well, my question, nothing official, but was it

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 29

1    known among the emergency room physicians that you couldn't

2    get an MRI in the emergency room?

3         A    Known as a policy?  No.

4         Q    Well, was it possible?

5         A    Was it possible to not get one or possible --

6         Q    No.  Was it possible to get one?

7         A    I was attempting to.

8         Q    Okay.  I'm thinking about when did this -- when did

9    you first become aware of this issue?

10        A    That they would not do one --

11        Q    Yes.

12        A    -- absolutely?  That day.

13        Q    When did you first become aware that the North

14   Louisiana Medical Center had such a policy that it made it

15   extremely difficult, if not impossible, for an emergency room

16   physician to get an MRI?

17             MR. GRUNER:  Object to the form.

18        A    I can't give you a time, date or anything.

19        Q    Was it years ago?

20        A    I don't know if I've ever tried to order one

21   before.

22        Q    Had other physicians tried to order MRIs and not

23   been successful?

24        A    Not that I know of.  Not directly, no.

25        Q    But you were aware of this before August 2014.

EXHIBIT A

9a0c3o83-be8a-46a5-b387-b14bb655a077

Page 30

1    Correct?

2         A     That they would probably give me a difficult time?

3         Q     Yeah.

4         A     Yes, sir.

5         Q     Well, if not this case, what case would warrant an

6    emergency MRI with a twelve-year-old girl who could face

7    potential paralysis if this diagnosis was not made as soon as

8    possible?  They still would not allow you.  Did you tell them

9    that?

10        A     I can tell you what happened.

11        Q     What happened?

12        A     Ron subsequently told me that they said that we

13   couldn't do an MRI.  I tried to get -- oh, good Lord! -- our

14   ER manager, --

15              MS. WHITE:   Sandy.

16        A     -- Sandy, Sandy Goss, to try to intervene.

17        Q     And what happened with Sandy?

18        A     She immediately told me, she goes, "They're not

19   going to do an MRI for us."  And I said, "Can you please just

20   go try; go talk to them?"  She later told me, "No."  So later

21   I went to Sherry Burns, the radiology manager, and talked to

22   her and she told me that they couldn't do it.  So I told her

23   I was going to have to admit Jordan to get the MRI.  That's

24   what I told her.

25        Q     Well, I thought at one point you discharged her.

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 31

1     A    This was all before that.

2     Q    And why did you discharge her if you wanted to get

3   an MRI?

4     A    A mental lapse on my part.

5     Q    So you admit that you made a misdiagnosis?

6         MS. HOSKINS:  Object to the form.

7     A    I did not make a misdiagnosis.  I made a bad

8   judgment at that particular time.

9     Q    Well, you admit that you breached the standard of

10  care, then.  Is that correct?

11        MS. HOSKINS:  Object to the form.

12    A    For having that discussion with them?

13    Q    No.  For not making sure that this girl who had

14  neurological deficits received an MRI as soon as possible

15  when you knew that continued compression on the cord could

16  cause her to become paralyzed.

17    A    That was part of the differential.  Yes, sir.

18    Q    But you admit that you breached the standard of

19  care by not making sure she had an MRI and discharging her

20  home.  Correct?

21        MS. HOSKINS:  Object to the form.

22    A    I did not discharge her home.

23    Q    Well, you admit that you breached the standard of

24  care by attempting to discharge her home when she needed to

25  get an MRI.  Do you agree with that?

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 32

1           MS. HOSKINS:  Object to the form.

2      A    I did not discharge her home.

3      Q    Do you feel you gave her proper care?

4      A    With the resources I had available, I did the best

5 I could at that time.

6      Q    Would you agree that any hospital the size of North

7 Monroe [sic] Hospital should allow an emergency room

8 physician to obtain an MRI if an emergency situation such as

9 Jordan Scott faced August 19th, 2014?

10          MR. GRUNER:  Object to the form.

11     A    My professional opinion, yes, sir.

12     Q    And did you bring this up at any point in time to

13 the hospital administrator?

14     A    That day or afterwards?

15     Q    Any time.

16     A    Yes, sir.

17     Q    And what did -- what happened?

18     A    Nothing has changed.

19     Q    Nothing has still changed.  Is that correct?

20     A    That's correct.

21     Q    Now, Doctor, didn't you note this problem in the

22 medical record?

23     A    Of what part?

24     Q    The fact that you couldn't get an MRI.

25     A    I did make a little note of it, yes, sir.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 38

1    Q    The MRI?

2    A    Yes, sir.

3    Q    Okay.  As soon as possible?

4    A    Relatively quickly.  Yes, sir.

5    Q    And isn't it true that even minutes and hours can

6    make a huge difference in the diagnosis and recovery of a

7    patient such as Jordan Scott when she's got progressing

8    neurological deficits?

9    A    Yes.

10    Q    So did Dr. Wood suggest to you that this was

11    conversion disorder?

12    A    The word "conversion" never came out.  No, sir.

13    Q    Did you write that in the medical record?

14    A    I think on one of my addendums, I did.

15    Q    Did you write in the medical record that he

16    suggested conversion disorder could have caused this?

17    A    It was part of the -- part of the things that we

18    talked about; not conversion, but social issues.  No.  But

19    she had neurologically something going on.  Yes, sir.

20    Q    Is it true you never suspected an epidural

21    hematoma?

22    A    Did I ever suspect it?  No, sir.

23    Q    And why is that?

24    A    Was not aware that that could happen in that case

25    like that.  It was a -- it's one of the risk factors that we

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 41

1    certified by the attorneys for the hospital under oath?

2        A    No, sir.

3             MR. GRUNER:  Object to the form.  The lawyers don't

4             certify.

5             MR. SHOENFELT:  It's in a response to request for

6             production, so I think it's under oath, unless I'm

7             mistaken.

8        Q    So why is that not in the medical record?

9        A    I don't know why it's not in there.

10       Q    It's on the computer, is it not?

11       A    It was two days ago.

12       Q    All right.  Isn't it true that the patients asked

13   you to have an MRI done many times?

14       A    Do people ask me a lot  -

15       Q    No.  The parents, Mr. and Mrs. Scott.

16       A    We talked about it, yes.

17       Q    And what did you tell them?

18       A    I told them I couldn't get one, they wouldn't let

19   me get one through the emergency department.  And that's when

20   I went in and talked with them after I got off the initial

21   phone call with Dr. Wood, had a discussion with them.  It was

22   Jordan's mom is the one that hit me between the eyes verbally

23   and, basically, her reaction was "No, no, no; that's not

24   acceptable."  And then, she asked me, "If this was your

25   daughter, would you take her home?"  And how are you supposed

Page 42

1    to respond to that, "No, I would not."

2        Q   Well, shouldn't you treat each patient as if it was

3    your own daughter?

4        A   That's correct.  Yes, sir.  That's why -- that's

5    why, at that particular time, it was a horrible lapse of

6    judgment on my part because that's when I lost -- that's when

7    I lost their trust and confidence, and that's what I took

8    personally.

9        Q   Okay.  And you breached the standard of care, did

10   you not?

11       A   I lost their confidence and trust at that moment.

12           MS. HOSKINS:  Object to the form.

13           MR. SHOENFELT:  What's your objection?  State it on

14           the --

15           MS. HOSKINS:  He's not saying he breached the

16           standard of care.  You are.

17           MR. SHOENFELT:  Well, I'm asking him a question.

18       A   No, sir.

19       Q   You did not breach the standard of care?

20       A   Not by -- not with that ten minutes I was in there

21   talking with them.

22       Q   Well, what about when she came in and she had

23   uneven deficits when you first examined her from a

24   neurological point of view and you knew it was an emergency

25   and no MRI was ordered?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 43

1    A    I tried -- was trying to get an MRI.

2    Q    Well, what time did you do the physical exam?

3    A    When I first saw her.

4    Q    No.  What time in the morning?

5    A    7:50ish.  7:40.

6    Q    That's what I'm saying.  So 7:40 in the morning,

7    you started trying to get an MRI.  Correct?

8    A    No, sir.

9    Q    Okay.  When?

10   A    It was around 9:10.

11   Q    Well, what happened from 7:40 to 9:10?

12   A    Waiting for lab work.

13   Q    Why did you wait for the lab work?

14   A    To make sure it wasn't something metabolic.

15   Q    So you said each minute and each hour can be

16   important.  Correct?

17   A    It can be.  Yes, sir.

18   Q    So you decided to wait to see if -- instead of

19   ordering the MRI, to see if there was something metabolic

20   that was causing this paralysis with the child as opposed to

21   going ahead and ordering the MRI?

22        MS. HOSKINS:  Object to the form.

23   Q    Is that correct?

24   A    That's correct.  Yes.

25   Q    Okay.  Is that proper medical care?

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 44

1    A    I did not order the MRI sooner.

2    Q    You should have.  Right?

3    A    I wish I had.

4    Q    Well, Dr. Wood said that, as soon as you knew there

5    was a difference in the upper and the lower limbs, that you

6    should have tried to order an MRI on an emergency basis and

7    got a neurosurgical consult.  Is that --

8         MR. ZIEGLER:  Object to the form.

9         MR. SHOENFELT:  What's your objection?

10        MR. ZIEGLER:  I'm objecting to the form.  All I

11        have to do is say I object to the form.  I think --

12        MR. SHOENFELT:  Well, I don't think that's actually

13        true.

14        MR. ZIEGLER:  Well, --

15        MR. SHOENFELT:  You're supposed to say what your

16        objection is because a lot of people just say it

17        because they think it's a safeguard.

18        MR. ZIEGLER:  I tell you what.  We'll let the judge

19        decide that.

20        MR. SHOENFELT:  Well, we --

21        MR. ZIEGLER:  I object to the form.  He can answer

22        the question.

23   A    That's his medical opinion.  Yes, sir.

24   Q    Okay.  You disagree with that or are you agreeing?

25   A    Say that again.  I'm sorry.

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 45

1     Q    Don't you agree that as soon as you saw the

2    neurological deficits that were of a progressive nature this

3    child was exhibiting, that you should have began an emergency

4    ordering of an MRI and look for a neurosurgical consult?

5     A    They weren't progressing before my eyes.

6     Q    It's either a "yes" or "no."

7     A    No.

8     Q    Okay.  And the reason is because that it was not

9    progressing before your eyes?

10    A    It's the time period.  It's part of the

11   differential.

12    Q    So what did you think metabolically could have

13   caused this type of -- with a history, first of all, of

14   progressive for four or five days, activity as a cheerleader?

15   Did you do a percussion in the thoracic area?

16    A    I did.

17    Q    And what did that show?

18    A    She had some tenderness in the upper -- between the

19   upper scapulas, between the scapula and the upper part of the

20   scapula, but she also demonstrated numbness, as well.

21    Q    So what did that indicate to you?

22    A    That she had something neurologically going on.

23    Q    Did it indicate to you that it was not caused by

24   compression on a cord as opposed to something metabolic?

25    A    Did I know there was compression on the cord?

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 46

1   Q   Yes.

2   A   No, I did not.

3   Q   I'm trying to figure out why you decided to wait to

4   see if it was metabolic instead of going ahead and starting

5   the emergency procedures while it was progressing with these

6   neurological deficits as you waited.

7   A   Because there's other things that can cause it.

8   Q   That's what I'm saying.  What could have caused

9   this type of -- with this history with this child, with the

10   percussion, with the pain in the thoracic area, what would be

11   causing it just in the thoracic area?

12   A   Could have transverse myelitis, could have

13   Guillain-Barre syndrome, could have extremely high potassium

14   or extremely low potassium, could have thyroid disorders,

15   could have a type of neural polymyositis.

16   Q   But shouldn't a compression on the cord caused by a

17   physical injury be number one on your list based on the

18   history, the pain in the thoracic area of this child?

19   A   I had no history of injury.

20   Q   You had no history that she had been cheerleading?

21   A   She had been cheerleading, but no history of

22   injury.

23   Q   So did you feel that more probably than not that

24   you had a metabolic issue?

25   A   Oh, no, sir.  No, sir.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 47

1    Q    Well, why, if you -- what did you think was most

2    probable?

3    A    That something was going on with her

4    neurologically.

5    Q    Did you think, based on the history and the

6    physical examination, that more probably than not it was a

7    compression on the cord?

8    A    Or the cord involved itself.

9    Q    Did you note that the nursing notes said that the

10   pain was eight out of ten in the thoracic area?

11   A    I've seen that in reviewing the nursing notes.

12   Q    Do you agree with that?

13   A    No, sir.

14   Q    Okay.

15   A    Eight out of ten?

16   Q    Yeah.

17   A    No, sir.

18   Q    Well, how do you account for the discrepancy?

19   A    I'm not sure.

20   Q    Well, Dr. Wood says in the admit summary, "She has

21   been heavily involved in cheerleading practices and was not

22   absolutely sure that she did not have an acute injury, but

23   she cannot recall any falls or specific times."  Do you agree

24   with that?

25   A    There was no history of injury when I talked with

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 48

1    them.

2        Q    But you did have the history that she had been

3    involved in cheerleading practice.   Correct?

4        A    I did.   I did.

5        Q    Anything about the trampoline?

6        A    Didn't know anything about a trampoline.

7        Q    Are you aware this had been going on for -- that

8    she had been having back pain for how long?

9        A    Five days.

10       Q    Okay.   Let's go over -- all right.   Let's see.   Do

11   you have the record there?

12       A    Yes, sir.

13       Q    Page 1 is the admit sheet.   Correct?

14       A    Yes.

15       Q    All right.

16            MR. SHOENFELT:   For the record, I'm going to attach

17            this as an exhibit to the deposition.   I'll mark it

18            as "Exhibit 2."   This is, again, the certified copy

19            of the record from the hospital.

20            MR. GRUNER:   How many pages is it?

21            MR. SHOENFELT:   Thirty-six.

22       Q    Okay.   So "Exhibit 2" contains the certified copy

23   of the record received from the hospital's attorneys.   Page 1

24   is the admit sheet.   Do you have it?   Oh, this is it.   I'm

25   sorry.   I've got it here.

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 49

1     A     Yeah.

2     Q     I got a little mixed up there.  I've got it sitting

3  here.  All right.  That's the admit sheet.  Correct?

4     A     That's correct.

5     Q     Let me see that.

6     A     Yes, sir.

7     Q     All right.  So did you have anything to do with the

8  creation of any of this particular document?

9     A     Of the face sheet?

10    Q     Yes.

11    A     No, sir.

12    Q     Do you know what that "821/NA Coded" means?

13    A     No, sir.

14    Q     Do you know whose signature is on the front?

15    A     No, sir.

16    Q     Page 2, did you have anything to do with the

17  creation of that particular sheet?

18    A     No, sir.

19    Q     Page 3 is the short-stay summary of Dr. Wood.  Did

20  you have anything to do with this sheet?

21    A     No, sir.

22    Q     Is there anything that you disagree with on this

23  page 3?

24          MS. HOSKINS:  Object to the form.

25    A     (Peruses document.)  The only thing I would

Page 50

1    disagree with is about the progression, like, the last three

2    lines of the history of present illness.

3         Q    When you say she had a complete work-up and

4    everything was negative, that's not true, is it?

5         A    That's correct.  That's not true.

6         Q    Is that what you told him?

7         A    No, sir.

8         Q    What did you actually tell him when you talked to

9    him?

10        A    The first conversation?

11        Q    Yes.

12        A    That I had -- we discussed different things that

13   had taken place.  I told him about the labs that were ordered

14   and that I couldn't get an MRI.

15        Q    So basically, with your differential diagnosis of

16   some kind of physical injury as opposed to metabolic, after

17   you got the labs back you knew that it was a physical injury

18   that was compressing the cord.  Correct?

19        A    Not necessarily a physical injury, but cord

20   compression is on there for other reasons.  It could be a

21   disc; it could be a tumor.

22        Q    Well, that's a physical compression on the cord, is

23   it not?

24        A    Yeah, but it's not an injury.

25        Q    I just said there was a physical compression on the

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 62

```
1        A    No, sir.

2        Q    Okay.  Did you ever consider making a neurosurgical

3   consult by telephone?

4        A    Neurosurgery will not take a transfer without a

5   surgically-proven pathology.

6        Q    What do you mean by "surgically proven"?

7        A    Like, by imaging.

8        Q    Oh, you mean, like, an imaging?

9        A    Yes, sir.

10       Q    So, again, the MRI was important.  Correct?

11       A    To get her -- to get her transferred.  Yes, sir.

12       Q    And you knew that from the beginning?

13       A    I got the MRI ordered when I felt like I needed to.

14       Q    No.  But you knew from the beginning as soon as she

15   walked in the emergency room that --

16       A    I knew she had something neurologically going on.

17       Q    I know that, but let me finish my question.  You

18   knew when she walked in that, in order to get her transferred

19   if there was -- if she needed surgery, you had to have an

20   MRI?

21       A    That's correct.

22            MS. HOSKINS:  Object to the form.  She didn't walk

23            in.

24            MR. SHOENFELT:  That's a good point.

25       Q    Okay.  You knew when she came in not neurologically
```

Page 134

1    Q    So you sat there for five minutes just

2  contemplating?

3    A    I don't know if it was five minutes, but it was --

4  I didn't jump up out of the chair and go.

5    Q    Okay.  So what did you think was going to happen to

6  Jordan when you ordered the discharge?

7    A    Can't tell you.

8    Q    Well, that's something you should consider when

9  you're discharging a patient.

10   A    Sure.  Absolutely.

11   Q    You would agree with that?  I mean, like, wait

12  until I ask the question.  That's something you should

13  consider when discharging a patient.  Correct?

14   A    That's correct.

15   Q    Did you feel like she would have permanent

16  paralysis?

17   A    I didn't know what was going to happen.  I used bad

18  judgment for that short period of time there.

19   Q    Now, after this, did you go to anyone in the

20  hospital and tell them that it's a bad policy not to be able

21  to order an MRI from the emergency room?

22   A    Yes.

23   Q    Who specifically did you talk to?

24   A    Brady Dubois, the CEO at the time.

25   Q    Brittany --

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 135

1     A    Brady.  I'm sorry.

2     Q    Brady?

3     A    Yes.

4     Q    Okay.  Where did you have this conversation with

5    him?

6     A    Which one?

7     Q    Okay.  Well, let's — the first one.

8     A    I can't tell you —

9          MR. GRUNER:  Let me enter an objection here. Just

10         in case I need this again as a result or

11         discussions taken during any type of quality

12         assurance peer review or committee meetings, they

13         are privileged pursuant to Louisiana law.  So,

14         again, I will make an objection with respect to the

15         discussion of peer review and committee meetings.

16         If there's any discussions outside of that that

17         were just hallway or office discussions that were

18         not part of committees, I don't have an objection

19         to that.

20    Q    Having said that, can you respond?

21    A    I had one in a stairwell and I had one in his

22   office —

23    Q    Okay.  Well, —

24    A    — that were not — that were not part of those

25   episodes.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 136

1    Q    Okay.  Were there others that were part of those

2    episodes as referred to by counsel for the hospital?

3    A    Were there other people with --

4    Q    No.

5    A    -- Brady and I, or during those episodes that he

6    objected to?

7    Q    Well, I'll ask both of those questions.  That's a

8    good question.  Was this run -- I'll just ask this directly

9    instead of referring to the previous objection.  Was this

10   discussed at committee hearings and quality control committee

11   hearings? And you can answer that "yes" or "no."

12           MR. GRUNER:  I think you can answer "yes" or "no."

13           The specifics of the discussions and those sorts of

14           things are not discoverable.

15   A    Yes.

16   Q    When did those meetings take place?

17   A    Afterward.  I can't tell you what dates they were.

18   Q    Now, how many were there, committee, control,

19   whatever he's saying is privileged?  How many meetings were

20   there?

21           MR. GRUNER TO WITNESS:  If you know.

22   A    Discussed, two.

23   Q    What specific meetings?  I mean, was it the quality

24   assurance meeting, or what was the --

25   A    Peer review.  Peer review.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 137

```
 1      Q    Peer review?

 2      A    Med exec.

 3      Q    Med exec?

 4      A    That's correct.

 5      Q    So it was one peer review and one med exec?

 6      A    And they were combined, yes.

 7      Q    Okay.  Now, when was the -- you had a meeting in

 8  the stairwell and you had one in his office.  When did those

 9  meetings take place?

10      A    Afterwards.

11      Q    I understand that.  But which one was first?

12      A    I believe the stairwell one was the first one.

13      Q    Okay.  And when was that?

14      A    I can't tell you when.  I have no idea.

15      Q    Well, I mean, was it within a month of this

16  treatment on August 19th, 2014?

17      A    There was one within a month.

18      Q    Within a month?

19      A    Yes.

20      Q    In the stairwell?

21      A    Yes.

22      Q    Okay.  Tell me what you told -- was his name Brady?

23      A    That's correct.

24      Q    What did you tell Brady?

25      A    That we needed to be able to get MRIs in the
```

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 138

1    emergency department, that this is the 21st Century and that

2    there's emergent conditions that we need to be able to get

3    them.

4         Q    I take it by that you felt that this was an

5    antiquated policy?

6              MR. GRUNER:   Object to the form.

7         Q    You can answer the question.

8         A    The MRI machine is right down the hallway.

9         Q    How far?

10        A    Less than fifty yards.

11        Q    Well, let's draw a little map.

12        A    Oh, Lord!

13             MR. SHOENFELT:   "Exhibit 8."

14        A    This is the best of my ability.  If I've got

15   different rooms wrong, then -- but it's the general location.

16        Q    No, I understand.  I know you're answering to the

17   best of your ability, Doctor.

18        A    (Witness drawing.)  Roughly, that's -- the

19   radiology department is right across the hallway from the

20   emergency department, and the MRI is going down the hallway

21   going towards ICU.

22        Q    So the area from the emergency room to radiology is

23   how far?

24        A    I'd say less than fifty yards.

25        Q    Fifty yards?  So if you really wanted to, you could

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 150

1     condition.

2          Q     Okay.  And did you say anything else specifically?

3          A     That in 2015 you should be able to get an MRI if

4     you have it available, that there are conditions that only

5     MRI can diagnose, not CAT scan.

6          Q     Well, can you order a CAT scan in the emergency

7     room?

8          A     Yes.  Yes.

9          Q     What is the reason for the difference?

10         A     They type of imaging.

11         Q     I mean, they are both in the radiology department.

12     Correct?

13         A     Uh-huh (yes).

14         Q     So why do you have to be admitted for one and not

15     for the other?

16         A     I can't answer that for you.

17         Q     Is there any sense to that as far as you know?

18         A     As far as me, personally?

19         Q     Yeah.

20         A     Absolutely not.

21         Q     What is the reason as far as why the hospital does

22     it?

23         A     The reason I was given, or do you want to ask them?

24         Q     No.  I want to ask you.

25         A     I was told financial reimbursement.

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 151

1      Q    Okay.  Explain that to me.

2      A    They said to get reimbursed on an MRI, they had to

3 precertify.

4      Q    Precertify?  What does that mean?

5      A    It's to get permission from the insurance company.

6      Q    So what does that have to do with admission?

7      A    I have no idea.

8      Q    Okay.  Had you ever -- did you tell him

9 specifically this -- well, strike that.  Did you tell him

10 that the outcome could have been different for Jordan if she

11 had had an earlier MRI?

12     A    I did not tell him that her condition could have

13 been -- could have been different, that it was -- that I

14 needed to be able to get an MRI for her.

15     Q    Okay.  What did he say?

16     A    That they couldn't do MRIs out of the ER.

17     Q    But he didn't elaborate any further other than it

18 was a financial issue?

19     A    It was a financial issue.

20     Q    Did he discuss it -- did he say anything about the

21 effect it would have on health care?  Was that a

22 consideration at all?

23          MR. GRUNER:  During the stairwell?

24          MR. SHOENFELT:  Yes.  During the stairwell

25          conversation.

Page 152

1          MR. GRUNER:  And let me object to the form before.

2      I wasn't quite sure that you established that it

3      was Brady who told you about the financial issue in

4      that conversation.

5          WITNESS:  He did.  He did.

6          MR. GRUNER:  I'm just making sure it's clarified.

7      A      And the day that Jordan was there in my

8  conversation with Sherry, the radiology manager, and she said

9  it was because of reimbursement.

10     Q      And that was at 9:07 when you decided --

11     A      No.  That would have been around 11 o'clockish.

12     Q      Sherry -- what was her name again?

13     A      I believe it's Burns, I believe.

14     Q      Is she a health care provider?

15     A      She's radiology department manager.

16     Q      I mean, but does she --

17     A      I'm sure she -- I'm sure she probably has a history

18  of rad tech.  I don't know for sure.

19     Q      And she told you at 11:00 that the reason that you

20  couldn't get the MRI was because of a financial issue?

21     A      The reason why we can't do it in the emergency --

22  why they don't do them out of the emergency department.

23     Q      Had there ever been any other complaints regarding

24  that, to your knowledge?

25     A      That specific?

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 153

1     Q    Yes.

2     A    No.

3     Q    All right.  So is the policy still the same?

4     A    If we were in the emergency department right now

5  and I tried to get an MRI?

6     Q    Yes, sir.

7     A    I think I would be met with some resistance.

8     Q    Is there a written policy on this?

9     A    I don't know.

10    Q    Do you have written emergency room protocols?

11    A    We do.

12    Q    Who wrote those?

13    A    I've never -- I've never seen a policy for an MRI

14  in the emergency department, but I cannot tell you that one

15  doesn't exist.

16    Q    You've never seen an emergency room protocol --

17    A    For the MRIs.  That would be a radiology policy.

18    Q    Okay.  Have you ever looked at the radiology

19  protocol?

20    A    No.

21    Q    Have you ever looked at the emergency room

22  protocol?

23    A    I've looked at some of them, yes.

24    Q    I mean, didn't you write those?

25    A    No.

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 155

1    A    To come and get them?

2    Q    Yes.

3    A    I wouldn't say twenty seconds.

4    Q    It doesn't take but a few minutes to come down

5    there and pick somebody up.   Correct?

6    A    That's as long as it takes to get it done.

7    Q    Did you talk to Brady about policies of other

8    hospitals you've worked at?

9    A    Yes.

10   Q    I mean, when you were at St. Francis, —

11   A    Yeah.

12   Q    — did they have that same policy?

13   A    If you needed to get — you had to talk to

14   radiology  department about getting one.

15   Q    I mean, was it —

16   A    There was no button to push for an MRI.

17        MR. GRUNER:  Are you talking about at St. Francis?

18   A    No.  At St. Francis Cabrini in Alexandria.

19   Q    Yeah.  St. Francis Cabrini.

20   A    Yes.

21   Q    Could you order an MRI from the emergency room?

22   A    I had before, yes.

23   Q    So that was back when?

24   A    I was there from '97 to 2005.

25   Q    So their policy was different from the one at North

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 156

1    Monroe -- North Louisiana Medical Center.  Correct?

2         MR. GRUNER:  Object to the form of the question.

3    A    I was able to get an MRI in Alexandria.

4    Q    And you could get it done quickly?

5    A    Relatively quickly.

6    Q    Well, I mean, when you said something about "This

7    is 2015; you should be able to get an MRI done," --

8    A    Uh-huh (yes).

9    Q    -- what did you mean by that?

10   A    That I could order an MRI and it would get done.

11   Q    You think that's required for proper health care in

12   the emergency room.  Correct?

13   A    Yes, sir.

14   Q    And when you told Brady that, he said, "Well, it's

15   a financial consideration"?

16   A    He started explaining the reason why.

17   Q    How long did that conversation last?

18   A    Five minutes.

19   Q    When is the next time you saw him?

20   A    It was much later.  It was in his office.

21   Q    Okay.  Tell me when that -- what happened then?

22   A    We work different -- some of the things, like,

23   there weren't enough techs.  They weren't able to do twenty-

24   four/seven MRI.

25   (OFF RECORD TALKING.)

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 158

1    trained on CT and did some limited MRI.  And she knew how

2    upset I had been about this and she offered to come and sit

3    and watch them do -- retrain on some MRIs and to offer her

4    services uncompensated to be on call as long as I wasn't

5    working to come help out the ER.

6        Q.   How long have you been upset about it?

7        A    Since that day.

8        Q    Since August 2014.  Correct?

9        A    Absolutely.  Absolutely.

10       Q    Because you knew the delay shouldn't have occurred?

11       A    I was upset with the system, the very things that

12   we're talking about.

13       Q    Okay.

14       A    I have anxiety before every shift.

15       Q    You mean, since that time?

16       A    Oh, absolutely.

17       Q    And why is that?

18       A    Because I'm afraid another Jordan Scott is going to

19   come in the door.

20       Q    Did you tell Brady all this?

21       A    Oh, yeah.

22       Q    And what did he say?

23       A    He sympathized and said it affected him, too,

24   because his child is in the same grade and he has to see them

25   at school and --

EXHIBIT A

Exhibit "1"

9a0c3e83-be8a-46a5-b387-b14bb655a077

Page 159

1    Q    But he still wouldn't change the policy?

2    A    Never gave in, no.  And then, I was told something

3  about the radiologists on after hours has to pay for a

4  virtual radiology reading and it's not in the contract to be

5  reimbursed for that, and the radiologists would be out three

6  hundred and fifty dollars ($350) for every MRI that was read

7  not by them.

8    Q    Not by who?

9    A    By the radiologists.  Like, if they had to use an

10 off-site, off-hours radiology service.

11   Q    Was that in the second meeting?

12   A    That was actually kind of in a follow-up after my

13 wife, but that was just in passing he was trying to explain.

14 There was a third one.

15   Q    A third meeting?

16   A    Yes.

17   Q    Okay.

18        MR. SHOENFELT:  Let me call this other court

19        reporter and see if we can get somebody.

20        COURT REPORTER:  Yeah.  I haven't heard back from

21        the one who lives here, so she must be busy.

22        MR. SHOENFELT:  I really want to finish this now.

23 (OFF RECORD.)

24 EXAMINATION BY MR. SHOENFELT, continuing:

25   Q    All right.  My last question was -- oh.  I think

EXHIBIT A

9a0c3e83-be8a-48a5-b387-b14bb655a077

Page 173

1              came out of peer review, they are privileged.

2      Q    Was that in peer review or did you discuss it

3  outside of peer review?

4      A    Both.

5      Q    Okay.  Well, good.  Tell me what -- tell me what

6  you discerned from that issue.  Did you talk -- strike that.

7  Did you talk to Brady about that, also?

8      A    Yes.

9      Q    And what did he say?

10      A    It was financial implications.

11      Q    Like what?

12      A    Reimbursement.

13      Q    And how would that affect reimbursement?

14      A    They have -- a lot of insurance companies will not

15  reimburse for non-precertified MRIs.

16      Q    So part of the time that was the two and a half

17  hours was while the hospital was precertifying the --

18      A    I don't know that.

19          MR. SHOENFELT:  For the record, the court reporter,

20          although we don't want her to go and we're not

21          agreeing that she's going, but she has to go.

22          Correct?

23          COURT REPORTER:  I have to go.

24          MR. SHOENFELT:  She has to go.

25          COURT REPORTER:  I have to go.  I can't find

Exhibit "1"

EXHIBIT A

9a0c3e83-be8a-46a5-b387-b14bb655a077

James P. Taylor, M.D.
February 25, 2016

20

1      A.  He said that he could not do an MRI in the
2   emergency department.
3      Q.  Did he tell you who he spoke with?
4      A.  He did not.  I asked him to call MRI, but I
5   don't know if that's who he called.
6      Q.  Okay.  How long after your initial
7   conversation with Ron do you believe he told you
8   that?
9      A.  Twenty, thirty minutes, maybe.
10     Q.  I took your earlier testimony that once Ron
11  told you that, that you then got on the phone.  Is
12  that correct?
13     A.  No, in person with Sandy Goss.
14     Q.  Okay.  So Sandy was the next person you
15  talked to?
16     A.  Yeah.  Sandy was around at that time.  I
17  think she was familiar with at least Jordan's mom.
18  I believe they knew each other or knew of each
19  other.
20     Q.  Okay.  And what did you tell Sandy at that
21  time?
22     A.  I was frustrated that they said they
23  wouldn't do an MRI and she said, well, they're not
24  going to do one in the emergency department.  And I
25  said, would you please go talk to somebody and I

James P. Taylor, M.D.
February 25, 2016

21

1    need an MRI.

2         Q.   Okay.   What did Sandy do then?   Do you

3    know?

4         A.   I assumed that she went and talked to them

5    and came back and later told me that they don't do

6    ER MRIs.

7         Q.   Do you know who Sandy spoke with?

8         A.   I do not.

9         Q.   How long after Ron told you that he had

10   spoken with somebody in radiology did you talk to

11   Sandy?

12        A.   Not very long after.

13        Q.   Okay.   But you don't know who Ron or Sandy

14   spoke with?

15        A.   No.

16        Q.   Your next action then to get the MRI was to

17   call Sheri?

18        A.   I walked over there.

19        Q.   You walked over and talked to her in

20   person?

21        A.   I walked to her office, right.   She was

22   actually out in the hallway.

23        Q.   Again, what specifically did you tell Sheri

24   at that time?

25        A.   That I needed to get an MRI.

James P. Taylor, M.D.
February 25, 2016

22

1    Q.  Did you tell her it was emergent?

2    A.  I needed an MRI in the emergency

3  department.

4    Q.  Did you tell her --

5    A.  Did I use the word "emergent"?

6    Q.  Yeah.

7    A.  I did not use the word "emergent."

8    Q.  Did you tell her specifically what the

9  nature of Jordan's neurological deficit was?

10    A.  Yeah, it was something with her spine.

11    Q.  What did she say?

12    A.  We don't do emergency -- we can't do MRIs

13  in the emergency department -- through the emergency

14  department.

15    Q.  After that conversation with Sheri, about

16  what time frame are we talking -- well, strike that.

17  What was the time frame that you spoke with Sheri,

18  if you recall?

19    A.  It was not long.  It was enough time for me

20  to leave her office to say I'm going to admit her to

21  get an MRI and for me to walk up to administration

22  to go and try to find Brady and talk to him, but he

23  was out.  So I came back and just called Jake Wood

24  to do it.

25    Q.  So --

James P. Taylor, M.D.
February 25, 2016

26

1      Q.  Okay.  Subsequent to this case, have you
2    ever attempted to order an MRI out of the emergency
3    department?
4      A.  Yes.
5      Q.  And were you successful in getting that MRI
6    accomplished?
7      A.  Yeah, there was one time.
8      Q.  Okay.  What type of case was that?
9      A.  It was immediately after peer review.  In
10   urgent care, there was somebody there with lower
11   back pain, with weakness in their legs and they
12   called from urgent care -- Quickcare, that was the
13   particular urgent care, called Dr. Blair to discuss
14   it with him, and he told them to have the patient
15   come to the ER for me to see.
16     Q.  And was it your order for the MRI that was
17   accomplished or Dr. Blair's order?
18     A.  No, it was me.  I became a disruptive
19   physician that day because of what I had been
20   through, and I went all the way to the CEO.
21   Dr. Blair knew I was unhappy back then.
22     Q.  All right.  Any other attempts to order an
23   MRI out of the emergency department?
24     A.  The only other time -- that I had tried to
25   order an MRI?  No.  There was a -- since that time,

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

* * * * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

VERSUS                                    PCF NO. 2015-00923

JACOB WOOD, M.D.,
THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER
AND JAMES TAYLOR, M.D.

* * * * * * * * * * * * * * * * * *

DEPOSITION OF

SHERI GARRETT BURNS

May 12, 2016

(commencing at 1:01 p.m.)

* * * * * * * * * * * * * * * * * *

Taken at:

        Northern Louisiana Medical Center
        401 East Vaughn Avenue
        Ruston, Louisiana 71270

* * * * * * * * * * * * * * * * * *

Reported By:              WANDA J. EADY
                         CERTIFIED COURT REPORTER
                         CERTIFICATE NO. 87255
                         PARISH OF OUACHITA
                         STATE OF LOUISIANA

EXHIBIT
3

1a08a

**Page 2**

```
1  APPEARANCES:
2
      FOR GREGORY SCOTT AND MICHELLE SCOTT,
3     INDIVIDUALLY AND ON BEHALF OF THE MINOR,
      JORDAN SCOTT, AS THE PARENTS AND TUTORS
4     OF JORDAN SCOTT:
5        OSCAR L. SHOENFELT, III
         ATTORNEY-AT-LAW
6        2109 Perkins Road
         Baton Rouge, Louisiana 70808
7
8     FOR NORTHERN LOUISIANA MEDICAL CENTER:
9
         BLUE WILLIAMS
10       3421 North Causeway Boulevard,
         No. 900
11       Metairie, Louisiana 70002
         appearing herein by and through
12       Mr. Kurt S. Blankenship
13
14    FOR JACOB M. WOOD, M.D.:
15       HUDSON, POTTS & BERNSTEIN
         Post Office Drawer 3008
16       Monroe, Louisiana 71210-3008
         appearing herein by and through
17       Ms. Sera White on behalf of
         Mr. Gordon L. James
18
19  VIA    FOR JAMES PATRICK TAYLOR, M.D.:
20  TELEPHONE:
         DEGAN, BLANCHARD & NASH
21       400 Poydras Street, Suite 2600
         New Orleans, Louisiana 70130
22       appearing herein by and through
         Ms. Maryann Hoskins
23
24  ALSO PRESENT:   Susan White, Risk Manager
25  * * * * * * * * * * * * * * * * *
```

**Page 3**

```
             INDEX OF EXHIBITS
1
2   Exhibit 1   Page 1 of MRI List . . . . . . . . . . . . 12
3   Exhibit 2   Page 2 of MRI List . . . . . . . . . . . . 12
4
5   * * * * * * * * * * * * * * * * * * * *
6
7             STIPULATIONS
8       This deposition is taken for use before the Medical
9   Review Panel, pursuant to the Louisiana Code of Civil
10  Procedure, and may be used for all purposes and in any manner
11  consistent therewith.  All objections except as to the form
12  of the question and responsiveness of the answer are
13  reserved.
14
15  * * * * * * * * * * * * * * * * * * * *
16
17      The witness, SHERI GARRETT BURNS, was advised of her
18  right to read and sign this deposition, and she elected to
19  exercise that right.
20
21  * * * * * * * * * * * * * * * * * * * *
22
23
24
25
```

**Page 4**

```
1        SHERI GARRETT BURNS, being first duly sworn, testified
2   as follows:
3   EXAMINATION BY MR. SHOENFELT:
4      Q   Would you please state your full name for the
5   record?
6      A   Sheri Garrett Burns.
7      Q   And give me your address, please.
8      A   Home address?
9      Q   Yeah.  That would be good.
10     A   996 Long Straw Road, Choudrant, Louisiana.
11     Q   How do you spell that?
12     A   C-H-O-U-D-R-A-N-T.
13     Q   I was wondering how you pronounced that.
14         MR. SHOENFELT:  So I'm going to ask you some
15     questions today.  This is called a deposition.
16     Have you ever taken a deposition?
17         WITNESS:  I have not.
18         MR. SHOENFELT:  Okay.  If you don't understand any
19     question, just ask me to repeat it and I'll be
20     happy to do so.  But if you do answer, I will
21     assume you understand it.  Does that sound fair?
22         WITNESS:  Yes.
23     Q   Can you give me your occupation?
24     A   I am the director of radiology.
25     Q   At Northern --
```

**Page 5**

```
1      A   Northern Louisiana Medical Center.
2      Q   And what does that encompass?
3      A   I manage the radiology department and all of the
4   techs that work for me.
5      Q   Can you give me a rundown of your educational
6   background?
7      A   I have a Bachelor of Science in radiologic
8   technology.
9      Q   And where was that?
10     A   From ULM, University of Louisiana at Monroe.
11     Q   And what year did you obtain that?
12     A   1988.
13     Q   And where did you go to high school?
14     A   Bastrop High School.
15     Q   The Rams.  Correct?
16     A   The mighty Rams.
17     Q   All right.  What year did you graduate?
18     A   1983.
19     Q   What did you do from '83 to '88?
20     A   I was in college.
21     Q   In college?  At ULM?
22     A   Yes.
23     Q   And after you got your B.S. in radiology, what did
24  you do?
25     A   I worked at St. Francis Medical Center in Monroe
```

                    2  (Pages 2 to 5)

Page 10

1  create them?
2    A  I did help create, and they are reviewed by my
3  radiologist that's over the department.
4    Q  Who is that?
5    A  Steve Pate.
6    Q  He's an M.D.?
7    A  Yes.
8    Q  P-A-Y-T-E?
9    A  P-A-T-E.
10   Q  How long has he been at North Louisiana Medical
11  Center?
12   A  He was here prior to me.
13   Q  Prior to 1999?
14   A  Yes.
15   Q  That's a long time.
16   A  (Affirmative nod.)
17   Q  Okay.  So you report to the assistant CEO, but
18  Steve Pate is the M.D. --
19   A  He's the medical director of radiology.
20   Q  So he's the medical director?
21   A  Correct.
22   Q  And you're the director?
23   A  Yes.
24   Q  So as a medical director, what does he do?
25   A  He oversees.  He approves our policies and

Page 11

1  procedures, too.  He looks at those yearly.  He participates
2  in our radiation safety meetings.
3    Q  So does the -- what's that? -- the Joint
4  Commission, ACAH, do they require a medical director, M.D.,
5  or do you know?
6    A  I'm not sure.  I don't know if that's a true
7  requirement.  We've always had a medical director over the
8  department.
9    Q  You said he looks at the policies periodically.  Is
10  that correct?
11   A  Yes.
12   Q  Okay.  What did you review in preparation for your
13  deposition?
14   A  I reviewed Dr. Taylor's --
15      MR. BLANKENSHIP:  Deposition.
16   A  -- deposition, and I pulled the list of MRIs that
17  had been done in the emergency room.
18   Q  Where is that?
19   A  (Proffers document.)
20      MR. SHOENFELT:  For the record, we're --
21      MR. BLANKENSHIP TO MS. HOSKINS:  Maryann, I'm
22  sorry.  I didn't think about faxing this to you.
23  Maybe we could take a short break and send it to
24  you.
25      MS. HOSKINS:  Just tell me, how many pages is it?

Page 12

1      MR. BLANKENSHIP:  Two pages.
2      MS. WHITE:  I can text it to her or e-mail it to
3  her.
4      MR. BLANKENSHIP:  Sara is offering to e-mail it.
5  She's going to take a picture of it real quick and
6  e-mail it to you.
7      MS. HOSKINS:  Okay.  Thank you.
8  (OFF RECORD DISCUSSION.)
9      MR. SHOENFELT:  Okay.  For the record, I'm going to
10  mark this as "Exhibit 1."
11   Q  And I guess -- this is two pages.  Correct?
12   A  Yes.
13      MR. SHOENFELT:  So I'll mark the second page as
14  "Exhibit 2."
15   Q  So --
16      MR. BLANKENSHIP:  And for the record, the original
17  of this document had actual patient names on it.
18  We have redacted those names, but left everything
19  else.
20   Q  Okay.  Sheri -- Sheri? --
21   A  Yes.
22   Q  All right.  -- tell me about this "Exhibit 1" and
23  "2."
24   A  I just pulled a list of -- I pulled by the order
25  service, EOP.  It stands for emergency outpatient.  So I

Page 13

1  pulled all MRIs that were ordered from the emergency room.
2    Q  So you're saying where it says "HSV"?
3    A  Yes.
4    Q  What does that stand for?
5      MR. BLANKENSHIP:  EOP.  He's asking what --
6    A  The EOP is for emergency outpatient.
7    Q  Emergency outpatient?  Okay.  So explain this to
8  me, what this means.
9    A  This is just MRIs that were ordered from the
10  emergency room, and I did it by date range that's listed at
11  the top.
12   Q  Okay.  According to this, this was a computer
13  printout?
14   A  Yes.
15   Q  Okay.  Where is this kept?  In the radiology
16  department or --
17      MR. BLANKENSHIP:  The physical computer or --
18   Q  Yeah.  The physical computer.
19   A  The computer?  Yes.
20   Q  Okay.  And I assume it's part of the hospital
21  computer system?
22   A  Yes.
23   Q  And what is it under, if you wanted to pull this
24  up?
25   A  The report name is Statistics by Procedure.

4 (Pages 10 to 13)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 14

1    Q    Statistics by Procedure?  I see.  And how did you
2  narrow it down to the emergency room?
3    A    Because I picked just those orders that originated
4  from EOP, emergency outpatient.
5    Q    Okay.  What is an emergency outpatient?
6    A    A patient that is registered in the emergency –
7  being seen in the emergency room.
8    Q    So would these be patients who were never admitted
9  to the hospital?
10   A    Some of these could be.
11   Q    Do you know when these studies would have been
12 ordered and when they would have been performed?
13   A    The order date and perform date is the start date
14 to the left.
15   Q    Okay.  Where it says "start date."  Well, the first
16 one, for example, on "Exhibit 1" says, "12-10-15."  Correct?
17   A    Correct.
18   Q    That's the start date.  That's when it would have
19 been ordered?
20   A    Ordered and done.
21   Q    Well, how long would it have taken to have been
22 completed?  Do you know?
23   A    Would be within that day.  I mean, I would have to
24 pull specific exams to –
25   Q    So it is your testimony that these were ordered in

Page 15

1  the emergency room.  Correct?
2    A    Correct.
3    Q    Okay.  How were they ordered?
4    A    How were they ordered?
5    Q    Yeah.  I understand there is no button to order an
6  MRI.
7    A    Well, the order is put into the computer system.
8    Q    Order is put into computer.  How do you put it in?
9    A    You –
10       MR. BLANKENSHIP:  He's asking how does a physician
11       put it in or order them?
12   A    They go into HMS, pull up – I mean, do you want
13 step by step?
14   Q    Yeah.  I mean, there was some testimony earlier
15 about filling out some kind of outpatient sheet.
16       MR. BLANKENSHIP:  Downtime form.
17   Q    Downtime form.  Is that what this is?
18   A    Oh.  Like, they do a written order, and then
19 somebody would take the written order and put it in the
20 computer.
21   Q    Well, was that how these were done?  Do you know?
22   A    I don't know.
23   Q    Okay.  And all these are emergency room physicians,
24 Holly Kidd, –
25   A    She is not.  And that one has "106" beside it,

Page 16

1  which could be that they started out in the emergency room
2  and went to the floor.  So on that particular one, I don't
3  know for sure if the order started in the ER or if it was
4  after they were admitted.  But if it doesn't have a room
5  number, they were strictly an emergency room patient.
6  (OFF RECORD DISCUSSION.)
7    Q    I'm going to get you – this is the exhibit.
8    A    Okay.
9    Q    I'm going to get you to mark some stuff.  So why
10 don't you write out on the exhibit, where it says "EOP," just
11 write out "emergency room – " whatever that –
12       MR. BLANKENSHIP:  Emergency outpatient.
13   Q    Emergency outpatient.
14   A    (Complies.)
15   Q    Okay.  Then, you said as far as, if we're looking
16 at this, it says the procedure, which would be – is that
17 "MR"?  Is that an MRI?
18   A    Yes, sir.
19   Q    Okay.  "MR" is MRI.  Ankle – is that without
20 contrast?
21   A    Correct.
22   Q    Okay.  And then, it says "12-10-15" at the top of
23 "Exhibit 1."  That's the start date.  That would be the date
24 they would take it or order it?
25   A    (Affirmative nod.)

Page 17

1        MR. BLANKENSHIP:  Both.
2    A    Both.
3    Q    Both.  Okay.  Service, patient name was taken off.
4  Correct?
5    A    Correct.
6    Q    The patient number is there and it has an order,
7  order number and it says "300."  Where would that order be?
8    A    In the computer system.
9    Q    In the computer system?
10   A    And it's automatically assigned as orders are
11 entered, so that would have been the third order entered –
12   Q    Oh, is that –
13   A    – because it goes – it jumps by one hundred.
14   Q    I see.  Okay.  For that day?
15   A    For that visit.
16   Q    For that visit for that patient?
17   A    Correct.
18   Q    What's "Location; Q/P"?  Is that outpatient?
19       MR. BLANKENSHIP:  I think it's O/P.
20   Q    Is that outpatient?
21   A    Outpatient.  Correct.
22   Q    Outpatient.  And the ordering physician, and then
23 the family physician.  Correct?
24   A    Correct.
25   Q    And what's the "ST tech"?

5 (Pages 14 to 17)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 18

1    A   The "ST" is the status, and the "tech" is the x-ray
2  tech that performed the exam.
3    Q   So what does "F" mean, status F?
4    A   Final.
5    Q   Final?  What does that mean?
6    A   That there is a final report.
7    Q   The report was run.  What does "R" mean?
8    A   Resulted?  I'm not familiar with the "R."
9    Q   And then, "Exhibit 1" is -- why is that a different
10  page than "Exhibit 2"?  Is this just different dates?
11    A   It's a different time range.
12    Q   Okay.  All right.  So would I be correct in saying
13  that, in the year 2013, these would -- "Exhibit 2" would have
14  all of the MRIs that would have been ordered in the emergency
15  room?
16    A   Yes.
17    Q   So these are MRIs of the brain, cervical spine,
18  hip, and then an MRA of the head.  Is that the same as an
19  MRI?
20    A   Well, it's MR angiography.  It's looking at the
21  vessels themselves.
22    Q   And then, on "Exhibit 2" for 2013, which of those
23  physicians are actually ER physicians?
24    A   All but Sheila Mariano, Derek Liston, --
25    Q   Why don't you put an "X" by those, the ones that

Page 19

1  are not ER?
2    A   -- and Holly Kidd.  (Complies.)  Oh, wait.  Liston
3  is.
4       MR. BLANKENSHIP:  I was going to say isn't Dr.
5    Liston an ER physician?
6       WITNESS:  He is.
7       MR. BLANKENSHIP:  Once you're finished, say out
8    loud which ones you've marked as not ER physicians.
9    A   Sheila Mariano and Holly Kidd.
10    Q   Okay.  Now, as far as "Exhibit 1," would I be
11  correct in saying that this list would contain every MRI that
12  was performed or ordered in the emergency room for the year
13  2014 at North Louisiana Medical Center?
14    A   Yes.
15    Q   Okay.  So there's one at, like, April 28th, it
16  looks like; one June 1st; one June 22nd; one August 21st; and
17  one September 18th.  Is that correct?  The MRA was
18  September --
19    A   18th.
20    Q   -- 18th.
21    A   Correct.
22    Q   And then, will you mark on "Exhibit 1" all the
23  physicians that are not ER physicians?
24    A   Okay.  Holly Kidd, Mark Blackwelder, Reagan Bonin.
25  That's all.

Page 20

1    Q   What is this "Procedure total; 5," and it says
2  "inpatient"?  What does that mean?  I'm talking about
3  "Exhibit 1."
4    A   Five of these converted from an ER patient to an
5  inpatient.
6    Q   Okay.  So the study could have been ordered in the
7  emergency room, and then it would have been performed when
8  the patient was admitted?
9    A   I can't really say positively from this.  It could
10  have ordered in the ER or it could have ordered after they
11  were inpatient.
12    Q   Now, and then on "Exhibit 1," it says, "Procedure
13  total inpatient, 4; outpatient, 9."
14       MR. BLANKENSHIP:  I'm sorry.  Where are you?
15       MR. SHOENFELT:  I'm on "Exhibit 2."
16    Q   How do those numbers come up?  I don't -- it says
17  "Inpatient, 4; outpatient, 9; industrial, 0; total, 13," I
18  guess, procedure total thirteen?
19       MR. BLANKENSHIP:  Oh, okay.  I see.
20    A   Correct.
21    Q   Patient count would be three inpatient, and
22  outpatient seven.  Correct?
23    A   Correct.
24    Q   So do you have an explanation as to -- there's been
25  some testimony that there is a button in the emergency room

Page 21

1  that you can order a CT and an x-ray, but there's not a
2  button where you can order an MRI.
3       MR. BLANKENSHIP:  In the computer.
4    Q   In the computer.
5    A   Yes.  I understand.
6    Q   Are you aware of that?
7    A   I have been made aware of that.
8    Q   When?
9    A   I don't remember exactly when.
10    Q   I mean, -- okay.  Was that recently or, I mean,
11  what --
12    A   Yes.
13    Q   Recently?  You mean, like, in the last week?
14    A   Like, in the last month or so.
15    Q   Last month or so?  Okay.  When did that come up?
16    A   Maybe when I was reviewing --
17       MR. BLANKENSHIP:  Dr. Taylor's?
18    A   -- Dr. Taylor's deposition.
19    Q   I mean, how did that -- how did you get that
20  information?  He doesn't say it in the deposition.
21    A   It said that there was nothing -- he couldn't order
22  it from within the ED documentation system.
23    Q   And that's the first time you were aware that there
24  was not a button to order an MRI on the computer?
25    A   Correct.

6  (Pages 18 to 21)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 22

1　　MR. BLANKENSHIP: So we can be specific, the
2　emergency department computer system.
3　A　The emergency.
4　Q　The emergency department.
5　　MR. BLANKENSHIP: Because there's a separate
6　computer system --
7　A　Yes.
8　Q　Well, can you order an MRI anywhere in the hospital
9　on the computer?
10　A　Yes.
11　Q　Why is there a difference in the ER and the
12　hospital as to how you can order an MRI?
13　A　Apparently, the MRI was not set up on the ED
14　system.
15　Q　Okay. So it's set up everywhere except for in the
16　emergency room, -- is that correct? -- as far as your
17　knowledge?
18　　MR. BLANKENSHIP: As a computer button.
19　Q　As a computer button.
20　A　As a computer button? Apparently so.
21　Q　Apparently so? And what is the reason for that?
22　What is the reason that the MRI is set up on the computer to
23　order in every place in the hospital except for the ER?
24　A　I don't know.
25　Q　Did you discuss it with anyone?

Page 23

1　A　I have not.
2　Q　I mean, you seem to hesitate. Did you get some
3　information on it or --
4　A　Well, I mean, I just didn't -- I didn't realize
5　that it wasn't set up in there.
6　　MR. BLANKENSHIP: And maybe she's hesitating
7　because she discussed it with counsel.
8　Q　Did you discuss it with anyone other than counsel?
9　A　No.
10　　MR. BLANKENSHIP TO MS. HOSKINS: Maryann, did you
11　get it?
12　　MS. HOSKINS: Yes, sir. Thank you.
13　　MR. BLANKENSHIP: Okay.
14　Q　Now, have you been involved at any time personally
15　with any patients who have -- where an MRI has been ordered
16　in the emergency room and the patient has been taken directly
17　to the diagnostic center to have the MRI run from the
18　emergency room at North Louisiana Medical Center?
19　A　Say that one more time. I didn't under--
20　　MR. BLANKENSHIP: I'm going to object to the form.
21　She may not understand what you mean "involved
22　personally."
23　Q　Okay. I mean, do you have any -- I mean, you ran
24　this "Exhibit 1" and "2." Correct?
25　A　Correct.

Page 24

1　Q　Were you involved in any of these --
2　A　Not directly.
3　Q　I mean, do you remember any of them?
4　A　Not specifically, no.
5　Q　Do you remember specifically any time to your
6　knowledge that an ER physician ordered an -- was able to
7　order an MRI while in the emergency room, had the patient
8　taken directly over to the MRI machine at North Louisiana
9　Medical Center and had the MRI run?
10　A　Am I aware of --
11　Q　Yes.
12　A　Yes.
13　　MR. BLANKENSHIP: Are you aware of that happening?
14　A　Yes.
15　Q　Okay. In that instance, are there any written
16　procedures or anything written down as to who should take the
17　patient over there, how the MRI should be facilitated in any
18　way?
19　A　No.
20　Q　As the director of the radiology department, how do
21　you feel that should be effectuated when that order is made
22　in the emergency room?
23　A　I don't understand.
24　　MR. BLANKENSHIP: Are you asking physically how it
25　happens?

Page 25

1　Q　Yeah. I mean, who -- you're saying the order can't
2　be put in the computer. Correct?
3　　MR. BLANKENSHIP: In the emergency room.
4　A　Oh, it is put in the computer.
5　Q　It's put in the computer by how if there is no
6　button in the emergency room?
7　A　They go into the other computer system and put it
8　in.
9　Q　Who is "they"?
10　A　I can't say for sure who is actually putting it in.
11　Q　Okay. I mean, you don't know who would put it in.
12　The doctor couldn't put it in, or could he?
13　A　I know they do now.
14　Q　Well, when did that start?
15　A　I don't know when it started, but --
16　Q　Well, when did you become aware? You said now you
17　are aware. When did you become aware?
18　A　Again, from when I was reading his, he said that he
19　can now put it in, that he used to have to write it.
20　Q　Well, was there a change made at some point in time
21　that you are aware of?
22　A　Not that I'm aware of, no.
23　Q　Okay. So I'm trying to figure out, like, for these
24　exhibits, how these patients -- who took these patients over
25　to radiology and had the test run?

7 (Pages 22 to 25)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Exhibit "1"



**Page 26**

1  A  My technologists go to the emergency room and get
2  the patients and bring them back.
3  Q  Okay. And you are aware of that happening before?
4  A  Yes.
5  Q  So if Jordan Scott on August 19th, 2014 was denied
6  an MRI based on any reason, including financial, that would
7  not have -- that would have been different treatment than
8  other patients had received?
9  MR. BLANKENSHIP: Object to the form.
10  A  Can you repeat that again?
11  Q  Yeah. You read Dr. Taylor's deposition. Correct?
12  A  Correct.
13  Q  Okay. Assuming that Jordan Scott was denied an MRI
14  being run in the emergency room at 9:07, that would have been
15  different from the way other patients have been treated at
16  North Louisiana Medical Center. Would that be correct?
17  MR. BLANKENSHIP: Same objection.
18  A  To my knowledge, it was not denied.
19  Q  I understand that. But I'm just saying, assuming
20  that what Dr. Taylor said to be true, she would have been
21  treated differently than other patients at North Louisiana
22  Medical Center. Correct?
23  MR. BLANKENSHIP: Same objection. (To witness):
24  You can answer, if you can.
25  A  I really don't know how to answer that.

**Page 27**

1  Q  I'm just -- assuming that what Dr. Taylor --
2  assuming. Okay? I can ask you, assuming that Dr. Taylor,
3  what he said was true, that she was denied or maybe his
4  request for an MRI because of money oriented or financial
5  reasons, that would have been different than other patients
6  who have been treated at North Louisiana Medical Center?
7  MR. BLANKENSHIP: Same objection.
8  A  We don't even know financial stuff in radiology. I
9  mean, we have an order from a physician. They've got an
10  armband that they are registered, and we do what's on the
11  order. I mean, we don't even know financial stuff on a
12  patient.
13  Q  I understand. But I'm just asking you --
14  MR. SHOENFELT TO COURT REPORTER:  Can you read the
15  question back?
16  COURT REPORTER: I can play it back for you.
17  MR. SHOENFELT: Play it back.
18  Q  In other words, you can respond to the question.
19  Okay?
20  A  Okay.
21  MR. BLANKENSHIP: If you know the answer.
22  (OFF RECORD DISCUSSION.)
23  Q  I'm going to ask it again. I want you to listen to
24  me -- okay? --
25  A  Okay.

**Page 28**

1  Q  -- and try to answer the question, if you can. I
2  said, assuming what Dr. Taylor said in his deposition was
3  true, that Jordan Scott was denied an MRI in the emergency
4  room because of financial reasons, that would be different
5  than any other patient you know that's been treated at North
6  Louisiana Medical Center. You would agree with that?
7  MR. BLANKENSHIP: Object --
8  MS. HOSKINS: Object to the form. I don't think
9  that's exactly what Dr. Taylor said.
10  MR. BLANKENSHIP: And I join in the objection. (To
11  witness): But you can answer, Sheri, if you can.
12  A  That would be different.
13  Q  I mean, in other words, you are telling me that you
14  never know -- that you know of no requisite of a patient to
15  show any kind of financial ability to pay before an MRI is
16  run from -- ordered from the emergency room and run at North
17  Louisiana Medical Center?
18  A  No.
19  Q  You don't know of any. Correct?
20  A  Correct.
21  Q  Okay. So am I correct that you have no knowledge
22  of any necessity for a patient to be admitted before an MRI
23  or something can be ordered in the emergency room?
24  A  No.
25  MS. HOSKINS: Pardon me. I didn't hear the answer.

**Page 29**

1  MR. BLANKENSHIP: "No," she said.
2  A  No.
3  Q  I take it no one has ever discussed that with you
4  at any point in time? No one from the hospital has ever
5  discussed with you that you need to get insurance
6  verification or some kind of ability to pay before a
7  diagnostic study can be run?
8  A  No.
9  Q  So, I mean, are you telling me that, if a patient
10  had an appointment to come get this study run, you don't
11  verify it with insurance?
12  A  Not personally. That happens in the business
13  office in admissions. They don't get to me if all that is
14  not taken care of, whatever --
15  Q  Well, how do you know that? You just testified you
16  didn't know anything about the financial ability to pay.
17  A  Well, I don't personally. I know that -- how I
18  know is, occasionally we have had somebody on the schedule
19  that we don't do because of whatever reason, you know,
20  something in the business office.
21  Q  Oh, really?
22  A  It might be rescheduled, you know, if they weren't
23  precerted, but we have nothing to do with that process.
24  Q  But you are aware of that. I mean, you --
25  MR. BLANKENSHIP: Let her finish her answer.

8 (Pages 26 to 29)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 30

1    Q   Go ahead.
2    A   I have nothing to do with that.
3    Q   That's not my --
4    A   I don't check it.  I don't know about it.
5    Q   Well, your testimony is you were unaware of any
6  kind of financial status of the patient, and now you are
7  testifying you are aware that patients have been denied
8  coverage if they are not precertified, -- is that correct? --
9  or denied --
10       MR. BLANKENSHIP:  Object to the form.
11   Q   -- denied having the test done if they are not
12 precertified?
13       MR. BLANKENSHIP:  Object to the form.  That's not
14       what she said.
15   A   I have no knowledge of their financial status when
16 a patient comes to my department.
17   Q   But you are assuming that they've been precertified
18 by the business office.  Correct?
19   A   Yes, because I know that does take place.  I just
20 have nothing --
21   Q   You just know it takes place, but you don't know
22 anything about it?
23   A   Correct.
24   Q   So what else do you know that you don't know
25 anything about as far as they have to do -- what? -- get

Page 31

1  precertified or --
2        MR. BLANKENSHIP:  Object to the form.  (To
3        witness):  You can answer.
4    A   Most MRIs have to be precertified on an
5  outpatient --
6    Q   Most of them?
7    A   I assume.  Like I said, I don't -- I'm not involved
8  in that process.
9    Q   So they may need to be precertified if they are in
10 the ER.  You don't really know, do you?
11   A   I don't think so in ER.  I really don't know.
12   Q   You really don't know?
13   A   I don't know.
14   Q   Okay.  I mean, there is a financial registration
15 portion at the emergency room.  You're aware of that?
16   A   I'm sure there is at some point.
17   Q   No one has ever talked to you about, "We want to
18 make sure that these patients are certified so we can make
19 sure that we get reimbursed for these MRIs"?
20   A   I've never had that conversation.
21   Q   Never had that?  That would come from the business
22 office?
23   A   Yes.
24   Q   Now, you said there were cases where people had to
25 reschedule when they didn't get precertified, -- correct? --

Page 32

1  patients at North Louisiana Medical Center?
2    A   Yes.
3    Q   To your knowledge, has anybody not been
4  precertified that got an MRI at North Louisiana Medical
5  Center?
6        MR. BLANKENSHIP:  Object to the form.
7    A   I have no knowledge.
8    Q   You have no knowledge one way or the other?
9    A   No, sir.
10   Q   You don't know if what happened with "Exhibit 1" or
11 "Exhibit 2," if these patients who got these MRIs from the ER
12 may have been precertified.  Correct?
13   A   I have no idea.
14   Q   But you were assuming they all had been
15 precertified.  Correct?
16       MR. BLANKENSHIP:  Object to the form.
17   A   I don't know.  I don't know their status as far as
18 insurance or --
19       MR. BLANKENSHIP:  She's said that six or seven
20       times.
21   Q   And how hands-on are you as far as, if an order
22 comes through and you're saying a patient is in the ER that,
23 according to your supervision, then radiology should come
24 over and get the patient and take them directly to the
25 diagnostic center.  Is that correct?

Page 33

1    A   Correct.
2    Q   And you've seen that happen before?
3    A   Yes.
4    Q   And my question to you would be why didn't that
5  happen on August 19th, 2014, when Dr. Taylor ordered an MRI
6  for Jordan Scott?
7        MR. BLANKENSHIP:  Object to the form.
8    Q   Meaning, why didn't someone from radiology come
9  over and take her immediately to get the MRI?
10   A   To my knowledge, as soon as we received the order,
11 she was brought to MRI.
12   Q   Okay.  Well, an order was made -- a written order
13 was made at 12:35 and she wasn't in MRI until after 3
14 o'clock.  How do you explain that?
15       MR. BLANKENSHIP:  I don't think that's correct.  I
16       object to the form.  It's, like, 2:30 or 2:40,
17       something like that.  It's in the record.  Whatever
18       the record says.
19   Q   It says to x-ray at 12: --
20       MR. BLANKENSHIP:  Those are different.  That was
21       the chest and the neck x-rays.
22   Q   Okay.  Did you review the medical record?
23   A   I have not looked at the medical record.
24   Q   Is there any -- you just pulled up these charts.
25 Correct?

9   (Pages 30 to 33)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 38

1  believe. "Is she a health care provider?" "She's radiology
2  department manager." "I mean, but does she -- " "I'm sure
3  she -- I'm sure she probably has a history of rad tech. I
4  don't know for sure." "And she told you at 11:00 that the
5  reason you couldn't get the MRI was because of financial
6  issues?" "The reason we can't do it in the emergency -- why
7  they don't do them out of the emergency room." You don't
8  recall any of that?
9      A  No, sir.
10     Q  You don't have any knowledge of any financial
11  issues of getting MRIs out of the emergency room?
12     A  No.
13     Q  And you don't know why there's not an order button
14  in the emergency room for MRIs?
15         MR. BLANKENSHIP: In the emergency room computer
16         system?
17     Q  In the emergency room computer.
18     A  No.
19     Q  I mean, can you think of any reason from a physical
20  or physiological point of view why a button couldn't be in
21  the emergency room for an MRI order?
22     A  No.
23     Q  Page 27, Dr. Taylor says, referring to another
24  instance, "The only other time that I tried to order an MRI
25  since that time, there was a female with headaches and visual

Page 39

1  problems that had multiple negative CTs of her head that was
2  seen. I can't give you an age, nine-year-old or ten-year-old
3  or something like that, that was seeing a neuro
4  ophthalmologist in Shreveport and he had an order, an MRI
5  that was being done, scheduled for outpatient at 1:30 that
6  day, and her and her mother checked in because her headache
7  got worse. That physician called the hospital and wanted to
8  go ahead and do the MRI. On that particular one, I actually
9  talked to Sheri about that one because she was already
10  scheduled and stuff like that. The MRI was done." You don't
11  recall that?
12     A  I don't recall that, no.
13     Q  Well, are you saying that might have occurred,
14  didn't occur or you just don't recall?
15         MR. BLANKENSHIP: Object to the form. She already
16         answered.
17     A  I don't recall it.
18     Q  Have you ever received any electronic mail of any
19  type concerning whether MRIs can be run -- or ordered from
20  the emergency room at North Louisiana Medical Center?
21         MR. BLANKENSHIP: Object to the form. I think he's
22         talking about e-mails.
23     Q  I'm talking about anything, e-mails, something
24  faxed, anything, any information.
25     A  No.

Page 40

1      Q  Never? Never come up.
2      A  (Negative nod.)
3      Q  Is that correct?
4      A  Correct.
5      Q  You never talked to Dr. Wood about it, about that
6  issue. Is that correct?
7      A  No. That's correct.
8      Q  Dr. Blair?
9      A  No.
10     Q  Do you know Dr. Blair?
11     A  Yes.
12     Q  You did see Dr. Blair there on August 19th, 2014.
13  Correct?
14     A  Yes. He was physically in the department.
15     Q  Was any other physician physically in the
16  department to your recollection?
17     A  Not to my -- well, the radiologist was.
18     Q  Did you go in and look at the MRI that was run on
19  Jordan Scott?
20     A  I did.
21     Q  What did you see?
22     A  I'm not an MRI technologist, so I don't really -- I
23  can't interpret MRIs, but --
24     Q  Okay. Well, tell me what you recall in the
25  conversation -- any conversations that took place in the

Page 41

1  radiology department concerning Jordan Scott between anybody.
2      A  Well, the conversations were that, "We need to get
3  her out of here."
4      Q  And that was between the radiologist and Dr. Blair.
5  Is that correct?
6      A  Correct.
7      Q  Anyone else?
8      A  Not to my knowledge, no.
9      Q  Okay. Dr. Taylor, page 21. I think this is the
10  second -- the telephone deposition. "Your next action to get
11  the MRI was to call Sheri?" Answer: "I walked over there."
12  "You walked over there and talked to her in person?" Dr.
13  Taylor: "I walked to her office, right. She was actually
14  out in the hallway." "Again, specifically, did you tell
15  Sheri at that time?" Answer: "Do I need to get an MRI?"
16  Question: "Did you tell her it was emergent?" "I need an
17  MRI in the emergency department." Question: "Did you tell
18  her?" "Did I use the word 'emergent?'" He says, "Yeah. I
19  did not use the word 'emergent.'" "Did you tell her
20  specifically what the nature of Jordan's neurological deficit
21  was?" Answer: "Yeah. It was something with her spine." Do
22  you recall any of that conversation?
23     A  I do not. Do not recall speaking with him at all.
24     Q  "What did she say?" Answer: "We don't do
25  emergencies. We can't do MRIs in the emergency department

11 (Pages 38 to 41)

1a08adaf-d104-435c-8703-b0bc0306c2e1

Page 42

1 through the emergency department." You deny that
2 conversation?
3     A.  Yes.  I deny that.
4     Q.  But if that's true, Jordan Scott would have been
5 treated different than any other patient you've ever known
6 that would need an MRI at North Louisiana Medical Center.
7 Correct?
8     MR. BLANKENSHIP:  Object to the form.  (To
9     witness):  You can answer.
10     A.  If she had been denied, that would be different.
11 Yes.
12     Q.  And you weren't aware of Dr. Taylor trying to talk
13 to Brady on August 19th, 2014?
14     A.  I am not aware.
15     Q.  Did you see Brady on August 19th, 2014?
16     A.  I do not remember.
17     Q.  Did you ever talk to him about the care Jordan
18 Scott received?
19     A.  No, sir.
20     Q.  Did you make any kind of -- did you give any kind
21 of statements to anyone about anything that happened
22 regarding Jordan Scott on August 19th, 2014?
23     A.  No.
24     Q.  And the first time that -- when is the first time
25 you were aware there was a complaint filed or a lawsuit had

Page 43

1 been brought?
2     A.  It was when I spoke with you (indicating Mr.
3 Blankenship).
4     Q.  That was just recently?
5     MR. BLANKENSHIP:  "You," being counsel, she means.
6     A.  Counsel.
7     Q.  You mean just recently?
8     A.  Yes.
9     Q.  Did you ever talk with -- were you called to give
10 any kind of testimony of any nature in any hospital review
11 committees or anything of that nature?
12     A.  No.
13     Q.  Did you ever talk to Sandy Goss about this?
14     A.  No.
15     Q.  Who do you deal with in the business office
16 regarding precertification for diagnostic studies?
17     A.  I do not deal with anyone.
18     Q.  I mean, how do you know -- you don't have any idea
19 if the patient has been precertified or not?
20     A.  No.
21     Q.  There's nothing in the computer to say that?
22     A.  I don't know.
23     Q.  Let's see.  Let me get the right record here.  Were
24 you involved in the patient being transferred at all?
25     A.  No, sir.

Page 44

1     Q.  Page 18 of the 2016 record, there's a doctor's
2 order for an MRI.
3     MR. BLANKENSHIP:  For Jordan Scott.
4     Q.  How would that order in the emergency department
5 get into the computer?
6     A.  The nurse, M. Rhodes, put it in at 1430.
7     MR. BLANKENSHIP:  That was after she was on the
8     floor.
9     Q.  So why would that happen, if the order is at 12:35,
10 but it's not put in until two hours later?
11     A.  I'm assuming it's, whenever the patient gets to the
12 floor, they put the inpatient orders in.
13     Q.  So that's an inpatient order, in your opinion?
14     A.  It's what it appears, yes, observation to peds for
15 Dr. Wood, admission orders, --
16     MR. BLANKENSHIP:  It says "admission orders" on the
17     bottom.
18     Q.  Okay.  Page 23, this is a chest x-ray.  Can you
19 tell me what time that was taken?
20     MR. SHOENFELT:  For the record, it's Jordan Scott's
21     chest x-ray.
22     MR. BLANKENSHIP:  It's page 23, I would assume, of
23     one of the versions, the 20- --
24     MR. SHOENFELT:  The 2016 record.  That's what I'm
25     using now.

Page 45

1     MR. BLANKENSHIP:  The 2016.
2     A.  The order date and time is 8-19 at 7:48 a.m.  This
3 does not show the exact time the x-ray was taken on this
4 report.
5     Q.  Is there something --
6     A.  It was dictated at 8:49 a.m., so it was between
7 those times.
8     Q.  Okay.  So would someone have taken Jordan Scott
9 over to x-ray?
10     A.  This was a single view chest, so -- it says
11 "portable."  They went to the emergency department and took
12 the x-ray --
13     Q.  So someone actually went from the --
14     A.  -- with a portable unit.
15     Q.  -- radiology department to take the x-ray at
16 9 o'clock that morning.  Correct?
17     A.  It would have been before 9 o'clock because it was
18 dictated at 8:49, so --
19     Q.  Was it dictated on August 19th?
20     A.  Yes.  At the very bottom.
21     Q.  Okay.  So how would that -- that order would have
22 got in the computer, put in the computer by the nurse --
23 correct? -- in the ER?
24     A.  I don't know who put it in.
25     Q.  But they would have gone over there to do a

1a08adaf-d104-435c-8703-b0bc0306c2e1

Exhibit "1"

STATE OF LOUISIANA

PATIENT COMPENSATION FUND

MEDICAL REVIEW PANEL PROCEEDING

* * * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE
SCOTT, INDIVIDUALLY AND ON
BEHALF OF THE MINOR, JORDAN
SCOTT, AS THE PARENTS AND
TUTORS OF JORDAN SCOTT

VERSUS                                    PCF NO. 2015-00923

JACOB WOOD, M.D.,
THE GREEN CLINIC,
NORTHERN LOUISIANA MEDICAL CENTER
AND JAMES TAYLOR, M.D.


* * * * * * * * * * * * * * * * *

DEPOSITION OF

SANDRA THORNHILL GOSS

May 12, 2016

(commencing at 9:05 a.m.)

* * * * * * * * * * * * * * * * *


Taken at:

        Northern Louisiana Medical Center
        401 East Vaughn Avenue
        Ruston, Louisiana 71270

        * * * * * * * * * * * * * * * * *


Reported By:                    WANDA J. EADY
                                CERTIFIED COURT REPORTER
                                CERTIFICATE NO. 87255
                                PARISH OF OUACHITA
                                STATE OF LOUISIANA

EXHIBIT
4

**Page 2**

```
 1  APPEARANCES:
 2
         FOR GREGORY SCOTT AND MICHELLE SCOTT,
 3       INDIVIDUALLY AND ON BEHALF OF THE MINOR,
         JORDAN SCOTT, AS THE PARENTS AND TUTORS
 4       OF JORDAN SCOTT:
 5       OSCAR L. SHOENFELT, III
         ATTORNEY-AT-LAW
 6       2109 Perkins Road
         Baton Rouge, Louisiana 70808
 7
 8       FOR NORTHERN LOUISIANA MEDICAL CENTER:
 9
         BLUE WILLIAMS
10       3421 North Causeway Boulevard,
         No. 900
11       Metairie, Louisiana 70002
         appearing herein by and through
12       Mr. Kurt S. Blankenship
13
14       FOR JACOB M. WOOD, M.D.:
15       HUDSON, POTTS & BERNSTEIN
         Post Office Drawer 3008
16       Monroe, Louisiana 71210-3008
         appearing herein by and through
17       Ms. Sara White on behalf of
         Mr. Gordon L. James
18
19  VIA
    TELEPHONE:   FOR JAMES PATRICK TAYLOR, M.D.:
20
         DEGAN, BLANCHARD & NASH
21       400 Poydras Street, Suite 2600
         New Orleans, Louisiana 70130
22       appearing herein by and through
         Ms. Maryann Hoskins
23
24  ALSO PRESENT:   Gregory Scott
                    Susan White, Risk Manager
25       * * * * * * * * * * * * * * * * * *
```

**Page 3**

```
 1            INDEX OF EXHIBITS
 2  Exhibit 1   Drawing . . . . . . . . . . . . . . . . . . 26
 3  Exhibit 2   Triage Assessment Recording . . . . . . . . 56
 4
 5       * * * * * * * * * * * * * * * * * * *
 6
 7            STIPULATIONS
 8       This deposition is taken for use before the Medical
 9  Review Panel, pursuant to the Louisiana Code of Civil
10  Procedure, and may be used for all purposes and in any manner
11  consistent therewith.  All objections except as to the form
12  of the question and responsiveness of the answer are
13  reserved.
14
15       * * * * * * * * * * * * * * * * * * *
16
17       The witness, SANDRA THORNHILL GOSS, was advised of her
18  right to read and sign this deposition, and she elected to
19  exercise that right.
20
21       * * * * * * * * * * * * * * * * * * *
22
23
24
25
```

**Page 4**

```
 1       SANDRA THORNHILL GOSS, being first duly sworn, testified
 2  as follows:
 3  EXAMINATION BY MR. SHOENFELT:
 4       Q   Would you please state your full name for the
 5  record?
 6       A   Certainly.  It's Sandra Thornhill Goss.
 7       MR. SHOENFELT:  Ms. Goss, my name is Oscar
 8       Shoenfelt.  I'm here today to ask you some
 9       questions.  This is a deposition.  Have you ever
10       taken a deposition?
11       WITNESS:  No, sir.
12       MR. SHOENFELT:  Well, your attorney is going to
13       advise you can read and sign after.  I'm going to
14       ask you a series of questions.  If you don't
15       understand any question, just ask me to repeat it
16       and I'll be happy to do so.  You understand that?
17       WITNESS:  I understand.
18       Q   Can you give me your address, please?
19       A   Yes.  It's 106 Winwood Avenue, and that's here in
20  Ruston.
21       Q   That's your residence.  Is that correct?
22       A   That's correct.
23       Q   And you are, as I can tell by looking at your tag
24  there, Director of Emergency Services for North Louisiana
25  Medical Center.  Is that correct?
```

**Page 5**

```
 1       A   Yes, sir.
 2       Q   Tell me what that encompasses.
 3       A   As the director, I am responsible for overseeing
 4  the day-to-day operations of the emergency room.
 5       Q   And when you say "day-to-day operations," what does
 6  that mean exactly?
 7       A   Staffing, budget, meetings.
 8       Q   Who is your immediate superior?
 9       A   The CNO, which is Ronnie Erson.
10       Q   Did you say he was the C- --
11       A   CNO.
12       Q   What does "CNO" mean?
13       A   The Chief Nursing Officer.
14       Q   Is he a nurse?
15       A   He is.
16       Q   And who does he report to?
17       A   He reports to the CEO, which is Roy Finch.
18       Q   And how long has Mr. Finch been there -- or been
19  here?
20       A   Just a few months.
21       Q   Okay.  Who was his predecessor?
22       A   Brady Dubois.
23       Q   So it's Brady Dubois, and then Ronnie, and then
24  you.  Correct?
25       A   Correct.  Now, Ronnie wasn't here at that time.
```

Page 14

1  policies?
2      A   Yes, sir.
3      Q   So when did Mr. -- is his name Dubois?
4      A   Dubois.  Uh-huh (yes).
5      Q   Dubois?
6      A   Dubois.
7          MR. BLANKENSHIP: Dubois.
8      Q   Dubois?  When did Mr. Dubois begin to work at --
9      A   I don't --
10     Q   -- North Louisiana Medical Center?
11     A   I don't recall that.
12     Q   Okay.  Well, was he there when you were in the
13  education department?
14     A   No, sir.
15     Q   All right.  So did he come while you were Director
16  of Emergency Services?
17     A   I don't remember.
18     Q   You just know it was sometime -- you were in
19  education up until 2009, so it was sometime after 2009?
20     A   I don't remember.
21     Q   Did you ever have a meeting with him?
22     A   Well, yes.  I've met with him.
23     Q   I mean, your immediate boss was who again?
24     A   The CNO.
25     Q   The CNO?

Page 15

1      A   Uh-huh (yes).
2      Q   Okay.  You never had any kind of written materials
3  as to the policies that you were to enforce in the emergency
4  room other than just the regular ER policies?
5      A   Correct.
6          MR. BLANKENSHIP:  I'm going to object to the form.
7      (To witness):  But you can answer.
8      Q   Did you receive e-mails from Mr. Dubois at any
9  time?
10     A   Yes.  I have --
11     Q   What have you reviewed in preparation for your
12  deposition?
13     A   The medical record and the policies.
14     Q   Did you review the -- which medical record?  The
15  new one or the one that was presented earlier?
16         MR. BLANKENSHIP TO WITNESS:  If you know.
17     A   I don't know.
18     Q   Okay.  Well, how many pages is the one that you
19  reviewed?
20     A   Are they numbered?
21         MR. BLANKENSHIP:  They're not numbered at the
22      bottom?
23     A   Do you want me to count them?
24     Q   Well, let me ask you what date is the
25  certification?

Page 16

1      A   March the 1st of '16.
2      Q   Okay.  So that was the second copy that was
3  presented.  Did you ever look at any records prior to those
4  records --
5      A   No, sir.
6      Q   -- regarding this case?
7      A   No, sir.
8      Q   All right.  So the only thing that you've reviewed
9  in preparation for your deposition would be the emergency
10  room record from August 19th, 2014?
11     A   If that's the date on the record, yes.  I don't
12  remember the date.  Yes.  It looks like August the 19th.
13     Q   Well, this case involves Jordan Scott.  You are
14  familiar with the case, I'm assuming?
15     A   Yes, sir.
16     Q   So what do you have besides the record there?
17     A   I have the policies.
18         MR. BLANKENSHIP:  The ones you requested.
19     Q   The ones I requested?
20     A   Yes, sir.
21     Q   All right.  Are there any policies particular to
22  the emergency room that you are aware of as to the ordering
23  of diagnostic studies in the emergency room?
24         MR. BLANKENSHIP:  Any diagnostic studies?
25         MR. SHOENFELT:  Yes.

Page 17

1      A   In the emergency room?
2      Q   Yeah.  You're the director of the emergency room.
3      A   I do not have policies relating to that.
4      Q   There's no policies?
5      A   (Negative nod.)
6      Q   So there's no written policies as to the ordering
7  of studies in the emergency room that you are aware of, --
8      A   Not that I'm aware of, no.
9      Q   -- particularly on August 19th, 2014.  Is that
10  correct?
11     A   That is correct.
12     Q   Were there -- the only thing you reviewed in
13  preparation for this deposition were the emergency room
14  records -- or the policies that I asked for specifically, and
15  also the record.  Is that correct?
16     A   That is correct.
17     Q   You didn't review anything else?
18     A   No, sir.
19     Q   Did you talk to anyone else?
20         MR. BLANKENSHIP:  Excuse me.  (To witness):  And
21      you reviewed Dr. Taylor's deposition.
22     A   Oh, yes.
23     Q   You reviewed Dr. Taylor's deposition?
24     A   Yes.  Yes.
25     Q   Anything else you reviewed?

5 (Pages 14 to 17)

b01c7bdf-906d-48b8-9df9-4529b35364dd

## Page 42

1  an MRI in the emergency room and that the patient be taken
2  directly to the MRI machine and have an MRI done at North
3  Louisiana Medical Center?
4     A   I'm sorry. Can you repeat it? I --
5     Q   Do you know of any reason why a physician cannot
6  order an MRI at the emergency room so that a patient who is
7  neurologically impaired and timing is important could go
8  directly to the MRI from the emergency room and have the
9  study done while under the care of the emergency room
10 physician at North Louisiana Medical Center?
11    A   I do not know.
12    Q   That issue has never arose since you have been
13 Director of Emergency Services at North Louisiana Medical
14 Center?
15        MR. BLANKENSHIP: I'm going to object to the form.
16        "Issue"? I'm not sure if she understands what you
17        mean by that, but --
18    Q   Well, you do understand -- you read Dr. Taylor's
19 deposition, didn't you?
20    A   Yes.
21    Q   Okay. He's saying that he wasn't allowed to order
22 an MRI from the emergency room because the patient had to be
23 admitted, and then cleared for insurance. Are you aware of
24 any such policies?
25    A   No.

## Page 43

1         MS. HOSKINS: Object to the form -- this is Maryann
2         Hoskins -- just insofar as it characterizes Dr.
3         Taylor's deposition testimony.
4         MR. BLANKENSHIP TO WITNESS: Okay. I'm sorry. Did
5         you answer?
6     Q   Well, let me ask you. Since you've been Director
7  of Emergency Services at North Louisiana Medical Center, have
8  physicians been able to order -- emergency room physicians
9  been able to order MRIs in the emergency room and the patient
10 be taken directly to the imaging center here to have those
11 studies done?
12    A   Yes.
13    Q   Have you seen that happen?
14    A   I haven't seen it happen, but I know that it's
15 happened. I mean, I know that they've ordered them.
16    Q   Well, how do you know that they've ordered them if
17 you haven't --
18    A   I mean, I wasn't in the room. But I review records
19 daily on different things, so I've seen MRIs being ordered.
20    Q   So you, as Director of Emergency Services, would
21 agree that a physician should have the ability -- ER
22 physicians should have the ability to order an MRI in the
23 emergency room and have the patient taken directly over
24 there, particularly if timing is important?
25    A   Yes.

## Page 44

1     Q   And you know of no other instance other than Jordan
2  Scott where the ER physician has ordered an MRI, and then had
3  to have the patient admitted in order to have the MRI
4  performed?
5         MR. BLANKENSHIP: Object to the form. (To
6         witness) But you can answer.
7     A   I don't recall any other names, no.
8     Q   Was anything about whether she could get an MRI, --
9  Jordan Scott get an MRI on August 19th, 2014, was that ever
10 discussed by anyone with you --
11    A   No.
12    Q   -- on August 19th, 2014?
13    A   No, sir.
14    Q   So if Dr. -- assuming Dr. Taylor had come to you at
15 9:07 a.m. and said, "I want to get an MRI immediately; this
16 patient has neurological deficits; timing is important," what
17 would you have done?
18    A   I would have went to my boss, and then up the chain
19 of command.
20    Q   Up the chain of command? Why is that?
21    A   If he needed it done and he wasn't able to get it
22 done, we would -- I would go outside to find somebody to talk
23 to him.
24    Q   Well, couldn't you make it happen?
25    A   Absolutely not. I'm --

## Page 45

1     Q   Why?
2     A   Well, that -- I don't have the --
3         MR. BLANKENSHIP: Let her finish her answer.
4         MR. SHOENFELT: Okay.
5     A   I don't have the authority.
6     Q   You don't have the authority to do what?
7     A   To order a test. To make someone do a test. I
8  don't have that authority.
9     Q   But Dr. Taylor was ordering -- assuming he was
10 ordering the MRI, --
11    A   Okay.
12    Q   -- you don't have the facility or you don't have
13 the authority as Director of Emergency Services to call
14 radiology and say, "Hey, we need to get this test done as
15 soon as possible; we've got a twelve-year-old girl here who
16 is neurologically impaired; every second is important; we
17 need to get the test done so we can see what the problem is"?
18 You don't have that authority?
19        MR. BLANKENSHIP: Object to the form. (To
20        witness) But you can answer.
21    A   Yes. I could call radiology for that, yes.
22    Q   Okay. You do have that authority?
23    A   I can --
24        MR. BLANKENSHIP: Object to the form. (To
25        witness) You can answer.

12 (Pages 42 to 45)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 46

1     A   I can call radiology and say that the doctor has
2  requested or ordered this test.
3     Q   And have you ever done that?
4     A   Yes.
5     Q   Well, tell me about that instance.  What happened
6  in that particular case?
7     A   I don't know the name, but a patient came in that
8  was needing an MRI of a hip, and the doctor ordered the MRI.
9  And I called radiology and said that the physician had
10 ordered the MRI.
11    Q   All right.  What happened?
12    A   They did the MRI.
13    Q   What?  They took him directly from the emergency
14 room over to the radiology center and had the MRI done?
15    A   Yes, sir.
16    Q   And do you recall when that was?
17    A   Several --
18        MR. BLANKENSHIP:  Go ahead.
19    A   Several months ago.  I don't know the exact date.
20 No, sir.
21    Q   Several months ago?
22    A   Uh-huh (yes).
23    Q   Okay.  It was not prior to August 19th, 2014.  Is
24 that correct?
25    A   No, sir.

Page 47

1     Q   Prior to August 19th, 2014, had you ever done
2  that?  Had you ever had an ER physician want to order an MRI
3  and had the patient taken directly over there?
4     A   Not that I --
5         MR. BLANKENSHIP:  I object to the form.  (To
6         witness):  You can answer.
7     A   Not that I recall, no.
8     Q   To your knowledge, prior to August 19th, 2014, had
9  any patient ever been in the emergency room at North
10 Louisiana Medical Center and the ER physician ordered an MRI
11 and the patient was taken directly over to the imaging center
12 to have the MRI done?
13    A   I don't know.
14    Q   But your testimony is there was never an issue --
15 was there ever an issue of that occurring before
16 August 19th, 2014?
17        MR. BLANKENSHIP:  Object to the form.  (To
18        witness):  But you can answer.
19    A   No.  I mean, I don't know if there was an issue,
20 no.
21    Q   You don't know of any issues?
22    A   No, sir.
23    Q   So you don't -- you are unaware of any ER physician
24 ever ordering an MRI at North Louisiana Medical Center where
25 the patient was taken directly from the ER to the imaging

Page 48

1  center prior to August 19th, 2014?
2     A   I don't know of any issues, no.
3     Q   But you don't know of it ever happening?
4     A   Correct.  I don't know.
5     Q   Is there any reason for that?
6     A   Not to my knowledge, no.
7     Q   Does that seem unusual to you?
8         MR. BLANKENSHIP:  That she wouldn't know?
9     A   No.  I mean, that -- so you've never heard --
10 you've never seen a patient taken directly from the ER over
11 to imaging prior to August 19th, 2014?
12    A   Not that I recall, no.
13    Q   But you agree that the ER -- I mean, the physician
14 should have that capability to make that order and have the
15 patient taken directly over there?
16    A   If it's -- if that's what they order, yes, sir.
17    Q   Okay.  Was there ever any discussions or any
18 procedures or policies that you were ever aware of regarding
19 the issue of ER physicians being able to order MRIs in the
20 emergency room at North Louisiana Medical Center after
21 August 19th, 2014?
22        MR. BLANKENSHIP:  Ever any discussions after
23        August 19th?
24    Q   Anything.  Any discussions, any e-mails, any memos.
25 Anything that you are aware of where this was ever discussed

Page 49

1  with anyone in the ER or anyone at the hospital?
2     A   Not that I'm aware of, no.
3     Q   All right.  So page 40 of Dr. Taylor's deposition
4  he states, quote, "...I guess it was two days later that I
5  wrote the addendum, I was asked to clarify because, by doing
6  the admission, it looked like there was a time gap where
7  nobody was doing anything and they wanted me to explain."
8  "Who asked you to do it?"  Answer:  "The hospital."
9  Question:  "So the hospital was certainly aware of this
10 problem?"  Answer:  "Sandy Goss asked me to clarify."  "Who
11 is Sandy Goss?"  "She's the ED manager.  Now, whether it came
12 from quality department or whoever, I don't know."  Do you
13 deny that taking place, that conversation with Dr. Taylor?
14    A   No, I don't deny that.
15    Q   Why?
16    A   Because --
17        WITNESS TO MR. BLANKENSHIP:  Can I answer that?
18        MR. BLANKENSHIP:  Sure.
19    A   Because she came back to the emergency room and,
20 when she comes from admission in the hospital back to our
21 care, she falls back under Dr. Taylor.  And so, there was no
22 documentation from the time she came from MRI back into the
23 emergency room to the time of dispo, or us transferring to
24 LSU.
25    Q   Okay.  Run that by me again.

Exhibit "1"

Page 54

1  2014, had Jordan taken directly over there when he made
2  the -- or wanted to have the MRI done. Correct?
3      A. Correct.
4      Q. And do you have any idea, like, once he placed the
5  order in the record, why she couldn't be taken directly over
6  there?
7      A. I don't know that answer.
8      Q. Well, I think the order was actually placed in the
9  record after she was going to be admitted. Let's see. At
10  12:35 p.m. Do you know why, in a situation -- emergency
11  situation with a child with neurological deficits, why she
12  couldn't be taken directly to the imaging center at that
13  point in time?
14      MR. BLANKENSHIP: "At that point," being 12:35?
15      MR. SHOENFELT: Yes.
16      A. These are admission orders, so it would have been
17  done when she was admitted to the hospital.
18      Q. Okay. And you just think it's -- you think it's a
19  coincidence that Dr. Taylor went ahead and admitted her when
20  he ordered the MRI?
21      MR. BLANKENSHIP: Admit -- I mean, I'm going to
22      object to the form. (To witness): You can answer.
23      A. I don't -- I don't know the reasoning behind Dr.
24  Taylor --
25      Q. You know of no reason that she couldn't have been

Page 55

1  taken over there at any point in time from the emergency room
2  to the imaging center the morning of August 19th, 2014?
3      A. I do not.
4      Q. You don't know anything about any kind of policy
5  where that you had to have -- be admitted to the hospital to
6  have an MRI performed?
7      A. No.
8      Q. And you've never had any discussion with anyone at
9  the hospital regarding any issue with an MRI being ordered
10  from the emergency room?
11      A. No.
12      Q. Nothing in a -- have you ever had to clear
13  insurance with a patient before they had anything done at the
14  emergency room at North Louisiana Medical Center?
15      A. No, sir.
16      Q. You're not privy to any kind of discussions that
17  took place regarding reimbursement for MRIs run at North
18  Louisiana Medical Center?
19      A. No, sir.
20      Q. Is there any, to your knowledge, any policies --
21  emergency room policies regarding what screening should be
22  done if a patient presents with a neurological deficit at the
23  emergency room?
24      A. No, sir.
25      Q. As far as you know, a patient such as Jordan Scott

Page 56

1  with neurological deficits could have had an MRI done --
2  ordered in the emergency room and taken directly over to the
3  imaging center on August 19, 2014. Is that correct?
4      A. That's correct.
5      Q. Now, you do have some kind of financial
6  registration when a patient comes to the emergency room.
7  Correct?
8      A. I'm sorry. I don't understand that.
9      Q. I mean, that is part of your procedure to get
10  insurance information and that type of thing?
11      A. Admissions does that. Yes, sir.
12      Q. And the procedure says that "The emergency room
13  physician, provider or designee retains the right and
14  responsibility to perform a medical screening examine on
15  every patient presenting for emergency services, determine if
16  a life or limb-threatening situation exists unless the
17  private physician is in attendance at the time the patient
18  presents." Correct?
19      A. Correct.
20      Q. That's the policy that you understand?
21      A. Yes, sir.
22      MR. SHOENFELT: For the record, I have --
23      Q. What is this chart?
24      MR. SHOENFELT: I made a copy of it. I'm going to
25      attach it as "Exhibit 2."

Page 57

1      A. This is our triage assessment scoring that the
2  nurses provide to each patient they triage.
3      Q. So what does it mean, "requires immediate life-
4  saving intervention"? It says "A," and then it says go to
5  No. 1. What does that mean?
6      A. That means 1 is the level of triage, so Level 1
7  would be a lifesaving measure would be required.
8      Q. Okay. And that would include the ability to order
9  diagnostic studies as soon as possible in the emergency room?
10      MR. BLANKENSHIP: Object to the form. (To
11      witness): You can answer.
12      A. That would be the -- I'm sorry.
13      Q. No. 1 is what?
14      A. 1 means that's a level of triage. We have five
15  levels, a five-level triage system in the emergency room. It
16  goes from 1 for lifesaving to 5, meaning there's no resources
17  needed.
18      Q. So what was Jordan Scott, based on your review of
19  the medical record?
20      MR. BLANKENSHIP: Object to the form.
21      A. I don't recall that.
22      Q. Can you look in the record and identify it for me?
23      A. Uh-huh. (yes).
24      MR. BLANKENSHIP: You're talking about the initial
25      triage?

15  (Pages 54 to 57)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 70

1  gotten MRIs from the emergency department?
2      A   Yes, ma'am.
3      Q   Okay.  Have you spoken to Dr. Taylor about his
4  deposition?
5      A   No, ma'am.
6      Q   Have you spoken to anybody else at the hospital
7  regarding Dr. Taylor's deposition?
8      A   Just Susan White and Kurt.
9      Q   Okay.  And I'm sure Kurt will keep you straight,
10  but I don't want to know about anything that you discussed
11  with him.  Dr. Taylor testified that he -- there's no button
12  for the emergency department physicians to check to order an
13  MRI from the emergency department.
14      MR. BLANKENSHIP:  Are you talking about now or at
15      that time?
16      MS. HOSKINS:  Thank you.
17      Q   At that time.
18      A   No, ma'am.
19      Q   Is that correct or, at that time was that correct?
20      A   That is correct.  There is no button.
21      Q   Do you know why that was?
22      A   No, ma'am.
23      Q   So is there a check button for a physician to order
24  a CT from the emergency room?
25      A   Yes, ma'am.

Page 71

1      Q   If a physician wanted to order an MRI, how would he
2  or she order it through the computer system?
3      A   He would have to go on the HMS side of the
4  medical -- I'm sorry -- of the electronic system, or a
5  handwritten paper order could have taken place.
6      Q   Okay.  Did you ever speak to Mr. Dubois about
7  whether he had conversations with Dr. Taylor regarding the
8  ability to order an MRI from the ED?
9      MR. BLANKENSHIP:  You cut out, Maryann.  We
10      couldn't ask who you were asking.  Dubois --
11      MS. HOSKINS:  I'm sorry.
12      Q   Dr. Taylor testified that he had several
13  conversations with Brady Dubois regarding the ability for ED
14  physicians to order an MRI from the ER.  Did Mr. Dubois tell
15  you about any conversations he had with Dr. Taylor?
16      A   No, ma'am.
17      MS. HOSKINS:  That is all I have.
18      MR. SHOENFELT:  I have a couple of follow-ups.
19  REEXAMINATION BY MR. SHOENFELT:
20      Q   My recollection of your testimony was that, prior
21  to August 19th, 2014, you could not think of any instances at
22  all where a physician ordered an MRI from the emergency room
23  and the patient was taken directly to the emergency room.  Is
24  that correct?
25      A   That's correct.

Page 72

1      Q   It's not a matter of remembering names.  You just
2  can't remember any time?
3      A   Right.
4      Q   Okay.  Now, tell me about this button.  That sounds
5  interesting.
6      A   It's an -- he's talking about the order.  On the
7  computer screen, it's not an actual button you pick like a
8  keyboard.  It's on the screen.  You check what boxes you want
9  to order, and there's not an MRI button or check mark.
10      Q   Okay.  Is there one now?
11      A   No, sir.
12      Q   Okay.  There's never been an MRI button?
13      A   No, sir.
14      Q   Okay.  And what's the reason for that?
15      MR. BLANKENSHIP TO WITNESS:  If you know.
16      A   I don't know.
17      Q   So I would be correct in saying you do treat
18  patients that come in that need an MRI different from
19  patients who come in and need a CT, for example?
20      MR. BLANKENSHIP:  Object to the form.  (To
21      witness):  You can answer.
22      A   I mean, that's dependent upon what the physician
23  orders.
24      Q   No.  No, no.  There's no button for an MRI
25  Correct?

Page 73

1      A   Correct.
2      Q   There never has been.  Will there ever be one?
3      MR. BLANKENSHIP:  Object to the form.  (To
4      witness):  You can answer, if you know.
5      A   I don't know.
6      Q   Well, why -- you told me that you felt that it
7  would be the appropriate standard of care for an emergency
8  room to have the ability for a physician to order an MRI for
9  a neurologically impaired patient and have them taken
10  directly over there, but there's no button for it?
11      A   If the physician feels the need to order that,
12  then, yes.
13      Q   The question was, but there's no button for it even
14  though you feel that the physician should be able to order
15  it.  Correct?
16      MR. BLANKENSHIP:  Object to the form.  (To
17      witness):  You can answer.
18      A   Correct.
19      Q   And why?
20      A   I can't answer that.
21      Q   Well, you're the Director of Emergency Services.
22  That never peaked your curiosity?
23      A   But I'm not a physician, so I don't order -- I
24  don't do the orders.  So that's a physician --
25      Q   Well, you're director of the whole emergency

19  (Pages 70 to 73)

b01c7bdf-905d-48b8-9df9-4529b35364dd

Exhibit "1"

Page 74

1 services, though. Correct?
2  A  Yes.
3  Q  You help physicians; you assist them?
4  A  Correct.
5  Q  Okay. So have you ever thought that they may want
6 to order an MRI from the emergency room?
7  A  Yes.
8  Q  What did you do? Did you talk to anyone about that
9 issue or follow up on it in any way?
10     MR. BLANKENSHIP: "That issue," being the button
11     issue?
12     MR. SHOENFELT: Yeah.
13  A  No, sir.
14  Q  But there is a button for a CT?
15  A  Yes.
16  Q  And why is that?
17  A  I can't answer that.
18  Q  Could it be a financial reason, perhaps?
19     MR. BLANKENSHIP: Object to the form. (To
20     witness): You can answer.
21  A  Not that -- I don't know that answer.
22  Q  You don't know. But you've never discussed it with
23 anybody --
24  A  No, sir.
25  Q  -- even though you think the proper standard of

Page 75

1 care would be for there to be -- a physician should be able
2 to order an MRI in the emergency room. Correct?
3  A  Correct.
4  Q  So you don't intend to follow up on that
5 whatsoever?
6     MR. BLANKENSHIP: Object to the form. (To
7     witness): You can answer.
8  A  No.
9  Q  Why?
10  A  Because that's a physician test.
11  Q  Well, you're a nurse. Correct?
12  A  I am.
13  Q  You don't ever help a physician when you think they
14 are making an error or if they've made a misdiagnosis? You
15 don't ever step in and say, "Well, Doctor, I think you should
16 consider that."
17     MR. BLANKENSHIP: Object to the form.
18  Q  Isn't that part of your duty as a nurse?
19  A  It is.
20     MR. BLANKENSHIP: Object to the form.
21  Q  Shouldn't that be part of your duty as Director of
22 Emergency Services? If you feel that the ER doctor should be
23 able to order that MRI, shouldn't you follow up on that?
24     MR. BLANKENSHIP: Object to the form.
25  A  Yes.

Page 76

1  Q  Are you going to do it now?
2     MR. BLANKENSHIP: Object to the form. (To
3     witness): Don't answer that.
4     MR. SHOENFELT: On what grounds?
5     MR. BLANKENSHIP: Possible remedial action, I
6     guess.
7  Q  Okay. So now, tell me, can you order x-rays in the
8 emergency room? Is there a button for that?
9  A  Yes, sir.
10  Q  How about an ultrasound?
11  A  Yes, sir.
12  Q  Any diagnostic studies that you can order -- that
13 you know of that you can order in the emergency room there's
14 a button for except the MRI?
15  A  I can't answer that. I don't know if there's any
16 other buttons that aren't there.
17  Q  And I'm correct in saying, then, that there is
18 disparity as far as that MRI screening process. If a
19 physician wants to order that, it's not as easy as ordering a
20 CT.
21     MR. BLANKENSHIP: Object to the form.
22  Q  Would you agree with that?
23     MR. BLANKENSHIP: Object to the form. Sorry.
24  A  He can order it.
25  Q  No, that's not my question. If you want to order

Page 77

1 a -- a patient comes in and you want to order a CT, you push
2 the button. Correct?
3  A  Correct.
4  Q  And what happens?
5  A  The CT is ordered.
6  Q  And is the patient taken over to the imaging
7 center?
8  A  Yes.
9  Q  Directly from the ER?
10  A  Yes.
11  Q  And you've seen that happen?
12  A  Yes.
13  Q  But you've never seen an MRI ordered except one
14 time that you can recall after August 19th, 2014. Correct?
15     MR. BLANKENSHIP: Object to the form. (To
16     witness): You can answer.
17  A  Correct.
18  Q  And that hasn't -- you haven't ever questioned
19 anyone why that is?
20  A  No, sir.
21  Q  You've never heard any rumors it's because MRIs are
22 expensive and there might be some issue about getting
23 reimbursement unless they are cleared by insurance first?
24  A  No, sir.
25  Q  You wouldn't agree with that policy, would you?

b01c7bdf-906d-48b8-9df9-4529b35384dd

Exhibit "1"

Page 78

1     A   Agree with the policy --
2         MR. BLANKENSHIP:  With such a policy.
3     A   Oh.
4     Q   Yeah.  You wouldn't agree with such a financial
5  policy, would you?
6     A   No.
7     Q   Now, tell me, if a patient wants to order an MRI,
8  what is the -- is there a procedure for that?
9         MR. BLANKENSHIP:  You mean, if a physician, I
10        assume?
11    Q   Yeah.  A physician.  All right.  Let's just say,
12 you know, Dr. Taylor wanted to order an MRI at 9:07.  He
13 couldn't push a button, could he?
14    A   No.
15    Q   Okay.  Well, what would -- what's the procedure you
16 have in place to make sure he knows how to get the MRI done?
17    A   The easiest is to write it on a downtime x-ray
18 form, order the MRI, is the easiest.
19    Q   Okay.  Well, I want to know what written policy you
20 have so the physician will know how to do it.
21    A   I don't know of any such policy.
22    Q   Okay.  Well, how does he know that that's the
23 easiest way?
24    A   I don't know.
25    Q   Well, don't you think it would be good for the ER

Page 79

1  physicians to know that, --
2         MR. BLANKENSHIP:  Object to the form.  (To
3         witness):  You can answer.
4     Q   -- as Director of Emergency Services?
5     A   They are instructed on our downtime procedures and
6  that's considered a downtime paper form.  They write on it
7  and it goes to the perspective unit, whether it's lab or
8  x-ray.
9     Q   It goes to the perspective unit.  But you've never
10 done that.  Correct?
11        MR. BLANKENSHIP:  Personally?
12    Q   Yeah.  You've never known it to happen.  Is that
13 correct?
14        MR. BLANKENSHIP:  That's a different question.
15    Q   Have you ever known that to happen?
16    A   For an MRI --
17    Q   Yeah.
18    A   -- or for anything?
19    Q   For an MRI to be written on this down thing and
20 taken over there.
21    A   I can't recall of any.
22    Q   Now, what about when you arranged this hip thing?
23 Is that what you did?
24    A   No.
25    Q   So why didn't you use the procedure that the

Page 80

1  physicians should use?
2     A   Because I'm not -- I can't order.
3     Q   Well, you could have told -- the doctor wanted to
4  order the hip, you said, after August 19th, 2014.
5     A   Uh-huh (yes).
6     Q   What did you -- who was this anyway?  What doctor?
7     A   I don't recall that.
8     Q   Well, what did you do?  He had to come to you.
9  Correct?
10    A   I was in the nurse's station again.
11    Q   But he didn't know the procedure, that he could
12 have written on a down-- down-- -- what is it?  The down
13 paper?
14    A   It's called downtime, and it's just a piece of
15 paper that has orders and you can write what you want on the
16 paper.
17    Q   All right.  Did you do that when the hip MRI was
18 ordered?
19    A   No, sir.
20    Q   Well, why?
21    A   Because I'm not doing the ordering.
22    Q   Well, could you have told the doctor to do that?  I
23 mean, --
24    A   Yes.
25    Q   Did you?

Page 81

1     A   I don't recall how the MRI was ordered that day.  I
2  don't know if he ordered it on downtime or on the other HMS
3  system.  I don't know.
4     Q   Well, shouldn't you have written policies as to how
5  an MRI can be ordered?
6         MR. BLANKENSHIP:  Object to the form.
7     A   I don't have a policy pertaining to that, no, sir.
8     Q   And you've never -- I mean, have you told
9  physicians that?  There's -- what? -- five physicians that
10 work in the ER primarily.  Correct?
11    A   Yes, sir.
12    Q   Do they all know about this downtime ordering?
13    A   Yes, sir.
14    Q   Okay.  Now, who takes the sheet over to imaging?
15    A   When we -- for instance, if they ordered an MRI, we
16 would pick up the phone and call MRI and say, "We have a
17 patient for a downtime procedure."  They come and pick up the
18 patient and the order because they have to have an order to
19 do a procedure.
20    Q   Okay.  But that's never been done, to your
21 knowledge?
22        MR. BLANKENSHIP:  Object to the form.
23    A   For an MRI?
24    Q   Yes.
25    A   I can't specifically pinpoint a particular time,

21 (Pages 78 to 81)

b01c7bdf-906d-48b8-9df9-4529b35364dd

Page 82

1  so, no, I can't answer that.
2      Q   So you do agree, on August 19, 2014, that Dr.
3  Taylor could not push a button and order an MRI like every
4  other diagnostic study. Correct?
5      A   Correct.
6      Q   What is the cost of an MRI?
7      A   I have no idea.
8      Q   What is the cost of a CT? Do you know?
9      A   I have no idea.
10     Q   Have you ever discussed that with anybody in the
11  radiology department?
12     A   No, sir.
13     Q   There's no -- I'm assuming there's no policies you
14  know of, standard protocol for a patient presenting with
15  neurological deficits at the emergency room. Correct?
16     A   Correct.
17     Q   But if a patient, for example, presented with
18  neurological symptoms that could be diagnosed with a CT, the
19  doctor could readily order that with the button. Correct?
20     A   Correct.
21     Q   Or an x-ray, they could order. The same thing.
22  Correct?
23     A   Correct.
24     Q   But the MRI, there's really no set procedure for
25  that?

Page 83

1      MR. BLANKENSHIP: Object to the form.
2      Q   Correct?
3      A   There's no button.
4      Q   There's no button, but there's no written procedure
5  in place or any procedure that you know of?
6      A   Correct.
7      Q   And it's never been done, to your knowledge, using
8  this procedure you said they can write on the down sheet?
9      MR. BLANKENSHIP: Object to the form.
10     Q   Correct?
11     WITNESS TO MR. BLANKENSHIP: I can answer?
12     MR. BLANKENSHIP TO WITNESS: You can answer.
13     Q   Correct?
14     A   Correct.
15     MR. SHOENFELT: That's all I have.
16     MR. BLANKENSHIP: Just a follow-up on that issue,
17  Ms. Goss.
18  EXAMINATION BY MR. BLANKENSHIP:
19     Q   When you say you don't have any knowledge that
20  "that" has been done, are you talking about whether a
21  downtime form was used to order an MRI by any ER physician at
22  any time?
23     A   Correct.
24     Q   Okay. Are you saying that you know for a fact that
25  it's never happened or you're just not aware one way or the

Page 84

1  other?
2      A   I'm just not aware one way or the other.
3      Q   All right. And --
4      MR. BLANKENSHIP: Okay. That's all I wanted to
5  clarify.
6      MR. SHOENFELT: No further questions. Thank you.
7      COURT REPORTER: Read and sign?
8      MR. BLANKENSHIP: Yes. And I want you to send it
9  directly to her, please.
10     COURT REPORTER: Okay.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                DEPOSITION CONCLUDED AT 11 A.M.

Page 85

1                    CERTIFICATE
2      I, WANDA J. EADY, Certified Court Reporter in and for
3  the State of Louisiana, as the officer before whom this
4  testimony was taken, do hereby certify that SANDRA THORNHILL
5  GOSS, after having been duly sworn by me upon authority of
6  R.S. 37:2554, did testify as hereinbefore set forth in the
7  foregoing 84 pages; that this testimony was reported by me in
8  the penwriter reporting method, was prepared and transcribed
9  by me or under my personal direction and supervision, and is
10  a true and correct transcript to the best of my ability and
11  understanding; that the transcript has been prepared in
12  compliance with transcript format guidelines required by
13  statute or by rules of the board, and that I am informed
14  about the complete arrangement, financial or otherwise, with
15  the person or entity making arrangements for deposition
16  services; that I have acted in compliance with the
17  prohibition on contractual relationships, as defined by
18  Louisiana Code of Civil Procedure Article 1434 and in rules
19  and advisory opinions of the board; that I have no actual
20  knowledge of any prohibited employment or contractual
21  relationship, direct or indirect, between a court reporting
22  firm and any party litigant in this matter nor is there any
23  such relationship between myself and a party litigant in this
24  matter. I am not related to counsel or to the parties herein
25  nor am I otherwise interested in the outcome of this matter.

b01c7bdf-906d-48b8-9df9-4529b35364dd

Exhibit "1"

www.northernlouisianamedicalcenter.com/northern-louisiana-medical-center/diagnosticimaging.asp

SERVICES, DIAGNOSTIC IMAGING

# Diagnostic Imaging

At Northern Louisiana Medical Center, diagnostic imaging is used to create a graphic depiction of the structures and functions of the body's organs and other internal systems. These images are used to examine and diagnose certain medical conditions.

## Our services:

- CT Scanner
- DEXA
- Digital Mammography
- Magnetic Resonance Angiography (MRA)
- Magnetic Resonance Imaging (MRI)
- Nuclear Medicine
- Ultrasound
- X-Ray



Northern Louisiana
Medical Center

NOW THE OFFICIAL IMAGING CENTER FOR

LA TECH  LOUISIANA TECH ATHLETICS

## Accreditation Frequently Asked Questions:

**What should I know about radiation safety?**
Before your imaging procedure, be sure to ask your physician the following questions:

- Why is the test needed?
- How will having the test improve my care?
- Are there alternatives that do not use radiation and deliver similar results?
- Is the facility accredited by the American College of Radiology (ACR)?
- Are pediatric and adult tests delivered using the appropriate radiation doses?

**Why should I have my imaging exam done at an accredited facility?**
When you see the gold seals of accreditation prominently displayed in our imaging facility, you can be sure that you are in a facility that meets standards for imaging quality and safety. Look for the **ACR Gold Seals of Accreditation.** To achieve the ACR Gold Standard of Accreditation, our facility's personnel qualifications, equipment requirements, quality assurance, and quality control procedures  have gone through a rigorous review process and have met specific qualifications. It's important for patients to know that every aspect of the

# Accreditation – American College of Radiology

www.acr.org/quality-safety/accreditation

**ESPN  Yahoo**



## MRI

The MRI Accreditation Program evaluates staff qualifications, quality control, MR safety policies and image quality. Accreditation is required for providers that bill for MRI under part B of the Medicare Physician Fee Schedule.

Exhibit "1"



# ACR Appropriateness Criteria®
## Overview

**Prologue**

In creating the ACR Appropriateness Criteria® (ACR AC), the ACR Task Force on Appropriateness Criteria incorporated attributes for developing acceptable medical practice guidelines used by the Agency for Healthcare Research and Quality (AHRQ) as designed by the Institute of Medicine. These attributes are:

Exhibit "1"



## Defining Appropriateness

The ACR has adopted the AQA's definition of appropriateness. "The concept of appropriateness, as applied to health care, balances risk and benefit of a treatment, test, or procedure in the context of available resources for an individual patient with specific characteristics. Appropriateness criteria provide guidance to supplement the clinician's judgment as to whether a patient is a reasonable candidate for the given treatment, test or procedure."[1]

An assumption when assessing appropriateness is that the ordering health care provider has not yet determined whether a radiological procedure is clinically useful for the specific situation. The expert panel may recommend no radiological procedure as being appropriate for a specific clinical scenario. In those instances where more than one radiological procedure may be appropriate, the expert panel will provide additional guidance or clarification of the issues.

## Rating Appropriateness

The ACR AC methodology is based on the RAND Appropriateness Method[2]. The appropriateness ratings for each of the procedures or treatments included in the AC topics are determined using a modified Delphi method. A series of surveys are conducted to elicit each panelist's expert interpretation of the evidence, based on the available data, regarding the appropriateness of an imaging or therapeutic procedure for a specific clinical scenario. The expert panel members review the evidence presented and assess the risks or harms of doing the procedure balanced with the benefits of performing the procedure. The direct or indirect costs of a procedure are not considered as a risk or harm when determining appropriateness. When the evidence for a specific topic and variant is uncertain or incomplete, expert opinion may supplement the available evidence or may be the sole source for assessing the appropriateness.



Northern Louisiana
Medical Center

SERVICES          PATIENTS          VISITORS          COMMUNITY          Al



**PATIENTS, ADMISSIONS, PRECERTIFICATION**

# Precertification

**Get ready. Get set.**

## It's all about preparation.

Completing paperwork before you arrive saves time and reduces stress at check-in.

**CLICK HERE to Pre-Register Online.**
Online pre-registration is available for all inpatient, outpatient services including diagnostic testing. You may pre-register online at least 3 business days in advance of your requested procedure date.

*10*



SERVICES                PATIENTS              VISITORS              COMMUNITY              AB



**PATIENTS, INSURANCE/ACCEPTED PLANS**

# Insurance Accepted Plans

**Are you covered?**

## If you have insurance:

Northern Louisiana Medical Center accepts most major insurance providers. Contact our Financial Counselors if you have questions about our accepted providers.

## If you don't have insurance:

No one will be denied necessary medical care due to lack of insurance or inability to pay. However, if you are uninsured you may be asked to pay a deposit when you're admitted or when you register for an outpatient procedure.



Northern Louisiana Medical Center

SERVICES   PATIENTS   VISITORS   COMMUNITY   AE

## Less Waiting

Less waiting where it matters most – our emergency room.

**LEARN MORE**

**30**
30-Minutes-Or-Less
E.R. Service Pledge

Ex. 13

OER30    User: ...URNS

Sort report: by Sub-Department
Department : MRI Imaging
HSV : EOP    Analyzer : *ALL
Procedures : *ALL
Physician # : *ALL

NORTHERN LOUISIANA MEDICAL CENTER
Statistics by Procedure - Patient listing
From 01/01/14 *ALL  To 03/24/16 *ALL  (CONTINUOUS)

Page:  1
Date:  3/24/16
Time:  16:08

| Procedure | Qty | Start Dt | Service Dt | Patient Name | Patient# | Order# | HSV | Location | | Ordering Physician | Family Physician | ST | Tech | Anlz |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MR-ANKLE WO CONTRAST | 1 | 12/10/15 | | | 8453743 | 300 | EOP | O/P | | ALAM MOHAMMAD J MD | WILLIS MELINDA | F | LLH | |
| MR-BRAIN W | 1 | 1/09/16 | | | 8457736 | 1100 | EOP | NUIE | 106 | KIDD HOLLY | TAMKLOE MARTINA | F | DLD | |
| MR-BRAIN WO | 1 | 4/28/14 | | | 8367497 | 1300 | EOP | NUSW | 305 -1 | CALVERT EDWARD H M | BATES JOHNATHAN | R | LLH | |
| MR-BRAIN WO | 1 | 6/01/14 | | | 8372538 | 700 | EOP | O/P | | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WO | 1 | 9/03/15 | | | 8439075 | 700 | EOP | O/P | | BLACKWELDER MARK A | BLACKWELDER MARK A | F | OLD | |
| MR-BRAIN WO | 1 | 1/05/16 | | | 8457235 | 1000 | EOP | NUIW | 148 -1 | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 6/22/14 | | | 8375571 | 200 | EOP | NUIE | 106 -1 | ALAM MOHAMMAD J MD | THOMPSON DANIEL | F | DLD | |
| MR-BRAIN WW | 1 | 9/18/14 | | | 8388181 | 900 | EOP | O/P | | ALAM MOHAMMAD J MD | BELUE JAMES M MD | F | LLH | |
| MR-BRAIN WW | 1 | 6/30/15 | | | 8429526 | 1000 | EOP | O/P | | WHITE JACQUELYN K | GRIGSBY BENSON A M | F | LLH | |
| MR-BRAIN WW | 1 | 8/12/15 | | | 8435872 | 800 | EOP | O/P | | BURTON BEAU | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 9/01/15 | | | 8438642 | 2000 | EOP | NUIW | 154 -1 | BONIN REAGAN | TAMKLOE MARTINA | F | LLH | |
| MR-BRAIN WW | 1 | 9/25/15 | | | 8442425 | 100 | EOP | O/P | | TAYLOR JAMES PATRI | MCGEHEE DAVID W MD | F | LLH | |
| MR-BRAIN WW | 1 | 10/05/15 | | | 8443948 | 200 | EOP | O/P | | COLEMAN THOMAS WIL | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 10/22/15 | | | 8446658 | 200 | EOP | O/P | | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 9/21/15 | | | 8441721 | 300 | EOP | O/P | | WALKER CHARLES | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 1/20/16 | | | 8459335 | 700 | EOP | O/P | | NGUYEN HOA | UNKNOWN PRIMARY CA | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 8/21/14 | | | 8384060 | 300 | EOP | O/P | | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 4/02/15 | | | 8416517 | 600 | EOP | O/P | | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MR-LUMB SPINE WO CON | 1 | 3/05/16 | | | 8466513 | 900 | EOP | O/P | | ALAM MOHAMMAD J MD | BALLARD RICHARD I | F | LLH | |
| MR-ORBT-FAC-NCK W | 1 | 10/05/15 | | | 8443948 | 300 | EOP | O/P | | COLEMAN THOMAS WIL | UNKNOWN PRIMARY CA | F | LLH | |
| MR-ORBR SPINE WO CON | 1 | 4/02/15 | | | 8416517 | 500 | EOP | O/P | | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MRA-CHEST W-CONTRAST | 1 | 5/19/15 | | | 8423653 | 1100 | EOP | O/P | | ALAM MOHAMMAD J MD | BLACKWELDER MARK A | F | LLH | |
| MRA-LEG WO | 1 | 9/18/14 | | | 8388181 | 1000 | EOP | O/P | | ALAM MOHAMMAD J MD | BELUE JAMES M MD | F | OLD | |

| | Inpatient | Outpatient | Industrial | Total |
|---|---|---|---|---|
| PROCEDURE TOTAL: | 5 | 18 | 0 | 23 |
| PATIENT COUNT: | 5 | 15 | 0 | 20 |

Exhibit 1

OER30   User: .suBURNS

Sort report: by Sub-Department
Department : MRI Imaging
HSV : EOP
Procedures : *ALL
Physician #: *ALL

    Analyzer : *ALL

NORTHERN LOUISIANA MEDICAL CENTER
Statistics by Procedure - Patient listing
From 01/01/10  To 12/31/13 *ALL   (CONTINUOUS)

Page: 1
Date: 3/24/16
Time: 16:10

| Procedure | Qty | Start Dt | Service Dt | Patient Name | Patient# | Order# | HSV | Location | | Ordering Physician | Family Physician | ST | Tech | Anlz |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MR-BRAIN WO | 1 | 1/04/13 | | | 8294172 | 1900 | EOP | NU3W | 323 -1 | ALAM MOHAMMAD J MD | MARIANO SHEILA MAR | F | LLH | |
| MR-BRAIN WO | 1 | 3/27/13 | | | 8307646 | 1600 | EOP | O/P | | AGARWAL KUSHAL MD | AGARWAL KUSHAL MD | F | DLD | |
| MR-BRAIN WO | 1 | 5/01/13 | | | 8313389 | 1200 | EOP | NU1W | 146 -1 | MARIANO SHEILA MAR | MARIANO EDWARD J M | F | DLD | |
| MR-BRAIN WW | 1 | 3/01/13 | | | 8303476 | 1200 | EOP | O/P | | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-BRAIN WW | 1 | 6/30/13 | | | 8322616 | 700 | EOP | O/P | | ALAM MOHAMMAD J MD | TAMACLOE SEDO E | F | LLH | |
| MR-BRAIN WW | 1 | 12/09/13 | | | 8327305 | 1900 | EOP | NU3W | 314 -1 | LISTON DEREK C | HARRIS BRYAN | F | DLD | |
| MR-BRAIN WW | 1 | 12/30/13 | | | 8350438 | 1000 | EOP | O/P | | TAYLOR JAMES PATRI | UNKNOWN PRIMARY CA | F | LLH | |
| MR-CERV SPINE WO CON | 1 | 5/29/13 | | | 8317759 | 700 | EOP | O/P | | EUGENE EDWIG MD | UNKNOWN PRIMARY CA | F | LLH | |
| MR-HIP WO CONTRAST | 1 | 1/05/13 | | | 8294414 | 300 | EOP | O/P | | ALAM MOHAMMAD J MD | GRIGSBY BENSON A M | F | LLH | |
| MRA-HEAD WO | 1 | 6/07/13 | | | 8319327 | 100 | EOP | NU3W | 323 -1 | BELUE JAMES M MD | BELUE JAMES M MD | F | LLH | |
| MRA-HEAD WO | 1 | 1/04/13 | | | 8294172 | 1000 | EOP | O/P | | KIDD HOLLY | MARIANO SHEILA MAR | F | LLH | |
| MRA-HEAD WO | 1 | 3/01/13 | | | 8303476 | 300 | EOP | O/P | | ALAM MOHAMMAD J MD | UNKNOWN PRIMARY CA | F | LLH | |
| MRA-HEAD WO | 1 | 3/27/13 | | | 8307646 | 1500 | EOP | O/P | | AGARWAL KUSHAL MD | AGARWAL KUSHAL MD | F | DLD | |

|  | Inpatient | Outpatient | Industrial | Total |
|---|---|---|---|---|
| PROCEDURE TOTAL: | 4 | 9 | 0 | 13 |
| PATIENT COUNT: | 3 | 7 | 0 | 10 |

Current Computer System started 2013

Exhibit "1"

GREGORY SCOTT, ET AL.  
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.  
October 17, 2016

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

* * * * * * * * * * * * * * * * * * * *

GREGORY SCOTT AND MICHELLE  
SCOTT, INDIVIDUALLY AND ON  
BEHALF OF THE MINOR, JORDAN  
SCOTT, AS THE PARENTS AND  
TUTORS OF JORDAN SCOTT

VS.            NO. 3:16-CV-00376

NORTHERN LOUISIANA MEDICAL  
CENTER, RUSTON, LOUISIANA,  
HOSPITAL COMPANY, LLC, AND  
BRADY DuBOIS

* * * * * * * * * * * * * * * *

DEPOSITION OF

EDWARD CALVERT, M.D.

October 17, 2016

* * * * * * * * * * * * * * * *

At:

North Louisiana Medical Center  
401 E. Vaughn Avenue  
Ruston, Louisiana 71270

REPORTED BY:

LINDA PEROT  
CERTIFIED COURT REPORTER  
CERTIFICATE NO. 23012  
STATE OF LOUISIANA

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

### Page 2

APPEARANCES:

FOR PLAINTIFFS:

BREITHAUPT, DUNN, DuBOS, SHAFTO & WOLLESON
1811 Tower Drive, Suite D
Monroe, Louisiana 71201
Phone: (318) 322-1202
    appearing herein by and through
    Mr. Russell A. Woodard, Jr.
    rwoodard@bddswlaw.com
AND VIA TELEPHONE CONFERENCE CALL
    OSCAR L. SHOENFELT
    ATTORNEY AT LAW
    2109 Perkins Road
    Baton Rouge, Louisiana 70808
    Phone: (225) 336-4300
    E-Mail: info@shoenfeltlaw.com

FOR DEFENDANT NORTHERN LOUISIANA MEDICAL CENTER:

BLUE WILLIAMS
3421 North Causeway Boulevard
Suite 900
Metairie, Louisiana 70002
Phone: (504) 831-4091

    appearing herein by and through
    Mr. Kurt S. Blankenship
    E-Mail: kblankenship@bluewilliams.com

FOR DEFENDANT JACOB M. WOOD, M.D.:

HUDSON, POTTS & BERNSTEIN
1800 Hudson Lane, Suite 300
Monroe, Louisiana 71201
Phone: (318) 388-4400
    appearing herein by and through
    Mr. Donald H. Zeigler, III on behalf of
    Mr. Gordon L. James
    E-Mail: tzeigler@hplaw.com

---

### Page 3

```
 1    APPEARANCES (CONTINUED):
 2    FOR DEFENDANT JAMES PATRICK TAYLOR, M.D.:
 3       DEGAN, BLANCHARD & NASH
         400 Poydras Street, Suite 2600
 4       New Orleans, Louisiana 70130
         Phone: (504) 529-3333
 5
         appearing herein by and through
 6       Ms. Maryann G. Hoskins
         E-Mail: dhoskins@degan.com
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

### Page 4

```
 1                 INDEX
 2                           PAGE
 3    EXAMINATION
 4       BY MR. WOODARD. . . . . . . . . . . . . . . . 7,74
 5
 6    EXAMINATION
 7       BY MR. BLANKENSHIP. . . . . . . . . . . . . 55
 8
 9    OBJECTIONS
10       BY MS. HOSKINS. . . . . 9, 11, 14, 15, 18, 19, 20, 22,
         . . . . .24, 25, 26, 27, 33, 36, 39, 40,
11       . . . .41, 43, 45, 47, 48, 50, 52, 76,
         . . . . . . . . . . . . . 75, 77, 79, 80
12
13       BY MR. BLANKENSHIP . . . . .10, 11, 14, 15, 16, 18, 20,
         . . . . .21, 22, 24, 25, 26, 27, 28,
14       . . . . .30, 33, 34, 35, 37, 39, 40,
         . . . .41, 42, 43, 45, 47, 49, 50,
15       . . . 51, 52, 53, 76, 77, 78, 79, 80
16
17
18
19
20
21
22
23
24
25
```

---

### Page 5

```
 1              EXHIBIT INDEX
 2                           PAGE
 3
 4    Exhibit 1    Transcript of Dr. Alam . . . . . . . . . . .8
 5    Exhibit 2    Excerpts from Transcript of Dr. Taylor . . .9
 6    Exhibit 3. . . . . . . . . . . . . attached post-deposition
 7    Exhibit 4. . . . . . . . . . . . . attached post-deposition
 8    Exhibit 5    Website Screen Shot . . . . . . . . . . .28
 9    Exhibit 6    Website Screen Shot . . . . . . . . . . . .30
10    Exhibit 7. . . . . . . . . . . . . attached post deposition
11    Exhibit 8    The ACR Appropriateness Criteria . . . . . 31
12    Exhibit 9    Screen Shot from The ACR Appropriateness
13                 Criteria . . . . . . . . . . . . . . . . 32
14    Exhibit 10   Screen Shot from The ACR Appropriateness
15                 Criteria . . . . . . . . . . . . . . . . 36
16    Exhibit 11   Website Screen Shot . . . . . . . . . . . .38
17    Exhibit 12   Thirty Minutes or Less Pledge . . . . . . . 39
18    Exhibit 13 . . . . . . . . . . . . . . . . . . . . . .74
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 6

1        STIPULATIONS
2        It is stipulated and agreed between counsel
3    that this deposition of EDWARD CALVERT, M.D., is
4    taken pursuant to Notice by counsel for
5    Defendants in accordance with the Federal Rules
6    of Civil Procedure, and may be used for all
7    purposes and in any manner consistent therewith.
8    All objections except as to the form of the
9    question and responsiveness of the answer are
10   reserved until such time as the deposition is
11   offered and introduced into evidence.
12
13       The parties hereto waive all formalities in
14   connection with the taking of said deposition,
15   except the swearing of the witness, reduction of
16   the questions and answers to typewriting, and
17   reading and signing of the deposition.
18
19       The witness, EDWARD CALVERT, M.D., was
20   advised of his right to read and sign this
21   deposition, and he elected to exercise that
22   right.
23
24       * * * * * * * * * * * * * * * * * * * *
25

---

Page 7

1            EDWARD CALVERT, M.D.,
2    being first duly sworn by LINDA PEROT, Certified
3    Court Reporter 23012, was examined and testified
4    as follows:
5            EXAMINATION
6    BY MR. WOODARD:
7    Q   Good morning, Doctor.
8    A   Good morning.
9    Q   Will you please state your name and address
10       for the record?
11   A   Edward Calvert, 1120 Brookhaven Avenue,
12       Ruston, Louisiana.
13   Q   And it's my understanding you are a
14       physician in the North Louisiana Emergency
15       Physicians Partnership?
16   A   I am.
17   Q   Okay.  And that serves Northern Louisiana
18       Medical Center?
19   A   Correct.
20   Q   And you are not technically an employee of
21       Northern Louisiana Medical Center?
22   A   I think, technically, we are partners of
23       some kind.  I'm self-employed, I suppose.
24   Q   And the partners of NLEP, LLP, that would be
25       Drs. Alam, Taylor, White and yourself?

---

Page 8

1    A   I'm not certain who all the partners are.
2    Q   Okay.  Alam and Taylor are your partners,
3        though?
4    A   I think -- I suppose.  It's sort of unusual
5        the way this ER is set up.  Most of the
6        time, you are self-employed.  With this one,
7        they make you partners of some kind.  I
8        think it's a tax issue more than an actual
9        partnership.
10   Q   How long have you known Dr. Alam and Dr.
11       Taylor?
12   A   I've known Dr. Alam since probably 2005; Dr.
13       Taylor since, I believe, 2013.
14   Q   Have you found them both to be trustworthy?
15   A   I have.
16   Q   Reliable?
17   A   Yes.
18   Q   Honest?
19   A   Yes.
20   Q   Can you think of any instance of dishonesty
21       since you've known Dr. Alam or Dr. Taylor?
22   A   I cannot.
23   Q   I'd like to show you --
24       MR. WOODARD:
25           what's been marked as "-- 1."

---

Page 9

1    Q   This is a transcript of Dr. Alam's testimony
2        from a trial Mr. Ziegler and I actually had
3        not too long ago.  If you will, flip with me
4        to the second page, Lines 7 through 9.  Can
5        you read for the record that question and
6        answer?
7    A   "No MRI or CT scan of the thoracic spine.
8        Is that right?"  "No.  MRI is not emergency
9        med department procedure.  It takes longer
10       time.  We cannot order it fast."
11   Q   Okay.  Have you ever seen that before?
12   A   No.
13       MR. WOODARD:
14           I have "Exhibit 2" here, some
15       deposition excerpts from Dr. Taylor.
16   Q   Have you read that deposition?
17   A   I have not.
18   Q   Okay.  I want you to assume for me instead
19       of going through these excerpts in detail
20       that Dr. Taylor has testified in this
21       particular case he asked for an MRI.  His
22       request was denied or delayed and the reason
23       he was given was financial considerations.
24       MS. HOSKINS:
25           Object to the form.

---

3 (Pages 6 to 9)

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 10

1    (To Witness): Go ahead.
2    MR. BLANKENSHIP:
3        I join in the objection.
4    MR. WOODARD:
5        You can state the basis for your
6    form objection.
7    MS. HOSKINS:
8        Well, I don't think that's
9    exactly --
10   MR. BLANKENSHIP:
11       His answer --
12   MS. HOSKINS:
13       Right.  I don't think that's exactly
14   what he said.  I'm not -- it's a
15   paraphrase of what he said and I'm just
16   making my objection for the record.
17   MR. WOODARD:
18       Okay.
19   MS. HOSKINS:
20       I mean, if you want a verbatim, we
21   can read it.  I don't think that's
22   necessary, but --
23   MR. WOODARD:
24       That's fine.  I just -- if there was
25   some way I could rephrase the

Page 11

1    paraphrasing that you don't have a
2    problem with.
3    Q  All right.  And I want you to also assume
4    for me that Dr. Taylor testified that he was
5    told that requests for MRIs from the
6    emergency room have to be precertified.
7    MS. HOSKINS:
8        Object to the form.
9    MR. BLANKENSHIP:
10       Same objection.
11   Q  Have you ever heard of any of those things I
12   just mentioned by Dr. Taylor?
13   A  I have not.
14   Q  Okay.  Look back at "Exhibit 1."  Do you
15   agree with Dr. Alam that MRIs cannot be
16   ordered fast from the emergency room?
17   A  I do.
18   Q  And why do you agree with that?
19   A  MRI is not an emergency procedure.  It's
20   just not something that is available to us
21   through the emergency room.
22   Q  Is that something you wish was available?
23   A  I'm sorry?
24   Q  Is that something that you personally wish
25   was available?

Page 12

1    A  In an ideal world.  However, MRI takes
2    thirty minutes to an hour and it's just not
3    an emergency procedure by the nature of MRI.
4    Q  Have you ever attempted to order an MRI from
5    the emergency room?
6    A  Not on an emergency room patient.
7    Q  Have you ever had occasion to order an MRI
8    on an emergency room patient, but you did
9    not make an order because you knew it would
10   take a significant amount of time?
11   A  It's not really available through the
12   emergency room, so --
13   Q  Who has told you that it's not available
14   through the emergency room?
15       MS. HOSKINS:
16           Objection.  I don't think that's
17       what he said.
18   Q  Is that what you said?
19   A  It's not a test that we use in the emergency
20   room because it's not available for us to
21   order.
22   Q  What do you mean that it's not available for
23   y'all to order?
24   A  If I attempted to order an MRI, it wouldn't
25   be done.  There's -- unless we order it on

Page 13

1    an inpatient, it's something that I would
2    have to discuss directly with either an
3    admitting physician or a radiologist or get
4    the orthopaedic doctor to tell me that it
5    was necessary.  It's not something that I
6    could just type an order in the computer and
7    it would be done.
8    Q  Do you have any idea why -- you could press
9    a button and order a CT scan.  Correct?
10   A  Correct.
11   Q  Do you have any idea why you can't do that
12   for an MRI?
13   A  It's just one of tests that's typically
14   reserved for people who require an inpatient
15   stay or can be done on an outpatient basis.
16   Q  Typically, --
17   A  We use the CT to rule out emergency
18   conditions typically, and then if somebody
19   needs further investigation, that's done
20   sort of at the next level, not through the
21   emergency room.
22   Q  And when you say it's typically reserved for
23   inpatients and who else?
24   A  Done on an outpatient basis.  Typically, we
25   order a CAT scan to rule out emergency

4 (Pages 10 to 13)

LINDA PEROT, CCR

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 14

1   conditions and, if the CAT scan is negative,
2   then we would send them to have an
3   outpatient MRI via their primary physician.
4   Q    And the way you're understanding MRIs are
5   used at Northern, typically there's a delay
6   which allows for confirmation of either
7   insurance or a patient's ability to pay?
8        MS. HOSKINS:
9            Objection.
10       MR. BLANKENSHIP:
11           Object to the form.
12   A   I don't know anything about the financial
13   aspect of it.
14   Q    It was a poor question.  It's your
15   understanding that, typically, the way MRIs
16   are ordered and conducted at Northern,
17   there's a significant period of time to
18   where confirmation of reimbursement can be
19   confirmed.  Is that correct?
20       MS. HOSKINS:
21           Objection.
22       MR. BLANKENSHIP:
23           Same objection.
24   A   Again, I have no idea about the financial
25   aspect of it.

---

Page 15

1   Q    If Dr. Taylor testified that he spoke with
2   Brady Dubois, the former CEO of Northern, --
3   do you remember -- were you working here
4   when Mr. Dubois was so employed? --
5   A   I was.
6   Q    -- that he spoke with Mr. Dubois and he
7   said, "We can't allow emergency room MRIs
8   for financial considerations," would you be
9   in a position to dispute Dr. Taylor's
10   testimony?
11       MS. HOSKINS:
12           Object to the form.
13       MR. BLANKENSHIP:
14           Object to the form.
15   A   I have no idea what conversation he had with
16   Brady.
17   Q    Would you have any reason to doubt
18   Dr. Taylor?
19       MR. BLANKENSHIP:
20           Same objection.
21   Q    So it seems that you, Dr. Alam and
22   Dr. Taylor all agree that it's very
23   difficult to obtain an MRI from the
24   emergency room.  Is that correct?
25   A   That's correct.

---

Page 16

1        MR. BLANKENSHIP:
2            Object to the form.
3   Q    And as we discussed before, I'm a lawyer.
4   I'm not a doctor.  Tell me, if I come to you
5   and I present with something, some
6   conditions, and you say, "I want this test
7   run," where do you go?  Is it a computer
8   screen?  Is it a station where you write
9   handwritten notes?
10   A   It's a computer screen.
11       MS. HOSKINS:
12           Just for clarification, you're
13   talking about if you present to NLMC
14   emergency room?
15       MR. WOODARD:
16           I think he understands the question.
17   Q    You can go ahead.
18   A   Yeah.  We have a system called MEDHOST that
19   we do all of our documentation and we order
20   our tests through MEDHOST.
21   Q    Okay.  And MEDHOST is electronic?
22   A   Correct.
23   Q    And if you want to order a CT scan, you can
24   press a button?
25   A   Correct.

---

Page 17

1   Q    Are there any other type of diagnostic
2   images you can order with the press of a
3   button?
4   A   X-rays, some ultrasound.
5   Q    But there is no button on MEDHOST for MRIs?
6   A   There is not, not that I'm aware of.
7   Q    How often do you see or use that MEDHOST
8   software?
9   A   Every day.
10   Q    Daily?  And you've never --
11   A   Every day that I work, yes.
12   Q    Poor question.  And you've never noticed an
13   MRI button?
14   A   I have not.
15   Q    Have you ever inquired as to why there is no
16   MRI button?
17   A   I have not.
18   Q    Do you have any idea as you sit here today
19   why there is no MRI button?
20   A   It's just not a modality we use in the
21   emergency department.
22   Q    I can't remember their first names, but are
23   you familiar with Ms. Burns and Ms. Goss?
24   A   Yes.  Sandy Goss.
25   Q    Sandy Goss?

---

5 (Pages 14 to 17)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 18

1   A   Sandy Goss is her name.
2   Q   Okay.
3   A   I don't know who Burns is.
4   Q   Would you agree if they said all other
5   departments can order an MRI electronically
6   except the emergency room?
7       MR. BLANKENSHIP:
8           Object to the form.
9       MS. HOSKINS:
10          Object to the form.
11  A   I have no knowledge of other departments.
12  Q   Are you aware of any MRIs ever being ordered
13  from the emergency room by any physician?
14  A   I am not.
15  Q   And how long have you been at Northern?
16  A   On and off since 2005.
17  Q   Would it be fair to say that the ordering of
18  MRIs from the emergency department at
19  Northern is discouraged?
20      MR. BLANKENSHIP:
21          Object to the form.
22  A   I've never been discouraged.  It's just not
23  something that's typically available to us.
24  Q   Are you aware of -- let me ask this.  Have
25  you ever made any complaints to hospital

Page 19

1   administration that you would like to have
2   the option for an MRI?
3   A   I have not.
4   Q   Are you aware of any physicians who have
5   made such a complaint?
6   A   I am not.
7   Q   And you've never requested an MRI out of the
8   emergency room?
9   A   I have not.
10  Q   But since 2005, you have had some patients
11  where they presented with symptoms where you
12  would have like to have obtained an MRI?
13      MS. HOSKINS:
14          Object to the form.
15  A   Normally, I can rule in or out conditions
16  with what's available to me in CAT scan or
17  plain x-ray enough to give the patient a
18  really need to be for that MRI.  So through
19  the nature of MRI, it's not something that
20  we can do quickly in the emergency room.
21  Q   The MRI machine is right down the hallway
22  from the emergency department.  Correct?
23  A   I honestly don't know.
24  Q   If Dr. Taylor testified that the MRI machine
25  is right down the hallway from the emergency

Page 20

1   department, would you be in any position to
2   dispute that?
3   A   I would not.
4   Q   If Dr. Taylor testified that "This is the
5   21st Century; we ought to be able to obtain
6   an MRI from the emergency department," would
7   you agree with that?
8       MR. BLANKENSHIP:
9           Object to the form.
10      MS. HOSKINS:
11          Object to the form.
12  A   That's his statement.  I don't -- I've never
13  worked in an emergency room where MRI was
14  available to me.
15  Q   How many emergency rooms have you worked in?
16  A   Six or seven.
17  Q   If a hospital advertises and markets that it
18  has MRIs available for all patients,
19  inpatients and outpatients, would it be fair
20  for patients to expect that they can obtain
21  an MRI from the emergency room?
22      MR. BLANKENSHIP:
23          Object to the form.
24      MS. HOSKINS:
25          Object to the form.

Page 21

1   A   It's not an emergency procedure.
2   Q   I understand.  But my question was, if a
3   hospital advertises that they provide MRIs
4   for all patients, inpatients, outpatients,
5   emergency, non-emergency, would it be fair
6   for patients to expect that they can obtain
7   an emergency room MRI?
8       MR. BLANKENSHIP:
9           Same objection.
10  A   I don't really know how to answer that.  I
11  mean, they can advertise whatever they want,
12  I suppose.  It's just not something we use
13  through the emergency room.  It's available
14  for inpatients; it's available for
15  outpatients.  But whatever they advertise,
16  it's just not something we do in the ER.
17  Q   But you wouldn't condone it as a good
18  medical practice to falsely advertise what
19  services a hospital can or can't offer.
20  Correct?
21      MS. HOSKINS:
22          Object to the form.
23      MR. BLANKENSHIP:
24          Object to the form.
25  A   Correct.

6 (Pages 18 to 21)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 22

1   **Q**   Are you -- do you have any knowledge at all
2   about the case that I'm here on today?
3   **A**   I do not.
4   **Q**   Have you ever heard of Jordan Scott?
5   **A**   I've heard the name strictly because I know
6   that's the case that I'm here for today.
7   **Q**   Are you aware she's a patient who presented;
8   at the time, she was twelve years old?  And,
9   according to Dr. Taylor's testimony, he
10   wanted an MRI at around 9 a.m. and an MRI
11   was not conducted until nearly 3 p.m.?
12   MS. HOSKINS:
13   Object to the form.
14   MR. BLANKENSHIP:
15   Same objection.
16   **A**   I have no knowledge of the case.
17   **Q**   Are you aware that that girl is now
18   paralyzed for the rest of her life?
19   **A**   I am not.
20   **Q**   Would you agree that's a tragic case?
21   MR. BLANKENSHIP:
22   Object to the form.
23   MS. HOSKINS:
24   Object to the form.
25   **A**   I do agree.

Page 23

1   **Q**   Doctor, you are trained to help people.
2   Correct?
3   **A**   Correct.
4   **Q**   You're not trained on how to give
5   depositions?
6   **A**   I'm not.
7   **Q**   Right now, you're thinking about "What am I
8   going to do once I get out of this
9   deposition and what am I going to walk into
10   in the emergency department?"  Correct?
11   **A**   I don't work today, thankfully.
12   **Q**   You're not working today.  If you were
13   working today, you walk in every day not
14   knowing what's going to present itself?
15   **A**   Correct.
16   **Q**   You're holding a cup of coffee in your hand.
17   When you're working, you may be drinking a
18   cup of coffee, and then all of a sudden
19   things go from tranquil to a gunshot wound
20   comes in and you've got all hands on deck?
21   **A**   Correct.
22   **Q**   And you've got to use your expertise, your
23   medical judgment to try to help that person?
24   **A**   Correct.
25   **Q**   You've got to assess the situation, diagnose

Page 24

1   the problem, and then treat the problem.
2   Correct?
3   **A**   Correct.
4   **Q**   And you've been educated.  You've been
5   trained.  You have experience to help deal
6   with those medical issues?
7   **A**   Correct.
8   **Q**   Is it true that sometimes business decisions
9   can get in the way of you exercising -- or a
10   doctor exercising his medical judgment?
11   MS. HOSKINS:
12   Object to the form.
13   MR. BLANKENSHIP:
14   Object to the form.
15   **A**   Not with me.
16   **Q**   Have you ever wanted to do something,
17   provide treatment to a particular patient
18   and been handcuffed by a particular
19   administrative or business decision?
20   **A**   Yes.  I'm sure that I have, but I can't
21   think of a specific example.
22   **Q**   And that's more of where I was going with my
23   question.  Again, I'm asking you to assume
24   instead of making you read all this
25   deposition testimony.  I'm trying to move

Page 25

1   things along so you can get out of here.  If
2   Dr. Taylor testified he wanted to order an
3   MRI as early as, say, 9 a.m., he made the
4   request to order an MRI, he was denied his
5   request for an MRI, and when he was told why
6   his requests were denied it was because of
7   administrative financial consideration.  I
8   want you to assume those things.  If that's
9   true, would that be an instance where a
10   physician's medical judgment was being
11   handcuffed by a business decision?
12   MR. BLANKENSHIP:
13   Object to the form.
14   MS. HOSKINS:
15   Object to the form.
16   **A**   Assuming all those things are true, yes, it
17   would be.
18   **Q**   Okay.  And sometimes, those business or
19   administrative decisions are made by people
20   who never went to medical school like you?
21   MR. BLANKENSHIP:
22   Object to the form.
23   **A**   Yes.
24   **Q**   People who never went to medical school like
25   Dr. Taylor or Dr. Alam.  Correct?

7 (Pages 22 to 25)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 26

1  **A**  Correct.
2  **Q**  And sometimes, those administrative and
3  business decisions are made without any
4  consultation with people who went to medical
5  school such as yourself, Dr. Alam and Dr.
6  Taylor?
7      MR. BLANKENSHIP:
8          Object to the form.
9  **A**  Yes.
10 **Q**  And when those decisions are adopted, y'all
11 pretty much have to just go with the hands
12 you are dealt. Correct?
13 **A**  Correct.
14 **Q**  Okay. Again, I'm asking you to accept as
15 true Dr. Taylor's testimony that Mr. Dubois
16 told him, "We, as a hospital, cannot grant
17 or order MRIs from the emergency room for
18 financial considerations." Assuming that is
19 true, would it be fair to say that that
20 policy does not involve an assessment of
21 each particular patient's condition?
22      MR. BLANKENSHIP:
23          Object to the form.
24      MS. HOSKINS:
25          Object to the form.

---

Page 27

1  **A**  If it's a global policy, then I guess it
2  doesn't involve individual patients.
3  **Q**  And if Jordan Scott presented --
4      MR. WOODARD:
5          Y'all help me. August 19th?
6      MR. BLANKENSHIP:
7          That's right.
8  **Q**  If Jordan Scott presented August 19th of
9  2014 and that policy I'm asking you to
10 assume exists, that would not have been
11 applied for her specific case. Correct?
12      MR. BLANKENSHIP:
13          Object to the form.
14 **A**  Correct.
15 **Q**  It wouldn't have been applied during the
16 scope of her particular treatment?
17      MR. BLANKENSHIP:
18          Same objection.
19 **A**  I suppose.
20 **Q**  If that policy exists, that would be an
21 administrative or a business decision
22 without consideration of any medical
23 judgment?
24      MS. HOSKINS:
25          Object to the form.

---

Page 28

1      MR. BLANKENSHIP:
2          Same objection.
3  **A**  If it exists, yes.
4  **Q**  And I think you used the word "globally."
5  If it's applied globally or universally,
6  that would mean that it's being done so
7  without specific considerations of each
8  specific patient. Correct?
9  **A**  Correct.
10 **Q**  And if Dr. Taylor says the policy exists and
11 the hospital says it doesn't exist, that
12 would require a credibility call between the
13 two. Correct?
14      MS. HOSKINS:
15          Object to the form.
16      MR. BLANKENSHIP:
17          Object to the form.
18 **A**  I suppose.
19 **Q**  I'm trying to move along.
20      MR. WOODARD:
21          I'm going to show you what's been
22          marked as "Exhibit 5."
23 **Q**  Are you aware that Northern Louisiana
24 Medical Center has a website?
25 **A**  Not directly, no. I've never seen it.

---

Page 29

1  **Q**  I'll represent to you that this is taken off
2  Northern's website. Do you see the top
3  line? It says, "Magnetic Resonance
4  Imaging?"
5  **A**  I do.
6  **Q**  Is that what lay folks like me refer to as
7  an MRI?
8  **A**  Yes.
9  **Q**  Look in the second paragraph. It says,
10 "Northern has been offering MRIs as a part
11 of the diagnostic imaging department since
12 1994, and today we serve both inpatients and
13 outpatients." Do you see that?
14 **A**  I do.
15 **Q**  When Jordan Scott was presenting to the
16 emergency department in August of 2014,
17 would she be considered an inpatient or an
18 outpatient?
19 **A**  She was an emergency room patient.
20 **Q**  So inpatient?
21 **A**  She doesn't really fall into either
22 category.
23 **Q**  Assuming she was admitted?
24 **A**  If she was admitted, she would be an
25 inpatient.

---

8 (Pages 26 to 29)

GREGORY SCOTT, ET AL.                                        EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                       October 17, 2016

---

Page 30

1  Q   Okay. And you see 1994. If Dr. Taylor
2      testified that, "Look, this is the 21st
3      Century; we ought to be able to have access
4      to an MRI," that would be consistent with
5      Northern's own website. Correct?
6          MR. BLANKENSHIP:
7              Object to the form.
8  A   Correct.
9          MR. WOODARD:
10             I next want to show you "Exhibit 6,"
11         which is another caption of Northern's
12         website.
13  Q   Look at the top. It says, "Diagnostic
14      Imaging." Correct?
15  A   Yes. Correct.
16  Q   And if you see down toward the bottom, it
17      says, "Why should I have my imaging exam
18      done in an accredited facility?" Northern
19      is an accredited facility. Correct?
20  A   I don't know.
21  Q   Okay. According to this website?
22          MR. BLANKENSHIP:
23              Object. Speaks for itself.
24          MR. WOODARD:
25              That's fair.

---

Page 31

1  Q   Do you see the line I've highlighted there,
2      "ACR gold standards of gold seals of
3      accreditation?"
4  A   I do.
5  Q   ACR, is that the American College of
6      Radiology?
7  A   Yes.
8  Q   Are you aware that accreditation is required
9      for providers that bill for MRIs under
10     Medicare?
11 A   I am not.
12         MR. WOODARD:
13             I want to show you "Exhibit 8."
14 (OFF RECORD DISCUSSION.)
15 Q   "Exhibit 8" is entitled The ACR
16     Appropriateness Criteria. Do you see that?
17 A   I do.
18 Q   And again, that's the American College of
19     Radiology?
20 A   Yes.
21 Q   And whenever you, as an emergency room
22     physician, want to order diagnostic imaging,
23     do you work with your radiology department?
24 A   I do.
25 Q   Okay.

---

Page 32

1          MR. WOODARD:
2              I now want to show you "Exhibit 9,"
3          which is a screen shot from another part
4          of that article.
5  Q   It looks like the ACR has defined
6      "appropriateness" on when imaging is or is
7      not required. Do you see that highlighted
8      paragraph at the top?
9  A   I do.
10 Q   And in the paragraph toward the bottom, that
11     speaks to rating appropriateness. Do you
12     see that?
13 A   I do.
14 Q   Do you see the highlighted line toward the
15     bottom that says, "The direct or indirect
16     cost of a procedure are not considered as a
17     risk or harm when determining -- " quote,
18     unquote, " -- 'appropriateness'."
19 A   I do.
20 Q   Does that make sense to you?
21 A   Yes.
22 Q   And do you think that's how things ought to
23     be, especially in the emergency department,
24     considerations based on a financial -- or
25     excuse me. Strike that. Financial

---

Page 33

1      considerations should not be considered when
2      deciding which treatment to offer to a
3      particular patient?
4          MS. HOSKINS:
5              Object to the form.
6          MR. BLANKENSHIP:
7              Same objection.
8  A   I do.
9  Q   You do agree with that?
10 A   I do agree with it.
11 Q   And I'm not trying to trick you. If you
12     look at "Exhibit 9," I have one question
13     here. The top paragraph, "The concept of
14     appropriateness as applied to health care."
15     It's the second sentence of the first
16     paragraph. Do you see that?
17 A   I do.
18 Q   Do you understand the difference, if any,
19     between appropriateness and health care, or
20     does there appear to be a difference in this
21     article between appropriateness and the
22     practice of medicine?
23 A   I'm not sure what you mean.
24 Q   I'm not sure what I mean either. What does
25     that sentence mean to you?

---

9 (Pages 30 to 33)

GREGORY SCOTT, ET AL.                                     EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 34

1    **A**   They are defining appropriateness in the
2          setting of health care.
3    **Q**   And in that definition, they say costs are
4          not to be considered.  Correct?
5          MR. BLANKENSHIP:
6              Object to the form.
7    **A**   I don't believe it mentions cost at all in
8          that paragraph.
9    **Q**   I'm sorry.  In the writing appropriate
10         paragraph.
11   **A**   Yes.
12   **Q**   Have you ever heard of precertification?
13   **A**   I have.
14   **Q**   What is your understanding of what
15         precertification means?
16   **A**   I think it's normally when someone has a
17         test that's ordered on a non-emergency basis
18         and the insurance company can require sort
19         of oversight to see if that procedure is
20         appropriate.
21   **Q**   Precertification is required or used in non-
22         emergent basises?
23   **A**   That's my understanding.
24         MR. BLANKENSHIP:
25              Object to the form.

Page 35

1    **Q**   Is it your understanding that requiring
2          precertification in emergency basis would be
3          inappropriate?
4          MR. BLANKENSHIP:
5              Object to the form.
6    **A**   Yes.
7    **Q**   And it would be inappropriate because it
8          would delay or deny possibly pressing or
9          emergency medical needs to inquire into
10         insurance?
11   **A**   Yes.
12   **Q**   And I'm guessing, as an emergency room
13         physician, you are trained and educated on
14         what I would call EMTALA?
15   **A**   Yes.
16   **Q**   What is your understanding of what EMTALA
17         is?
18   **A**   It's a series of laws or rules, I guess,
19         that state that we have to do everything
20         within our power to determine that somebody
21         is medically stable before you would then
22         deny treatment to them, I suppose, or refer
23         them somewhere else for treatment.
24   **Q**   Right.  And you've been trained on that.
25         You've been educated on that.  And you've

Page 36

1          been told, as an emergency room physician,
2          you have different duties than a non-
3          emergency doctor.  Correct?
4    **A**   Correct.
5          MS. HOSKINS:
6              Object to the form.
7    **Q**   And those duties include you can't dump a
8          patient just because he or she doesn't have
9          insurance or money.  Correct?
10   **A**   Correct.
11   **Q**   And you can't deny screening examinations to
12         a patient just because he or she does not
13         have money or insurance.  Correct?
14   **A**   Correct.
15   **Q**   If there is necessary treatment that's
16         available, you provide it without regard for
17         insurance or for payment.  Correct?
18   **A**   Correct.
19   **Q**   In your training and education of EMTALA,
20         are you trained or informed on how to
21         identify when there has been an EMTALA
22         violation?
23   **A**   Yes.  I think so.
24         MR. WOODARD:
25              On "Exhibit 10," I have another

Page 37

1          screen shot from Northern's website on
2          the precertification issue.  This seems
3          to echo what you were saying.  It says,
4          "You may preregister online at least
5          three business days in advance of your
6          requested procedure date."  That does
7          not seem to speak to emergency
8          procedures.  Correct?
9          MR. BLANKENSHIP:
10             Object to the form.  It speaks for
11         itself.
12   **A**   Correct.
13   **Q**   Emergencies, you don't get three day's
14         notice.  Correct?
15   **A**   Correct.
16   **Q**   And so, applying this precertification in an
17         emergency setting would be kind of a square
18         peg in a round hole?
19   **A**   Correct.
20         MS. HOSKINS:
21             Excuse me.  Do you want to turn your
22         speaker down?
23   (OFF RECORD DISCUSSION).
24         MR. WOODARD TO MR. SHOENFELT:
25              Hey, Oscar.

10 (Pages 34 to 37)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 38

```
 1        MR. SHOENFELT:
 2        Yes?
 3     MR. WOODARD:
 4        Mute your phone for me.  And I'm not
 5     trying to hush you up, just in case you
 6     need to engage.
 7     MS. HOSKINS:
 8        Just for clarification, Oscar is on
 9     your cell phone listening.
10     MR. WOODARD:
11        That's right.
12     MR. WOODARD:
13        Now, "Exhibit 11" is a screen shot
14     from Northern's website.
15  Q  And this also seems to echo what you were
16     saying.  The part at the bottom, "If you
17     don't have insurance, no one will be denied
18     necessary medical care due to lack of
19     insurance or inability to pay."  Do you see
20     that?
21  A  I do.
22  Q  That's what you've been trained to do as an
23     ER physician?
24  A  Correct.
25  Q  That's consistent with your Hippocratic
```

Page 39

```
 1     oath?
 2  A  Correct.
 3  Q  And a policy or a practice or even a single
 4     instance in violation of that would
 5     constitute an EMTALA violation.  Correct?
 6     MS. HOSKINS:
 7        Object to the form.
 8     MR. BLANKENSHIP:
 9        Object to the form.
10  Q  I can rephrase the question.  Accepting
11     Dr. Taylor's testimony as true that there
12     was an emergency condition, that the MRI was
13     available, that the MRI was requested, that
14     the MRI was denied because of insurance
15     inquiries, it's your understanding that
16     would result in an EMTALA violation.
17     Correct?
18     MS. HOSKINS:
19        Object to the form.
20     MR. BLANKENSHIP:
21        Object to the form.
22  A  Yes.
23     MR. WOODARD:
24        "Exhibit 12."
25  Q  Northern Louisiana Medical Center represents
```

Page 40

```
 1     on its website the thirty minutes or less
 2     pledge.  Have you ever seen that?
 3  A  I have.
 4  Q  And that basically says you're going to get
 5     meaningful service within thirty minutes.
 6     You're going to be treated on an as-needed
 7     basis based on the severity of the condition
 8     presented.  Correct?
 9     MS. HOSKINS:
10        Object to the form.
11     MR. BLANKENSHIP:
12        Object to the form.
13  A  I think what it means is that you will be
14     seen and triaged within thirty minutes of
15     your arrival to the emergency department.
16  Q  You will be seen and triaged within thirty
17     minutes.  And then, after that, you're going
18     to be pigeonholed into, okay, here is a
19     runny nose, and then on the other end of the
20     continuum we've got a heart attack or
21     neurological deficits, something like that.
22     Correct?
23  A  Correct.
24     MR. BLANKENSHIP:
25        Object to the form.
```

Page 41

```
 1  Q  With this thirty-minute pledge in mind, if
 2     Dr. Taylor testified that he wanted an MRI
 3     for a twelve-year-old girl with neurological
 4     deficits in her hands and feet as early as
 5     9 a.m. and she did not obtain the MRI until
 6     3 p.m., do you think that would be
 7     consistent with the thirty-minute pledge?
 8     MS. HOSKINS:
 9        Object to the form.
10     MR. BLANKENSHIP:
11        Object to the form.
12  A  I don't think the pledge applies to that as
13     long as she was seen and triaged within
14     thirty minutes of her arrival to the ER.
15  Q  Okay.  Do you think that would be
16     consistent, the scenario I just gave to you,
17     MRI requested as early as 9 a.m., not
18     conducted until 3 p.m. with emergency
19     progressing neurological deficits in a
20     twelve-year-old girl?  Do you think that gap
21     in time is consistent with best practices at
22     Northern Louisiana Medical Center's
23     emergency department?
24     MS. HOSKINS:
25        Object to the form.
```

11 (Pages 38 to 41)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 42

1       MR. BLANKENSHIP:
2           Object to the form.
3   A   Again, an MRI is not something that is
4       available to us through the emergency room.
5   Q   Fair point. That would be an instance
6       where, assuming those facts as true, request
7       at 9:00, MRI finally given at 3:00, if you
8       accept Dr. Taylor's testimony, he was doing
9       everything he could to try to get the MRI in
10      that time frame. But because of a business
11      decision at the hospital, he could not get
12      it, --
13          MR. BLANKENSHIP:
14              Object to the form.
15  Q   -- assuming those facts as true. Is that
16      correct?
17  A   That's correct.
18  Q   Now, I know you feel like you're probably
19      banging your head against the wall and I'm
20      almost done, but it's my understanding you
21      say "MRIs can't be ordered from the
22      emergency room department because that's not
23      a modality we use." Is that a fair
24      characterization of your testimony?
25  A   Yes.

---

Page 43

1   Q   And you don't know -- you don't know why
2       that's something that's not available to
3       y'all?
4           MS. HOSKINS:
5               Object to the form.
6           MR. BLANKENSHIP:
7               Same objection.
8   A   No, not directly.
9   Q   Can you think of any legitimate reason if
10      the radiology department is right down the
11      hall, the MRI machine is right down the
12      hall, why you can't have access to that in
13      the special cases where you may need it as
14      an emergency room physician?
15          MS. HOSKINS:
16              Object to the form.
17          MR. BLANKENSHIP:
18              Same objection.
19  A   I don't know exactly how to answer that.
20      It's just always been we try to use another
21      modality that's faster in itself to try to
22      rule out emergency conditions. A CT can be
23      done in a few minutes whereas an MRI takes,
24      you know, a half hour or an hour, you know,
25      to do the procedure. So typically, we use

---

Page 44

1       the faster modality to try to rule in or out
2       an emergency condition, and then move on to
3       the next step.
4   Q   But there are certain things that an MRI
5       will pick up that a CT scan will not pick
6       up. Correct?
7   A   Correct.
8   Q   And, say, blood thickness, the density of
9       blood around, say, a spinal cord. That may
10      be an incident where you can run a CT scan
11      and it won't pick up, but an MRI would
12      definitely pick that up. Correct?
13  A   I'm not a radiologist, so I'm not sure about
14      that.
15  Q   Sure.
16  A   My understanding is that I think blood --
17      acute blood shows up fairly well on a CAT
18      scan, but there certainly may be things that
19      an MRI would pick up that a CAT scan can't.
20  Q   Which test is typically more expensive, a CT
21      scan or an MRI?
22  A   I have no direct knowledge of that.
23  Q   Do you have any knowledge -- when you say
24      you have no direct knowledge, do you have
25      any indirect knowledge?

---

Page 45

1   A   No, not really. I honestly have no idea
2       what things cost.
3   Q   Okay. Who would be the best person to ask
4       that?
5   A   I guess someone in the billing department.
6       I don't -- I don't really know.
7   Q   Who is in charge of the billing department?
8   A   I have no idea.
9   Q   You don't know?
10  A   No.
11  Q   It sounds like you walk into work like I do,
12      ready to get in and get out.
13  A   That's right.
14  Q   But I think you said, in an ideal world, you
15      would like to have the option to press a
16      button and get an MRI if a particular case
17      came in front of you and you decided you
18      wanted one. Correct?
19          MR. BLANKENSHIP:
20              Object to the form.
21          MS. HOSKINS:
22              Object to the form.
23  A   Yes.
24  Q   You said an MRI can take thirty minutes to
25      an hour to conduct?

---

12 (Pages 42 to 45)

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 46

1   **A**   Yes.
2   **Q**   And a CT scan about fifteen minutes?
3   **A**   Closer to five, probably, for most CTs.
4   **Q**   Okay.  What about an x-ray?
5   **A**   A few seconds.
6           MR. WOODARD:
7               Can we go off the record real quick?
8       I'd like to talk with my counsel.
9           MS. HOSKINS:
10              Sure.
11          MR. BLANKENSHIP:
12              Sure.
13  (OFF RECORD.)
14              EXAMINATION
15  BY MR. WOODARD, continuing:
16  **Q**   All right.  Doctor, a few more questions and
17      you're off.  If a -- I want you to put
18      yourself in Dr. Taylor's shoes.  If a young
19      twelve-year-old girl comes in with
20      progressing neurological deficits in her
21      hands and feet and you have reason to
22      believe there is a compression of the cord
23      which would require an MRI, what would you
24      do to try to get an MRI ordered and
25      conducted for that patient?

Page 47

1           MS. HOSKINS:
2               Object to the form.
3           MR. BLANKENSHIP:
4               Same objection.
5   **A**   Assuming all of those things, should have
6       two options.  I could probably call and try
7       to talk to the radiologist directly and see
8       if that's something that we could get done,
9       or transfer her to a facility where an MRI
10      is routinely available, assuming I knew all
11      of this.
12  **Q**   And who would you call when you say "and
13      talk to the radiologist"?
14  **A**   Whoever was on duty for that day.  Or I may
15      call and try to talk with the orthopaedic
16      surgeon to see if they could order the MRI.
17  **Q**   And if the request to radiology and the
18      request to another physician were denied,
19      you would then say, "Look, I recommend this
20      patient for transfer"?
21  **A**   Assuming all of those things, yes, probably.
22  **Q**   Okay.  Are there any written rules on when
23      you can order an MRI from the emergency
24      room?
25  **A**   I don't know.  I have not seen a written

Page 48

1       rule.
2   **Q**   And remind me.  You've been here off and on
3       since 2005?
4   **A**   I have.
5   **Q**   Any training on when you can or cannot order
6       an MRI from the emergency room?
7           MR. BLANKENSHIP:
8               Here at the hospital or in general
9           as part of his medical training?
10  **Q**   I think he understands the question.
11  **A**   No.  I don't think there's any specific
12      training.  It's just sort of what I've
13      experienced in practice.
14  **Q**   Is it your understanding that a patient has
15      to be admitted to obtain an MRI?
16  **A**   At this facility.
17  **Q**   At Northern?
18  **A**   Correct.  Or done on an outpatient basis.
19  **Q**   Which would be a non-emergency setting.
20  **A**   Correct.
21  **Q**   So, the only way an emergency room MRI can
22      be conducted at this facility is admitting
23      the patient?
24          MS. HOSKINS:
25              Object to the form.

Page 49

1           MR. BLANKENSHIP:
2               Join the objection.
3   **A**   That wouldn't be an emergency room MRI.
4   **Q**   Sure.  You said that an MRI is different from
5       the other tests in that it can be done in
6       fifteen to thirty minutes.  Are there also
7       some additional benefits to MRIs as opposed
8       to a CT scan and an x-ray?
9   **A**   Yes, there are things we can see on an MRI
10      that we can't see on the other two.
11  **Q**   And that's why I think you used the phrase
12      "ideal world."  You'd like to be able to
13      have that option.  Correct?
14          MR. BLANKENSHIP:
15              Object to the form.
16  **A**   Correct.
17  **Q**   Have you ever discussed with anyone at the
18      hospital -- doctors, nurses, administration
19      why MRIs are not available on the software
20      that you mentioned?
21          MS. HOSKINS:
22              Object to the form.
23          MR. BLANKENSHIP:
24              Same objection.
25  **A**   I have not.

13 (Pages 46 to 49)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 50

1   **Q**   When you were a resident, did you ever order
2   an MRI from the emergency room?
3   **A**   I don't know for sure.  I trained at a much
4   larger facility, so it's possible.
5   **Q**   Aside from being a slightly longer test, can
6   you think of any other reason as to why you
7   would not be allowed to order an MRI from
8   the emergency room?
9        MR. BLANKENSHIP:
10         Object to the form.
11        MS. HOSKINS:
12         Object to the form.
13   **A**   Normally, we can rule in or out what we need
14   to based on other modalities.
15   **Q**   But you would agree, in an emergency
16   department, there's really no such thing as
17   normal.  Correct?  You get new cases every
18   day.
19   **A**   Correct.
20   **Q**   All right.  Let me make sure I understand
21   this note from my counsel.  Are you
22   testifying that the emergency department
23   here does not include determining if a
24   patient needs a MRI on an emergency basis if
25   that is available to an in-patient?

---

Page 51

1   **A**   I'm not sure I understand the question.
2   **Q**   I don't either.  I'll move on.  And again,
3   you said, if you need an MRI, you've got to
4   admit the patient.  Correct?
5   **A**   Correct.
6   **Q**   And so, that would be an administrative
7   decision where Northern has not allowed the
8   emergency department to order an MRI.
9   Correct?
10        MR. BLANKENSHIP:
11         Object to the form.
12   **A**   I'm not sure where the decision came from.
13   It's not my decision.
14   **Q**   You're not aware that it was Dr. Alam's
15   decision?
16   **A**   No.
17   **Q**   You're not aware that it was Dr. Taylor's
18   decision?
19   **A**   No.
20   **Q**   You're not aware of any physician who said
21   hey, we don't want to be able to order an
22   MRI?
23   **A**   Correct.
24   **Q**   Would it be safe to assume that that came
25   from administration?

---

Page 52

1   **A**   Or the radiology department, possibly.
2   **Q**   And if the radiology department said that
3   was not its decision, it'd be safe to assume
4   that came from the business department or
5   administration at Northern?
6        MR. BLANKENSHIP:
7         Same objection.
8   **A**   Yes.
9   **Q**   Would you agree with Dr. Taylor's testimony
10   if he said that minutes can be critical when
11   you're talking about compression of the
12   spinal cord in a patient such as a twelve
13   year old girl with progressing neurological
14   deficits?
15        MS. HOSKINS:
16         Object to the form.
17        MR. BLANKENSHIP:
18         Same objection.
19   **A**   Yes, I would agree with that.
20   **Q**   And so, your options that you're allowed as
21   an emergency room physician, if you're ever
22   presented with a situation that requires an
23   MRI, you either call radiology, you call
24   another doctor such as an ortho, or you
25   transfer.  Correct?

---

Page 53

1   **A**   Yes.
2   **Q**   And all three of those decision take a
3   significant amount of time.
4   **A**   Correct.
5   **Q**   The actual call to radiology, is that you
6   pick up your cell phone and you call them or
7   do you have a phone in your office?
8   **A**   At the nurses' station.
9   **Q**   All right.  And if you call her and she
10   denies and says we can't do that, then you
11   call the doctor and he says we can't do
12   that, that's several minutes which have
13   passed.  Correct?
14   **A**   Correct.
15   **Q**   And then, if you transfer, where would you
16   transfer the patient?
17   **A**   Typically, LSU-Shreveport.
18   **Q**   And that's about an hour and a half drive,
19   if you're booking it.  Correct?
20   **A**   About an hour.
21   **Q**   By helicopter, how long are we talking?
22        MR. BLANKENSHIP:
23         Object to the form.  Calls for
24         speculation.
25   **A**   I think it's about twenty or thirty minutes.

---

14 (Pages 50 to 53)

GREGORY SCOTT, ET AL.                                      EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 54

1  Q    And you're aware of instances where patients
2       have been transferred from here to
3       Shreveport by helicopter?
4  A    Yes.
5  Q    And you're aware of both the time they've
6       left and the time they've arrived,
7       generally?
8  A    Generally.
9  Q    So, it wouldn't call for speculation on your
10      part, would it?
11 A    I suppose not.
12 Q    But those are the only three options you
13      have available, calling radiology, calling
14      another doctor, and transferring the
15      patient.  Correct?
16 A    Correct.
17 Q    And all three of those options take time.
18 A    Correct.
19 Q    Time in a situation, a hypothetical I'll
20      pose to you, where minutes are very
21      critical.
22 A    Correct.
23 Q    Okay.
24      MR. WOODARD:
25         Thank you, Doctor.

Page 55

1      MS. HOSKINS:
2         Trey?
3      MR. ZEIGLER:
4         No questions.
5      MR. BLANKENSHIP:
6         Good morning, Dr. Calvert.  Again,
7      I'm Kurt Blankenship and I represent the
8      hospital.  I do have some questions for
9  you.
10         EXAMINATION
11 BY MR. BLANKENSHIP:
12 Q    Touching on the helicopter flights to
13      Shreveport, you have ridden on those
14      helicopter flights with the patient?
15 A    Not to Shreveport; no, sir.
16 Q    So your understanding of the time frame
17      involved is just a general understanding you
18      have, not based on any personal knowledge of
19      yours.  Correct?
20 A    Yes, sir.
21 Q    All right.  You've said several times in
22      your testimony this morning that you can
23      rule out conditions faster using other
24      modalities than an MRI.  Is that a fair
25      understanding of what you said?

Page 56

1  A    Yes.
2  Q    And you've told us that the CAT scan can
3       take just a few minutes; x-rays just a few
4       seconds, and the MRI takes longer, thirty
5       minutes to an hour.
6  A    Yes.
7  Q    So, my sense from what you're saying, my
8       understanding of what you're saying, in
9       general, is that because you're in an
10      emergency room setting, you generally go to
11      the faster tests that you as the physician
12      believes will rule in or out a condition or
13      a possible diagnosis and ascertain faster
14      whether the condition is present or not.
15      Correct?
16 A    Correct.
17 Q    And that's why you would normally order the
18      CT first, because that rules in or out a
19      number of modalities.  Correct?
20 A    Correct.
21 Q    You would agree with me, wouldn't you,
22      Doctor, that a radiologist is, by virtue of
23      his specialized -- his or her specialized
24      training and experience, better qualified
25      than an ER physician to determine what

Page 57

1      medical conditions are best ruled in and out
2      by an MRI?
3      MR. WOODARD:
4         Object to form.
5  A    They certainly have more specialized
6      training than we do.
7  Q    Okay.  And they have more specialized
8      training in interpreting MRIs than you do as
9      an ER physician.
10 A    Correct.
11 Q    Do you ever, as an ER physician, interpret
12      the MRI itself?
13 A    Not an MRI, no.
14 Q    But you do interpret tests?
15 A    Preliminary interpretations.  They're always
16      over rid by a radiologist.
17 Q    It's fair to say, isn't it, that you rely on
18      the radiologist to give sort of a definitive
19      interpretation of either the CAT scan or the
20      MRI?
21 A    Correct.
22 Q    Now, you were asked what would your options
23      be if a twelve year old girl presented with
24      neurological deficits and you described
25      those for us, and I want to go back over

15 (Pages 54 to 57)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 58

1  just a couple of them.  First of all, your
2  decision making path would depend, wouldn't
3  it, on a number of things that you as the ER
4  physician learn or see as part of your
5  treatment and examination of the patient.
6  And, by that, I mean first you'd be looking
7  at the history the patient gave you.
8  A   Correct.
9  Q   Then you'd be relying on your clinical
10  assessment of the patient in whether or not
11  neurological deficits are demonstrated.
12  Correct?
13  A   Correct.
14  Q   And then, based on your training and
15  experience, that information, the history
16  and your clinical assessment, would lead you
17  down one of several paths as to what further
18  testing you would want to do to make a more
19  definitive diagnosis.  Correct?
20  A   Correct.
21  Q   And that's the normal course of events for
22  ER physicians when they're treating and
23  examining patients in the ER.  Correct?
24  A   Correct.
25  Q   All right.  And one of those options that's

---

Page 59

1  available to you is to consult with a
2  specialist.  Correct?
3  A   Correct.
4  Q   All right.  And there at Northern Louisiana
5  Medical Center, in August of 2014, there was
6  an orthopaedic surgeon available to consult
7  with.  Right?  Dr. Major Blair?
8  A   I'm not certain, you know, who was on call
9  that day or when he -- he's gone from this
10  facility and I don't know when he left.
11  Q   Let me make it just a general question.
12  Generally, are there specialists available
13  to consult with?
14  A   We only have one orthopaedist on staff right
15  now, so he's on call sometimes and he's not
16  other times.  I believe at that particular
17  time there was probably coverage every day
18  for orthopaedics.
19  Q   Okay.  But an orthopaedic surgeon would be
20  one of the types of specialists that you
21  could potentially consult as an ER physician
22  when you're confronted with a suspected
23  spinal cord injury.  Correct?
24  A   Correct.
25  Q   All right.  And that physician may or may

---

Page 60

1  not decide to order an MRI himself.
2  Correct?
3  A   Correct.
4  Q   And you've also testified earlier that
5  you've worked in six or seven emergency
6  rooms in the course of your career?
7  A   Yes.
8  Q   When did you start practicing emergency
9  medicine?
10  A   I believe 1999.
11  Q   All right.  And you've been here since 2005.
12  That's what you told us.  Correct?
13  A   Correct.
14  Q   All right.
15      MS. HOSKINS:
16          I think he said "off and on" --
17      MR. BLANKENSHIP:
18          Okay.
19      MS. HOSKINS:
20          -- since 2005.
21      MR. BLANKENSHIP:
22          All right.
23  Q   Have you worked in other emergency rooms
24  that are part of a facility that is
25  comparable to Northern Louisiana Medical

---

Page 61

1  Center?  And, by that, I'm just trying to
2  distinguish between a facility like
3  LSU-Shreveport and a facility like just a
4  rural clinic.  You know, there's a spectrum
5  of facilities available.
6  A   Most of the other facilities I have worked
7  at have had more options available than
8  Northern Louisiana Medical Center.
9  Q   Okay.  And when you say "options available,"
10  are you --
11  A   Specialty services available.
12  Q   Right, that's what I was getting at.  You're
13  talking about they might have neurologists
14  on staff or they might have neurosurgeons on
15  staff, things like that.
16  A   Correct.
17  Q   Okay.  Now, you were asked if you were
18  trained to identify EMTALA violations.  And
19  he first asked you -- EMTALA is a federal
20  law, is it not?
21  A   It is.
22  Q   All right.  And you're not trained in the
23  practice of law.  Correct?
24  A   I am not.
25  Q   And you're not called upon to determine

---

16 (Pages 58 to 61)

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                          October 17, 2016

Page 62

1   whether certain fact scenarios constitute a
2   violation of the law or not. Correct?
3   A   I'm not.
4   Q   You have a basic understanding as a
5   physician of what EMTALA obligates you as a
6   physician to do. Correct?
7   A   Correct.
8   Q   And to summarize that obligation, is it fair
9   to say that it's basically to triage and
10  stabilize the patient within the
11  capabilities of the facility. Correct?
12  A   Correct.
13  Q   And that process, the triage unit and the
14  stabilization of the patient is to be done
15  without consideration for finances.
16  Correct?
17  A   Correct.
18  Q   All right. And that's what you believe you
19  do here as the ER physician at Northern
20  Louisiana Medical Center. Correct?
21  A   Correct.
22  Q   You never ask a patient, I'm going to order
23  this test, can you pay for it?
24  A   No, I don't.
25  Q   That's never a consideration for you?

Page 63

1   A   No, it's not.
2   Q   And I take it that in your practice as an
3   emergency room physician here at the
4   hospital at Northern Louisiana Medical
5   Center, you don't get involved in any
6   decisions about whether a test is going to
7   be paid for by the patient's insurance
8   company or the patient himself or not.
9   A   I don't, no.
10  Q   You're not trained or familiar with the
11  requirements of various health insurers and
12  their contracts with their patients in the
13  hospital. Correct?
14  A   I am not.
15  Q   You were asked a number of questions about
16  administration making decisions versus
17  physicians making decisions. Let me phrase
18  it to you this way: You as the physician,
19  it's your prerogative, isn't it, to assess
20  the patient and make the appropriate
21  diagnosis. Correct?
22  A   Correct.
23  Q   And it's your prerogative to order what
24  tests you believe are necessary to make that
25  diagnosis, if they're within the capability

Page 64

1   of the hospital. Correct?
2   A   Correct.
3   Q   And it's your prerogative as the physician
4   to decide whether a patient could best be
5   treated for a specific condition at another
6   facility. Correct?
7   A   Correct.
8   Q   And then, recommend or order the transfer.
9   Correct?
10  A   Correct.
11  Q   And that happens all the time for an
12  emergency room physician. Correct?
13  A   Correct.
14  Q   You said, I believe, that you don't have any
15  knowledge of the specifics of this case.
16  Correct?
17  A   Correct.
18  Q   And just to be clear for the record, you
19  have not reviewed the medical chart for
20  Jordan Scott's visit to the emergency room
21  on August 19, 2014?
22  A   I have not.
23  Q   I believe you said at one point, if I wrote
24  it down correctly, that you've never worked
25  in an ER where the MRI is available.

Page 65

1   Correct?
2   A   Correct.
3   Q   So, if that is the policy or the practice
4   here, and I'm not suggesting that it is, but
5   if it is, it's not unusual in your
6   experience, is it?
7   A   Correct.
8   Q   I want to show you, Dr. Calvert, a document
9   that was identified and attached as an
10  exhibit in a previous deposition in this
11  case. I'll give you a minute to take a look
12  at it, but I'll represent to you while
13  you're looking at it that this is a list of
14  MRIs ordered through the emergency room here
15  at Northern Louisiana Medical Center from
16  roughly 2013 to 2016 that was generated from
17  the hospital's computer system. And, as you
18  can see, the name of the patient is redacted
19  from this document. If you look at the
20  first page of this attachment, the third
21  line down indicates that you, yourself,
22  ordered an MRI through the emergency room on
23  April 28th, 2014. Let me first ask you, you
24  treat, in the course of any shift in the ER,
25  anywhere from ten or so patients to maybe

17 (Pages 62 to 65)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

Page 66

1   multiple tens of patients.  Correct?
2   A   Typically, twenty-five patients or so.
3   Q   And you normally do how many ER shifts a
4   month?
5   A   Sixteen to eighteen.
6   Q   So, just roughly doing the math, you take
7   care of at least several hundred patients
8   per month every month.  Correct?
9   A   Correct.
10  Q   And it would be straining or taxing the
11  ability of anyone to remember all the
12  specifics of the patients that they treat.
13  Correct?
14  A   Correct.
15  Q   All right.  So, with that by way of
16  background, first let me ask if you
17  specifically recall ordering a brain MRI
18  without contrast for a patient on
19  April 28th, 2014?
20  A   I do not.
21  Q   But, given this list, do you have any reason
22  to believe that the hospital computer system
23  is inaccurate when it says that such an MRI
24  was ordered?
25  A   I do not.  But my suspicion is that that was

---

Page 67

1   ordered as an in-patient.
2   Q   Okay.  There's a code that allows us to
3   determine whether they were in-patient or
4   outpatients but it shows you as the ordering
5   physician.  Correct?  And the other people
6   listed in the ordering physician column, let
7   me ask you about some of these.  First of
8   all, you'll notice that Dr. Alam's office --
9   I mean, name appears many times.  Do you see
10  that?
11  A   I do.
12  Q   Are you familiar with Dr. Holly Kidd?
13  A   I am.
14  Q   And who is that?  Is that another ER
15  physician?
16  A   No, it's not.  She's a Green Clinic Internal
17  Medicine doctor.
18  Q   All right.  And Dr. Martin Blackwelder?
19  A   Green Clinic Internal Medicine.
20  Q   You see Dr. Taylor's name there?
21  A   I do.
22  Q   And then, Dr. Jacqueline White?
23  A   I do.
24  Q   Who is that?
25  A   She's an emergency room doctor.

---

Page 68

1   Q   And what about Dr. Beau Burton?
2   A   He's a -- I believe a nurse practitioner in
3   the ER.
4   Q   Okay.  Does he work with your group?
5   A   He does.
6   Q   Or for your group?  All right.  And
7   Dr. Regan Bonan?
8   A   Green Clinic Internal Medicine.
9   Q   Okay.  So, we've seen enough names to know
10  that the ordering physician here is a
11  mixture of Green Clinic Physicians and ER
12  physicians.  Correct?
13  A   Correct.
14  A   All right.  And the list speaks for itself,
15  but you can verify for us, can't you, that a
16  number of the MRIs shown ordered here are of
17  the cervical spine.  Correct?
18  A   Yes.  It looks like three of them.
19  Q   Okay.  And then some are of the lumbar
20  spine.  Correct?
21  A   Correct.
22  Q   At least one is of the thoracic spine.
23  A   Correct.
24  Q   And then, a lot of them are either of the
25  head or the brain.

---

Page 69

1   A   Correct.
2   Q   Okay.  Does it happen sometimes,
3   Dr. Calvert, either in the emergency room
4   here at Northern Louisiana Medical Center or
5   others that if you believe an MRI might be
6   appropriate for a patient for whatever
7   reason, that you would call the radiologist
8   on duty and say, hey, I've got a patient
9   here.  This is what I'm seeing.  I think
10  maybe an MRI is in order.  What do you
11  think?  Does that happen?
12  A   Yes.
13  Q   All right.  And under those circumstances,
14  does the radiologist sometimes respond that
15  yeah, I agree.  Send him up.  We'll do an
16  MRI.  Or, try this first or anything like
17  that?
18  A   I can't remember a specific instance but,
19  yes, they would go over the possibilities,
20  you know, of potential things that we could
21  do to try to take care of the patient.
22  Q   Okay.  Is it fair to say that the
23  radiologist, the physician radiologist is
24  sort of the gatekeeper for determining
25  whether an MRI is appropriate for a patient?

---

18 (Pages 66 to 69)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

## Page 70

1  A   I'm not sure that I would use the term
2      "gatekeeper," but they have, certainly, more
3      training to know whether the test is
4      appropriate or not.
5  Q   Okay. You were asked a number of questions
6      about whether you had ever discussed the
7      unavailability, as you described, of MRIs
8      here with either administration or other
9      physicians, and I want to ask you about
10     that. First of all, to use the term
11     "unavailability," it has different meanings
12     in my mind, so I want to clarify that. An
13     MRI machine is present here in the hospital.
14     Correct?
15 A   Yes.
16 Q   And MRIs can be physically performed here in
17     the hospital. Correct?
18 A   Correct.
19 Q   So, another way of saying "unavailability,"
20     as you've been describing it, of saying is
21     it's not normally ordered through the ER?
22     An MRI is not normally ordered through the
23     ER?
24 A   I have not ever ordered an MRI from the
25     emergency room.

## Page 71

1  Q   That you recall?
2  A   I have not ever ordered an MRI other than on
3      an in-patient.
4  Q   Even though this computer sheet shows that
5      it was ordered for --
6          MR. WOODARD:
7             Object to form. He's stated he
8          thinks that was an in-patient.
9  Q   I think you said you suspect it was an
10     in-patient.
11 A   It's not possible for me to order an MRI
12     from the emergency room; so if this shows up
13     under my name, chances are that was an MRI
14     written on admission orders. And I write
15     for those every day.
16 Q   For a patient that is going to be admitted.
17 A   For a patient who's going to be admitted.
18 Q   Right. And when you write the admission
19     orders under those circumstances, is that an
20     order that you, yourself, are generating,
21     for lack of a better way to describe it, or
22     is that an order that comes from another
23     physician?
24 A   I think technically it's from another
25     physician because we don't have admitting

## Page 72

1      privileges to the hospital. As sort of part
2      of the customary procedure, we write what
3      we'll call "bridge orders" to get the
4      patient admitted to the hospital. The order
5      technically comes from me, but it's on
6      behalf of the admitting physician.
7  Q   Okay. It happens, though, sometimes that
8      you don't actually talk to the admitting
9      physician when you're writing the bridge
10     orders, right? You have sort of a standard
11     protocol for ordering sets of tests for
12     specific kinds of patients, right?
13 A   Yes, but we always discuss admissions with
14     the admitting physician.
15 Q   Okay.
16 A   But yes, there's a typical work up for a
17     heart patient or a --
18 Q   But you don't necessarily have to talk to
19     the admitting physician to know what that
20     is. Correct?
21 A   Correct.
22 Q   Now, getting back to the questions about
23     discussions, have you ever discussed this
24     unavailability, as you've described it, of
25     the MRIs through the emergency room with

## Page 73

1      other physicians here?
2  A   Not that I recall.
3  Q   Because, again, in your experience, it's not
4      that unusual, right?
5  A   Correct.
6  Q   And I'm not sure you were asked this
7      specific question, so I want to ask it:
8      You've never had any discussion with anyone
9      in hospital administration about
10     unavailability of MRIs through the ER as you
11     have described it in this testimony today?
12 A   I have not.
13 Q   And I think we know the answer to this
14     question but, just to be sure, to get ready
15     for this deposition today, you didn't review
16     any physical documents. Correct?
17 A   I did not.
18     MR. BLANKENSHIP:
19        Thank you, Dr. Calvert.
20     MR. WOODARD:
21        I've got a few follow-ups.
22     WITNESS:
23        Okay.
24     MR. WOODARD:
25        This sheet, what do you want to mark

19 (Pages 70 to 73)

GREGORY SCOTT, ET AL.                                            EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                              October 17, 2016

---

Page 74

1          this, Mr. Blankenship?
2          MR. BLANKENSHIP:
3              Your last number was ten, I believe,
4      so we can make it eleven.
5          COURT REPORTER:
6              The last number was twelve.
7          MR. BLANKENSHIP:
8              Twelve?  Let's make it "13."
9              REEXAMINATION
10     BY MR. WOODARD:
11     Q    Okay.  This sheet right here, Doctor,
12         there's nothing showing what time any of
13         these MRIs were ordered.  Correct?
14     A    I don't believe so.
15     Q    There's nothing showing what time any of
16         these MRIs were conducted.  Correct?
17     A    Correct.
18     Q    So, if you're looking at this sheet,
19         Exhibit 13, there could have been a
20         five-minute delay between the order and the
21         MRI or there could have been a five-day
22         delay for all you know.  There is no
23         telling.
24     A    Correct.
25     Q    There's nothing on Exhibit 13 that shows

---

Page 75

1          whether these MRIs required precertification
2      or did not require precertification.
3      Correct?
4      A    Correct.
5      Q    And of these few MRIs that purportedly come
6          from the ER in Exhibit 13, it looks like at
7          least seven of them dealt with the spine.
8          Correct?
9      A    Correct.
10     Q    And you understand that the MRI that
11         Dr. Taylor wanted in this case addressed the
12         thumbar area of the spine?
13         MS. HOSKINS:
14             Object to the form.
15     A    Lumbar?
16     Q    "Thumbar."  Thoracic.
17     A    Thoracic.
18     Q    Hey, that's that new area that I invented
19         between thoracic and lumbar.
20     A    I'm not sure what ordered.  I honestly
21         don't have any knowledge.
22     Q    Assume that he wanted the thoracic area of
23         the spine to be examined.  That would be
24         consistent with the few MRIs that exist on
25         Exhibit 13.  Correct?

---

Page 76

1      A    There is a thoracic spine MRI on it.
2      Q    Okay.  And then, several other areas, the
3          cervical and the lumbar.  Correct?
4      A    Correct.
5      Q    And so, that would suggest that at least the
6          brain and the spine are areas where you may
7          need an MRI on certain occasions?
8          MS. HOSKINS:
9              Object to the form.
10         MR. BLANKENSHIP:
11             Same objection.
12     A    Correct.
13     Q    An MRI is a diagnostic screening
14         examination.  Correct?
15     A    I don't know about a "screening"
16         examination.  It's a diagnostic examination.
17     Q    Diagnostic.
18     A    You don't use them to screen for anything
19         that I'm aware of.
20     Q    I said "screening."  Diagnostic imaging
21         examination?
22     A    Correct.
23     Q    And when we were talking about
24         unavailability, it's physically available at
25         Northern Louisiana Medical Center.  Correct?

---

Page 77

1      A    There is a machine here.
2      Q    There is a machine here and it's relatively
3          close to the emergency department.  Correct?
4      A    I'm not aware of it's location.
5      Q    You would not be in a position to dispute or
6          argue with Dr. Taylor whenever he describes
7          where the MRI machine is located?
8      A    I would not.
9      Q    And so, while it's physically available, for
10         all practical respects, it's not available
11         to you in the emergency department.
12         Correct?
13         MR. BLANKENSHIP:
14             Object to the form.
15     A    Correct.
16     Q    And that's because, due to an administrative
17         business decision, you are not available to
18         press a button and order an MRI from the
19         emergency department?
20         MS. HOSKINS:
21             Object to the form.
22         MR. BLANKENSHIP:
23             Object to the form.
24     A    I'm not sure where the decision came from.
25         I just know it's not available.

---

20 (Pages 74 to 77)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

---

**Page 78**

1  Q  It didn't come from the doctors.  Correct?
2  A  Correct.
3  Q  Who orders the software?
4  A  I assume administration.
5  Q  And so, if the software is ordered by
6     administration and the software doesn't have
7     a button that allows you to order an MRI, it
8     would be safe to say that administration has
9     made the decision to not allow emergency
10    room doctors to order an MRI?
11       MR. BLANKENSHIP:
12          Object to the form.
13  A  Again, I'm not sure who made the decision
14     not to include it.
15  Q  You've seen no evidence based on the
16     software ordered by the administration that
17     they want to allow you to be able to order
18     an MRI from the emergency room?
19       MR. BLANKENSHIP:
20          Object to the form.
21  A  Correct.
22  Q  We talked about the delay in an MRI, fifteen
23     to thirty minutes, typically?
24  A  That's how long it takes to perform the
25     actual MRI.

---

**Page 80**

1  A  Yes.
2  Q  And would it keep you up at night knowing
3     that that policy has now left a teenage girl
4     paralyzed for the rest of her life?
5       MS. HOSKINS:
6          Object to the form.
7       MR. BLANKENSHIP:
8          Object to the form.
9  A  Yes.
10  Q  You have a daughter yourself.  Correct?
11  A  I do.
12  Q  That would be very troubling to you?
13  A  Yes.
14       MR. WOODARD:
15          No further questions.
16    (WITNESS ELECTED TO READ AND SIGN.)
17          DEPOSITION CONCLUDED AT 9:30 A.M.
18
19
20
21
22
23
24
25

---

**Page 79**

1  Q  Okay.  That would, of course, be a shorter
2     time frame than several hours.  Correct?
3  A  Correct.
4  Q  And so, even if it's not the fastest test
5     available, if under certain circumstances
6     it's the best test available, that would be
7     better than having a patient sit around and
8     wait seven hours.
9       MS. HOSKINS:
10          Object to the form.
11       MR. BLANKENSHIP:
12          Same objection.
13  A  Correct.
14  Q  Especially a patient with progressing
15     neurological defects.
16  A  Correct.
17  Q  Would it be very frustrating for you as a
18     physician if you were presented with a
19     patient who you thought, in your medical
20     judgment, using your training, your
21     expertise required an MRI and, because of
22     hospital policies and procedures, you were
23     not able to get an MRI?
24       MR. BLANKENSHIP:
25          Object to the form.

---

**Page 81**

1       REPORTER'S PAGE
2       I, LINDA PEROT, Certified Court Reporter
3  No. 23012, in and for the State of Louisiana,
4  the officer, as defined in Rule 28 of the
5  Federal Rules of Civil Procedure and/or Article
6  1434(B) of the Louisiana Code of Civil
7  Procedure, before whom this proceeding was
8  taken, do hereby state on the Record:
9
10      That due to the interaction in the
11  spontaneous discourse of this proceeding, dashes
12  (--) have been used to indicate pauses, changes
13  in thought, and/or talkovers; that same is the
14  proper method for a Court Reporter's
15  transcription of proceeding, and that the dashes
16  (--) do not indicate that words or phrases have
17  been left out of this transcript;
18
19      That any words and/or names which could
20  not be verified through reference material have
21  been denoted with the phrase "(spelled
22  phonetically)."
23
24  _____
25      LINDA PEROT, CCR No. 23012

---

GREGORY SCOTT, ET AL.                                    EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                        October 17, 2016

Page 82

1            CERTIFICATE
2        This certification is valid only for a
3    transcript accompanied by my original signature
4    And required official seal stamped on this
5    certificate.
6        I, LINDA PEROT, Certified Court Reporter,
7    Certificate No. 23012, as the officer before
8    whom this testimony was taken, do hereby certify
9    that EDWARD CALVERT, M.D., after having been
10   duly sworn by me upon authority of R.S. 37:2554,
11   did appear on the 27th day of July, 2016,
12   commencing at 8:06 a.m., and concluding at
13   9:30 a.m., as hereinbefore set forth in the
14   foregoing 81 pages; that this testimony was
15   reported by me in the stenomask reporting
16   method, was prepared and transcribed by me or
17   under my personal direction and supervision, and
18   is true and correct to the best of my ability
19   and understanding; that the transcript has been
20   prepared in compliance with the transcript
21   format guidelines required by statute and rules
22   of the Board; that I am informed about the
23   complete arrangement, financial or otherwise,
24   with the person or entity making arrangements
25   for deposition services; that I have acted in

Page 83

1    compliance with the prohibition on contractual
2    relationships, as defined by Louisiana Code of
3    Civil Procedure Article 1434 and rules and
4    advisory opinions of the Board; that I have no
5    actual knowledge of any prohibited employment or
6    contractual relationship, direct or indirect,
7    between a court reporting firm and any party
8    litigant in this matter, nor is there any such
9    relationship between myself and a party litigant
10   in this matter; that I am not related to counsel
11   or to any of the parties hereto, I am in no
12   manner associated with counsel for any of the
13   interested parties to this litigation, and I am
14   in no way concerned with the outcome thereof.
15       West Monroe, Louisiana, on this the 18th
16   day of October, 2016.
17
18       _____
19       LINDA PEROT
20       CERTIFIED COURT REPORTER
21       CERTIFICATE NO. 23012
22       STATE OF LOUISIANA
23
24
25

22 (Pages 82 to 83)

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 1

---

**A**

**a.m** 22:10 25:3 41:5,17 80:17 82:12,13
**ability** 14:7 66:11 82:18
**able** 20:5 30:3 49:12 51:21 78:17 79:23
**accept** 26:14 42:8
**Accepting** 39:10
**access** 30:3 43:12
**accompanied** 82:3
**accreditation** 31:3,8
**accredited** 30:18 30:19
**ACR** 5:11,12,14 31:2,5,15 32:5
**acted** 82:25
**actual** 8:8 53:5 78:25 83:5
**acute** 44:17
**additional** 49:7
**address** 7:9
**addressed** 75:11
**administration** 19:1 49:18 51:25 52:5 63:16 70:8 73:9 78:4,6,8 78:16
**administrative** 24:19 25:7,19 26:2 27:21 51:6 77:16
**admission** 71:14 71:18
**admissions** 72:13
**admit** 51:4
**admitted** 29:23

29:24 48:15 71:16,17 72:4
**admitting** 13:3 48:22 71:25 72:6,8,14,19
**adopted** 26:10
**advance** 37:5
**advertise** 21:11 21:15,18
**advertises** 20:17 21:3
**advised** 6:20
**advisory** 83:4
**ago** 9:3
**agree** 11:15,18 15:22 18:4 20:7 22:20,25 33:9,10 50:15 52:9,19 56:21 69:15
**agreed** 6:2
**ahead** 10:1 16:17
**Alam** 5:4 7:25 8:2,10,12,21 11:15 15:21 25:25 26:5
**Alam's** 9:1 51:14 67:8
**allow** 15:7 78:9 78:17
**allowed** 50:7 51:7 52:20
**allows** 14:6 67:2 78:7
**American** 31:5 31:18
**amount** 12:10 53:3
**and/or** 81:5,13 81:19
**answer** 6:9 9:6 10:11 21:10 43:19 73:13
**answers** 6:16

**appear** 33:20 82:11
**APPEARAN...** 2:1 3:1
**appearing** 2:6 2:17,23 3:5
**appears** 67:9
**applied** 27:11,15 28:5 33:14
**applies** 41:12
**applying** 37:16
**appropriate** 34:9,20 63:20 69:6,25 70:4
**appropriateness** 5:11,12,14 31:16 32:6,11 33:14,19,21 34:1
**appropriatene...** 32:18
**April** 65:23 66:19
**area** 75:12,18,22
**areas** 76:2,6
**argue** 77:6
**arrangement** 82:23
**arrangements** 82:24
**arrival** 40:15 41:14
**arrived** 54:6
**article** 32:4 33:21 81:5 83:3
**as-needed** 40:6
**ascertain** 56:13
**Aside** 50:5
**asked** 9:21 57:22 61:17,19 63:15 70:5 73:6
**asking** 24:23 26:14 27:9

**aspect** 14:13,25
**assess** 23:25 63:19
**assessment** 26:20 58:10,16
**associated** 83:12
**assume** 9:18 11:3 24:23 25:8 27:10 51:24 52:3 75:22 78:4
**assuming** 25:16 26:18 29:23 42:6,15 47:5 47:10,21
**attached** 5:6,7 5:10 65:9
**attachment** 65:20
**attack** 40:20
**attempted** 12:4 12:24
**ATTORNEY** 2:9
**August** 27:5,8 29:16 59:5 64:21
**authority** 82:10
**available** 11:20 11:22,25 12:11 12:13,20,22 18:23 19:16 20:14,18 21:13 21:14 36:16 39:13 42:4 43:2 47:10 49:19 50:25 54:13 59:1,6 59:12 61:5,7,9 61:11 64:25 76:24 77:9,10 77:17,25 79:5 79:6
**Avenue** 1:20 7:11

**aware** 17:6 18:12,24 19:4 22:7,17 28:23 31:8 51:14,17 51:20 54:1,5 76:19 77:4

---

**B**

**back** 11:14 57:25 72:22
**background** 66:16
**banging** 42:19
**based** 32:24 40:7 50:14 55:18 58:14 78:15
**basic** 62:4
**basically** 40:4 62:9
**basis** 10:5 13:15 13:24 34:17 35:2 40:7 48:18 50:24
**basises** 34:22
**Baton** 2:10
**Beau** 68:1
**behalf** 1:6 2:23 72:6
**believe** 8:13 34:7 46:22 59:16 60:10 62:18 63:24 64:14,23 66:22 68:2 69:5 74:3 74:14
**believes** 56:12
**benefits** 49:7
**BERNSTEIN** 2:20
**best** 41:21 45:3 57:1 64:4 79:6 82:18
**better** 56:24 71:21 79:7

---

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 2

**bill** 31:9
**billing** 45:5,7
**Blackwelder** 67:18
**Blair** 59:7
**BLANCHARD** 3:3
**Blankenship** 2:18 4:7,13 10:2,10 11:9 14:10,22 15:13 15:19 16:1 18:7,20 20:8 20:22 21:8,23 22:14,21 24:13 25:12,21 26:7 26:22 27:6,12 27:17 28:1,16 30:6,22 33:6 34:5,24 35:4 37:9 39:8,20 40:11,24 41:10 42:1,13 43:6 43:17 45:19 46:11 47:3 48:7 49:1,14 49:23 50:9 51:10 52:6,17 53:22 55:5,7 55:11 60:17,21 73:18 74:1,2,7 76:10 77:13,22 78:11,19 79:11 79:24 80:7
**blood** 44:8,9,16 44:17
**BLUE** 2:14
**Board** 82:22 83:4
**Bonan** 68:7
**booking** 53:19
**bottom** 30:16 32:10,15 38:16
**Boulevard** 2:15
**Brady** 1:11 15:2

15:16
**brain** 66:17 68:25 76:6
**BREITHAUPT** 2:3
**bridge** 72:3,9
**Brookhaven** 7:11
**Burns** 17:23 18:3
**Burton** 68:1
**business** 24:8,19 25:11,18 26:3 27:21 37:5 42:10 52:4 77:17
**button** 13:9 16:24 17:3,5 17:13,16,19 45:16 77:18 78:7

―――――――
**C**
―――――――
**call** 2:8 28:12 35:14 47:6,12 47:15 52:23,23 53:5,6,9,11 54:9 59:8,15 69:7 72:3
**called** 16:18 61:25
**calling** 54:13,13
**Calls** 53:23
**Calvert** 1:15 6:3 6:19 7:1,11 55:6 65:8 69:3 73:19 82:9
**capabilities** 62:11
**capability** 63:25
**caption** 30:11
**care** 33:14,19 34:2 38:18 66:7 69:21
**career** 60:6

**case** 9:21 22:2,6 22:16,20 27:11 38:5 45:16 64:15 65:11 75:11
**cases** 43:13 50:17
**CAT** 13:25 14:1 19:16 44:17,19 56:2 57:19
**category** 29:22
**Causeway** 2:15
**CCR** 81:25
**cell** 38:9 53:6
**Center** 1:10,20 2:13 7:18,21 28:24 39:25 59:5 61:1,8 62:20 63:5 65:15 69:4 76:25
**Center's** 41:22
**Century** 20:5 30:3
**CEO** 15:2
**certain** 8:1 44:4 59:8 62:1 76:7 79:5
**certainly** 44:18 57:5 70:2
**certificate** 1:24 82:1,5,7 83:21
**certification** 82:2
**Certified** 1:23 7:2 81:2 82:6 83:20
**certify** 82:8
**cervical** 68:17 76:3
**chances** 71:13
**changes** 81:12
**characterizati...** 42:24
**charge** 45:7

**chart** 64:19
**circumstances** 69:13 71:19 79:5
**Civil** 6:6 81:5,6 83:3
**clarification** 16:12 38:8
**clarify** 70:12
**clear** 64:18
**clinic** 61:4 67:16 67:19 68:8,11
**clinical** 58:9,16
**close** 77:3
**Closer** 46:3
**code** 67:2 81:6 83:2
**coffee** 23:16,18
**College** 31:5,18
**column** 67:6
**come** 16:4 75:5 78:1
**comes** 23:20 46:19 71:22 72:5
**commencing** 82:12
**company** 1:10 34:18 63:8
**comparable** 60:25
**complaint** 19:5
**complaints** 18:25
**complete** 82:23
**compliance** 82:20 83:1
**compression** 46:22 52:11
**computer** 13:6 16:7,10 65:17 66:22 71:4
**concept** 33:13
**concerned** 83:14
**CONCLUDED**

80:17
**concluding** 82:12
**condition** 26:21 39:12 40:7 44:2 56:12,14 64:5
**conditions** 13:18 14:1 16:6 19:15 43:22 55:23 57:1
**condone** 21:17
**conduct** 45:25
**conducted** 14:16 22:11 41:18 46:25 48:22 74:16
**CONFEREN...** 2:8
**confirmation** 14:6,18
**confirmed** 14:19
**confronted** 59:22
**connection** 6:14
**consideration** 25:7 27:22 62:15,25
**considerations** 9:23 15:8 26:18 28:7 32:24 33:1
**considered** 29:17 32:16 33:1 34:4
**consistent** 6:7 30:4 38:25 41:7,16,21 75:24
**constitute** 39:5 62:1
**consult** 59:1,6 59:13,21
**consultation** 26:4

GREGORY SCOTT, ET AL.        EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.    October 17, 2016

Page 3

| | | | | |
|---|---|---|---|---|
| **CONTINUED** 3:1 | 60:3,12,13 61:16,23 62:2 | 46:2 49:8 56:18 | **defining** 34:1 | **describes** 77:6 |
| **continuing** 46:15 | 62:6,7,11,12 62:16,17,20,21 | **CTs** 46:3 **cup** 23:16,18 | **definitely** 44:12 **definition** 34:3 | **describing** 70:20 **detail** 9:19 |
| **continuum** 40:20 | 63:13,21,22 64:1,2,6,7,9,10 | **customary** 72:2 | **definitive** 57:18 58:19 | **determine** 35:20 56:25 61:25 |
| **contracts** 63:12 | 64:12,13,16,17 | — D — | **DEGAN** 3:3 | 67:3 |
| **contractual** 83:1 83:6 | 65:1,2,7 66:1,8 66:9,13,14 | **D** 2:4 | **delay** 14:5 35:8 74:20,22 78:22 | **determining** 32:17 50:23 |
| **contrast** 66:18 | 67:5 68:12,13 | **Daily** 17:10 | **delayed** 9:22 | 69:24 |
| **conversation** 15:15 | 68:17,20,21,23 69:1 70:14,17 | **dashes** 81:11,15 **date** 37:6 | **demonstrated** 58:11 | **dhoskins@de...** 3:6 |
| **cord** 44:9 46:22 52:12 59:23 | 70:18 72:20,21 73:5,16 74:13 | **daughter** 80:10 **day** 17:9,11 | **denied** 9:22 25:4 25:6 38:17 | **diagnose** 23:25 **diagnosis** 56:13 |
| **correct** 7:19 13:9,10 14:19 | 74:16,17,24 75:3,4,8,9,25 | 23:13 47:14 50:18 59:9,17 | 39:14 47:18 **denies** 53:10 | 58:19 63:21,25 **diagnostic** 17:1 |
| 15:24,25 16:22 16:25 19:22 | 76:3,4,12,14 76:22,25 77:3 | 71:15 82:11 83:16 | **denoted** 81:21 **density** 44:8 | 29:11 30:13 31:22 76:13,16 |
| 21:20,25 23:2 23:3,10,15,21 | 77:12,15 78:1 78:2,21 79:2,3 | **day's** 37:13 **days** 37:5 | **deny** 35:8,22 36:11 | 76:17,20 **difference** 33:18 |
| 23:24 24:2,3,7 25:25 26:1,12 | 79:13,16 80:10 82:18 | **deal** 24:5 **dealt** 26:12 75:7 | **department** 9:9 17:21 18:18 | 33:20 **different** 36:2 |
| 26:13 27:11,14 28:8,9,13 30:5 | **correctly** 64:24 **cost** 32:16 34:7 | **decide** 60:1 64:4 **decided** 45:17 | 19:22 20:1,6 23:10 29:11,16 | 49:4 70:11 **difficult** 15:23 |
| 30:8,14,15,19 34:4 36:3,4,9 | 45:2 **costs** 34:3 | **deciding** 33:2 **decision** 24:19 | 31:23 32:23 40:15 41:23 | **direct** 32:15 44:22,24 83:6 |
| 36:10,13,14,17 36:18 37:8,12 | **counsel** 6:2,4 46:8 50:21 | 25:11 27:21 42:11 51:7,12 | 42:22 43:10 45:5,7 50:16 | **direction** 82:17 **directly** 13:2 |
| 37:14,15,19 38:24 39:2,5 | 83:10,12 **couple** 58:1 | 51:13,15,18 52:3 53:2 58:2 | 50:22 51:8 52:1,2,4 77:3 | 28:25 43:8 47:7 |
| 39:17 40:8,22 40:23 42:16,17 | **course** 58:21 60:6 65:24 | 77:17,24 78:9 78:13 | 77:11,19 **departments** | **discouraged** 18:19,22 |
| 44:6,7,12 45:18 48:18,20 | 79:1 **court** 1:1,23 7:3 | **decisions** 24:8 25:19 26:3,10 | 18:5,11 **depend** 58:2 | **discourse** 81:11 **discuss** 13:2 |
| 49:13,16 50:17 50:19 51:4,5,9 | 74:5 81:2,14 82:6 83:7,20 | 63:6,16,17 **deck** 23:20 | **deposition** 1:14 5:10 6:3,10,14 | 72:13 **discussed** 16:3 |
| 51:23 52:25 53:4,13,14,19 | **coverage** 59:17 **credibility** 28:12 | **defects** 79:15 **DEFENDANT** | 6:17,21 9:15 9:16 23:9 | 49:17 70:6 72:23 |
| 54:15,16,18,22 55:19 56:15,16 | **Criteria** 5:11,13 5:15 31:16 | 2:13,19 3:2 **Defendants** 6:5 | 24:25 65:10 73:15 80:17 | **discussion** 31:14 37:23 73:8 |
| 56:19,20 57:10 57:21 58:8,12 | **critical** 52:10 54:21 | **deficits** 40:21 41:4,19 46:20 | 82:25 **depositions** 23:5 | **discussions** 72:23 |
| 58:13,19,20,23 58:24 59:2,3 | **CT** 9:7 13:9,17 16:23 43:22 | 52:14 57:24 58:11 | **describe** 71:21 **described** 57:24 | **dishonesty** 8:20 **dispute** 15:9 |
| 59:23,24 60:2 | 44:5,10,20 | **defined** 32:5 81:4 83:2 | 70:7 72:24 73:11 | 20:2 77:5 **distinguish** 61:2 |

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 4

| | | | | |
|---|---|---|---|---|
| **DISTRICT** 1:1 1:2 **DIVISION** 1:3 **doctor** 7:7 13:4 16:4 23:1 24:10 36:3 46:16 52:24 53:11 54:14,25 56:22 67:17,25 74:11 **doctors** 49:18 78:1,10 **document** 65:8 65:19 **documentation** 16:19 **documents** 73:16 **doing** 42:8 66:6 **don't'** 72:8 **Donald** 2:23 **doubt** 15:17 **Dr** 5:4,5 8:10,10 8:12,12,21,21 9:1,15,20 11:4 11:12,15 15:1 15:9,18,21,22 19:24 20:4 22:9 25:2,25 25:25 26:5,5 26:15 28:10 30:1 39:11 41:2 42:8 46:18 51:14,17 52:9 55:6 59:7 65:8 67:8,12 67:18,20,22 68:1,7 69:3 73:19 75:11 77:6 **drinking** 23:17 **drive** 2:4 53:18 **Drs** 7:25 **DuBOIS** 1:11 15:2,4,6 26:15 | **DuBOS** 2:3 **due** 38:18 77:16 81:10 **duly** 7:2 82:10 **dump** 36:7 **DUNN** 2:3 **duties** 36:2,7 **duty** 47:14 69:8 --- **E** **E** 1:20 **E-Mail** 2:11,18 2:25 3:6 **earlier** 60:4 **early** 25:3 41:4 41:17 **echo** 37:3 38:15 **educated** 24:4 35:13,25 **education** 36:19 **Edward** 1:15 6:3,19 7:1,11 82:9 **eighteen** 66:5 **either** 13:2 14:6 29:21 33:24 51:2 52:23 57:19 68:24 69:3 70:8 **elected** 6:21 80:16 **electronic** 16:21 **electronically** 18:5 **eleven** 74:4 **Emergencies** 37:13 **emergency** 7:14 9:8 11:6,16,19 11:21 12:3,5,6 12:8,12,14,19 13:17,21,25 15:7,24 16:14 17:21 18:6,13 18:18 19:8,20 | 19:22,25 20:6 20:13,15,21 21:1,5,7,13 23:10 26:17 29:16,19 31:21 32:23 35:2,9 35:12 36:1,3 37:7,17 39:12 40:15 41:18,23 42:4,22 43:14 43:22 44:2 47:23 48:6,21 49:3 50:2,8,15 50:22,24 51:8 52:21 56:10 60:5,8,23 63:3 64:12,20 65:14 65:22 67:25 69:3 70:25 71:12 72:25 77:3,11,19 78:9,18 **emergent** 34:22 **employed** 15:4 **employee** 7:20 **employment** 83:5 **EMTALA** 35:14 35:16 36:19,21 39:5,16 61:18 61:19 62:5 **engage** 38:6 **entitled** 31:15 **entity** 82:24 **ER** 8:5 21:16 38:23 41:14 56:25 57:9,11 58:3,22,23 59:21 62:19 64:25 65:24 66:3 67:14 68:3,11 70:21 70:23 73:10 75:6 **especially** 32:23 | 79:14 **events** 58:21 **evidence** 6:11 78:15 **exactly** 10:9,13 43:19 **exam** 30:17 **examination** 4:3 4:6 7:5 46:14 55:10 58:5 76:14,16,16,21 **examinations** 36:11 **examined** 7:3 75:23 **examining** 58:23 **example** 24:21 **excerpts** 5:5 9:15,19 **excuse** 32:25 37:21 **exercise** 6:21 **exercising** 24:9 24:10 **exhibit** 5:1,4,5,6 5:7,8,9,10,11 5:12,14,16,17 5:18 9:14 11:14 28:22 30:10 31:13,15 32:3 33:12 36:25 38:13 39:24 65:10 74:19,25 75:6 75:25 **exist** 28:11 75:24 **exists** 27:10,20 28:3,10 **expect** 20:20 21:6 **expensive** 44:20 **experience** 24:5 56:24 58:15 65:6 73:3 | **experienced** 48:13 **expertise** 23:22 79:21 --- **F** **facilities** 61:5,6 **facility** 30:18,19 47:9 48:16,22 50:4 59:10 60:24 61:2,3 62:11 64:6 **fact** 62:1 **facts** 42:6,15 **fair** 18:17 20:19 21:5 26:19 30:25 42:5,23 55:24 57:17 62:8 69:22 **fairly** 44:17 **fall** 29:21 **falsely** 21:18 **familiar** 17:23 63:10 67:12 **fast** 9:10 11:16 **faster** 43:21 44:1 55:23 56:11,13 **fastest** 79:4 **federal** 6:5 61:19 81:5 **feel** 42:18 **feet** 41:4 46:21 **fifteen** 46:2 49:6 78:22 **finally** 42:7 **finances** 62:15 **financial** 9:23 14:12,24 15:8 25:7 26:18 32:24,25 82:23 **fine** 10:24 **firm** 83:7 **first** 7:2 17:22 33:15 56:18 |

GREGORY SCOTT, ET AL.                                EDWARD CALVERT, M.D.
VS. NORTHERN LA MEDICAL CENTER, ET AL.                October 17, 2016

Page 5

58:1,6 61:19
65:20,23 66:16
67:7 69:16
70:10
**five** 46:3
**five-day** 74:21
**five-minute**
74:20
**flights** 55:12,14
**flip** 9:3
**folks** 29:6
**follow-ups**
73:21
**follows** 7:4
**foregoing** 82:14
**form** 6:8 9:25
10:6 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
33:5 34:6,25
35:5 36:6
37:10 39:7,9
39:19,21 40:10
40:12,25 41:9
41:11,25 42:2
42:14 43:5,16
45:20,22 47:2
48:25 49:15,22
50:10,12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**formalities** 6:13
**format** 82:21

**former** 15:2
**forth** 82:13
**found** 8:14
**frame** 42:10
55:16 79:2
**front** 45:17
**frustrating**
79:17
**further** 13:19
58:17 80:15

— **G** —
**G** 3:6
**gap** 41:20
**gatekeeper**
69:24 70:2
**general** 48:8
55:17 56:9
59:11
**generally** 54:7,8
56:10 59:12
**generated** 65:16
**generating**
71:20
**getting** 61:12
72:22
**girl** 22:17 41:3
41:20 46:19
52:13 57:23
80:3
**give** 19:17 23:4
57:18 65:11
**given** 9:23 42:7
66:21
**global** 27:1
**globally** 28:4,5
**go** 10:1 16:7,17
23:19 26:11
46:7 56:10
57:25 69:19
**going** 9:19 23:8
23:9,14 24:22
28:21 40:4,6
40:17 62:22
63:6 71:16,17

**gold** 31:2,2
**good** 7:7,8 21:17
55:6
**Gordon** 2:24
**Goss** 17:23,24
17:25 18:1
**grant** 26:16
**Green** 67:16,19
68:8,11
**GREGORY** 1:5
**group** 68:4,6
**guess** 27:1 35:18
45:5
**guessing** 35:12
**guidelines** 82:21
**gunshot** 23:19

— **H** —
**H** 2:23
**half** 43:24 53:18
**hall** 43:11,12
**hallway** 19:21
19:25
**hand** 23:16
**handcuffed**
24:18 25:11
**hands** 23:20
26:11 41:4
46:21
**handwritten**
16:9
**happen** 69:2,11
**happens** 64:11
72:7
**harm** 32:17
**head** 42:19
68:25
**health** 33:14,19
34:2 63:11
**heard** 11:11
22:4,5 34:12
**heart** 40:20
72:17
**helicopter** 53:21
54:3 55:12,14

**help** 23:1,23
24:5 27:5
**hereinbefore**
82:13
**hereto** 6:13
83:11
**hey** 37:25 51:21
69:8 75:18
**highlighted** 31:1
32:7,14
**Hippocratic**
38:25
**history** 58:7,15
**holding** 23:16
**hole** 37:18
**Holly** 67:12
**Honest** 8:18
**honestly** 19:23
45:1 75:20
**Hoskins** 3:6
4:10 9:24 10:7
10:12,19 11:7
12:15 14:8,20
15:11 16:11
18:9 19:13
20:10,24 21:21
22:12,23 24:11
25:14 26:24
27:24 28:14
33:4 36:5
37:20 38:7
39:6,18 40:9
41:8,24 43:4
43:15 45:21
46:9 47:1
48:24 49:21
50:11 52:15
55:1 60:15,19
75:13 76:8
77:20 79:9
80:5
**hospital** 1:10
18:25 20:17
21:3,19 26:16
28:11 42:11

48:8 49:18
55:8 63:4,13
64:1 66:22
70:13,17 72:1
72:4 73:9
79:22
**hospital's** 65:17
**hour** 12:2 43:24
43:24 45:25
53:18,20 56:5
**hours** 79:2,8
**Hudson** 2:20,21
**hundred** 66:7
**hush** 38:5
**hypothetical**
54:19

— **I** —
**idea** 13:8,11
14:24 15:15
17:18 45:1,8
**ideal** 12:1 45:14
49:12
**identified** 65:9
**identify** 36:21
61:18
**III** 2:23
**images** 17:2
**imaging** 29:4,11
30:14,17 31:22
32:6 76:20
**in-patient** 50:25
67:1,3 71:3,8
71:10
**inability** 38:19
**inaccurate**
66:23
**inappropriate**
35:3,7
**incident's** 44:10
**include** 36:7
50:23 78:14
**INDEX** 4:1 5:1
**indicate** 81:12
81:16

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 6

**indicates** 65:21
**indirect** 32:15
  44:25 83:6
**individual** 27:2
**INDIVIDUAL...**
  1:6
**info@shoenfel...**
  2:11
**information**
  58:15
**informed** 36:20
  82:22
**injury** 59:23
**inpatient** 13:1
  13:14 29:17,20
  29:25
**inpatients** 13:23
  20:19 21:4,14
  29:12
**inquire** 35:9
**inquired** 17:15
**inquiries** 39:15
**instance** 8:20
  25:9 39:4 42:5
  69:18
**instances** 54:1
**insurance** 14:7
  34:18 35:10
  36:9,13,17
  38:17,19 39:14
  63:7
**insurers** 63:11
**interaction**
  81:10
**interested** 83:13
**Internal** 67:16
  67:19 68:8
**interpret** 57:11
  57:14
**interpretation**
  57:19
**interpretations**
  57:15
**interpreting**
  57:8

**introduced** 6:11
**invented** 75:18
**investigation**
  13:19
**involve** 26:20
  27:2
**involved** 55:17
  63:5
**issue** 8:8 37:2
**issues** 24:6
**it'd** 52:3

— J —
**JACOB** 2:19
**Jacqueline**
  67:22
**James** 2:24 3:2
**join** 10:3 49:2
**Jordan** 1:6,7
  22:4 27:3,8
  29:15 64:20
**Jr** 2:6
**judgment** 23:23
  24:10 25:10
  27:23 79:20
**July** 82:11

— K —
**kblankenship...**
  2:18
**keep** 80:2
**Kidd** 67:12
**kind** 7:23 8:7
  37:17
**kinds** 72:12
**knew** 12:9 47:10
**know** 14:12 18:3
  19:23 21:10
  22:5 30:20
  42:18 43:1,1
  43:19,24,24
  45:6,9 47:25
  50:3 59:8,10
  61:4 68:9
  69:20 70:3

72:19 73:13
74:22 76:15
77:25
**knowing** 23:14
  80:2
**knowledge**
  18:11 22:1,16
  44:22,23,24,25
  55:18 64:15
  75:21 83:5
**known** 8:10,12
  8:21
**Kurt** 2:18 55:7

— L —
**L** 2:9,24
**lack** 38:18 71:21
**Lane** 2:21
**larger** 50:4
**law** 2:9 61:20,23
  62:2
**laws** 35:18
**lawyer** 16:3
**lay** 29:6
**lead** 58:16
**learn** 58:4
**left** 54:6 59:10
  80:3 81:17
**legitimate** 43:9
**Let's** 74:8
**level** 13:20
**life** 22:18 80:4
**LINDA** 1:23 7:2
  81:2,25 82:6
  83:19
**line** 29:3 31:1
  32:14 65:21
**Lines** 9:4
**list** 65:13 66:21
  68:14
**listed** 67:6
**listening** 38:9
**litigant** 83:8,9
**litigation** 83:13
**LLC** 1:10

**LLP** 7:24
**located** 77:7
**location** 77:4
**long** 8:10 9:3
  18:15 41:13
  53:21 78:24
**longer** 9:9 50:5
  56:4
**look** 11:14 29:9
  30:2,13 33:12
  47:19 65:11,19
**looking** 58:6
  65:13 74:18
  75:6
**looks** 32:5 68:18
**lot** 68:24
**Louisiana** 1:2,9
  1:10,20,21,24
  2:4,10,13,16
  2:21 3:4 7:12
  7:14,17,21
  28:23 39:25
  41:22 59:4
  60:25 61:8
  62:20 63:4
  65:15 69:4
  76:25 81:3,6
  83:2,15,22
**LSU-Shrevep...**
  53:17 61:3
**lumbar** 68:19
  75:15,19 76:3

— M —
**M** 2:19
**M.D** 1:15 2:19
  3:2 6:3,19 7:1
  82:9
**machine** 19:21
  19:24 43:11
  70:13 77:1,2,7
**Magnetic** 29:3
**Major** 59:7
**making** 10:16
  24:24 58:2

63:16,17 82:24
**manner** 6:7
  83:12
**mark** 73:25
**marked** 8:25
  28:22
**markets** 20:17
**Martin** 67:18
**Maryann** 3:6
**material** 81:20
**math** 66:6
**matter** 83:8,10
**mean** 10:20
  12:22 21:11
  28:6 33:23,24
  33:25 58:6
  67:9
**meaningful** 40:5
**meanings** 70:11
**means** 34:15
  40:13
**med** 9:9
**MEDHOST**
  16:18,20,21
  17:5,7
**medical** 1:9,20
  2:13 7:18,21
  21:18 23:23
  24:6,10 25:10
  25:20,24 26:4
  27:22 28:24
  35:9 38:18
  39:25 41:22
  48:9 57:1 59:5
  60:25 61:8
  62:20 63:4
  64:19 65:15
  69:4 76:25
  79:19
**medically** 35:21
**Medicare** 31:10
**medicine** 33:22
  60:9 67:17,19
  68:8
**mentioned**

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 7

11:12 49:20
**mentions** 34:7
**Metairie** 2:16
**method** 81:14
82:16
**MICHELLE** 1:5
**mind** 41:1 70:12
**MINOR** 1:6
**minute** 65:11
**minutes** 5:17
12:2 40:1,5,14
40:17 41:14
43:23 45:24
46:2 49:6
52:10 53:12,25
54:20 56:3,5
78:23
**mixture** 68:11
**modalities** 50:14
55:24 56:19
**modality** 17:20
42:23 43:21
44:1
**money** 36:9,13
**Monroe** 1:3 2:4
2:21 83:15
**month** 66:4,8,8
**morning** 7:7,8
55:6,22
**move** 24:25
28:19 44:2
51:2
**MRI** 9:7,8,21
11:19 12:1,3,4
12:7,24 13:12
14:3 15:23
17:13,16,19
18:5 19:2,7,12
19:18,19,21,24
20:6,13,21
21:7 22:10,10
25:3,4,5 29:7
30:4 39:12,13
39:14 41:2,5

41:17 42:3,7,9
43:11,23 44:4
44:11,19,21
45:16,24 46:23
46:24 47:9,16
47:23 48:6,15
48:21 49:3,4,9
50:2,7,24 51:3
51:8,22 52:23
55:24 56:4
57:2,12,13,20
60:1 64:25
65:22 66:17,23
69:5,10,16,25
70:13,22,24
71:2,11,13
74:21 75:10
76:1,7,13 77:7
77:18 78:7,10
78:18,22,25
79:21,23
**MRIs** 11:5,15
14:4,15 15:7
17:5 18:12,18
20:18 21:3
26:17 29:10
31:9 42:21
49:7,19 57:8
65:14 68:16
70:7,16 72:25
73:10 74:13,16
75:1,5,24
**multiple** 66:1
**Mute** 38:4

_____

**N**

**name** 7:9 18:1
22:5 65:18
67:9,20 71:13
**names** 17:22
68:9 81:19
**NASH** 3:3
**nature** 12:3
19:19
**nearly** 22:11

**necessarily** 72:18
**necessary** 10:22
13:5 36:15
38:18 63:24
**need** 19:18 38:6
43:13 50:13
51:3 76:7
**needs** 13:19 35:9
50:24
**negative** 14:1
**neurological** 40:21 41:3,19
46:20 52:13
57:24 58:11
79:15
**neurologists** 61:13
**neurosurgeons** 61:14
**never** 17:10,12
18:22 19:7
20:12 25:20,24
28:25 62:22,25
64:24 73:8
**new** 3:4 50:17
75:18
**night** 80:2
**NLEP** 7:24
**NLMC** 16:13
**non-** 34:21 36:2
**non-emergency** 21:5 34:17
48:19
**normal** 50:17
58:21
**normally** 19:15
34:16 50:13
56:17 66:3
70:21,22
**North** 1:20 2:15
7:14
**Northern** 1:9
2:13 7:17,21
14:5,16 15:2

18:15,19 28:23
29:10 30:18
39:25 41:22
48:17 51:7
52:5 59:4
60:25 61:8
62:19 63:4
65:15 69:4
76:25
**Northern's** 29:2
30:5,11 37:1
38:14
**nose** 40:19
**note** 50:21
**notes** 16:9
**notice** 6:4 37:14
67:8
**noticed** 17:12
**number** 56:19
58:3 63:15
68:16 70:5
74:3,6
**nurse** 68:2
**nurses** 49:18
**nurses'** 53:8

_____

**O**

**oath** 39:1
**Object** 9:25 11:8
14:11 15:12,14
16:2 18:8,10
18:21 19:14
20:9,11,23,25
21:22,24 22:13
22:22,24 24:12
24:14 25:13,15
25:22 26:8,23
26:25 27:13,25
28:15,17 30:7
30:23 33:5
34:6,25 35:5
36:6 37:10
39:7,9,19,21
40:10,12,25
41:9,11,25

42:2,14 43:5
43:16 45:20,22
47:2 48:25
49:15,22 50:10
50:12 51:11
52:16 53:23
57:4 71:7
75:14 76:9
77:14,21,23
78:12,20 79:10
79:25 80:6,8
**objection** 10:3,6
10:16 11:10
12:16 14:9,21
14:23 15:20
21:9 22:15
27:18 28:2
33:7 43:7,18
47:4 49:2,24
52:7,18 76:11
79:12
**objections** 4:9
6:8
**obligates** 62:5
**obligation** 62:8
**obtain** 15:23
20:5,20 21:6
41:5 48:15
**obtained** 19:12
**occasion** 12:7
**occasions** 76:7
**October** 1:16
83:16
**offer** 21:19 33:2
**offered** 6:11
**offering** 29:10
**office** 53:7 67:8
**officer** 81:4 82:7
**official** 82:4
**okay** 7:17 8:2
9:11,18 10:18
11:14 16:21
18:2 25:18
26:14 30:1,21
31:25 40:18

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 8

41:15 45:3
46:4 47:22
54:23 57:7
59:19 60:18
61:9,17 67:2
68:4,9,19 69:2
69:22 70:5
72:7,15 73:23
74:11 76:2
79:1
**old** 22:8 52:13
57:23
**once** 23:8
**online** 37:4
**opinions** 83:4
**opposed** 49:7
**option** 19:2
45:15 49:13
**options** 47:6
52:20 54:12,17
57:22 58:25
61:7,9
**order** 9:10 12:4
12:7,9,21,23
12:24,25 13:6
13:9,25 16:19
16:23 17:2
18:5 25:2,4
26:17 31:22
47:16,23 48:5
50:1,7 51:8,21
56:17 60:1
62:22 63:23
64:8 69:10
71:11,20,22
72:4 74:20
77:18 78:7,10
78:17
**ordered** 11:16
14:16 18:12
34:17 42:21
46:24 65:14,22
66:24 67:1
68:16 70:21,22
70:24 71:2,5

74:13 75:20
78:5,16
**ordering** 18:17
66:17 67:4,6
68:10 72:11
**orders** 71:14,19
72:3,10 78:3
**original** 82:3
**Orleans** 3:4
**ortho** 52:24
**orthopaedic**
13:4 47:15
59:6,19
**orthopaedics**
59:18
**orthopaedist**
59:14
**Oscar** 2:9 37:25
38:8
**ought** 20:5 30:3
32:22
**outcome** 83:14
**outpatient** 13:15
13:24 14:3
29:18 48:18
**outpatients**
20:19 21:4,15
29:13 67:4
**oversight** 34:19

**P**
**p.m** 22:11 41:6
41:18
**page** 4:2 5:2 9:4
65:20 81:1
**pages** 82:14
**paid** 63:7
**paragraph** 29:9
32:8,10 33:13
33:16 34:8,10
**paralyzed** 22:18
80:4
**paraphrase**
10:15
**paraphrasing**

11:1
**PARENTS** 1:7
**part** 29:10 32:3
38:16 48:9
54:10 58:4
60:24 72:1
**particular** 9:21
24:17,18 26:21
27:16 33:3
45:16 59:16
**parties** 6:13
83:11,13
**partners** 7:22,24
8:1,2,7
**partnership**
7:15 8:9
**party** 83:7,9
**passed** 53:13
**path** 58:2
**paths** 58:17
**patient** 12:6,8
19:17 22:7
24:17 28:8
29:19 33:3
36:8,12 46:25
47:20 48:14,23
50:24 51:4
52:12 53:16
54:15 55:14
58:5,7,10
62:10,14,22
63:8,20 64:4
65:18 66:18
69:6,8,21,25
71:16,17 72:4
72:17 79:7,14
79:19
**patient's** 14:7
26:21 63:7
**patients** 19:10
20:18,20 21:4
21:6 27:2 54:1
58:23 63:12
65:25 66:1,2,7
66:12 72:12

**PATRICK** 3:2
**pauses** 81:12
**pay** 14:7 38:19
62:23
**payment** 36:17
**peg** 37:18
**people** 13:14
23:1 25:19,24
26:4 67:5
**perform** 78:24
**performed**
70:16
**period** 14:17
**Perkins** 2:10
**PEROT** 1:23
7:2 81:2,25
82:6 83:19
**person** 23:23
45:3 82:24
**personal** 55:18
82:17
**personally** 11:24
**phone** 2:5,11,16
2:22 3:4 38:4,9
53:6,7
**phonetically**
81:22
**phrase** 49:11
63:17 81:21
**phrases** 81:16
**physical** 73:16
**physically** 70:16
76:24 77:9
**physician** 7:14
13:3 14:3
18:13 31:22
35:13 36:1
38:23 43:14
47:18 51:20
52:21 56:11,25
57:9,11 58:4
59:21,25 62:5
62:6,19 63:3
63:18 64:3,12
67:5,6,15

68:10 69:23
71:23,25 72:6
72:9,14,19
79:18
**physician's**
25:10
**physicians** 7:15
19:4 58:22
63:17 68:11,12
70:9 73:1
**pick** 44:5,5,11
44:12,19 53:6
**pigeonholed**
40:18
**plain** 19:17
**PLAINTIFFS**
2:2
**please** 7:9
**pledge** 5:17 40:2
41:1,7,12
**point** 42:5 64:23
**policies** 79:22
**policy** 26:20
27:1,9,20
28:10 39:3
65:3 80:3
**poor** 14:14
17:12
**pose** 54:20
**position** 15:9
20:1 77:5
**possibilities**
69:19
**possible** 50:4
56:13 71:11
**possibly** 35:8
52:1
**post** 5:10
**post-deposition**
5:6,7
**potential** 69:20
**potentially**
59:21
**POTTS** 2:20
**power** 35:20

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 9

| | | | | |
|---|---|---|---|---|
| **Poydras** 3:3 | **procedure** 6:6 | **R.S** 82:10 | **relationship** | **reserved** 6:10 |
| **practical** 77:10 | 9:9 11:19 12:3 | **radiologist** 13:3 | 83:6,9 | 13:14,22 |
| **practice** 21:18 | 21:1 32:16 | 44:13 47:7,13 | **relationships** | **resident** 50:1 |
| 33:22 39:3 | 34:19 37:6 | 56:22 57:16,18 | 83:2 | **Resonance** 29:3 |
| 48:13 61:23 | 43:25 72:2 | 69:7,14,23,23 | **relatively** 77:2 | **respects** 77:10 |
| 63:2 65:3 | 81:5,7 83:3 | **radiology** 31:6 | **Reliable** 8:16 | **respond** 69:14 |
| **practices** 41:21 | **procedures** 37:8 | 31:19,23 43:10 | **rely** 57:17 | **responsiveness** |
| **practicing** 60:8 | 79:22 | 47:17 52:1,2 | **relying** 58:9 | 6:9 |
| **practitioner** | **proceeding** 81:7 | 52:23 53:5 | **remember** 15:3 | **rest** 22:18 80:4 |
| 68:2 | 81:11,15 | 54:13 | 17:22 66:11 | **result** 39:16 |
| **precertification** | **process** 62:13 | **rating** 32:11 | 69:18 | **review** 73:15 |
| 34:12,15,21 | **progressing** | **read** 6:20 9:5,16 | **remind** 48:2 | **reviewed** 64:19 |
| 35:2 37:2,16 | 41:19 46:20 | 10:21 24:24 | **rephrase** 10:25 | **rid** 57:16 |
| 75:1,2 | 52:13 79:14 | 80:16 | 39:10 | **ridden** 55:13 |
| **precertified** | **prohibited** 83:5 | **reading** 6:17 | **reported** 1:22 | **right** 6:20,22 9:8 |
| 11:6 | **prohibition** 83:1 | **ready** 45:12 | 82:15 | 10:13 11:3 |
| **Preliminary** | **proper** 81:14 | 73:14 | **Reporter** 1:23 | 19:21,25 23:7 |
| 57:15 | **protocol** 72:11 | **real** 46:7 | 7:3 74:5 81:2 | 27:7 35:24 |
| **prepared** 82:16 | **provide** 21:3 | **really** 12:11 | 82:6 83:20 | 38:11 43:10,11 |
| 82:20 | 24:17 36:16 | 19:18 21:10 | **Reporter's** 81:1 | 45:13 46:16 |
| **preregister** 37:4 | **providers** 31:9 | 29:21 45:1,6 | 81:14 | 50:20 53:9 |
| **prerogative** | **purportedly** | 50:16 | **reporting** 82:15 | 55:21 58:25 |
| 63:19,23 64:3 | 75:5 | **reason** 9:22 | 83:7 | 59:4,7,14,25 |
| **present** 16:5,13 | **purposes** 6:7 | 15:17 43:9 | **represent** 29:1 | 60:11,14,22 |
| 23:14 56:14 | **pursuant** 6:4 | 46:21 50:6 | 55:7 65:12 | 61:12,22 62:18 |
| 70:13 | **put** 46:17 | 66:21 69:7 | **represents** 39:25 | 66:15 67:18 |
| **presented** 19:11 | | **recall** 66:17 71:1 | **request** 9:22 | 68:6,14 69:13 |
| 22:7 27:3,8 | _____ | 73:2 | 25:4,5 42:6 | 71:18 72:10,12 |
| 40:8 52:22 | **Q** | **recommend** | 47:17,18 | 73:4 74:11 |
| 57:23 79:18 | | 47:19 64:8 | **requested** 19:7 | **risk** 32:17 |
| **presenting** | **qualified** 56:24 | **record** 7:10 9:5 | 37:6 39:13 | **Road** 2:10 |
| 29:15 | **question** 6:9 9:5 | 10:16 31:14 | 41:17 | **room** 11:6,16,21 |
| **press** 13:8 16:24 | 14:14 16:16 | 37:23 46:7,13 | **requests** 11:5 | 12:5,6,8,12,14 |
| 17:2 45:15 | 17:12 21:2 | 64:18 81:8 | 25:6 | 12:20 13:21 |
| 77:18 | 24:23 33:12 | **redacted** 65:18 | **require** 13:14 | 15:7,24 16:14 |
| **pressing** 35:8 | 39:10 48:10 | **reduction** 6:15 | 28:12 34:18 | 18:6,13 19:8 |
| **pretty** 26:11 | 51:1 59:11 | **REEXAMIN...** | 46:23 75:2 | 19:20 20:13,21 |
| **previous** 65:10 | 73:7,14 | 74:9 | **required** 31:8 | 21:7,13 26:17 |
| **primary** 14:3 | **questions** 6:16 | **refer** 29:6 35:22 | 32:7 34:21 | 29:19 31:21 |
| **privileges** 72:1 | 46:16 55:4,8 | **reference** 81:20 | 75:1 79:21 | 35:12 36:1 |
| **probably** 8:12 | 63:15 70:5 | **Regan** 68:7 | 82:4,21 | 42:4,22 43:14 |
| 42:18 46:3 | 72:22 80:15 | **regard** 36:16 | **requirements** | 47:24 48:6,21 |
| 47:6,21 59:17 | **quick** 46:7 | **reimbursement** | 63:11 | 49:3 50:2,8 |
| **problem** 11:2 | **quickly** 19:20 | 14:18 | **requires** 52:22 | 52:21 56:10 |
| 24:1,1 | **quote** 32:17 | **related** 83:10 | **requiring** 35:1 | 63:3 64:12,20 |
| | _____ | | | |
| | **R** | | | |

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

**Page 10**

65:14,22 67:25
69:3 70:25
71:12 72:25
78:10,18
**rooms** 20:15
60:6,23
**Rouge** 2:10
**roughly** 65:16
66:6
**round** 37:18
**routinely** 47:10
**rule** 13:17,25
19:15 43:22
44:1 48:1
50:13 55:23
56:12 81:4
**ruled** 57:1
**rules** 6:5 35:18
47:22 56:18
81:5 82:21
83:3
**run** 16:7 44:10
**runny** 40:19
**rural** 61:4
**Russell** 2:6
**Ruston** 1:10,21
7:12
**rwoodard@b...**
2:7

——————
**S**
**S** 2:18
**safe** 51:24 52:3
78:8
**Sandy** 17:24,25
18:1
**saying** 37:3
38:16 56:7,8
70:19,20
**says** 28:10,11
29:3,9 30:13
30:17 32:15
37:3 40:4
53:10,11 66:23
**scan** 9:7 13:9,25

14:1 16:23
19:16 44:5,10
44:18,19,21
46:2 49:8 56:2
57:19
**scenario** 41:16
**scenarios** 62:1
**school** 25:20,24
26:5
**scope** 27:16
**Scott** 1:5,6,7,7
22:4 27:3,8
29:15
**Scott's** 64:20
**screen** 5:8,9,12
5:14,16 16:8
16:10 32:3
37:1 38:13
76:18
**screening** 36:11
76:13,15,20
**seal** 82:4
**seals** 31:2
**second** 9:4 29:9
33:15
**seconds** 46:5
56:4
**see** 17:7 29:2,13
30:1,16 31:1
31:16 32:7,12
32:14 33:16
34:19 38:19
47:7,16 49:9
49:10 58:4
65:18 67:9,20
**seeing** 69:9
**seen** 9:11 28:25
40:2,14,16
41:13 47:25
68:9 78:15
**self-employed**
7:23 8:6
**send** 14:2 69:15
**sense** 32:20 56:7
**sentence** 33:15

33:25
**series** 35:18
**serve** 29:12
**serves** 7:17
**service** 40:5
**services** 21:19
61:11 82:25
**set** 8:5 82:13
**sets** 72:11
**setting** 34:2
37:17 48:19
56:10
**seven** 20:16 60:5
75:7 79:8
**severity** 40:7
**SHAFTO** 2:3
**sheet** 71:4 73:25
74:11,18
**shift** 65:24
**shifts** 66:3
**SHOENFELT**
2:9 37:24 38:1
**shoes** 46:18
**shorter** 79:1
**shot** 5:8,9,12,14
5:16 32:3 37:1
38:13
**show** 8:23 28:21
30:10 31:13
32:2 65:8
**showing** 74:12
74:15
**shown** 68:16
**shows** 44:17
67:4 71:4,12
74:25
**Shreveport** 54:3
55:13,15
**sign** 6:20 80:16
**signature** 82:3
**significant**
12:10 14:17
53:3
**signing** 6:17
**single** 39:3

**sir** 55:15,20
**sit** 17:18 79:7
**situation** 23:25
52:22 54:19
**six** 20:16 60:5
**Sixteen** 66:5
**slightly** 50:5
**software** 17:8
49:19 78:3,5,6
78:16
**somebody** 13:18
35:20
**sorry** 11:23 34:9
**sort** 8:4 13:20
34:18 48:12
57:18 69:24
72:1,10
**sounds** 45:11
**speak** 37:7
**speaker** 37:22
**speaks** 30:23
32:11 37:10
68:14
**special** 43:13
**specialist** 59:2
**specialists** 59:12
59:20
**specialized**
56:23,23 57:5
57:7
**Specialty** 61:11
**specific** 24:21
27:11 28:7,8
48:11 64:5
69:18 72:12
73:7
**specifically**
66:17
**specifics** 64:15
66:12
**spectrum** 61:4
**speculation**
53:24 54:9
**spelled** 81:21
**spinal** 44:9

52:12 59:23
**spine** 9:7 68:17
68:20,22 75:7
75:12,23 76:1
76:6
**spoke** 15:1,6
**spontaneous**
81:11
**square** 37:17
**stabilization**
62:14
**stabilize** 62:10
**stable** 35:21
**staff** 59:14 61:14
61:15
**stamped** 82:4
**standard** 72:10
**standards** 31:2
**start** 60:8
**state** 1:24 7:9
10:5 35:19
81:3,8 83:22
**stated** 71:7
**statement** 20:12
**STATES** 1:1
**station** 16:8 53:8
**statute** 82:21
**stay** 13:15
**stenomask**
82:15
**step** 44:3
**stipulated** 6:2
**STIPULATI...**
6:1
**straining** 66:10
**Street** 3:3
**strictly** 22:5
**Strike** 32:25
**sudden** 23:18
**suggest** 76:5
**suggesting** 65:4
**Suite** 2:4,15,21
3:3
**summarize** 62:8
**supervision**

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

Page 11

82:17
**suppose** 7:23 8:4
  21:12 27:19
  28:18 35:22
  54:11
**sure** 24:20 33:23
  33:24 44:13,15
  46:10,12 49:4
  50:3,20 51:1
  51:12 70:1
  73:6,14 75:20
  77:24 78:13
**surgeon** 47:16
  59:6,19
**suspect** 71:9
**suspected** 59:22
**suspicion** 66:25
**swearing** 6:15
**sworn** 7:2 82:10
**symptoms** 19:11
**system** 16:18
  65:17 66:22

———————
**T**
**take** 12:10 45:24
  53:2 54:17
  56:3 63:2
  65:11 66:6
  69:21
**taken** 6:4 29:1
  81:8 82:8
**takes** 9:9 12:1
  43:23 56:4
  78:24
**talk** 46:8 47:7,13
  47:15 72:8,18
**talked** 78:22
**talking** 16:13
  52:11 53:21
  61:13 76:23
**talkovers** 81:13
**tax** 8:8
**taxing** 66:10
**Taylor** 3:2 5:5
  7:25 8:2,11,13

8:21 9:15,20
  11:4,12 15:1
  15:18,22 19:24
  20:4 25:2,25
  26:6 28:10
  30:1 41:2
  75:11 77:6
**Taylor's** 15:9
  22:9 26:15
  39:11 42:8
  46:18 51:17
  52:9 67:20
**technically** 7:20
  7:22 71:24
  72:5
**teenage** 80:3
**TELEPHONE**
  2:8
**tell** 13:4 16:4
**telling** 74:23
**ten** 65:25 74:3
**tens** 66:1
**term** 70:1,10
**test** 12:19 16:6
  34:17 44:20
  50:5 62:23
  63:6 70:3 79:4
  79:6
**testified** 7:3 9:20
  11:4 15:1
  19:24 20:4
  25:2 30:2 41:2
  60:4
**testifying** 50:22
**testimony** 9:1
  15:10 22:9
  24:25 26:15
  39:11 42:8,24
  52:9 55:22
  73:11 82:8,14
**testing** 58:18
**tests** 13:13 16:20
  49:5 56:11
  57:14 63:24
  72:11

**Thank** 54:25
  73:19
**thankfully**
  23:11
**thereof** 83:14
**therewith** 6:7
**thickness** 44:8
**thing** 50:16
**things** 11:11
  23:19 25:1,8
  25:16 32:22
  44:4,18 45:2
  47:5,21 49:9
  58:3 61:15
  69:20
**think** 7:22 8:4,8
  8:20 10:8,13
  10:21 12:16
  16:16 24:21
  28:4 32:22
  34:16 36:23
  40:13 41:6,12
  41:15,20 43:9
  44:16 45:14
  48:10,11 49:11
  50:6 53:25
  60:16 69:9,11
  71:9,24 73:13
**thinking** 23:7
**thinks** 71:8
**third** 65:20
**thirty** 5:17 12:2
  40:1,5,14,16
  41:14 45:24
  49:6 53:25
  56:4 78:23
**thirty-minute**
  41:1,7
**thoracic** 9:7
  68:22 75:16,17
  75:19,22 76:1
**thought** 79:19
  81:13
**three** 37:5,13
  53:2 54:12,17

68:18
**thumbar** 75:12
  75:16
**time** 6:10 8:6
  9:10 12:10
  14:17 22:8
  41:21 42:10
  53:3 54:5,6,17
  54:19 55:16
  59:17 64:11
  74:12,15 79:2
**times** 55:21
  59:16 67:9
**today** 17:18 22:2
  22:6 23:11,12
  23:13 29:12
  73:11,15
**told** 11:5 12:13
  25:5 26:16
  36:1 56:2
  60:12
**top** 29:2 30:13
  32:8 33:13
**Touching** 55:12
**Tower** 2:4
**tragic** 22:20
**trained** 23:1,4
  24:5 35:13,24
  36:20 38:22
  50:3 61:18,22
  63:10
**training** 36:19
  48:5,9,12
  56:24 57:6,8
  58:14 70:3
  79:20
**tranquil** 23:19
**transcribed**
  82:16
**transcript** 5:4,5
  9:1 81:17 82:3
  82:19,20
**transcription**
  81:15
**transfer** 47:9,20

52:25 53:15,16
  64:8
**transferred** 54:2
**transferring**
  54:14
**treat** 24:1 65:24
  66:12
**treated** 40:6
  64:5
**treating** 58:22
**treatment** 24:17
  27:16 33:2
  35:22,23 36:15
  58:5
**Trey** 55:2
**triage** 62:9,13
**triaged** 40:14,16
  41:13
**trial** 9:2
**trick** 33:11
**troubling** 80:12
**true** 24:8 25:9
  25:16 26:15,19
  39:11 42:6,15
  82:18
**trustworthy**
  8:14
**try** 23:23 42:9
  43:20,21 44:1
  46:24 47:6,15
  69:16,21
**trying** 24:25
  28:19 33:11
  38:5 61:1
**turn** 37:21
**TUTORS** 1:7
**twelve** 22:8
  52:12 57:23
  74:6,8
**twelve-year-old**
  41:3,20 46:19
**twenty** 53:25
**twenty-five** 66:2
**two** 28:13 47:6
  49:10

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

**Page 12**

types 59:20
typewriting 6:16
typical 72:16
typically 13:13
  13:16,18,22,24
  14:5,15 18:23
  43:25 44:20
  53:17 66:2
  78:23
tzeigler@hpla...
  2:25

**U**

ultrasound 17:4
unavailability
  70:7,11,19
  72:24 73:10
  76:24
understand 21:2
  33:18 50:20
  51:1 75:10
understanding
  7:13 14:4,15
  34:14,23 35:1
  35:16 39:15
  42:20 44:16
  48:14 55:16,17
  55:25 56:8
  62:4 82:19
understands
  16:16 48:10
unit 62:13
UNITED 1:1
universally 28:5
unquote 32:18
unusual 8:4 65:5
  73:4
use 12:19 13:17
  17:7,20 21:12
  23:22 42:23
  43:20,25 70:1
  70:10 76:18

**V**

valid 82:2

various 63:11
Vaughn 1:20
verbatim 10:20
verified 81:20
verify 68:15
versus 63:16
violation 36:22
  39:4,5,16 62:2
violations 61:18
virtue 56:22
visit 64:20
VS 1:8

**W**

wait 79:8
waive 6:13
walk 23:9,13
  45:11
wall 42:19
want 9:18 10:20
  11:3 16:6,23
  21:11 25:8
  30:10 31:13,22
  32:2 37:21
  46:17 51:21
  57:25 58:18
  65:8 70:9,12
  73:7,25 78:17
wanted 22:10
  24:16 25:2
  41:2 45:18
  75:11,22
way 8:5 10:25
  14:4,15 24:9
  48:21 63:18
  66:15 70:19
  71:21 83:14
we'll 69:15 72:3
we've 40:20 68:9
website 5:8,9,16
  28:24 29:2
  30:5,12,21
  37:1 38:14
  40:1
went 25:20,24

26:4
West 83:15
WESTERN 1:2
White 7:25
  67:22
WILLIAMS
  2:14
wish 11:22,24
witness 6:15,19
  10:1 73:22
  80:16
WOLLESON
  2:3
WOOD 2:19
Woodard 2:6
  4:4 7:6 8:24
  9:13 10:4,17
  10:23 16:15
  27:4 28:20
  30:9,24 31:12
  32:1 36:24
  37:24 38:3,10
  38:12 39:23
  46:6,15 54:24
  57:3 71:6
  73:20,24 74:10
  80:14
word 28:4
words 81:16,19
work 17:11
  23:11 31:23
  45:11 68:4
  72:16
worked 20:13
  20:15 60:5,23
  61:6 64:24
working 15:3
  23:12,13,17
world 12:1
  45:14 49:12
wouldn't 12:24
  21:17 27:15
  49:3 54:9
  56:21 58:2
wound 23:19

write 16:8 71:14
  71:18 72:2
writing 34:9
  72:9
written 47:22,25
  71:14
wrote 64:23

**X**

x-ray 19:17 46:4
  49:8
x-rays 17:4 56:3

**Y**

y'all 12:23 26:10
  27:5 43:3
yeah 16:18
  69:15
year 52:13 57:23
years 22:8
young 46:18

**Z**

Zeigler 2:23
  55:3
Ziegler 9:2

**0**

**1**

1 5:4 8:25 11:14
10 4:13 5:14
  36:25
11 4:10,13 5:16
  38:13
1120 7:11
12 5:17 39:24
13 5:18 74:8,19
  74:25 75:6,25
14 4:10,13
1434 83:3
1434(B) 81:6
15 4:10,13
16 4:13
17 1:16
18 4:10,13

1800 2:21
1811 2:4
18th 83:15
19 4:10 64:21
1994 29:12 30:1
1999 60:10
19th 27:5,8

**2**

2 5:5 9:14
20 4:10,13
2005 8:12 18:16
  19:10 48:3
  60:11,20
2013 8:13 65:16
2014 27:9 29:16
  59:5 64:21
  65:23 66:19
2016 1:16 65:16
  82:11 83:16
21 4:13
2109 2:10
21st 20:5 30:2
22 4:10,13
225 2:11
23012 1:24 7:3
  81:3,25 82:7
  83:21
24 4:10,13
25 4:10,13
26 4:10,13
2600 3:3
27 4:10,13
27th 82:11
28 4:13 5:8 81:4
28th 65:23 66:19

**3**

3 5:6 22:11 41:6
  41:18
3:00 42:7
3:16-CV-00376
  1:8
30 4:14 5:9
300 2:21

GREGORY SCOTT, ET AL.
VS. NORTHERN LA MEDICAL CENTER, ET AL.

EDWARD CALVERT, M.D.
October 17, 2016

**Page 13**

**31** 5:11
**318** 2:5,22
**32** 5:13
**322-1202** 2:5
**33** 4:10,14
**336-4300** 2:11
**34** 4:14
**3421** 2:15
**35** 4:14
**36** 4:10 5:15
**37** 4:14
**37:2554** 82:10
**38** 5:16
**388-4400** 2:22
**39** 4:10,14 5:17

**4**
**4** 5:7
**40** 4:10,14
**400** 3:3
**401** 1:20
**41** 4:11,14
**42** 4:14
**43** 4:11,14
**45** 4:11,14
**47** 4:11,14
**48** 4:11
**49** 4:14

**5**
**5** 5:8 28:22
**50** 4:11,14
**504** 2:16 3:4
**51** 4:15
**52** 4:11,15
**529-3333** 3:4
**53** 4:15
**55** 4:7

**6**
**6** 5:9 30:10

**7**
**7** 5:10 9:4
**7,74** 4:4
**70002** 2:16

**70130** 3:4
**70808** 2:10
**71201** 2:4,21
**71270** 1:21
**74** 5:18
**75** 4:11
**76** 4:11,15
**77** 4:11,15
**78** 4:15
**79** 4:11,15

**8**
**8** 5:4,11 31:13 31:15
**8:06** 82:12
**80** 4:11,15
**81** 82:14
**831-4091** 2:16

**9**
**9** 4:10 5:5,12 9:4 22:10 25:3 32:2 33:12 41:5,17
**9:00** 42:7
**9:30** 80:17 82:13
**900** 2:15