## U.S. DISTRICT COURT * W.D. LOUISIANA * MONROE DIVISION

**GREGORY SCOTT,** *et al.*                                **JUDGE: S. Maurice Hicks**

*Versus***: 3:16-cv-00376**

**NORTHERN LOUISIANA MEDICAL
CENTER,** *et al.*                                **MAGISTRATE: Karen Hayes**

## PLAINTIFFS' 1ST SET OF DISCOVERY TO NORTHERN

To: Northern Louisiana Medical Center, through its counsel of record:
Kurt S. Blankenship: kblankenship@bluewilliams.com

Now come Gregory Scott and Michelle Scott, individually and on behalf of Jordan Scott ("Plaintiffs"), who propound the following Discovery to Defendant, Northern Louisiana Medical Center, to be answered fully, completely, in writing, and under oath within the delays allowed by law, in accordance with the Federal Rules of Civil Procedure. This Discovery is deemed to be continuing and Defendant must supplement as more information becomes available.

### DEFINITIONS

**YOU; YOUR; DEFENDANT; DEFENDANTS; NORTHERN:** Defendant refers to Northern Louisiana Medical Center, and its affiliated medical groups, partnerships, contractors, and departments (collectively referred to herein as "Northern").

**DOCUMENT(S):** This word or any variation thereof is intended to refer to any medium by which information is recorded, including papers of any kind or character, photographs of any kind or character, and any method or medium by which information is utilized by computers. In addition to a copy of the original of any such requested documents, the request should be deemed to include a request for a copy of any and all studies, reports, memos, inter-office communications, or writings, by whatever name called, which relate to the original specifically including any material underlying, supporting, or used in the preparation of any such document; and any and all attachments to the original and any and all documents referred to in the original; and any and all subsequent additions, deletions, substitutions, amendments, or modifications to the original of any sort.

**IDENTIFY; IDENTITY OF A PERSON OR DOCUMENT:** Provide as much information as is available to you to lead to that person's/document's being located, including the name/title, email address, and all other identifying information related to that person or document.

**BLUE CROSS**: As used herein, Blue Cross is intended to refer to Plaintiffs' insurer in this matter and any affiliate thereof.

**MEDHOST**: This term pertains to the software referenced in prior depositions in this matter. *See*. Calvert Deposition.

EXHIBIT "1"

---

### *INTERROGATORIES*

---

**(1)**　　Does Northern permit MRI's to be ordered from the emergency room? If "yes," please explain in detail how MRI's can be ordered from the emergency room. If "no," please explain why not. For either "yes" or "no," please identify all witnesses and documents which will substantiate the response.

　　　　Response:

**(2)**　　Please explain in detail whether Northern makes its MRI machine easily accessible to its emergency physicians who request an MRI? In answering this question, please identify all witnesses and documents which will substantiate the response.

　　　　Response:

**(3)**　　Why is there not a MRI button on MEDHOST in Northern's emergency room? In answering this question, please identify all witnesses and documents which will substantiate the response.

　　　　Response:

**(4)**　　Are there any other departments (*i.e.* other than the emergency department) at Northern which use MEDHOST? If "yes," please identify all such departments and whether they have an MRI button.

　　　　Response:

**(5)**　　With respect to MEDHOST software at Northern, please provide answers to the following questions:

　　　　(i)　　　Who ordered it?

　　　　(ii)　　Who installed it in Northern's emergency department, and when?

　　　　(iii)　　Who decided what options would and would not be available on the MEDHOST screens used in Northern's emergency department?

　　　　(iv)　　What modifications, if any, have been made to MEDHOST's software in Northern's emergency department over the past two (2) years?

　　　　Response:

**(6)**　　Does Northern ever require its emergency patients to be "precertified"? If "yes," please explain under what circumstances, and if "no," please explain why not. In answering this question, please identify all witnesses and documents who will substantiate the response.

　　　　Response:

EXHIBIT "1"

**(7)**      Does Northern train or instruct any of its physicians or other staff on when "precertification" is or is not appropriate? If "yes," please describe all such instructions and training in detail. If "no," please explain why not. In answering this question, please identify all witnesses and documents who will substantiate the response.

        Response:

**(8)**      Does Northern offer treatments/procedures to emergency patients once they are admitted which are not available to them without being admitted? If "yes," please explain which treatments/procedures, and if "no," please explain why not. In answering this question, please identify all witnesses and documents who will substantiate the response.

        Response:

**(9)**      Does Northern have any evidence to contradict the following testimony taken from pages 37 and 38 of Dr. Taylor's deposition:

        Q: Was there a reason why you didn't order a CAT scan?
        A: It wasn't a test that she [Jordan] needed.
        Q: Would a CAT scan have shown the hematoma?
        A: There's a good chance not.
        Q: Being it may or may not?
        A: It probably would not.
        Q: Why is that?
        A: Because of the density and the makeup of the disease
        process of the spinal cord.

If "yes," please identify all witnesses, documents, facts, and opinions which support a position contrary to the above testimony.

        Response:

**(10)**      Does Northern instruct or train any of its physicians on EMTALA? If "yes," please explain in detail what training is given, by whom, and when. If "no," explain why not training is given. In answering this question, identify all witnesses and documents who will substantiate the response.

        Response:

**(11)**      Does Northern instruct or train any of its administrative staff on EMTALA? If "yes," explain in detail what training is given, by whom, and when. If "no," explain why no training is given. In answering this question, identify all witnesses and documents who will substantiate the response.

        Response:

**(12)**      Does Northern receive federal or state money or benefits for complying with EMTALA requirements and regulations? If "yes," explain how much money Northern has received over the

past five (5) years for complying with EMTALA's requirements and regulations. Also, identify all documents and witnesses who will substantiate the position that Northern has complied with EMTALA requirements and regulations.

     <u>Response</u>:

**(13)**    Did anyone at Northern contact or attempt to contact Plaintiffs' insurance company on the date of the incident? If "yes," explain in detail all contacts or attempted contacts. If "no," describe all effort taken by you before reaching the conclusion that no such contacts or attempts were made. For both "yes" and "no," identify all witnesses and documents that will substantiate your response.

     <u>Response</u>:

**(14)**    Identify all CPT codes utilized by Northern, including its emergency department, for MRI's over the past five (5) years.

     <u>Response</u>:

**(15)**    Identify all CPT codes utilized by Northern, including its emergency department, for CT scans over the past five (5) years.

     <u>Response</u>:

**(16)**    Identify all by names of participants, time, and telephone number all calls made and/or received by anyone at Northern to/from Plaintiffs' insurer on August 19, 2014.

     <u>Response</u>:

**(17)**    Identify by names of participants, time, and fax number all facsimiles sent and/or received by anyone at Northern to/from Plaintiffs' insurer on August 19, 2014.

     <u>Response</u>:

**(18)**    Identify all by names of participants, time, and email address all emails sent and/or received by anyone at Northern to/from Plaintiffs' insurer on August 19, 2014.

     <u>Response</u>:

**(19)**    Has Northern changed any of its policies as a consequence of Jordan Scott's treatment on August 19, 2014? If "yes," please describe all changes in detail. If "no," please explain why not.

     <u>Response</u>:

**(20)**    Identify all persons by name, DOB, and job title (other than enrolled counsel) who had any responsibility or participation in answering this discovery.

     <u>Response</u>:

EXHIBIT "1"

## *REQUESTS FOR PRODUCTION*

**(1)**     Contracts between Northern and Northern Louisiana Emergency Physicians, LLP over the past five (5) years.

**(2)**     Contracts between James Patrick Taylor, M.D., any physician practice group he is associated with, and Northern.

**(3)**     Contracts between Northern and Blue Cross from August 19, 2014, through present date.

**(4)**     Fee schedules between Northern and Blue Cross from August 19, 2014, through present date.

**(5)**     Policies and procedures relating to the emergency department of Northern in effect on or about August 19, 2014.

**(6)**     Policies and procedures relating to the emergency department of Northern currently in effect.

**(7)**     Policies and procedures relating to the radiology department of Northern in effect on or about August 19, 2014.

**(8)**     Policies and procedures relating to the radiology department of Northern currently in effect.

**(9)**     All records contained, at any time, within the computer system of Northern related to Jordan Scott's admission to Northern on or about August 19, 2014, other than the certified medical records previously produced in the state-court litigation.

**(10)**     All documents of any type and/or information of any type, including information maintained on any computer database, regarding any policy which existed on August 19, 2014, regarding a requirement that patients had to be admitted as an in-patient to Northern in order for an MRI to be ordered and/or performed on the patient.

**(11)**     All documents of any type and/or information of any type, including information maintained on any computer database, relating to Peer Review (or any other committee review) of Northern's policies, procedures, and/or practices regarding the ordering and performing of MRI's from its emergency department.

**(12)**     Peer Review Meeting Minutes at Northern from January 1, 2014 through present date.

**(13)**     Lists of CPT codes related to MRI's utilized by Northern over the past five (5) years.

**(14)**     Lists of CPT codes related to CT scans utilized by Northern over the past five (5) years.

**(15)**     Pages from Northern's Chargemaster related to reimbursement rates for MRI's at Northern.

EXHIBIT "1"

**(16)**    Pages from Northern's Chargemaster related to reimbursement rates for CT scans at Northern.

**(17)**    Documents showing reimbursement rates for MRI's ordered from Northern's emergency room over the past five (5) years, not otherwise produced in response to the above requests for production.

**(18)**    Documents showing reimbursement rates for CT Scans ordered from Northern's emergency room over the past five (5) years, not otherwise produced in response to the above requests for production.

**(19)**    Instructions, manuals, guidelines or other documents touching upon or related to the MEDHOST software utilized by Northern over the past five (5) years.

**(20)**    Emails touching upon or related to MEDHOST from January 1, 2014, through December 31, 2014.

**(21)**    Instructions, policies, procedures, and/or guidelines related to ordering MRI's at Northern over the past five (5) years.

**(22)**    Documents, including emails, touching upon or related to the ordering of MRI's from Northern's emergency room over the past five (5) years.

**(23)**    Instructions, policies, procedures, and/or guidelines related to "precertification" at Northern over the past five (5) years.

**(24)**    Documents evidencing any training given by Northern to its administrative staff, employees, contracts, and physicians regarding EMTALA compliance over the past five (5) years.

**(25)**    Documents evidencing monies received by Northern from the federal or state government or any governmental agency for promising to comply with, or actually comply with, EMTALA over the past five (5) years.

**(26)**    Documents sent by Northern to any state or federal government or regulatory agency pursuant to EMTALA's reporting requirements over the past five (5) years.

**(27)**    Documents evidencing Northern's compliance with EMTALA over the past five (5) years.

**(28)**    Documents evidencing any violation of EMTALA committed at Northern over the past five (5) years.

**(29)**    Documents, including emails, which mention or refer to Jordan Scott's treatment at Northern from August 17, 2014 through August 19, 2014 which have not otherwise already been produced.

**(30)**    Faxes and emails sent by and between Northern and Blue Cross on August 19, 2014.

**(31)**    Phone records for incoming and outgoing calls between Northern and Blue Cross on August

EXHIBIT "1"

19, 2014.

**(32)**   Phone records for all incoming and outgoing calls at Northern on August 19, 2014.

**(33)**   Reports and documentation to and from Quality Improvement Organizations and Northern over the past five (5) years.

**(34)**   All documents identified in response to the preceding Interrogatories not otherwise produced in response to any of the more specific requests above.

**(35)**   All expert reports, including CV's and all other information required under FRCP Rule 26, for any experts you anticipate calling to trial at this matter.

**(36)**   A privilege log of all documents withheld on the basis of any privilege.

Certificate of Service:
I hereby certify that a copy of the
above and foregoing has been sent
to all counsel of record on this 27th
day of November 2016, by mail,
fax, and/or email.
***Russell A. Woodard, Jr.***

Respectfully Submitted:
BREITHAUPT, DUNN, DUBOS,
SHAFTO & WOLLESON, LLC
1811 Tower Drive, Suite D
Monroe, Louisiana  71201
Telephone:   (318) 322-1202
***Russell A. Woodard, Jr. (34,163)***

EXHIBIT "1"